# ATTACHMENT B

## SCI-Cambridge Springs Inmate County for September 25, 1992

Daily Count for 9/25/92 .. .. 9/25/92

In - house                    147    (148 - 1 SP)
                                     1. Moelzel / State Parole

Furlough                        0    ( N/C )

ATA (Count)          ___1___        (N/C)

Total                         148

Verified @ 1000

# **ATTACHMENT C**

## **Deposition of John Raun**

1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * * * * * * * *

*

LISA LAMBERT,                   *

    Plaintiff             *   NO.:

      vs                 *   C.A. 96-247-Erie

SUPERINTENDENT                  *

WILLIAM WOLF, et al.,  *

    Defendants            *

*

*

* * * * * * * * *

DEPOSITION OF

JOHN RAUN

SEPTEMBER 9, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * * * * * * * *

*

SYLVIA VASQUEZ,                    *

    Plaintiff                   *   NO.:

      vs                       *   C.A. 96-429-Erie

SUPERINTENDENT                     *

WILLIAM WOLF, et al.,  *

    Defendants                  *

*

* * * * * * * * *

DEPOSITION OF

JOHN RAUN

SEPTEMBER 9, 1998

Any reproduction of this transcript is
prohibited without authorization by the
certifying agency.

Sargent's Court Reporting Service, Inc.

(814) 536-8908

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

ROBIN PHILLIPS,                    \*

    Plaintiff                  \*   NO.:

      vs                       \*   C.A. 98-59-Erie

SUPERINTENDENT                     \*

WILLIAM WOLF, et al.,   \*

    Defendants                 \*

\*

\*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

JOHN RAUN

SEPTEMBER 9, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

Page 2

```
1              U.S. DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3              * * * * * * * * *
4                        *
5    SYLVIA VASQUEZ,          *
6         Plaintiff          *   NO.:
7             vs             *   C.A. 96-429-Erie
8    SUPERINTENDENT          *
9    WILLIAM WOLF, et al.,   *
10        Defendants         *
11                           *
12             * * * * * * * * *
13
14             DEPOSITION OF
15               JOHN RAUM
16            SEPTEMBER 9, 1998
17
18
19
20
21
22
23       Any reproduction of this transcript is
24       prohibited without authorization by the
25              certifying agency.
```

Page 3

```
1              U.S. DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3              * * * * * * * * *
4                        *
5    ROBIN PHILLIPS,          *
6         Plaintiff          *   NO.:
7             vs             *   C.A. 98-59-Erie
8    SUPERINTENDENT          *
9    WILLIAM WOLF, et al.,   *
10        Defendants         *
11                           *
12                           *
13             * * * * * * * * *
14
15             DEPOSITION OF
16               JOHN RAUM
17            SEPTEMBER 9, 1998
18
19
20
21
22
23       Any reproduction of this transcript is
24       prohibited without authorization by the
25              certifying agency.
```

Page 4

```
1                  DEPOSITION
2                     OF
3
4    JOHN RAUM, taken on behalf of the
5    Plaintiff herein, pursuant to the Rules
6    of Civil Procedure, taken before me, the
7    undersigned, Shannon C. Hagerty, a Court
8    Reporter and Notary Public in and for the
9    Commonwealth of Pennsylvania, at SCI
10   Cambridge Springs, Cambridge Springs,
11   Pennsylvania, on Wednesday, September 9,
12   1998, at 2:50 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1              A P P E A R A N C E S
2
3    JERE KRAKOFF, ESQUIRE
4    1705 Allegheny Building
5    429 Forbes Avenue
6    Pittsburgh, PA 15219
7        COUNSEL FOR PLAINTIFF
8
9    THOMAS HALLORAN, ESQUIRE
10   Pennsylvania Office of Attorney General
11   Litigation Section
12   564 Forbes Avenue
13   6th Floor
14   Pittsburgh, PA 15219
15       COUNSEL FOR DEFENDANT
16
17   ALSO PRESENT: Deputy Superintendent
18                Karmanic
19
20
21
22
23
24
25
```

Page 6

```
 1                    I N D E X
 2
 3   WITNESS:  JOHN RAUN
 4   DIRECT EXAMINATION
 5       By Attorney Krakoff          9 - 81
 6   CERTIFICATE                      82
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1         E X H I B I T   P A G E
 2
 3                    PAGE
 4   NUMBER   DESCRIPTION        IDENTIFIED
 5
 6              NONE OFFERED
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1         O B J E C T I O N   P A G E
 2
 3   ATTORNEY                        PAGE
 4
 5              NONE MADE
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1         P R O C E E D I N G S
 2   -----------------------------------------
 3   JOHN RAUN, HAVING FIRST BEEN DULY SWORN,
 4   TESTIFIED AS FOLLOWS:
 5   -----------------------------------------
 6   DIRECT EXAMINATION
 7   BY ATTORNEY KRAKOFF:
 8   Q.   What is your full name?
 9   A.   John Aaron Raun.
10   Q.   How is the Aaron spelled?
11   A.   A-A-R-O-N.
12   Q.   How old are you, Officer Raun?
13   A.   Thirty-four.
14   Q.   Are you a captain at this point?
15   A.   No, sir, I'm not.  I'm a
16   lieutenant.
17   Q.   When did you become a lieutenant,
18   what year?
19   A.   Let's see, I've been a lieutenant
20   for about three years now.
21   Q.   Why don't you describe when you
22   began working here and the progression in
23   terms of promotions, when they occurred?
24   A.   Okay.  I started in April of 1992
25   and I went to the academy during that
```

Page 10

1 month into May 20th and then after that I
2 went into one year of training status and
3 I became a CO-1 as of April 1993. Then I
4 was 501 to CO-2 probably about nine
5 months after that, January ---
6 Q. Of '94?
7 A. --- '94.
8 Q. Is CO-2 equivalent ---?
9 A. Sergeant.
10 Q. Sergeant.
11 A. And then I became a CO-3, a
12 lieutenant --- I don't know the exact
13 dates. I'm going to go round about. It
14 was probably sometime in '95, April of
15 '95.
16 Q. Had you been employed with the
17 Department of Corrections before coming
18 to Cambridge Springs?
19 A. No, sir, I started here.
20 Q. Now, did you know James Icker
21 while he was employed at Cambridge
22 Springs?
23 A. In what sense?
24 Q. Well, ---.
25 A. Just as a coworker.

Page 11

1 Q. You knew him as a coworker?
2 A. Right.
3 Q. Okay. And do you recall whether
4 Officer Icker started the same time you
5 did or whether it was after?
6 A. It was after I did.
7 Q. And had you ever worked with him
8 on any sort of regularly assigned post?
9 A. No, sir.
10 Q. Did you ever socialize with James
11 Icker off of Cambridge Springs grounds?
12 A. No, sir.
13 Q. So I take it that you didn't
14 consider Icker to be a social friend but
15 as a --- just as a coworker; is that
16 correct?
17 A. Yes, sir.
18 Q. Now, were you ever questioned by
19 OPR personnel and they might have been
20 called Office of Special Investigation
21 along the line. But were you ever
22 questioned by OPR or OSI personnel
23 regarding any allegations that were made
24 against Officer Icker in connection with
25 sexual involvement with any Cambridge

Page 12

1 Springs inmate?
2 A. No, sir, I don't recall. I was
3 questioned by OPR and I don't think it
4 was in regards to Icker, but it was in
5 regards to myself in an investigation
6 that was done on me.
7 Q. Okay. I'm going to question you
8 about that, ---
9 A. All right. Okay.
10 Q. --- but I just wanted to know
11 whether anybody with the central office
12 questioned you about any aspect of
13 allegations against Officer Icker that he
14 had been sexually involved with any
15 inmate at Cambridge Springs?
16 A. I don't recall that.
17 Q. And let me define what I mean by
18 sexually involved though I think probably
19 all of us have a general sense of what I
20 mean by sexual involvement so it is
21 clear. Sexual involvement would include
22 kissing, fondling or touching an inmate
23 in the vaginal area, in the legs and
24 buttocks, the breasts, things of that
25 sort. So you don't have any recollection

Page 13

1 of being questioned in connection with
2 any such allegations against Icker; is
3 that correct?
4 A. Right.
5 Q. Okay. Now, do you have any
6 recollection of ever being questioned by
7 anybody at the institutional level,
8 meaning here at Cambridge Springs, in
9 connection with allegations or rumors
10 that Icker was sexually involved or had
11 been sexually involved with any Cambridge
12 Springs prisoners?
13 A. Our policy is when someone is
14 under investigation, we don't talk about
15 it.
16 Q. Okay. Meaning if somebody is
17 under investigation at the central office
18 level, people at this level aren't
19 questioning personnel about it, is that
20 what you meant?
21 A. No. I'm saying unless you are
22 directly involved and saying you have to
23 come in because you're part of the
24 investigation, it comes from OPR or it
25 comes from the superintendent's

Page 14

1  discretion or the deputy's discretion,
2  okay, on who should be involved. And
3  only at that time during your questioning
4  in a professional way, you know, of your
5  involvement in an investigation. That is
6  the only time that you are to say
7  anything about an investigation.
8  Otherwise you're not to talk about it.
9  Q.    I don't think I understand.
10 You're not going to talk about it with?
11 A.    Coworkers.
12 Q.    Coworkers. What I was asking was
13 whether --- and it might have come before
14 a referral to the central office, but
15 were you ever questioned by either the
16 superintendent, one of the deputy
17 superintendents, the captain or security
18 lieutenant or any commissioned officer
19 about possible sexual misconduct on the
20 part of a Cambridge Springs staff member
21 in connection with an inmate?
22 A.    Not that I can recall.
23 Q.    Okay. Did you at some point
24 become aware of the fact that Officer
25 Icker --- that there were allegations

Page 15

1  that Officer Icker was --- had been
2  involved or was involved sexually with
3  one or more inmates at the prison?
4  A.    The day that he was escorted off
5  grounds, yes.
6  Q.    And how did you become aware of
7  that?
8  A.    Everyone was talking about it. I
9  don't know who exactly told me about it,
10 but I had heard that in general consensus
11 that Icker was walked off grounds because
12 of sexual infractions.
13 Q.    Okay. Had you heard any rumors
14 prior to that, any talk of Icker's being
15 sexually involved with any Cambridge
16 Springs inmates?
17 A.    No. As I remember, it was a
18 surprise to me.
19 Q.    Okay. Apart from Icker, did you
20 become aware of any rumors of sexual
21 improprieties on the part of any member
22 of the prison staff toward Cambridge
23 Springs inmates from the time that you
24 became employed at Cambridge Springs to
25 the time that Officer Icker was escorted

Page 16

1  off the grounds?
2  A.    There are rumors that go around,
3  but I can't really be specific on who or
4  what the rumors are about. I don't
5  really get into the rumor mill myself.
6  Q.    Well, do you remember hearing
7  rumors?
8  A.    About Icker?
9  Q.    No. About any other personnel,
10 prior to the time that Icker was escorted
11 off the ground?
12 A.    I believe Carl Zimmerman was ---
13 but that wasn't really a rumor. I mean,
14 he was escorted off grounds.
15 Q.    Prior to that, had you heard
16 anything about Zimmerman's alleged
17 involvement with an inmate?
18 A.    No.
19 Q.    Okay. Anybody else?
20 A.    No. Normally it was at the time
21 where the people were escorted off
22 grounds that we were made aware of what
23 happened because it was an indication of
24 what not to do at Cambridge Springs and
25 it was a message that was sent out

Page 17

1  amongst everybody that was working at
2  Cambridge Springs. That it was like zero
3  tolerance for any type of sexual
4  infractions or stepping across the line
5  is what we call it.
6  Q.    Okay. But you said that there
7  were rumors that were circulated?
8  A.    Things were said, but, you know,
9  I can't really speculate whether it's
10 rumor or not because some things were
11 factual and, you know, those people were
12 escorted off grounds.
13 Q.    Did you hear any rumors before
14 those people were escorted off grounds?
15 A.    I can't really recall, sir.
16 Q.    Now, what about after Icker was
17 escorted off grounds? Did you hear any
18 rumors about say Marty Miller after Icker
19 was escorted off grounds before Marty
20 Miller was escorted off grounds?
21 A.    No, sir, not until after he was
22 escorted off grounds.
23 Q.    What about Mr. Walton (phonetic)?
24 Had you heard any rumors about him before
25 Mr. Walton was escorted off grounds?

Page 18

1 A.   No.  I think that was a
2 spontaneous thing any way that they just
3 escort him off grounds after the fact.
4 That's why I didn't hear anything prior
5 to that.
6 Q.   At any point did you hear any
7 rumors about Officer Mary (phonetic) and
8 his being involved with any inmates?
9 A.   Yes.  Officer Mary I did and I
10 had heard that he was under
11 investigation.
12 Q.   And did you hear about what the
13 outcome of the investigation was?
14 A.   I just know that he was
15 terminated or quit.  I don't know if he
16 resigned or what.
17 Q.   Okay.  Prior to hearing that he
18 was under investigation, had you heard
19 any rumors about Officer Mary?
20 A.   No.
21 Q.   How did it come to your attention
22 that he was under investigation?
23 A.   Due to the fact that I believe he
24 was working at control center and he was
25 posted there.

Page 19

1 Q.   While he was under investigation?
2 A.   Yes.
3 Q.   His assignment had been changed?
4 A.   Yes.
5 Q.   And in the control center he
6 wouldn't have direct contact with any
7 inmates, was that the idea?
8 A.   I believe so.  I don't know what
9 management's way of thinking was.  Like I
10 said, I was only a sergeant.  I had only
11 been here for a year and a half.
12 Q.   What about Sergeant Coffee
13 (phonetic) or CO Coffee?  Had you heard
14 any allegations at any point about his
15 being involved with any inmates?
16 A.   That's the first time I heard it.
17 Q.   What about Lieutenant Rogers and
18 he might not have been a lieutenant, but
19 CO Rogers?
20 A.   No, he's a lieutenant.  No, I
21 hadn't heard anything about him.
22 Q.   What about CO Schmidt?
23 A.   There were some rumors going
24 around about Schmidt.
25 Q.   And what was the nature of those

Page 20

1 rumors?
2 A.   I believe Lambert was claiming
3 that she was pregnant by Schmidt.
4 Q.   Had Lambert claimed that they had
5 had sexual involvement?
6 A.   Well, she claimed she was
7 pregnant by him.
8 Q.   Right.  But had there been rumors
9 --- other than sexual intercourse, rumors
10 that there had been some sort of sexual
11 involvement between Schmidt and Lambert?
12 A.   No, sir.
13 Q.   Do you recall who you heard the
14 rumor from that Lambert was claiming that
15 she had been impregnated by CO Schmidt?
16 A.   No, sir.
17 Q.   What about Wain Young?  Had you
18 heard any rumors about him?
19 A.   No, sir.  If I would have heard
20 any rumor, I would have reported it any
21 way.  There would have been something in
22 writing.
23 Q.   Okay.  What about Officer Stone?
24 A.   No.  Didn't hear any rumors about
25 him either.

Page 21

1 Q.   Harry Stewart?
2 A.   No.
3 Q.   Monteho (phonetic)?
4 A.   I knew that Monteho was under
5 investigation at one time.
6 Q.   Okay.  And do you know who he was
7 under investigation in connection with?
8 A.   I couldn't really tell you.
9 Q.   And do you know how you learned
10 that he was under investigation?
11 A.   It was just general knowledge
12 from talk in the institution.
13 Q.   Okay.  What about Arnold Requin
14 (phonetic) or Requeen (phonetic)?  He was
15 a laundry supervisor?
16        MS. KARMANIC:
17        It's Mr. Pequeen.
18        ATTORNEY KRAKOFF:
19        Pequeen, I've gotten him
20 wrong ever time.
21 A.   Pequeen.
22 BY ATTORNEY KRAKOFF:
23 Q.   Had you heard any rumors about
24 him?
25 A.   No.

Page 22

1 Q.   **What about Officer Hammers? Did**
2 **you hear any rumors, allegations about**
3 **him?**
4 A.   That was during the time of Allen
5 and Hammers and --- you just --- I really
6 can't differentiate between the time that
7 they, you know, resigned or whatever.
8 Did I hear this then or --- that was a
9 long time ago, sir, I'm sorry. I really
10 can't tell you if there was rumors prior
11 to that or whatever.
12 Q.   **And I think you've been in most**
13 **of the depositions where I compile a list**
14 **of personnel who in one way or another**
15 **there had been allegations?**
16 A.   Right.
17 Q.   **Okay. And what I want to do is to see**
18 **whether --- and I'm prefacing this with**
19 **the fact that I'm not here today to smear**
20 **any of these people. I'm here to --- I'm**
21 **attempting to get the names of people**
22 **which might ultimately lead to some**
23 **evidence that will assist the Plaintiffs**
24 **in establishing a case.**
25 A.   Right.

