# ATTACHMENT D

## Table of Inappropriate Social or Sexual Contact with SCI-Cambridge Springs Inmates

Inappropriate Social or Sexual Contact
with a SCI-Cambridge Springs Inmate

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs

**SUBJECT:**  *Inappropriate Social or Sexual Contact with a SCI-Cambridge Springs
Inmate*

The following is a list by name and job title, every SCI-Cambridge Springs staff member
who was alleged by an inmate or another staff member to have had inappropriate
social or sexual contact with a SCI-Cambridge Springs inmate.

| NAME | CLASSIFICAITON | DATE OF INVESTIGATION |
|---|---|---|
| Amato, Barbara | Correction Officer | April 1996 |
| Bailey, Joel | Food Service Instructor | November 1996 |
| Basile, Scott | Correction Officer | June 1996 |
| Basile, Scott | Correction Officer | December 1996 |
| Bish, Linda | Food Service Instructor | February 1995 |
| Chase, Lori | Sergeant | January 1997 |
| Coffee, Jerome | Sergeant | August 1996 |
| Eicher, James | Correction Officer | November 1994 |
| Free, William | Correction Officer | August 1996 |
| Graves, Peter | Correction Officer | June 1995 |
| Hargett, Barbara | Food Service Instructor | November 1997 |
| Hammers, Richard | Correction Officer Trainee | January 1995 |
| Horoschuck Norma | Religious Advisor | November 1996 |
| Hargett, Barbara | Food Service Instructor | January 1996 |
| Hull, Mary | Correction Officer | January 1997 |
| Jones, Brenda | Correction Officer | January 1996 |
| Lawton, Donald | Correction Officer Trainee | July 1995 |



EXHIBIT
138

| Leone, Judy | Correctional Industries Foreman | June 1998 |
|---|---|---|
| Manski, Larry | Lieutenant | June 1997 |
| McCloskey, Thomas | Teacher | June 1996 |
| Merry, James | Sergeant | November 1994 |
| Miller, Mike | Facility Maintenance Manager 1 | September 1997 |
| Miller, Martin | Plumbing Trade Instructor | September 1994 |
| Mitchell, Carla | Correction Officer | January 1997 |
| Montejo, Emanuel | Sergeant | June 1997 |
| Mort, Kenneth | Lieutenant | December 1993 |
| Myers, James | Correction Officer | November 1997 |
| Randolph, Ronald | Electrical Trade Instructor | May 1997 |
| Shabazz, Iman | Islamic Advisor | January 1995 |
| Shank, Brian | Correction Officer | April 1997 |
| Shrock, Christine | Correction Officer | March 1997 |
| Sittig, Kimberly | Correction Officer | January 1997 |
| Soboleski, Joseph | HVAC Instructor | January 1997 |
| Soboleski, Joseph | HVAC Instructor | April 1997 |
| Stallard, Lisa | Food Service Instructor | October 1994 |
| Stuyvesant, Darrell | Correction Officer | March 1997 |
| Stone, Michael | Correction Officer | April 1995 |
| Stone, Michael | Correction Officer | December 1995 |
| Tawney, Jeff | Correction Officer | December 1996 |
| Unrue, William | Correction Officer | April 1997 |
| Walton, Paul | Food Service Instructor | September 1994 |
| Zimmerman, Carl | Facility Maintenance Manager | August 1994 |

#4. Table listing Inappropriate Social or Sexual Contact.

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs

SUBJECT: *Inappropriate Social or Sexual Contact with a SCI-Cambridge Springs Inmate*

The following is a list by name and job title, every SCI-Cambridge Springs staff member who was alleged by an inmate or another staff member to have had inappropriate social or sexual contact with a SCI-Cambridge Springs inmate.

| NAME | CLASSIFICAITON | DATE OF INVESTIGATION | INMATE (S) INVOLVED | INVESTIGATOR | RESULTS |
|---|---|---|---|---|---|
| Amato, Barbara | Correction Officer | April 1996 | Lisa Lazzel | Captain Lazenby | Unfounded |
| Bailey, Joel | Food Service Instructor | November 1996 | Eggleton, Webb | Captain Lazenby | Unfounded |
| Basile, Scott | Correction Officer | June 1996 | Sprowls, Mayer s | Captain Lazenby | Unfounded |
| Basile, Scott | Correction Officer | December 1996 | Hallock | Lt. Beck | Unfounded |
| Bish, Linda | Food Service Instructor | February 1995 | Givler, Woods' | Captain Bartlett | Employee resigned |
| Chase, Lori | Sergeant | January 1997 | Albright | Captain Lazenby | Turned over to OPR |
| Coffee, Jerome | Sergeant | August 1996 | Campion | Captain Lazenby | Unfounded |
| Eicher, James | Correction Officer | November 1994 | Lambert, | Captain Bartlett | Criminal charges filed |
| Free, William | Correction Officer | August 1996 | Campion | Captain Lazenby | Unfounded |
| Graves, Peter | Correction Officer | June 1995 | Skipper | Captain Lazenby | Unfounded |

