# ATTACHMENT I

## Deposition of Ronald Lazenby

1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

LISA LAMBERT,              \*

    Plaintiff          \*NO.:

      vs              \*C.A. 96-247 - ERIE

SUPERINTENDENT,            \*

WILLIAM WOLFE, et.al.,\*

    Defendants          \*

                 \*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

RONALD R. LAZENBY

JUNE 9, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

Page 2

```
 1                   DEPOSITION
 2                      OF
 3   RONALD R. LAZENBY, taken on behalf of the
 4   Plaintiff herein, pursuant to the Rules
 5   of Civil Procedure, taken before me, the
 6   undersigned, Shannon C. Hagerty, a Court
 7   Reporter and Notary Public in and for the
 8   Commonwealth of Pennsylvania, at
 9   Commonwealth of Pennsylvania, Department
10   of Corrections, SCI-Cambridge Springs,
11   Cambridge Springs, Pennsylvania, on
12   Tuesday, June 9, 1998, at 2:30 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2
 3   ANGUS R. LOVE, ESQUIRE
 4   924 Cherry Steet
 5   Suite 523
 6   Philadelphia, PA  19107
 7       COUNSEL FOR PLAINTIFF
 8
 9   JERE KRAKOFF, ESQUIRE
10   1705 Allegheny Building
11   Pittsburgh, PA  15219
12       COUNSEL FOR PLAINTIFF
13
14   THOMAS HALLORAN, ESQUIRE
15   Sr. Deputy Attorney General
16   Litigation Section
17   6th Floor - Manor Complex
18   564 Forbes Avenue
19   Pittsburgh, PA  15219
20       COUNSEL FOR DEFENDANTS
21
22   ALSO PRESENT: Deputy Victoria L. Kormanic
23
24
25
```

Page 4

```
 1                  I N D E X
 2
 3   WITNESS:  RONALD R. LAZENBY
 4   EXAMINATION
 5       By Attorney Krakoff      7 - 147
 6   EXAMINATION
 7       By Attorney Love        147 - 154
 8   EXAMINATION
 9       By Attorney Halloran    154 - 155
10   CERTIFICATE                    156
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1         E X H I B I T   P A G E
 2
 3                            PAGE
 4   NUMBER   DESCRIPTION        IDENTIFIED
 5                NONE MARKED
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1           O B J E C T I O N   P A G E

2

3   ATTORNEY                          PAGE

4   Halloran                          56

5   Halloran                          69

6   Halloran                          86

7   Halloran                          91

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1           P R O C E E D I N G S

2   ----------------------------------------

3   RONALD R. LAZENBY, HAVING FIRST BEEN DULY

4   SWORN, TESTIFIED AS FOLLOWS:

5   ----------------------------------------

6   EXAMINATION

7   BY ATTORNEY KRAKOFF:

8   Q.   What is your name?

9   A.   Ronald, R-O-N-A-L-D, Ray, R-A-Y,

10   Lazenby, L-A-Z-E-N-B-Y.

11   Q.   And I'm Jere Krakoff. We haven't

12   really met. I'm representing three

13   women, and this is Angus Love, my

14   associate. I should say that we're

15   representing three women who allege in

16   separate Federal Civil Rights complaints

17   that their constitutional rights were

18   violated by alleged misconduct of a

19   sexual nature between members of the

20   staff here at Cambridge Springs and

21   themselves.

22        You're not a party to the

23   lawsuit. Lieutenant Bartlett who was

24   deposed this morning is one of the

25   Defendants, Superintendent Wolfe is one

Page 8

1   of the Defendants, Deputy Kormanic is one

2   of the Defendants. And then the

3   personnel who allegedly were directly

4   involved in the violations are named as

5   Defendants.

6        For your information the inmates

7   in question are Lisa Lambert, Sylvia

8   Vasquez and Robin Phillips, is the third.

9        Now, I don't know whether you've

10   ever had your deposition taken but

11   assuming --- have you?

12   A.   Yes, I have.

13   Q.   Just very, very basically I'm

14   here to ask you questions. I'm here to

15   try to collect as much data and

16   information about not only these three

17   issues but also about, from a historical

18   perspective any other investigations,

19   allegations that may or may not have been

20   investigated of alleged sexual

21   improprieties between staff members,

22   which would include not only officers but

23   maintenance staff personnel and the

24   industries personnel, et cetera. And so

25   as I put a question to you I don't always

Page 9

1   ask questions as clearly as I think I am,

2   and so I invite you and urge you to tell

3   me when you think you're confused by one

4   of my questions.

5   A.   I understand.

6   Q.   I'll either repeat or rephrase

7   it.

8   A.   I understand.

9   Q.   Your testimony is going to be

10   taken down by the Court Reporter who's to

11   your left. If you want to pause at some

12   point, just tell me and we will take a

13   break.

14   A.   Okay.

15   Q.   Now, how old are you Captain

16   Lazenby?

17   A.   I'm 48 years old.

18   Q.   How long have you been employed

19   first by the Department of Corrections

20   and secondly here at SCI-Cambridge?

21   A.   I've been employed --- I'm in my

22   25th year of finishing up 25 years. I

23   worked at SCI-Cambridge Springs from

24   February of 1992, to October 1997. I am

25   now at the State --- the State Regional

**Page 10**

1 Correctional Facility in Mercer, PA.
2 Q.   Where were you before you came to
3 Cambridge Springs?
4 A.   I came from SCI-Waynesburg. I
5 worked there from February of '88, to the
6 time I came in here which was February of
7 '92.
8 Q.   All right. And then you were
9 somewhere before that?
10 A.   Yeah, I started my career in
11 December of 1973 until February of '88 at
12 SCI-Pittsburgh. I was there, what, 14
13 years, 15 years, something like that.
14 Q.   And did you make your way up from
15 a CO eventually to a captain?
16 A.   Yes, I did.
17 Q.   Now, it's my understanding that
18 at one time you were the Intelligence
19 Captain here at Cambridge Springs?
20 A.   That is correct.
21 Q.   And when did you assume that
22 position?
23 A.   It would be somewhere late March
24 of 1995 until I left in October of '97.
25 Q.   I understand that you succeeded

**Page 11**

1 Captain Bartlett?
2 A.   That's correct.
3 Q.   Do you know who succeeded you?
4 A.   There was an acting Captain Beck
5 took my place. That's my understanding
6 it was.
7 Q.   Beck?
8 A.   Beck.
9 Q.   And he had been Lieutenant Beck
10 at one point here at Cambridge Springs?
11 A.   Yes, yes. My understanding was
12 he was an acting captain. He took my
13 position when I left.
14 Q.   Now, at the time you were
15 appointed to the position as Intelligence
16 Captain, what had your assignment been?
17 A.   I was basically captain of the
18 guard.
19 Q.   And just very generally what did
20 your function as captain of the guard
21 include? And I don't need a lot of
22 detail.
23 A.   Yeah. Basically, I oversaw the
24 lieutenants to make sure they were at
25 their jobs and staff. And assigned

**Page 12**

1 people to shifts and stuff like that.
2 Q.   Now, before becoming Intelligence
3 Captain, had you had any direct
4 involvement in investigations at
5 Cambridge Springs? And I'm not limiting
6 it to investigations of alleged sexual
7 misconduct on the part of staff members.
8 A.   Before I became Intelligence
9 Captain? No, basically no. That would
10 have been the --- at first it was the
11 security lieutenant then the Intelligence
12 Captain. No, it'd still be no.
13 Q.   Now, did you receive --- how much
14 notice did you have that you were going
15 to be appointed captain, intelligence
16 captain?
17 A.   They brought me up here, I'd like
18 to say, sometime late March, early April
19 and just said it's your --- you know,
20 you're going to be --- now be
21 Intelligence Captain. Bartlett will be
22 the captain of the guards.
23 Q.   So you switched positions
24 essentially?
25 A.   Yes.

**Page 13**

1 Q.   And how much --- you learned that
2 one day and how much after that did you
3 begin to function as the intelligence
4 captain? According to what period of
5 time?
6 A.   We had like a transitional
7 period. Where he put me up to speed what
8 he was, you know, what he was doing and
9 told me to look over his files and stuff
10 like that.
11 Q.   Did you receive any training
12 either on the job or more formal training
13 off site or on site in the nature of kind
14 of classroom instruction?
15 A.   Oh, I'll go back. I have a
16 degree in ---
17 Q.   We'll get to that.
18 A.   Okay.
19 Q.   But let me narrow it because that
20 was too broad of a question. And then
21 I'd like you to continue with what you
22 were saying. With respect to the new
23 position as intelligence captain, did you
24 receive any training either on site or
25 off site?

**Multi-Page™**

Page 14

1  A.    No.

2  Q.    But I take it that you had some,

3  what you consider to be some background

4  to prepare you for that position?

5  A.    Any experience as you grow ---

6  what 24 or what was it 23 years, you

7  know, you pick it up watching other

8  people do it.

9  Q.    Right.  Okay.  Now, after

10  assuming your position, did you receive

11  any training?

12  A.    I had to after.  Some formal

13  training, it would have been September,

14  1997 and what I picked up from Special

15  Investigator Mike Wolanin and I sort of

16  --- he's the professional.  And so when

17  he came in to talk I would watch what he

18  would do and we'd go over stuff, how he

19  did things.

20  Q.    Now, did you, when Wolanin was

21  conducting investigations at Cambridge

22  Springs, in the course of those

23  investigations, did you ever observe him

24  while he interviewed either staff member

25  or inmates?

Page 15

1  A.    Yes, I did.

2  Q.    Now, let me represent to you what

3  Lieutenant, what I believe Lieutenant

4  Bartlett told me and ask you whether your

5  experience ordinarily differed from his.

6  I asked Lieutenant Bartlett whether, when

7  Mr. Wolanin was interviewing either

8  witnesses or a person about whom

9  allegations had been made, that it was

10  Wolanin's practice not to have Lieutenant

11  or Captain Bartlett in the room with him.

12  Wolanin's practice, in Captain Bartlett's

13  experience, was to conduct the interviews

14  with Bartlett elsewhere, not inside the

15  room.  Now, I gathered from your response

16  to my previous question that wasn't quite

17  your experience; is that right?

18  A.    No, sometime --- what we'd do

19  we'd start out, he'd do the interviewing

20  I would put my input into it.  And if we

21  got to a point where he felt my being

22  there, he couldn't get what he was

23  looking for I would, he would sometimes

24  ask me to leave the room.

25  Q.    So it wasn't that uncommon for

Page 16

1  you to be there during at least a portion

2  of Wolanin's interrogation?

3  A.    No, it was not.

4  Q.    Could you summarize for me what

5  your function was in connection with

6  investigations of --- and I'm going to

7  give you a definition so that you

8  understand what I'm asking.  I gave

9  Lieutenant Bartlett the same definition.

10  What I'm going to be asking you about are

11  either allegations or investigations of

12  alleged sexual abuse or sexual

13  exploitation.  And I --- when I'm asking

14  about that, I'm asking about abuse and

15  exploitation by a staff member which can

16  include either a CO or somebody in the

17  trades or ---.

18  A.    I'm confused but go ahead and

19  I'll try to work with it.

20  Q.    Let me define what I mean by

21  sexual abuse and sexual exploitation.

22  This phrase encompasses activities such

23  as the touching of breasts by Cambridge

24  Springs personnel, buttocks, legs and

25  other private parts of the body of an

Page 17

1  inmate.  The kissing, caressing or

2  fondling of an inmate.  Attempts by

3  prison personnel to force or encourage

4  inmates to engage in sexual acts either

5  by words, threats or physical force.  Do

6  you understand that definition?

7  A.    Yes.

8  Q.    So that the definition is far

9  broader than sexual intercourse.

10  A.    Absolutely.

11  Q.    And when I ask you --- I may also

12  use a short term phrase which I used when

13  I questioned Lieutenant Bartlett.

14  Instead of always repeating sexual abuse

15  and exploitation I would use something

16  like sexual misconduct or allegations of

17  sexual misconduct.  They're

18  interchangeable.

19  A.    If I'm confused I'll ask you just

20  in case.

21  Q.    Yes, and I'd be glad to review

22  that definition with you again either now

23  or later.

24  A.    Okay.

25  Q.    Do you want me to review it now?

Page 18

1 A.   No, it's okay.
2 Q.   Now, have you brought any
3 institutional files with you today?
4 A.   No, I'm no longer at the
5 institution. I no longer have access to
6 any files.
7 Q.   Have you reviewed any
8 institutional files including but not
9 limited to investigative files,
10 misconduct records, fact-finding ---
11 notes of fact-finding sessions or any
12 other documents before this deposition
13 A.   I talked to Mr. Halloran and a
14 few light things. Nothing big.
15 Q.   I have no right to even inquire
16 about --- I don't want to inquire about
17 what you discussed with him. I might
18 have a right.
19 A.   I didn't look at the file, you
20 know what I mean?
21 Q.   Now, have you reviewed any
22 portions of the transcript of the
23 depositions of Deputy Kormanic or
24 Superintendent Wolfe? I'll represent to
25 you that I deposed him about a year ago.

Page 19

1 A.   No, I have not in either case.
2 Anybody's.
3 Q.   Now, who at the prison level ---
4 and I'm always going to be asking, if I
5 speak in present tense, I know you're
6 gone from there but sometimes I may use
7 the present. You understand that means
8 when you were here?
9 A.   Yes.
10 Q.   Who at the prison level had the
11 authority to either order or authorize an
12 investigation into possible sexual abuse
13 or exploitation on the part of Cambridge
14 Springs personnel?
15 A.   Superintendent.
16 Q.   Did anybody --- did you have any
17 occasions where somebody at the Central
18 Office level either Mr. Wolanin or
19 others, Mr. Davis or others at the
20 Central Office contacted you and either
21 ordered or asked you to conduct an
22 investigation, or did that always come
23 through the Superintendent?
24 A.   It always came through the
25 Superintendent. You know, whether they

Page 20

1 went to him and it filtered down through
2 me. I never got anything directly from
3 the OPR's office that said do this. It
4 would come from the Superintendent's
5 office.
6 Q.   And OPR is just a new way of
7 referring to ---
8 A.   Office of Professional
9 Responsibilities.
10 Q.   OSI or something?
11 A.   Office of Special Investigations.
12 They just changed the name recently.
13 Q.   That's correct. Now, am I ---
14 are there occasions where you, meaning
15 you or your lieutenant or others on your
16 behalf conducted an investigation on the
17 local level without the assistance of
18 anybody from the Central Office?
19 A.   Yes, we have.
20 Q.   And were there occasions when the
21 Central Office conducted an
22 investigation, by Central Office you know
23 what I mean?
24 A.   Yes, I understand.
25 Q.   Was the Central Office conducting

Page 21

1 an investigation without any
2 participation on the part of local
3 people, other than acting as a liaison or
4 facilitator?
5 A.   Not to my memory, no.
6 Q.   Were there occasions when the
7 Central Office did conduct investigations
8 into alleged sexual misconduct in the
9 part of a staff member against an inmate?
10 A.   You mean had they come in here
11 and done the ---
12 Q.   Yes.
13 A.   Yes, they have.
14 Q.   And I take it that on the
15 occasions that they came here they were
16 assisted by members of your staff?
17 Either you or ---?
18 A.   Yes, we usually help.
19 Q.   And what was the nature of the
20 assistance that either you or members of
21 the Cambridge Springs staff forwarded the
22 Central Office investigators?
23 A.   If I understand your question,
24 basically, we collected maybe statements
25 and that and handed everything over to

Page 22

1 them so they could get up to speed and
2 conduct an investigation.
3 Q.    So you would actually go out and
4 conduct interviews?
5 A.    If we already had something. If
6 somebody had already come to us with, or
7 wrote us a note or something like that
8 and we had possession of it.
9 Q.    Yes.
10 A.    When OPR came in, we would turn
11 it over to them.
12 Q.    But once OPR came in then it was
13 ---.
14 A.    We basically helped them. It was
15 there investigation. If that makes sense
16 to you.
17 Q.    Yes. Now, after becoming
18 intelligence captain, how many
19 investigations would you estimate, if you
20 don't know an exact figure, would you
21 estimate were conducted here at the
22 institution into allegations of alleged
23 sexual misconduct on the part of a staff
24 member against an inmate?