Page 23

1 Q.   **So in that vain, I'm going to**
2 **list for you, without describing the**
3 **nature, of people whose names have come**
4 **up in one fashion or another in**
5 **connection with allegations of**
6 **inappropriate conduct, not always sexual,**
7 **in relation to an inmate. And I'm going**
8 **to ask you at the conclusion of that**
9 **whether you can think of any other staff**
10 **members, officers, maintenance or**
11 **otherwise who would fall within the**
12 **framework of inappropriate relationships**
13 **with inmates.**
14 Q.   **Okay. Zimmerman, Icker, Walton**
15 **(phonetic), Mary (phonetic), Hull, that's**
16 **H-U-L-L, Coffee, Rogers, Schmidt, Young,**
17 **Stone, Stewart, Raun, Monteho, Free,**
18 **Pequeen, Hammers, Randolph, Mort,**
19 **Langford (phonetic), Miller, Bish,**
20 **Strickland (phonetic), Allen, Lawfton**
21 **(phonetic) is 24. Can you think of any**
22 **other names that I have not listed here**
23 **now that come to mind as you sit here?**
24 A.   No, I think you listed them all.
25 Q.   **Okay.**

Page 24

1         MS. KARMANIC:
2         That Strickland is not
3 accurate, strike that. It should
4 be Stallard.
5 A.   Stallard.
6         ATTORNEY KRAKOFF:
7         Lisa Stallard, thank you.
8 BY ATTORNEY KRAKOFF:
9 Q.   **Now, you had testified earlier**
10 **that there was zero tolerance at**
11 **Cambridge Springs in connection with**
12 **inappropriate relations between ---**
13 **inappropriate sexual relations between**
14 **members of the staff and inmates; is that**
15 **correct?**
16 A.   Yes, I did.
17 Q.   **Okay. And when and how did you**
18 **first become aware of the zero tolerance**
19 **policy?**
20 A.   See I was the sixth one hired at
21 the institution and as far as I can
22 remember back the superintendent at that
23 time, Captain Lazenbee, had worked with
24 female inmates at SCI ---.
25 Q.   **Muncy?**

Page 25

1 A.   Nope, Waynesburg. That was a
2 female institution. He was then the
3 captain in charge and with his experience
4 and his policies that he had been through
5 --- us being new off the streets it was
6 stressed from that point. From the time
7 that I started in corrections and which I
8 continued on telling the officers that
9 were hired as an area training sergeant,
10 Sergeant Coffee, all the sergeants that
11 were on there. It was always part of the
12 criteria that we went ahead and we told
13 these people there was zero tolerance for
14 it.
15 Q.   **All right. Now, was there**
16 **anything in writing, any written policy,**
17 **any memo, statement that said there will**
18 **be zero tolerance?**
19 A.   Yes, sir. We have a good ethics
20 book. It's written in there.
21 Q.   **Anything else?**
22 A.   There's a sexual harassment
23 policy that the Department of Corrections
24 has.
25 Q.   **Was that in existence as far as**

Page 26

1 **you know, when you first began working**
2 **here?**
3 A.   I can't tell you an exact date,
4 but I know that the Department of
5 Corrections has had that instituted for a
6 very long time.
7 Q.   **Okay. Sexual harassment**
8 **vis-a-vis inmates?  In other words,**
9 **sexual harassment is a policy involving**
10 **sexual harassment from officers vis-a-vis**
11 **inmates or is it sexual harassment**
12 **between officers or other staff members?**
13 A.   It's a Department of Corrections
14 policy.
15 Q.   **Right.  And I'm asking does that**
16 **policy prohibit sexual harassment among**
17 **the staff or does that policy extend to**
18 **sexual harassment from the staff toward**
19 **inmates?**
20 A.   The way that I interpret it?
21 Q.   **Well, the way it was written.**
22 A.   I can't tell you unless I have
23 the policy in front of me, sir.  The way
24 I interpret it is sexual harassment is
25 sexual harassment.  Everybody is human

Page 27

1 here.
2          ATTORNEY KRAKOFF:
3          Do we have that policy,
4 Mr. Halloran?  Do you know
5 whether that's been produced?
6          ATTORNEY HALLORAN:
7          I think it was produced
8 at the first set of depositions
9 in this case.
10          ATTORNEY KRAKOFF:
11          Okay.
12          ATTORNEY HALLORAN:
13          I think it's been
14 produced in discovery.
15 BY ATTORNEY KRAKOFF:
16 Q.   **Do you remember any efforts by**
17 **the administration, meaning**
18 **Superintendent Wolf, Deputy**
19 **Superintendent Utts, Deputy**
20 **Superintendent Karmanic, with respect to**
21 **announcing and reinforcing the policy of**
22 **zero tolerance?**
23 A.   I believe that it was designated
24 that we did get the information relayed
25 to us through the captain of the guard

Page 28

1 that this is the institution's policy
2 that there is zero tolerance for sexual
3 harassment.
4 Q.   **So it came in that form?**
5 A.   Yes, sir.
6 Q.   **Do you have any recollection of**
7 **any special meetings, training sessions,**
8 **seminars that were conducted for members**
9 **of the Cambridge Springs staff in**
10 **connection with the issue of sexual**
11 **relations between inmates and officers**
12 **---**
13 A.   Yes.
14 Q.   **--- or other staff members?**
15 A.   Yes.
16 Q.   **And when did that occur or what**
17 **does that consist of?**
18 A.   It consisted of, like I said,
19 prior to this, the sexual harassment
20 policy was read to us at role call on
21 numerous occasions.  The code of ethics
22 books was --- they were assigned to us,
23 yes, and we were told that we were to
24 adhere to those policies.  And ---.
25 Q.   **Go ahead.  Is there anything else**

Page 29

1 **that you can think of?**
2 A.   Yeah.  Later on there was actual
3 --- we had somebody come in from central
4 office, I believe it was Vandavis
5 (phonetic).  He came in and every
6 employee in the institution was required
7 to go to his seminar on sexual
8 harassment.  And I believe it was a
9 two-hour frame where people had to sit
10 there and listen to things that could be
11 construed as sexual harassment.
12 Q.   **Okay.  Do you remember what year**
13 **that took place?**
14 A.   I really couldn't tell you, sir.
15 Q.   **Now, did you testify at Icker's**
16 **trial?**
17 A.   No, sir, I did not.
18 Q.   **Were you asked to testify?**
19 A.   At first.
20 Q.   **Okay.  By the prosecution or by**
21 **defense?**
22 A.   I don't know.
23 Q.   **Was it by the District Attorney's**
24 **Office or was it by central office that**
25 **somebody asked you?  Well, who asked you?**

Page 30

1  A.    I was just told to be there. I
2  had a subpoena. I can't remember who
3  sent it to me. I was only there for
4  about an hour and then they told me I
5  could go home, so I really didn't concern
6  myself.
7  Q.    Had you been interviewed by the
8  Crawford County District Attorney's
9  Office?
10  A.    No.
11  Q.    Had you been interviewed by
12  anybody at central office in connection
13  with Icker's criminal trial?
14  A.    No.
15  Q.    Had you been interviewed by
16  anybody at Cambridge Springs in
17  connection with Icker's criminal trial?
18  A.    No.
19  Q.    Have you testified at any
20  criminal proceedings of Cambridge Springs
21  personnel in which the personnel had been
22  accused of any sexual improprieties
23  toward Cambridge Springs inmates?
24  A.    No.
25  Q.    Now, I take it from your earlier

Page 31

1  testimony that between 1993 and 1996 the
2  only occasion that you can recall being
3  interviewed by OPR or OSI in connection
4  with possible sexual improprieties
5  between staff and inmates was in the
6  context of the investigation of you; is
7  that correct?
8  A.    No, sir, I didn't say that.
9  Q.    Okay.
10  A.    Sexual improprieties?
11  Q.    Yes.
12  A.    I was never put under
13  investigation for any sexual
14  improprieties.
15  Q.    Okay. I didn't say that to try
16  to confuse you. So then is it your
17  testimony that you've never been
18  questioned by OPR, OSI about possible
19  sexual improprieties between staff
20  members at Cambridge Springs and inmates
21  at Cambridge Springs?
22  A.    No, I have never.
23  Q.    Sorry, you have to speak up.
24  A.    I don't think I've ever been with
25  anybody else's other than my own.

Page 32

1  Q.    Okay. But yours didn't involve
2  sexual improprieties or alleged sexual
3  improprieties; ---
4  A.    No, sir.
5  Q.    --- is that correct?
6  A.    That's correct.
7  Q.    I've asked you about being
8  questioned by OPR or OSI or ---.
9  A.    It's OPR.
10  Q.    Okay. Was there an OSI at one
11  point?
12  A.    That's Air Force Office of
13  Special Investigation.
14          ATTORNEY KRAKOFF:
15          Off the record.
16  OFF RECORD DISCUSSION
17  BY ATTORNEY KRAKOFF:
18  Q.    I'm going to refer to whatever
19  the investigative body is and central
20  office says OPR and you'll understand
21  what I mean, whatever it was called at
22  that time, okay?
23  A.    I'm fine with that.
24  Q.    I asked you whether you had ever
25  been questioned by OPR in connection with

Page 33

1  allegations of sexual improprieties
2  between staff members at Cambridge
3  Springs and inmates. Have you ever
4  provided any written statements or
5  extraordinary occurrence reports or other
6  documents to OPR in connection with such
7  matters?
8  A.    Sexual?
9  Q.    Sexual?
10  A.    No, are you saying sexual?
11  Q.    Yes. I'm limiting it to sexual
12  improprieties as I defined it before,
13  hugging, kissing, fondling between a
14  member of the staff and an inmate?
15  A.    No.
16  Q.    Have you ever written an
17  extraordinary occurrence report and
18  submitted it here at Cambridge Springs in
19  connection with alleged sexual
20  improprieties between a member of the
21  staff and an inmate at Cambridge Springs?
22  A.    Not that I can recall.
23  Q.    Now, to your knowledge, has any
24  Cambridge Springs inmate alleged to
25  prison officials or central office

Page 30 - Page 33

Page 34

1 officials that you sexually abused or
2 harassed them, to you knowledge?
3 A.   Not to my knowledge.
4 Q.   Okay.  Now, on what work shift
5 were you employed between January ---
6 there may have been shifts.  There may
7 have been more than one shift.  I'm
8 taking you back to the period between
9 January of 1993 and October 1994.
10 A.   Okay.
11 Q.   I'm framing a time when Lisa
12 Lambert made --- a time period during
13 which she made certain allegations.
14 A.   Right.
15 Q.   Okay.  Between January of 1993
16 and October of 1994, on what work shift
17 or shifts were you employed?
18 A.   I believe I was only on one and
19 that was six o'clock a.m. until 2:00 p.m.
20 Q.   Okay.  Did you have a regular
21 assignment during that time period?
22 A.   I think I had two different
23 assignments.
24 Q.   What were they?
25 A.   One was CO-1 which you can do any

Page 35

1 assignment.
2 Q.   You could ---
3 A.   I could ---
4 Q.   --- be a floater?
5 A.   --- virtually be a floater
6 anywhere, right.  1 could work anywhere.
7 But at the time I couldn't work housing
8 units.  That would be the only place I
9 couldn't and area training Sergeant as a
10 CO-2 on 6:00 to 2:00.
11 Q.   And I believe that you became an
12 area training sergeant in approximately
13 January of 1994; is that right?
14 A.   January or June, I can't
15 remember.
16 Q.   I'm sorry, January or June?
17 A.   June, I can't remember which date
18 it is.
19 Q.   Now, once you became an area
20 training sergeant, where were you
21 assigned?
22 A.   I was assigned to the
23 institution.  I had all kinds of
24 different responsibilities.
25 Q.   Was there a particular area of

Page 36

1 the prison that you were assigned to?
2 A.   No.
3 Q.   And what were your
4 responsibilities in a very general sense
5 as an area training sergeant?  What were
6 you ---?
7 A.   Okay.  I was assigned to train
8 all the trainees that were on shift.
9 That lasted for a full year and you have
10 to document in their books ever single
11 day that you're on duty and ensure that
12 they're trained in the posts that they're
13 working or in areas of their phase is
14 connected with.  We ensured that people
15 got relieved for meals and did their ---
16 you know, their schedules for the day,
17 made sure that authorized temporary
18 absences were going out of the
19 institution at a proper time, made sure
20 that meal line was running well, had to
21 interject up at the yard.  We basically
22 were the liaison between the shift
23 commander and the CO-1s that were working
24 on post.
25 Q.   Okay.  So would it be accurate to

Page 37

1 say that when you were a CO-1, you could
2 be in any place at the prison with the
3 exception of the interior of the housing
4 units?
5 A.   Well, the housing units
6 themselves, I wouldn't be assigned there
7 as a post.
8 Q.   Right.
9 A.   The restricted housing unit, I
10 wouldn't be there.  That's a gender post.
11 Q.   I think your testimony was that
12 when you were a CO-1, you could be
13 assigned to any post in the institution
14 with the exception of the housing units;
15 is that correct?
16 A.   Correct.
17 Q.   Okay.  And does that mean that
18 you could be assigned say to the yard?
19 A.   Yes.
20 Q.   And does that mean that you could
21 be assigned to the dietary area which, I
22 mean, the inmate cafeteria?
23 A.   Yes.
24 Q.   And were you allowed as a CO-1 to
25 be in the immediate area of the inmate

Page 38

1  housing units outside of the units or
2  were you not allowed anywhere near the
3  units?
4  A.   Yes, I was permitted.
5  Q.   Okay.  You were allowed to be in
6  the perimeter of the housing units, but
7  you weren't allowed to work inside the
8  housing units; is that correct?
9  A.   Correct.
10  Q.   And as the area training
11  sergeant, could you go --- could you be
12  in any of the areas of the prison,
13  including the housing units?
14  A.   Yes.  I have to do security
15  inspections in the housing units.
16  Q.   Okay.  So those would be kind of
17  walking through the housing units, but
18  not sitting at the desk; is that right?
19  A.   Certainly.  That's where I did my
20  training.
21  Q.   Okay.  So when you were a
22  sergeant, you would train the officers
23  who were assigned to the desk ---
24  A.   Correct.
25  Q.   --- how to work the desk?

Page 39

1  A.   Correct.
2  Q.   So you could be right there with
3  them and tell them this is how you do
4  this here, this is how you do that; is
5  that correct?
6  A.   Sure.
7  Q.   When you were a CO-1 though, you
8  weren't --- were you trained to work
9  inside the housing units at the desk?
10  A.   Yes.
11  Q.   Okay.  But I guess I'm confused.
12  A.   Due to my gender I couldn't work
13  the post though.  But we had to be
14  trained, it was part of our phase-two
15  training at that time.
16  Q.   Okay.  So you would spend a
17  couple hours --- when you were a trainee,
18  would you be taken inside the housing
19  units and you'd spend, what, a few
20  minutes being told what to do or how
21  would that go?
22  A.   They would be done in the same
23  fashion as I trained the individuals.  We
24  had a certain number of questions that we
25  had to complete during that phase and

Page 40

1  that's what we did.  We spent the time on
2  questions that would arise if you were
3  working the housing unit.
4  Q.   Would you be right with them on
5  the unit though?
6  A.   With the inmates?
7  Q.   Yes.
8  A.   Sure.
9  Q.   Now, when you were CO-1 and you
10  were assigned to work the inmate
11  cafeteria, what were your
12  responsibilities?
13  A.   Well, there was a lot of them.
14  Q.   Just in general.
15  A.   Just in general, ensure that
16  inmates didn't take anything out of the
17  dietary they weren't supposed to, ensure
18  that they were dressed properly, ensure
19  that they don't talk in line when they're
20  going through the line, make sure that
21  they're seated properly at their tables,
22  ensure that, you know, if something would
23  happen up there, that we reported it to
24  control immediately, observe the inmates
25  in their activities up there due to the

Page 41

1  fact that they weren't allowed to talk
2  from table to table, weren't allowed to
3  pass food from table to table and just
4  ensure that, you know, they were
5  following the rules and regulations.
6  Q.   And when you were assigned to
7  work in dietary, how long would the lunch
8  period or the dinner period or the
9  breakfast period respectively be
10  approximately?  How long would you be in
11  there?
12  A.   Well, when I started as a COT, it
13  would have been 20 minutes because of the
14  number of inmates that we had.  So it
15  would depend on the amount of people that
16  we had in population according to the
17  time that it would take for us to go
18  ahead and feed them.
19  Q.   And as the population increased,
20  their time increased?
21  A.   Their time increased, exactly.
22  Q.   And when you were a sergeant and
23  were training a trainee on how to work
24  the dietary post or the dining hall post,
25  how long would you be in the dining hall?

Page 42

1  A.   With a trainee?
2  Q.   **With a trainee, yes.**
3  A.   Well, we only went up there when
4  meals were being served so it wasn't like
5  an assignment for the day.  Nobody got
6  assigned to dietary all day long.
7  Q.   **But when you were in there**
8  **training them, would you be there**
9  **generally ---**
10 A.   During breakfast.
11 Q.   **--- for the duration of the**
12 **meals?**
13 A.   During breakfast I'd be there
14 during the duration, sure.  We had to be
15 up there.  The sergeant has to be at
16 dietary, during the time that it's
17 opened.  Then we didn't have zones.
18 Q.   **Did you only have breakfast or**
19 **did lunch occur on your shift as well?**
20 A.   Lunch also.
21 Q.   **Were there occasions when you**
22 **were a --- the training sergeant that you**
23 **were assigned to monitor --- strike that.**
24 **When you were assigned to work in**
25 **Luder Hall?**

Page 43

1  A.   As a sergeant?
2  Q.   **Yes.**
3  A.   No.
4  Q.   **Were there times that you went**
5  **through Luder Hall?**
6  A.   Yes.
7  Q.   **And what would generally be the**
8  **purpose for your going through there?**
9  **What would your function be?**
10 A.   As a CO-2?
11 Q.   **Yes.**
12 A.   I would do training and also
13 check the housing unit for cleanliness
14 and basically do a walk through which I
15 very rarely did.
16 Q.   **It's my understanding based upon**
17 **previous testimony that at some point, I**
18 **think it was the fourth floor of Luder,**
19 **was not occupied by inmates, is that your**
20 **recollection?**
21 A.   Yes.
22 Q.   **Was that when you were a sergeant**
23 **or is that when you were a CO-1 or did it**
24 **extend through both of them?**
25 A.   It was both of them because Luder

Page 44

1  wasn't occupied at all during part of the
2  time that I was a COT.
3  Q.   **Okay.  Now, do you have a**
4  **recollection of the first time you saw**
5  **Lisa Lambert?**
6  A.   Yes, I do.
7  Q.   **Okay.  When was that?**
8  A.   That was --- I believe the day
9  that I was working was the date that she
10 was transferred here and I remember her
11 coming off the van.
12 Q.   **And was she one of the early**
13 **inmates to arrive here?**
14 A.   I really couldn't tell you.
15 Q.   **Now, how is it that you were able**
16 **to recall seeing her come off of the van?**
17 **Was there something that stood out in**
18 **your mind or something that occurred or**
19 **whatever?**
20 A.   Yeah.
21 Q.   **What was that?**
22 A.   Just the way that she looked at
23 me as soon as she got off the van.  She
24 like stared right through me and I can
25 remember going home and telling my wife

Page 45

1  that night that, you know, this inmate
2  that came to Cambridge Springs, she was
3  --- I don't know.  She just kind of gave
4  me the chills, the willies.
5  Q.   **Was that something basically you**
6  **told your wife?**
7  A.   That's what I told my wife.
8  Q.   **Okay.  Now, did that give you a**
9  **chill because there was something**
10 **menacing in her look or something**
11 **sarcatious (phonetic) in her look?**
12 A.   Just something stuck out about
13 it.  I don't know how to really explain
14 it to you.  Something really stuck out
15 about it.
16 Q.   **Okay.  When she looked at you, if**
17 **you can recall, do you have a**
18 **recollection of whether you continued to**
19 **look at her the entire time she looked at**
20 **you or whether you just went ---?**
21 A.   No.  I was just basically --- you
22 know how you look at somebody and you
23 just kind of, well, that was weird.
24 Q.   **Right.**
25 A.   It was basically like that.