EXHIBIT
139

| Name | Position | Date | | | Disposition |
|---|---|---|---|---|---|
| Hargett, Barbara | Food Service Instructor | November 1997 | Hulbert | Lt. Beck | Unfounded |
| Hammers, Richard | Correction Officer Trainee | January 1995 | Maysonet | OPR | Criminal charges filed |
| Horoschuck, Norma | Religious Advisor | November 1996 | Washington | Captain Lazenby | Confirmed |
| Hargett, Barbara | Food Service Instructor | January 1996 | Albright | Captain Lazenby | Unfounded |
| Hull, Mary | Correction Officer | January 1997 | Garrison, Brown, Albright, Nicholson | Captain Lazenby | Employee Termination |
| Jones, Brenda | Correction Officer | January 1996 | Bynum | OPR | Unfounded |
| Lawton, Donald | Correction Officer Trainee | July 1995 | Skipper | Captain Lazenby | Termination |
| Leone, Judy | Correctional Industries Foreman | June 1998 | Foster | Captain Scott | Employee Resignation |
| Manski, Larry | Lieutenant | June 1997 | Pehlman | Captain Lazenby | Unfounded |
| McCloskey, Thomas | Teacher | June 1996 | Stephens | Captain Lazenby | Unfounded |
| Mitchell, Carla | Correction Officer | January 1997 | Green | Lt. Beck | Unfounded |
| Miller, Martin | Plumbing Trade Instructor | September 1994 | Pehlman | Captain Bartlett | Termination |
| Miller, Mike | Facility Maintenance Manager 1 | September 1997 | Bell, Jackson | Captain Lazenby | Unfounded |
| Merry, James | Sergeant | November 1994 | Masonette | Captain Bartlett | Employee Resignation |
| Montejo, Emanuel | Sergeant | June 1997 | Deemer | Captain Lazenby | Unfounded |
| Mort, Kenneth | Lieutenant | December 1993 | Groves, Russo, Kloss | Captain Bartlett | Employee Resignation |
| Myers, James | Correction Officer | November 1997 | Skipper | Lt. Beck | Unfounded |
| Randolph, Ronald | Electrical Trade Instructor | May 1997 | Jones | Captain Lazenby | Unfounded |
| Shabazz, Iman | Islamic Advisor | January 1995 | Wilson, Wallace | Captain Bartlett | Unfounded |
| Shank, Brian | Correction Officer | April 1997 | Adams | Captain Lazenby | Unfounded |
| Shrock, | Correction Officer | March 1997 | Graham | Captain Bartlett | Unfounded |

| Christine | | | | | |
|---|---|---|---|---|---|
| Sittig, Kimberly | Correction Officer | January 1997 | Vicheck | Captain Lazenby | Unfounded |
| Soboleski, Joseph | HVAC Instructor | January 1997 | Miller | Captain Lazenby | Unfounded |
| Soboleski, Joseph | HVAC Instructor | April 1997 | Miller | Captain Lazenby | Unfounded |
| Stallard, Lisa | Food Service Instructor | October 1994 | Givler | Captain Bartlett | Employee Resignation |
| Stuyvesant, Darrell | Correction Officer | March 1997 | Purdie, Milano, Thompson | Captain Lazenby | Counseling session |
| Stone, Michael | Correction Officer | April 1995 | Johnson | Captain Lazenby | |
| Stone, Michael | Correction Officer | December 1995 | Johnson | Captain Lazenby | Employee Resignation |
| Tawney, Jeff | Correction Officer | December 1996 | Huntley | Captain Lazenby | Unfounded |
| Unrue, William | Correction Officer | April 1997 | Jones | Captain Lazenby | Unfounded |
| Walton, Paul | Food Service Instructor | September 1994 | Gleckl | OPR | Criminal Charges Filed |
| Zimmerman, Carl | Facility Maintenance Manager | August 1994 | Foreman | OPR | Criminal Charges Filed |

44. Table listing Inappropriate Social or Sexual Contact.

# ATTACHMENT E

## Department of Corrections Code of Conduct

# COMMONWEALTH OF PENNSYLVANIA

# DEPARTMENT OF CORRECTIONS

# CODE OF ETHICS

## Martin F. Horn
## Commissioner

DC-174

# Foreword

The mission of the Pennsylvania Department of Corrections is as follows:

The Pennsylvania Department of Corrections recognizes and accepts its public responsibility to maintain a safe and secure environment for both incarcerated offenders and the staff responsible for them.