25 A.    I have no ideal. When I was

Page 23

1 doing it, I think I want to say a couple
2 two or three but I'm guessing. I really
3 am.
4 Q.    Now, prior to becoming
5 intelligence captain, I take it from your
6 earlier answer that you really didn't
7 participate in any investigations of the
8 kind that I'm exploring here ---
9 A.    That's correct.
10 Q.    --- in alleging sexual
11 misconduct?
12 A.    That's correct.
13 Q.    On the basis of you being the
14 captain of the guard at the time, from I
15 guess from the early days that this
16 institution opened ---
17 A.    That's correct.
18 Q.    --- until you assumed your
19 investigative duties in March of 1995,
20 did you learn about investigations being
21 conducted, first by prison personnel into
22 alleged misconduct of the sexual nature
23 involving staff and inmates and, two,
24 with respect to any Central Office
25 investigations into sexual matters?

Page 24

1 A.    I wasn't made part of them but I
2 would hear about them. I wouldn't know
3 any details or anything else. That's as
4 far as my ---.
5 Q.    I'm going to --- in a moment or
6 two I'm going to try to --- because
7 you've been here a long time, and I'm
8 going to try to perhaps refresh your
9 recollection if possible, by naming some
10 people who might have been investigated
11 and see if you know anything about that.
12        ATTORNEY HALLORAN:
13            When you ask the question
14 I also would like him to answer
15 in the context in the way he was
16 aware of it. In other words, he
17 may be aware of things now that
18 he wasn't aware of at the time it
19 was happening.
20        ATTORNEY KRAKOFF:
21            Sure.
22 BY ATTORNEY KRAKOFF:
23 Q.    Were you aware of it
24 contemporaneously with when the
25 investigations were conducted or did you

Page 25

1 become aware of it at a later point?
2 A.    Sometime --- usually at the later
3 point. I wasn't, like I said, everything
4 was kept confidential. I did not have
5 the need to know so I really wasn't
6 involved in them.
7 Q.    Were the outcomes of
8 investigations, to your knowledge, kept
9 confidential whether the investigation
10 concluded that there was sexual
11 misconduct or concluded that there was no
12 sexual misconduct?
13 A.    Did they come to me and tell me
14 the outcomes?
15 Q.    Not only to you but was the
16 information generally made known to
17 members of the Cambridge Springs staff?
18 First, when a --- I'll break it into two
19 questions. I take it that when an
20 officer or another staff member was
21 exonerated that information was not
22 generally published or made known to the
23 staff in general; is that correct?
24 A.    If I can go back. If they were
25 exonerated, the unit --- you knew that

Page 26

1 was --- something was happening. If they
2 were exonerated and nothing took place
3 and they didn't have any PDC you knew
4 that they were ---
5 Q.    You draw the inference?
6 A.    Yeah, you draw the conclusion
7 that there was nothing there.
8 Q.    Now, what about when --- are you
9 ever aware of a situation where the
10 conclusion of the investigation was that
11 a staff member had engaged in sexual
12 misconduct?
13 A.    Not quite --- I don't understand
14 the question. If you could ---?
15 Q.    Are you aware of any staff member
16 from 1992 until the time you assumed your
17 duties as an intelligence captain, were
18 you aware of either the Central Office or
19 local investigators concluding that a
20 member of the staff had engaged in sexual
21 misconduct?
22 A.    Yes.
23 Q.    And how did you become aware of
24 that?
25 A.    Basically, you just hear rumors

Page 27

1 going on. Nobody actually came to me and
2 said, we're doing an investigation on
3 such and such this person. But, you
4 know, you see things going on. You hear
5 rumors.
6 Q.    And nobody came to you and said
7 ---
8 A.    No.
9 Q.    --- such and such we found that
10 Mr. X had engaged in sexual misconduct?
11 A.    No, they didn't come and tell me
12 that.
13 Q.    To your knowledge was this
14 published, you know, in the form of a
15 memo or anything else of that sort to the
16 staff?
17 A.    No, not to my knowledge.
18 Q.    Now, okay, let me throw these
19 names --- let me preface this with ---
20 this is information that has been related
21 to me from various sources. And then
22 when I ask you whether you heard anything
23 about that doesn't necessarily mean that
24 it occurred. Okay. Does the name Carl
25 Zimmerman sound familiar?

Page 28

1 A.    Yes.
2 Q.    And what was his position when
3 ---?
4 A.    He was a maintenance
5 superintendent, I believe was his title.
6 Q.    Are you aware of any
7 investigation occurring about Carl
8 Zimmerman's relationship with Cambridge
9 Springs ---
10 A.    I heard the rumors.
11 Q.    --- with a Cambridge Spring
12 inmate or inmates?
13 A.    I had heard the rumors.
14 Q.    Are you aware of what happened to
15 Mr. Zimmerman?
16 A.    No.
17 Q.    You know at some point there came
18 a time where he no longer worked here?
19 A.    Yes.
20 Q.    Do you know whether he resigned
21 or whether he was discharged?
22 A.    I have no idea.
23 Q.    You had heard rumors that he was
24 being investigated?
25 A.    Yes, like I said people talk.

Page 29

1 But I wasn't made privy to the
2 investigation or anything else.
3 Q.    And so with respect to Carl
4 Zimmerman, you never received any
5 information of a solid nature that there
6 had been any sort of a determination that
7 he had engaged in sexual misconduct?
8 A.    No, I never saw anything.
9 Q.    According to the rumor mill were
10 any inmates mentioned in connection with
11 Carl Zimmerman?
12 A.    Oh, I'm sure there were but I
13 have no idea who they would be.
14 Q.    You don't have any --- okay.
15 A.    No, I wouldn't.
16 Q.    Paul Walton?
17 A.    Yes.
18 Q.    Are you familiar with him being
19 investigated?
20 A.    Yes, I was.
21 Q.    Did this happen during the time
22 that you were the intelligence captain?
23 A.    No.
24 Q.    Before right?
25 A.    Before.

Page 30

1 Q. And do you know what Walton
2 allegedly had done?
3 A. Something about sexually did
4 something with an inmate. I know it went
5 to court and, you know, what you read in
6 the papers.
7 Q. Right. But do you remember where
8 it was and what occurred?
9 A. Something about over in dietary.
10 I'm not quite sure, in the freezer or
11 something or other. Again, I wasn't made
12 privilege to the information.
13 Q. After you assumed the position as
14 intelligence captain, did you have access
15 to Paul Walton's file? Is there a ---
16 let me ask it this way. Did Lieutenant
17 Bartlett maintain case files for the
18 cases that he was investigating, separate
19 discreet case files?
20 A. Yeah, I received some from him,
21 yes.
22 Q. Were they in the filing cabinet?
23 A. He brought them to my office.
24 Q. Were those active ongoing cases?
25 A. Not to my knowledge, no.

Page 31

1 Q. They had already been taken care
2 of?
3 A. Do you recall what they were?
4 Were they broader than --- did they
5 include issues other than sexual
6 misconduct?
7 A. Yes, yes.
8 Q. Did you ever review the Walton
9 file?
10 A. No, it was pretty well dead so I
11 really --- there was no --- I think it
12 was on appeal and I really didn't --- I
13 didn't sit down and read the file.
14 Q. There's no need for you to know?
15 A. No, not that it, you know, he was
16 gone, it was over and everything else.
17 Q. What about James Eicher? Have
18 you ever reviewed the file on James
19 Eicher?
20 A. No.
21 Q. Did you not review it for the
22 same reason you didn't review the Walton
23 file?
24 A. Yeah, this all took place before
25 I did.

Page 32

1 Q. Now, what if anything were you
2 told or did you learn about Eicher and
3 what he had allegedly done or had done?
4 A. I really learned about his when
5 Ms. Lambert wanted to see me and she
6 talked to me about it.
7 Q. Okay.
8 A. That was sometime in May of '95.
9 Q. This was after you had assumed
10 your ---?
11 A. Yeah, shortly after, you know, a
12 few weeks after a month or whatever it
13 was.
14 Q. Can you describe how that meeting
15 occurred? Where you were and what ---
16 A. Basically, I was in my office. I
17 believe I received a phone call from the
18 officer in restricted house unit, that
19 was where Lisa Lambert was housed, and
20 that she wanted to see me. She had some
21 information. So I had her escorted over
22 to my office. She came in the office and
23 basically, she said, I have some
24 information. The text was basically do
25 you have any, you know --- Lisa I

Page 33

1 understand is all business. Do you have
2 anything new? Do you have any evidence?
3 And she said, yes I do. I said, well
4 where's it at. I'd like to see it. And
5 she said, it's back in my cell. I told
6 her, okay, don't tell anybody. I'll have
7 you escorted back over to your cell.
8 Don't tell anybody what you're doing. Go
9 get it get it for me. Do not show it to
10 anybody. Bring it back to show me.
11       And basically, I told the
12 officers who escorted her over, don't ask
13 her questions. Don't do anything. She's
14 going to get something for me. Don't
15 look at it. Bring it over here and give
16 it to me. She did that within a half
17 hour, whatever it took her to go back,
18 get the stuff and bring it back. She
19 brought it to me and I looked at it and I
20 thought there was something to it. And
21 that's basically the text of that.
22 Q. Do you remember what it was that
23 she brought?
24 A. I think calendars. I saw it one
25 time and never saw it again.

Page 34

1 Q.   But there was something that in
2 your mind led some credence to
3 allegations that Eicher had somehow ---?
4 A.   Yes, that there was inappropriate
5 behavior. At the time, that's was what
6 my feeling was.
7 Q.   And now that ultimately then, was
8 the --- at the time that you spoke with
9 Lisa was there an ongoing investigation?
10 A.   Not to my knowledge.
11 Q.   Did a new investigation begin
12 after you saw the calendar?
13 A.   Yes, yes.
14 Q.   And how was that triggered?
15 A.   Basically, ---
16 Q.   I know you told me you got some
17 information ---
18 A.   Yes, and I notified the
19 Superintendent. I believe it was one or
20 two days after that I went to National
21 Guard. I was in the Pennsylvania
22 International Guard. I went to summer
23 camp out in Nevada and I never saw
24 anything more about it but it was the end
25 of mine and OPR came in and Lieutenant

Page 35

1 Beck. And I was never involved in it
2 again.
3 Q.   Did Lieutenant Beck on the
4 institutional level have some
5 involvement?
6 A.   Yes, he did. That's my
7 understanding any ways. Evidently,
8 you're looking for the --- she said she
9 had more because I asked her, do you have
10 anymore. She said she had more. Her
11 attorney had it and she was trying to get
12 transferred and all that. I said, Lisa,
13 you know, I'm not in a position --- I
14 can't make deals.
15 Q.   Okay.
16 A.   If there was more evidence than
17 that, I never did see it.
18 Q.   I'm going to come back to the
19 Lambert situation a little later. Let me
20 refer you to Exhibit 27. And you have a
21 copy of that there. You'll notice you
22 the numbers of the pages on the bottom
23 (indicating). If you can turn to page
24 29?
25 A.   Does it start off with 1 ---?

Page 36

1 Q.   I can't ---.
2 A.   Okay. I'm on the same page.
3 Q.   Can you flip through these pages,
4 29 onward, and tell me were there any of
5 ---?
6 A.   That does not look familiar.
7 Q.   No?
8 A.   Uh-huh (yes).
9 Q.   Now, do you recall investigating
10 or recommending an investigation of
11 Eicher in connection with any other
12 women, another Cambridge Spring woman?
13 A.   Not that I remember, no.
14 Q.   Let me give you some names and
15 see if any --- if you might have, Paula
16 Hoover?
17 A.   No.
18 Q.   Elizabeth Jones?
19 A.   No.
20 Q.   You heard of the Maysonet sister?
21 A.   No.
22 Q.   Another staff member, Jim Merry,
23 do you know anything about his being
24 investigated?
25 A.   Yeah, I caught the very end.

Page 37

1 That was already an ongoing or they had
2 already did something with it because I
3 remember about the time I took over I
4 went out with Michael Wolanin to
5 interview a person. He wanted to take me
6 up and show me how, you know, the police
7 powers to track this person down.
8 Q.   Now, was this person a former
9 staff member or current staff member?
10 A.   No, it was somebody that owned a
11 kung fu shop that Merry had used to ---
12 Merry, he was a member of it and he was
13 using --- allegedly using the phone at
14 this person's to call, I think, Maysonet.
15 I'm not sure what sister. I'm not sure.
16 Like I said, I caught the very end of
17 that.
18 Q.   Do you recall any investigation
19 of Merry in connection with Carmella
20 Bynum?
21 A.   No.
22 Q.   Is Merry still here?
23 A.   No, he was gone by the time I ---
24 he was already gone by the time --- when
25 I got involved I think it was April.

Multi-Page™

Page 38

1 Q.   He was already gone?
2 A.   He was already gone.
3 Q.   Were you told by anybody in the
4 administration why he was gone?
5 A.   Not to my knowledge. I don't
6 remember actually coming and saying this
7 is why Officer Merry is gone, no.
8 Q.   Do you recall any more
9 generalized announcement to other staff
10 members indicating why Merry was gone?
11 A.   No, if you're asking if they put
12 out for publication to let people know.
13 No, that's never been the practice.
14 Q.   To do that?
15 A.   To publish, yeah, to publish
16 stuff like that.
17 Q.   Roger Beck, is that Captain Beck
18 now?
19 A.   No, he's a Lieutenant. He was
20 acting. Now, he's back to Lieutenant
21 Beck.
22 Q.   Are you aware of his being
23 investigated at any point in connection
24 with alleged sexual misconduct?
25 A.   No.

Page 39

1 Q.   Do you know an inmate by the name
2 of Marjoline DeBello?
3 A.   The name's familiar. I do not
4 know, you know, the name. I do not know
5 the inmate personally.
6 Q.   Jerome Coffee, are you aware of
7 his being investigated?
8 A.   No.
9 Q.   Were you aware of any rumors
10 about his being involved with any of the
11 prisoners?
12 A.   Seems like there was something
13 and I don't know --- I know it was looked
14 into. But I remember something about it
15 but I didn't care to know.
16 Q.   Does Marita Diaz sound familiar?
17 A.   Diaz?
18 Q.   Diaz.
19 A.   Her name sounds familiar but ---.
20      DEPUTY KORMANIC:
21           Marissa.
22 A.   Yeah, I was going to say Marissa
23 Diaz.
24 BY ATTORNEY KRAKOFF:
25 Q.   What about Phillip David Schmidt,

Page 40

1 are you aware of any allegations of his
2 being involved in any sexual misconduct
3 toward an inmate?
4 A.   I had heard it or something but
5 I'm not even sure when I heard it.
6 Q.   Do you remember what you heard?
7 A.   No.
8 Q.   And I take it you're not aware of
9 what inmate or inmates he was allegedly -
10 --
11 A.   No, I don't remember details at
12 all. Like I said, you hear stuff.
13 Q.   Bob Rogers, did you hear anything
14 about him?
15 A.   Not right off the top of my head,
16 no. He was a lieutenant here.
17 Q.   Is he still here?
18 A.   No.
19 Q.   Do you know why he left?
20 A.   He asked to be transferred. He
21 took a demotion and transferred to
22 Mercer. He works at Mercer with me.
23 Q.   Wayne Young, plumbing trades
24 instructor, I understand?
25 A.   Yeah, there was something about

Page 41

1 it. I don't remember well. I don't know
2 if it was any sexual allegations or just
3 bringing stuff in for inmates. I'm not
4 sure what it is right off the top of my
5 head.
6 Q.   When you assumed your position or
7 at anytime after you assumed it during
8 that approximately two-year period, were
9 you ever told either by the
10 administration here at Cambridge Springs
11 or the Central Office that bringing ---
12 about the significance if any, of a staff
13 member bringing in gifts for an inmate?
14 A.   That's been since my --- since I
15 started with the department back in '73.
16 That has always been a no-no.
17 Q.   Were you told why?
18 A.   I'm sure I was but common sense
19 would tell you that, you know, it's
20 inappropriate to bring things for
21 inmates. It's been longstanding with the
22 department.
23 Q.   Did you in any of the
24 investigations that you conducted, did
25 any of those investigations involve, I'm

**Multi-Page™**

Page 42

1  not saying were they limited to, but were
2  any of them involved in bringing of gifts
3  for inmates?
4  A.  Yes, if I remember.
5  Q.  Do you remember what
6  investigation or investigations ---?
7  A.  No, not right off the top of my
8  head.  We never did find --- we never
9  found any proof, you know.  Allegations
10  but no proof.