Page 46

1  Q.   And then at that point you kind
2  of went on to other things or looked at
3  ----?
4  A.    Yeah.  I had things to do.  I was
5  very busy that day.
6  Q.   Okay.  Do you have a recollection
7  of whether Lisa Lambert said anything to
8  you as she came off the bus or made any
9  gestures towards you?
10  A.    Nope.
11  Q.   Okay.  Is it that you don't have
12  a recollection or that you recall that
13  ---?
14  A.    I don't remember her saying
15  anything.
16  Q.   Okay.  And do you recall any
17  gestures on her part?  By gestures I
18  don't mean facial expressions, I mean,
19  did she wave, was there anything about
20  her arms or her legs or any other part of
21  her body that appeared to be a gesture?
22  A.    I just noticed ---
23  Q.   The stare?
24  A.    --- that stare.  That's it.
25  Q.   Do you have a recollection of

Page 47

1  whether there was a smile on her face
2  when she stared at you?
3  A.    No.
4  Q.   Do you recall what the expression
5  was on her face?
6  A.    No, I really don't.
7  Q.   Okay.  Do you have a recollection
8  of what your wife said in response,
9  whether she gave you any response or any
10  advice?
11  A.    No, I don't recall anything.
12  Q.   Was that the first time that you
13  had that experience of an inmate staring
14  at you in a way that caused you some ---
15  at least to react?
16  A.    No.
17  Q.   Was that the first time?
18  A.    No.  No.  We've had other inmates
19  in there that just --- I kind of have a
20  good sense of, you know, when you look at
21  somebody you can tell, you know, that
22  there's just something about them, you
23  know, that just kind of gives you that
24  sense of --- you know, that's just kind
25  of strange.  You know, they're strange or

Page 48

1  whatever.  You know, it's just a
2  different feeling.  I don't know.
3  Everybody has different perceptions of
4  people I guess.
5  Q.   Did you think she was strange in
6  a way that she appeared to be imbalanced
7  in some way?
8  A.    No.  No.  Like I said, it was
9  just a glance and that was it.
10  Q.   A glance from you?
11  A.    From her or whatever, I don't
12  know.
13  Q.   Okay.  Now, do you have a
14  recollection of the next time that you
15  saw Lisa Lambert?
16  A.    No.
17  Q.   Now, even if it wasn't the next
18  time, do you have a recollection of any
19  discussions with Lisa Lambert?  Let me
20  define discussions so that it's clear.
21  Maybe I shouldn't use the term
22  discussions.  Do you have a recollection
23  of Lisa Lambert saying anything to you
24  from the point that she came off the bus
25  and the subsequent days or weeks during

Page 49

1  the time period that we're talking about?
2  A.    No.
3  Q.   Do you have a recollection of
4  your saying anything to her during the
5  time period that I framed before?  So
6  it's clear, we're talking about the ---
7  so you understand what the time period
8  is.  It's between January of '93 and
9  October of 1994.
10  A.    I really don't recall saying
11  anything to her.
12  Q.   Do you have any recollection of
13  her looking at you in any way that gave
14  you --- you know, that gave you reason to
15  --- you know, to be concerned or alarmed?
16  A.    Yes.
17  Q.   Okay.  And when was that?
18  A.    She's speaking of dietary?  When
19  she was speaking of dietary, okay, and I
20  was observing the inmates in dietary, she
21  was always with one of her friends, which
22  she would always stare and as I'm looking
23  across, of course, she's looking at me,
24  she'd whisper to the person next to her
25  and then she'd look back at me and they'd

Page 46 - Page 49

Page 50

1  both chuckle. You know, it was like a
2  big game for them is what it came down
3  to.
4  Q.    Do you remember whether there was
5  any particular friend that would be with
6  her or were there several, more than one?
7  A.    Three come to mind.
8  Q.    Okay. Who were they that come to
9  mind?
10 A.    Lisa Gunderson was one.
11 Q.    Okay. Who else?
12 A.    Inmate Javka and Inmate Lezell.
13 Q.    Do you know how to spell her
14 name? It's L-E-Z-E-L-L or something of
15 that sort.
16 A.    Something like that.
17 Q.    Did you have the impression that
18 she was flirting with you when she would,
19 you know, look at you and then they would
20 giggle?
21 A.    No. I didn't get the impression
22 that she was flirting with me. I got the
23 impression that she was basically just
24 trying to get my attention is what it
25 was.

Page 51

1  Q.    Okay. Did you at any point
2  approach her and say anything to her
3  about what you described her doing, this
4  looking at you and then giggling with her
5  friends?
6  A.    No. Because I believe that that
7  happened after she tried to hand me a
8  note.
9  Q.    Okay. In other words, the kinds
10 of --- what you described as occurring in
11 dietary you think that occurred after she
12 had tried to hand you a note?
13 A.    Right. Right.
14 Q.    So you ---.
15 A.    Well, actually, I don't know. It
16 was around that time period though.
17 Q.    Okay. All right. What was the
18 significance --- if it was after she had
19 handed you the note, what impact, if any,
20 did that have on your going over to her
21 and saying, you know, what are you
22 looking at or why are you giggling or
23 what are you trying to do, what are you
24 up to or something like that?
25 A.    Well, being a male officer in a

Page 52

1  female institution, if you could put
2  yourself in my shoes, okay, that's
3  probably something that could happen to
4  you. It's pretty detrimental, you know
5  what I mean. I mean, you're trying to
6  work day after day and you've got an
7  inmate handing you a note, okay. Of
8  course, I reported it. All right. And
9  that next day we brought her down to
10 interview her and let her know that that
11 was not condoned in the institution. So
12 what my point is is that this inmate has
13 now approached me. She has become bold
14 enough to approach me with a note, okay.
15 That gives you the feeling of standing
16 back and saying, hey, I can't deal with
17 this person on a one on one. I can't
18 deal with this person, you know, in
19 correcting her behaviors because of the
20 way that she was around me. Okay. It
21 gave me a very uneasy feeling to say
22 anything to this inmate after that. She
23 was not approachable.
24 Q.    You said that there were --- that
25 three of her friends came to mind in

Page 53

1  connection with times when she would look
2  at you and then giggle. Were there at
3  least three times that this occurred or
4  were these three inmates with her on one
5  occasion when it occurred?
6  A.    It was different states as she
7  was in the institution. The first person
8  was Gunderson. Then after Gunderson left
9  --- she was transferred out of here. The
10 next person I believe was Lezell. And
11 then after Lezell was out of here or
12 maybe at the same time her, Lezell and
13 Javka depending on where they lived at
14 Javka was the third person that she hung
15 out with. And she shared this with all
16 three of them.
17 Q.    This kind of conduct?
18 A.    This kind of conduct, exactly.
19 Q.    And can you give me just an
20 estimate --- I'm not asking you --- I
21 know you didn't stand there counting ---
22 I assume you didn't, you know, make a
23 note of it every time or count it up or
24 whatever. I'm just asking for an
25 estimate of how many occasions that kind

Page 54

1  of behavior occurred in the dining hall
2  where you saw her looking at you and then
3  this kind of giggling?  How many times
4  would you say that happened?
5  A.    It was to the point where I just
6  avoided even looking at her, to the point
7  where I even avoided scanning across her
8  table because I felt that uncomfortable
9  around her.
10 Q.   How many times before you reached
11 that point where you didn't want to even
12 look in her direction?  How many times
13 would you estimate that occurred?
14 A.    Well, it would still occur after
15 that.  I mean, it's not like I could just
16 say, okay, Lisa Lambert is sitting there
17 and I'm going to go like this
18 (indicating) every time I go across her
19 table.  It still occurred after that.  I
20 really couldn't give you a set number,
21 but I could give you the way that I could
22 tell ---.
23 Q.    Just give me a range of times
24 that you figure that that happened,
25 whether it was 10 times or 20 times, 50

Page 55

1  times or whatever?
2  A.    I don't know.  What's enough?  I
3  mean, ten times.  I don't know.  I really
4  don't know.  You've got to understand
5  I've been in there five days a week, six
6  days a week doing meals every single day,
7  okay.  And, you know, do you become numb
8  to that afterwards, I'm not sure.  But,
9  you know, at a point in time where I felt
10 this was ridiculous enough that I felt
11 uncomfortable with it.
12 Q.    When you reached that point, did
13 you prepare an extraordinary occurrence
14 report about that behavior that she was
15 engaging in?
16 A.    No, I didn't, but I made people
17 aware of it.
18 Q.    Okay.  And did you prepare any
19 other sort of written report, whether it
20 was called an extraordinary occurrence
21 report or something else?  Did you
22 prepare any written reports about that?
23 A.    About that particular --- her
24 staring at me?
25 Q.    Yes.  That behavior.

Page 56

1  A.    I just considered that part of
2  the job.
3  Q.    Okay.  Had this happened to you
4  before with other inmates?
5  A.    No.
6  Q.    Why did you ---?
7  A.    I'll make a clarification.  I
8  thought you were talking about the
9  incident of her --- exclusively her
10 staring at me at dietary if I had written
11 a report on that, ---
12 Q.    Yes.
13 A.    --- is that what you're saying?
14 Q.    Yes.  I know that there was
15 another report.  That's what I'm talking
16 about.
17 A.    As far as that goes, no.
18 Q.    Okay.  Why did you feel that that
19 was part of the job when, you know, you
20 reached a point where you didn't even
21 want to basically look her way?  What
22 made you feel that that was part of the
23 job?
24 A.    Because I knew that the ---
25 working at an institution with females,

Page 57

1  okay, that there's a possibility that
2  that may happen.  You know, that certain
3  inmates wouldn't like you or would like
4  you.  It didn't really --- you know, I
5  only work here.  I don't have to get into
6  the personal issues with the inmates or
7  what they're saying about me or whatever.
8  You know, that's just --- you're going to
9  have that and that's the way I thought
10 about it.  You know, it's going to happen
11 once in a while.
12 Q.    Did you reach a point where you
13 thought what Lisa was doing in the inmate
14 cafeteria was flirtatious toward you?
15 A.    I don't know.  It wasn't like she
16 was going like this (indicating) or
17 anything.  No hand indications.
18 Q.    Just so we can describe what
19 you're ---.
20 A.    That would be like me going
21 across the table and whispering to you
22 and then looking up and laughing.  Is
23 that considered flirtatious, I don't
24 know.  I didn't consider it flirtatious
25 because I don't involve myself with an

Page 58

1 inmate in a flirtatious manor so it was
2 disregarded.
3 Q. **In other words, she didn't you**
4 **said going like this. She didn't take**
5 **her index finger and kind of give you a**
6 **come hither sign with that finger?**
7 A. Nothing like that. They would
8 just whisper back and forth to each
9 other. I didn't consider that
10 flirtatious, no.
11 Q. **Now, you said that you made**
12 **others on the staff, I believe --- I**
13 **don't know that you said on the staff,**
14 **but I think you said that you made others**
15 **aware of what Lisa was doing in the**
16 **dining hall; is that correct?**
17 A. Yes.
18 Q. **Okay. Who did you make aware of**
19 **that?**
20 A. The people that I had worked
21 with, coworkers. On a couple of
22 occasions it would annoy me a little bit
23 and I'd be like I wish Lambert would
24 knock that off, things like that.
25 Q. **Do you recall the names of any of**

Page 59

1 **your coworkers?**
2 A. I really don't. Like I said, it
3 was like a spontaneous thing, I wish
4 Lambert --- you know, you're sitting
5 there talking with somebody while you're
6 doing dietary.
7 Q. **But you didn't think that it was**
8 **a significant enough of a problem that it**
9 **was something that you should report to**
10 **your superiors; is that correct?**
11 A. Basically I had already been
12 through an investigation prior to that
13 for allegations she had made about me
14 throwing rocks at her window and things
15 like that. And they were well aware.
16 They were very well aware of everything
17 that Lisa Lambert had done. Yes, I did
18 report that and it was investigated.
19 Q. **You reported what?**
20 A. I reported Lisa Lambert's
21 mannerisms and the way that she was
22 around me in detail, yes.
23 Q. **Do you recall was that a written**
24 **report or was that an oral report?**
25 A. That was an oral interview.

Page 60

1 Q. **Okay. And who did you tell that**
2 **to during an interview?**
3 A. It must have been Michael
4 Walanon.
5 Q. **Okay.**
6 A. I don't know who my first
7 interview was. I think it was Michael
8 Walanon. I can't be positive about that.
9 Q. **When you told Walanon about what**
10 **Lisa Lambert had done in the cafeteria,**
11 **----.**
12 A. Excuse me, let me clarify
13 something. I don't know if I told him
14 about what she had done in the cafeteria.
15 A generalization of what her mannerisms
16 were when she was around me in the
17 cafeteria, at yard, in the housing unit,
18 out on the institutional grounds, okay.
19 It's a broad prospective so that he could
20 understand exactly her demeanor around
21 me.
22 Q. **Okay. Now, was that in**
23 **connection --- let's turn to an exhibit**
24 **which I think is Exhibit ---**
25        ATTORNEY KRAKOFF:

Page 61

1        What's that Number?
2        ATTORNEY HALLORAN:
3        Six.
4 BY ATTORNEY KRAKOFF:
5 Q. **--- Exhibit Six. Mr. Halloran**
6 **has --- let me show you two exhibits.**
7 **Exhibit Six is a report.**
8 **BRIEF INTERRUPTION**
9 BY ATTORNEY KRAKOFF:
10 Q. **I'm trying to determine when you**
11 **related the information to OPR. Exhibit**
12 **Six concerns an investigation where a**
13 **report issued December 5th, 1994, was**
14 **issued and maybe you can just kind of**
15 **leaf through that and then I'm going to**
16 **ask you to ---.**
17 A. This is October 4th, 1994 ---
18 October 13th --- the 28th?
19 Q. **Yeah. This is the October ---.**
20 A. This is the last investigation?
21 Q. **Right. That's where Lisa Lambert**
22 **alleged that you had assaulted her.**
23 A. Correct.
24 Q. **Not sexually, but you had**
25 **assaulted her in the stairway landing.**

Page 62

1  A.   Right.
2  Q.   And then the other investigation
3  that I'm aware of is Exhibit Four, that's
4  a multi-page exhibit as well.  And
5  there's a report issued June 15, 1994,
6  and this is where she alleged that you
7  had stared at her, had written her notes
8  and had grabbed her chest one time and
9  some other things.
10 A.   Well, I guess that was sort of
11 sexual harassment there.
12 Q.   Right.  And I wanted to know
13 whether you can review these two and tell
14 me when it was that you told OPR about
15 Lisa Lambert's general behavior toward
16 you?  Turn by looking at those two
17 documents.
18        ATTORNEY HALLORAN:
19        He didn't say okay to
20 that.
21        ATTORNEY KRAKOFF:
22        Okay.
23 A.   I think --- in summary of the
24 investigations a lot of times they kind
25 of ask you things off the record and

Page 63

1  stuff like that.  I don't know.  This
2  just looks like my answers to his
3  questions that he had asked me directly
4  during the interview.
5  BY ATTORNEY KRAKOFF:
6  Q.   Which one are you talking about,
7  both of those exhibits or one exhibit as
8  opposed to the other?
9        ATTORNEY HALLORAN:
10       It's in reference to
11 Exhibit Four.
12        ATTORNEY KRAKOFF:
13       Exhibit Four, okay.  Is
14 there a Five?  Off the record.
15 OFF RECORD DISCUSSION
16 BY ATTORNEY KRAKOFF:
17 Q.   Let me pose the question, are you
18 able to determine --- by reviewing these
19 two investigative reports, namely
20 Exhibits Four and Exhibits Six --- and
21 Six, are you able to determine by
22 reviewing these when you told somebody
23 from OPR about Lisa Lambert's alleged
24 general behavior towards you?
25 A.   Not that I can see.

Page 64

1  Q.   Okay.  So then are you able to
2  --- it's clear in your mind though, is
3  that right, that you related --- you
4  described Lisa Lambert's general conduct
5  toward you in the context of some
6  investigate --- one of the investigations
7  of you; is that correct?  Is that when
8  you told OPR?
9  A.   I can't tell you if it was OPR
10 because investigations are started by the
11 institution itself.  It could have been
12 initially during the fact finder or
13 whatever.  But, you know, people and
14 upper management knew my position with
15 Lisa Lambert.
16 Q.   Okay.  Was there a fact finding
17 in connection with the incident described
18 --- or the incidents described in the
19 June 15, 1994 report?
20 A.   No.
21 Q.   Was there a fact finding in
22 connection with the other investigation,
23 the one that's reflected in Exhibit Six?
24 A.   Six?
25 Q.   Yes.

Page 65

1  A.   I believe so, because it was
2  referred to by Superintendent Wolf.
3  Q.   Where's that?
4  A.   To Vandavis, Wolf's referral to
5  review that inmate Lambert OB claims she
6  was assaulted on October 4th and 5th in
7  the stairwell.
8  Q.   Okay.  Is that indicative of a
9  --- the fact that there had been a fact
10 finding prior to the referral?
11 A.   Well, it says that I denied all
12 the allegations that Lambert had made.
13 Q.   Right.
14 A.   And I submitted that I would take
15 a polygraph examination.
16 Q.   Okay.  Was that during the fact
17 finding?
18 A.   I don't know, sir.  I really
19 don't.  Who knows where the fact finding
20 ends and the investigation starts?  Well,
21 it's kind of hard for me to tell.  I'm
22 not doing it myself.  It's being done to
23 me so I don't know what they consider
24 investigation fact finding.  I could do
25 it if I was the one doing the fact

Page 62 - Page 65

Page 66

1 finding myself. I could tell you that.
2 Q.    Okay.  In terms of a time line,
3 the investigation encompassed by Exhibit
4 Four, according to this report, was
5 authorized in May of '94.  The
6 investigation encompassed in Exhibit Six
7 was authorized in October of '94?
8 A.    Approximately six months apart.
9 Q.    Right.  Do you know whether,
10 prior to May of '94, you had told anybody
11 either at the institution or at the
12 central office that Lisa Lambert had
13 somehow been conducting herself
14 inappropriately towards you?
15 A.    Yes.
16 Q.    Okay.  And when did that occur?
17 A.    That was when she sent me the
18 letter.
19 Q.    Okay.  Apart from that, was there
20 a time when you described to somebody
21 either here or at the institution or at
22 the central office, behavior by Lisa
23 Lambert?  I think you alluded to it
24 earlier in various parts of the
25 institution where you thought that she

Page 67

1 had been behaving towards you in an
2 inappropriate way; is that correct?
3 A.    Yeah.  I would say it's
4 inappropriate, but I told you that it was
5 part of the job and I accept it as part
6 of the job and I accepted that that was
7 the way that Lisa Lambert was going to
8 conduct herself in front of me as long as
9 I worked at SCI Cambridge Springs.  So it
10 was an acceptance on my part.  This is
11 part of the job, avoid her and do your
12 job and don't worry about --- I didn't
13 come in worrying everyday what Lisa
14 Lambert's going to do to me next.
15 Q.    Will you please describe to me,
16 because you've already done it within the
17 dining hall, ---
18 A.    Sure.
19 Q.    --- where else did Lisa Lambert,
20 in your view, behave inappropriately
21 towards you?  Where else within this
22 complex did she do that?
23 A.    And I can express to you that it
24 was all nonverbal.
25 Q.    Right.