We believe that every inmate should have an opportunity to be constructively engaged and involved in a program of self improvement.

Authority exercised over inmates will be fair and professionally responsible.

We recognize our responsibility to be open to and provide access to inmate families, religious groups, and community volunteers.

We are sensitive to the concerns of victims and their need for inclusion in the correctional process.

We recognize that our greatest source of strength lies within our human resources - the men and women and their families who are the Pennsylvania Department of Corrections.

As a correctional employee, your integrity, professional deportment and attitude demonstrated through the performance of your duties contributes greatly to the respect, trust, and confidence afforded our agency by the public and by the inmates.

This handbook will provide you with the basic principles, rules and regulations by which you as an employee of the Department of Corrections are to conduct yourself. The success of all programs in the correctional system depends upon adherence to these standards by all employees.

With every confidence in your ability to do the job, I wish you success as a professional in the Department of Corrections.

Sincerely,

Martin F. Horn
Commissioner

June 01, 1995

# DEPARTMENT OF CORRECTIONS
# CODE OF ETHICS

This handbook does not include every detail or situation involved in the operation of a Department facility. It aims at the presentation of overall policy guidelines. Facilities will issue more specific and detailed information as needs or circumstances dictate. In no instance, however, will facility rules and regulations take precedence over the policy contained herein.

## A.    General Responsibility of Department of Corrections Employees

Consistent with the responsibility of all correctional employees in the Commonwealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

### 1.    Discrimination

The responsibility of all corrections employees is to act in relation to all citizens of the Commonwealth without regard to age, race, color, ancestry, creed, sex, marital status, national origin, non-job related handicap, or political beliefs. This necessarily includes the inmates whom we supervise and fellow employees with whom we work. All employees are expected to fully comply with the Department of Corrections policy prohibiting sexual harassment.

### 2.    Conflicts of Pecuniary Interest

No Department employee shall engage directly or indirectly in any personal business transaction or private arrangements for personal profit which accrues from or is based upon his/her official position or authority. The scope of this provision shall include prohibition against entering into any type of business transaction or private arrangements with inmates. Honorariums paid to Department officials for speaking on official topics shall be deposited in the appropriate Department fund.

### 3.    Representation of Interests

No Department employee shall represent or act as an agent for any private interest, whether compensable or not, which could be reasonably expected to result in a conflict between the private interest of the employee and his official state responsibility. This includes but is not limited to representing the interests of inmates.

With prior written approval from the Commissioner or his designee, employees can represent inmates in certain proceedings, such as the Pardons Board provided no conflict arises as a result of the representation.

**4.    Gifts and Favors**

Employees and their families shall not directly or indirectly solicit, accept, or agree to accept any gift of money or goods, loans or services for personal benefit which would influence the performance of their work duties or decision making. Correctional employees shall not accept or perform favors or accept or distribute and gifts, money, or loans to or from inmates or members of an inmate's family.

**5.    Information**

No Department employee shall, for personal gain or for the gain of others, use information not available to the public at large, or divulge confidential information without its authorized release; nor shall the employee receive compensation for consultation which substantially draws upon official ideas or data which have not been disclosed to the public.

**6.    Private Employment**

No Department employee shall engage in or accept private employment or render private services when such employment or service is incompatible or in conflict with the discharge of the employee's official duties or would tend to impair the employee's independent judgement or action in the performance of his/her duties. Requests for outside employment must be made in compliance with Management Directive 515.18, Supplementary Employment.

**B.    Specific Rules and Regulations - Department of Corrections**

1.    Each employee in the correctional system is expected to subscribe to the principle that something positive can be done for each inmate. This principle is to be applied without exception.

This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

2.    Only the minimum amount of force necessary to defend oneself or others, to prevent escape, to prevent serious injury or damage to property or to quell a disturbance or riot will be used. Excessive

-4-

force, violence or intimidation will not be tolerated. Fighting or horseplay while on duty is prohibited.