11  Q.  What about Officer Stone, have
12  you heard anything about either his being
13  investigated for alleged sexual
14  misconduct or ever about his being
15  involved in such conduct?
16  A.  Inappropriate behavior is
17  basically what his was.
18  Q.  And what was that?  What did that
19  consist of?
20  A.  With another inmate, talking to
21  her when he shouldn't be.  I don't
22  remember the details.  It was nothing ---
23  no sexual ---.
24  Q.  Not sexual?
25  A.  No.

Page 43

1  Q.  Is Officer Stone still here?
2  A.  No, he resigned.
3  Q.  Do you know why, the
4  circumstances of his resignation?
5  A.  I think it had to do with the
6  investigation.  He just had enough, you
7  know.  I can't go into --- but he
8  resigned.
9  Q.  Harry Stewart, food service
10  manager?
11  A.  I know him.  I don't know
12  anything.
13  Q.  Nothing?
14  A.  No.
15  Q.  What about John Raun?
16  A.  I had heard it with the, you
17  know, Lisa Lambert thing.
18  Q.  Had you heard that he was under
19  investigation at one point?
20  A.  Yeah, because, you know, you hear
21  --- it's correct.
22  Q.  And did Raun ever tell you why he
23  was being investigated, ---
24  A.  No.
25  Q.  --- what the allegations were?

Page 44

1  A.  No, you figured it out from, you
2  know, what things you heard.
3  Q.  What did you hear?
4  A.  That with Lisa Lambert that he
5  had been with Lisa Lambert and something
6  about he pushed her or something and
7  shoved her and stuff like that.
8  Q.  Had you heard anything about
9  allegations by Ms. Lambert or by other
10  inmates that Raun had engaged in any sort
11  of sexual misconduct in relation to Lisa
12  Lambert?
13  A.  Not that I remember, no.
14  Q.  Did you at any point become aware
15  of the fact that Lisa Lambert had spoken
16  with Deputy Utz about alleged harassment
17  by Officer Raun toward her?
18  A.  I had heard those rumors.
19  Q.  And did Officer Raun at some
20  point tell you that he had heard that
21  Lisa had gone to Deputy Utz?
22      ATTORNEY HALLORAN:
23          Let me just clarify the
24  question.  You're asking about a
25  particular point in time?

Page 45

1      ATTORNEY KRAKOFF:
2          Yes, 1993.
3  A.  That would have been before ---
4  no, not that --- did he come to me and
5  ask me, not to my knowledge, no.
6  BY ATTORNEY KRAKOFF:
7  Q.  At what point --- what year was
8  it that you became aware that Lisa
9  Lambert had gone to Deputy Utz?
10  A.  I couldn't even tell you.  You
11  know, you just hear the rumors, you know.
12  You're not dumb.  You figure out all ---
13  you see things going on and, you know,
14  OPR coming in and talking to people, you
15  can figure it out, been around for a long
16  time.  I couldn't give you the time
17  frames.
18  Q.  Well, was it early in the opening
19  of this institution or toward the time
20  that you left?
21  A.  No, it was ---.
22      ATTORNEY HALLORAN:
23          He already answered the
24  question.
25  BY ATTORNEY KRAKOFF:

Multi-Page™

Page 46

1 Q.   You don't remember; is that
2 right?
3 A.   It would --- yeah, really.
4 Q.   Were you a friend of Officer
5 Raun's?
6 A.   No, co-worker.
7 Q.   You didn't socialize with him?
8 A.   No.
9 Q.   Did you at any point in 1993,
10 call Lisa to your office to speak with
11 her about the Raun situation?
12 A.   Did I call for her?  No, I
13 wouldn't have been involved in it.
14 Q.   Did you have her brought to the
15 office?
16 A.   I don't that I remember.
17 Q.   Did Bartlett, while he was in the
18 office have Lisa Lambert brought to your
19 office?
20 A.   He could have.  That would have
21 been more appropriate for him to call her
22 --- call her over, if he was involved in
23 the investigation than me.
24 Q.   Do you recall a meeting, I'm told
25 that it was Bartlett's office.  Do you

Page 47

1 recall meeting in Bartlett's office,
2 where Bartlett and you and Raun were
3 present and Lisa Lambert was also
4 present?
5 A.   There's a possibility.
6 Q.   And can you tell me what you
7 recall about that possible meeting?  I'd
8 like you to think very carefully about it
9 and as much detail as possible and tell
10 me what you recall?
11 A.   I can't think, Raun, even if he
12 brought her or had her called over.
13 Basically, if he --- if you were talking
14 to an inmate about other staff, you'd
15 want like a witness, to make sure, you
16 know, nothing was misunderstood.  Again,
17 you didn't want to get caught in a
18 situations where they could accuse you of
19 doing something.  But if you're talking
20 about exactly what took place, no, I'm
21 not sure.
22 Q.   Do you remember generally what
23 took place?
24 A.   If it was Lisa Lambert, there was
25 an investigation.  It probably had to be

Page 48

1 an investigation or ---.
2 Q.   Do you know?  I don't want you to
3 guess.
4 A.   It was a lot of times that I sit
5 in on meetings.  If it was particulars, I
6 couldn't tell you.  It was particulars I
7 couldn't --- there were a lot times I sit
8 in on meetings.
9 Q.   Do you know whether this meeting
10 concerned either Raun's alleged behavior
11 toward Lisa Lambert or Lisa Lambert's
12 alleged behavior toward Raun?
13 A.   No, I don't remember.
14 Q.   Do you recall Lisa Lambert crying
15 at that time?
16 A.   I don't remember Lisa Lambert
17 ever crying.
18 Q.   Never?
19 A.   No, not right off the top of my
20 head, no.
21 Q.   Do you recall getting angry at
22 Lisa Lambert?
23 A.   I don't get angry at anybody.
24 Q.   Well, whether you were angry or
25 not, did you become harsh in your ---?

Page 49

1 A.   No, I wouldn't.  That's not my
2 personality.
3 Q.   Are you aware of Bartlett being
4 investigated in relation to allegations
5 that he hadn't conducted an inadequate
6 investigation into the Raun situation?
7 A.   No.  No, there would have been
8 --- I wouldn't have done it.  We wouldn't
9 investigate each other.  They would have
10 brought someone in from outside if it
11 took place.
12 Q.   Did you at any point warn or
13 caution or tell Lisa Lambert that she
14 better not get Raun into any trouble?
15 A.   No.
16 Q.   Were you at any point ever
17 interviewed as part of an investigation
18 of Officer Raun's alleged behavior toward
19 Lisa Lambert?
20 A.   No, no.
21 Q.   Were you ever interviewed as part
22 of an investigation of Captain Bartlett?
23 A.   Not that I would know.
24 Q.   Now, are you aware of an Officer
25 by the name of Emmanuel Montegjo?

Page 46 - Page 49

Page 50

1 A.  Yes.
2 Q.  Did you hear of any allegations
3 of any sexual misconduct on his part
4 toward staff --- toward inmates?
5 A.  Not by your definition, no.
6 Maybe inappropriate behavior, you hear
7 the stuff.  It was ---.
8 Q.  Just a rumor?
9 A.  Yeah, I don't remember going
10 anywhere with it.
11 Q.  What about Bill Free?
12 A.  Nothing sexual I remember.
13 Q.  Anything in connection with
14 either Lisa Lambert or an inmate by the
15 name of LeAnn Jafka?
16 A.  No, not that I recall, no.
17 Q.  Had you heard anything of a non-
18 sexual relation that related with his
19 dealings with inmates?
20 A.  No.
21 Q.  Are you aware of a person,
22 laundry supervisor here at the prison one
23 time, his name was Requine?
24 A.  Requine?
25 Q.  Yes.

Page 51

1 A.  Yes.
2 Q.  R-E-Q-U-I-N-E or something like
3 that.
4 A.  Yes, I'm not sure how the
5 spelling is.  Yes, he was --- he worked
6 in the laundry.
7 Q.  At any point, did you hear that
8 he was under investigation for alleged
9 sexual misconduct?
10 A.  No, no.
11 Q.  Do you know the circumstances of
12 why he left here?
13 A.  He really had bad health.
14 Q.  Bad health?
15 A.  Uh-huh (yes).  I think he's dead.
16 He might be deceased by now, I'm not
17 sure.
18 Q.  What about Richard Hammers?  Do
19 you recall anything about his being
20 investigated or allegations made about
21 him?
22 A.  Allegations but I can't remember
23 right off the top of my head what they
24 were.
25 Q.  You weren't involved in the

Page 52

1 investigation associated with Hammers?
2 A.  No.
3 Q.  What about a staff member by the
4 name of Randolph?
5 A.  Yes.
6 Q.  Do you recall, was he an officer?
7 A.  No, he was a maintenance person,
8 an electrician.
9 Q.  And did you hear any allegations
10 of sexual misconduct on his part?
11 A.  No, they weren't sexual in
12 nature.
13 Q.  What about Lieutenant Mort?
14 A.  I was --- I heard them.  That's
15 about it.
16 Q.  What were the allegations?
17 A.  I'm not even sure what they were.
18 He like resigned.  He come in on Sunday
19 or Saturday and resigned on a Monday.
20 Q.  Jennifer Langford; did you hear
21 any allegations about her?
22 A.  Something about it.  I couldn't
23 ---
24 Q.  You don't remember what?
25 A.  No.

Page 53

1 Q.  Martin Miller?
2 A.  Yes, I'm aware of that.
3 Q.  Were you involved in
4 investigating him?
5 A.  Yes, I was, along with OPR or I
6 helped OPR.
7 Q.  And Linda Bisch, from dietary?
8 A.  I heard about that one.  I wasn't
9 involved in it.
10 Q.  What did you hear about that?
11 A.  Something with an inmate.
12 Q.  Was it of a sexual nature or
13 romantic nature?
14 A.  Maybe romantic nature.  I don't
15 remember hearing anything sexual about
16 it.
17 Q.  Lisa Strickland?
18 A.  That doesn't ring a bell at all.
19 Q.  Bruce Allen?
20 A.  I heard something about him.  He
21 resigned.  I don't think his was --- he
22 was involved in anything.
23 Q.  CO Lofton?
24 A.  Yes.
25 Q.  What did you hear about him, if

**Multi-Page™**

Page 54

1 **anything?**
2 A.   I'm trying to think if I did the
3 investigation. If I remember right, he
4 was --- he wanted to make a phone call to
5 an inmate or something like that. It was
6 nothing sexual.
7 **Q.   Okay.**
8 A.   And I could be ---.
9 **Q.   Was she a former inmate or**
10 **current inmate?**
11 A.   Former.
12 **Q.   You mean he tried to make a phone**
13 **call from ---**
14 A.   If I remember, yeah. He was
15 trying ---.
16 **Q.   --- from here?**
17 A.   No, he was going to have her
18 contact him.
19 **Q.   Okay.**
20 A.   And that could be --- I'm trying
21 to think if that's the guy.
22 **Q.   Maybe not?**
23 A.   No. Yeah.
24 **Q.   Now, did you have any discussion**
25 **with Superintendent Wolfe in connection**

Page 55

1 **with how he viewed the level of sexual**
2 **abuse or exploitation at the prison?**
3 A.   He would not tolerate it
4 whatsoever. He actively went after
5 people, had me actively go after people.
6 **Q.   Did he ever indicate to you or in**
7 **your presence how significant he thought**
8 **the scope of any problem was associated**
9 **with sexual abuse or exploitation of**
10 **inmates?**
11 A.   I'm not sure what you're asking.
12 **Q.   Well, did he ever say like ---**
13 **I'm trying to get a sense of how serious**
14 **he thought the problem was of sexual**
15 **misconduct on the part of officers toward**
16 **inmates, which could be anything from**
17 **zero to a hundred.**
18      ATTORNEY HALLORAN:
19          I think he already
20 answered the question, that he
21 thought --- he said he wouldn't
22 tolerate it. What you're trying
23 to ask him now is how prevalent
24 he felt the problem was. Which
25 is a different ---.

Page 56

1      ATTORNEY KRAKOFF:
2          That's right. Whether
3 the Superintendent ever expressed
4 to him ---
5      ATTORNEY HALLORAN:
6          One way or the other.
7      ATTORNEY KRAKOFF:
8          --- one way or the other
9 how significant or how prevalent
10 he thought the problem was.
11 A.   Not to my knowledge, no.
12 BY ATTORNEY KRAKOFF:
13 **Q.   Okay.**
14 A.   I mean he didn't sit down and we
15 have a serious problem and --- if that's
16 what you're asking. No, he never
17 discussed that kind of stuff with me.
18 **Q.   Did he ever indicate to you**
19 **without using an adjective, I mean, did**
20 **he indicate to you in other ways the**
21 **extent, if any, to which he thought it**
22 **was a significant problem?**
23      ATTORNEY HALLORAN:
24          I'm going to object to
25 the form of the question. You

Page 57

1 can't --- the word significant
2 has two different meanings. You
3 can use it in two different ways.
4 BY ATTORNEY KRAKOFF:
5 **Q.   The same question that I asked**
6 **originally about Superintendent Wolfe**
7 **about whether he ever indicated the**
8 **magnitude of the problem in his mind to**
9 **you. Did Deputy Kormanic?**
10 A.   No.
11 **Q.   What about Deputy Utz?**
12 A.   No, I didn't have much contact
13 with Deputy Utz.
14 **Q.   Did Keith Bartlett during that**
15 **transition period ever indicate to you**
16 **how significant he thought the problem**
17 **was?**
18 A.   No. Not to my knowledge, no.
19 **Q.   How long did that transition**
20 **period last?**
21 A.   It was like two or three weeks.
22 You have to go back once you're doing
23 something like that and you're, you know,
24 what's going on, if I was reading
25 something or heard something, have you

Page 58

1 looked in, you know, stuff like that.
2 Q. Sure.
3 A. It took a little bit, not long.
4 Q. What ongoing cases of alleged
5 sexual misconduct did you inherit from
6 Captain Bartlett?
7 A. None that I remember. Everything
8 was pretty well closed up.
9 Q. What cases of alleged sexual
10 misconduct were generated during the time
11 that you were intelligence captain?
12 A. How many?
13 Q. Yes, well we know Miller; is that
14 right?
15 A. Yeah.
16 Q. Any others?
17 A. Not right off the top of my head,
18 no.
19 Q. So as I understand your
20 testimony, when you assumed the position
21 as intelligence captain, there were no
22 open investigations that were occurring
23 at the institutional level?
24     ATTORNEY HALLORAN:
25         I think he testified to

Page 59

1 one. I think Sergeant Merry, you
2 said, was still.
3     ATTORNEY KRAKOFF:
4         I thought he had left
5 already.
6 A. He had already left.
7     ATTORNEY HALLORAN:
8         He had left but I think
9 you said the investigation was
10 ---.
11 A. Well, they were trying to find
12 him for whatever reason. I don't know if
13 that's open. They were looking for him
14 to ask him some questions, if you want to
15 consider that open.
16 BY ATTORNEY KRAKOFF:
17 Q. So there was one that there was
18 some activity?
19 A. Yeah, that's correct.
20     ATTORNEY HALLORAN:
21         That's the one with the
22 kung fu that you were talking
23 about.
24 A. Yes, that's absolutely correct,
25 yes.

Page 60

1 BY ATTORNEY KRAKOFF:
2 Q. Other than the Merry case, did
3 you inherit any open cases from Captain
4 Bartlett?
5 A. Not that I remember.
6 Q. Are you aware of any open cases,
7 active investigations of alleged sexual
8 misconduct occurring at the Central
9 Office level involving Cambridge Springs,
10 after you assumed your duties?
11 A. No, not that I can remember.
12 Q. And the Miller case was one that
13 actually the Central Office did much of
14 that investigation; didn't it?
15 A. Yes.
16 Q. But you did a significant amount,
17 as well on the prison level?
18 A. Yes.
19 Q. Other than the Miller case, can
20 you recall any other case that the
21 Central Office investigated either by
22 self or with the support of Cambridge
23 Springs staff, after you became
24 intelligence captain?
25 A. Not right off the top of my head.

Page 61

1 Q. Do you think there were any or do
2 you doubt that there were?
3 A. After I took over?
4 Q. Yes.
5 A. There was one with --- it was
6 inappropriate behavior.
7 Q. And who did that involve?
8 A. Mary Hall, Sergeant Chase, an
9 inmate that already left.
10 Q. Is that one where she had some
11 relationship or seeking a relationship?
12 A. Something like that, it was never
13 ---
14 Q. I don't know why I didn't mention
15 her.