Page 68

1 A.    Okay.  And at the yard they were
2 allowed to roll up their pants.  She
3 would sit up there flipping her hair back
4 like this (indicating) and just waiting
5 for me to look at her.
6 Q.    Anything else in the yard that
7 you can recall?
8 A.    Well, she approached me at one
9 time after the note and had apologized
10 for sending a little note to me.
11 Q.    Okay.
12 A.    And that was the only probably
13 verbal conversation that I had with her.
14 Q.    Ever that you can recall?
15 A.    Other than hi, that's it.  And
16 that was prior to the note too that I
17 would say --- you know, the inmates would
18 say hi, of course, you say hi back.  You
19 know, I mean, it's just a response.
20 Q.    She would say hi to you before
21 the note?
22 A.    Well, before the note, yeah, once
23 in a while.
24 Q.    Now, the note that you're
25 referring to, is that the note --- is it

Page 69

1 the second page of Exhibit One, the one
2 that starts hey sexy?
3 A.    Yeah, that's it, sir.
4 Q.    Okay.  And you sent this note
5 onto Lieutenant Bartlet; correct?
6 A.    Lieutenant Mort I believe.
7 Q.    But in any event you reported to
8 Deputy Mack who is now ---
9 A.    Karmanic.
10 Q.    --- Karmanic?  You reported to
11 her that you had referred --- were you
12 reporting --- you would refer the matter
13 to Lieutenant Bartlet and Lieutenant
14 Mort?
15 A.    Lieutenant Mort wrote that.
16 Q.    Okay.
17 A.    He does the actions taken part.
18 The portion of it that I did is under
19 description of incidents and detail.
20 Q.    Okay.  And then that was dated
21 the 20th of June.  And then did something
22 else happen after the 20th in connection
23 with communications from Lisa Lambert?
24 A.    The only other type of
25 communication she had with me was

Page 70

1 apologizing to me up on the yard for
2 having the note sent.
3 Q.    What did she say to you as best
4 you can recall?
5 A.    I really can't remember the
6 conversation.
7 Q.    But you can remember that ---?
8 A.    I just know that she was
9 apologizing.
10 Q.    Did she apologize, if you can
11 recall, before the second incident, the
12 incident of the 25th of June?
13 A.    That's what I was just
14 discussing. I'm not sure that I have my
15 dates right because it was a long time
16 ago.
17 Q.    That's all right. Take your
18 time.
19 A.    The second note was five days
20 later. And there's another EO somewhere.
21 Q.    Exhibit Three is another EO.
22 A.    That's the second one which I
23 refused.
24 Q.    I think Exhibit Two was the
25 second note, wasn't it?

Page 71

1 A.    Okay. No passing. Then Exhibit
2 Three, this is when I was approached by
3 --- okay, it might be in this one. I
4 don't see the EO in here.
5 Q.    Do you think that there was
6 another one that occurred after the 25th
7 of June before the 21st of July?
8 A.    It was around the middle of July
9 when she apologized to me.
10 Q.    Okay.
11 A.    So I think it was probably after
12 the second note.
13 Q.    Okay. Why don't you tell me what
14 occurred --- where were you when you
15 received the note on the 20th of June?
16 A.    Inmate Campbell was a dietary
17 worker and like I said I worked 6:00 to
18 2:00 and she was an a.m. dietary worker
19 and I don't know if she hung onto the
20 note for a couple days or whatever, but
21 when she saw me out in front of dietary
22 is when she approached me with the note.
23 Q.    And did she hand it to me?
24 A.    She handed it to me. She said,
25 here, I got something for you.

Page 72

1 Q.    Okay. Did you read it?
2 A.    No, I didn't even open it. I
3 just took it down to the shift commander
4 and handed it in and he read it to me.
5 Q.    Was the note in an envelope of
6 some sort?
7 A.    Nope, it was just folded up.
8 Q.    Folded up. Did Campbell tell you
9 who it was from?
10 A.    She didn't tell me who it was
11 from until the second note, but I had
12 figured out who it was from already.
13 Q.    How did you figure that out?
14 A.    I just new that it was her.
15 Q.    You knew that it was Lambert?
16 A.    I had a feeling it was her.
17 Q.    Okay. Did she tell you what was
18 in the note? Did Campbell say here's a
19 note?
20 A.    No. She didn't say here's a
21 note. She says, I have something for
22 you. It could have been anything as far
23 as I was concerned. But when I saw that
24 the note was read to me down there in
25 front of --- or Lieutenant Mort read the

Page 73

1 note to me I saw that it was from --- I
2 presumed Lisa Lambert.
3 Q.    Did he ask you who it was from?
4 Did Lieutenant Mort ask you who it was
5 from?
6 A.    No.
7 Q.    Okay. Now, let's turn to Exhibit
8 Two. This ---.
9 A.    Sorry.
10         ATTORNEY KRAKOFF:
11         Well, wait. I'm trying
12 to get his recollection, not ---.
13         ATTORNEY HALLORAN:
14         Well, you can ask him
15 questions. Before you ask him
16 the next question I want to point
17 something else to him. This
18 doesn't relate to this question.
19 It relates to what he was looking
20 for before.
21         ATTORNEY KRAKOFF:
22         You mean whether he had
23 talked with somebody about ---?
24         ATTORNEY HALLORAN:
25         Right.

Page 74

1  ATTORNEY KRAKOFF:
2  Okay.
3  A.  Right.  It was the second note
4  where she said, here's a note from Lisa
5  Lambert and I said, no thanks.  Inmate
6  Campbell already stated that.  Inmate
7  Lambert ---.
8  BY ATTORNEY KRAKOFF:
9  Q.  What are you reading from now?
10  ATTORNEY HALLORAN:
11  Exhibit Two.
12  A.  By this reader denying the
13  letter.  Inmate Campbell told me that
14  Lisa Lambert would have regrets if I
15  didn't take the letter.  In other words,
16  she was trying to force it on me.
17  BY ATTORNEY KRAKOFF:
18  Q.  And that was the second ---
19  A.  That was the second letter.
20  Q.  --- letter?  The second note; is
21  that correct?
22  A.  Yes, it is.
23  Q.  Okay.  And that was a note that
24  you never took; is that correct?
25  A.  That's correct.

Page 75

1  Q.  That's not the note that's
2  attached to Exhibit One; is that correct?
3  A.  No, it's not.  I don't have that
4  note and I didn't accept it so it's
5  nowhere to be found.
6  Q.  Okay.
7  A.  And your question about apology.
8  You asked me when she apologized?
9  Q.  Yes.
10  A.  It was after the second note.  It
11  was on 7/21/93 at 0710 hours.
12  Q.  Are you refreshing your
13  recollection from something?
14  A.  Yes.  From an EO, Exhibit Three.
15  Q.  Okay.  So did it happen on the
16  21st that she apologized or prior?
17  A.  The 20th.
18  Q.  Now, going back to Exhibit Two,
19  on this occasion she identified Lisa as
20  the person who had prepared the note that
21  she was attempting to pass; is that
22  correct?
23  A.  Yes.
24  Q.  And did she mention Lisa by name?
25  A.  Yes.

Page 76

1  Q.  And by then you already knew who
2  Lisa was by name; correct?
3  A.  I knew her as Ms. Lambert.
4  Q.  And inmate Campbell told you that
5  Lambert would regret it if you didn't
6  ---?
7  A.  If I denied the letter.
8  Q.  Meaning if you didn't take the
9  letter?
10  A.  Yes.
11  Q.  Now, let me refer you to where it
12  says actions taken.  That isn't your
13  handwriting; is it?
14  ATTORNEY HALLORAN:
15  Are you referring to Two?
16  ATTORNEY KRAKOFF:
17  Yes, Exhibit Two.
18  A.  No.
19  BY ATTORNEY KRAKOFF:
20  Q.  Okay.  Do you know whose
21  handwriting that is?
22  A.  Lieutenant Wagner's.
23  Q.  Now, this says that Captain B,
24  ---
25  A.  Bartlet.

Page 77

1  Q.  --- Captain L ---
2  A.  Lazenbee.
3  Q.  --- and you; is that correct,
4  Raun, ---
5  A.  Yes, sir.
6  Q.  --- talked to Lambert?  You
7  reiterated policy.  Now, do you have a
8  recollection of talking to Lambert about
9  this incident?
10  A.  Yes, sir.
11  Q.  Where did you talk with her?
12  A.  That occurred in Captain
13  Lazenbee's office in Kurry (phonetic)
14  Hall.
15  Q.  Was Lisa Lambert there ---
16  A.  Yes, she was.
17  Q.  --- already?
18  A.  No.
19  Q.  She came after you were already
20  there?
21  A.  We called her down.
22  Q.  Had you discussed with Captain
23  Bartlet and Captain Lazenbee what was
24  going to be said to Lisa Lambert before
25  she appeared?

Page 78

1 A.  No, I did not.
2 Q.  **Had you been asked any questions**
3 **by either Captain Bartlet or Captain**
4 **Lazenbee about the incident?**
5 A.  Yes, they asked me what was going
6 on prior to inmate Lambert coming down.
7 Q.  **Okay. And what did you tell**
8 **them?**
9 A.  Exactly what happened. She's
10 tried to pass me two notes now.
11 Q.  **Did you tell them anything about**
12 **Lisa's behavior towards you prior to the**
13 **attempt by Campbell to hand you the note?**
14 A.  It was known, yes, that she was
15 trying to gain my attention.
16 Q.  **How do you know that it was known**
17 **by these two officers?**
18 A.  Because I talked to Captain
19 Bartlet on many occasions and also
20 Captain Lazenbee.
21 Q.  **Okay. What had you told them on**
22 **those occasions, the sum and substance of**
23 **what you told them?**
24 A.  Lambert's was --- she was up to
25 something.

Page 79

1 Q.  **Did you tell them what she was up**
2 **to?**
3 A.  In what aspect?
4 Q.  **Well, you said that you told them**
5 **that she was up to something. Did you**
6 **indicate the nature of what she appeared**
7 **to be up to?**
8 A.  She just was acting on less than
9 a professional level as far as an inmate
10 should be on Cambridge Springs.
11 Q.  **Did you tell them that Lisa was**
12 **flirting with you?**
13 A.  I don't think I used the word
14 flirting.
15 Q.  **Okay.**
16 A.  I just felt that she was a little
17 more aggressive than normal.
18 Q.  **Sexually aggressive.**
19 A.  She never tried anything sexually
20 with me, I couldn't say that.
21 Q.  **So when Lisa came, what**
22 **transpired?**
23 A.  She sat down at a table and
24 Captain Bartlet proceeded to reiterate to
25 her about policy and procedures as far as

Page 80

1 inmate/staff relationships and how, you
2 know, they're not to occur. We're
3 supposed to remain on a professional
4 level. She wasn't to deliver anymore
5 notes or do anything out of context of
6 policy.
7 Q.  **Okay. Did Lisa say anything that**
8 **you can recall?**
9 A.  No, she did not say a word. She
10 just sat there.
11 Q.  **And was she warned about --- that**
12 **if she did that was she warned that**
13 **something would happen?**
14 A.  She was told that she wasn't ---
15 no, nobody warned her about any --- I
16 mean, they didn't give her a warning or
17 anything. They just told her that this
18 is the way it is.
19 Q.  **Okay. Nothing was said about if**
20 **she continued to do that, she might be**
21 **disciplined or anything of that sort?**
22 A.  Well, I'm sure she understood
23 that misconduct could be served to her if
24 she continued with the explicit behavior.
25 Q.  **Was anything explicitly said as**

Page 81

1 you can recall?
2 A.  No.
3 BRIEF INTERRUPTION
4         * * * * * * *
5     DEPOSITION CONCLUDED AT 4:30 P.M.
6         * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

86

CONTINUED DEPOSITION

OF


JOHN RAUN, taken on behalf of the

Plaintiffs herein, pursuant to the Rules

of Civil Procedure, taken before me, the

undersigned, Shannon Hagerty, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania, at SCI-

Cambridge Springs, Cambridge Springs,

Pennsylvania, on Thursday, September 10,

1998, at 10:07 a.m.

Page 87

```
 1        A P P E A R A N C E S
 2
 3  JERE KRAKOFF, ESQUIRE
 4  1705 Allegheny Building
 5  429 Forbes Avenue
 6  Pittsburgh, PA  15219
 7     Counsel for Plaintiffs
 8
 9  THOMAS HALLORAN, ESQUIRE
10  PA Office of Attorney General
11  Litigation Section
12  564 Forbes Avenue
13  6th Floor
14  Pittsburgh, PA  15219
15     Counsel for Defendants
16
17  Also Present:  Angus R. Lore
18                 924 Cherry Street
19                 Suite 523
20                 Philadelphia, PA  19107
21
22                 Deputy Superintendent
23                 Karmanic
24
25
```

Page 89

```
 1        E X H I B I T   P A G E
 2
 3                          PAGE
 4  NUMBER   DESCRIPTION       IDENTIFIED
 5
 6              NONE OFFERED
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 88