3.   In event of an emergency, all correctional employees may be utilized for custodial services under the direction of the Superintendent or his designee.

4.   Each employee is to assist in preventing escape or in pursuing an escapee as directed by the Superintendent or his designee.

5.   In the event any official or employee has been seized, no employee or official shall disregard, alter, modify, or change in any manner the prescribed duties, responsibilities, or obligations on demand by the prisoner or plea between hostages, regardless of consequences, unless on orders from the Commissioner or higher authority.

6.   There shall be no fraternization or private relationship of staff with inmates, or members of their families. This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from either the inmate or the inmate's friends, relatives, or representatives. Moreover, employees are not to deliver gifts or money to inmates' friends, relatives, or representatives.

7.   The personal property of inmates will be handled with extreme care and disposed of only by properly designated authority in a manner designated by official Department of Corrections policy. Similarly, no employee may assume the right of ownership of property owned by fellow employees, the state or by inmates; theft or abuse of property or equipment is prohibited.

8.   No employee shall leave his assigned post or leave the institution or grounds without being properly relieved and receiving proper authorization from a supervisor. Proper relief involves communicating any special observations or orders to the relief personnel.

9.   Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employee may question the wisdom of such order.

The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

-5-

10. Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

11. All facility keys issued to employees will remain in their possession at all times. Under no circumstances are keys ever to be unguarded, mislaid, unaccounted for, taken from the institution, or turned over to an inmate.

12. Employees in uniform are required to keep said uniforms in a clean and neat condition, free from decoration, other than those officially prescribed. Non-uniformed employees will be required to meet the standards of neatness and grooming as established by their facility.

13. Employees may use their identification as an employee of the Department of Corrections only for identification in performing the duties and responsibilities required in the scope of their employment. Department identification will not be used where an employee may have other employment or in representing other interests.

14. Employees will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

15. Alcoholic beverages and controlled substances shall not be carried, stored, or consumed on state property or in any state Facility or vehicle. When a controlled substance or non-propriety drug is prescribed by a physician, the employee shall immediately notify his/her supervisor and obtain proper written approval to bring the medication onto facility grounds. Such medication must always be kept under the secure control of the employee. An employee shall not report for duty in an unfit condition.

16. Personal weapons shall not be brought onto state property without the advanced written approval of the Superintendent.

17. Employees shall not testify in any civil case in which the Department of Corrections may have an interest without informing the Commissioner, unless under court order.

18.  An employee shall not use a Commonwealth vehicle for personal business or for any other reason except as authorized. When involved in an accident while operating a state vehicle, all employees will promptly notify their supervisor, and follow the guidelines established in the Governor's Office Administrative Circular 76-23, dated May 9, 1976, and Commissioner's memorandum dated January 27, 1982.

19.  Employees shall not read books, magazines, newspapers, or other non-job related printed material while on official duty. Employees are required to remain alert while on duty; inattentiveness, sleeping or the appearance thereof is prohibited.

20.  Whenever a supervisor has reasonable grounds to believe that an employee is being influenced by a medical or psychiatric condition which is effecting or is likely to effect the employee's ability to perform assigned duties, the Deputy Commissioners, Superintendent, Bureau Director, or Regional Director shall direct such employee to undergo reasonable examination, at the expense of the Department, to determine the employee's fitness for duty.

An employee who has sustained an injury, illness, or any other condition incurred in the line of duty which could affect the employee's ability to perform assigned duties may be required by the Deputy Commissioners, Superintendent, Bureau Director, or Regional Director to undergo reasonable examination, at the expense of the Department, to determine the employee's fitness for duty.

An employee who has suffered an injury, illness, or any other debilitation condition not incurred in the line of duty which could affect his/her ability to perform required duty assignments, may be required by the Deputy Commissioners, Superintendent, Bureau Director, or Regional Director to obtain and submit a complete medical report from his/her physician concerning his/her physical and/or mental condition. The report shall include a detailed explanation and prognosis of the employee's injury, illness, or condition and any other pertinent information which would aid the Facility's medical officer in evaluating the situation prior to the employee's return to active duty.

21.  An employee who knows that he/she will be unable to report for duty due to illness, emergency, or injury shall immediately notify his/her supervisor in accordance with their local policy, advising the

supervisor of the nature of the injury, emergency, or illness; and, the expected date of return to duty.

The supervisor shall also be advised of a change in any conditions which may occur after the original notification was given. An employee injured while on duty shall report such injury to his/her supervisor as soon as possible and shall comply with the provisions of existing regulations pertaining to such injuries. An employee who becomes ill while on duty and finds it necessary to be relieved from an assigned post or duty shall report this fact to his/her immediate supervisor and comply with #8 above.