16 A. That would be the only one.
17 Q. Okay.
18 A. And it was just inappropriate
19 behavior.
20 Q. When I asked you the questions
21 about whether Wolfe or Utz or Kormanic or
22 Bartlett expressed one way or the other
23 what they thought the magnitude of the
24 problem was, you know, I think I was
25 focusing on whether you were ever present

**Multi-Page™**

Page 62

1 when they expressed it. Do you recall
2 any memos or written documents, where
3 they expressed a view of what they
4 thought the magnitude of what the quote,
5 the problem was?
6 A.    Not that I ever read, no.
7 Q.    Let me refer you to Exhibit 27,
8 which is in the first volume.
9 A.    I'm on the page.
10 Q.    This concerns an investigation of
11 James Eicher.
12 A.    Yes.
13 Q.    And the second page, where it
14 says synopsis. Michael Wolanin states
15 that quote, this investigation was
16 authorized by Vaughn L. Davis, Director
17 of Special Investigations Office, IO on
18 May 24, 1995, predicated by memo to the
19 Director from Captain Ronald Lazenby,
20 State Correctional Institution Cambridge
21 Springs.
22      So does this refresh your
23 recollection that during your tenure
24 there was an investigation of Eicher?
25 A.    Yes.

Page 63

1 Q.    Okay.
2 A.    But I wasn't involved in it.
3 Q.    And this makes reference to a
4 memo and you'll see on page five, if you
5 turn to page five. Do you see where it
6 says details? You'll see the last line.
7 It says a copy of Lazenby's memo is
8 appended as attachment number one.
9 A.    Yes.
10 Q.    And then if you turn to page   15
11 of this Exhibit, you'll see on pages 15
12 and 16 a two-page document which is
13 identified as attachment one.
14 A.    Yes, but that's not mine.   .
15 Q.    That's not yours?
16 A.    No.
17 Q.    Okay.
18 A.    It's not my handwriting.
19 Q.    Why don't you look at the
20 information and tell me whether you
21 remember any of this information coming
22 to your attention in some other form?
23      Well, had you seen these
24 allegations in either this document or in
25 some other document more or less during

Page 64

1 that time period?
2 A.    It doesn't ring a bell, no.
3 Q.    Now, do you recognize the
4 printing or do you believe that you
5 recognize the printing?
6 A.    No, I just know it's not mine.
7 I'm not a very good printer.
8 Q.    Now, let me refer you to Exhibit
9 125. It's the very last document.
10 A.    Yes.
11 Q.    This is a document dated the 6th
12 of May 1995.
13 A.    Uh-huh (yes).
14 Q.    6th of May 1995. It's apparently
15 from J. Metzger --- is that Officer Jill
16 Metzger?
17 A.    I'm not --- it's a female
18 officer.
19 Q.    And do you see on the very top of
20 the right hand corner it says cc Lazenby?
21 A.    That's correct.
22 Q.    And also S-U-P-T, which I assume
23 is superintendent?
24 A.    Uh-huh (yes).
25 Q.    And you'll see on the second page

Page 65

1 of this document, which I think might be
2 the same, looks similar.
3 A.    Yes, it does.
4 Q.    Now that you see Exhibit 125, do
5 you have a recollection of ever reviewing
6 this document?
7 A.    No.
8 Q.    You became the intelligence
9 captain at the end of March, so you ---
10 A.    Yes.
11 Q.    --- by May 6th, you would have
12 been the intelligence ---?
13 A.    That's correct.
14 Q.    Were you working at the prison on
15 or about the 6th of May 1995?
16 A.    I'd have to look at a calendar.
17 Q.    I mean, you weren't ---?
18 A.    Yeah, I was here. If it was the
19 next day or something I got vacation.
20 Q.    You'll notice it says actions
21 taken. It says, reviewed, previously
22 brought to my attention and turned over
23 to Deputy Kormanic and Captain Lazenby.
24 A.    Yes.
25 Q.    This is signed by Lieutenant

Page 66

1 Foster?
2 A.  Yes.
3 Q.  Do you have any recollection of
4 Lieutenant Foster giving you a document
5 of this sort?
6 A.  No, not right off the top of my
7 head.  I did not always get things that
8 were --- that would be cc'd to me.  I
9 just didn't get them all the time.
10 Q.  So --- you can see the various
11 officers and other personnel who were
12 named in this two-page attachment to
13 Officer Metzger's report, ---
14 A.  Yes.
15 Q.  --- that these concerned Eicher,
16 not only in connection with Lisa Lambert,
17 but other allegations that Eicher had
18 contact with other female prisoners in
19 1993 and 1994; isn't that ---?
20 A.  That's what it says.
21 Q.  Isn't that what it says?
22 A.  Yes, that's what it says.
23 Q.  And this document also reflects
24 that there were other officers other than
25 Eicher who allegedly had contact with

Page 67

1 inmates of, you know, involving alleged
2 sexual abuse or exploitation; isn't that
3 correct?
4 A.  Well, it says contact.  I'm not
5 sure what they meant by contact.
6 Q.  Okay.
7 A.  Some of it says physical contact.
8 Some of it just says alleged contact.
9 Q.  Right.
10 A.  And that was all before my time.
11 Q.  But in any event, this
12 information just never came to you
13 anyway?
14 A.  It doesn't, no.
15 Q.  It didn't?
16 A.  It could have been placed --- no.
17 Q.  What about the report itself?
18 What about Wolanin's report itself, which
19 did contain that memo on September 11,
20 1995, were you in the chain of
21 distribution?
22 A.  Would I ever have received a
23 letter from Michael Wolanin?
24 Q.  Well, would you have received in
25 the ordinary course of events as the

Page 68

1 intelligence captain, were you in the
2 chain of distribution when the Office of
3 Special Investigations issued a report of
4 this sort?
5 A.  No, it wouldn't come to me.
6 Q.  It wouldn't come to you?  Then
7 how would you --- was there some other
8 way that you had become aware of the
9 report?
10 A.  Not unless the Superintendent
11 shared the information with me.
12 Q.  Do you have any recollection of
13 receiving a copy of this report?
14 A.  No.  Like I said, I didn't
15 investigate it so I really, you know ---.
16 Q.  Right.  And I take it that you
17 have no recollection of ever discussing
18 the incidents that were alleged in the
19 Metzger memo with Deputy Kormanic; is
20 that correct?
21 A.  No, I don't remember.
22 Q.  Okay.
23        ATTORNEY KRAKOFF:
24        We'll take a break.
25 SHORT BREAK

Page 69

1 BY ATTORNEY KRAKOFF:
2 Q.  Did you at some point become
3 aware of the fact that an investigation
4 concluded that in 1995 that Eicher had
5 engaged in misconduct, sexual misconduct
6 of an abusive nature toward Lisa Lambert?
7 A.  Was I made aware of it, yes.
8 Q.  How did you become aware of that?
9 A.  I saw --- well, I watched them
10 escort Mr. Eicher off grounds and, you
11 know, I was probably told somewhere along
12 there.  I mean it's common sense that
13 something's wrong.
14 Q.  I take it that you weren't ---
15 that the Superintendent didn't inform you
16 of that or ---
17 A.  No, not that I remember, no.
18 Q.  --- or the Deputy?
19 A.  Not that they called me up and
20 tell me, no, not that I remember, no.
21 Q.  And I take it that neither the
22 Superintendent nor anybody else in
23 administration said to you, why don't you
24 come and read the --- or suggested that
25 you read the report issued by the Office

Page 70

1  of Special Investigation in connection
2  with Eicher; is that so?
3  A.   No, that's true.
4  Q.   Do you believe that having that
5  information would have been worthwhile in
6  any way in connection with any efforts to
7  either to fair it out or to preclude
8  sexual misconduct against inmates?
9       ATTORNEY HALLORAN:
10      Objection.  He testified
11 that he never saw the report.
12      ATTORNEY KRAKOFF:
13      I understand that but I'm
14 asking since he was the
15 intelligence captain whether
16 having such a report would have
17 been in your view, of any value
18 to you either in connection with
19 your efforts to investigate
20 sexual abuse at the prison.
21 A.   Well, the case was over so it
22 wouldn't --- not unless there was
23 something in the report that reflected on
24 some other that we should investigate,
25 no.  It wouldn't have been any help to

Page 71

1  me.
2  BY ATTORNEY KRAKOFF:
3  Q.   But in fact, you've learned today
4  that this report did have something?
5  A.   Yes.
6  Q.   It had attachment one which had
7  been attributed to you but in any event
8  did make reference to other alleged acts
9  of abuse against other inmates by Eicher;
10 correct?
11 A.   That's true.
12 Q.   And also alleged acts of abuse by
13 other personnel?
14 A.   That's true.
15 Q.   So that knowing this now, in your
16 view, would knowing that two years ago or
17 three years ago have been any value to
18 you?
19 A.   It could have.
20 Q.   In what way?
21 A.   Just to make sure that it was
22 followed up on.
23 Q.   Followed up in what respect?
24 A.   If there was an investigation
25 completed on it, I'd have probably looked

Page 72

1  at it and said, make sure that somebody
2  followed it up, you know.  Because it was
3  before my time I'd make sure that ---
4  what happened, what happened to the case,
5  did anybody look into it.
6  Q.   With the other inmates?
7  A.   Yes.
8  Q.   And with Eicher's other ---?
9  A.   This was done so I don't know how
10 much more would help you.  It's already
11 gone and prosecuted.  I don't know if
12 that would help you follow through.
13 Books were closed.
14 Q.   Now, I'm going to turn now to
15 Martin Miller.  At what point did you
16 become involved with the investigation of
17 Martin Miller?  And let me ask that
18 first.
19 A.   With who?
20 Q.   The investigation with Miller
21 concerning allegations of misconduct
22 against any Cambridge Spring inmate?
23 A.   There was a couple of times where
24 they went nowhere, until this last time
25 in, what was it, March of '96.  I think

Page 73

1  it was March of '96.  And that happened
2  when I was out of the institution, I
3  think I was training or something, when I
4  was made aware of it.  And when I
5  returned I think they already --- Marty
6  Miller had already been suspended and OPR
7  or Michael Wolanin came in and I helped
8  him work on it, assisted him I guess is a
9  better word.
10 Q.   All right.  Was the Miller case
11 open when you became the intelligence
12 captain?
13 A.   No, not that I can remember, no.
14 It was closed.
15 Q.   Okay.
16 A.   We still had the --- you don't
17 never throw the stuff away so it was in a
18 file.
19 Q.   Where are those files kept?
20 A.   Oh, when I got them they were
21 kept in my office, locked up in my
22 office.
23 Q.   Was there any sort of list
24 maintained either on a computer or
25 otherwise that reflected each of the

Page 74

1 cases that happened in an investigation?
2 A.    When I took it over I gave the
3 case numbers and I kept them like that,
4 in case number. So if I pulled one and
5 if it had to refer to another one I would
6 refer to another case number. I took
7 care of that, yes.
8 Q.    Okay.
9 A.    It's in a ledger on the computer.
10 Q.    Did you indicate the nature of
11 the investigation?
12 A.    Yes.
13 Q.    And was there some --- where
14 would this have --- what, did you have
15 some sort of a code, a blank for a
16 physical?
17 A.    No, it would be case number, and
18 I had like a cover sheet for it, people
19 involved --- basic people involved, the
20 date it was open, who did the
21 investigation, a real quick summary of
22 the outcome, you know, allegations that
23 blah blah would take out to place, real
24 brief.
25 Q.    Did Captain Bartlett's files ---

Page 75

1 I take it that he wasn't --- you didn't
2 inherit his office or did you inherit his
3 office?
4 A.    To go right into his office, no.
5 Q.    When you became the ---?
6 A.    No, I stayed over --- no, they
7 just transferred stuff over.
8 Q.    So did they bring ongoing files?
9 A.    Anything he had.
10 Q.    So you got all of his files?
11 A.    Uh-huh (yes).
12 Q.    And were his files by the names
13 of the accused --- I won't use the name
14 accused, the person that was being
15 investigated?
16 A.    He had names on it and stuff. He
17 didn't have case numbers, he had names on
18 them.
19 Q.    Right. For example, if Eicher
20 was the subject of investigation would it
21 be under E for Eicher or under Eicher?
22 A.    He'd have an envelope with the
23 name Eicher on it. Anything having to do
24 with Eicher would be in there.
25 Q.    Now, let me refer you to Exhibit

Page 76

1 35, which is also in Volume 1. It's a
2 document dated September 19, 1994. It's
3 from Keith Bartlett to Superintendent
4 Wolfe.
5 A.    You said 35?
6 Q.    Exhibit 35. It's two-thirds of
7 the way.
8 A.    Yes, I found it.
9 Q.    Okay.
10 A.    Dated September 9 --- 19th, 1994?
11 Q.    Yes, September 19th, 1994. And
12 you're on the cc, the third name down.
13 A.    Uh-huh (yes).
14 Q.    And I'm going to ask you whether
15 you have any recollection of receiving
16 this memo or of the information contained
17 in the memo?
18 A.    I remember a little bit about it.
19 Q.    Okay.
20      ATTORNEY HALLORAN:
21        The answer to that
22 question about whether you saw
23 it, do you remember something
24 about it or do you remember
25 seeing the memo?

Page 77

1 A.    I remember seeing the memo.
2 Both, I remember the memo.
3 BY ATTORNEY KRAKOFF:
4 Q.    Now, let me refer you to Exhibit
5 38.
6 A.    Thirty-eight (38)?
7 Q.    Yes. It's a document dated the
8 22nd of May 1995.
9 A.    Yes, I have it.
10 Q.    It's handwritten. It's to
11 Lieutenant Beck and it's from Laurie
12 Donahue, CO. I'm going to ask you to
13 review this and tell me --- you'll see
14 there's a reference to you in there.
15 Tell me whether you recall anything about
16 a brief discussion with CO Donahue about
17 this matter.
18 A.    Not right off the top of my head,
19 no.
20 Q.    Here's something dated May 24,
21 1995, Exhibit 39. It's from the desk of
22 Victoria L. Meck, which I understand was
23 the premarried name of Deputy Kormanic;
24 is that your understanding?
25 A.    Pardon me, I'm sorry?

Page 78

1 Q.   Deputy Kormanic used to be
2 referred to as Victoria Meck ---
3 A.   Yes, that's correct. That's
4 correct.
5 Q.   Do you recall seeing a copy of
6 this memo?
7 A.   No.
8 Q.   Was anything referred to you
9 either by the Deputy or by anybody else
10 during this time, this time period on or
11 about the 24th of May about allegations
12 by Robin Owens about inappropriate
13 behavior on the part of Marty Miller?
14 A.   There might have been. There
15 were several investigations with ---
16 pertaining to Marty Miller.
17 Q.   And then here's an Exhibit 41
18 which may refresh your recollection.
19 This is six days later on May 30th, 1995,
20 from you. Is that your signature?
21 A.   Yes, it is.
22 Q.   To Superintendent Wolfe? And you
23 were requesting permission to investigate
24 alleged allegations by inmate Robin Owens
25 that Marty Miller is touching inmate.

Page 79

1 A.   Yes, I remember that.
2 Q.   And I take it from what appears
3 below is that this was approved by the
4 Superintendent; is that correct?
5 A.   Yes.
6 Q.   And he asked you to keep him
7 advised?
8 A.   That's correct.
9 OFF RECORD DISCUSSION
10 BY ATTORNEY KRAKOFF:
11 Q.   Exhibit 42. This is on the 2nd
12 of June a couple of days later. And it
13 indicates that Lieutenant Beck is the
14 investigating staff.
15 A.   That's correct.
16 Q.   Is this when you think --- were
17 you out of town at this time?
18 A.   Yes, I was.
19 Q.   And inmates involved were Diane
20 Clinton, Maryanne McGelincy, it looks
21 like, Robin Owens and then Ms. Blood, who
22 I understand was the secretary to one of
23 the ---?
24 A.   I probably did this later after I
25 came back because I wasn't here on the

Page 80

1 2nd. So I had to pick up what he did and
2 who he talked to.
3 Q.   Now, can you tell --- here's
4 Exhibit 43. Can you determine by the
5 handwriting who wrote this?
6 A.   It looks like Lieutenant Beck.
7 Q.   And what about the next page?
8 A.   Lieutenant Beck too. I'm just
9 assuming because he did the investigation
10 he would have taken the notes.
11 Q.   Page three looks like his?
12 A.   Yes.
13 Q.   And then page four looks like
14 his?
15 A.   Yes.
16 Q.   Five is another document.
17 A.   Yes.
18 Q.   Six looks like Beck's based upon
19 the others?