```
 1           I N D E X
 2
 3  WITNESS:  JOHN RAUN
 4  CONTINUED EXAMINATION
 5     By Attorney Krakoff        91 - 183
 6  CERTIFICATE                       184
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 90

```
 1        O B J E C T I O N   P A G E
 2
 3  ATTORNEY            PAGE
 4  Halloran           115, 118, 158
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 91

P R O C E E D I N G S

--------------------------------------

JOHN RAUN, HAVING BEEN PREVIOUSLY DULY

SWORN, TESTIFIED AS FOLLOWS:

--------------------------------------

     ATTORNEY KRAKOFF:

       This is a continuation of

yesterday's deposition. You're

still under oath. It will be the

same format. I'll offer

questions to you and you'll do

your best to answer the

questions.

CONTINUED EXAMINATION

BY ATTORNEY KRAKOFF:

Q.    I had asked you yesterday whether

you consider yourself to be a social

friend of Officer Icker (phonetic) and

you testified that you did not.

A.   Yes.

Q.    At work did you --- either at

work or outside of the compound did you

ever have any discussions with Officer

Icker about Lisa Lambert?

A.   Not that I can recall.

Page 92

Q.  **Did you have any discussions ---**
**and maybe I shouldn't --- discussion**
**implies that there's maybe more than one**
**sentence or it's a two-way sort of thing.**
A.  Right.
Q.  **Was the subject of Lisa Lambert**
**ever the subject of something that you**
**said to Icker or that Icker said to you,**
**as you can recall?**
A.  No.
Q.  **Now, did you have any**
**discussions, I know there was a meeting**
**that you testified to yesterday, did you**
**ever have any discussions with Bartlet**
**(phonetic) about Lisa Lambert?**
A.  Other than the meeting that we
had?
Q.  **Right.**
A.  I'm sure I talked to him on
occasions about Lambert.
Q.  **Can you re ---?**
A.  I don't know the substance of the
conversation or anything, but, you know,
there was times where there was things
that I had to bring to his attention.

Page 93

Q.  **Right. Even if you don't know**
**what you said, what was the subject**
**matter?**
A.  Normally it was Lisa Lambert's,
whatever, did this or, you know, just
keeping him abreast of what's going on.
That way, you know, he knows just what's
going on in the institution. You know
it's his job as a Captain and normally
and as my --- not my immediate
supervisor, but one of the higher ups in
the security department, without going to
the deputy next. I would use Captain
Bartlet as like a liaison to discuss my
things, you know, with him.
Q.  **When you said --- when you made**
**reference to telling Bartlet, Lisa**
**Lambert did this or did that, were you**
**talking about did something in your**
**presence that you consider --- I think**
**you described it yesterday as being**
**unprofessional, toward you ---.**
A.  Yes. With the letters, yes.
And that was basically it. I mean that
was the brunt of the whole situation with

Page 94

Lisa Lambert was the letters that she had
written me.
Q.  **Okay. Yesterday though you**
**testified, and I'm not going to give you**
**the exact language because I didn't take**
**it down, but tell me if this isn't**
**accurate. You testified that Lisa**
**Lambert behaved unprofessionally towards**
**you in various parts of the institution;**
**is that correct?**
A.  I had stated that there was times
when she would walk down the walkways
trying to get my attention. There was a
time in the yard, or a couple times in
the yard, I worked the yard, where she
would try to get my attention just by
flirtatious movements. You know, by, you
know, she would see me, she would smile,
she would flip her hair, whatever. I
mean, that's about it.
Q.  **Did she ever reveal any part of**
**her body to you?**
A.  No.
Q.  **So you thought it was significant**
**to keep Captain Bartlet apprised of**

Page 95

1 things that Lisa Lambert had done that
2 you considered to be inappropriate toward
3 you?
4 A.  Yes.
5 Q.   Was it broader than merely those
6 letters.  I mean, for exam --- you gave
7 me the example of body language being
8 what you perceived to be flirtatious.
9 Would you report that kind of information
10 to Captain Bartlet?
11 A.   No.
12 Q.   So then what you reported to
13 Captain Bartlet was it confined to the
14 letters that you made reference to,
15 nothing else?
16 A.   The letters.  Well, as the
17 investigations went along too, I mean he
18 did have something to do with that, you
19 know, because of his role here at the
20 institution.  So up to the point where
21 OPR would come in and investigate these
22 things, he was the person that I had to
23 talk to.
24 Q.   Now, within the framework of his
25 investigation and I think you're talking

Page 96

1 about his investigation of allegations
2 made --- allegations by Lisa Lambert ---
3 A.   Allegations by Lisa Lambert.
4 Q.   --- against you?
5 A.   Exactly.
6 Q.   I think we're aware of two, at
7 least two separate investigations that
8 eventually were conducted by OPR.  One
9 was Exhibit --- was reflected in Exhibit
10 Four.
11 A.   Right.
12 Q.   And then Six was the other.  Did
13 Captain Bartlet ask you questions within
14 the framework of the investigation
15 covered by Exhibit Four?
16 A.   It depends on --- it's Captain
17 Bartlet and --- both Captain Bartlet and
18 Captain Lazenbee (phonetic) were
19 switching roles at that time, too, so
20 ---.
21 Q.   If you can't recall which one
22 asked you questions, I'll put them
23 together.  Do you have a recollection of
24 either Bartlet or Lazenbee asking you
25 questions within the framework of the

Page 97

1 investigation that is contained in the
2 report identified as Exhibit Four?
3         ATTORNEY HALLORAN:
4         Are you also including
5 anyone that was involved in the
6 investigations including Walanon
7 (phonetic)?
8         ATTORNEY KRAKOFF:
9         No.  I'm limiting it to
10 --- I'm basing --- predicating my
11 question on the Lieutenant's
12 response that Bartlet would be
13 involved in the investigation
14 before the matter was referred on
15 to OPR.  And that's what I'm
16 talking about, that part of the
17 investigation.
18 BY ATTORNEY KRAKOFF:
19 Q.   Did Bartlet or Lazenbee question
20 you about anything involving the
21 investigation contained in Exhibit Four?
22 The matter, the subject matter of the
23 investigation that was contained in
24 Exhibit Four?
25 A.   Four?

Page 98

1 Q.   Yes.  I think that was Bartlet.
2 So that it is clear, in this
3 investigation --- in this investigation
4 ---.
5 BRIEF INTERRUPTION
6 A.   In Exhibit Four the investigation
7 was not brought to my attention until OPR
8 was actually on grounds and they were
9 brought --- they brought me up on that.
10 BY ATTORNEY KRAKOFF:
11 Q.   So within the framework of Lisa
12 Lambert's allegations that you had
13 sexually harassed her, that you had
14 become obsessed with her, that you stared
15 at her, that you wrote her several notes
16 and grabbed her chest one time, and that
17 this was unwelcome harassment.  With
18 reference to that subject matter, you
19 don't have a recollection of either
20 Bartlet or Lazenbee questioning you about
21 those allegations; is that correct?
22 A.   That's correct.
23 Q.   Do you have any recollection of
24 your discussing any of those allegations
25 with them.  And that's in contrast to you

Page 99

1 being questioned, but you're discussing
2 it with them?
3 A.    No.
4 Q.    Now, let's turn to Exhibit Six.
5 That's another investigation. And this
6 is the one that concerns her allegation
7 that she was assaulted in early October
8 of 1994 in the stairway landing between
9 Luder One and Luder Two. Did you have
10 any discussions with or were you
11 questioned about this subject by either
12 Captain Lazenbee or Captain Bartlet?
13 A.    Yes.
14 Q.    Okay.
15 A.    That was Captain Lazenbee.
16 Q.    All right.
17 A.    I remember that distinctly
18 because --- I believe the only question
19 that he really asked me --- and then he
20 told me what was going on was that he had
21 asked me where my name tag was on my
22 jacket and he told me that we're going to
23 have to have an investigation. Lisa
24 Lambert has made allegations against you
25 again in regards to ---. What's the

Page 100

1 charges she was putting on me? She
2 claimed that between October 4th ---
3 between 9:00 and 10:45 while she was
4 sweeping the landing between Luder One
5 and Two that I pinned her up against the
6 wall and rammed my knee into her, okay.
7 That was basically what he told me and
8 that there was going to be an
9 investigation on that.
10 Q.    Did you speak with Captain
11 Lazenbee before you were aware then that
12 OPR was going to investigate?
13 A.    No. I mean, he told me at the
14 same time when he spoke to me.
15 Q.    That there was going to be an
16 investigation by OPR?
17 A.    Yes. Because they wanted to call
18 them in right away.
19 Q.    Where did you meet with Captain
20 Lazenbee when he asked you about your
21 name tag?
22 A.    It was in his office in
23 operations in Kurry Hall.
24 Q.    Was this something that he
25 summoned you to or did you just happen to

Page 101

1 be in the office for some other business?
2 A.    I was just in the office and he
3 called me into his office.
4 Q.    Okay. The question he put to you
5 was something about your name tag. Do
6 you recall ---.
7 A.    He asked me where my name tag
8 was.
9 Q.    Did you not have your name tag on
10 at that time?
11 A.    No, I didn't.
12 Q.    By that time, I mean the occasion
13 that you were in his office.
14 A.    No, I did not have it on.
15 Q.    Were you in his office when he
16 asked you where's your name tag?
17 A.    Yes.
18 Q.    Why were you in his office?
19 A.    Because he summons me in there
20 from --- I was in the operations area
21 doing something else and then he called
22 me into his office.
23 Q.    Okay. So I take it that the
24 impression you had was that Lazenbee had
25 observed at that time that you didn't

Page 102

1 have your name tag on?
2 A.    Right.
3 Q.    Is wearing a name tag part --- is
4 a name tag part of your uniform?
5 A.    Yes, it is.
6 Q.    Are you out of uniform if you
7 don't have a name tag on?
8 A.    Yes.
9 Q.    What was your response, if any,
10 when he asked you about your name tag?
11 A.    Well, the name tag had worn out
12 and the --- we call them frogs on the
13 back of the name tag, if you know what
14 I'm talking about. It's underneath my
15 collar, one of these little brass
16 buttons. It had worn off because I had
17 caught it on a sally port. And when I
18 did that, it ripped my name tag off. I
19 was working the sally port on occasions
20 then.
21 Q.    Okay.
22 A.    And due to the fact that it
23 wouldn't stay on my jacket, I had removed
24 it.
25 Q.    Had it fallen off your jacket

Page 103

1  prior to ---?
2  A.   Just hanging down on one side.
3  Q.   Okay.  And that's --- the name
4  tag has two clips on the back?
5  A.   Yes, it does.
6  Q.   Okay.  And those are the things
7  that you refer to as the frogs?
8  A.   Yes.
9  Q.   You had caught the name tag on an
10 object?
11 A.   The fence line in the sally port
12 below --- on the door itself.
13 Q.   That separated --- well, is the
14 frog attached to the name tag?
15 A.   No, it's not.  It's got a little
16 indentation on the name tag where the
17 frog catches on to it.  You can see, that
18 was worn away.
19 Q.   Okay.  Was that worn away --- was
20 that --- now, when somebody says worn
21 away, that indicates to me that over some
22 period of time something has happened.
23 A.   Right.  It was --- you know, I
24 had been at the institution for over two
25 years and I had the same name tag.  And

Page 104

1  you put it on and off, you know, a lot.
2  Q.   So was it your catching it on ---
3  in the sally port area, was that simply
4  the straw that broke the camel's back?
5  A.   That's the final straw, yes.
6  Q.   When was it that --- how many
7  days before your conversation with
8  Captain Lazenbee had the name tag come
9  loose in the sally port area?
10 A.   I really don't know how many
11 days.
12 Q.   Had it happened that day?
13 A.   No, no.
14 Q.   Had it happened the day before?
15 A.   I would say maybe around a month.
16 A month before.
17 Q.   How long had it been since you
18 had last worn your name tag?
19 A.   It was a month before.
20 Q.   About a month?
21 A.   Uh-huh (yes).
22 Q.   Okay.  Now, I see that you have a
23 name tag on your shirt?
24 A.   Yes.
25 Q.   Is there another name tag then

Page 105

1  that was on the jacket?
2  A.   Yes.
3  Q.   It was the name tag on the jacket
4  that you're referring?
5  A.   Yes, it is.
6  Q.   Is that the only name tag that's
7  on the jacket?
8  A.   Yes.
9  Q.   Was that a jacket that you ---
10 when you were in uniform and were wearing
11 the jacket, was that jacket something
12 that you buttoned or zipped?
13 A.   I zipped it.
14 Q.   Okay.  So that when your jacket
15 was on and it was zipped, a person
16 couldn't see the name tag if it was on
17 the shirt underneath; correct?
18 A.   Correct.
19 Q.   Was there a name tag on any other
20 part of your uniform, your hat or your
21 slacks or any other part of your uniform?
22 A.   No, just my shirt.
23 Q.   So with the name tag not on the
24 jacket, there wouldn't have been a name
25 tag when you were wearing the jacket that

Page 106

1  would have been visible?
2  A.   Exactly.
3  Q.   Were you aware at that time prior
4  to meeting with Captain Lazenbee that you
5  were out of uniform without your name tag
6  on?
7  A.   I really wasn't like saying, oh
8  my gosh, I need my name tag on my jacket
9  now.
10 Q.   Okay.  But my question is, were
11 you aware that not having a name tag on
12 your jacket made you out of uniform
13 under the policies of the DOC?
14 A.   Yes.
15 Q.   Did that subject you to potential
16 discipline of any sort?
17 A.   No.
18 Q.   Was it unusual at that time for
19 an officer not to have a name tag on his
20 jacket?
21 A.   No.
22 Q.   So there were a significant
23 number of other officers on any given day
24 who wouldn't have a name tag on their
25 jacket?

Page 107

1 A.    Yes. I mean, there are times I
2 hold roll call and there are people
3 without name tags on their jackets.
4 Q.    What do you tell them?
5 A.    That you need to order a name
6 tag.
7 Q.    Where was the name tag after the
8 incident approximately a month before in
9 the sally port, what did you do with the
10 name tag?
11 A.    I was sitting on my dryer at
12 home.
13 Q.    For that whole time?
14 A.    Yes. I didn't know it at the
15 time. As a matter of fact, I didn't know
16 where the location of my name tag was.
17 And it was my wife that found it sitting
18 on the dryer. Because after I was
19 questioned about the name tag, it took me
20 about three or four days before I could
21 locate it. And there it was on the
22 dryer. I mean, you know how you stack
23 things on the dryer and there was a lot
24 of stuff on there and the name tag was
25 underneath some items that were on my

Page 108

1 dryer.
2 Q.    Now, did you have an extra name
3 tag?
4 A.    I had two issued to me, sir, and
5 I had the one on my shirt.
6 Q.    The one was on your shirt.
7 A.    Correct.
8 Q.    How do you go --- at that time,
9 how would you go about ordering a name
10 tag, what was the procedure?
11 A.    I would think you would go
12 through personnel or the captain, I'm not
13 positive. Now we just have them made on
14 the institution itself. We didn't have a
15 sign making shop then or anything like
16 that, so ---.
17 Q.    So that would have been man ---
18 the name tag with your name on it would
19 have been manufactured outside of the
20 institution?
21 A.    Correct.
22 Q.    Do you recall why you didn't ---
23 after that incident you were aware,
24 weren't you, after the incident for
25 approximately a month that you didn't

Page 109

1 have a name tag on your coat?
2 A.    Yes.
3 Q.    Do you recall why you didn't take
4 steps to order a replacement tag?
5 A.    Just a matter of not ordering it.
6 I couldn't give you a specific reason why
7 I didn't order one. I just didn't do it.
8 I think I said that --- when I was called
9 into Captain Lazenbee's office, it wasn't
10 the reason that I didn't have a name tag
11 why he called me in there. It was
12 because of the allegation that a name tag
13 brushed up against Lisa Lambert. You
14 know, her allegations of me beating her
15 up in the stairwell that he called me in.
16 And that was why he specifically asked me
17 where is your name tag.
18 Q.    Apart from whatever Mr. Halloran
19 just told you, how do you know why
20 Captain Lazenbee called you into the
21 office that day?
22 A.    I didn't know that at the time.
23 When he called me in?
24 Q.    Yes.
25 A.    I'm speculating that. That was

Page 110

1 the reason why he asked me about my name
2 tag because that was part of the
3 investigation or something that Lisa
4 Lambert had alleged during the time.
5 That's why he had asked me about it.
6 Q.    So you're speculating then that
7 that's the reason?
8 A.    Well, I mean, that the
9 investigation started right after. You
10 know, he said that he told me at the same
11 time I was in the office that OPR was
12 coming in to investigate.
13 Q.    Did he ask you how long your name
14 tag had been missing?
15 A.    I don't remember.
16 Q.    Did he take any notes when he
17 spoke with you?
18 A.    I couldn't tell you, sir.
19 Q.    Did he tell you at that time that
20 one of the allegations was that you had
21 injured Lisa Lambert with your name tag?
22 A.    Yes.
23 Q.    Did he ask you whether you had
24 injured her with your name tag?
25 A.    No, he did not. He asked me if I

Page 111

1 knew where my name tag was and he felt
2 that Lisa Lambert had my name tag.
3 Q.   What did you tell him?
4 A.   That's impossible.
5 Q.   What was that?
6 A.   Because it didn't happen.
7 Q.   No, but how do you know that Lisa
8 didn't have your name tag?
9 A.   Well, I didn't know where it was,
10 but I knew it wasn't in the institution,
11 it was at home somewhere.
12 Q.   How did you know that?
13 A.   Because I took it off and left it
14 at home.
15 Q.   Was it your practice to take your
16 coat home with you?
17 A.   Yes, it was.
18 Q.   And you recall taking it off
19 while you were at home?
20 A.   I recall I left it at home.  I
21 recall taking it off of my jacket.
22 Q.   If a name tag were somewhere on
23 the grounds, that's something that an
24 inmate shouldn't come into possession of;
25 correct?

Page 112

1 A.   Correct.
2 Q.   So you knew before you were
3 questioned --- strike that.
4        Were you eventually questioned by
5 somebody at OPR?
6 A.   Yes.
7 Q.   Do you recall who questioned you
8 about the October incident?
9 A.   Mike Walanon.  He started the
10 investigation and it ended with Mark
11 Datson (phonetic), or Mike Datson, sorry.
12 Q.   Did Mr. Walanon bring up the
13 issue of your name tag?
14 A.   Yes, he did.  He said that I need
15 the name tag.  I need to see what you
16 mean that the name tag if it was
17 malfunctioning.  I needed to see how it
18 was malfunctioning.
19 Q.   Before he brought up the question
20 --- before he told you that he needed to
21 see the name tag, did Mike Walanon tell
22 you why it was significant for him or why
23 he wanted to see the name tag?
24 A.   No.  I don't know if it was Lisa
25 Lambert that told him that she had the

Page 113

1 name tag or what brought that on.  I have
2 no idea.  I don't know what the