22.    An employee shall submit any necessary and/or requested work related reports in a timely manner and in accordance with existing regulations. Reports submitted by employees shall be truthful and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresent the facts in any Department record or report.

23.    During off-duty hours, employees will conduct themselves in such a manner so as to demonstrate the public's trust and confidence inherent in their position as a public servant. Any conduct which brings discredit to their profession, responsibilities, the Department of Corrections, or public service at large shall be subject to immediate discipline.

24.    All individuals, including employees, are subject to search upon entrance or egress from a state facility or at any time while on state property owned by the Department of Corrections.

25.    Personal cameras and recording devices are prohibited from being brought onto state grounds or introduced into Department of Corrections facilities by employees, inmates, visitors or the public at large without the advanced written approval of the Superintendent or Regional Director. Similarly, such devices are prohibited from detached duty assignment areas, such as outside hospitals, etc.

26.    All employees shall participate in training that is mandated or required by the Department of Corrections.

27.    Gambling on official duty is strictly prohibited.

28.    All employees have the responsibility to provide their supervisor with their current address and telephone number.

29. All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

30. No employee shall permit an inmate to be in control or exercise authority over other inmates.

31. Corrections Officers are to read, sign and fully comply with all post orders.

32. All employees including medical staff and counselors are required to report inmate abuse complaints or incidents of inmate abuse to their immediate supervisor.

## C.   ENFORCEMENT

These rules and regulations have been written in the best interest of the Department of Corrections, its employees, and the public which we serve and protect. In event of a conflict involved in interpretation, the best interest of public policy shall be served.

Any employee who violates the provisions of this code shall be subject to immediate disciplinary action by the appointing authority. Nothing herein shall abridge the remedies or responsibilities of employees covered by the Civil Service Act, applicable Collective Bargaining Agreements, Governor's Code of Conduct, #1980-18, or the laws of the Commonwealth.

# ATTACHMENT F

## DC-173 Form-Receipt of Code of Ethics Handbook

**DC-173**

**Receipt of Code of Ethics Handbook**

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF CORRECTIONS

I have received, read, and agree to abide by the Commonwealth of Pennsylvania, Department of Corrections Code of Ethics Handbook.

at _____

_____    _____
(Date)                                    (Employee Signature)

_____    _____
(Witness)                                 (Personnel Office Verification)

**WHITE**—Employee Copy    **CANARY**—Institutional Employee File    **PINK**—Department Employee File

# ATTACHMENT G

## Excerpt of Deposition of Vaughn Davis

```
 1              V. Davis - by Mr. Krakoff
 2      department policy was?
 3          Q.   Whether there was a policy, first of
 4      all, or is that something that --
 5          A.   Well, certainly, the department code of
 6      ethics and the governor's code of conduct would
 7      be, you know, the overwhelming authority there.
 8      Yes.
 9          Q.   And what would that mean?  What would
10      that counsel?
11          A.   Well, it simply means that everyone
12      who's inducted into service with the Department
13      of Corrections is trained and advised and given
14      an individual copy of the code of ethics and the
15      governor's code of conduct which would forbid
16      that type of fraternization that could be
17      considered sexual misconduct.
18          Q.   Here's what I'm asking, and I can reword
19      it, if necessary, but so that you understand the
20      thrust of my question.  We have a person, a
21      staff member accused by an inmate of sexual
22      abuse against the inmate, then there's an
23      investigation.  And then either in the wake of
24      the charges, in the wake of the investigation or
25      after a report is issued --
```

```
1                  V. Davis - by Mr. Krakoff
2      -- my question was misleading.
3                  MR. HALLORAN:  I thought you were
4      subjecting --
5                  MR. KRAKOFF:  No.
6         Q.  You're not sure of the first time that
7      you came?
8         A.  No.
9         Q.  Let me represent to you that we had
10     testimony earlier, and I believe it was by
11     Superintendent Wolfe, that -- well, let me
12     strike that.  I don't want to suggest anything.
13            Can you describe the circumstances in
14     which you first came to Cambridge Springs to
15     speak on the issue of sexual abuse?  You know,
16     what lead to that?
17        A.  There was a dialogue that had developed
18     between myself and the Deputy Commissioner,
19     Tom Fulcomer, including Superintendent Wolfe and
20     Deputy Kormanic, who was deputy of operations.
21            So it was really her responsibility --
22     you know, employee misconduct became her
23     responsibility rather than Deputy Utz.  And we
24     had developed a dialogue discussing the
25     possibility of some ethics, specific ethics
```

```
 1              V. Davis - by Mr. Krakoff
 2     lecturing, which I would conduct since I had
 3     done that in the police academy at IUP for many
 4     years.
 5              And they thought it would be appropriate
 6     if I would make that presentation of that type
 7     to the staff at Cambridge Springs.
 8         Q.  Did they tell you any event or events
 9     had precipitated their request or their
10     suggestion that you lecture on --
11         A.  I don't recall them talking about a
12     specific event.
13         Q.  Do you know whether the Zimmerman
14     allegations had already percolated by the time
15     you were asked to come?
16         A.  I'm really not sure.
17         Q.  Do you know whether an investigation
18     regarding Eicher's alleged abuse of Lambert had
19     been conducted when you were asked for the first
20     time to come lecture at Cambridge Springs?
21         A.  No.  No, I'm rather certain that hadn't
22     occurred yet.  I'm fairly certain that I started
23     to lecture up there before that situation.
24         Q.  Were you told anything that caused you
25     to believe at that time, the first time you were
```