20 A.   Yes.
21 Q.   And the same with seven?
22 A.   Yes.
23 Q.   So did Beck just continue --- how
24 long were you gone, a month?
25 A.   I was gone a couple of weeks.

Page 81

1 Q.   When you came back, you came back
2 what the third week of June?
3 A.   Yeah, it was close to that, third
4 week of June of 1995.
5 Q.   Now, did you just let Beck
6 continue with it?
7 A.   The Superintendent sort of gave
8 it to him, so I was out of the picture.
9 Q.   And then on Exhibit 44, ---
10 A.   Okay.
11 Q.   --- it says remarks, closed as of
12 July 19, 1995. PDC will be held. And
13 what does PDC stand for?
14 A.   Pre-disciplinary conference.
15 Q.   And then Exhibit 45 is a memo
16 from Lieutenant Beck dated June 19, 1995,
17 to Superintendent Wolfe.
18 A.   Yes.
19 Q.   And do you recall whether you
20 reviewed any of this?
21 A.   Probably more than likely, yes.
22 Q.   And then --- I noted that on
23 Exhibit 46 it identified the Employment
24 Job Coordinator as, I think that's M.
25 Lazenby?

Page 82

1  A.   Marsha Lazenby.
2  Q.   **Is that your wife?**
3  A.   That's correct.
4  Q.   **And then now we're at Exhibit 47,**
5  **where it's September, the 13th of**
6  **September of '95. And I note that this**
7  **is from Martin Miller to Deputy Kormanic**
8  **and it's cc'd to Lieutenant Beck. And**
9  **then is that reviewed by, is that**
10 **Lieutenant Maulo, M-A-U-L-O, or can't you**
11 **tell? I don't know if --- it might not**
12 **be Lieutenant.**
13 A.   It's lieutenant. It may be
14 Lieutenant Manski. I'm trying to think.
15 Yeah, 350. It could be Lieutenant
16 Manski, M-A-N-S-K-I.
17 Q.   **And then 48, this concerns**
18 **allegations of lipstick on Martin**
19 **Miller's pants.**
20 A.   Yes.
21 Q.   **Do you recall anything about**
22 **those allegations?**
23 A.   Yes.
24 Q.   **And this is dated the 1st of**
25 **October '95, Exhibit 48.**

Page 83

1  A.   Yes. Yes, I do.
2  Q.   **What do you recall?**
3  A.   Somebody that we'd heard or
4  somehow would come to my office or come
5  through the Superintendent and he'd come
6  out of one of the buildings here and
7  there was something red on his pants.
8  Q.   **Near his crotch, I guess it's**
9  **called?**
10 A.   Crotch, that's correct. We could
11 never get anything to it because when we
12 went to talk to the inmates --- he said
13 it was paint. He brushed it off. And
14 when you talked to inmates, if I remember
15 right, he went in, came out and it was
16 gone. And my questioning was, was the
17 crotch area wet where he might have been
18 scrubbing it off and they were saying no.
19 If it was lipstick you would have to
20 scrub it off. So it was another dead end
21 alley we went down.
22 Q.   **Let me refer you to Exhibit 49,**
23 **which is dated the 2nd of October of '95,**
24 **the day after apparently these**
25 **allegations surfaced.**

Page 84

1  A.   Yes.
2  Q.   **And this is CO Mitchell.**
3  A.   Uh-huh (yes), yes.
4  Q.   **What is the first name of**
5  **Mitchell; do you know?**
6  A.   Carla.
7  Q.   **Carla Mitchell. Okay. This is**
8  **to you. I'd like you to review this and**
9  **tell me whether you remember receiving**
10 **this?**
11 A.   I believe I did.
12 Q.   **Now, here CO Mitchell is telling**
13 **you about --- she received, that Mika**
14 **Carter, inmate OC6903, had received a**
15 **misconduct from Marty Miller and that**
16 **while she was venting this to Mitchell,**
17 **Carter informed Mitchell that she planned**
18 **to tell everything Miller had been doing**
19 **with Jackson OC4895.**
20 A.   Johnson.
21 Q.   **Johnson, sorry. And it says, I**
22 **believe she has in mind to cause some**
23 **grief. I advised her not to take these**
24 **actions. And if this is true she should**
25 **have contacted you. She could wind up**

Page 85

1  paying consequence.
2       **Do you recall what, if anything,**
3  **--- whether you responded to CO Mitchell**
4  **or whether you took any action to --- any**
5  **steps to interview Mika Carter?**
6  A.   I'm trying to think. That was
7  probably part of that same time we
8  started the investigation. It was all,
9  you know, done up around the same time
10 period, looking at all these dates and
11 stuff. I wouldn't call Ms. Mitchell
12 back. I mean, I don't reply to her,
13 unless there was something else I wanted.
14 Q.   **Your chain of command would be**
15 **through --- on down to Lieutenant ---?**
16 A.   Yeah, if it's something that she
17 doesn't have proof, you know. I don't
18 remember the details exactly but this was
19 all part of the investigation about that
20 time of Marty Miller.
21 Q.   **Now, were you at all concerned at**
22 **the time that Mitchell had advised Mika**
23 **Carter not to tell everything Miller had**
24 **been doing with Johnson?**
25 A.   I don't remember the details, the

Page 86

1 particulars, no.
2 Q.  As you read this now, does this
3 raise any concerns in your mind that an
4 officer is telling the inmate ---?
5 A.  No, because I probably called the
6 inmate in.  If I had the inmate, I'd call
7 her in.  I wouldn't ---.
8 Q.  I'm sorry.  I'm confused.
9 A.  I would have called the inmate in
10 anyway and talked to the inmate.
11 Q.  You?
12 A.  Yes.
13 Q.  Well, that's what I asked.  Did
14 you call this inmate in?
15 A.  Probably, if there's a thing in
16 here.  There's probably a statement form,
17 something in here, if I talked to her or
18 if she talked to me.  A lot of times they
19 would say stuff to other staff members
20 and then when you call them they'd say,
21 that's not what I told the officer.
22 That's not true.  I never said that to
23 the officer.
24 Q.  But I guess my question to you
25 is, Mitchell is telling Carter that she

Page 87

1 shouldn't take these actions.  You know,
2 she shouldn't tell everything that Miller
3 has been doing with Johnson.  And then
4 saying, well, she should come to you.
5      ATTORNEY HALLORAN:
6           I'm going to object to
7 the form.  What Mitchell said is
8 written down on this letter.  And
9 I think you can't take it out of
10 context.  You know, he's saying,
11 Mitchell, she's saying that she
12 has a mind to cause some grief
13 which sounds like she's
14 questioning the veracity.  And
15 she says, if this is true, she
16 should have contacted you, which
17 is Lazenby.
18 BY ATTORNEY KRAKOFF:
19 Q.  I take it you weren't concerned
20 when you read this letter about what
21 Mitchell had written?
22 A.  Not right off the top of my head
23 ---
24 Q.  Okay.
25 A.  --- because I would have ---.

Page 88

1      ATTORNEY HALLORAN:
2           But you did testify that
3 you would have interviewed ---?
4 A.  Yes, I would have interviewed the
5 inmate.
6 BY ATTORNEY KRAKOFF:
7 Q.  You don't know whether you did?
8 A.  There would be an --- a witness
9 statement somewhere in here that I
10 interviewed her, talked to her, some kind
11 of notes.  Again, you hear this stuff and
12 you go to the inmate and they say no, I
13 never told the officer that.  And that's
14 about the end of it.  You can't force
15 them to ---.
16 Q.  I might be wrong but I don't
17 think we have any statements from Ms.
18 Carter or anything indicating that you
19 had attempted to interview her and she
20 refused to talk.  But in any event  ---
21 well here is something.  Exhibit 50
22 concerns Carter.
23 A.  Yes, she's talking about rumors.
24 Ms. Carter is talking about rumors that
25 she'd heard.

Page 89

1 Q.  Right.
2 A.  Again, they're rumors.
3 Q.  Now, here is Exhibit 51.  This
4 indicates that you were --- I suppose
5 that both you and Deputy Kormanic,
6 according to this, were to receive a copy
7 of this report; is that right?
8 A.  That's what it looks like.  But
9 again they always --- sometimes they
10 would do them and they would put the
11 stuff on but they never cc'd you, for
12 whatever the reasons.
13 Q.  Right.  Do you have a
14 recollection of ever having reviewed this
15 document?
16      ATTORNEY HALLORAN:
17           Are you talking about
18 Exhibit 51?
19           ATTORNEY KRAKOFF:
20           Fifty-one (51).
21 BY ATTORNEY KRAKOFF:
22 Q.  This is where Sargent Gross
23 (phonetic) ---
24 A.  I remember ---
25 Q.  --- related some rumors about the

Page 90

1 ---.
2 A.   --- about the lipstick and stuff,
3 yes. I must have ---- I got it
4 somewhere. I'm too particular about ----
5 Q.   What about his allegedly bringing
6 cigarettes to Sylvia Vasquez?
7 A.   We heard about it. Again, we
8 interviewed Sylvia Vasquez. I believe I
9 talked to her and she denied it all.
10 Q.   And then said, had inmate Mika
11 Carter taking messages to an inmate,
12 Aleshia Johnson. And then, here's
13 Exhibit 52. If you can look at this and
14 tell me whether you have a recollection
15 of receiving and reading this?
16 A.   Yes.
17 Q.   Okay.
18 A.   Yes, it's about the lipstick and
19 how he brushed it off.
20 Q.   Right. Miller says in this,
21 you'll see in the next to the last
22 paragraph he says, the lipstick wouldn't
23 have, I think he was saying, wouldn't
24 have brushed off, as I prove to Captain
25 Lazenby and Lieutenant Beck.

Page 91

1     Do you recall Miller kind of
2 showing you how, you know, whatever it
3 was on there that he had brushed it off?
4 A.   I think so. I think he went
5 something like this (indicating).
6 Q.   So was the red stuff still on his
7 ---?
8 A.   No, this was all --- this was
9 days later after it took place.
10 Q.   Right.
11 A.   This took place on Friday the
12 29th. And I don't know when we
13 interviewed him, something like that.
14 Q.   Well how did he prove to you ---
15 did he prove to you that lipstick
16 wouldn't have rubbed off by putting
17 lipstick on something?
18 A.   No.
19 Q.   Well, how did he prove ---?
20 A.   Well, he said ---.
21     ATTORNEY HALLORAN:
22         Wait a minute, this is
23 his statement.
24     ATTORNEY KRAKOFF:
25         I know that.

Page 92

1 A.   Yeah.
2 BY ATTORNEY KRAKOFF:
3 Q.   Miller is saying --- Miller is
4 indicating in a memo to you that he had
5 proven to you that lipstick wouldn't have
6 rubbed off. Is he telling --- is he
7 being honest when he says in this memo to
8 you that he had proven that to you and to
9 Lieutenant Beck?
10 A.   Well, common sense ---.
11     ATTORNEY HALLORAN:
12         We object. The witness
13 previously testified with regard
14 to the same question, that the
15 witnesses who said they saw the
16 red stuff on his trousers said it
17 was gone, I can't remember what
18 time frame it was, moments later
19 and there was no sign of wet, you
20 know, that it had been rubbed off
21 or wiped off.
22     ATTORNEY KRAKOFF:
23         Right.
24 BY ATTORNEY KRAKOFF:
25 Q.   But in here, I don't know what he

Page 93

1 means by that, he proved this to you. Do
2 you recall, did he just tell you
3 something or did he run an experiment?
4     ATTORNEY HALLORAN:
5         Well, do you know what he
6 means by it?
7 A.   Well, I'm thinking ---.
8 BY ATTORNEY KRAKOFF:
9 Q.   Well do you recall what he did?
10 A.   I'm thinking he brushed it off.
11 But what he was trying to conceive (sic)
12 to me, is the same thing that I took,
13 that if somebody put lipstick on you, it
14 doesn't brush off.
15 Q.   Right.
16 A.   It would have to be scrubbed off.
17 Q.   Right. But you weren't there
18 when he brushed something off, were you?
19 A.   No.
20 Q.   And he didn't show you --- did he
21 show the pants?
22 A.   No.
23 Q.   So you don't know whether, in
24 fact, it was lipstick or not?
25 A.   Just by what the other inmate

**Multi-Page™**

Page 94

1 said.
2 Q.    And who was the other inmate?
3 A    I'd have to go back in here and
4 look in here. There has to be --- I
5 think we brought it up and asked. I
6 think I asked Sylvia Vasquez or I asked
7 somebody about when he came out of the
8 restroom, were his pants wet in the
9 front, did he look like he had scrubbed
10 it off. If, I believe, my memory serves
11 me correctly, they're saying, no. He
12 went in the restroom and came out and it
13 was gone.
14 Q.    Now, this medical problem that he
15 advised you of, did he tell you, was that
16 impotence?
17 A.    Yes, that's what he ---.
18 Q.    That he claimed?
19 A.    That's what he claimed.
20 Q.    Then Exhibit 53.
21 A.    Yes.
22 Q.    This is from you to Wolfe. And I
23 guess that Miller, on the --- you were
24 saying that on the 3rd, Miller had
25 approached you; is that right?

Page 95

1 A.    Yeah. Evidently, yes.
2 Q.    And what did you mean you had
3 been approached by Miller concerning this
4 allegation?
5 A.    Uh-huh (yes).
6 Q.    And did he come to your office?
7 A.    Probably, more than likely.
8 Q.    I noted in the second paragraph
9 he said he was --- you note that Miller
10 said, quote, he was alone with an inmate
11 when he removed the urinal. And then it
12 goes on from there to say there was
13 nothing more to it.
14        Was there a policy to your
15 knowledge at the institution against
16 maintenance personnel being alone with an
17 inmate?
18 A.    In October, there probably was.
19 Q.    When did that come into effect?
20 Let me ask you this. Had there once been
21 a time in the institution when there was
22 no such policy?
23 A.    When we opened it, sure. This
24 was a new institution, so we grew and
25 learned things. And, you know, I'm sure

Page 96

1 we didn't open the day --- the day that
2 we opened this institution with a policy
3 that said maintenance people never be
4 alone.
5 Q.    Was there a written policy?
6 A.    Later on that?
7 Q.    Yeah.
8 A.    I believe there is. I'm not sure
9 though.
10 Q.    And do you know who established
11 that policy?
12 A.    It probably came from the
13 Superintendent's office.
14        ATTORNEY KRAKOFF:
15        Well, if there is such a
16 policy, I'd like to receive a
17 copy of it.
18 BY ATTORNEY KRAKOFF:
19 Q.    Is it possible that policy was
20 established after October of '95?
21 A.    The time frames, I couldn't ---.
22 Q.    So in answer to that, it is
23 possible?
24 A.    It is possible.
25 Q.    Okay.

Page 97

1 A.    Again, maybe it was ---.
2 Q.    You sought permission to close
3 the investigation, ---
4 A.    That's correct.
5 Q.    --- saying that this was just
6 another inmate rumor with no evidence to
7 substantiate the claims?
8 A.    That's correct.
9        ATTORNEY KRAKOFF:
10        I could not read this
11 Exhibit 54. If you have a
12 better, if you can mark that
13 down. If you have a better ---
14 this is a document dated
15 10/11/95. It's from Michael
16 Miller to Deputy Kormanic. I
17 would appreciate a more legible
18 --- plus part of the line is cut
19 off.
20 BY ATTORNEY KRAKOFF:
21 Q.    This seems to say that Miller was
22 allegedly bringing in gifts of cigarettes
23 to Vasquez, that he brought in two cans
24 of perfumed powder. Then three, Inmate
25 White saw Mr. Miller kiss Inmate Vasquez

Page 98

1 on the check.

2     Do you recall receiving a copy of

3 this document?

4 A.    Not right off the top of my head,

5 no.

6 Q.    Do you recall any of those

7 allegations?

8 A.    Yes. Yes I do.

9 Q.    Do you recall being aware of

10 those allegations more or less

11 contemporaneous with the date on this

12 memo, October 11, 1995?

13 A.    I believe so.

14 Q.    And in this next document Exhibit

15 55, is dated October 12, '95. This has

16 Lieutenant Scott --- the name Lieutenant

17 Scott on the upper left hand corner. Can

18 you tell whether this is a document ---

19 are you familiar with Lieutenant Scott's

20 printing?

21 A.    Yes.

22 Q.    Does this appear to be in his

23 ---?

24 A.    It's a her. No, this is mine.

25 That means Lieutenant Scott was present

Page 99

1 when I talked to Inmate White.