3 significance was other than the fact that
4 they felt that one of her injuries were
5 caused by my name tag, or she was
6 claiming that through her accusations.
7 Q.   Well, then you --- didn't you ---
8 you knew from your conversation with and
9 the question from your conversation with
10 Captain Lazenbee that the name tag was
11 somehow involved in Lisa Lambert's
12 allegations against you?
13 A.   Correct.
14 Q.   Didn't Captain Lazenbee tell you
15 that the name --- that your name tag had
16 allegedly somehow became separated during
17 that situation in the stairwell?
18 A.   Did he tell me that it became
19 separated during that time in the
20 stairwell?
21 Q.   Yes.
22 A.   No.
23 Q.   Did he tell you that the name tag
24 had allegedly cut her during the
25 situation in the stairwell?

Page 114

1 A.   Not cut her.  He said that it
2 caused an injury to her.  She was
3 claiming it caused an injury to her.
4 Q.   But Captain Lazenbee didn't tell
5 you that --- strike that.
6        Did you bring the name tag to
7 Mike Walanon?
8 A.   Yes, I did.
9 Q.   And it was the same name tag?
10 A.   Yes, it was.
11 Q.   What did you show him?  Did you
12 show him how the back had worn out?
13 A.   Yes, I did.
14 Q.   Did he ask you when was the last
15 time you had worn that name tag?
16 A.   I can't remember if he asked me
17 that or not.
18 Q.   Did you --- do you recall telling
19 him when the last time was that you wore
20 the name tag?
21 A.   I can't recall.
22 Q.   But before you met with Mr.
23 Walanon, you knew that the name tag was
24 going to somehow be involved in that
25 investigation though?

Page 115

1  A.    Yes, I did.
2  Q.    **Was there a rule in this**
3  **institution at that time that if OPR was**
4  **going to conduct an investigation the**
5  **person at this institution was not**
6  **supposed to question the subject of the**
7  **investigation?**
8  A.    I didn't know that, sir, no.
9  Q.    **Is that the rule now?**
10 A.    To as far as what?
11 Q.    **At Cambridge Springs, that if the**
12 **insti --- if OPR is going to investigate,**
13 **that institutional people are not**
14 **supposed to question institutional**
15 **personnel about them.**
16        ATTORNEY HALLORAN:
17        I'm going to object to
18 the form of the question. You're
19 taking the question out of
20 context. The individual that
21 he's talking about, he talked to,
22 was security ---.
23        ATTORNEY KRAKOFF:
24        I understand that. I'm
25 including him. Was there a rule

Page 116

1  --- I'll ask him more
2  specifically.
3  BY ATTORNEY KRAKOFF:
4  Q.    **Was there a rule that if OPR was**
5  **going to conduct an investigation that**
6  **nobody, including the security captain**
7  **was supposed to question the officer or**
8  **the other staff member who was going to**
9  **be the subject of the investigation?**
10 A.    I don't know the rule of the
11 security captain's position.
12 Q.    **Okay.**
13 A.    I don't know. I know up to the
14 point of the investigation.
15 Q.    **Right.**
16 A.    They're the ones that have to
17 collaborate everything that's going to be
18 involved with the investigation.
19 Q.    **Right.**
20 A.    In order to make the decision
21 through the deputy and the superintendent
22 of whether or not they're going to go up
23 to OPR with that. So I'm sure there are
24 some significant questions that need to
25 be answered prior to OPR coming in.

Page 117

1  Q.    **Were you questioned by anybody on**
2  **the institutional level after OPR came in**
3  **about the October incident?**
4  A.    No.
5  Q.    **Do you have any recollection of**
6  **ever telling Captain Lazenbee about ---**
7  **I'm excluding this October incident and**
8  **I'm excluding the letters that you**
9  **referred to. Apart from those areas, did**
10 **you have --- at any point, did you**
11 **discuss with Captain Lazenbee any**
12 **perceived inappropriate behavior on the**
13 **part of Lisa Lambert towards you?**
14 A.    No.
15 Q.    **Apart from the letters and apart**
16 **from the October incident, did you have**
17 **any discussions or conversations with**
18 **Captain Bartlet about any perceived**
19 **inappropriate behavior on the part of**
20 **Lisa Lambert toward you?**
21 A.    No.
22 Q.    **Given the fact that she was**
23 **acting in the way that you thought was**
24 **flirtatious towards you on occasion, why**
25 **didn't you report that in an**

Page 118

1  **extraordinary occurrence report?**
2        ATTORNEY HALLORAN:
3        Objection. You asked
4  that numerous times yesterday and
5  he answered it numerous times
6  yesterday.
7        ATTORNEY KRAKOFF:
8        I don't remember the
9  answer.
10        ATTORNEY HALLORAN:
11        He said it was part of
12 his job to be able to deal with
13 it.
14        ATTORNEY KRAKOFF:
15        I'm sorry?
16        ATTORNEY HALLORAN:
17        He said it was part of
18 his job to be able to deal with
19 that type of situation.
20 BY ATTORNEY KRAKOFF:
21 Q.    **On your own?**
22 A.    Yes, sir.
23 Q.    **Now, let me go back to something**
24 **I had asked you yesterday. I had asked**
25 **you whether you had testified in the**

Page 115 - Page 118                    **Sargent's Court Reporting Service, Inc.**

Page 119

1 criminal proceedings involving CO Icker.
2 I believe your testimony was that you
3 didn't; correct?
4 A.  I didn't testify, right.
5 Q.  Now, did you testify in any habea
6 corpus, post conviction relief act
7 proceedings, during any other proceedings
8 that were brought on behalf of Lisa
9 Lambert?
10 A.  No. Well, the one down in
11 criminal? Would that be down in
12 Lancaster? I went down to Lancaster.
13 Q.  Okay.
14 A.  Yes.
15 Q.  And did you provide testimony
16 there?
17 A.  Yes, I did.
18 Q.  And do you recall what the
19 subject matter --- what the area was that
20 you were testifying about?
21 A.  I believe that Lisa Lambert was
22 claiming that I did not --- she didn't
23 write me a letter.
24 Q.  Okay. Let me call your attention
25 --- so then was the subject of your

Page 120

1 testimony about whether Lisa had written
2 you a letter?
3 A.  Yes.
4 Q.  Now, let me refer you to Exhibit
5 One which has two pages. One is the
6 extraordinary occurrence report that you
7 prepared; correct? The first page.
8 A.  I initiated it, yes, sir.
9 Q.  Right. And then attached to that
10 was a letter.
11 A.  Correct.
12 Q.  Did you attach that letter or a
13 copy of that letter to the report or ---?
14 A.  No, sir. That was the shift
15 commander that attached it when I handed
16 it in.
17 Q.  Okay.
18 A.  He's the one that made a decision
19 to attach it.
20 Q.  Okay. Now, I recall your
21 testimony yesterday was that when you
22 received that letter from Campbell. I
23 think it was Campbell ---.
24 A.  Inmate Campbell, yes, sir.
25 Q.  Right. When you received that

Page 121

1 letter, you didn't --- it was folded and
2 you did not read the text of the letter
3 ---
4 A.  I did not.
5 Q.  --- before taking it to
6 Lieutenant Mort; ---
7 A.  Correct.
8 Q.  --- is that correct? Okay. And
9 then when you took it to Lieutenant Mort,
10 did he open the ---
11 A.  He opened the letter in my
12 presence.
13 Q.  --- letter in your presence? And
14 he read it out loud?
15 A.  Yes, he did.
16 Q.  Okay. And was this the letter,
17 this one that was attached to Exhibit
18 One, the one that begins, hey, sexy, how
19 are you? I'm okay. Just sort of bored
20 and it goes on from there. Is this the
21 letter that you testified about in
22 Lancaster?
23 A.  Yes, it was.
24 Q.  Now, there was another --- there
25 was another exhibit which is Two, dated

Page 122

1 June 25, 1993, and I believe that you
2 testified yesterday that this is a report
3 --- an extraordinary occurrence report
4 that you initiated; correct?
5 A.  Yes.
6 Q.  And the description of the
7 incident is in your hand; is that
8 correct? You wrote that?
9 A.  Yes.
10 Q.  Okay.
11 A.  On the bottom portion ---
12 Q.  The bottom.
13 A.  --- is a description of incident.
14 Q.  Yes. You wrote on the above
15 stated date and time, Inmate Campbell,
16 you give her number, attempted to pass a
17 note to this writer stating here's a
18 letter from Lisa and you go on from
19 there. Then you testified that you
20 replied, no, thanks and then wrote Inmate
21 Campbell then stated that Inmate Lambert
22 have regrets ---
23 A.  Would have regrets.
24 Q.  --- would have regrets. Is there
25 a would in there?

Page 123

1 A.   No, there's no would.

2 Q.   **That's what you meant?**

3 A.   Yes.

4 Q.   **Would have regrets by this writer**
5 **denying the letter. Did you mean by you**
6 **not taking the letter?**

7 A.   Yes.

8 Q.   **This is now the second letter**
9 **written to this officer in one week's**
10 **time period. Okay. That letter you did**
11 **not accept and you never at any point**
12 **came in the possession of that letter;**
13 **correct?**

14 A.   No, I did not.

15 Q.   **And you never at any point came**
16 **in possession of a photocopy of that**
17 **letter; correct?**

18 A.   No, sir.

19 Q.   **Okay.**

20 A.   There is a reason for that.

21 Q.   **Okay. Why don't you ex --- I**
22 **think you talked about that yesterday,**
23 **but go ahead.**

24 A.   Yeah, because once the letter I
25 took down the first time, I was told not

Page 124

1 to accept anything from inmates. Which I
2 knew prior to that and ---.

3 Q.   **Lieutenant Mort told you that?**

4 A.   Yes.

5 Q.   **Okay. Now, this situation**
6 **occurred in the dietary area; correct?**

7 A.   It was right outside of dietary's
8 main entrance, sir.

9 Q.   **Okay. The first situation you**
10 **identified the area as dietary; correct?**

11 A.   Yes, sir.

12 Q.   **Was that inside the dietary?**

13 A.   It was outside of the dietary at
14 the main entrance.

15 Q.   **If you can describe the scene to**
16 **me, where is the main entrance in**
17 **relation to walkways?**

18 A.   There's only one main entrance
19 that doesn't --- there's no drop off that
20 goes into any doors in the building.
21 It's a straight shot into the front of
22 the building facing the access road that
23 runs through the institution.

24 Q.   **Where is that in relation to the**
25 **yard?**

Page 125

1 A.   It's approximately 100 yards
2 north of the yard.

3 Q.   **What was your assignment that**
4 **day? I think you testified yesterday**
5 **that on the 20th of June 1993, you were**
6 **working in dietary; correct?**

7 A.   That wasn't my assignment. I
8 don't know what my assignment was that
9 day.

10 Q.   **Well, what were you doing in that**
11 **area?**

12 A.   I was assigned there for the
13 dietary meal.

14 Q.   **Oh, all right. That's what I**
15 **meant.**

16 A.   Right. But not for a whole day's
17 eight-hour shift period.

18 Q.   **Then with respect to the June**
19 **25th incident where there was an attempt**
20 **to pass a note to you, were you also**
21 **working in dietary that day?**

22 A.   Yes.

23 Q.   **Okay. Then there's a third**
24 **incident July 21, 1993. Why don't you**
25 **read that?**

Page 126

1 A.   On the above stated date and time
2 Inmate Gunderson (phonetic) 086877
3 approached this writer and stated that I
4 heard everything between you and Lisa
5 Lambert are okay. I then stated that
6 yes, she did apologize to me at the yard
7 on 7/20, which was the date prior, '93
8 for a prior incident involving Lambert
9 0B6416 having a letter which she had
10 written and delivered. And I referred to
11 an EO that was written on 6/20.

12 Q.   **Okay.**

13 A.   Inmate Gunderson then proceeded
14 that she was very close friends with
15 Inmate Lambert and that Lambert had plans
16 to get personal with this officer. And
17 that she was planning to build with this
18 officer, Inmate Gunderson ---

19 Q.   **What did you mean build?**

20 A.   --- build a relationship with
21 this officer. Inmate Gunderson was then
22 told by this officer that Lambert has
23 already been warned about getting
24 involved with officers personally. At
25 this time the above information was

Page 123 - Page 126                    **Sargent's Court Reporting Service, Inc.**

Page 127

1 provided to Captain Lazenbee and shift
2 commander Lieutenant Mansky. A meeting
3 was then decided to be held with Inmate
4 Lambert and a final warning was given on
5 Inmate Lambert's acts.
6 Q.    Then there was a meeting;
7 correct?
8 A.    Yes, sir.
9 Q.    Now, let me go to the letter
10 that's attached to Exhibit One. She
11 writes, how are you, I'm okay, just sort
12 of bored. I never see you much anymore
13 because of this crazy thing they have you
14 doing now. Do you have any idea what
15 this is referring to, this crazy thing
16 they have you doing now?
17 A.    I'm working a different shift I
18 believe.
19 Q.    What shift had you been working?
20 A.    6:00 to 2:00.
21 Q.    Okay. What shift were you
22 working during this time period, the time
23 period of this letter?
24 A.    She says she doesn't see me
25 anymore, I would have to guess it would

Page 128

1 be midnights, 10:00 to 6:00.
2 Q.    Was there a period of time that
3 you had been shifted to midnight?
4 A.    Yes.
5 Q.    Okay. And do you recall when
6 that occurred?
7 A.    No, I don't.
8 Q.    Well, this was June 20th of 1993
9 and had it been a matter of a few days, a
10 couple of weeks, a few months?
11 A.    I don't know the specifics, sir.
12 Q.    Okay. The roster would reflect
13 that?
14 A.    It would reflect that, yes.
15 Q.    Then she wrote, I wonder if I'm
16 ever going to start seeing you days
17 again. Do you think you'll be out at the
18 run-a-thon? Do you know what the run-a-
19 thon was?
20 A.    Yes. It's a function that we put
21 on to raise funds for different
22 charities.
23 Q.    What does that consist of
24 briefly? Who participates in it?
25 A.    Staff, people outside the

Page 129

1 institution. We welcome the community in
2 the run, inmates also.
3 Q.    Is that something that if you run
4 so much ---
5 A.    So many miles.
6 Q.    --- they give you so much money
7 per mile or give you a flat rate?
8 A.    Yes.
9 Q.    Okay. Is that something that had
10 been done --- was this the first run-a-
11 thon or had it been done the year before
12 that, do you remember?
13 A.    No, I don't.
14 Q.    Is this something that had ---
15 was advertised or posted that there would
16 be run-a-thon?
17 A.    I believe. I don't participate
18 in the run-a-thon, so ---.
19 Q.    Have you ever participated?
20 A.    No.
21 Q.    She says I hope you're out there.
22 I'll let you go. Hope I see you soon,
23 try to stay awake and then she says ---
24 it closes, see you sexy and then there's
25 some ---.

Page 130

1 A.    Me.
2 Q.    Me. Okay. Do you recall how
3 long after the incident --- after the
4 letter attached to Exhibit One you were
5 reassigned back to the day shift?
6 A.    No, I don't.
7 Q.    You don't know if it was a matter
8 of days or weeks or months?
9 A.    No, but it would be reflected on
10 the schedule. Now, it must have been
11 within six months or so. What is this,
12 '93 and that incident was '94. It could
13 have been anytime in between there
14 because I working day turn as a Sergeant
15 in '94.
16 Q.    At the time of the October 1994
17 --- or the alleged incident of October of
18 1994, you were working day turn?
19 A.    Yes.
20 Q.    Are you aware of the dormitory
21 where Lisa Lambert was housed at
22 Cambridge Springs between January of '93
23 and October of '94?
24 A.    I don't know if she was in Luder
25 or Cosmore. She could have been in

Page 131

1 either one. It probably was Luder. I'm
2 not sure when they opened the building or
3 anything, so ---.
4 Q.  Why do you say it was probably
5 Luder?
6 A.  Because that was later, I think
7 around '94, because once Luder opened,
8 she was moved over there, I believe.
9 Q.  What makes you recall that?
10 A.  Because Cosmore became a
11 treatment center for inmates. Due to the
12 fact that her level was a Z code, because
13 she was a lifer, I believe they moved her
14 up there in a single cell around that
15 time. I'm not positive though.
16 Q.  Okay. Do you have any
17 recollection of ever seeing Lisa Lambert
18 while over at Luther --- Luder Hall?
19 A.  Yes.
20 Q.  Did you see her in the context of
21 her working or her apparently residing
22 there or some other ---?
23 A.  She was just housed there.
24 Q.  So then you did she her at some
25 point --- you don't know whether it was

Page 132

1 between January of '93 and October of '94
2 that you saw her?
3 A.  If she was being housed there, I
4 probably did.
5 Q.  But you don't have a specific
6 recollection?
7 A.  I don't have the specific dates
8 or anything.
9 Q.  No, no. But do you have a
10 specific recollection that she was housed
11 during the time period between January of
12 '93 and October of '94 that at some point
13 during that time period she was living in
14 Luder?
15 A.  Yes.
16 Q.  And you know that because you saw
17 her over there?
18 A.  Yes.
19 Q.  Was she still in a cell or was
20 she in a dormitory when you saw her?
21 A.  Cell --- dormitory. Well, there
22 all cells. It's a cell in a dormitory.
23 Q.  Is it like a dormitory setting
24 with individual cells?
25 A.  It's a dormitory that has doors

Page 133

1 removed off of the hinges, there's no
2 doors.
3 Q.  Okay. Now, ---.
4 A.  I didn't see her in the cell. I
5 saw her in the dayroom. In the dormitory
6 itself.
7 Q.  Okay. In the dormitory itself,
8 did she act in any --- when you did see
9 her, did she act in what you considered
10 an inappropriate way towards you?
11 A.  She would do her same, talking to
12 her friends and giggling, things like
13 that to try to get my attention. Yes,
14 sir.
15 Q.  Now, I had asked you yesterday
16 about the fourth floor of Luder Hall and
17 that was not occupied at least during
18 some part of the period between January
19 of '93 and October of '94?
20 A.  Correct.
21 Q.  Was that most of the period or
22 all of the period?
23 A.  I don't know.
24 Q.  Now, were you --- were officers
25 --- despite the fact that it wasn't

Page 134

1 occupied, were officers nevertheless
2 still supposed to make rounds through the
3 fourth floor as part of inside perimeters
4 check to go through the floors at that
5 time?
6 A.  Now, it's not.
7 Q.  Were there occasions when you
8 went through the fourth floor during the
9 period that it was unoccupied?
10 A.  Only during construction. The
11 time that they were doing construction up
12 there.
13 Q.  When was that?
14 A.  I really couldn't be specific. I
15 mean, it's probably right prior to them
16 opening it up. Because they did it one
17 floor at a time.
18 Q.  Was there a period between
19 January of '93 and October of '94 that
20 you did go through the fourth floor while
21 it was not unoccupied on a round?
22        ATTORNEY HALLORAN:
23        Could you read back that
24 question?
25        ATTORNEY KRAKOFF:

Page 135

1        Was that not
2 comprehensible?
3        ATTORNEY HALLORAN:
4        Let's go off the record
5 for a second.
6 OFF RECORD DISCUSSION
7 A.   On occasions. It wasn't like a
8 daily routine.
9 BY ATTORNEY KRAKOFF:
10 Q.   **Did you ever see Lisa Lambert on**
11 **the fourth floor while it was unoccupied?**
12 A.   No.
13 Q.   **Did you consider Lisa Lambert to**
14 **be physically attractive?**
15 A.   No.
16 Q.   **How did you view her ---**
17 A.   As an inmate.
18 Q.   **--- from a physical standpoint?**
19 A.   As an inmate. I don't make
20 assumptions on inmates. I treat them all