# ATTACHMENT H

## Excerpt of Deposition of Mike Wolanin

```
 1              M. Wolanin - by Mr. Krakoff
 2    members of the staff toward inmates?
 3         A.  My take on Wolfe was he had zero
 4    tolerance for problems up at Cambridge Springs
 5    regarding any kind of sexual --
 6         Q.  Well, that's not the question that I
 7    asked you.  I asked you whether he had expressed
 8    to you any concerns of sexual abuse on the part
 9    or exploitation on the part of staff towards
10    inmates.
11         A.  Possibly on a case-by-case basis we may
12    have spoken, and his concern is if it's going
13    on, they shouldn't be there.
14         Q.  Yes.  But you can't recall any general
15    discussion where he expressed concern about in a
16    general sense --
17                   MR. HALLORAN:  I think he just
18    answered that.
19                   MR. KRAKOFF:  Okay.
20         Q.  Did you just answer that?
21         A.  Yeah, I did.
22         Q.  And the answer was no?
23                   MR. HALLORAN:  No.  The answer --
24    he --
25         A.  The answer --
```

```
 1              M. Wolanin - by Mr. Krakoff
 2        Q.   Did he ever say to you, you know, we
 3   have some problems up here and we've got to get
 4   to the bottom of it?  Did he ever say anything
 5   like that to you?
 6        A.   No.  He never came and said -- he never
 7   came to me and said no.  Forgive me.  I have a
 8   head cold.  He never came to me and said we have
 9   problems up here.  As each of these incidents or
10   any other incidents was identified and we became
11   involved in, it was handled on a case-by-case
12   basis, and, like I said, he had zero tolerance
13   for fraternization issues at the institution.
14        Q.   Yes.  Do you have any recollection of
15   Vaughn Davis coming to the institution between
16   February of '94 and May of '96 to provide
17   training to members of the staff with respect to
18   their behavior toward inmates?
19        A.   He was involved.  I wasn't involved in
20   going to Cambridge Springs.  From what I can
21   recall, he did a seminar or a program regarding
22   issues of fraternization.
23        Q.   You weren't there, though?
24        A.   I was not there.  So I don't know what
25   was said, what was not said.
```

```
1              M. Wolanin - by Mr. Krakoff
2      Wolfe relate to you that he had heard rumors
3      around the institution regarding Zimmerman's
4      possible sexual relationships with inmates?
5          A.   Did Wolfe relate that to me?
6          Q.   Yes.  Did Wolfe say to you, I've heard
7      rumors going around this institution that
8      Zimmerman had possible sexual relationships with
9      inmates?
10         A.   If he did, it was in -- during the
11     course of this investigation.
12         Q.   Oh, I understand that, and that's what
13     my question was related to.  In the course of
14     your investigation, did Wolfe say to you words
15     to the effect, I've heard rumors going around
16     this institution about possible sexual
17     relationships between Zimmerman and Cambridge
18     Springs' inmates?
19         A.   I can't say that Wolfe said that.  I can
20     explicitly recall that the night that we
21     interviewed Zimmerman, Wolfe said that if the
22     guy's dirty, he's dirty, he doesn't belong
23     here.  I cannot recall those words that you
24     threw at me, sir.
25         Q.   Was Wolfe present when you sat down with
```