2 Q.    I see. So this is yours?

3 A.    Yes, it is.

4 Q.    Okay.

5 A.    They're just notes.

6 Q.    So this phase of the

7 investigation of Miller or this new

8 investigation of Miller --- this was a

9 new investigation?

10 A.    Yeah, because we had already

11 stopped the one in October 4th, when Mike

12 Miller came out with his incident report

13 ---

14 Q.    Right.

15 A.    --- dated the 10th.

16 Q.    Right. And then this one you

17 were conducting; is that right?

18 A.    Yes.

19 Q.    Was Lieutenant Beck involved as

20 well?

21 A.    Not that I remember, no.

22 Q.    And why don't you tell me --- I

23 think I can read most of this, but I'm

24 not sure. Can you just read this to me,

25 please?

Page 100

1 A.    Well, it looks like it's --- boy,

2 it's hard reading my writing. Talked

3 about this before with Captain Bartlett.

4 I'm referring to Marty Miller. Claims

5 back in '94, late. Gave it to Mr. Miller

6 --- gave it to Mr. Miller, Avon powder.

7 She got rid of it. And evidently they

8 gave it to Pelman and she got rid of it.

9 No idea why he gave it them. He asked

10 and brought it in. Claims he has --- has

11 headphones belonging to inmate at home to

12 fix Jafka. Again --- evidently I put the

13 big hearsay, so nothing is factual.

14 Q.    Is that McCaffey (phonetic), or

15 you said Jafka?

16 A.    It looks like McCaffey.

17 Q.    Okay.

18 A.    Cigarettes. He has ---.

19 Q.    What is that saying also about

20 --- what is that?

21 A.    Also about cigarettes.

22 Q.    Okay.

23 A.    Again, you have to remember he

24 has pics of inmates --- he has pics ---

25 I'm probably talking about friends or

Page 101

1 people he likes, of inmates who he talks

2 about. Upset --- something --- somebody

3 was upset. Evidently White was upset

4 about a pay raise that Marty Miller

5 didn't get or Marty Miller didn't give it

6 to her. Not sexual at this time. So

7 evidently it was --- and it claims that

8 ---

9 Q.    What is this, talked about last

10 time she talked about Marty Miller? I

11 don't understand?

12 A.    I'd have to go back and look.

13 Q.    Okay.

14 A.    Claims that he's still touching

15 inmate Jackson, and asked Jackson if he

16 could touch her. No one comes to tell

17 because she feels no one cares.

18 Q.    No one comes to tell because she

19 feels no one cares. What did that mean?

20 A.    Evidently, Jackson didn't come

21 forward to say anything because --- White

22 claims that Jackson wouldn't come to

23 anybody because nobody cared. These are

24 all hearsay, again, by other inmates.

25 Q.    By nobody cared, did you

**Multi-Page™**

Page 102

1 understand that to mean staff or inmates?
2 A.   Could be both.
3 Q.   What about the second page of
4 Exhibit 55?
5 A.   This is from White.  This is her
6 ---.
7 Q.   Is that your signature?  Did you
8 witness this?
9 A    I witnessed this.  That's in her
10 handwriting that she --- that her boss
11 treats people unfairly and she talks
12 about favoritism to other inmates.  And
13 this is all hearsay.
14 Q.   She says, I received an inmate
15 powder?
16 A.   Yeah, and this is hearsay.
17 Q.   What does that mean?  Do you
18 know?
19 A.   I have seen Marty Miller act out
20 favoritism.  Meaning he brings --- what
21 she's talking about ---
22 Q.   I see.
23 A.   --- she's heard that Marty Miller
24 brings in other stuff, if I'm reading
25 this right.

Page 103

1 Q.   And then she says, I received an
2 inmate powder
3        ATTORNEY HALLORAN:
4           I don't think that's what
5 that says.
6        ATTORNEY KRAKOFF:
7           It doesn't say ---.
8        ATTORNEY HALLORAN:
9           I don't think that's
10 inmate.
11 BY ATTORNEY KRAKOFF:
12 Q.   An Imari powder?  Do you know
13 what she is saying?
14        ATTORNEY HALLORAN:
15           Yes, something like that.
16 BY ATTORNEY KRAKOFF:
17 Q.   Do you know what that means?
18 A.   No.  Then she goes on, this is
19 just hearsay, that Sylvia --- she thought
20 he brought Sylvia stuff from outside.
21 Again, it's all hearsay what she thinks
22 she saw or heard.
23 Q.   And then here's from Auxier
24 (phonetic)?
25 A.   Auxier, uh-huh (yes).

Page 104

1 Q.   Exhibit 56.  Do you recall
2 receiving this?
3 A.   Probably, yes.
4 Q.   This is not dated.  Do you
5 recall, was this during more or less the
6 same time period in October of '95?
7 A.   Probably, yes.  That's what it
8 sounds like reading this.  It's talking
9 about White and Johnson, everything else.
10 That's what was talked about before.  So
11 I'm just assuming yes.
12 Q.   And in here; is this Auxier's
13 writing?
14 A.   I have no idea ---.
15 Q.   As far as you know?
16 A.   As far as I know, yes.  As far as
17 I know, it's her writing.  I don't know
18 what her writing looks like.
19 Q.   Concerning sexual activity
20 between him and inmates or his crew.  Did
21 you talk with Auxier about this or ask
22 somebody to talk with her about this?
23 A.   No.  I went to Johnson on this
24 --- probably went to Johnson ---
25 Q.   Okay.

Page 105

1 A.   --- and asked her about it.
2 Q.   Do you recall interviewing
3 Johnson?
4 A.   Not right off.  I'd have to look
5 and see if there's any notes in here.
6 This here is another investigation,
7 Exhibit 58.
8 Q.   Yeah, 58, is October 17, you were
9 investigating.  Does this mean that this
10 is when the investigation was initiated?
11 A.   Yes.
12 Q.   And you were investigating
13 matters ---?
14 A.   Probably --- almost like a
15 follow-up.  We finished the other one,
16 then we got more information so we
17 reopened another investigation.
18 Q.   When you finished the other one
19 that we've just reviewed, had there been
20 any conclusion one way or another?
21 A.   There was no evidence --- you're
22 talking about the ---?
23 Q.   About the bringing in gifts?
24 A.   Yeah, there was no ---.
25 Q.   And there was no evidence

Multi-Page™

Page 106

1 apparently of --- as far as you can tell,
2 there was no evidence ---?
3 A.   The first one was on that
4 lipstick and stuff.
5 Q.   Right.  I understand that.
6 A.   And then this one, case 95-25,
7 was about the allegations about
8 contraband being brought in.
9 Q.   So maybe this Auxier letter was
10 more involved with the next
11 investigation, which is the one that was
12 initiated on the 17th?  I don't know.
13 Because you mentioned Commendi, Johnson,
14 Vasquez ---.
15 A.   They were all like intertwined.
16 It was like one after another and they
17 were closely related.
18 Q.   Did you ever meet with
19 Superintendent Wolfe or Deputy Kormanic
20 to discuss, you know, here's this Miller
21 and all of these allegations are being
22 brought up?  Did you ever meet with him
23 to discuss it?
24 A.   Yes.
25 Q.   And when was that?

Page 107

1 A.   Probably around the same time all
2 this was all taking place.
3 Q.   And what did you tell the
4 Superintendent?
5 A.   Basically, that, you know, I
6 probably asked him to read --- since we
7 got more information, to reopen the case
8 again.
9 Q.   Whenever you'd get --- was it
10 typical that you would speak with the
11 Superintendent rather than send him a
12 memo about reopening a case?
13 A.   Sometimes, yes, sometimes.
14 Q.   Okay.
15 A.   Because 59 goes back and that's
16 when I started taping.  I did some
17 taping.
18 Q.   Now, I asked Lieutenant Bartlett
19 this morning about taping.  And his
20 testimony, and Mr. Halloran can correct
21 me if I'm wrong, my recollection is that
22 he said that ordinarily he didn't tape
23 because he wasn't supposed to tape or
24 words to that effect.
25     ATTORNEY HALLORAN:

Page 108

1     Staff members.
2     ATTORNEY KRAKOFF:
3         Just staff members?  Is
4 that your recollection?  I
5 thought it was more universal.
6 OFF RECORD DISCUSSION
7 A.   What number are you on?
8 BY ATTORNEY KRAKOFF:
9 Q.   Fifty-nine (59).  I think you
10 said that you began to do some tapes.
11 A.   Yeah.  These are --- if you
12 notice it says, no, I didn't tape this.
13 They have the right not to be taped.
14 Q.   What document?
15 A.   Fifty-nine (59 ).
16 Q.   Okay.  Okay.
17 A.   I guess everybody has the right
18 not to be taped.
19 Q.   Was it routine for you to tape
20 interviews?
21 A.   It would all depend on if I
22 wanted to see --- if I'm asking questions
23 that I wanted to see a response from the
24 person's face.  And I want to pay
25 attention, as I was giving the directions

Page 109

1 to see, you know, what kind of facial
2 expression and what the answer --- how it
3 come across.  It all depended.
4 Q.   Now, this was the interview of
5 Miller?
6 A.   Yes, Marty Miller.
7 Q.   And it was his option whether or
8 not to be tape recorded.  Was that under
9 a union agreement or something or ---?
10 A.   Probably.
11 Q.   In any event that ---
12 A.   I did not tape record.
13 Q.   --- that was your practice?
14 A.   Yes.
15 Q.   And was that, as you understood
16 it, the policy of the institution that if
17 a member of the staff did not wish to be
18 taped ---?
19 A.   That was my understanding, yes.
20 Q.   Now, what about an inmate, what
21 was your practice with respect to taping
22 inmate interviews?
23 A.   The same way.  I would ask and
24 get their permission.
25 Q.   Did you tape any of the --- did

Page 110

1  you tape any either alleged victims of
2  Martin Miller or witnesses?
3  A.   Yes, I did.
4  Q.   And who did you tape?  Are you
5  able to determine from the documents?
6  A.   We'd have to go back to ---
7  that's where I would have started at.
8  Q.   I see.  Was it Exhibit 60?
9  A.   I don't think it's in this one.
10 There were some.  It's not in this book.
11 Q.   Let me show you Exhibit 60.  Are
12 these --- now, it says lieutenant --- on
13 the first page it says Lieutenant Scott.
14 Does that mean he was present?
15 A.   That's a she.
16 Q.   She was present?
17 A.   Yes, she was present, yeah.
18 Q.   Is this your ---?
19 A.   Yes, it is.  It looks like my
20 handwriting.
21 Q.   And see where it says tape number
22 one.
23 A.   Uh-huh (yes)
24 Q.   So I take it that you ---
25 A.   Taped Ortez.

Page 111

1  Q.   --- you taped Ortez.  And then is
2  what you wrote here, the text on the
3  first page of Exhibit 60, is that a
4  summary of what was said or is that
5  verbatim?
6  A.   No, that's a summary.
7  Q.   And were these tapes preserved?
8  A.   Yes.  Yes, they were.
9  Q.   And then the next page, which is
10 page two, once again, Lieutenant Scott
11 was present?
12 A.   Uh-huh (yes), yes.
13 Q.   And I take it that you
14 interviewed Johnson and it was recorded?
15 A.   No tape.  She would not be ---
16 Q.   No tape?
17 A.   No.
18 Q.   Oh, I see where it says no tape.
19 A.   She refused to be recorded.
20 Q.   And then the next page, can you
21 recognize the handwriting?
22 A.   That's my handwriting.
23 Q.   And this concerns a Clemente.  Do
24 you remember Clemente's first name?
25 A.   No.

Page 112

1  Q.   I take it it says, Clemente and
2  then it says Vasquez?
3  A.   Vasquez, yes.
4  Q.   Vasquez?
5  A.   Yes.
6  Q.   And I take it that these are your
7  summaries of ---?
8  A.   Yeah, basically as I took
9  questions, yes.  Yes.
10 Q.   Now, was Vasquez taped?
11 A.   Yes, she was.
12 Q.   And then the next page, which is
13 page four?
14 A.   Yes.
15 Q.   Okay.
16 A.   She was also taped.
17 Q.   And this was Inmate Jackson?
18 A.   Yes.
19 Q.   And then we come to Exhibit 61.
20 A.   Yes.  that would be a summary.  I
21 mean, that would be my report, the
22 results of the investigation.
23 Q.   And you were advising --- I know
24 this speaks for itself, but basically you
25 concluded that there was not sufficient

Page 113

1  evidence to ---
2  A.   Yeah, that's what it looks like,
3  yes.
4  Q.   --- to continue with the
5  investigation?
6  A.   That's correct.
7  Q.   Was the investigation closed at
8  this point; do you know?
9  A.   Probably.
10 Q.   In any event, as far as you were
11 concerned the case was closed unless new
12 evidence was revealed; is that right?
13 A.   Yes, yes.
14 Q.   And you didn't hear back --- did
15 you hear anything back from the
16 Superintendent, Wolfe?
17 A.   More than likely he probably
18 called me and told me, you know, yeah, go
19 ahead and close it.  Sometimes he wrote
20 on the bottom, gave me a memo and
21 sometimes he didn't.
22 Q.   Now, did you Mirandize any of the
23 women.  Clemente, Vasquez, Jackson,
24 Ortez?  Did I say Jackson?  I meant
25 Johnson.

Page 114

1 A.  No, because they weren't
2 suspects.
3 Q.  Do you ever recall Mirandizing
4 any of the women who were interviewed in
5 connection with the investigation of
6 Marty Miller?
7 A.  No, not that I remember.  Mike
8 might have, but I didn't.
9 Q.  Mike?
10 A.  Wolanin.
11 Q.  And if --- have you ever
12 Mirandized somebody who --- a woman ---
13 Cambridge Springs inmate who you ---
14 strike that.
15     Now, Exhibit 63 appears to be a
16 document from Wolfgang, a psychologist at
17 the prison?
18 A.  Yes.
19 Q.  It's dated March 12, 1996.  And
20 this concerned an inmate by the name of
21 Pelman?
22 A.  Yes.
23 Q.  And did --- do you recall
24 receiving this document?
25 A.  Right off the top of my head, no.

Page 115

1 Q.  Do you recall being apprised in
2 some other way, either directly by Ms.
3 Wolfgang --- is it Dr. Wolfgang or Ms.
4 Wolfgang?
5 A.  Miss, she's not a doctor.
6 Q.  Either by Ms. Wolfgang or some
7 other source that Pelman had made some
8 allegations?
9 A.  Probably later on because that
10 was about the same time another
11 investigation started.
12 Q.  And what did that investigation
13 concern?
14 A.  That investigation started when
15 --- it was sometime in March when, I
16 think, was it Robin Phillips and
17 DiGiovoni (phonetic), stepped forward to
18 Mike Miller.  And then Lieutenant Beck
19 started it because I wasn't on the
20 grounds.  Then when I returned, I think
21 it had already been turned over to OPR.
22 Q.  Now, what year was that?
23 A.  '96.
24 Q.  Was it the Spring of '96?
25 A.  Yes.

Page 116

1 Q.  Let me refer you to Exhibit 64.
2 It's the last document in the first
3 volume.  And this is a memo from Keith
4 Bartlett to the Superintendent concerning
5 Pelman.  And I note that you're cc'd on
6 the bottom.  Do you recall receiving this
7 document?
8 A.  I probably do.  It looks --- like
9 I said it was around the same time
10 everything started to go back.
11 Q.  Now, do you have any idea why
12 Keith Bartlett --- he was Captain of the
13 guard by this point, ---
14 A.  Yes, yes.
15 Q.  --- at least that's how he
16 identified himself.  Do you have any idea
17 why Bartlett interviewed Pelman as
18 opposed to yourself or some other member
19 of your staff?
20 A.  I might have been out of the
21 institution.  And a lot of times when I
22 was out of the institution, Captain
23 Bartlett took my place, him or Lieutenant
24 Spern or Lieutenant Beck.
25 Q.  And now that we go to Exhibit 65.

Page 117

1 This is a --- I don't know if there's a
2 clearer one but this is another document.
3 If there's a better copy of it, I'd
4 appreciate it, which is dated March ---
5 is that 18th?  I don't know.
6        MS. KORMANIC:
7        16th, 1996.
8 BY ATTORNEY KRAKOFF:
9 Q.  It's from you to Superintendent
10 Wolfe concerning Mr. Miller.  Now, it
11 says, as requested --- there's no comma
12 after that, but it says, as requested,
13 Captain Bartlett investigated the
14 allegations by Pelman.  It goes on from
15 there.  Now, are you able to read this?