21 the same.
22 Q.   **Not in terms of treating them,**
23 **but when you look at inmates you just see**
24 **them as inmates and you don't see one as**
25 **being attractive or pretty and others as**

Page 136

1 **not?**
2 A.   Some inmates are not attractive.
3 I wouldn't consider them attractive, no.
4 Q.   **Now, are you aware of what Lisa**
5 **Lambert's job was in May of 1993?**
6 A.   No.
7 Q.   **During any part of 1993?**
8 A.   I don't know. I know she was
9 working detail in '94 because that's when
10 she claimed that --- that's the only part
11 that I knew. I never followed her
12 schedule.
13 Q.   **Do you know that she was working**
14 **detail in October of '94 just because she**
15 **alleged that or did you know that**
16 **independently that she was working the**
17 **detail?**
18 A.   I knew that because she had a
19 broom in her hand when I was walking up
20 through the stairwell one day.
21 Q.   **Okay. Was that in October?**
22 A.   I don't know.
23 Q.   **Did you see her on more than one**
24 **occasion where she had a broom in her**
25 **hands while you were walking up the**

Page 137

1 **stairwell?**
2 A.   Not that I can recall.
3 Q.   **Where was the location of that**
4 **stairwell?**
5 A.   It was the main stairwell going
6 up on the, let's see, on the west center
7 stairwell. That's the main stairwell
8 that we use and the only stairwell that
9 we use.
10 Q.   **Is that the same or a different**
11 **stairwell that Lisa Lambert alleged the**
12 **incident in October occurred?**
13 A.   The same.
14 Q.   **Why don't you describe what you**
15 **recall about the day that you saw her**
16 **with a broom in her hand. Why don't you**
17 **start from the beginning at the point of**
18 **which you first saw her.**
19 A.   Okay. From the time I saw her?
20 Q.   **Yes.**
21 A.   I just come off the first floor
22 doing my security rounds and I was
23 walking up to the second floor. And as
24 you're walking up the stairs, you know,
25 you're looking down at the stairs and

Page 138

1 when I hit about the third or fourth
2 stair, somewhere around there, because I
3 think there's only like eight or ten
4 steps going up, I was about close to
5 halfway up the stairs and the movement
6 caught my eye and I looked up.
7 Q.   **The movement of what?**
8 A.   Her broom, her foot, whatever. I
9 mean, you got peripheral vision, you use
10 it especially working in an area like
11 this, you're aware of your surroundings.
12 Q.   **She was above ---?**
13 A.   She was above me. She was ---
14 the stairwell, there's two sets of steps
15 in between each floor. So you have a
16 landing here and then you go up into the
17 second floor.
18 Q.   **She was in the second series of**
19 **steps?**
20 A.   She was coming --- yeah, she was
21 coming down the second series and I was
22 going up.
23 Q.   **And after some movement caught**
24 **your eye, what happened?**
25 A.   I looked up and when I saw that

Page 139

1  it was Lambert I just basically put my
2  head down and I walked around the stairs
3  and went right up into the second floor.
4  Q.  You say you walk --- I don't know
5  what you mean by walked --- because I'm
6  not familiar with the stairwell. You
7  said you walked around the stairs? What
8  does that mean?
9  A.  I walked up the stairs, around
10 the landing, and then up the second set
11 of steps.
12 Q.  Did you pass her?
13 A.  I passed her.
14 Q.  Okay.
15 A.  She was on my left-hand side
16 looking down over the stairwell rail. As
17 I walked by I just kind of give a little
18 glimpse and walked by.
19 Q.  Okay. Did you have any physical
20 contact with her?
21 A.  None.
22 Q.  Did she say anything?
23 A.  No.
24 Q.  Did she look at you in any
25 unusual way?

Page 140

1  A.  No. Well, let me rephrase that
2  because when I looked up she was looking
3  down at me.
4  Q.  Okay.
5  A.  She was looking down at me.
6  Q.  Staring at you?
7  A.  I don't know. I only looked up
8  for a second, a little glance.
9  Q.  Then you walked by?
10 A.  Yes.
11 Q.  So it was not an eventful
12 occasion; correct? I mean, there was
13 nothing that occurred of an unusual
14 nature in your mind?
15 A.  Well, to me it was. I got the
16 willies.
17 Q.  Why did you get the willies?
18 A.  Because she had already put
19 claims against me which were untrue on,
20 you know, the other occasion and stuff
21 and I just felt uneasy. You know, you
22 get that uneasy feeling if someone puts
23 you through something as traumatic as
24 going through an investigation when it's
25 only allegations on the part of the

Page 141

1  inmate. When you've been put through this
2  time and time again with her, you know,
3  you're going to get an uneasy feeling
4  being around someone like that,
5  especially in a stairwell where all
6  that's between you is, you know, the
7  officer on the second floor and the
8  officer on the first floor.
9  Q.  Okay. Could either the officers
10 on the first floor or the second floor,
11 were they positioned inside this
12 stairwell or were they ---?
13 A.  They were positioned right
14 outside of the stairwell at the officer's
15 station.
16 Q.  Okay. From where they were,
17 assuming that they were at the stations,
18 would they have been in a position to see
19 you walking up and past her?
20 A.  Yes. At that point?
21 Q.  Yes.
22 A.  Where she was standing and where
23 I walked around her, yes, the officer on
24 the second floor could see into the
25 stairwell.

Page 142

1  Q.  Do you recall who that officer
2  was?
3  A.  No, I don't.
4  Q.  Okay.
5  A.  And I've beaten myself up for it
6  because I don't know who he is.
7  Q.  Were you asked during the
8  investigation whether you ever had an
9  occasion where you were in the stairwell
10 at the same time as Lisa Lambert?
11 A.  Yes. During my polygraph test
12 hearing I was asked during that time.
13 Q.  Okay.
14 A.  I was asked during the
15 investigation prior to the polygraph
16 before I decided to go ahead and take the
17 polygraph. And that was pretty much it.
18 During the investigation that's when they
19 asked me.
20 Q.  Okay.
21 SHORT BREAK TAKEN
22 BY ATTORNEY KRAKOFF:
23 Q.  During the time period of October
24 of 1994 was it the practice of this
25 institution for there to be roll call for

Page 143

1 the officers?
2 A.   Yes.
3 Q.   And as part of the roll call,
4 were all of the officers on the shift
5 expected to report to the roll call?
6 A.   Yes.
7 Q.   This is something that had
8 existed ever since you were at this
9 prison?
10 A.   First day.
11 Q.   Right. As part of the roll call,
12 do you have --- are the officers expected
13 to line up on some way or how ---?
14 A.   Yes, we do.
15 Q.   Okay. What, in some sort of a
16 straight row or several rows?
17 A.   Usually two rows, but back then I
18 think it was just one.
19 Q.   Okay. Were your uniforms
20 inspected as part of this?
21 A.   No, they were not.
22 Q.   Okay. Has that practice --- is
23 that still not the practice to inspect
24 the ---.
25 A.   It's still not the practice. We

Page 144

1 have the option of doing it, but we don't
2 do it. With a new uniform policy that's
3 coming out, again another change, there
4 will be inspections for uniforms. And
5 that's once our new uniforms come in.
6 Q.   Okay. Now, had you made that
7 trip up the stairwell before on other
8 occasions or just the one occasion?
9 A.   Yes.
10 Q.   Was that the only time you saw
11 Lisa Lambert in the stairwell?
12 A.   Yes.
13 Q.   The note that was attached to
14 Exhibit One, it was read to you. When
15 was the first time that you actually read
16 the note yourself?
17 A.   Right after he read it to me.
18 Q.   Did he hand it to you?
19 A.   Yes.
20 Q.   And did he ask you whether you
21 recognized the handwriting?
22 A.   No.
23 Q.   Did he ask you whether you had an
24 understanding of who had prepared the
25 note?

Page 145

1 A.   I thought it was Lisa Lambert.
2 Q.   Right. Did he ask you that
3 though?
4 A.   No.
5 Q.   Was there any discussion where
6 you told the Lieutenant who you thought
7 had written that note?
8 A.   Who I thought?
9 Q.   Yes.
10 A.   The Lieutenant as in Lieutenant
11 Mort, the one I hand delivered it to?
12 Q.   Yes, Lieutenant Mort.
13 A.   I don't recall.
14 Q.   Other than Lieutenant Mort, was
15 there anybody else in the office when you
16 handed the note to him?
17 A.   I don't recall.
18 Q.   Did you hand the note to
19 Lieutenant Mort shortly after you were
20 given the note?
21 A.   As soon as I got the note?
22 Q.   Yes.
23 A.   It takes me about --- what's it
24 close to a minute to walk down to the
25 office. That's when I handed it to him.

Page 146

1 You can see that the time is 0500 hours
2 that I wrote on there and that's when the
3 inmates were taken up to dietary and
4 that's when I wrote the incident report.
5 Q.   I'm sorry. You said that's when
6 the inmates were taken to dietary?
7 A.   That's when the inmates come up
8 to dietary to work. That's when Denise
9 Campbell is reporting to work.
10 Q.   Were there not any inmates in the
11 dining hall yet eating?
12 A.   No. Nobody was eating. She's a
13 worker there. She prepared breakfast.
14 Q.   That's five o'clock in the
15 morning?
16 A.   Yes.
17 Q.   If it was five o'clock in the
18 morning I can make the --- draw the
19 inference from this that you were working
20 the evening shift at that point; correct?
21 A.   Possibility, yes.
22 Q.   Were there occasions that you
23 began work at 5:00 when you were working
24 the 6:00 a.m. to ---?
25 A.   No. No.

Page 147

1 Q. I'm sorry. When did your shift
2 start, 8:00 a.m.?
3 A. My shift started at --- I'm
4 presuming since I'm working nights here
5 at ---.
6 Q. No, but when you worked days,
7 when did that start?
8 A. 6:00 in the morning.
9 Q. That's what I thought.
10 A. Yes.
11 Q. Were there times when you worked
12 the 6:00 a.m. to 4:00 that you, and I'm
13 going to ask this in two ways, where you
14 actually began to work at 5:00?
15 A. No.
16 Q. Were there occasions when you
17 worked the evening shift and then worked
18 6:00 a.m.?
19        ATTORNEY HALLORAN:
20           You had said --- did you
21 say until ---?
22 A. The shifts are broken down to
23 6:00 to 2:00, 2:00 to 10:00 ---
24 BY ATTORNEY KRAKOFF:
25 Q. Right.

Page 148

1 A. --- and then 10:00 to 6:00.
2 Q. 10:00 to 6:00.
3 A. So if I was working 10:00 to 6:00
4 I would have been here at 0500 hours. If
5 I was working 6:00 to 2:00 obviously I
6 wouldn't be there.
7 Q. Okay. Night shift.
8 A. Right. I'm working night shift.
9 Q. So you were working the evening
10 shift on the 20th of June?
11 A. Yes. As I'm indicating ---
12 Q. Does this refresh your
13 recollection?
14 A. --- with this report. Not
15 really, but yes, it's obvious that at
16 0500 hours I wouldn't be in the
17 institution.
18 Q. Now, did he hand that note ---
19 did Lieutenant Mort hand that note back
20 to you? After he read it to you did he
21 the note back to you?
22 A. Yes.
23 Q. And that's when you read it?
24 A. Yes.
25 Q. Okay. And then what did you do

Page 149

1 with the note?
2 A. I gave it back to Lieutenant
3 Mort.
4 Q. Was there any time after that you
5 saw the note again?
6 A. No. Not until the investigation.
7 Q. And then somebody showed you the
8 note in the course of the investigation?
9 A. Yes.
10 Q. Did they ask you whether you
11 recognized the handwriting?
12 A. No.
13 Q. Did they ask you whether you
14 thought you knew or you did know who
15 wrote that note?
16 A. I did know at the time it was
17 her.
18 Q. How did you know that?
19 A. Because Campbell tried to hand me
20 a second note.
21 Q. And did she say something to the
22 effect, here's another note or here's a
23 second note or how did you know that it
24 was from the same person?
25 A. She just indicated that here is a

Page 150

1 letter from Lisa.
2 Q. Right. Well, how did you that
3 Lisa was the author of the first letter?
4 A. Because I told her that Inmate
5 Lambert --- I told Campbell --- well, the
6 first letter?
7 Q. Yes.
8 A. I don't know. I mean she tried
9 to hand me a second letter through the
10 same inmate.
11 Q. How did you know it was the same
12 inmate? Oh, you mean Campbell was the
13 same inmate.
14 A. Well, during the first incident
15 Campbell did state that it was from
16 Inmate Lambert.
17        ATTORNEY KRAKOFF:
18           You know, I really would
19 appreciate it if --- I think that
20 you certainly can advise your
21 client, but I don't think it's
22 appropriate for you to be showing
23 your client documents so that he
24 can answer my questions.
25        ATTORNEY HALLORAN:

Page 151

1       Well, you're trying to
2 confuse him by going over the
3 same questions 12 times in a row.
4 And if you insist on doing that
5 when he's already given you an
6 answer that relies upon a
7 document he wrote at the time,
8 which identifies Inmate Lambert
9 as the one who ---.
10      ATTORNEY KRAKOFF:
11      I was asking him for his
12 recollection.
13      ATTORNEY HALLORAN:
14      For about the 12th time.
15 If you're going to repeat the
16 questions like this then --- he's
17 referring to the report that he
18 wrote.
19 A.   The report that I wrote, which is
20 Exhibit One, I stated in here that the
21 letter was from Inmate Lambert who was
22 stated by Campbell at the time that she
23 delivered the letter to me.
24 BY ATTORNEY KRAKOFF:
25 Q.   And that's an exhibit that your

Page 152

1 Counsel just furnished to you to look at?
2 A.   No.  I've had this book in front
3 of me all morning.
4 Q.   Well, I recognize that, but your
5 attorney just pointed something out on
6 Exhibit One for you to look at before you
7 answered that question; is that correct?
8 A.   No, sir.  I read it on my own.
9 He just flipped it to Exhibit One.  I
10 read that on my own, he didn't point at
11 it.
12 Q.   Well, he flipped it for you ---
13 A.   Yes, he did.
14 Q.   --- and called your attention to
15 that?
16 A.   Yes, he did.
17 Q.   Had you known who Denise Campbell
18 was prior to the June 20th incident?
19 A.   Yes.
20 Q.   Did you know her by name?
21 A.   Inmate Campbell, yes.
22 Q.   Had you had any interaction with
23 her of a social nature?
24 A.   No.
25 Q.   Had Ms. Campbell ever been part

Page 153

1 of a group that --- with Lisa where there
2 was giggling going on and looking at you?
3 A.   No.
4 Q.   Now, you testified earlier that
5 you had known even before that that you
6 weren't supposed to accept anything from
7 an inmate; correct?
8 A.   Prior to the second letter, yes.
9 Q.   And you didn't know it prior to
10 the first letter?
11 A.   It was --- I don't know why I
12 grabbed the letter.  I really don't know
13 why I did.
14 Q.   Right.  But did you know before
15 you took the letter on the 20th of June
16 that you weren't under the policies or
17 practices of this institution supposed to
18 accept something from an inmate?
19 A.   Yes.  That's why after I grabbed
20 the letter, I went directly down to the
21 shift commander.
22 Q.   Do you know whether --- do you
23 know whether --- strike that.
24      Did you prepare an extraordinary
25 report for disciplinary misconduct

Page 154

1 against Ms. Campbell for having given you
2 the letter the first time?
3 A.   No, sir.  My practice was and
4 still is to this day that you inform the
5 inmate of something like this where you
6 feel that maybe they weren't aware of the
7 rules and regulations in that area.
8 Q.   Right.
9 A.   And you give them a warning.
10 And, yes I did, I warned Inmate Campbell
11 that the next time she delivered a letter
12 in the presence of Sergeant Slater, she
13 was a CO-1 at the time, that if she
14 continued to deliver letters for Inmate
15 Lambert, that she would be written a
16 misconduct.  I was very specific about
17 telling her that.
18 Q.   When did you tell --- did you
19 tell her that between the first and
20 second letter or after the second one?
21 A.   After the second letter.
22 Q.   And did that end it?  Did she
23 make any other efforts to give you a
24 letter or anything else on behalf of Lisa
25 Lambert?

Page 155

1  A.    No.
2  Q.    You had described the first
3  letter as folded. You couldn't see the
4  text when it was folded?
5  A.    Correct.
6  Q.    What about the second letter?
7  Was that folded?
8  A.    Yes.
9  Q.    You'll see where it says actions
10 taken on Exhibit Two.
11 A.    Yes.
12 Q.    All right. It says advised CO to
13 speak with Deputy Mack. Did somebody
14 advise you to speak with Deputy Mack?
15 A.    Yes.
16 Q.    Did you speak with her?
17 A.    I don't recall.
18 Q.    Now, Exhibit Three is the third
19 extraordinary occurrence report that you
20 prepared dated the 21st of July, 1993.
21 The time here is 7:10. So that would be
22 seven o'clock, 7:10 in the morning?
23 A.    Yes.
24 Q.    So does this refresh your
25 recollection that by this time, by July, you

Page 156

1  were working the day shift again?
2  A.    Yes.
3  Q.    Had you ever had any interaction
4  with Inmate Gunderson prior to the date
5  of the incident?
6  A.    No.
7  Q.    Had your action ---?
8  A.    Do you want to be more specific?
9  Q.    Yes. I'm talking about other
10 than the ordinary telling inmates what to
11 do or advise them to go to bed or, you
12 know, kind of directions that you give
13 --- did you ever have any conversations
14 with Inmate Gunderson?
15 A.    No.
16 Q.    Did you know, as of July 21st,
17 1993, of any allegations that Inmate
18 Gunderson had been involved in some sort
19 of a relationship of a sexual nature with
20 Mr. Zimmerman?
21 A.    No.
22 Q.    How long would you estimate the
23 encounter with Ms. Gunderson --- how much
24 time would you say past from the time she
25 --- Gunderson first spoke with you on the

Page 157

1  21st and the time she ended her
2  discourse?
3  A.    Well, an inmate's permitted to
4  --- or they're required to keep moving so
5  she was coming out of Medline if I
6  remember and it was just a passing
7  statement. I would think that it would
8  probably be anywhere between 45 seconds
9  and a minute.
10 Q.    Did you tell Gunderson that Lisa
11 had apologized to you in the yard the day
12 before?
13 A.    Yes.
14 Q.    Was that something that you
15 thought was something that Gunderson had
16 to know?
17 A.    I felt that I had to be specific
18 with her because when she asked me I
19 heard everything between you and Lisa
20 Lambert are okay, I didn't know what her
21 presumption was.
22 Q.    Okay. Did you at any time in the
23 spring of 1993 receive any information
24 that Lisa Lambert had discussed you with
25 Deputy Utts (phonetic)?

Page 158

1  A.    No.
2  Q.    By that I mean, would she have
3  made some allegations that you had acted
4  in an inappropriate way toward her?
5  A.    Prior to?
6  Q.    Anytime during the spring of '93?
7  A.    I don't know.
8  Q.    Did there come a time when you
9  became aware during 1993 that, apart from
10 this investigation, did there come a time
11 that you became aware that Lisa Lambert
12 had gone to Deputy Utts with allegations
13 that you had behaved in an inappropriate
14 way toward her?
15          ATTORNEY HALLORAN:
16          I'm going to object to
17 the form of the question. Can
18 you describe --- there have been
19 numerous allegations ---.
20          ATTORNEY KRAKOFF:
21          Well, I think there was
22 testimony yesterday that the
23 Lieutenant was present where Ms.
24 Wolfgang testified that Lisa
25 Lambert had told her that she had

Page 159

1 been trying to get the attention