16 A.  A little bit.
17 Q.  Were you merely summarizing in
18 this memo what Captain Bartlett had
19 related in his memo of a day or so before
20 or were you basing this on some
21 information you personally ---?
22 A.  I believe on the next page, on
23 Exhibit 66, says I evidently went to talk
24 to her and she changed her statement that
25 she had given to Captain Bartlett.  When

Page 118

1 she told Captain Bartlett one thing, when
2 I pressed her for the details and stuff,
3 she decided ---.
4 Q.    Well doesn't this say, changed
5 her story when pressed for a written
6 statement 3/15/96 by Captain Bartlett?
7 That says that she changed her story when
8 Captain Bartlett pressed her for an
9 investigation.  If you read that
10 carefully; isn't that ---?
11 A.    Well, no, it's in my notes.  What
12 I'm trying to tell myself is that she
13 told Captain --- just like I said, she
14 told Captain Bartlett one thing and when
15 I went to talk to her, she told me
16 something else.  She changed it.
17 Q.    You're sure of that?
18 A.    Yes.
19 Q.    When did you interview her?
20 A.    I'm trying to see if I can find
21 it in here.
22 WITNESS REVIEWS DOCUMENT
23 A.    I couldn't tell you.  It's not in
24 here.
25 BY ATTORNEY KRAKOFF:

Page 119

1 Q.    Your interview notes though, as a
2 matter of custom and practice, would have
3 been in the Miller --- in the file that
4 you maintained on Miller?
5 A.    Yeah.
6         ATTORNEY KRAKOFF:
7             I'd like to request
8 somebody attempt to locate notes
9 from Captain Lazenby of an
10 interview of Inmate Pelman
11 sometime after ---.
12 BY ATTORNEY KRAKOFF:
13 Q.    Is that correct?  Sometime after
14 the 15th of March?
15 A.    I guess.  Because I'm not seeing
16 ---.
17 OFF RECORD DISCUSSION
18 A.    Captain Bartlett.
19         ATTORNEY KRAKOFF:
20             Right.  That's what I
21 thought.
22 A.    You're absolutely correct.  I
23 stand corrected.
24 BY ATTORNEY KRAKOFF:
25 Q.    So I withdraw the request because

Page 120

1 I don't think there are --- there
2 wouldn't be any notes; is that correct?
3 A.    Yeah, I stand corrected.  You're
4 right.
5 Q.    Now, you were basing --- when you
6 wrote, changed her story when pressed for
7 written statement 3/15/96 by Captain
8 Bartlett, were you basing that on what
9 Captain Bartlett had related in Exhibit
10 64?
11 A.    Evidently.
12 Q.    Do you have any recollection of
13 yourself, personally interviewing Pelman?
14 A.    Not at that time.  Probably a
15 couple of weeks later we talked on
16 another investigation.
17 Q.    Now, if you review what Captain
18 Bartlett wrote on the 15th of 1996, the
19 memo, which is Exhibit 64, is there
20 anything in here that gave you reason to
21 believe that she had changed her
22 statement as opposed to merely saying she
23 didn't want to prepare a witness form?
24 A.    It looks like he went to have her
25 write a statement and have it notarized

Page 121

1 and to submit to a polygraph.  When he
2 went to go get the witness form, she
3 changed her mind.  She wanted to wait
4 until she got out of jail.  She said she
5 really didn't want to do this anyway,
6 quote.
7 Q.    Right.
8 A.    It looks like when he pressed her
9 to actually test --- you know, and it
10 happened quite a bit, when you pressed
11 somebody to actually put it in writing,
12 they'd say --- because then you could go
13 back and question.  That's what it looks
14 like what happened to Captain Bartlett.
15 Q.    Right.  But she didn't actually
16 --- based upon what this was, Bartlett
17 wasn't telling --- wasn't saying that she
18 changed the substance of her statement.
19 She changed her mind about ---
20 A.    That's correct.
21 Q.    ---- about giving a statement?
22 A.    That's what it looks like.
23 That's exactly what it looks like.
24 Q.    And there are pressures, are
25 there not, on the parts of inmates while

Multi-Page™

Page 122

1 they're still in prison. Have inmates
2 expressed to you a reluctance on their
3 part to sign statements against staff
4 members accusing staff members of
5 wrongdoing, while they're still in the
6 institution?
7 A.    Probably, probably.
8 Q.    I mean, this isn't the first time
9 you've heard of this?
10 A.    No.  No, it's not.
11 Q.    Now, Exhibit 70, dated March
12 25th, 1996.  Here there are two inmates
13 identified.  DiGiovoni ---?
14 A.    Which Exhibit is that?
15 Q.    I'm sorry, 70.  This reflects ---
16 if you can review this, is this an
17 authorization for another investigation
18 into Miller?
19 A.    Yeah, basically it's my cover
20 sheet for an investigation.  It's been
21 filled out by Captain --- by Lieutenant
22 Beck this time.
23 Q.    And this is to look into
24 allegations, what, from DiGiovoni and
25 from Phillips?

Page 123

1 A.    Yes, about Marty Miller.
2 Q.    And then 71, this is a document
3 dated the 26th of March 1996.  This is
4 from Lieutenant Beck to William Wolfe.
5 It's a report of investigation and you're
6 cc'd on the second page.  Was this during
7 --- and then the other two pages
8 apparently are in Roger Beck's hand; do
9 you recognize it?
10 A.    Yeah, it looks like his notes.
11 It looks like his handwriting notes.
12 Q.    And do you --- is the reason
13 Lieutenant Beck issued this because you
14 were out --- away dealing with your
15 military responsibility?
16 A.    No.  Evidently --- I believe I
17 was at some kind of training because it
18 says, I advise that they would make
19 Captain Lazenby aware of this situation
20 upon his return.  This is in '96.  My
21 military was in late May early June of
22 1995.  So I believe that I was in
23 Elizabethtown ---.
24 Q.    For some training?
25 A.    Yes.

Page 124

1 Q.    And did you review Lieutenant
2 Beck's report after your return?
3 A.    Yes.
4 Q.    And then Exhibit 72, that's dated
5 the 28th of '96.  That's another
6 authorization for investigation?
7 A.    Yeah.  It's another cover sheet.
8 I'm not asking --- it's just a cover
9 sheet.
10 Q.    And what is the cover sheet to
11 reflect?
12 A.    Basically, it gives me an idea,
13 when I open the folder, it's self-
14 explanatory, the reason for the
15 investigation, the inmates involved.  It
16 gives me a quick ---.
17 Q.    Is this what you were referring
18 to before?
19 A.    Yes, yes, yes.
20 Q.    Now, what's the significance of
21 --- what's the difference between ---
22 other than the date, between 72, you
23 know, which is a cover sheet, the same
24 inmates that's dated the 28th, and then
25 Exhibit 70, which is dated the 25th?

Page 125

1 A.    One evidently involved --- a
2 staff involved.  Officer Szibacker
3 (phonetic).  I can't pronounce her name.
4 The other one has evidently to do with
5 the inmates.
6 Q.    Okay.  Okay.
7 A.    So it would be like a difference
8 in looking into an officer.
9 Q.    But there are still inmates
10 listed above the officer's ---?
11 A.    Yeah, there were witnesses
12 involved.  If you notice, it says
13 involved.
14 Q.    So this is Phillips, DiGiovoni
15 and now an officer?
16 A.    Uh-huh (yes).
17 Q.    Okay.
18 A.    Yes.
19 Q.    Do you recall what the officer
20 was alleging?
21 A.    That she might have been touched.
22 I'd have to ---
23 Q.    And then it says, investigating
24 staff and it says, Captain ---.
25 A.    It's probably me, I just didn't

**Multi-Page™**

Page 126

1 finish it all.
2 Q.   Is this in your ---?
3 A.   Yeah, this is in my handwriting.
4 Q.   And then Exhibit 73.  Do you
5 recognize --- this has apparently some
6 identities redacted, but do you recognize
7 the handwriting?
8 A.   Let me see.
9 WITNESS REVIEWS DOCUMENT
10 BY ATTORNEY KRAKOFF:
11 Q.   It has 12 pages and it --- the
12 last page states, evidence in this case
13 suggests appropriate disciplinary action
14 be taken against Martin Miller.
15 A.   This sort of looks like
16 Lieutenant Beck's handwriting.
17 Q.   But it's not yours?
18 A.   No.  No, it's not mine, no.
19 Q.   And then Exhibit 74 is a document
20 dated the 25th of April of '96.  It
21 reflects who attended.
22 A.   I think it's April 25th.
23 Q.   What did I say?  I'm sorry.  Did
24 I say April 26th?  That's all right.
25 April 25th, 1996.

Page 127

1      This note mentions that you were
2 in attendance.  This concerned a meeting.
3 Do you know what kind of a meeting this
4 was?
5 A.   This is what we call a PDC, a
6 Pre-Disciplinary Conference, where we go
7 over what we have ---
8 Q.   Okay.
9 A.   --- with the accused.
10 Q.   I note that Deputy Utz said, due
11 to confidentiality, no inmate or staff
12 names will be released at this time.
13 When we read the following statements
14 which we received for verifying accuracy
15 and it goes on from there.  Okay.
16      And then Exhibit 75.  It says,
17 thanks, Rich or Ryke (phonetic)?
18 A.   Ryke.
19 Q.   Is he an officer or is she an
20 officer?
21 A.   She's an officer, yes.
22 Q.   This note, I may have some info
23 concerning Vasquez and Marty Miller.
24 Before Carter and Vasquez went to RHU,
25 Carter made some allegations you and

Page 128

1 Captain Lazenby might be interested in.
2 A.   Yeah.  And this goes back to the
3 October, if you look at the date.  This
4 is Officer Wallawac (phonetic) it goes
5 back to October.
6 Q.   That's right.  I had this out of
7 --- did you --- for some reason this is
8 coming back?
9 A.   And evidently, yeah, because we
10 did interview Carter.
11 Q.   Right.  And then here's 10/4.
12 A.   This is the same note.
13 Q.   Are we replicating some of these?
14 A.   Yes, yes you are.
15 Q.   Okay.
16 A.   Yes.  For a few pages, then it
17 goes back to --- there's a few pages that
18 are out of line.
19 Q.   Okay.  Remember, I asked you
20 about that lieutenant, M-A-N ---?
21 A.   Manski?
22 Q.   Yeah, something like that.  Okay.
23 That's not important.  Exhibit 78.  Do
24 you recognize in whose hand ---?
25 A.   Yes.  That looks like Lieutenant

Page 129

1 Beck's.
2 Q.   And the same for page two, which
3 is March 25th?
4 A.   Uh-huh (yes).
5 Q.   What about page three?
6 A.   Yes.
7 Q.   Four?
8 A.   Yes.
9 Q.   What about five?
10 A.   It still looks like his.
11 Q.   Six?
12 A.   That's mine.
13 Q.   Robin Phillips --- can you read
14 that?  This is dated the 27th of March.
15 A.   It says, been given a hard time
16 by, it looks like, N. Young, which is an
17 inmate.  Doesn't feel threatened by
18 anyone's ---.
19 Q.   What does L. Smith mean, do you
20 know?
21 A.   I think it's another inmate.
22 It's not a staff.
23 Q.   Okay.
24 A.   Doesn't wear a bra.  Doesn't want
25 transferred.  Doesn't want involved.

Page 130

1 Q. Or does that say, doesn't want
2 moved?
3 A. Oh, I'm sorry. Doesn't want
4 moved. I'm sorry. So evidently, she was
5 in a housing unit with these two inmates
6 and they were giving her a hard time for
7 whatever the reason.
8 Q. Do you know what she meant by
9 doesn't wear a bra?
10 A. No, not right off.
11 Q. And page seven, do you remember
12 --- I realize that sometimes this is
13 foolish. This is a one line thing, but
14 do you have any recollection of this?
15 There may be a reason ---.
16 A. Well, I might've. It was around
17 the same time so more than likely, yes.
18 Q. What about Exhibit 79; do you
19 recognize the writing? Is that yours?
20 A. No. No, it's not. No, I don't.
21 Q. Now, what about this, that's not
22 your ---?
23 A. No, no.
24 Q. Then it says effective March
25 25th, Martin Miller is not permitted to

Page 131

1 enter the institution until further
2 notice without the approval of my office.
3 And then it says, not to be read at roll
4 call with an explanation mark. Do you
5 know what that means? I know it means
6 not to be read, but do you know what the
7 reason is that this is not to be read?
8 A. No. I can't answer for him.
9 Q. Well, was it --- has it been ---
10 was it routine over the period of years
11 that you were here ---?
12     ATTORNEY HALLORAN:
13         What Exhibit are we on?
14     ATTORNEY KRAKOFF:
15         Eighty (80).
16 OFF RECORD DISCUSSION
17 A. Yes.
18 BY ATTORNEY KRAKOFF:
19 Q. Do you know whether it was
20 routine for Superintendent Wolfe, not to
21 have this sort of information, ie, a
22 staff --- a member of the staff is not
23 permitted to enter the institution? Was
24 it routine for him not --- for that
25 information not to be read at roll call?

Page 132

1 A. Yeah, we didn't read that type of
2 information at roll call, no. It was
3 routine.
4 Q. All right. And ---
5 A. He would put out these memos and
6 ---
7 Q. Was that to avoid embarrassment
8 or something or ---?
9 A. I can't answer for Mike. I just
10 can't answer that. But, no, we didn't
11 announce it at roll call.
12 Q. And then Exhibit 81, do you
13 recognize the handwriting?
14 A. That's mine.
15 Q. And I take it that Lieutenant
16 Miller was present?
17 A. Evidently, yes.
18 Q. Is this a summary?
19 A. Yeah, it's little notes and stuff
20 that I take.
21 Q. Was this taped?
22 A. Evidently not, no.
23 Q. And then what about the 4/8; do
24 you know who's that ---?
25 A. Which one's that?

Page 133

1 Q. I'm sorry.
2 A. It looks like my handwriting.
3 Q. That's the one that says 4/8/96?
4 A. Yeah, it looks like my
5 handwriting. I'm sure it is.
6 Q. And can you read that? Does it
7 say Pullman something?
8 A. It's Pelman.
9 Q. Pelman, I mean.
10 A. Reported information, Officer
11 McQuaid, and explained about perfume to
12 Inmate J. White. See statement 4/8/97.
13 Q. And then Exhibit 82, were you
14 involved in obtaining these statements?
15 A. I was there with him because I
16 signed the witness sheet.
17 Q. You witnessed; is that right?
18 A. Yes, yes. These statements were
19 given Michael Wolanin and I witnessed it.
20 Q. And then page 11 of this same
21 Exhibit, is that your writing?
22 A. Yes, it is.
23 Q. Page 13, is that your
24 handwriting?
25 A. Yeah, that's my handwriting.

Page 134

1 Q.   Now, on page 25 you will see that
2 your name is crossed out and Roger Beck,
3 Sr.'s name appears on the first two ---
4 page 25 and 26 to Miranda.  These are ---
5 I don't think these --- at least one of
6 these doesn't fit here.  It's the wrong
7 date, 12/30/94.  Okay.
8       While I have this, why don't I
9 ask you.  There's an article that
10 appeared in the local newspaper.  What is
11 that number?
12 A   Exhibit 122.
13 Q.   Okay, 122.  Were you here when I
14 was questioning Mr. Bartlett about this
15 article?
16 A   No.
17 Q.   The long and short of it is, the
18 article --- and I'm not testifying to
19 this, I'm just trying to summarize this
20 for you, two inmates, one by the name of
21 Boyd and the other by the name of Ronka
22 Wright (phonetic) ---
23        DEPUTY KORMANIC:
24        Boyd.
25 BY ATTORNEY KRAKOFF:

Page 135

1 Q.   --- Ronka Boyd and another inmate
2 by the name of Wright --- do we have her
3 name?
4        DEPUTY KORMANIC:
5             Yvonne Wright.
6 BY ATTORNEY KRAKOFF:
7 Q.   Yvonne Wright.  The reporter
8 says that Boyd and Wright said that they
9 witnessed no change in policy and
10 procedures after charges were brought
11 against employees.  However, Sergeant
12 Terry Pelitere (phonetic), president of
13 the local union for officers at Cambridge
14 Springs, said changes were made.
15 Surveillance cameras were installed and a
16 policy adopted that prohibits male
17 employees from being with only one inmate
18 at a time.
19       Now, are you aware of either of
20 those two things taking place after any
21 of the criminal prosecutions that we've
22 discussed today?