2 of people for a long time and had
3 spoken with Deputy Utts about it.
4 And that's why I'm asking the
5 question.
6           ATTORNEY HALLORAN:
7           I'm not objecting to the
8 question. I object to --- it's
9 inappropriate. Part of the
10 question is ---
11           ATTORNEY KRAKOFF:
12           It's not inappropriate.
13           ATTORNEY HALLORAN:
14           --- inappropriate conduct
15 because we have physical assault
16 allegations.
17           ATTORNEY KRAKOFF:
18           Okay.
19           ATTORNEY HALLORAN:
20           I believe that you're
21 asking him about the sexual ---.
22 BY ATTORNEY KRAKOFF:
23 Q.   I'm asking about contact of a
24 sexual nature either touching her on her
25 breast or any other part of her body or

Page 160

1 harassing her or stalking her. Any of
2 these kinds of things?
3 A.   For what date?
4 Q.   I'm just asking during ---.
5 A.   Spring. You're question was
6 spring of '93.
7 Q.   Yes, during that spring of 1993.
8 But I thought I had broadened it.
9 A.   No.
10 Q.   Okay.
11 A.   Not that I can recall.
12 Q.   Okay. Do you have any
13 recollection prior to yesterday when Ms.
14 Wolfgang testified --- did you hear her
15 testify that ---
16 A.   Yes, I did.
17 Q.   --- that Lisa had told her that
18 she had gone to Deputy Utts with
19 complaints about your behavior toward
20 her?
21 A.   Yes, I did.
22 Q.   Prior to yesterday when Ms.
23 Wolfgang testified to that, had you heard
24 from any source that Lisa had gone to
25 Deputy Utts with complaints about

Page 161

1 inappropriate behavior toward her on your
2 part?
3 A.   Yes.
4 Q.   How did you --- how did you hear
5 --- how did that information come to your
6 attention?
7 A.   Deputy Utts called me into his
8 office ---
9 Q.   Okay.
10 A.   --- and he sat down with me and
11 said that he had complaints about me
12 harassing Lisa Lambert.
13 Q.   Did he tell you --- did he
14 describe in any way the nature of the
15 complaints --- of her complaints?
16 A.   I can't recall, sir.
17 Q.   Do you recall what year it was
18 that Deputy Utts called you into his
19 office to relate that Lisa Lambert had
20 complained about you?
21 A.   I would say it would be 1993.
22 Q.   Do you have any recollection that
23 --- of Utts making any reference to
24 either stalking or flirtatious or contact
25 of a sexual nature between you and Lisa

Page 162

1 Lambert?
2 A.   He told me her allegations.
3 Q.   Do you recall anything about what
4 the nature of her allegations were, what
5 she was saying, according to what Utts
6 told you?
7 A.   To recall his conversation with
8 me?
9 Q.   Yes. I don't mean verbatim, but
10 can you recall the gist of what he told
11 you?
12 A.   Yeah, it was about the sexual
13 harassment, stating that she was stalking
14 me --- or I was stalking her, whatever.
15 Q.   What did you tell Deputy Utts?
16 A.   That I absolutely had nothing to
17 do with that. That it wasn't occurring
18 and it never had and never would.
19 Q.   Did Deputy Utts say anything in
20 response to what you said that you can
21 recall? You know, did he say, well, be
22 on your way and good luck. Or did he say
23 --- did he warn you, did he indicate what
24 he was going to do?
25 A.   I believe he just told me that

Page 163

1 there's going to be an investigation. I
2 don't know. I can't really recall
3 exactly what he said.
4 Q.   Did Superintendent Wolfe at any
5 point during 1993 or 1994 indicate to you
6 that Lisa Lambert had brought complaints
7 of inappropriate conduct on your part of
8 this sexually harassing nature?
9 A.   Yes.
10 Q.   What did he --- do you recall the
11 gist of what he told you?
12 A.   He had told me the same thing
13 basically that Deputy Utts did and then
14 said that he was going to look into it.
15 Q.   Was that about the same time
16 period?
17 A.   Yes.
18 Q.   And was that basically what he
19 told you? Can you recall anything else
20 of significance that he told you?
21 A.   Just to stay clear of Lisa
22 Lambert.
23 Q.   Now, let me ask you about --- and
24 I know --- I assume that you're aware of
25 the thrust of Lisa Lambert's allegations

Page 164

1 about you and that one of the --- one
2 category of allegations was that you had
3 given her some gifts. Are you aware of
4 that?
5 A.   Yes.
6 Q.   Now, did you ever give Lisa
7 Lambert a pair of Reebok sneakers?
8 A.   No.
9 Q.   Did you ever order or purchase
10 sneakers for Lisa Lambert?
11 A.   No.
12 Q.   Did you have anybody else
13 purchase sneakers for Lisa Lambert?
14 A.   No.
15 Q.   Did you have anybody else give
16 sneakers on your behalf to Lisa Lambert?
17 A.   No.
18 Q.   Did you give her shoes of any
19 sort?
20 A.   No.
21 Q.   Did you ever order or purchase
22 shoes of any sort for Lisa Lambert?
23 A.   No.
24 Q.   Did you ever give Lisa Lambert
25 panties or a bra?

Page 165

1 A.   No.
2 Q.   Did you ever order panties or a
3 bra for Lisa Lambert?
4 A.   No.
5 Q.   Did you ask anybody to purchase
6 those items for you?
7 A.   No.
8 Q.   Did you ask anybody to give those
9 items on your behalf to Lisa Lambert?
10 A.   No.
11 Q.   Did you at any point ever order
12 anything in the nature of a gift of any
13 kind for Lisa Lambert?
14 A.   Never.
15 Q.   Did you ever purchase anything in
16 the nature of a gift for her?
17 A.   Never.
18 Q.   Did you ever give her anything in
19 the nature of a gift?
20 A.   Never.
21 Q.   Have you ever ordered or
22 purchased anything from Victoria's
23 Secret?
24 A.   That's a company for anybody.
25 Q.   Yes. Is that through a catalog?

Page 166

1 A.   No.
2 Q.   Okay. Is that going into a
3 store?
4 A.   Yes.
5 Q.   And where is the store that you
6 purchased something?
7 A.   Millcreek Mall in Erie.
8 Q.   I'm sorry?
9 A.   Millcreek Mall in Erie.
10 Q.   Okay. Have you done that on more
11 than one occassion?
12 A.   Twice.
13 Q.   Do you recall approximately when?
14 A.   Christmas of last year.
15 Q.   Okay. The last year?
16 A.   I don't know, you know, I can't
17 remember. Last year, no, it was the year
18 before.
19 Q.   199 ---?
20 A.   Six.
21 Q.   Six. And what about the second
22 time?
23 A.   '96, somewhere around there.
24 Q.   But not during 1993 or 1994?
25 A.   No.

Page 167

1 Q. Did you ever have somebody
2 purchase on your behalf anything from
3 Victoria's Secret?
4 A. No.
5 Q. Did you purchase the items that
6 you referred to or alluded to at
7 Victoria's Secret by check, by cash or by
8 credit card?
9 A. Credit card.
10 Q. It's clear in your mind that it
11 would have had --- the purchase from
12 Victoria's Secret would have occurred
13 after 1995; is that correct?
14 A. Yes.
15 Q. You had never purchased anything
16 from Victoria's Secret during 1993 or
17 1994, is that clear in your mind?
18 A. Specifically bras and panties or
19 ---?
20 Q. Anything.
21 A. I may have gotten some lotion or
22 something prior to that. I don't know.
23 Q. Now, I'm going to ask you
24 specific questions about some of her
25 allegations of physical contact.

Page 168

1 A. Okay.
2 Q. Now, --- before I get to that,
3 let me ask you this. Did you ever during
4 the time that Lisa Lambert was an inmate
5 at Cambridge Spring ever give or send
6 either directly by yourself or through
7 some other person a written communication
8 to Lisa Lambert?
9 A. No.
10 Q. Have you ever kissed Lisa
11 Lambert?
12 A. No.
13 Q. Have you ever fondled Lisa
14 Lambert?
15 A. No.
16 Q. And by fondled I think ---
17 A. I know what fondled means, sir.
18 Q. --- you know what I mean. Have
19 you ever touched her with your hands on
20 any part of body?
21 A. No.
22 Q. Have you ever grabbed her hair?
23 A. No.
24 Q. Has any part of your body ever
25 come in contact with any part of Lisa

Page 169

1 Lambert's body, as best you recall?
2 A. No.
3 Q. Let me go back to the stairwell
4 for a moment. The time that you were
5 going up the stairwell and you saw Lisa
6 Lambert on the steps above where you
7 were, do you have any recollection of
8 approximately the hour of the day? First
9 of all, let me divide it into kind of a
10 gross period of time. You were --- just
11 so we have the framework, you were
12 working that day from 6:00 until 4:00; is
13 that correct?
14 A. 6:00 to 2:00.
15 Q. 6:00 to 2:00, I'm sorry. And
16 let's call from 6:00 until noon the
17 morning and from noon until 2:00 the
18 afternoon. Do you have a recollection of
19 whether that occasion occurred in the
20 morning or in the afternoon?
21 A. I would have to say in the
22 morning.
23 Q. Okay. So somewhere between ---
24 we'll start with that and try to narrow
25 it ---

Page 170

1 A. Okay.
2 Q. --- because it was somewhere
3 between 6:00 and --- 6:00 in the morning
4 and 12:00 in the afternoon; is that
5 correct?
6 A. Yes.
7 Q. Okay. Can you narrow it any
8 closer so that --- can you rule out just
9 based upon what your --- what your
10 routine would have been if you were going
11 through the housing unit. I think you
12 said you were going through the housing
13 units that day?
14 A. Yeah. There's log books that
15 reflect my times in the housing unit that
16 day.
17 Q. Okay. Yes.
18 A. And they would be --- get you
19 down to the minute anyway.
20 Q. Okay. But we're not --- I think
21 you testified earlier you're not sure
22 what day that was.
23 A. I'm not sure of the day that
24 she's claiming that happened, right.
25 Q. Right. Well, are you sure of the

Page 171

1 date that it was?
2 A.   I'm not sure of the date that
3 she's claiming that I had done that in
4 the stairwell.
5 Q.   Well, what day is she claiming
6 that that occurred?
7 A.   I don't know.
8 Q.   Do you have a recollection?
9 A.   No. I don't know.
10 Q.   Well, then how do you know --- I
11 guess I'm getting confused. If you don't
12 know what day she's claiming it, how are
13 we going to know --- and --- let me start
14 from your perspective. I think you told
15 me that you're not sure what day it was
16 that you saw her.
17 A.   Right. It's in the investigation
18 that --- you know, the day and all that.
19 I'm not sure. I can't really recall the
20 day right now, unless I look at that.
21 Q.   Is it your recollection that you
22 told somebody during the investigation
23 the exact day that you saw Lisa Lambert
24 in the stairwell?
25 A.   Yeah.

Page 172

1 Q.   Okay. All right. Let's turn to
2 the investigation and see whether that's
3 reflected in the reports.
4 OFF RECORD DISCUSSION
5 BY ATTORNEY KRAKOFF:
6 Q.   I think when we broke I was
7 inquiring about whether you had told
8 anybody in the course of the
9 investigation ---
10 A.   Correct.
11 Q.   --- what you recall the date of
12 the encounter. And I shouldn't --- I'm
13 not going --- I know from your
14 perspective it's not an encounter, but
15 whether you could recall --- whether you
16 told me that what you thought the date
17 was that you saw Lisa Lambert in the
18 hallway. Did you tell anybody during the
19 investigation? Did you identify a date?
20 A.   That I saw her?
21 Q.   Yes.
22 A.   No.
23 Q.   Okay. Now, you had also said
24 that I believe, and correct me if I'm
25 wrong. I think you testified that at the

Page 173

1 point in which you passed Lisa Lambert on
2 the stairway that an officer, if sitting
3 at the post desk, would have been able to
4 see --- would have been able to see you
5 passing her; is that correct?
6 A.   Yes.
7 Q.   Approximately how far --- was
8 there like an open door?
9 A.   Yes.
10 Q.   When you passed her, how many
11 steps down from the top landing were you?
12 A.   Was she, because I was coming up.
13 Q.   Okay. Yes, I meant ---
14 A.   See what I mean?
15 Q.   --- were you when you passed her?
16 A.   Where we actually passed each
17 other, I would say probably four steps
18 from the landing between the stairs.
19 Approximately four steps.
20          ATTORNEY HALLORAN:
21          Approximately four steps.
22 BY ATTORNEY KRAKOFF:
23 Q.   Would that have been ---?
24 A.   Four steps going up into the
25 second floor.

Page 174

1 Q.   Was that the top landing?
2 A.   Well, there's a center. Remember
3 I told you there was a set of steps that
4 go up and then there's a landing. Then
5 there's a second set and that's the next
6 floor.
7 Q.   All right. When you passed her
8 you were closer to the second floor than
9 to the first one?
10 A.   Second floor, right.
11 Q.   To the second landing?
12 A.   Uh-huh (yes).
13 Q.   Was she ---
14          ATTORNEY HALLORAN:
15          It's not a second
16 landing, it's a second ---
17 there's a first floor ---.
18          ATTORNEY KRAKOFF:
19          Oh, there's not a landing
20 at the top?
21          ATTORNEY HALLORAN:
22          There's a landing in the
23 middle.
24          ATTORNEY KRAKOFF:
25          In the middle I knew

Page 175

1 that. There's not a second
2 landing. There's simply a step
3 and then ---.
4 A.   It's right at the ---.
5           ATTORNEY HALLORAN:
6           It's at the floor level.
7 A.   Yeah, at the floor level, yeah.
8 It's just a little opening right there.
9 BY ATTORNEY KRAKOFF:
10 Q.   Okay. When you passed Lisa, was
11 she stationary or was she in the process
12 of either walking up the steps, the
13 direction that you were going, or walking
14 down the steps?
15 A.   She was stationary.
16 Q.   Okay.
17 A.   She turned her back towards me
18 ---
19 Q.   Okay.
20 A.   --- and I walked behind her.
21 Q.   So when you walked behind her,
22 she wasn't facing you?
23 A.   No.
24 Q.   Could you ---.
25 A.   As I was going up the stairs I

Page 176

1 noticed she was already facing --- I
2 don't know if she turned around during
3 the time that I was passing her. I did
4 not look back.
5 Q.   At the point at which you passed
6 her, her back was to you?
7 A.   As I was passing her back was
8 towards me, yes.
9 Q.   Okay. And, you know, maybe the
10 easiest way rather than asking Sergeant
11 Ron about what his estimate of the width
12 of that stairway is, maybe at some point,
13 we'll go in there and just measure it or
14 something.
15 A.   There's enough room for two
16 people to come up and down.
17 Q.   Okay.
18 A.   I'd say it's five feet across,
19 whatever.
20 Q.   So that I can understand how that
21 works, could you just demonstrate ---
22 it's not going to appear on the
23 transcript, but how the name tag --- is
24 it kind of like one of those boy scout
25 things that I remember?

Page 177

1 A.   That goes through the shirt and
2 see that catches so you can wiggle on
3 that and see how it fastens on there.
4 You can't pull it off unless you depress
5 these two flips and pull it off.
6 Q.   Okay. You referred to this
7 little round thing as ---
8 A.   A frog.
9 Q.   --- a frog. Are those also
10 referred to as clips here?
11 A.   Here. I've always called them
12 frogs since I've been in the military to
13 this point. I don't know if they're
14 called clips or not.
15 Q.   Okay. Other than those two frogs
16 is there anything that keeps that tag on?
17 A.   No.
18 Q.   Okay. Did you lose either of
19 those two frogs?
20 A.   No, I didn't. I have it. I have
21 the frog.
22 Q.   Okay. What I meant was so we're
23 clear, when you realized that the clip
24 was not really adhering because one of
25 the frogs had worn out --- one of them

Page 178

1 had worn out?
2 A.   One.
3 Q.   Okay. You then took your jacket
4 home, you took the name tag off ---.
5 A.   I took the name tag off at work.
6 Q.   Okay. So you kept your jacket at
7 work?
8 A.   I took it home.
9 Q.   Okay. Do you carry the jacket
10 home? Did you take that tag off and put
11 it somewhere when you went home that
12 night? Did you like put it in the pocket
13 or was it still on the jacket?
14 A.   Well, I thought I had lost the
15 name tag so I wasn't really sure what I
16 had done with it.
17 Q.   Okay.
18 A.   Even recalling back to a couple
19 days after that.
20 Q.   So you weren't sure that it was
21 home until you found it at home; ---
22 A.   Correct.
23 Q.   --- is that correct?
24 A.   Yes.
25 Q.   Did you think it was home?

Page 179

1 A.    I thought it was home.
2 Q.    Okay. When you found the name
3 tag, were the frogs still there?
4 A.    Yes.
5 Q.    Both of them?
6 A.    Yes.
7 Q.    Now, my understanding based upon
8 a report, Exhibit Six in paragraph five
9 of that, I think it's in paragraph --- or
10 maybe I mean page five. There was a
11 reference to your having taken a lie
12 detector test. I think you testified to
13 that earlier.
14 A.    Yes, I did.
15 Q.    You passed it as far as you know;
16 is that correct? You were told that you
17 passed it?
18 A.    Yes, sir.
19 Q.    We didn't ---.
20         ATTORNEY KRAKOFF:
21         Mr. Halloran, we --- I
22 don't think we've received a copy
23 of the lie detector test results.
24 That was an attachment to ---.
25         ATTORNEY HALLORAN:

Page 180

1         We went over that
2 yesterday. We'll get you the
3 attachment.
4         ATTORNEY KRAKOFF:
5         Okay.
6         ATTORNEY HALLORAN:
7         I don't think I received
8 the attachments either.
9         ATTORNEY KRAKOFF:
10        Okay.
11 BY ATTORNEY KRAKOFF:
12 Q.    Is there a policy in place ---
13 first I'll ask you whether there is a
14 written policy in place now that
15 prohibits a male officer from being alone
16 with a fe --- with an inmate in any part
17 of the prison? Is there anything in
18 writing that says that as far as you
19 know?
20 A.    It is the institution's policy
21 now --- I'm not sure where it's written
22 at, ---
23 Q.    Okay.
24 A.    --- but the guidelines which have
25 been instilled at the institution --- I

Page 181

1 don't know if it's in writing or not,
2 sir, I can't really tell you because I
3 presume this from the day that I started
4 that you're never alone with a female off
5 --- or with a female inmate. It is the
6 best policy for that officer if he's a
7 male officer and he needs to counsel an
8 inmate that a female officer be present
9 at all times.
10 Q.    Okay. As I understand it, you're
11 not sure if there's something in writing
12 saying that or not; is that correct?
13 A.    I couldn't tell you, sir, because
14 I just --- I follow that rule.
15 Q.    Okay. Do you recall ever hearing
16 any rumors or reference to condoms being
17 found in the bathrooms in the dining hall
18 area between 1993 and 1996?
19 A.    No.
20         ATTORNEY KRAKOFF:
21         Let's take a break for a
22 minute.
23 SHORT BREAK TAKEN
24 BY ATTORNEY KRAKOFF:
25 Q.    Just another couple questions of

Page 182

1 a biographical nature.
2 A.    Okay.
3 Q.    I don't think I ever asked you
4 how old you are?
5 A.    Thirty-four (34). You asked me
6 that already.
7 Q.    Did I?
8 A.    Uh-huh (yes).
9 Q.    I'm sorry.
10 A.    That's okay.
11 Q.    How far did you go in school?
12 A.    Twelfth grade. Graduated.
13 Q.    And you were in the service for a
14 period of time?
15 A.    I'm still in. Reserves now.
16 Q.    What were you in when you were on
17 active duty?
18 A.    The Air Force.
19 Q.    What was your rank at the time
20 you retired or ---?
21 A.    E4.
22 Q.    What is --- is that like a ---
23 A.    Sergeant.
24 Q.    --- sergeant?
25 A.    Uh-huh (yes).

Page 183

1 Q.   **Now, are you married?**
2 A.   I'm divorced.
3 Q.   **Okay. And when did you --- when**
4 **were you divorced?**
5 A.   As of May --- last May.
6          ATTORNEY KRAKOFF:
7          That's all. Thank you.
8 That's the end.
9 A.   Okay.
10          ATTORNEY HALLORAN:
11          I have no questions.
12          * * * * * * * *
13      CONTINUED DEPOSITION CONCLUDED
14          AT 12:11 P.M.
15          * * * * * * * *
16
17
18
19
20
21
22
23
24