23 A   Like how?  This institution has
24 always actively --- I don't know if
25 that's the word I want to --- actively

Page 136

1 went after people.  It's never been
2 condoned.  And I believe the cameras and
3 stuff, you know --- they purchased more
4 cameras --- or they purchased cameras and
5 installed them in the maintenance area
6 during that time.
7 Q.   The maintenance area was in what
8 building?
9 A.   It's in Curry, first and second
10 floor.  All three floors, I believe, they
11 installed cameras.
12 Q.   And the cameras had not existed
13 before that?
14 A.   No.
15 Q.   And what do the cameras --- what
16 are they able to ---- have you ever seen
17 the cameras?
18 A.   Basically, because I left shortly
19 thereafter.  Basically, they showed the
20 hallways.  You could see people moving in
21 --- I believe they're in the stairwells.
22 Q.   But you would be able to see
23 whether a person or persons left the
24 hallways to go into a stairway?
25 A.   Yeah.

Page 137

1 Q.   Is there a basement?
2 A.   Yeah, there's a basement.  The
3 cameras are on all three floors.
4 Q.   And the cameras would also
5 reflect --- are there lavatories,
6 bathrooms on those floors?
7 A.   Yeah, yes, there are.
8 Q.   And I take it the cameras would
9 be able to show who enters and exits the
10 bathrooms?  I don't mean inside the
11 bathrooms.
12 A.   Yes, I understand that.  I
13 believe they show the hallway.  I think
14 they point in both directions in the
15 hallway.
16 Q.   Were you involved in the decision
17 to purchase and install those cameras?
18 A.   I was probably asked about it.
19 Q.   Who asked you?
20 A.   It was probably the
21 Superintendent at a meeting or something.
22 I don't think, you know, it was not my
23 idea.  It was ongoing.
24 Q.   What did you tell them?
25 A.   Yes, I was in favor of cameras.

Page 138

1  **Q.   And why was that?**
2  A.   You could see more.  You don't
3  have --- a staff cannot be on all floors
4  and see everything all at once.  It's
5  just impossible.  Camera helps the job.
6  **Q.   Right.  And do you remember when**
7  **it was, what year it was that --- you**
8  **said it was shortly before you left?**
9  A.   I believe it was --- well, it had
10  to be in the summer of '96, fall,
11  somewhere around there.  They were
12  installed before I left.
13  **Q.   Was it your view that this**
14  **installing cameras might be able to**
15  **prevent acts of sexual misconduct by**
16  **staff members against inmates?**
17  A.   I don't know about preventing it.
18  Yeah, it probably would.  It would help
19  --- it's easier to see that way.  You're
20  being watched.  At least there's cameras
21  and nobody knows if somebody is watching
22  the cameras.  So you're going to be a
23  little bit leery around a camera.
24  **Q.   Right.  Okay.  And I did ask you**
25  **about the one on one or maybe I didn't.**

Page 139

1  **I'm getting confused as to who I asked**
2  **what of.  But has there ever been --- if**
3  **I asked you this, I apologize, but has**
4  **there ever been a policy at this**
5  **institution which prohibited male**
6  **employees from being with only one**
7  **inmate?**
8  A.   That's a department policy.
9  Yeah, you're not supposed to be.  I mean,
10  there's times it happens but it's ---
11  that's not the general rule.
12  **Q.   Now, is that limited to cross**
13  **gender or does that relate to both**
14  **genders?**
15  A.   No, cross genders.  A male and
16  female shouldn't --- male and male or
17  female and female, no.
18  **Q.   I'm sorry.  So that I understand**
19  **it, the one to one, did that relate to a**
20  **male officer with a female or vice versa?**
21  A.   The department policy, it's male
22  or female or male and a female.  A female
23  inmate, a male staff member.  Or if
24  you're at a male institution, a female
25  officer.

Page 140

1  **Q.   Right.  But if you're the same**
2  **gender ---**
3  A.   Yeah.
4  **Q.   --- it could be one on one?**
5  A.   Yes, yes.
6  **Q.   And do you know how far back that**
7  **policy goes back?**
8  A.   No, I don't.  It goes back a
9  ways.  I couldn't tell you.
10  **Q.   Is that something that existed in**
11  **other institutions ---**
12  A.   Yes, yes.
13  **Q.   --- before you came here?**
14  A.   Yes.
15  **Q.   A little while back I reviewed**
16  **with you a report from Ms. Wolfgang ---**
17  A.   Uh-huh (yes).
18  **Q.   --- concerning Inmate Pelman.**
19  **Did Ms. Wolfgang ever bring to your**
20  **attention or discuss in your presence any**
21  **allegations of sexual exploitation or**
22  **abuse she had received from Cambridge**
23  **Springs inmates?**
24  A.   No.
25  **Q.   What about Mr. Barr, the**

Page 141

1  **assistant to the Superintendent?  I**
2  **understand that he received grievance**
3  **complaints from inmates.  Did he ever**
4  **bring to your attention the grievances he**
5  **had received?**
6  A.   On what?
7  **Q.   In connection with allegations?**
8  A.   Well, if it was allegations he
9  would ask me --- if anything he'd go to
10  the superintendent who would in turn
11  shoot him down to me.  He wouldn't just
12  pick up the phone and say, I want you to
13  look into it.  No, he'd go through the
14  Superintendent.
15  **Q.   I see.  Do you recall any**
16  **situations where the Superintendent**
17  **contacted you and said, we have a**
18  **grievance complaint from an inmate**
19  **alleging sexual misconduct by a member of**
20  **the staff?**
21  A.   I'm sure there's been one.
22  **Q.   Do you think there's just been**
23  **one?**
24  A.   I'm --- it's happened.  I have no
25  idea what ---.

Multi-Page™

Page 142

1 Q. And on those occasions, did you
2 receive copies of the grievance
3 complaints?
4 A. If it happened, yes, I probably
5 did. Because I have to have a starting
6 point somewhere.
7 Q. I realize that authorization or
8 an order to proceed with an investigation
9 had to come from the Superintendent. Did
10 you receive --- I asked you about
11 Wolfgang and I asked you about Barr and I
12 asked you about the Superintendent and
13 Deputy Kormanic and others. Did you ---
14 were there any occasions where staff
15 members came to your office and said, in
16 effect, Captain Lazenby, I think that
17 there's a problem involving staff member
18 so and so, I think he or she may be
19 engaging in some form of sexual
20 misconduct?
21 A. Yes. In a case like that I would
22 have them make a statement.
23 Q. And where would those records be
24 when that occurred?
25 A. They would be in whatever

Page 143

1 investigation file I started.
2 Q. Do you recall specifically any of
3 the circumstances where you received
4 information from a staff member before
5 the file was open?
6 A. Yes. Yes.
7 Q. Can you recall any specific
8 instances?
9 A. One was an Officer Melnyck
10 (phonetic), approached me about an
11 officer and a Sergeant that may be doing
12 something inappropriate.
13 Q. Of a sexual nature?
14 A. Just inappropriate. No, it was
15 just inappropriate behavior. Not that I
16 can --- not right off the top of my head,
17 no.
18 Q. You can't identify it but going
19 back to my earlier questions and I'm not
20 here to put words in your mouth, but do
21 you recall any circumstances limiting it
22 to allegations of sexual misconduct? Do
23 you recall situations where a staff
24 member came to you, called you by phone
25 and said to you, Captain Lazenby, I think

Page 144

1 that there's a problem with so and so
2 engaging in sexual misconduct toward
3 either a specific inmate or toward
4 inmates in general?
5 A. And I have to go back and say, if
6 they did, I had them put it in writing.
7 It was like I said, the one with
8 inappropriate behavior.
9 Q. Right.
10 A. Another one with a hearsay about
11 some letters that the inmate was sending.
12 That's not sexual. I mean, it could lead
13 up to something sexual but that's not
14 what ---.
15 Q. So then you're not sure if you
16 received ---?
17 A. Not that I --- I would have some
18 --- no.
19 Q. You would have to review your
20 records?
21 A. Yeah, because I don't remember.
22 Q. Okay.
23 A. I would ask them to make a
24 statement.
25 Q. But you couldn't ask for a

Page 145

1 statement, could you, until you --- would
2 you ask for a statement before you
3 contacted the Superintendent to see
4 whether there could be an investigation?
5 A. Usually.
6 Q. So you'd say give me a statement
7 and then I'll take the matter to the
8 Superintendent?
9 A. Yes, because like I said, there's
10 been times where you would hear the stuff
11 and when you say, well, put it in writing
12 it's like --- so you don't want to go off
13 half cocked on an investigation when
14 there is nothing.
15 Q. Did you feel any reluctance about
16 investigating fellow officers in
17 connection with possible sexual
18 misconduct?
19 A. Absolutely not. They're dirty
20 then they need to be cleaned out.
21     ATTORNEY KRAKOFF:
22     Now, what I'd like to do
23 is take a minute to see whether
24 there is anything additional in
25 this line. There are a few

Page 142 - Page 145

Page 146

1 questions that Angus Love wants
2 to pose. We're not --- well,
3 then the other way of doing it,
4 if you want to take the time, is
5 for me to sit down with Angus and
6 make sure that's it's clear in my
7 mind and then I'll ask those
8 questions, if you prefer it that
9 way.
10      ATTORNEY HALLORAN:
11          I prefer to do it that
12 way.
13          ATTORNEY KRAKOFF:
14          Okay. Because this is
15 about a discreet area that I
16 haven't even questioned Captain
17 Lazenby about. So we're going to
18 be here until 6:00.
19      ATTORNEY HALLORAN:
20          You are done?
21      ATTORNEY KRAKOFF:
22          I am done. And it's a
23 discreet area. It simply would
24 take me probably ten minutes to
25 prepare those questions and Angus

Page 147

1 is not here to go over territory
2 that I've covered.
3      ATTORNEY HALLORAN:
4          With my right to object
5 ---.
6      ATTORNEY KRAKOFF:
7          If it's going astray then
8 we will ---.
9      ATTORNEY HALLORAN:
10          And your deposition will
11 be completed?
12      ATTORNEY KRAKOFF:
13          Right.
14      ATTORNEY HALLORAN:
15          And when you're done
16 that'll be it?
17      ATTORNEY KRAKOFF:
18          Right. I will not ask
19 any further questions.
20 SHORT BREAK TAKEN
21      ATTORNEY KRAKOFF:
22          I just want to see if
23 there's anything before I leave
24 Captain Lazenby.
25 EXAMINATION

Page 148

1 BY ATTORNEY LOVE:
2 Q.   Mr. Lazenby, When was the first
3 time that you heard of any problems
4 between Lisa Lambert and Officer Raun?
5 A.   Well, like I said, I told you
6 before, probably when it first took place
7 back in '93, whenever it took place. You
8 know, you hear the rumors. You hear
9 them.
10 Q.   How did you first hear it? From
11 whom, what sort of thing?
12 A.   I couldn't tell you.
13      ATTORNEY HALLORAN:
14          This is not a discreet
15 area. This is an area that
16 you've already been into. This
17 is not some new area.
18      ATTORNEY LOVE:
19          Jere asked him about a
20 certain meeting with Bartlett,
21 himself, Raun and Lambert.
22 That's the only part that he
23 asked him about. I'm just doing
24 a little bit more in that area.
25 A.   Well, you hear stuff. When you

Page 149

1 do an investigation it's supposed to be
2 confidential. So it would be very
3 unprofessional for me to approach anybody
4 and say what's all this about. So you
5 just hear the stuff.
6 BY ATTORNEY LOVE:
7 Q.   You heard it orally?
8 A.   Yeah. I didn't see anything in
9 writing. You heard it, you know, to the
10 best of my recollection.
11 Q.   Now, I just want to show you
12 Exhibit Three and see if that refreshes
13 your recollection at all.
14 A.   I assume I probably --- it's to
15 me. I probably read it because it would
16 come to me.
17 Q.   So would that have been the first
18 time you heard about the incident?
19 A.   Well, it says reoccurring. So I
20 probably read it before that.
21 Q.   Now, there's two memos before
22 that. They're not addressed to you. I
23 think they're addressed to Mr. Leak
24 (phonetic).
25 A.   Deputy Kormanic.

**Multi-Page™**

Page 150

1 Q.    Would you have been aware of
2 those?
3 A.    No, not necessarily, no.
4 Q.    Now, you had indicated that you
5 had been present at a meeting between
6 Lambert, Bartlett, Raun and yourself?
7 A.    Yes.
8 Q.    Do you recall whether that was
9 before or after you had received that
10 information?
11 A.    I'd have to find out what date
12 the meeting took place. I'm not sure
13 when the meeting took place. If you look
14 at the notes, it looks like it took place
15 after. Because there's a note in there
16 from actions taken by Captain Bartlett.
17 Q.    And that was the meeting?
18 A.    That's what it appears to be,
19 yes, that we met with Lisa Lambert.
20 Q.    And does that refresh your
21 recollection as to any of the details of
22 that meeting?
23 A.    It's hard to read. Regarding
24 something with contact of staff told her
25 not to get --- not to get personal with

Page 151

1 any staff, any further action on her part
2 will be resultant in misconduct. That's
3 what it looks like. It looks like he
4 told her she can't have any personal
5 relationship with the staff.
6 Q.    He being?
7 A.    It looks like Lieutenant
8 Bartlett. That's what it looks like. He
9 told her don't be getting personal with
10 our staff. If you continue to do it,
11 you're going to get a misconduct. That's
12 what it looks like by his notes.
13 Q.    And do you recall that
14 conversation yourself?
15 A.    No, not verbatim but that's
16 probably what was --- no, I don't
17 remember verbatim what occurred at that
18 meeting.
19 Q.    Do you recall a time when you
20 noticed that Officer Raun didn't have his
21 name tag on?
22 A.    No. That's not unusual for
23 officers not to have name tags on.
24 Q.    They're required to?
25 A.    Yes, they are.

Page 152

1 Q.    But they often don't wear them?
2 A.    If you forget it when you get
3 dressed in the morning, you forget to put
4 it on your uniform.
5 Q.    I show you --- this is in the
6 Exhibit but I'm not sure exactly where.
7 I'm going to show it to your attorney
8 first on bottom couple lines, if you
9 could read those and see if that
10 refreshes your memory. This is part of
11 the investigation into Officer Raun by
12 the department in 1994.
13         ATTORNEY HALLORAN:
14         In October 1994.
15         ATTORNEY LOVE:
16         Yes.
17 A.    Yeah, because I would have
18 ordered the name tags.
19 BY ATTORNEY LOVE:
20 Q.    Now, does that refresh your
21 recollection regarding an incident where
22 you noticed that Officer Raun did not
23 have his name tag on?
24 A.    Evidently so.
25 Q.    And do you recall why he didn't

Page 153

1 have his name tag or what explanation he
2 offered?
3 A.    He lost his name tag. He lost
4 the clips off the name tag of his shirt,
5 replaced it with clips on the tags of his
6 jacket. He broke the one and he used the
7 other one on his jacket.
8 Q.    Do you recall that Lisa Lambert
9 alleged that the marks on her arm were
10 made by his name tag?
11 A.    I wasn't involved in that, no. I
12 didn't do any investigations.
13 Q.    Now, what job did your wife hold?
14 A.    She was a sergeant at first and
15 then she was job placement coordinator.
16 Q.    Was she ever the property
17 manager?
18 A.    Yes, property sergeant.
19 Q.    What would her duties had been as
20 property sergeant?
21 A.    Taking packages from --- in and
22 out for the inmates. You want to ship a
23 package to an inmate, you go to her and
24 ship them out. If you were getting
25 packages then they'd come to her and she

Page 150 - Page 153

Page 154

1 searched and recorded them and give them
2 to the inmates.
3 Q.    Did she ever mention to you that
4 Officer Raun had given some property for
5 an inmate?
6 A.    No, none.
7        ATTORNEY LOVE:
8            I have nothing further.
9        ATTORNEY HALLORAN:
10           I have one question.
11 EXAMINATION
12 BY ATTORNEY HALLORAN:
13 Q.    You referred to Deposition
14 Exhibit Three and there's reference to
15 actions taken.  Is there a signature
16 below the note for actions taken?
17 A.    It looks like Lieutenant
18 Bartlett.
19       ATTORNEY HALLORAN:
20           Okay.  Thank you.  That's
21 all.
22       ATTORNEY KRAKOFF:
23           Do you want to explain
24 about waiving signature or
25 reading and all that?

Page 155

1        ATTORNEY HALLORAN:
2            We're going to not waive
3 on either one.
4            * * * * * * *
5        DEPOSITION CONCLUDED AT 5:55 P.M.
6            * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24