# ATTACHMENT J

## Deposition of Sandra Wolfgang

1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

LISA LAMBERT,            \*

    Plaintiff        \*   NO.:

      vs              \*   C.A. 96-247-Erie

SUPERINTENDENT            \*

WILLIAM WOLF, et al.,  \*

    Defendants        \*

\*

\*

\* \* \* \* \* \* \* \* \*


DEPOSITION OF

SANDRA WOLFGANG

SEPTEMBER 9, 1998


Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

SYLVIA VASQUEZ,                    \*

    Plaintiff                 \*   NO.:

      vs                    \*   C.A. 96-429-Erie

SUPERINTENDENT                     \*

WILLIAM WOLF, et al.,              \*

    Defendants                \*

\*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

SANDRA WOLFGANG

SEPTEMBER 9, 1998

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

ROBIN PHILLIPS,                    \*

    Plaintiff              \*   NO.:

       vs                  \*   C.A. 98-59-Erie

SUPERINTENDENT                     \*

WILLIAM WOLF, et al.,  \*

    Defendants             \*

\*

\*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

SANDRA WOLFGANG

SEPTEMBER 9, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

Sargent's Court Reporting Service, Inc.

(814) 536-8908

Page 2

```
1                U.S. DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                * * * * * * * * *
4                        *
5    SYLVIA VASQUEZ,        * .
6        Plaintiff        *  NO.:
7           vs           *  C.A. 96-429-Erie
8    SUPERINTENDENT        *
9    WILLIAM WOLF, et al., *
10       Defendants       *
11                       *
12               * * * * * * * * *
13
14            DEPOSITION OF
15           SANDRA WOLFGANG
16          SEPTEMBER 9, 1998
17
18
19
20
21
22
23       Any reproduction of this transcript is
24      prohibited without authorization by the
25              certifying agency.
```

Page 4

```
1                   DEPOSITION
2                       OF
3
4    SANDRA WOLFGANG, taken on behalf of the
5    Plaintiff herein, pursuant to the Rules
6    of Civil Procedure, taken before me, the
7    undersigned, Shannon C. Hagerty, a Court
8    Reporter and Notary Public in and for the
9    Commonwealth of Pennsylvania, at SCI
10   Cambridge Springs, Cambridge Springs,
11   Pennsylvania, on Wednesday, September 9,
12   1998, at 9:33 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                U.S. DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                * * * * * * * * *
4                        *
5    ROBIN PHILLIPS,        *
6        Plaintiff        *  NO.:
7           vs           *  C.A. 98-59-Erie
8    SUPERINTENDENT        *
9    WILLIAM WOLF, et al., *
10       Defendants       *
11                       *
12                       *
13               * * * * * * * * *
14
15            DEPOSITION OF
16           SANDRA WOLFGANG
17          SEPTEMBER 9, 1998
18
19
20
21
22
23       Any reproduction of this transcript is
24      prohibited without authorization by the
25              certifying agency.
```

Page 5

```
1              A P P E A R A N C E S
2
3    JERE KRAKOFF, ESQUIRE
4    1705 Allegheny Building
5    429 Forbes Avenue
6    Pittsburgh, PA  15219
7        COUNSEL FOR PLAINTIFF
8
9    THOMAS HALLORAN, ESQUIRE
10   Pennsylvania Office of Attorney General
11   Litigation Section
12   564 Forbes Avenue
13   6th Floor
14   Pittsburgh, PA  15219
15       COUNSEL FOR DEFENDANT
16
17   ALSO PRESENT: Deputy Superintendent
18                Karmanic
19
20
21
22
23
24
25
```

Page 6

1                    I N D E X

2

3  WITNESS:  SANDRA WOLFGANG

4  DIRECT EXAMINATION

5      By Attorney Krakoff              9 - 186

6  CROSS EXAMINATION

7      By Attorney Halloran          186 - 191

8  CERTIFICATE                          192

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

## O B J E C T I O N   P A G E

| | ATTORNEY | PAGE |
|---|---|---|
| 3 | Halloran | 35 |
| 4 | Halloran | 42 |
| 5 | Halloran | 67 |
| 6 | Halloran | 72 |
| 7 | Halloran | 84 |
| 8 | Halloran | 100 |
| 9 | Halloran | 122 |

2
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

## E X H I B I T   P A G E

|   | PAGE | |
|---|---|---|
| NUMBER  DESCRIPTION | | IDENTIFIED |

NONE OFFERED

Page 9

## P R O C E E D I N G S

-------------------------------------------

SANDRA WOLFGANG, HAVING FIRST BEEN DULY
SWORN, TESTIFIED AS FOLLOWS:

-------------------------------------------

DIRECT EXAMINATION
BY ATTORNEY KRAKOFF:

Q.   **Would you state your name,
please?**
A.   My name is Sandra Wolfgang.
          ATTORNEY HALLORAN:
          For the purposes of
discovery only the parties have
agreed to attach two volumes of
deposition exhibits relating to
three cases, Lambert versus Wolf,
Vasquez versus Wolf and Phillips
versus Wolf.  This is a
concession only for the purposes
of discovery and will not --- and
may be limited later at trial.
          ATTORNEY KRAKOFF:
          And we'll make it
explicit that as we've been doing
I think all along with these

Page 10

1  depositions is that Mr. Halloran
2  will reserve all objections with
3  the exception of the form of the
4  question for trial. And make it
5  clear that since we're getting
6  into information that may or may
7  not be relevant to each of the
8  cases, that Mr. Halloran is
9  reserving any objection as to
10 relevance or any other objection
11 in connection with the
12 introduction of exhibits that may
13 pertain to one of the Plaintiffs,
14 but not to the other.
15         ATTORNEY HALLORAN:
16         That's true for both the
17 exhibits and questions as they
18 relate to particular Plaintiffs.
19         ATTORNEY KRAKOFF:
20         Right. Okay. We're
21 ready to begin.
22 BY ATTORNEY KRAKOFF:
23 Q.  We started your deposition I
24 guess a couple of months ago and what I'm
25 going to do is to --- because I don't

Page 11

1  have the transcript. I'm going to
2  briefly cover some of the preliminary
3  questions again. I'm not doing this, so
4  that I can get a second crack at your
5  answers. I think that we barely began to
6  go into the substance of the testimony.
7         ATTORNEY HALLORAN:
8         Can we also indicate for
9  the purpose of the record that a
10 release has been obtained, a
11 written release has been obtained
12 from each Plaintiff, that's
13 Lambert, Vasquez and Phillips,
14 permitting the disclosure of
15 psychological and psychiatric
16 information.
17         ATTORNEY KRAKOFF:
18         And what I'll do so that
19 this will be fair, if this is
20 agreeable to you, let us have
21 this as the only deposition of
22 Ms. Wolfgang so that at a later
23 time if there's any consistency
24 between the first deposition and
25 this one, that I can't use the

Page 12

1  second one or the first one in
2  order to show a contradiction.
3  So this is going to supersede and
4  replace any previous deposition.
5  And the previous deposition will
6  be null and void for purposes of
7  this litigation.
8         ATTORNEY HALLORAN:
9         That's fine.
10 BY ATTORNEY KRAKOFF:
11 Q.  Ms. Wolfgang, when did you begin
12 to work as a staff psychologist at SCI
13 Cambridge Springs?
14 A.  I was hired by the Department of
15 Corrections in February of 1993. I spent
16 three weeks at the training academy and I
17 started in the capacity of psychologist I
18 in March of 1993.
19 Q.  And would you just summarize your
20 progression in terms of your position,
21 after you began to work at the prison.
22 A.  Well, within a year and a half we
23 hired two additional staff. I was
24 promoted to licensed psychologist
25 manager, I believe in '94, perhaps '95.

Page 13

1  Pretty much since the onset of my
2  employment I have functioned as the
3  department head for the psychological
4  services department here.
5  Q.  Do you have any clerical staff
6  that performs work on your behalf in
7  terms of transcribing notes or other
8  things?
9  A.  I have access to clerical staff
10 that type the psychological evaluations,
11 that are done by my staff and in the last
12 eight months I've been given some
13 part-time clerical support from the
14 secretary who had been with and still is
15 the parenting department, who does filing
16 and copying for me. As far as
17 transcribing notes, we pretty much do our
18 notes handwritten.
19 Q.  The DC-14 ---.
20 A.  Yeah. The cumulative adjustment
21 record forms.
22 Q.  Right. Did you type those or did
23 somebody type those for you relative to
24 Lisa Lambert?
25 A.  I do not type progress notes. If

Page 14

1 they were typed, they were typed by
2 someone else.
3 Q.  Now, in your capacity as a staff
4 psychologist at Cambridge Springs, did
5 you provide individual therapy to
6 Cambridge Springs' inmates during the
7 years 1994, 1995 and 1996?
8 A.  Yes, sir.
9 Q.  And in what year did you begin to
10 provide individual therapy for Cambridge
11 Springs' inmates?
12 A.  1993.
13 Q.  And in your capacity as a staff
14 psychologist at Cambridge Springs, did
15 you see Cambridge Springs' inmates in
16 group therapy sessions during the years
17 --- between 1994 and 1996?
18 A.  Yes.  Group counseling.
19 Q.  And in what year did you begin to
20 work with inmates in group counseling
21 encounters?
22 A.  I don't know for certain whether
23 we started doing groups as early as '93,
24 or whether it took us until 1994 to
25 actually get group programming underway.

Page 15

1 Q.  All right.  What groups between
2 the years, possibly 1993, but 1994, 1995
3 and 1996 did you operate?  What kinds of
4 groups?
5 A.  Myself personally or my staff?
6 Q.  Yourself.
7 A.  Conclusive of my staff.  I run a
8 couple of different treatment groups that
9 deal with the topic of co-dependency and
10 dysfunctional family systems.  Somewhere
11 in either '94 or '95 we got our sex
12 offender program up and running.  And I
13 run the second module of that program,
14 the relapse prevention module.  Both of
15 those groups are more didactic, more
16 psychoeducational and then I also run a
17 therapeutic group that deals more
18 specifically with the individual lives of
19 the women that is a step above the
20 co-dependency group.
21 Q.  Do you have a recollection of
22 whether you saw Lisa Lambert within the
23 framework of any groups while she was an
24 inmate at Cambridge Springs?
25 A.  It is my recollection that I

Page 16

1 never worked with Ms. Lambert in the
2 context of group therapy, group
3 counseling.
4 Q.  What about Robin Phillips?
5 A.  Robin Phillips has been in module
6 two of the sex offender program, probably
7 for about two years now.
8        ATTORNEY HALLORAN:
9        Could we just clarify
10 when --- was that the first time
11 you had her in a group?
12 A.  Ms. Phillips?
13        ATTORNEY HALLORAN:
14        Yes.
15 A.  Yes.
16        ATTORNEY HALLORAN:
17        And that would have been
18 two years from September of '98?
19 A.  Well, I'd have to --- I don't ---
20 I'm not going to swear as to the date.
21 I'd have to look in the records to
22 determine that.
23 BY ATTORNEY KRAKOFF:
24 Q.  What about Sylvia Vasquez?  Did
25 you see her within the framework of a

Page 17

1 group?
2 A.  No, sir, I did not.
3 Q.  Okay.  Did you see Lisa Lambert
4 in the context of providing individual
5 therapy to her?
6 A.  Individual counseling.
7 Q.  What is the distinction between
8 individual counseling and individual
9 therapy?
10 A.  Therapy is more of an in-depth
11 process as opposed to counseling which is
12 less in depth and dealing with more here
13 and now issues and towards resolution of
14 those here and now issues, as opposed to
15 attempting to resolve lifelong
16 difficulties that are engraved in the
17 character.
18 Q.  Did you see Robin Phillips in the
19 context of providing individual
20 counseling or individual therapy?
21 A.  In the last year or so I have, in
22 fact, seen Ms. Robin Phillips
23 individually and that has been as an
24 adjunct to sex offender specific group
25 therapy.  Those individual sessions have

Page 18

1 focused on her work in sex offender
2 specific treatment.
3 Q.    And Sylvia Vasquez, did you see
4 her in the context of either counseling
5 or in provision of individual therapy?
6 A.    I saw Ms. Vasquez for a series of
7 individual counseling sessions.
8 Q.    Do you recall when --- the time
9 period you saw her?
10 A.    I'm estimating here from memory.
11 Q.    Well, do you have her records
12 with you?
13 A.    No, I do not, sir. Those records
14 were transferred to SCI Muncy when she
15 left SCI Cambridge Springs and went to
16 SCI Muncy.
17         ATTORNEY HALLORAN:
18         We're trying to get them.
19 I thought we had them and they
20 may be here this morning. I
21 think they were being lifelong.
22         ATTORNEY KRAKOFF:
23         Okay. I'm going to
24 obviously reserve the right to
25 recall Ms. Wolfgang either today,

Page 19

1 if we don't have them or for
2 tomorrow.
3         ATTORNEY HALLORAN:
4         I understand. As soon as
5 they come, if they come, we'll
6 give them to you.
7 BY ATTORNEY KRAKOFF:
8 Q.    What about Robin Phillips? Do
9 you have her records?
10 A.    Robin Phillips' records should
11 all be here. She is in this institution
12 now.
13 Q.    And did you bring records
14 associated with Lisa Lambert?
15 A.    I have no records of Lisa
16 Lambert. Those records were relinquished
17 years ago when she left this institution.
18 Q.    Where were they relinquished to?
19 A.    To the records department. What
20 the records department does with them,
21 I'm not really certain.
22 Q.    Were you aware of the fact that
23 we had an authorization that was
24 furnished to Mr. Halloran in connection
25 with reviewing Lisa Lambert's records?

Page 20

1 A.    You mean the fact that she had
2 signed a release?
3 Q.    Yes.
4 A.    I became aware of that on Tuesday
5 of last week or Wednesday of last week.
6 Q.    Did you take any steps to have
7 those records located and brought to
8 Cambridge Springs?
9 A.    No, sir, I did not.
10         ATTORNEY HALLORAN:
11         Let me say --- I took
12 steps to have the records
13 located. I think they made a
14 mistake. What they sent me was
15 all the medical records and
16 didn't send the DC-14s. So they
17 are in the process of trying to
18 --- we're not objecting to
19 producing them. We'll produce
20 them as soon as we get them. The
21 Vasquez DC-14s, it's my
22 understanding were sent
23 overnight, yesterday. And I
24 realize that they didn't ---
25 hadn't sent the right records.

Page 21

1 Ms. Wolfgang does have
2 recollection, independent
3 recollection of her treatment of
4 each of these Plaintiffs which
5 she's prepared to testify to.
6         And I understand that you
7 can recall her, if you wish to,
8 in light of the records that are
9 produced. It's Ms. Wolfgang's
10 recollection that the records
11 with regard to Lambert are maybe
12 very sketchy, because there
13 wasn't any department requirement
14 that written DC-14s be maintained
15 of your interviews or
16 conversations with patients at
17 the time or your inmates at the
18 time that she was having
19 discussions with Lambert.
20         And it was also a time
21 when Ms. Lambert, I believe, was
22 in the RHU which also made it
23 more problematic in terms of
24 completing any written record
25 upon interview. So there may be

Page 22

1 recollection of interviews that
2 Ms. Wolfgang has that won't be
3 reflected in any written record
4 because the requirements didn't
5 exist at the time of the
6 contacts.
7 BY ATTORNEY KRAKOFF:
8 Q.   Do you adopt that testimony as
9 your testimony, what Mr. Halloran just
10 represented?
11 A.   Yes, sir.
12 Q.   And was that information that Mr.
13 Halloran related now, information that
14 you had provided to him?
15 A.   Yes, sir.
16 Q.   Now, let me focus a while on Lisa
17 Lambert.  You did see Lisa Lambert in
18 your capacity as a staff psychologist
19 while she was an inmate at Cambridge
20 Springs?
21 A.   Yes.
22 Q.   When did you begin to see her?
23 A.   My recollection is that it was
24 sometime in 1993, exactly when, I don't
25 know for certain.

Page 23

1 Q.   And do you recall why you saw her
2 in 1993, if, in fact, it was 1993?
3 Regardless of when it was, do you recall
4 why you saw her for the first time?
5 A.   I'm not certain whether I saw her
6 for the first time at her written request
7 or whether I saw her for the first time
8 because she was referred to me by her
9 corrections counselor.  But I believe it
10 was one of those two possibilities.
11 Either she wrote to me personally
12 requesting to be seen or the counselor
13 made a referral asking that I see her.
14 Q.   Would either a request by an
15 inmate to being seen or a referral by a
16 counselor be incorporated in the records
17 that you would maintain about an inmate?
18 A.   If the counselor referred the
19 person, in all likelihood there would be
20 a form entitled the DC-97 form, which is
21 a snap-set kind of form and one of the
22 four copies would exist in the record.
23 If the inmate wrote to me personally,
24 there is a possibility that at that time
25 I copied the inmate's request and my

Page 24

1 response to her request and sent that
2 copy over to the corrections counselor.
3 There's also a possibility that I simply
4 responded to the request, sent it to the
5 inmate and didn't make a copy.  In which
6 case there wouldn't be a copy of the
7 request or my response to the request in
8 the record necessarily.
9 Q.   Now, do you have a recollection
10 of what prompted the first contact from
11 Lisa Lambert, either directly by her or
12 through her counselor?  What issue or
13 issues?
14 A.   My recollection is that --- the
15 difficulties that were brought to my
16 attention initially with regard to Ms.
17 Lambert involved her having certain
18 feelings, possibly feelings of
19 frustration related to the perception on
20 her part that certain personnel within
21 the institution were not listening to
22 some of her concerns.
23 Q.   Do you recall scheduling a
24 meeting and, in fact, having a meeting
25 with her, a first meeting?

Page 25

1 A.   I don't remember the first
2 meeting very well at all and that's
3 honest.  My memory is more with regard to
4 content over a series of meetings with
5 her both in one-to-one sessions in my
6 office and while she was maintained in
7 the restricted housing unit.  I cannot
8 honestly say that I recall clearly our
9 first meeting and the specifics with
10 regard to content of that first meeting.
11 It's rather that my memory is more of a
12 kind of gestalt of this woman's
13 concerns and what we discussed in the
14 context of our one-to-one interactions.
15 Q.   Let me show you --- perhaps Mr.
16 Halloran can show you a copy of Group
17 Exhibit Ten, which is a DC-14 cumulative
18 adjustment record and there's an entry
19 dated 9/1/94.
20 A.   Yes.
21 Q.   And is that in your handwriting?
22 A.   Yes, it is, sir.
23 Q.   And it reads, Ms. Lambert
24 participating in individual therapy
25 sessions on 8/15 and 8/26/94?

Page 26

1  A.   Right.
2  Q.   Now, this is 1994 in September.
3  Based upon your testimony this morning, I
4  take it that while there is not a record
5  of that, that you have an independent
6  recollection of meeting with her sometime
7  prior to September of 1994?
8  A.   Well, now that I see this I guess
9  I question whether, in fact, I did see
10 her in '93 or, in fact, I started seeing
11 her in 1994. Because I do recall that
12 she was maintained in this institution
13 for quite a while before I started seeing
14 her. And it may be that I didn't start
15 seeing her until 1994.
16 Q.   Okay. And this is almost the end
17 of 1994?
18 A.   Right.
19 Q.   This is September.
20      ATTORNEY KRAKOFF:
21      I'm sorry, Mr. Halloran?
22      ATTORNEY HALLORAN:
23      I was just going to note
24 that the Group Exhibit Ten is a
25 two-page exhibit which refers to

Page 27

1  visits through October of '94.
2       ATTORNEY KRAKOFF:
3       Right. I was going to
4  get to that.
5  BY ATTORNEY KRAKOFF:
6  Q.   So maybe that August 15, 1994,
7  was the first time that you saw Ms.
8  Lambert?
9  A.   That may be, sir.
10 Q.   And you noted in here that she
11 was participating in individual therapy
12 sessions. You characterize that as
13 therapy?
14 A.   Yes.
15 Q.   Okay. So it was more than
16 counseling?
17 A.   I think I have a tendency to kind
18 of use those interchangeably, although,
19 they are not synonymous.
20 Q.   Okay. So therapy may not
21 accurately describe what those sessions
22 were in August of 1994?
23 A.   I think I would agree with that
24 because I recall basically that we did
25 not start out by doing a thorough

Page 28

1  psychosocial history and identifying, you
2  know, problems that were long-standing
3  that we were going to try to work on in
4  the course of individual therapy. It was
5  more that she was having difficulties in
6  the here and now which were situational
7  related to what was going on in the
8  institution and she was reaching out in
9  my opinion for a listener and for someone
10 to in some way assist her with those here
11 and now situational problems.
12 Q.   Do you recall when --- the first
13 time you actually recall visibly seeing
14 her? I'm distinguishing that from
15 engaging in some sort of either
16 counseling or therapy session with her.
17 Do you recall the first time that you
18 actually laid eyes on her?
19 A.   Not with regard to dates, sir,
20 no.
21 Q.   Okay. Do you recall whether the
22 first time you saw her she was in the
23 company of another inmate?
24 A.   No, I do not recall that, sir.
25 Q.   Do you sometimes prepare what

Page 29

1  would be referred to as a time line in
2  connection with the provision of either
3  counseling or therapy for an inmate?
4  A.   No, sir, I haven't used time
5  lines as a therapeutic tool.
6  Q.   Okay.
7  A.   I've used lifelines and had
8  inmates do a chronology of the
9  significant events in their life.
10 Q.   Okay. Perhaps I used the wrong
11 word. Do you recall --- what is the
12 purpose of a lifeline as you use them?
13 A.   A lifeline as I use them is
14 pretty much an autobiography that is
15 produced by the woman for the purpose of
16 dealing with issues of childhood abuse,
17 sexual, physical abuse, getting them
18 through that process to identify
19 unresolved issues that have impacted
20 their character development. The
21 ego-defense mechanisms that they have
22 developed in response to early trauma and
23 abuse. How those are still in some cases
24 being utilized in the here and now and
25 being utilized maladaptively and how we

Page 30

1  can begin to break through some of those
2  defenses and become more adaptive in our
3  behavior now.
4  Q.  Now, is that something when you
5  do a lifeline, is that something you do
6  in connection with counseling or is that
7  something you do in connection when you
8  begin the process of individual therapy?
9  A.  That is something that right now
10 I'm doing pretty much in the context of
11 the advanced co-dependency group which is
12 a therapeutic group and that is therapy.
13 Q.  Okay.  Back then did you prepare
14 lifelines in connection with mere
15 counseling as opposed to therapy?
16 A.  No, sir.
17 Q.  Do you have a recollection of
18 whether you prepared a lifeline for Lisa
19 Lambert?
20 A.  I did not prepare a lifeline for
21 Lisa Lambert.
22 Q.  And you're sure of that?
23 A.  Yes, sir.
24 Q.  The concern that Lisa Lambert
25 expressed to you, I think it was early on

Page 31

1  and correct me if I'm wrong, was that she
2  had a perception of having difficulty in
3  having certain feelings of frustration
4  related --- that she felt that certain
5  personnel were not listening to her
6  concerns; is that right?
7  A.  Yes, sir.
8  Q.  Okay.  And was that early on in
9  her contact with you that she expressed
10 that feeling that certain personnel were
11 not listening to her concerns?
12 A.  Yes, sir.
13 Q.  And do you have a recollection of
14 what the concerns were that she believed
15 personnel were not listening to her
16 about?
17 A.  My recollection is that she had
18 made some allegations regarding some
19 level of harassment that she was
20 subjected to identifying Sergeant Raun at
21 the time as someone who was harassing her
22 in the institutional setting.
23 Q.  Did she mention any other
24 personnel because you used the expression
25 certain personnel and at least I took

Page 32

1  that to mean more than one rather than a
2  certain person?
3  A.  At the time when we first started
4  interacting one on one, her focus was on
5  Sergeant Raun.
6  Q.  Okay.  Did she describe to you
7  what the harassment --- the nature of the
8  harassment that she said she was being
9  subjected to by Sergeant Raun?
10 A.  My recollection is that she had
11 indicated that he was staring at her in a
12 way that made her uncomfortable in the
13 dietary department while she was eating.
14 Q.  Anything else?
15 A.  Well, are we moving on here?
16 Q.  No, initially.  Initially.
17 A.  Initially that's all I can
18 remember.  I'm not saying that there
19 wasn't more, but without any written
20 documentation I couldn't be certain that
21 there was more than that.
22 Q.  Did she describe specific
23 episodes or incidents meaning dates or
24 occasions when Sergeant Raun was
25 allegedly staring at her?

Page 33

1  A.  She may have done that, but I
2  certainly can't recall.
3  Q.  You can't recall the specific
4  episodes or you can't recall whether she
5  was specific about episodes?  In other
6  words, was she giving you a general
7  allegation that Sergeant Raun was staring
8  at her in ways that made her feel
9  uncomfortable or did she give examples of
10 occasions when Sergeant Raun had
11 allegedly stared at her?
12 A.  She may have given me specific
13 examples, but I'm not able to say that
14 for certain.
15 Q.  Now, do you have a recollection
16 of whether you took notes early on when
17 she made these allegations or this
18 allegation about Sergeant Raun?
19 A.  I did not take notes.  This is
20 pretty much the extent of my note taking.
21 Q.  Meaning Exhibit Ten, pages one
22 and two?
23 A.  Yes, sir.
24 Q.  Was it your practice in or about
25 August of 1994 not to take notes when you

Page 34

1  had meetings with --- counseling meetings
2  with inmates?
3  A.   It was my practice to note that
4  the individual session did, in fact,
5  transpire and the date on which it
6  transpired or the dates.  That's pretty
7  much what we were instructed to do by the
8  Harrisburg people.
9          ATTORNEY HALLORAN:
10         And the format that
11 you're referring to was Exhibit
12 Ten of the deposition, this
13 format?
14 A.   Yes.
15 BY ATTORNEY KRAKOFF:
16 Q.   Now, who had instructed you to
17 limit your notes --- and I'm using the
18 term limit, to limit your notes to the
19 date of the session took place and the
20 name of the inmate who participated in
21 the session?
22 A.   Well, the chief of psychological
23 services at the time was very focused on
24 confidentiality and he had indicated in
25 the chief psychologist meetings that we

Page 35

1  wanted to, you know, keep any notes of
2  individual therapy very brief and
3  basically identifying that it's taking
4  place and the date without really getting
5  into disclosure of content.  And my
6  understanding was that this was because
7  we wanted confidentiality maintained.
8  Q.   Confidentiality vis-a-vis
9  inmate or confidentiality vis-a-vis third
10 parties or confidentiality vis-a-vis both
11 the inmate and third parties?  Did he
12 explain to you who you were attempting to
13 maintain confidentiality against or from?
14         ATTORNEY HALLORAN:
15         I'm going to object to
16 the form of the question.
17         ATTORNEY KRAKOFF:
18         Let me rephrase the
19 question.
20 BY ATTORNEY KRAKOFF:
21 Q.   Confidentiality, I take it, as
22 you understood it, meant that somebody
23 else other than at least yourself would
24 not become aware of the content of your
25 sessions; is that right?

Page 36

1  A.   Yes.
2  Q.   Now, what I'm asking is, did you
3  understand the chief psychologist to be
4  saying that the confidentiality was to be
5  vis-a-vis the inmate so that the inmate
6  wouldn't be able to read what had
7  occurred at the session?
8  A.   No, sir.
9  Q.   Okay.  Because the inmate would
10 have been there.
11 A.   My understanding, it was to
12 protect the interest of the inmate.
13 Q.   Okay.  From whom is my question?
14 Did the chief psychologist say who he was
15 attempting to ---?
16 A.   No, he did not specify, sir.
17 Q.   Okay.  Now, you were a
18 psychologist prior to coming to Cambridge
19 Springs?
20 A.   Yes, sir.
21 Q.   Okay.  And had you worked in ---
22 had you practiced as a psychologist
23 before coming to Cambridge Springs?
24 A.   Yes, sir.
25 Q.   Would you just identify the place

Page 37

1  or places where you had practiced
2  psychology prior to coming to Cambridge
3  Springs?
4  A.   I started out my career employed
5  by DuBois Regional Medical Center where I
6  was employed as a mental health
7  therapist.  I worked there for about five
8  and a half years.  During the course of
9  those five and a half years, I became
10 licensed to practice psychology in the
11 State of Pennsylvania.  My primary
12 responsibilities in that capacity were
13 psychological evaluations and individual
14 and group therapy with the inpatient
15 population of the psychiatric unit in
16 that hospital.
17         From there I took a position
18 employed by Clearfield Jefferson
19 Community Mental Health where I directed
20 a satellite clinic in Brookville,
21 Pennsylvania, which was outpatient and
22 was responsible for providing outpatient
23 psychiatric and psychological services to
24 the Brookville community.  I had a
25 consulting psychiatrist.  I had a small

Page 38

1  staff.  We did individual therapy
2  primarily with people in the community.
3       From there I moved to the State
4  of Ohio, okay, where I pretty much
5  relinquished my licensure status and was
6  employed by an agency called Parmadale
7  (phonetic), Incorporated, where I worked
8  for, oh, a little over a year in a
9  residential treatment setting with
10 adolescent sex offenders who were court
11 mandated to sex offenders specific
12 treatment.
13      From there I came back to the
14 State of Pennsylvania where I regained my
15 licensure status and was employed for
16 approximately a year and a half by
17 Lutheran Social Services, Bethesda
18 Children's Home where I worked as a
19 psychologist working with delinquent and
20 dependent youth.
21 Q.   Did you provide individual
22 therapy there?
23 A.   Yes, sir, I did.  And from there
24 I came to this position.
25 Q.   Now, in at least three of those

Page 39

1  settings, DuBois, Brookville and Lutheran
2  Social Services, you provided individual
3  therapy; correct?
4  A.   Yes, sir.
5  Q.   Now, was it your practice in
6  those settings not to take substantive
7  notes about the content of your therapy
8  sessions?
9  A.   I would say generally no.
10 Q.   That it was your practice not to
11 take notes or the reverse?
12 A.   No.  When I worked for DuBois
13 Regional Medical Center, there was a
14 certain format that we utilized to do
15 progress notes when we had individual
16 contact with the inpatients there and
17 that format was very similar.  It was
18 actually the same as the format that you
19 see in Ms. Phillips' records.  Okay.
20 It's soap note format which is a pretty
21 standard kind of format required for
22 accreditation of hospitals, okay, when
23 you're doing that kind of work.
24 Q.   You would include subjective
25 evaluation or subjective impressions?

Page 40

1  A.   Subjective is the quote from the
2  patient or the client.  Objective is your
3  observations.  A is your assessment and P
4  is your plan and that was the standard
5  format that I utilized during the years
6  that I worked for DuBois Regional Medical
7  Center.
8  Q.   So in that context you did take
9  notes ---
10 A.   Yes, sir.
11 Q.   --- which would have reflected
12 the specific complaint or issues raised
13 by the patient; correct?
14 A.   Yes, sir.
15 Q.   And you would take notes about
16 your impressions based upon what the
17 patient either told you or what you
18 observed about the patient; correct?
19 A.   Yes.
20 Q.   And what else would you notes
21 include, the assessment?
22 A.   Yes.
23 Q.   And generically speaking what
24 kind of information would that include?
25 A.   That may be one word and the word

Page 41

1  might be depressed.
2  Q.   Okay.  And then what was the P
3  for?
4  A.   That stands for plan and that's
5  to speak to where do we go in terms of
6  interventions to assist this individual.
7  Q.   And what about at Brookville, was
8  it similar?
9  A.   We used the same format.
10 Q.   Okay.  And Lutheran Social
11 Services?
12 A.   Lutheran Social Services I don't
13 believe that we used that format.  That
14 format is more familiar to me in
15 community mental health and in hospital
16 settings.  I don't think we used the soap
17 format, but I don't know that
18 definitively.  I don't know.
19 Q.   Do you have whether it was soap
20 or not?  Were your notes limited to the
21 name of the person that you were
22 counseling and the date that the session
23 took place or did you include substantive
24 information related to the issues
25 discussed and your impressions and what

Page 42

1 your plans would be as far as treatment?
2 A.  I think I can reasonably say that
3 in my prior employment settings that my
4 notes were generally more substantive
5 than what these are, sir.
6 Q.  Now, what was your understanding
7 as a psychologist of the purpose or
8 purposes to be served by having
9 substantive notes related to sessions?
10 A.  So that you can look back and you
11 can see what you did two weeks ago
12 without having to keep that in your mind
13 since memory is never perfect.  Also so
14 that it provides a written record of what
15 transpired in the sessions.
16 Q.  Okay.  Now, were you ordered by
17 the chief psychologist not to take
18 substantive notes or was that a
19 recommendation as you understood it, one
20 that you could either elect to follow or
21 not to follow?
22          ATTORNEY HALLORAN:
23          Let me object to the form
24 of the question because I don't
25 want to confuse the question as

Page 43

1 being --- are you directing the
2 question with regard specifically
3 to Ms. Lambert ---
4          ATTORNEY KRAKOFF:
5          No.
6          ATTORNEY HALLORAN:
7          --- or to her general
8 practice?
9          ATTORNEY KRAKOFF:
10          Yes.  The general
11 practice.
12 BY ATTORNEY KRAKOFF:
13 Q.  I'm going back to the time when
14 you said that the chief psychologist had
15 a meeting.
16 A.  I would say ordered is not the
17 appropriate word.  Okay.  Recommended is
18 the appropriate word.
19 Q.  Okay.  And when that
20 recommendation occurred, was that in 1993
21 as best you can recall?
22 A.  I don't know if it was '93 or
23 '94.
24 Q.  Is it your recollection that that
25 recommendation would have occurred

Page 44

1 sometime prior to August of 1994, when
2 the notes in Exhibit Ten ---
3 A.  Yes.
4 Q.  --- were prepared?
5 A.  Logically, yes.
6 Q.  Logically because you're drawing
7 an inference since this entry didn't
8 contain substantive notes that ---?
9 A.  It would have been prior to the
10 entry, yes.
11 Q.  Now, was it your practice, with
12 all of the women that you were seeing at
13 the time you were seeing Ms. Lambert ---
14 was it your practice to do as you did
15 here, not to include substantive notes?
16 A.  I recall, sir, that at that
17 particular time my memory is that the
18 Department of Corrections as far as
19 psychologically, psychiatric services was
20 in a transitional state and that in the
21 course of a couple of years, and I'm
22 talking '94 and '95, that the direction
23 that we were getting from Harrisburg was
24 not entirely consistent.  What I recall
25 was that early in my career there was a

Page 45

1 great deal of emphasis on
2 confidentiality, okay.  And then
3 somewhere along the line there with the
4 Austin litigation we kind of switched
5 from, say, less to, say, more and that
6 the direction fluctuated and changed
7 within a two to three-year period in the
8 mid 1990s.
9 Q.  But your recollection is that the
10 period that you were making entries in
11 the cumulative adjustment record for Lisa
12 Lambert, that during that time period
13 it's your recollection that there was a
14 recommendation that you not include
15 substantive notes; is that correct?
16 A.  Yes, sir.
17 Q.  And so that the circle is
18 complete, the question that I put to you
19 before I'll put to you again, were you
20 consistently employing the practice of
21 not including substantive notes with
22 respect to all of the women that you were
23 seeing here at Cambridge Springs?
24 A.  During this time period here?
25 Q.  Yes.

Page 46

1 A.  Yes.
2 Q.  Okay.  So Lisa Lambert was not an
3 exception?
4 A.  Absolutely not, no.
5 Q.  I'm sorry.
6          ATTORNEY HALLORAN:
7          I just wondered when you
8 said this time frame, you were
9 referring to Group Exhibit Number
10 Ten which refers to certain
11 sessions you conducted with Lisa
12 Lambert August through ---
13          ATTORNEY KRAKOFF:
14          October.
15          ATTORNEY HALLORAN:
16          --- October 1994?
17 A.  Right.
18 BY ATTORNEY KRAKOFF:
19 Q.  At this point, other than the two
20 documents in Exhibit Ten, you haven't
21 brought with you any other documents, is
22 that correct, associated with Lisa
23 Lambert?
24 A.  That's correct.
25 Q.  To make it clear there is one

Page 47

1 other document.  There may be more than
2 one, but there is one other document
3 incorporated in Exhibit Ten which is on
4 pages 13, 14 and 15, which I'm going to
5 question you about later, which appears
6 to be a letter --- memo from you.
7          ATTORNEY HALLORAN:
8          I was mistaken.  I
9 thought Exhibit Ten was a
10 two-page exhibit.  It's actually
11 a 15-page exhibit.
12          ATTORNEY KRAKOFF:
13          The two pages --- you
14 were correct, though.  I mean,
15 the only two pages of cumulative
16 adjustment records, I think we're
17 on the first two pages.
18          ATTORNEY HALLORAN:
19          And we are attempting to
20 obtain the rest of the records,
21 but it's possible that there are
22 no other records.
23          ATTORNEY KRAKOFF:
24          That's what I understand.
25 BY ATTORNEY KRAKOFF:

Page 48

1 Q.  So I'm going to ask you to think
2 as hard as you can and as clearly as you
3 can to try to reconstruct what occurred
4 in the sessions, what was said in the
5 sessions, not necessarily verbatim, but
6 at least the sum and substance of what
7 you recall about the sessions.  Okay.  So
8 at the inception, your recollection is
9 the first issue that Lisa brought to your
10 attention was an allegation that certain
11 personnel were not listening to her
12 concerns and the concerns, as you recall,
13 related to Sergeant Raun; correct?
14 A.  Correct.
15 Q.  Okay.  Did she identify to you
16 who the personnel were?  And by the way,
17 I want to correct something.  I think in
18 an earlier question to you I said certain
19 personnel.  You were referring to
20 personnel not listening to her as opposed
21 to alleged harassment by personnel.  So I
22 don't want to mislead the record on that.
23 You hadn't said that she was complaining
24 about certain personnel harassing her,
25 you said that certain personnel were not

Page 49

1 listening --- according to her
2 perception, were not listening to her
3 concerns about a staff member who was
4 allegedly harassing her; correct?
5 A.  Correct.
6 Q.  Okay.  Did she identify ---?
7          ATTORNEY KRAKOFF:
8          Did I confuse you?
9          ATTORNEY HALLORAN:
10          I mean, I think the
11 record is clear that the
12 individual that she complained
13 about initially was Sergeant Raun
14 ---
15          ATTORNEY KRAKOFF:
16          Right.
17          ATTORNEY HALLORAN:
18          --- staring at her in the
19 dietary.
20          ATTORNEY KRAKOFF:
21          Right.
22          ATTORNEY HALLORAN:
23          I don't want to suggest
24 that there were other personnel,
25 at that time that she was

Page 50

1  complaining about.
2          ATTORNEY KRAKOFF:
3          No. That's right and
4  that's what I was clarifying.
5  BY ATTORNEY KRAKOFF:
6  Q.  But she was complaining about
7  personnel here not listening to her
8  complaints or not treating her
9  complaints, not listening to her
10  concerns; is that correct?
11  A.  Yes. But at this point as I'm
12  considering where you may be going here I
13  would say that Charley Utts (phonetic) is
14  probably the only one that I could
15  identify with clear memory.
16  Q.  As a person who was not listening
17  to her concerns?
18          ATTORNEY HALLORAN:
19          From her perception?
20          ATTORNEY KRAKOFF:
21          Yes. Right.
22  A.  From her perception, yes.
23  BY ATTORNEY KRAKOFF:
24  Q.  Okay. And Utts was a deputy
25  superintendent at that time?

Page 51

1  A.  Yes, sir.
2  Q.  Is it your recollection that ---
3  can you only recall one name, the name of
4  one staff member who allegedly was not
5  listening to her concerns? Is that the
6  only name you can recall?
7  A.  Yes.
8  Q.  Okay. Do you have a recollection
9  that she identified more than Mr. Utts
10  and you're just not able to recall who
11  the others were or are you saying the
12  only person she identified was Mr. Utts?
13  A.  No. I did have a sense that she
14  had complained to more than one person
15  regarding her concerns about Sergeant
16  Raun.
17  Q.  Okay. Now, did she tell you what
18  she had told Mr. Utts?
19  A.  No, sir.
20  Q.  Did she tell you what she told
21  anybody else about what was bothering
22  her?
23  A.  Not verbatim, no, okay. Again,
24  my sense was that the perception on her
25  part that she was being harassed by

Page 52

1  Sergeant Raun, indication that she had
2  taken these concerns and made them known
3  to Deputy Utts and perhaps other
4  personnel and that people were not, in
5  her mind, listening, believing, perhaps
6  doing what she felt that they needed to
7  do.
8  Q.  Okay. Now, when she told you
9  that, in her mind at least, Sergeant Raun
10  was harassing her, did she tell you
11  anything more than that he was staring at
12  her, in her mind, inappropriately in the
13  dietary area? I'm talking about at the
14  inception of your meetings with her?
15  A.  She may have, but I do not recall
16  specifically if she did.
17  Q.  Now, do you have a recollection
18  of whether you questioned her about what
19  it was that Officer Raun allegedly was
20  doing? Can you recall whether you
21  questioned her in order to get any detail
22  about that?
23  A.  I can't recall specific
24  questions. I can recall more basically
25  listening to her.

Page 53

1  Q.  What was her demeanor like when
2  she first brought that allegation to your
3  attention?
4  A.  I would say that she was mildly
5  to moderately frustrated that there was
6  no evidence of acute distress. That is,
7  in her discourse she was relatively calm,
8  okay, with some indication of irritation,
9  like I said, frustration, but certainly
10  not hysterical or panicking or in the
11  midst of any anxiety attack. Certainly
12  no evidence of her being clinically
13  depressed. You know, conversation was
14  logical, goal directed. She was clearly
15  oriented.
16  Q.  She wasn't crying?
17  A.  No, sir.
18  Q.  Now, do you recall approximately
19  how long that first encounter with her
20  lasted?
21  A.  Typically the time frame that I
22  would set aside if I would schedule an
23  individual session would be a 50-minute
24  period.
25  Q.  5-0, 1-5? Fifteen (15) or 50?

Page 54

1  A.    Fifty (50) minutes.
2  Q.    **Okay. Nearly an hour?**
3  A.    Yes.
4  Q.    **And where would that session have**
5  **been held?**
6  A.    It would have been held in my
7  office.
8  Q.    **And the only two people at that**
9  **session would have been you and Lisa**
10 **Lambert?**
11 A.    Yes, sir.
12 Q.    **Within the framework of that**
13 **session, did you schedule another time to**
14 **see Lisa Lambert?**
15 A.    I would say given what I've
16 documented here, yes, I probably saw her
17 on 8/15 and then wrote in my appointment
18 book to see her again on 8/26.
19 Q.    **Okay. Now, you say you probably**
20 **saw her again on 8/15.**
21        ATTORNEY HALLORAN:
22        No, I don't think ---.
23 A.    I said I saw --- the way that I
24 basically operate, okay, is if I feel
25 that the problems are ongoing, I will go

Page 55

1  ahead and schedule a follow-up session.
2  I wouldn't stake my life on that, okay.
3  It could have been that I saw her on a
4  PRN basis on the 15th, didn't reschedule
5  her, but she wrote to me again and then I
6  rescheduled her for the 26th.
7  BY ATTORNEY KRAKOFF:
8  Q.    **Now, do you recall what the**
9  **purpose of the second session was?**
10 A.    Again, when I look back at the
11 time frame, when I look back at my
12 interactions with Ms. Lisa Lambert, I
13 basically, in terms of my memory, have a
14 gestalt of the content. I do not have
15 specifics in my memory with regard to
16 what specifically we discussed on the
17 15th, the 26th, the 9th, the 28th and the
18 13th as that's documented in my notes
19 here.
20 Q.    **Okay. By gestalt, so the record**
21 **is clear, what do you mean?**
22 A.    The whole, okay. The whole of
23 the issues that we discussed over the
24 context of several sessions. I'm going
25 to be much more accurate in recalling if

Page 56

1  we look at it in that sense as opposed to
2  what specifically happened on October
3  12th.
4  Q.    **I understand your testimony. So**
5  **let's do it within the boundaries of the**
6  **entire process without asking you what**
7  **occurred on a specific date. And why**
8  **don't you tell me your recollection of**
9  **what issues were discussed after the**
10 **first meeting, whenever they were**
11 **discussed, and try to keep them --- if**
12 **there's any way you can order them. And**
13 **tell me what she said as best you can**
14 **recall, what you said as best you can**
15 **recall in the context of your encounters**
16 **with her.**
17 A.    Okay. What I recall was that Ms.
18 Lambert indicated that she had an
19 attraction to Sergeant Raun. She also
20 indicated that she perceived at least
21 initially that that attraction was
22 mutual. Somewhere along the line, and
23 certainly I can't remember precisely
24 when, that changed. She felt betrayed by
25 Sergeant Raun. Subsequent to the feeling

Page 57

1  of betrayal, the perception of harassment
2  surfaced. As we moved on across the
3  course of these sessions, it became more
4  evident to me --- increasingly evident to
5  me that this woman was, in my opinion,
6  preoccupied with male officers in
7  general, preoccupied with sex, sexuality,
8  that she seemed to be pretty much having
9  her life revolve around relationships
10 with male officers. In fact, it was very
11 difficult really for me to get her to
12 discuss much of anything but interactions
13 that transpired between her and male
14 officers.
15 Q.    **What interactions did she**
16 **describe to you?**
17 A.    I can't remember specifics. What
18 I do remember is that, you know, she had
19 perceptions that certain officers were
20 attracted to her, perceptions that
21 certain officers weren't her friends,
22 other officers were her friends. At some
23 point, maybe session number three,
24 session number four, I told her that ---
25 I reminded her, if you will, that it was

Page 58

1 not appropriate for her to be sexual with
2 officers, that all of this focus that she
3 had didn't seem to me to be productive.
4 That she couldn't have sexual
5 relationships with male officers to which
6 she responded, I'm 20 some years old, and
7 I don't even remember how old she was, in
8 her early 20s. I think she turned 21
9 maybe in '93 or '94. And I'm young and I
10 have a life in prison and I am not going
11 to be celibate for the rest of my life.
12 Okay. And given her response and the
13 fact that she was very preoccupied, okay,
14 with officers and relationships with
15 officers and sexual interactions with
16 officers, I attempted to be very clear
17 with her regarding the limits of
18 confidentiality. I.e., Ms. Lambert, if
19 you come into my office and you tell me,
20 okay, that you are engaged in sexual
21 activity with officer so and so or
22 officer so and so, please be aware that I
23 am not able to keep that between you and
24 me, that that is a breach of the security
25 of the institution and I'm going to have

Page 59

1 to go talk to somebody about that. In
2 fact, the same day that I talked to her
3 about that, I reviewed with her the
4 limits of confidentiality, what I could
5 and could not keep confidential.
6 Q.    So that would have been either in
7 September or October of '94 that you told
8 her that; is that right?
9 A.    That would be my guess, sir, yes.
10 Q.    Now, had she told you anything
11 prior to your telling her that you
12 couldn't keep confidential any
13 information that she gave you about
14 engaging in a sexual relationship with an
15 officer?
16 A.    She did not say, you know, I had
17 sexual intercourse with officer so and
18 so, no, she did not say that. She did
19 allude to flirtatious interactions,
20 mutual attractions between herself and
21 officers.
22 Q.    Okay. She had not told you up
23 until that point anything about kissing
24 an officer?
25 A.    Not that I'm able to recall, no.

Page 60

1 Q.    Well, if she had told you that,
2 that would have been beyond the
3 boundaries or the limits of
4 confidentiality that you related to her;
5 wouldn't that?
6 A.    Yes, it would be, sir.
7 Q.    Did she relate to you any
8 touching, any fondling, any caressing
9 either from her to an officer or from an
10 officer to her?
11 A.    No, sir. What more made me feel
12 that she was going in that direction was
13 the fact that she had talked as if she
14 had known about the personal lives of an
15 officer.
16 Q.    Who was that?
17 A.    Sergeant Raun.
18 Q.    What did she tell you that
19 indicated to you that she might have
20 known Raun's personal life?
21 A.    That he was married, that he had
22 children. You know, how old he was. In
23 her mind, what he may and may not have
24 done in his younger years, things of this
25 nature.

Page 61

1 Q.    Like what, played football?
2 A.    Yes, things like this.
3         ATTORNEY HALLORAN:
4         Is that an example?
5         ATTORNEY KRAKOFF:
6         Yes, that was an example.
7         ATTORNEY HALLORAN:
8         I mean, ---.
9 A.    No, I can't say specifically
10 played football, but you're on the right
11 track. Things that you wouldn't be
12 discussing with an officer in the context
13 of the officer/inmate relationship.
14 BY ATTORNEY KRAKOFF:
15 Q.    Now, this limits of
16 confidentiality that you speak about, how
17 and when did you become informed of the
18 limits of confidentiality in the context
19 of the prison?
20 A.    Through a situation that
21 transpired involving another inmate,
22 another staff member. A situation that
23 involved an inmate coming to me, telling
24 me that she had witnessed, observed a
25 staff member in the basement of the

Page 62

1 dietary department kissing an inmate and
2 her walking down to fix something down in
3 the basement, happening upon this
4 interaction between the staff member and
5 this inmate, him saying I come to get a
6 can of coffee and her asking me
7 specifically, don't say anything because
8 I'm afraid. I'm afraid that if I snitch
9 on this staff member, that my life will
10 be miserable here and me viewing that at
11 the time, coming from a background in
12 metal health/human services that did not
13 heretofore involve corrections, believing
14 that that was legitimate confidential
15 information and specifically in the best
16 interest of the inmate, okay. Finding
17 out after the fact that I had kept this
18 information confidential, Superintendent
19 Wolf ---.
20 Q.    Who found it out after the fact?
21 A.    I don't know for sure. Do you
22 know?
23 Q.    You can't ask him.
24 A.    Okay. After the fact, somehow it
25 coming out. And I think what happened

Page 63

1 was that eventually that inmate disclosed
2 herself, okay, what had happened. But
3 then getting a call from Superintendent
4 Wolf and his being quite annoyed with me,
5 okay, that I did not tell him about this
6 at the time that it happened and my
7 telling him that, you know, in my mind it
8 was confidential, privileged information,
9 but I understand now. Explaining to him
10 that, you know, certainly if she would
11 have come to me and told me there was a
12 boom under Luder (phonetic) Hall, that I
13 wouldn't have kept that confidential, but
14 this to me was somewhat gray. And it was
15 at that point that I was very clear,
16 crystal clear, okay, on how
17 confidentiality is not the same out there
18 in the community as what it is here in
19 the state penitentiary.
20 Q.    Well, how long before your
21 beginning to see Lisa Lambert --- and I
22 know you said you're not exactly sure
23 when that is, but let's assume August of
24 '94. How long prior to August of '94 had
25 you had that discussion with

Page 64

1 Superintendent Wolf about
2 confidentiality?
3 A.    I don't know, but I have a
4 feeling it wasn't very long before and I
5 have a feeling that's why I made it so
6 explicit with her because I didn't want
7 to fall in that same hole again.
8 Q.    Now, who was the inmate who was
9 involved with a kissing incident with a
10 staff member?
11 A.    A woman by the name of Lisa
12 Gunderson (phonetic).
13 Q.    And who was the staff member?
14      ATTORNEY HALLORAN:
15           I'm sorry, I just want to
16 be clear. Was that the inmate
17 that reported it or was that the
18 inmate that was involved with the
19 kissing?
20 A.    He asked me about the kissing.
21      ATTORNEY KRAKOFF:
22           My question was about the
23 kissing.
24      ATTORNEY HALLORAN:
25           I understand that.

Page 65

1 A.    And I'm wondering here if the
2 first name is right. The last name was
3 Gunderson, I'm not sure if Lisa is
4 correct or not. Is it?
5      ATTORNEY HALLORAN:
6           My understanding ---
7 leave this on the record. My
8 understanding is that an inmate
9 reported to you that she saw
10 another inmate kissing an
11 officer.
12      ATTORNEY KRAKOFF:
13           I'm not going to ask the
14 name of the ---.
15 A.    No, not an officer.
16      ATTORNEY HALLORAN:
17           Not an officer.
18      ATTORNEY KRAKOFF:
19           A staff member.
20 A.    A staff member.
21      ATTORNEY KRAKOFF:
22           I'm not going to ask who
23 that inmate was who reported it.
24      ATTORNEY HALLORAN:
25           Okay.

Page 74

1 Q.   And I'm not asking you to recall
2 anything verbatim, I'm asking you to
3 recall as best you can about the
4 substance because most people cannot
5 recall verbatim something that --- a
6 conversation that took place somewhere
7 back.  So within those parameters, that's
8 what I'm asking you.  So can you recall
9 the substance of any conversation that
10 Lisa Lambert told you took place between
11 her and an officer at Cambridge Springs?
12 A.   No, sir.
13 Q.   And are you confident, to the
14 best of your recollection, that none of
15 the conversations that she related to you
16 as having taken place between her and an
17 officer concerned anything related to a
18 sexual act or sexual conduct between her
19 and the officer?
20 A.   Rephrase that again, please.
21 Q.   Are you confident that during the
22 time that you were seeing Lisa Lambert
23 that she did not relate any conversations
24 between her and a staff member that
25 concerned a matter that would be

Page 75

1 considered to be of a sexual nature?  I
2 define that as anything from kissing to
3 hugging to fondling and sexual
4 intercourse?
5 A.   I'm going to try to answer that,
6 okay.  She never explicitly said to me, I
7 kissed officer so and so.  I had
8 intercourse with officer so and so.
9 There were always sexual overtones, if
10 that ---.
11 Q.   Can you give me examples of what
12 you viewed as a sexual overtone?
13 A.   No, I can't.
14 Q.   Now, did she identify, other than
15 Sergeant Raun, any of the officers who
16 she appeared to have inappropriate
17 conversations with?
18 A.   Yes, sir.
19 Q.   And who are they?
20 A.   Icker (phonetic), Officer Icker.
21 Q.   Is that James Icker?
22 A.   I'm not sure what his first name
23 is.
24 Q.   Is that the officer who was
25 prosecuted?

Page 76

1 A.   Yes, sir.
2 Q.   Any other officers?
3 A.   Not that I can say were
4 inappropriate, definitely.
5 Q.   Okay.  Can you recall her
6 relating any conversations that she had
7 with any other officers?
8 A.   She talked about Officer Schmidt.
9 She called him Schmitty.
10 Q.   Is that S-C-H-M-I-D-T?
11 A.   Something like that.
12 Q.   And what did she talk about him?
13 What did she say about him?
14 A.   I don't recall.  That's why I
15 hesitated to even say.  All I recall is
16 that he had come up in conversation.
17 Q.   Any other officers?
18 A.   Those are the three that I
19 remember.
20 Q.   Do you think there were more or
21 do you think these were the only three?
22 A.   Those are the only three that I'm
23 able to remember.  There could have been
24 more.
25 Q.   Okay.  Who was the officer, if

Page 77

1 she identified the officer to you, who
2 had been her friend and protective of
3 her?
4 A.   Officer Icker.
5 Q.   And what did she say about
6 Officer Icker in the nature of how he had
7 been a friend to her or how he had
8 protected her?
9 A.   That he was looking out for her,
10 that he was giving her the scoop, that he
11 cared about her.
12 Q.   Was that contemporaneous?  Was
13 she telling you he is looking out for me,
14 he is giving me the scoop now ---
15 A.   Yes.
16 Q.   --- or in the past tense?
17 A.   No, in the here and now.
18 Q.   Okay.  And so she expressed
19 friendly thoughts about Icker?
20 A.   Absolutely.
21 Q.   Okay.  Did she explain to you
22 what the scoop meant?
23 A.   You know, that he was kind of
24 telling her who to watch out for, who was
25 cool, who was not cool.

Page 78

1 Q.   **Among the staff or among inmates**
2 **or both?**
3 A.   Among the staff.
4 Q.   **Did she say anything about**
5 **Officer Icker and her having any**
6 **meetings, private meetings away from**
7 **other staff and other officers?**
8 A.   Not that I am able to recall.
9 Q.   **Did she tell you that she and**
10 **Officer Raun had had any private**
11 **encounters? And by encounters, I'm not**
12 **meaning sexual, I'm talking about**
13 **meetings where they got together without**
14 **other people around?**
15 A.   Not that I'm able to recall, no.
16 Q.   **Did she talk to you about them**
17 **having conversations while others were**
18 **around, out in the yard, in dietary or**
19 **anywhere else, in Luder Hall?**
20 A.   Well, I definitely had the sense
21 that she had some verbal interaction with
22 Sergeant Raun, but I don't remember her
23 coming in and say, I talked to Sergeant
24 Raun and we talked about X, Y, and Z
25 today.

Page 79

1 Q.   **Okay. But she told you that she**
2 **thought that Officer Raun at some point**
3 **had an interest in her; is that correct?**
4 A.   She gave me the sense that she
5 had, in her mind, early in her coming to
6 SCI Cambridge Springs, an attraction to
7 Officer Raun and that that attraction was
8 mutual.
9 Q.   **But by the time she began to meet**
10 **with you that was in the past; is that**
11 **your recollection?**
12 A.   My recollection is that at the
13 time that she began to meet something had
14 transpired that generated within her
15 feelings of anger and resentment towards
16 Sergeant Raun.
17 Q.   **And that would have been prior to**
18 **your beginning to meet; is that correct?**
19 A.   That's what I'm thinking, yes.
20 Q.   **And you said that she had**
21 **expressed frustration over the fact that**
22 **Sergeant Raun had been promoted to**
23 **lieutenant?**
24 A.   Yes.
25 Q.   **What did she tell you about that?**

Page 80

1 A.   Well, I told you that she talked
2 about --- that she had indicated
3 discomfort with him, staring at her in
4 the dietary department. That she had
5 reported to other staff members that he
6 was harassing her and that at one point
7 she had talked to me about being out in
8 the yard and seeing Superintendent Wolf
9 having a conversation with Sergeant Raun
10 and it appeared to be a friendly
11 conversation and, you know, that
12 Superintendent Wolf seemed to like
13 Sergeant Raun and they were --- you know,
14 they were on good terms and that this
15 frustrated her because she was, you know,
16 reporting these feelings that she was
17 being harassed and simultaneously
18 somewhere along there he got promoted
19 from sergeant to lieutenant. And as I
20 mentioned before, this annoyed her
21 majorly.
22 Q.   **This harassment that she**
23 **described, let me ask you that. Did she**
24 **describe --- other than the fact that**
25 **Sergeant Raun had allegedly stared at her**

Page 81

1 **in the dietary department, did she tell**
2 **you anything about the nature of the**
3 **harassment?**
4 A.   The only other thing that I can
5 recall, and it's vague, is perhaps
6 allegations that relate to the stocking
7 kind of behavior. You know, that he was
8 following me, that he was here, that he
9 was there, he was behind me.
10 Q.   **Now, did you give her any advice**
11 **as to what she should do in connection**
12 **with Sergeant Raun via his alleged**
13 **harassment of her?**
14 A.   I don't know as if I'd say I gave
15 her advice. I knew that she had already
16 reported it to the appropriate personnel.
17 Q.   **Prior to seeing you?**
18 A.   Yes. And like I said, sir, I was
19 not highly confident that what Ms.
20 Lambert was telling me was truthful.
21 Q.   **Right.**
22 A.   Okay. You know, I may have told
23 her, you know, just go about your
24 business and focus on yourself. I don't
25 know about that.

Page 82

1  Q.   Did you view her allegations
2  about Sergeant Icker allegedly looking
3  after her, giving her the scoop, that
4  sort of thing as potential breach of
5  security of the institution at the time
6  she was telling you that?
7  A.   I think I certainly may have seen
8  a potential for that, okay. And I think
9  it was at that juncture, okay, that I
10 told her what I told you I told her about
11 20 minutes ago. Okay. That, you know,
12 if you're going to start talking to me
13 about sex with this officer or that
14 officer know that this is what I'm going
15 to have to do with that.
16       And as I've indicated because
17 this was the focus of her conversation
18 --- in my mind I had targeted as a
19 problem with her the fact that she was
20 preoccupied, okay, with sexual matters,
21 preoccupied with relationships with
22 officers. And I felt that this was ---
23 you know, since this was what she was
24 coming about, since this is what people
25 were concerned about, I felt that, yes,

Page 83

1  it was something that we needed to focus
2  on, that we needed to address in
3  counseling, but that I wasn't going to
4  get to first base, okay, unless I made it
5  clear to her that, you know, we couldn't
6  talk in terms of names here.
7        And, in fact, I told her, you
8  know, that if she wanted to talk about
9  relationships with officers, that we were
10 going to have to talk in terms of, you
11 know, relationship A, relationship B,
12 relationship C, rather than use names.
13 And I did that because that was her
14 primary focus. I wasn't at all certain
15 regarding her credibility. She had gone
16 to other sources within the institution
17 with the reporting and the allegations
18 and this is what I saw as the problem
19 area as pathology, if you will, that I
20 needed to try to address with this woman.
21 Do you understand what I'm saying?
22 Q.   You thought that she was sexually
23 preoccupied?
24 A.   Yes, I did, sir.
25 Q.   And had she identified any of her

Page 84

1  --- the persons she was preoccupied with
2  by name, prior to your telling her this
3  is something I may have to --- this is
4  not going to be confidential. I may have
5  to relate that information to others?
6        ATTORNEY HALLORAN:
7           Objection. Asked and
8  answered a couple of times.
9  BY ATTORNEY KRAKOFF:
10 Q.   What was the answer, no?
11 A.   The answer was Sergeant Raun and
12 Officer Icker.
13 Q.   Sexual?
14        ATTORNEY HALLORAN:
15           Sexual.
16 A.   No. Sexual, explicit sexual
17 things, I had intercourse, I was, you
18 know, kissing, no.
19 BY ATTORNEY KRAKOFF:
20 Q.   I want to have intercourse, did
21 she ever say that? I want to have
22 intercourse with Sergeant Raun or I want
23 to have intercourse with Sergeant Icker?
24 A.   No. What she did say I already
25 quoted to you. I'm 21 years old, I have

Page 85

1  life in prison and I am not going to be
2  celibate for the rest of my life.
3  Q.   Okay. And you took that, I take
4  it, to mean that she was going to
5  eventually have sex or at least to
6  attempt to have sex with a member of the
7  staff?
8  A.   I took that to mean that that was
9  something that she wanted, yes.
10 Q.   And did you view that as a
11 potential security risk?
12 A.   I viewed it as a problem which is
13 why I wanted to try to focus in on it
14 without getting bogged down, okay, and
15 trying to decipher what's fantasy, what's
16 fact and reporting obligations.
17 Q.   Did you view her saying that I'm
18 not going to remain celibate to pose a
19 security risk to the institution?
20 A.   Potential.
21 Q.   Did you go to anybody with that
22 information?
23 A.   Did I go to anyone with that
24 information?
25 Q.   Did you go to anybody within the

Page 86

1 administration or anybody within the
2 commission offices or anybody else and
3 say, you know, Lisa Lambert is saying
4 that she's not going to remain celibate?
5 A.   No, I did not.
6 Q.   And why not?  Did you consider
7 going to somebody with that information?
8 A.   My feeling was at the time that
9 this woman was talking to a lot of
10 people, okay.  That she was reporting to
11 other people specific concerns that she
12 had about Sergeant Raun, okay.  That the
13 issues that we're talking about here I
14 felt were issues of this woman being
15 preoccupied with sex and sexuality and
16 that as a psychologist that I was going
17 to try to deal with that issue as best as
18 I could under the circumstances and that
19 she was doing plenty of talking to other
20 personnel, okay.
21 Q.   About sexual things?
22 A.   Well, you'd have to ask them what
23 other allegations that she was making ---
24 she was making ---.
25 Q.   I'm asking about your thought

Page 87

1 processes.  I asked you whether you ---.
2         ATTORNEY HALLORAN:
3         I think that's what she's
4 testifying to.
5         ATTORNEY KRAKOFF:
6         Well, I don't know.  I
7 don't know that you said --- you
8 said she went to several people.
9 BY ATTORNEY KRAKOFF:
10 Q.   Was it your information she had
11 gone to several people about sexual
12 issues?
13 A.   About harassment issues.
14 Q.   About sexual issues?
15 A.   Sexual harassment.
16 Q.   And what was your understanding
17 of what the sexual harassment
18 constituted?
19 A.   I've already said that, sir.
20 Okay.  Staring at her in the dietary,
21 some suggestion of stalking behaviors,
22 that combined with the implication on her
23 part that there was this initial mutual
24 attraction between her and Sergeant Raun
25 when she first came to Cambridge Springs.

Page 88

1         ATTORNEY HALLORAN:
2         Take a break?
3         ATTORNEY KRAKOFF:
4         Yes.
5 SHORT BREAK TAKEN
6 BY ATTORNEY KRAKOFF:
7 Q.   I had asked you before about her
8 reference to officers, Lisa Lambert's
9 reference to officers.  I'm going to ask
10 you about a couple of others.  Did she
11 ever bring up the name of Officer Rogers
12 (phonetic) while with you?
13 A.   Not that I'm able to recall.
14 Q.   Did she ever bring up the name of
15 Officer Free while she was with you,
16 F-R-E-E?
17 A.   Not that I'm able to recall.
18 Q.   Let me ask about the note issue
19 and let me draw a distinction.  One
20 process might be to take notes while
21 you're in a session and then to use those
22 notes as you're going back, say, 30
23 minutes later and you can make reference
24 to something that the inmate had told
25 you, and then to destroy the notes, and I

Page 89

1 don't say that in any pejorative sense,
2 to destroy the notes so that you could
3 maintain the confidentiality that you
4 described.  And the other would be not to
5 take notes at all in the course of the
6 encounter.  Which was it when you were
7 interviewing Lisa Lambert, not to take
8 notes at all or to take notes and then to
9 discard the notes, not place them in the
10 file?
11 A.   First choice.
12 Q.   Okay.  And that was the same with
13 the --- that was your routine practice
14 with other inmates during the time period
15 that you were seeing Lisa Lambert?
16 A.   Yes, sir.
17 Q.   Now, this statement in effect,
18 I'm 21, I'm not going to remain celibate,
19 was that the first time at Cambridge
20 Springs that you ever heard a prisoner
21 express that to you that she wasn't going
22 to remain celibate?
23 A.   Yes, sir.
24 Q.   Was that mentioned by any inmates
25 after you saw Lisa Lambert, I'm not going

Page 86 - Page 89                     Sargent's Court Reporting Service, Inc.

Page 90

1 to remain celibate or words to that
2 effect?
3 A.    We had no other lifers here at
4 that time. She was the only lifer we
5 had.
6 Q.    Well, you had other inmates who
7 were serving 10 years or 15 years, didn't
8 you, at this prison?
9 A.    Yes. And I don't recall any
10 other inmate making that an issue.
11 Q.    Did you have other inmates,
12 either prior to or after you saw Lisa
13 Lambert, discuss the issue of how
14 difficult it was to be celibate while in
15 prison?
16 A.    Not that I recall, sir.
17 Q.    Now, as your meeting progressed,
18 as your meetings with Lisa Lambert
19 progressed and then ultimately concluded,
20 did she raise any other issues other than
21 those that you've already talked about
22 with you?
23 A.    Well, the issue that she raised
24 on 10/13/94.
25 Q.    And what was that issue?

Page 91

1 A.    That was the date where she came
2 to me and reported that Officer Raun had
3 assaulted her on the landing of the
4 stairway in Luder Hall.
5 Q.    Is that the first that you had
6 heard about allegations that Officer Raun
7 had assaulted her ---
8 A.    Yes.
9 Q.    --- on a landing in the stairway
10 of Luder Hall?
11 A.    Yes.
12 Q.    And I'm not limiting it to is
13 that the first time you heard it from
14 Lisa Lambert. My question is broader
15 than that. Had you heard it from any
16 other inmates or any staff members?
17 A.    No, sir, I had not.
18 Q.    Okay. And ---.
19        ATTORNEY HALLORAN:
20        Can we clarify for the
21 record this was not a sexual
22 assault?
23        ATTORNEY KRAKOFF:
24        Well, I was going to ask
25 her about the nature of the

Page 92

1 assault.
2        ATTORNEY HALLORAN:
3        Go ahead.
4 BY ATTORNEY KRAKOFF:
5 Q.    Describe to me, as best you can
6 recall, how that unfolded? How Lisa
7 Lambert brought that issue up and what
8 she said and what, if anything, you said
9 in response?
10 A.    Well, I do believe that she was
11 assigned a unit detail at the time. That
12 her job was keeping her particular part
13 of the unit clean. And I do recall that
14 she indicated that she was sweeping the
15 stairwell and Sergeant Raun came along.
16 I think she indicated that he grabbed her
17 by the hair, that he kind of shoved her
18 into the corner, that he took his knee
19 and, you know, kind of jammed it into her
20 abdomen, that he was forceful in gripping
21 her arms and that he was simultaneously
22 emotionally abusive. You know, calling
23 her a bitch, things of this nature.
24 Q.    Okay.
25 A.    And she also at that point

Page 93

1 indicated that she had bruises and she
2 asked me, did I want to see the bruises
3 and she got up off of her chair and
4 walked over to the window where the light
5 was better and proceeded to show me the
6 bruises.
7 Q.    Okay. What did you see?
8 A.    When I was talking about this
9 with him yesterday.
10 Q.    With who?
11 A.    With this man.
12 Q.    Okay. Mr. Halloran. You can't
13 tell me about anything that you said to
14 him.
15 A.    Okay. My recall was that she had
16 kind of like loosened her pants and
17 pulled down a little bit and there was a
18 bruise on her butt, if you will.
19 Q.    The upper part of her buttocks?
20 A.    Right. But I don't think that's
21 consistent with what the photograph shows
22 so my memory evidently is not good there.
23 I do remember that there were some
24 bruises on her arms, on her forearms and
25 that she had indicated that that was due

Page 94

1 to his grabbing her arms, okay, and
2 squeezing so tightly that it had bruised
3 the arms. That's about what I can
4 remember.
5 Q. Did she show you anything on her
6 thighs?
7 A. She may have shown me on her
8 thighs and maybe that's what it was. It
9 was her thighs rather than her butt. But
10 I do remember that she had to kind of
11 unzip her pants to show me these bruises.
12 Q. And you saw the bruises?
13 A. Yes, sir.
14 Q. Did you recall --- the second
15 page of Exhibit Ten reflects that you saw
16 Lisa on the 13th and also saw her on
17 the 12th. None of these other meetings,
18 these individual sessions that I can see
19 occurred one day after another. Can you
20 recall whether the 13th was a regularly
21 scheduled session or is that something
22 that just developed on the 13th?
23 A. I can't recall specifically, but
24 my guess was that --- the fact that these
25 two sessions are back to back one day

Page 95

1 after another, my guess was that she had
2 an officer call me to see me on the 13th
3 for the purpose of reporting this assault
4 and that that wasn't a scheduled session.
5 Q. Okay. Do you recall how long
6 approximately the session on the 13th
7 lasted?
8 A. No, sir, I don't.
9 Q. Do you recall whether you went
10 into any issues other than the alleged
11 assault in Luder Hall with Lisa Lambert
12 that day?
13 A. No. My sense was that once she
14 made those allegations I knew that we had
15 to report and that we basically proceeded
16 with the reporting process. I had her
17 wait in my office where I went and I
18 talked to Charley Utts about it. I told
19 her --- as I mentioned to you earlier, I
20 had already clarified with her, you know,
21 what would constitute grounds for me to
22 breach confidentiality and it is my
23 belief that she knew very well in coming
24 in there and reporting this to me what I
25 was going to do in reaction to it, i.e.,

Page 96

1 report it to the administration. And
2 that's what I proceeded to do. I had her
3 wait in the office. I went over and I
4 talked to Charley Utts. Charley Utts
5 said we got to take her down to medical.
6 She asked me to go down to medical with
7 her. We went down to medical where there
8 was a nurse and a female lieutenant and
9 from there they proceeded to take the
10 pictures and I did what paperwork is
11 required in such cases.
12 Q. Were you there when they took the
13 photographs?
14 A. Yes, sir. I mean, I was standing
15 by at her request. I wasn't hovering
16 over her. I was there in the office.
17 Q. You said that you had Lisa wait
18 in the office while you went to see
19 Deputy Superintendent Utts?
20 A. That's what I recall, yes.
21 Q. Now, when you say wait in your
22 office, was there an anteroom to your
23 office or did she literally wait in the
24 room where you had --- where you would
25 conduct your sessions with inmates?

Page 97

1 A. I believe I probably had her wait
2 in the room.
3 Q. In the actual room where you have
4 your sessions?
5 A. Yes.
6 Q. And do you recall approximately
7 how long it was before you returned?
8 A. Not precisely, but it wasn't long
9 at all.
10 Q. Are you talking about like 15
11 minutes or 20 minutes?
12 A. No. I'm talking more like four
13 minutes.
14 Q. Okay.
15 A. Once I told Mr. Utts what was
16 going down there was no question but what
17 we needed to do and we were down there in
18 medical ASAP.
19 Q. Okay. And then after returning
20 from Mr. Utts' office, you got Lisa and
21 the two of you went down to medical
22 together; is that correct?
23 A. Right.
24 Q. Now, when you told Lisa to wait
25 in the office, did you tell Lisa what you

Page 98

1  were going to do, where you were going to
2  go?
3  A.  Yes, I did.
4  Q.  What did you tell her?
5  A.  I told her I was going to have to
6  go talk to the --- I was going to have to
7  report.
8  Q.  Did you tell her who you were
9  going to report it to?
10  A.  Yes, I did.
11  Q.  Okay.  And you told her I'm going
12  to report this to Deputy Superintendent
13  Utts or words to that effect?
14  A.  Yeah.  Again, I wouldn't bet my
15  savings account on it because it was so
16  long ago.  But I'm pretty sure I told her
17  I'm going to go talk to Deputy Utts.
18  Q.  Okay.  But there's no question in
19  your mind, I take it, that you said ---
20  whether you identified Deputy Utts or
21  not, there's no question in your mind you
22  told her I'm going to report this to
23  somebody; is that correct?
24  A.  That is correct.
25  Q.  Okay.  And what did you tell

Page 99

1  Deputy Superintendent Utts?  Did you meet
2  with him?
3  A.  Yes.
4  Q.  Okay.  And what did you tell him?
5  A.  I told him essentially what she
6  had told me.
7  Q.  Okay.  And what did Deputy
8  Superintendent Utts say, if anything?
9  A.  He said we have to get her down
10  to the medical department and we have to
11  take pictures of the bruises and we have
12  to document what she's alleging.
13  Q.  Okay.  Had she told you anything
14  about a name tag when she related what
15  occurred between --- allegedly occurred
16  between her and Officer Raun?  Did she
17  make reference to a name tag?
18  A.  Now that you bring it up she
19  might have said something about a name
20  tag digging into her skin.
21  Q.  Did you see any marks that
22  appeared to be something that was
23  consistent with something like a name tag
24  digging into her skin?
25         ATTORNEY HALLORAN:

Page 100

1         Objection.  She's not
2  qualified to answer ---.
3         ATTORNEY KRAKOFF:
4         I think any layperson can
5  answer that.  But answer to the
6  best of your ability.
7  A.  Rephrase the question, please.
8  BY ATTORNEY KRAKOFF:
9  Q.  Did you see anything that
10  appeared to have been caused by a name
11  tag digging into her skin?
12  A.  I think I can be reasonably
13  certain in saying that she showed me the
14  scope of the injuries that she had or
15  what she reported she had.  And although
16  I cannot clearly remember the place on
17  the body, I would be reasonably secure in
18  saying that she probably showed me
19  whatever wound was there.
20  Q.  That she said had been caused by
21  the name tag?
22  A.  Right.
23  Q.  And do you recall whether, at
24  that time, you look at whatever it was
25  that she showed you and said, that

Page 101

1  couldn't have been caused by a name tag?
2  A.  Absolutely not.  I didn't say
3  that.
4  Q.  No, I mean, in your own mind.
5  Did what you looked at appear to have
6  been something that could have been
7  caused by a name tag?
8  A.  I didn't remember that until you
9  brought that up, in fact.
10  Q.  So you don't remember now?
11  A.  No.
12  Q.  Now, did she tell you when that
13  event, the alleged event where Sergeant
14  Raun assaulted her, occurred?
15  A.  I'm sure she did, but I don't
16  remember when it was.  I know it was
17  within 24 hours and probably within 12 to
18  18 hours of her coming to me.  That's
19  what she reported.  It wasn't something
20  that happened two, three days ago.  It
21  was something that just happened.
22  Q.  Okay.  And what was her demeanor
23  like when she reported it to you?
24  A.  She was ostensibly upset.
25  Q.  What --- go ahead.

Page 102

1 A.   I think that's probably the best
2 way that I can describe it.
3 Q.   **What was it that you saw that**
4 **indicated that she was ostensibly upset?**
5 A.   There was a certain urgency in
6 her voice, a kind of a look what he's
7 done to me.  The urgency with which she
8 wanted me to view, the bruises.  Some
9 pressure to her speech.  Her speech was
10 somewhat rapid, somewhat pressured.  I
11 don't recall her crying.
12 Q.   **Does that mean you don't recall**
13 **whether or not or you don't have a**
14 **picture as you view it backwards now of**
15 **her crying?**
16 A.   I don't recall her crying
17 profusely, let's put it that way.  She
18 may have become teary-eyed.  Again, I
19 don't recall.  I do recall general upset,
20 rapid pressured speech, urgency in
21 wanting me to look at the bruises and a
22 kind of indignant sense about her, again,
23 look what he's done to me.
24 Q.   **Now, do you recall, after the**
25 **photographs were taken, where you went?**

Page 103

1 A.   Where?
2 Q.   **I mean, what happened after that?**
3 A.   Well, one of the things that made
4 this difficult was that when she reported
5 this, even though I had made it clear to
6 her, as I had discussed with you earlier,
7 that bringing an allegation like this
8 would mean that I would need to report to
9 authorities.  I do recall her initially
10 objecting to that, okay.
11 Q.   **On the 13th ---**
12 A.   Yes.
13 Q.   **--- when you said I'm going to**
14 **have to report this, ---**
15 A.   Right.
16 Q.   **--- you remember her objecting to**
17 **that?**
18 A.   That is my memory, okay.  And my
19 memory's not perfect, but my sense is
20 that she objected to that and I basically
21 told her I've got to do it.  And the part
22 of the objection was the fear that she
23 was going to end up locked up.
24 Q.   **Did she tell you that?**
25 A.   Again, I'm going on memory and I

Page 104

1 think she did tell me that because when I
2 went to talk to Deputy Utts, one of the
3 things that I addressed immediately with
4 him was, you know, she's really afraid
5 that you're going to lock her up and
6 that's one of her biggest fears.  And I
7 say that because Deputy Utts told me
8 we're not going to lock her up.  Okay.
9 And then I went back to her.  I told her
10 what we were going to do, i.e., go get
11 pictures of the bruises taken.  And I
12 assured her that Deputy Utts said we
13 aren't going to look you up.
14 Q.   **Had she been locked up during**
15 **some period of time while you were seeing**
16 **her in individual sessions?  Had she been**
17 **in the RHU?**
18 A.   Well, this speaks to time.  But I
19 do know that there was a situation, and
20 I'm not sure if it was before or after
21 this, although I think it's before, okay,
22 where she was evidently found on the
23 fourth floor of the housing unit which
24 would have been at the time an
25 unauthorized area.  There was some

Page 105

1 question regarding her attire, the fact
2 that she wasn't wearing undergarments.
3 She was caught up there on the fourth
4 floor.  I don't know if she was
5 admonished, if she was issued a
6 misconduct, but her explanation for being
7 up on the fourth floor was that she had
8 blackouts.
9 Q.   **How do you know that?  Did you**
10 **read some documents or did you discuss**
11 **that with her or with somebody else?**
12 A.   One of the responsibilities that
13 I have as psychology staff here is
14 monitoring the restricted housing unit.
15 And she was in the restricted housing
16 unit in administrative custody as a
17 result of this particular incident and
18 her ---.
19 Q.   **Meaning the incident on the**
20 **fourth floor?**
21 A.   Yeah.  Maintaining that she had
22 blackouts.  And as I would do rounds in
23 the restricted housing unit, she would be
24 in one of the cells and she would talk to
25 me, okay.  She would talk to me about

Page 106

1 what had happened.
2 Q.  **When an inmate --- during this**
3 **time period in 1994, when an inmate was**
4 **confined to the restricted housing unit,**
5 **did your sessions take place in the unit**
6 **or do they still take place in your**
7 **office?**
8 A.  No.  When they were in the
9 restricted housing unit, we could not
10 have sessions, okay.  It would not be a
11 confidential thing.  We would have
12 discourse between the fence of the door
13 and where I was out in the hall.
14 Q.  **So the sessions that are listed**
15 **on pages one and two of Exhibit Ten,**
16 **those would have occur ---?**
17 A.  Those occurred in my office.
18 Q.  **So those would have occurred in**
19 **your office.  Okay.**
20 A.  But there were many interactions
21 that I had with Ms. Lambert while she was
22 maintained in the restricted housing unit
23 that were not documented.
24 Q.  **And in those interactions, did**
25 **she discuss any sexual issues with you?**

Page 107

1 A.  Not from this fence, not explicit
2 allegations or claims that she had
3 explicit sex with any officer.
4 Q.  **Did she make any reference to any**
5 **flirtatious encounters between her and**
6 **any officers?**
7        ATTORNEY KRAKOFF:
8        Now, I'm getting into
9 other context, not the sessions.
10 I questioned her about the
11 sessions.
12        ATTORNEY HALLORAN:
13        I believe her answers
14 with regard to the sessions dealt
15 not with just the sessions, but
16 any contacts with her.
17        ATTORNEY KRAKOFF:
18        Let's clarify that.
19 BY ATTORNEY KRAKOFF:
20 Q.  **Do you have any recollection of**
21 **whether she discussed any flirtatious**
22 **encounters between her ---**
23 A.  Not specifically.
24 Q.  **--- and any officers?**
25 A.  She may have.  She may have said

Page 108

1 some things.  She was in there for many,
2 many months.
3        ATTORNEY HALLORAN:
4        I just want to ---.
5        ATTORNEY KRAKOFF:
6        You can't testify for
7 her.
8        ATTORNEY HALLORAN:
9        No, I'm not.  I'm asking
10 for clarity.  It's my
11 understanding she was in the RHU
12 twice and was your answer just
13 now given relating to the second
14 time she was in the RHU?
15        ATTORNEY KRAKOFF:
16        I don't think that's what
17 she said.
18        ATTORNEY HALLORAN:
19        Is that what you're
20 saying?
21        ATTORNEY KRAKOFF:
22        Is that something you
23 want her to say?
24        ATTORNEY HALLORAN:
25        No.  I mean, I just don't

Page 109

1 want the record to be unclear.
2        ATTORNEY KRAKOFF:
3        Okay.  Let's get the time
4 period.
5 A.  Well, I mean, either, either
6 time, okay, the first time or the second
7 time.
8 BY ATTORNEY KRAKOFF:
9 Q.  **Now, did you have any encounters**
10 **with Lisa Lambert outside of your office?**
11 **By that, I mean, outside of the context**
12 **of your office, outside of the context of**
13 **the RHU in some other areas of the**
14 **institution where she related to you any**
15 **sexual or flirtatious encounters between**
16 **her and members of the Cambridge Springs**
17 **staff?**
18 A.  No.
19 Q.  **Now, did you leave the --- after**
20 **you left the medical area, did Lisa**
21 **accompany you or did you part your ways**
22 **at that point after the photographs were**
23 **taken?**
24 A.  We did part our ways and what I
25 recall was this was getting on late in

Page 110

1  the afternoon and at the time Charley
2  Utts was acting Superintendent because
3  Superintendent Wolf was out of the
4  institution.
5  Q.  For the day?
6  A.  For the day. But he had returned
7  late in the day, probably 4:30, five
8  o'clock. And at that point he, of
9  course, took over command and he decided
10  he was going to put Ms. Lambert in the
11  restricted housing unit. So before I
12  left that day, at the time, to my dismay
13  I saw her and an RHU guard being escorted
14  to the restricted housing unit which is
15  contrary, of course, to what I had
16  reassured her based on Deputy Utts
17  reassuring me two hours or an hour and a
18  half earlier.
19  Q.  Now, where was it that you
20  reassured her that she would ---?
21  A.  That was in my office.
22  Q.  Okay. After you came back from
23  your meeting with Deputy Utts, it was
24  then that you told her we're going to go
25  to medical, but you're not going to be

Page 111

1  placed in the RHU?
2  A.  Yes.
3  Q.  So I can get an understanding of
4  these DC-14s, who is in the chain of
5  distribution or in the stream of
6  distribution of the DC-14s? Who all
7  receives copies?
8  A.  At that time?
9  Q.  Right.
10  A.  Basically the counselor and I
11  kept a copy in my file. Now, the
12  original goes down to the psychiatric
13  section of the health care record, a copy
14  goes to the counselor and a copy is
15  placed in my psychology file.
16  Q.  Was it your practice during 1994
17  to open up a file for each of the inmates
18  that you were seeing individually?
19  A.  We would get raw testing data
20  from SCI Muncy from the diagnostic and
21  classification center there. So for
22  every inmate that was transferred from
23  Muncy --- or virtually every inmate, we
24  would already have a psychology file
25  started from the diagnostic and

Page 112

1  classification center. And then
2  depending on their degree of involvement
3  with the psychology staff, we may augment
4  that file with things of this nature.
5  Q.  Of the DC-14 nature?
6  A.  Right.
7  Q.  And if a person hadn't been at
8  Muncy, what would they be classified
9  here?
10  A.  At that time we weren't getting
11  any people that weren't coming from
12  Muncy?
13  A.  Okay.
14  Q.  So there was a file more or less
15  for everybody who was admitted to this
16  institution?
17  A.  There's the right to refuse the
18  testing and there are inmates who refuse
19  to participate in that process and they
20  wouldn't have a file.
21  Q.  Right. In any event, the routine
22  would have been that the DC-14 would be
23  placed in all files that had been opened
24  because of the classification process; is
25  that correct?

Page 113

1  A.  The DC-14 is really a form that
2  is from the counselor's forms. One thing
3  you have to realize is that historically
4  the Department of Corrections has not
5  made a practice of providing individual
6  counseling to inmates. I mean, the ratio
7  is one psychology staff for 300 inmates.
8  And in most institutions there's not a
9  whole lot of individual therapy going on.
10  And when there is, like I said, in the
11  earlier years before the Austin
12  litigation, there was not a whole lot in
13  place in the way of mandated
14  documentation of those individual
15  contacts.
16  Q.  Would you have opened up a file
17  for Lisa Lambert in 1994 of some sort?
18  A.  Probably we had her raw testing
19  data from SCI Muncy and there was a file.
20  Q.  Okay. And so your copy of the
21  DC-14 would have gone into that file?
22  A.  Yes.
23  Q.  And are those the only documents,
24  as best you can recall, that would have
25  been in her psychological file?

Page 114

1  A.   There may have been copies of any
2  EOs that I had written.  There may have
3  been copies ---.
4  Q.   Of any what?
5  A.   EOs, extraordinary occurrence
6  forms.  There may have been copies of
7  misconduct dispositions.
8  Q.   Did you prepare any extraordinary
9  occurrence form in connection with the
10 allegations made by Lisa Lambert on the
11 13th of October, 1994?
12 A.   I'm virtually certain I did
13 because that would have been required.  I
14 don't have that to look at because I
15 don't have the record.  But I bet the
16 bank I did.
17          ATTORNEY KRAKOFF:
18          I don't believe that
19 we've received a copy of such a
20 form so that's one of the things
21 that clearly is covered by the
22 request.
23          ATTORNEY HALLORAN:
24          We've looked and as far
25 as I know we don't have it.  It

Page 115

1  might be in the records that we
2  don't have yet.
3  BY ATTORNEY KRAKOFF:
4  Q.   Now, let me refer you to ---.
5          ATTORNEY KRAKOFF:
6          And by the way, is now a
7  good time --- I think we must be
8  getting on around 12:00 or 12:15.
9  A.   It is 12:00.
10 SHORT BREAK TAKEN
11 BY ATTORNEY KRAKOFF:
12 Q.   Now, let me refer you to ---
13 refer you.  We're on the same exhibit,
14 ten, page ten?
15 A.   Yes.
16 Q.   Okay.  Turn to the 10th page of
17 page 10 (sic).  They're marked.  I marked
18 them down here.  That's a multiple-page
19 exhibit.
20 Q.   Now, this is an inmates request
21 to a staff member dated the 14th of
22 October, 1994 and it's addressed to you
23 and you'll see the part that says
24 disposition.  Is that your handwriting
25 that appears below?

Page 116

1  A.   Yes.
2          ATTORNEY HALLORAN:
3          Where it begins with
4  Lisa?
5  BY ATTORNEY KRAKOFF:
6  Q.   Lisa, the string of misconducts
7  then did not turn out to be as bad as
8  they seemed.  Initially you wrote that?
9  A.   Uh-huh (yes).
10 Q.   I look at the bottom of this.
11 The last sentence reads, I will be
12 stopping by as much as possible.  It goes
13 on to the next page.  Do you see that?
14 A.   Uh-huh (yes).
15 Q.   I take it that page 11 is just
16 the continuation from page --- page 11 is
17 a continuation from page 10; is that
18 correct?
19 A.   Yes.
20 Q.   And that's your signature?
21 A.   Yes.
22 Q.   And it was dated the 17th of '94
23 which means --- of October 1994.  So I
24 take it that your response was on the
25 17th of October, is that correct, based

Page 117

1  upon ---?
2  A.   I can't see my 17, but I see
3  yours there.
4          ATTORNEY HALLORAN:
5          It's cut off on this
6  copy.
7  A.   Yes, sir, I see that.
8  BY ATTORNEY KRAKOFF:
9  Q.   Now, briefly, do you have a
10 recollection --- you can review this
11 document, if you'd like, to refresh your
12 recollection if it can.  Do you have a
13 recollection of what the string of
14 misconducts referred to?
15 A.   Not off the bat, no.  She's
16 talking up there.  She says, I didn't get
17 any time in locks on disciplinary
18 custody, but I'm still locked up anyway.
19 So they have still one.  I'm just trying
20 to read.
21          ATTORNEY HALLORAN:
22          You can read it quietly
23 to yourself.
24 BY ATTORNEY KRAKOFF:
25 Q.   You can read it to yourself.

Page 118

1 WITNESS REVIEWS DOCUMENT
2 A.   No, I don't recall what that
3 means.
4 BY ATTORNEY KRAKOFF:
5 Q.   Okay.  Now, if you turn to page
6 12 of this exhibit, do you have that?
7 A.   Yes.
8 Q.   This is fairly difficult from the
9 standpoint of legibility to make out.  In
10 any event, the bottom part where it says
11 disposition you have --- strike that.
12        It says, seen in RHU 10/17/94.
13 Is that your handwriting?
14 A.   Yes.
15 Q.   And that was dated the 18th of
16 October 1994?
17 A.   I don't know if that's the 13th
18 or the 18th.
19        ATTORNEY HALLORAN:
20        It has to be the 18th.
21 BY ATTORNEY KRAKOFF:
22 Q.   Well, it has to be the 18th,
23 doesn't it, ---
24 A.   Okay.  All right.
25 Q.   --- because this was sent on the

Page 119

1 17th?
2 A.   Yes, of course.
3 Q.   Now, turn to page 13 of Exhibit
4 Ten, please.  And then you'll see page 14
5 and page 15.  This was a document that
6 was turned over during the course of
7 discovery and I'm going to ask you some
8 questions about this.  And this you can
9 read to yourself.  So in the event you
10 haven't done it recently, just so you can
11 refresh your recollection.  First, I'm
12 going to ask you whether this is a
13 document that you prepared?
14 A.   Yes, it is a document that I
15 prepared.
16 Q.   And you note that on page 14, the
17 second page of this document, it's dated
18 12/16/94.  So that's December 16, 1994.
19 Do you have any reason to believe that
20 that's not an accurate date?
21 A.   No.
22 Q.   Okay.  Have you read this
23 document recently or would you like time
24 to review it now?
25 A.   No, I did read the document.

Page 120

1 Q.   Okay.  Now, do you have a
2 recollection of what caused you to
3 prepare this document?
4 A.   Yes, I do.
5 Q.   Okay.  Before I ask you what
6 caused you, I'll note that it says, Lisa,
7 and then it goes on from there, the text
8 of it.  Was this a document that you
9 addressed to Lisa Lambert?
10 A.   Yes, sir.
11 Q.   And what was it that prompted you
12 to prepare this document?
13 A.   I believe that it was the fact
14 that initially when she came to me
15 reporting the abuse, as I said earlier, I
16 assured her that she would not be locked
17 up in the restricted housing unit because
18 that is what Deputy Utts told me.  That
19 turned around very quickly.  She ended up
20 being locked up.  And being locked up
21 turned out to be a protracted prolonged
22 thing for her.  And she saw that as a
23 betrayal.
24 Q.   Now, do you have a recollection
25 of whether you wrote this in response to

Page 121

1 something that Lisa either said to you or
2 in response to something Lisa wrote to
3 you?
4 A.   I would suspect that it was a
5 response to something that she wrote to
6 me.
7 Q.   Do you know whether this response
8 --- whether the --- strike that.
9        Do you know whether the
10 correspondence of 12/16/94 was delivered
11 to Lisa?
12 A.   I think it probably was.  I can't
13 say with certainty.
14 Q.   Do you have a recollection of
15 giving this directly to Lisa?
16 A.   No, I don't deliver it directly.
17 It goes through the institutional mail.
18 That's why it's addressed the way it is
19 here.
20 Q.   Okay.  Now, this document
21 addresses two issues; doesn't it?  One
22 was her feelings of betrayal as you
23 referred to on page 15 in the second
24 paragraph and then the other addressed a
25 videotaping issue; is that correct?

Page 122

1  A.    Yes.
2  Q.    Let me preface this question with
3  a note that I'm not attempting to split
4  hairs, but I'm attempting to have this
5  correspondence as precisely described by
6  you as possible.  Let me refer you to
7  page 14 of Exhibit Ten.
8          ATTORNEY HALLORAN:
9          I'll object to the
10  question.  The correspondence
11  speaks for itself.
12          ATTORNEY KRAKOFF:
13          Okay.
14  BY ATTORNEY KRAKOFF:
15  Q.    Well, then, if it speaks for
16  itself, let me ask you --- you wrote I
17  could not have protected you without
18  notifying others of your reports.  That's
19  plural, reports.  What reports were you
20  referring to?
21  A.    I was speaking to the fact that
22  her allegations against Sergeant Raun
23  were very detailed, okay.  And that's the
24  only reason I put the S on there.  I was
25  speaking specifically about the 10/13/94

Page 123

1  allegations that she made that involved
2  the bruises in the landing.
3  Q.    Well, what reports?  What reports
4  were you referring to?
5  A.    The verbal reports, her
6  allegations.
7  Q.    And you viewed that as more than
8  one report to you?
9  A.    To me that's just a semantic kind
10  of thing there, report, reports,
11  verbalization, verbalizations.
12  Q.    Okay.  You wrote, I am ethically
13  and morally bound to report allegations
14  of abuse.  Now, what ethical principles
15  were you referring to?  What body or
16  single ethical principle were you
17  referring to?
18  A.    I wasn't reporting a single
19  specific ethical obligation.  I was using
20  that in a generic sense.  If an inmate
21  comes to me telling me a staff is
22  physically assaulting her, ethically I
23  need to report that.
24  Q.    Ethically under your rules as a
25  psychologist?

Page 124

1  A.    Under my rules as a human being.
2  Q.    Okay.  So you weren't referring
3  to any ethical obligation associated with
4  your license, your psychology license; is
5  that correct?
6  A.    Not specifically there, no.
7  Q.    And so then ethically and morally
8  would have been interchangable?
9  A.    Yes.
10  Q.    Now, in the next paragraph, after
11  telling Lisa that you had no authority to
12  release her from the RHU, you noted that
13  you had personally talked with the
14  Superintendent, that means Superintendent
15  Wolf?
16  A.    Uh-huh (yes).
17  Q.    And you told him that you did not
18  feel that an extended stay in the area,
19  meant the RHU, ---
20  A.    Uh-huh (yes).
21  Q.    --- is reasonable?  Did you, in
22  fact, have a talk with the
23  superintendent?
24  A.    I wouldn't have written it down
25  if I didn't.

Page 125

1  Q.    And do you recall approximately
2  how long prior to writing Lisa that you
3  had that talk with him?
4  A.    Not exactly how long prior, no,
5  sir.
6  Q.    Do you recall what you told the
7  superintendent?
8  A.    I don't recall verbatim.
9  Q.    Remember I'm never asking you
10  verbatim.  You know, I'm asking you the
11  sum and substance.
12  A.    The sum and substance, I told him
13  that I felt that maintaining her in the
14  restricted housing unit for a prolonged
15  period of time was not reasonable.
16  Q.    And did you explain to him why
17  you didn't believe it wasn't reasonable?
18  A.    I don't know if I did or not.
19  Q.    Did you have an impression in
20  your mind why it was not reasonable for
21  her to be in the RHU for an extended
22  period of time?
23  A.    Yes, I did.
24  Q.    And what was that?
25  A.    The impression in my mind is that

Page 126

1 it was --- there was a pitfall involved
2 in it and specifically the pitfall was
3 this woman comes reporting abuse at the
4 hands of a staff member, the contingency
5 therein, the consequence is to be locked
6 up in the restricted housing unit for
7 weeks and weeks. I was concerned about
8 the message that it was sending to the
9 population that if you speak out about
10 something like this, that you're going to
11 get locked up. Not to mention the fact
12 that I had some empathy for her being in
13 there day in and day out.
14 Q. Now, on page 15, the last
15 paragraph of your correspondence to Lisa,
16 you wrote regarding the videotaping of
17 you upon your return from ATA, what did
18 ATA mean?
19 A. That means authorized temporary
20 absence.
21 Q. You wrote, I did not know this
22 was happening. Nobody informed me of
23 your return and/or the plan to videotape
24 you. My question is, do you have a
25 recollection of Lisa describing the

Page 127

1 videotaping to you?
2 A. No, sir.
3 Q. Okay. Do you have a recollection
4 of having any sessions with Lisa Lambert
5 in your office after the 13th of October
6 1994, the date that you went with her to
7 the medical department?
8 A. No, sir.
9 Q. Now, it came to your attention at
10 some point, didn't it, that Officer Icker
11 was under investigation by OPR for
12 possible sexual encounters with Cambridge
13 Springs inmates?
14 A. What's OPR stand for?
15 Q. Office of Professional
16 Responsibility?
17 A. No, I was not aware that that
18 organization even existed.
19 Q. Did anybody from the central
20 office of the Department of Corrections
21 ever meet with you to address issues
22 involving alleged, inappropriate contact
23 between Officer Icker and Cambridge
24 Springs inmates?
25 A. Not that I can recall, sir.

Page 128

1 Q. Did anybody at Cambridge Springs,
2 and that's anybody from Superintendent
3 Wolf on down the chain of command through
4 the commission officers, at any point
5 question you about Officer Icker's
6 alleged relationships between --- with
7 Cambridge Springs women?
8 A. Not that I can recall, sir.
9 Q. Did you at any point ever prepare
10 anything in writing related to possible
11 inappropriate contact between Officer
12 Icker and Cambridge Springs inmates?
13 A. Not that I can recall, sir.
14 Q. Did you provide any testimony at
15 Officer Icker's criminal trial?
16 A. No, sir.
17 Q. So as far as you can recall,
18 neither Superintendent Wolf nor Deputy
19 Superintendent Utts nor Deputy
20 Superintendent Karmanic nor the captain
21 of security nor any lieutenants
22 questioned you about anything that Lisa
23 Lambert might have told you about contact
24 between her and Officer Icker; is that
25 correct?

Page 129

1 A. That's correct.
2 Q. Did any of those persons or job
3 titles, positions, question you about any
4 information you might have about alleged
5 inappropriate contact between any other
6 Cambridge Springs inmates and Cambridge
7 Springs staff?
8 A. Not that I can recall.
9 Q. Did Robin Phillips at any point
10 in her involvement with you in group
11 sessions ever discuss any allegations of
12 inappropriate conduct on the part of
13 Marty Miller toward her?
14 A. Yes, but it was post-conviction
15 of Marty Miller.
16 Q. Okay. What did she tell you?
17 A. She basically verbalized
18 dissatisfaction, frustration with the
19 fact that he had received what she
20 perceived as a light sentence for his
21 crimes and then less than a year ago she
22 apparently got some correspondence
23 regarding Mr. Miller's pending release.
24 And she brought that into group one day
25 and showed it to me and, again,

Page 130

1 verbalized upset, frustration with the
2 fact that he was getting out of jail.
3 Q.   Did she ever discuss with you
4 what Marty Miller had allegedly done to
5 her?
6 A.   Not until after his conviction?
7 Q.   But then after did she?
8 A.   I believe that she did at one
9 point indicate that his inclination, his
10 propensity was to grope, grope her
11 breast.
12 Q.   Okay.  I asked you whether she
13 had told you anything in the context of
14 group sessions about Marty Miller.  Had
15 she had any discussions with you in any
16 other context about Marty Miller and his
17 behavior toward her or other Cambridge
18 Springs women?
19 A.   No, sir.
20 Q.   What about Sylvia Vasquez?  Did
21 she have any discussions with you about
22 allegedly inappropriate behavior by Marty
23 Miller toward her or any other prisoners?
24 A.   Yes, she did, sir.
25 Q.   Okay.  And do you recall when she

Page 131

1 first approached the subject?
2 A.   Yes.  It was after she had
3 already reported to other personnel in
4 the institution.  In fact, it was after
5 Mr. Miller was removed from his position
6 in the institution.  It was, to the best
7 of my recollection, at the time that
8 there was --- the trial --- he was being
9 prepared for trial and she sought out
10 some assistance with the whole
11 circumstance, the whole thing.
12 Q.   Assistance of what nature?
13 A.   Well, I think that she was
14 struggling with having reported.  I think
15 that she was struggling with the
16 probability of having to testify at his
17 trial.  I think that she was struggling
18 with some of her associates/friends'
19 reactions to her reporting the
20 allegations.  I think she was struggling
21 with the after effects of what Mr. Miller
22 had done.
23 Q.   What did she tell you about the
24 after effects?
25 A.   She talked about believing

Page 132

1 initially that she could get this man to
2 stop what he was doing without having to
3 come forward.  She talked about some of
4 her feelings associated with his
5 approaches of her.
6 Q.   What did she say about her
7 feelings?
8 A.   She talked about typically
9 identified feelings as far as victims of
10 sexual assault and molestation.
11 Q.   Well, you've got to tell me what
12 those are?
13 A.   Powerless, helpless, ashamed,
14 anxious, afraid.
15 Q.   Were these during individual
16 counseling sessions ---
17 A.   Yes.
18 Q.   --- that she told you about that?
19 A.   Yes, sir.
20 Q.   And can you set a time period ---
21 an approximate time period?  I know that
22 you told me when they occurred.
23 A.   Not more than what I've already
24 done.  It was during the time that --- I
25 believe sometime in between his being

Page 133

1 arrested officially and the time that
2 they went to trial and during the course
3 of the trial itself I saw her.
4 Q.   Do you have any of her records
5 with you?
6 A.   No, sir.
7 Q.   Do you have a recollection of how
8 many times you saw her?
9 A.   I would estimate that I saw Ms.
10 Vasquez anywhere between seven and ten
11 sessions, probably closer to seven then
12 ten.
13 Q.   Okay.  And were all of those
14 sessions --- strike that.
15     Was her initial contact with you
16 expressly related to the Miller
17 situation?
18 A.   Yes, sir.
19 Q.   And do you recall what her
20 demeanor was like when she first began to
21 speak to you about the Miller situation?
22 A.   Yes.  She was anxious.  I would
23 say that that was the primary mood that I
24 was picking up on, anxiety.
25 Q.   How could you detect the anxiety?

Page 134

1 What did you see?
2 A.   Nervous mannerisms, fidgeting,
3 again, a certain rapidness about her
4 speech, a certain pressured quality to
5 her speech.
6 Q.   Do you recall her crying during
7 --- when she first contacted you?
8 A.   I don't recall that being
9 presented, that tears being presented
10 initially were there.
11 Q.   What about later?
12 A.   I would say that there was
13 certainly a possibility that some tears
14 were shed during the course of those
15 approximately seven sessions.
16 Q.   Did she appear to be depressed to
17 you?
18 A.   Yeah, she did appear to be
19 somewhat depressed.  There were other
20 stressors going on in her life as well.
21 Q.   Okay.  With her daughter?
22 A.   With her daughter, with her son,
23 with trying to get back to the State of
24 New Jersey on parole, with her
25 relationship with another inmate here and

Page 135

1 that tied into the Marty Miller thing.
2 Q.   What was the relationship?  What
3 do you mean by the relationship?
4 A.   She had a close relationship with
5 another woman here?
6 Q.   Of a sexual nature?
7 A.   I don't know that.
8 Q.   Okay.  You said earlier that she
9 had talked about what other inmates were
10 --- I don't remember what the exact words
11 were, but it had something to do with the
12 --- one of the issues she discussed with
13 you or how I believe the thrust of it was
14 how other inmates perceived her reporting
15 what Miller had done; is that accurate?
16 A.   That's accurate.
17 Q.   Okay.  And how did she describe
18 that?
19 A.   The sense that I got was that not
20 all other inmates were supportive of what
21 she had done.
22 Q.   Did she talk about any of them
23 viewing her as a snitch or --- you know
24 what the word snitch means in the prison
25 context?

Page 136

1 A.   Yes, I do.  I don't know if she
2 used the term snitch.  I did get the
3 sense that she was getting some input,
4 some comments from some of the other
5 womens --- the other women, excuse me,
6 that were not completely supportive,
7 okay.  That were in some ways derogatory
8 and not supportive.
9 Q.   Okay.  Did you get any impression
10 ---?
11        ATTORNEY KRAKOFF:
12        Do you want to take a
13 break?  Do you want to eat?
14 A.   I'm just saying I don't know if I
15 can go without eating all day long.
16        ATTORNEY KRAKOFF:
17        Well, let's take a break.
18 Let's take a break.
19        ATTORNEY HALLORAN:
20        Mr. Krakoff, how much
21 more do you have?  You can't have
22 that much.
23        ATTORNEY KRAKOFF:
24        No.
25 LUNCH BREAK TAKEN

Page 137

1 BY ATTORNEY KRAKOFF:
2 Q.   Would your practice of
3 interviewing or speaking with inmates
4 during the individual sessions for
5 approximately 50 minutes, was that still
6 your practice when you saw Sylvia
7 Vasquez?
8 A.   Yes.
9 Q.   Do you have any recollection of
10 whether Sylvia Vasquez saw anybody in the
11 psychology department in addition to you?
12 A.   No.  I'm not saying that that's
13 not a possibility.  I just don't have a
14 recollection.
15 Q.   Did you make a referral for
16 Sylvia Vasquez to be seen by any
17 physician or psychiatrist?
18 A.   I may have done that, but I
19 cannot say for certain.
20 Q.   What about for Robin Phillips?
21 A.   No, I have never referred Robin
22 Phillips for a psychiatric evaluation.
23 Q.   Did you view your sessions with
24 Sylvia Vasquez as individual counseling
25 sessions or did you view those as

Page 138

1 individual therapy sessions?
2 A.  Counseling, supportive individual
3 counseling.
4 Q.  Were there people during 1994,
5 1995 or 1996 who you were seeing for
6 individual therapy sessions?
7 A.  I would say so, yes.
8 Q.  So when you made reference in
9 Exhibit Ten to participating in
10 individual therapy sessions with Lisa
11 Lambert on the 15th and 26th of August,
12 that was in this statement?
13 A.  I would have been better to
14 phrase that as counseling.
15 Q.  And when you counsel an inmate,
16 does that include giving the inmates
17 advice?
18 A.  It can.
19 Q.  And what in a generic sense
20 determines whether you go from --- strike
21 that.
22    In a generic sense, what
23 determines whether you're going to see an
24 inmate for counseling or whether you're
25 going to see an inmate in contrast for

Page 139

1 therapy?
2 A.  I would say primarily two things,
3 what the presenting problem is and my
4 resources at the time.  And by resources,
5 I mean staff compared to demand,
6 workload.
7 Q.  Is therapy more difficult from
8 the standpoint of time constraints?
9 A.  Well, therapy is not necessarily
10 undertaken in a period of acute distress.
11 Therapy is more something that one
12 initiates because of long-standing
13 patterns of maladaptive behavior rather
14 than one precipitating event.
15 Q.  Okay.  The counseling would then
16 be generally when there's one
17 precipitating event?
18 A.  Exactly.
19 Q.  Did Sylvia Vasquez ever describe
20 to you what it was that Marty Miller had
21 allegedly done to her?
22 A.  I believe that she talked to me
23 about working with him on the plumbing
24 crew, being in relatively isolated parts
25 of a building, and I believe specifically

Page 140

1 what we come to call Freddy Krueger's
2 over there, cahoots check or whatever
3 it's called.  She talked about how he
4 would split up the crews and how she
5 would try to not be in a position where
6 she would have to work with him, just him
7 and her.  And the different ways that she
8 would try to avoid that and how it would
9 ultimately end up where she would end up
10 having to work side by side.
11    Again, we're talking substance
12 rather than specific verbatim content.  I
13 recall her talking about him unzipping
14 his zipper, exposing his penis,
15 soliciting oral sex from her.
16 Q.  And did she talk about after it
17 was solicited, what, if anything,
18 occurred?
19 A.  No.
20 Q.  Did she ever talk about anything
21 in a sexual nature other than exposing
22 himself that he did to her?
23 A.  That's what stands out, although
24 she may have talked about, you know, him
25 having an inclination to rub up against

Page 141

1 her in an unwanted way.  I think it's
2 called frottage or something of that
3 nature that he was just kind of in her
4 space and in an unwanted way.
5 Q.  Did she ever describe him
6 touching her genital areas?
7 A.  She may have done that, but I
8 don't recall that specifically.
9 Q.  What about her breasts?
10 A.  She may have done that.
11 Q.  Now, had any women, prior to your
12 counseling Sylvia Vasquez, registered any
13 complaints about Marty Miller getting in
14 their space?
15 A.  Yes, sir.
16 Q.  And did you report any of those
17 to any --- any of those allegations to
18 any members of the staff?
19 A.  Yes, sir.
20 Q.  And do you recall approximately
21 when it was that you reported that?
22 A.  No, sir.
23 Q.  Do you recall the year?
24 A.  I would guess 1995 or 1996.
25 Q.  Was this something that you

Page 142

1 reported in response to something --- in
2 response to somebody coming to you or did
3 you initiate it?
4 A.    No, it was something that I did
5 in response to an inmate coming to me and
6 reporting to me that Mr. Miller had
7 behaved inappropriately towards her.  And
8 that as a consequence she wanted to take
9 a job change.  She wanted to get away
10 from the man.
11 Q.    I'm not going to ask you to name
12 the inmate, but I'm going to ask you to
13 relate the substance of what she said
14 Miller had done toward her?
15 A.    She told me that he called her
16 into his office and that he basically
17 backed her up against the wall and he
18 groped her breast.
19 Q.    Okay.  After you received that
20 information, who did you go to?
21 A.    After I received that
22 information, I wrote it up on an
23 extraordinary occurrence form and sent it
24 to the intelligence captain.  I also
25 talked with Deputy Charles Utts and I

Page 143

1 also talked with Superintendent Wolf
2 about it.
3 Q.    When you spoke with Deputy
4 Superintendent Utts, what did you tell
5 him?
6 A.    The substance of what I told him
7 was that I had concerns about Mr. Marty
8 Miller.  That I had no reason whatsoever
9 to believe that this particular woman
10 would fabricate such an allegation and
11 that my intuitive sense was that the man
12 was inappropriate in his interactions
13 with the women.
14 Q.    Okay.  Plural, women as opposed
15 to woman?
16 A.    I am plural because my training
17 with regard to the nature of people who
18 commit sexual offenses and treating
19 sexual offenders is that rarely do you
20 see a man who sexual assaults one person,
21 one time in his life and that's the only
22 reason I make a plural there.
23 Q.    What was Deputy Superintendent
24 Utts' response?
25 A.    Deputy Superintendent Utts'

Page 144

1 response was to, in essence, validate my
2 feelings, indicate that this was not the
3 first time that someone had come to him
4 with suspicions that Mr. Miller was
5 inappropriate.  But also to let me know
6 that investigations are a process that
7 involves several steps and that we
8 couldn't --- you know, basically implying
9 that we couldn't just step off and, you
10 know, can the man based on one allegation
11 here.  That we needed to take the
12 investigatory steps to find out what was
13 going on.
14 Q.    Did he indicate to you that there
15 was already an investigation of Miller in
16 progress?
17 A.    I don't remember for certain, but
18 I do have a sense that this was not the
19 first time, okay, that Mr. Miller's name
20 had arisen with regard to inappropriate
21 interactions with females.
22 Q.    Did Mr. Utts explicitly tell you
23 that he had any concerns about Marty
24 Miller?
25 A.    Sure.  He was concerned because I

Page 145

1 was concerned.
2 Q.    But did he indicate to you that
3 he was concerned because of what you said
4 or did he indicate to you that his
5 concern was broader than that?
6 A.    As I said, he did indicate to me
7 that I was not the first person, okay, to
8 come to him or to report by some
9 mechanism that Mr. Marty Miller's
10 interactions with females were less than
11 appropriate.
12 Q.    Female inmates?
13 A.    Females generally.
14 Q.    Generally.  Okay.  So you
15 couldn't conclude from that discussion
16 whether he was referring to female staff
17 members or female inmates?
18 A.    Yes, sir.
19 Q.    Yes, you couldn't conclude?
20 A.    That's correct.
21 Q.    Now, you said that you spoke with
22 Officer --- strike that.
23      You said that you spoke with
24 Superintendent Wolf also about what that
25 inmate had told you; is that correct?

Page 146

1 A. Yes, sir.
2 Q. Did you speak with Superintendent
3 Wolf before or after you spoke with
4 Deputy Superintendent Utts?
5 A. It was concurrently. In fact,
6 the reason I spoke with Superintendent
7 Wolf was because he happened to come into
8 the office while I was talking to Deputy
9 Utts about it, coincidentally.
10 Q. All right. And what is your
11 recollection, if you have one, of what
12 Superintendent Wolf's reaction was?
13 A. Pretty much the same as how I've
14 described Deputy Utts' reaction.
15 Q. He indicated to you then that he
16 was aware of concerns about Marty Miller
17 prior to the day that you related the
18 information?
19 A. That is my recall, sir.
20 Q. Now, after that, did you have any
21 discussions with any other members of the
22 staff in conjunction with the complaint
23 about Marty Miller from the woman that
24 you had referred to?
25 A. Not that I'm able to recall, sir.

Page 147

1 Q. Okay. Other than that woman and
2 Sylvia Vasquez, were there any other
3 women prisoners who discussed Marty
4 Miller either getting in their space or
5 acting inappropriately toward them?
6 A. Yes, sir.
7 Q. And do you recall when that ---
8 when approximately that woman related the
9 information to you?
10 A. When? No, sir.
11 Q. Was it before or after the
12 meeting with the other woman you referred
13 to. Let's call ---
14 A. I would say after.
15 Q. --- her inmate A ---
16 A. I would say after.
17 Q. --- so that we can identify. So
18 we'll call her, the one subsequent inmate
19 B. Were you seeing inmate B in
20 counseling?
21 A. Inmate B had a major psychiatric
22 illness and my interactions with her were
23 more kind of monitoring and tracking her
24 stability with regard to her mental
25 illness.

Page 148

1 Q. Now, did you see her in your
2 office?
3 A. Yes.
4 Q. Okay. And what did she --- the
5 sum and substance, what did she tell you?
6 A. She told me that Mr. Miller was,
7 quote, unquote, a horny toad.
8 Q. Okay.
9 A. And that she was sick of the way
10 that he was around the women, that
11 somebody ought to do something about him.
12 She, again, had a major mental illness so
13 there was some tangentially about her
14 speech. She was not real goal directed
15 and always logical in her reports, but
16 she kind of rambled about candy. Okay.
17 About him bringing candy for the women
18 alluding that this was how he would get
19 sexual favors for them.
20 Q. Did she describe anything sexual
21 that he did --- allegedly did with any of
22 the women prisoners?
23 A. I believe that she talked more
24 about his language. Okay. About his
25 language being sexually laden, about

Page 149

1 possibly gestures, again, the space
2 issues.
3 Q. Did she get specific about his
4 language?
5 A. No. She may have, but I don't
6 recall.
7 Q. Now, your discussion with inmate
8 B, did that occur before Marty Miller was
9 removed from the institution?
10 A. I do believe so, yes, sir.
11 Q. Do you recall how long before he
12 was removed?
13 A. No, sir. I don't think too long
14 before.
15 Q. By too long, approximately what
16 --- are you talking about a matter of
17 days or weeks or months?
18 A. Not a matter of days. Less than
19 six months.
20 Q. Okay. Was there an inmate C?
21 A. No, sir, not prior to his
22 conviction.
23 Q. Now, what, if anything, did you
24 do with the information that you were
25 given by inmate B?

Page 150

1 A.    I wrote it up on an extraordinary
2 occurrence form.
3 Q.    Okay. And the extraordinary
4 occurrence form, that's something that is
5 distributed ultimately to whom?
6 A.    I'm not sure who all was cc'd. I
7 know that the deputy of facility
8 management gets a copy and that the
9 intelligence captain gets a copy.
10 Q.    Who did you direct the
11 extraordinary occurrence form to?
12 A.    Those, to my knowledge, are
13 supposed to be routinely directed to the
14 deputy of facility management.
15 Q.    Who was?
16 A.    Deputy Karmanic.
17 Q.    Now, were you interviewed about
18 that this guy --- the information you
19 received from inmate B? Did anybody on
20 the staff come to you to ask any
21 questions about what was in your report?
22 A.    I don't remember.
23 Q.    Did inmate B say that any of the
24 things that she had described, sexual
25 laden language, gestures, space intrusion

Page 151

1 or candy had been done to her or given to
2 her?
3 A.    I don't think she said that, no.
4 Q.    So as you understood it, this is
5 something that she was describing
6 happening between Miller and other
7 inmates rather than between Miller and
8 herself?
9 A.    Yes.
10 Q.    Do you recall whether your
11 extraordinary occurrence report
12 identified your source of information,
13 i.e., inmate B by name?
14 A.    Yes, sir.
15          ATTORNEY KRAKOFF:
16          I don't think, Mr.
17 Halloran, that I received either
18 of the extraordinary occurrence
19 reports, that has been testified
20 to and I would like to, you know,
21 have copies of those.
22          ATTORNEY HALLORAN:
23          We've looked for the
24 extraordinary occurrence reports,
25 unless they're in the records we

Page 152

1 don't have yet, I don't know if
2 we have them. Although, I do
3 believe we have reference to the
4 inmates' names in the ---.
5          ATTORNEY KRAKOFF:
6          Well, you can get that
7 information from her, I think, by
8 just --- you know, when I'm not
9 here, ask her what the names are.
10 Maybe they'll be in the inmate
11 files.
12          ATTORNEY HALLORAN:
13          They might be.
14          ATTORNEY KRAKOFF:
15          Is it your understanding
16 that there's like no central
17 repository of a collection of
18 extraordinary occurrence reports,
19 that you'd have to go to specific
20 files to get them?
21          ATTORNEY HALLORAN:
22          I remember how I keep
23 them.
24          ATTORNEY KRAKOFF:
25          Okay.

Page 153

1 LUNCH BREAK TAKEN
2 BY ATTORNEY KRAKOFF:
3 Q.    Ms. Wolfgang, in any discussions
4 that you might have had with other staff
5 members or any conversations that took
6 place when you were present, did you hear
7 any talk about any allegations of
8 inappropriate sexual contact between
9 Cambridge Springs personnel and Cambridge
10 Springs inmates during the years 1994,
11 1995 or 1996?
12 A.    Yes, sir.
13 Q.    Okay. And can you tell me what
14 you recall about those discussions or
15 conversations?
16          ATTORNEY HALLORAN:
17          Are you talking about
18 inmates to her?
19          ATTORNEY KRAKOFF:
20          No.
21 BY ATTORNEY KRAKOFF:
22 Q.    I've already asked about other
23 inmates relating things to you. But now
24 what I'm talking about is while you were
25 present either in a conversation that you

Page 154

1 had with another member of the Cambridge
2 Springs staff or that you were present
3 during did you hear any talk about
4 inappropriate sexual contact between
5 Cambridge Springs personnel and inmates?
6 A.   Yes, but that would be limited to
7 --- through the grapevine gossip
8 variety-type stuff at lunchtime, not in
9 an official investigatory capacity.
10 Q.   Let's focus on the year 1994.  Do
11 you recall any --- strike that.
12       Let's focus on the year 1993.
13 Did you hear any gossip about
14 inappropriate sexual contact between
15 personnel and Cambridge Springs inmates?
16 A.   I would not be able to isolate
17 1993.
18 Q.   What about 1994?
19 A.   I would say, if we're talking
20 1994, yes.
21 Q.   Who do you recall being the
22 subject of the gossip?
23 A.   I recall at that point Carl
24 Zimmerman was the subject of the gossip.
25 Q.   Okay.  Was he still working at

Page 155

1 the prison when you first heard the
2 gossip about Carl Zimmerman?
3 A.   Yes.
4 Q.   And what was the gossip that you
5 heard about him?
6 A.   The gossip had to do with him
7 being in the restricted housing unit when
8 you really didn't have any reason to be
9 in the restricted housing unit.  It had
10 to do with him coming into work at odd
11 shifts for reasons that were suspect.  It
12 had to do with him always apparently
13 having Ms. Gunderson by his side, these
14 types of things.
15 Q.   Do you recall whether
16 Superintendent Wolf was present during
17 any of that gossip?
18 A.   No, sir.
19 Q.   What about Deputy Utts?
20       ATTORNEY HALLORAN:
21       Do you mean you don't
22 recall or they weren't present?
23 A.   I mean, I don't recall.
24 BY ATTORNEY KRAKOFF:
25 Q.   What about Deputy Utts?

Page 156

1 A.   I don't recall.
2 Q.   What about Deputy Karmanic?
3 A.   I don't recall.
4 Q.   What about Lieutenant Bartlet
5 (phonetic)?
6 A.   I don't recall.
7 Q.   Did you take any of that gossip
8 to any of those persons that I
9 identified?
10 A.   No, sir.
11 Q.   Other than Carl Zimmerman in
12 1994, do you recall hearing any gossip
13 about any other personnel?
14 A.   The only other person would be
15 Mr. Marty Miller, but I can't ascertain
16 whether that was '94 or '95 or '96.
17 Q.   Okay.  In 1995, do you have any
18 recollection of hearing gossip about any
19 personnel in the nature that I asked
20 about?
21 A.   I may have heard some gossip
22 about Mr. Marty Miller by 1995.
23 Q.   Anybody else?
24 A.   No, sir.
25 Q.   What about 1996, possibly Miller

Page 157

1 I take it?
2 A.   Yes.
3 Q.   Anybody else?
4 A.   No, sir.
5 Q.   I take it --- so I can focus
6 specifically that you didn't hear any
7 gossip about Officer Raun?
8 A.   I may have heard some gossip
9 about Officer Raun.  I don't know for
10 sure.  I don't remember hearing a lot
11 about it, no, other than what Ms. Lambert
12 had disclosed that we already talked
13 about.
14 Q.   What about Icker?  Do you recall
15 any gossip about him?
16 A.   I don't remember Icker coming
17 onto the scene.  I don't know if he was
18 even employed here in 1995.  He might
19 have been.  No, I don't recall any gossip
20 about Icker.
21 Q.   Okay.
22 A.   Maybe he was here in '95.
23 Q.   Let me refer you to page 10 of
24 Exhibit Ten.  It's the inmate's request
25 to staff member dated October 14, 1994.

Page 158

1  A.   Yes.
2  Q.   You'll note on line six she
3  writes --- Lisa Lambert writes, I'm still
4  being kept away from my friend and she
5  goes on from there.  Do you have a
6  recollection of whether --- after
7  receiving this, whether Lisa Lambert
8  identified who that friend was?
9  A.   No, sir.
10  Q.   Do you recall whether at any
11  point she identified to you who the
12  friend was that she was referring to?
13  A.   She may have been talking about
14  LeeAnn Javka (phonetic).
15  Q.   Okay.  But you're not sure; is
16  that right?
17  A.   That's correct.
18  Q.   And then she goes on to say, I'm
19  not sorry I showed them what he did.
20  Someone has to make him stop.  I just
21  want him to stop and she has that
22  underlined.  Did she ever clarify to you
23  who she was referring to when she said, I
24  just want him to stop?
25  A.   Given that this was dated on the

Page 159

1  14th and the incident that we spoke about
2  occurring on the 13th involved the
3  allegations of assault at the hands of
4  Officer Raun, I would say that him refers
5  to Officer Raun, Sergeant Raun at the
6  time.
7  Q.   You're interpreting that from the
8  --- or you're inferring that from the
9  context; correct?
10  A.   Yes, sir.
11  Q.   Did she ever --- after you
12  received this, did you have any
13  discussion with her about --- that would
14  have identified who she was talking
15  about?
16  A.   Well, as I indicated, I would
17  monitor the restrictive housing unit and
18  I would see her in the context of that
19  monitoring and given that she had come to
20  me with the allegations, I'm sure that we
21  did have some discussion of what she had
22  said, what she had alleged, what was
23  going on from her vantage point.
24  Q.   Okay.  If you can turn to page 14
25  of Exhibit Ten, that's the 12/16/94

Page 160

1  correspondence to Lisa.
2  A.   Uh-huh (yes).
3  Q.   In the second paragraph, you
4  wrote, you've said to me that for two
5  years you tried to tell people here that
6  the officer was hurting you, but that
7  nobody listened or believed.  What
8  officer were you referring to?
9  A.   Officer Raun.
10  Q.   And when writing, quote, you've
11  said to me that for two years you tried
12  to tell people here that the officer was
13  hurting you, but that nobody listened or
14  believed, had she told you that she had
15  tried for two years to tell people at the
16  prison that Officer Raun was hurting her?
17  Had she told you that during your
18  counseling sessions or had she told you
19  that sometime after her last counseling
20  session with you in October?
21  A.   She told me that during the
22  counseling sessions.
23  Q.   Okay.  And did she describe to
24  you how Officer Raun was hurting her?
25  A.   Yes.  In the manner that I've

Page 161

1  spoken of earlier in this testimony to
2  the staring/stalking-type behaviors.
3  Q.   Okay.  So you weren't referring
4  to any sort of physical hurting?
5  A.   Not up to that point.
6  Q.   On page 15 of the exhibit in the
7  second paragraph you wrote, quote, I can
8  appreciate your feelings of betrayal and
9  your not wanting to see me.  Did she use
10  that word to you that she felt betrayed?
11  A.   I don't know for sure, sir.
12  Q.   Now, had she told you that she
13  didn't want to see you before you wrote
14  this?
15  A.   I think maybe that was part of
16  what she said, wasn't it, in this
17  response?  Where's the inmate request
18  that goes along with this?
19  Q.   We don't have that.
20  A.   My guess is that usually when I
21  respond to these, I deal directly with
22  the content of the inmate's request, what
23  she has said in the request.
24  Q.   Right.
25  A.   And I address those issues in my

Page 162

1 response. So my guess is that she had
2 indicated to me, I don't want to see you
3 anymore. That's a guess.
4 Q.  You think or you're guessing that
5 she submitted a request to you?
6 A.  Right.
7 Q.  But you don't have an independent
8 recollection of that; is that correct?
9 A.  No, sir. But I don't think I
10 would have said that unless that was in
11 there.
12 Q.  She could have told you that,
13 though, couldn't she, face to face?
14 A.  She could have, but I don't think
15 she would have.
16        ATTORNEY KRAKOFF:
17        Obviously, when Lisa's
18 file is obtained, if there is a
19 request associated that led ---
20 you know, that proceeded this,
21 we'd like to have that.
22 BY ATTORNEY KRAKOFF:
23 Q.  I'm not asking you about a
24 specific inmate's complaint or --- strike
25 that.

Page 163

1        I'm not asking you about a
2 specific inmate's complaint, this is a
3 much broader question. Did you ever
4 discuss with Superintendent Wolf any
5 concerns you might have had about
6 inappropriate sexual contact, sexual
7 harassment that were manic encounters
8 between Cambridge Springs personnel and
9 Cambridge Springs inmates? I'm asking
10 that in a general sense as opposed to you
11 early testified about going to
12 Superintendent Wolf, I think, on at least
13 one other occasion in response to a
14 specific complaint?
15 A.  Yes. Given my previous testimony
16 the answer is yes. I mean, I told you
17 there was at least one instant where I
18 did that. So the answer to your question
19 would be yes.
20 Q.  Okay. I'm asking about a ---.
21        ATTORNEY HALLORAN:
22        If you could repeat the
23 question again? Listen carefully
24 to the question.
25 BY ATTORNEY KRAKOFF:

Page 164

1 Q.  Did you have any general
2 discussions with Superintendent Wolf in
3 which you expressed concerns that inmates
4 at Cambridge Springs ---
5        ATTORNEY HALLORAN:
6        Generally.
7 BY ATTORNEY KRAKOFF:
8 Q.  --- generally and Cambridge
9 Springs personnel might be involved in
10 sexual contact, that sexual harassment
11 might be occurring or that there might be
12 inappropriate romantic encounters between
13 Cambridge Springs personnel and Cambridge
14 Springs inmates?
15 A.  Not that I'm able to recall.
16 Q.  What about with Deputy Utts. Did
17 you ever address that topic in a general
18 sense?
19 A.  Not that I'm able to recall.
20 Q.  Do you have a recollection of
21 having such a discussion with Deputy
22 Karmanic?
23 A.  Not that I'm able to recall.
24 Q.  Okay. Do you have any
25 recollection of having such a discussion

Page 165

1 with any member of the Cambridge Springs
2 staff?
3 A.  Yes, sir.
4 Q.  And who was that?
5 A.  Mr. Carl Zimmerman.
6 Q.  And can you explain when that
7 occurred and what was said?
8 A.  Yeah. After the inmate that I
9 spoke previously about disclosed to me
10 that she had observed Mr. Zimmerman
11 kissing Ms. Gunderson in the basement of
12 the dietary department, although I felt
13 that I needed to keep what the inmate had
14 told me confidentially --- confidential,
15 I also felt that there was certainly a
16 good chance that this was true and that
17 Mr. Zimmerman was inappropriate in his
18 conduct. And I made a decision to
19 confront him personally about it.
20 Q.  And you did?
21 A.  Yes, I did.
22 Q.  And why don't you describe that
23 encounter?
24 A.  That encounter involved sitting
25 down with him in a private way at

Page 166

1 lunchtime and basically telling him in a
2 very general way that for a staff member
3 to become involved sexually with one of
4 the inmates here is inappropriate
5 conduct, that it's really a breach of
6 trust and that many, many of the women
7 here are survivors of childhood sexual
8 abuse, incest and that they're not in a
9 position to consent to sexual
10 interactions with a staff member.
11 Q.   And that was a one-on-one
12 discussion between --- you said that one
13 to one to Zimmerman?
14 A.   Mr. Zimmerman, yes.
15 Q.   There weren't other people
16 present?
17 A.   No.
18 Q.   And did he have a response?
19 A.   Yes, he did.
20 Q.   What did he say?
21 A.   He became defensive. He told me
22 that his wife met all of his needs and
23 that he wasn't involved with any of the
24 inmates sexually here.
25 Q.   Okay. And was that the only

Page 167

1 discussion you had with him about that?
2 A.   Yes, sir.
3 Q.   Have you ever been questioned in
4 a general sense by Superintendent Wolf,
5 Deputy Utts, Deputy Karmanic, Captain
6 Bartlet, Captain Lazenbee (phonetic) or
7 any lieutenant regarding possible sexual
8 abuse, sexual encounters, sexual
9 harassment or romantic relationships
10 between members of the Cambridge Springs
11 staff and Cambridge Springs inmates?
12 A.   Not that I'm able to recall. I
13 may have been confused. Regarding what I
14 had talked about as far as Superintendent
15 Wolf bringing it to my attention that to
16 not inform administration regarding what
17 the one inmate had told me she observed
18 in the dietary department, that may have
19 been an affirmative answer to that
20 question that you had. That he basically
21 told me in a general sense that whenever
22 somebody brings something like this to
23 you, it is your duty to report it to me
24 because it is a breach of security to the
25 institution.

Page 168

1 Q.   I understand. My question really
2 had related to whether you had ever been
3 questioned by the superintendent or
4 anybody else regarding possible sexual
5 abuse, a general --- not in relation to a
6 specific allegation that you might have
7 brought to his attention?
8 A.   Yes. That's why I answered it
9 the first way because I'm trying to get
10 the specific general stuff down here.
11 Q.   In other words, let me give you a
12 scenario. Superintendent Wolf or Deputy
13 Utts or Deputy Karmanic meets with you at
14 some point either in their office or
15 somewhere else --- in your office, and
16 says, Ms. Wolfgang, have you received any
17 information about possible sexually
18 inappropriate conduct between a member of
19 the staff and an inmate? That's what I
20 meant.
21 A.   And my answer is --- remain as
22 they have been. No. I do not recall
23 ever any general discussions of that
24 nature.
25 Q.   Okay. In the same question with

Page 169

1 respect to anybody from the central
2 office of the Department of Corrections,
3 has any member --- anybody who identified
4 himself or herself as being from the
5 central office ever questioned you in a
6 general sense of what, if anything,
7 you knew about sexual abuse, sexual
8 encounters, sexual harassment or
9 inappropriate sexual relations between
10 members of the staff and inmates?
11 A.   Can I have a word with him for a
12 minute?
13          ATTORNEY KRAKOFF:
14          Certainly.
15 SHORT BREAK TAKEN
16 A.   I had recalled in the context of
17 what we're doing here that there was a
18 point --- I'm not sure what year it was.
19 It was at least three years ago, where I
20 did sit down and get interviewed by a man
21 from what I thought to be Internal
22 Affairs, okay, by the name of Mike. And
23 your question about anybody out of the
24 institution triggered that. But for the
25 life of me I can't with any certainty

Page 170

1 even recall what the issue was at that
2 point. I'm kind of leaning towards it
3 was the Zimmerman case, but I'm not sure.
4 Q.   Was that Mike Walanon (phonetic)?
5 A.   I believe that's who it was, yes.
6 Q.   Okay.
7 A.   The other thing that I wanted to
8 make sure that I was clear on was that,
9 you know, after that --- you know, at
10 that point, at that juncture where I
11 talked on the telephone with
12 Superintendent Wolf regarding the boo-boo
13 I had made by not reporting what Ms.
14 Foreman (phonetic) had told me she saw in
15 the basement of the dietary department.
16 The Superintendent made it crystal clear,
17 okay. That in any case like this if you
18 hear in any way, shape or form in any
19 context that staff are engaged in sexual
20 behavior with inmates, it is your duty to
21 report to me, that that is a breach of
22 security to the institution.
23 Q.   Well, did you report what Lisa
24 Lambert told you about Officer Raun to
25 Superintendent Wolf?

Page 171

1 A.   Meaning the assault allegations?
2 Q.   No. Meaning what she first
3 discussed with you about the stalking and
4 staring at her?
5 A.   No. Because as I've indicated in
6 my note here she told me that she had
7 reported that to other people, that it
8 had already been reported.
9 Q.   Right. But did you take any
10 measures to determine whether she had
11 reported it to other people?
12 A.   I know that I had talked to
13 Martha Miller, the parenting director
14 there, and that she had reported those
15 allegations. I know that Ms. Lambert was
16 in routine communication with Charley
17 Utts and that she was talking to Deputy
18 Utts about this intermittently.
19 Q.   How did you know that?
20 A.   Because Lisa told me that.
21 Because I talked to Martha and Martha had
22 indicated that Ms. Lambert had come to
23 her with those allegations. And Lisa
24 told me that she said part of what her
25 frustration was at the onset of our

Page 172

1 sessions --- I'm telling everybody this
2 and nobody seems to be listening to me.
3 Q.   I guess what occurs --- what is
4 raised in my mind is that if the
5 superintendent told you that it's a
6 security issue, why would you rely upon
7 an inmate representation that she had
8 told somebody else about it?
9 A.   I don't think I relied solely on
10 the inmate representation. I think I had
11 conversations with Charley Utts about it.
12 I think I had conversations with the
13 director of the parenting program about
14 it.
15 Q.   Okay. I don't know what that
16 programming is. That's Ms. Miller?
17 A.   Yes.
18 Q.   And what is the parenting
19 program?
20 A.   The parenting program is a
21 department within the institution that is
22 in place to assist incarcerated mothers
23 in maintaining contact with their minor
24 children while they're incarcerated.
25 Q.   And Ms. Miller had told you that

Page 173

1 she had related what Lisa had told her
2 about Officer Raun to somebody; is that
3 correct?
4 A.   What is correct is that Ms.
5 Miller and I had discussions about Ms.
6 Lambert and about Ms. Lambert's
7 reporting. I'm not going to sit here and
8 say that I know that Martha Miller was
9 formally involved in the reporting
10 process because I don't know that.
11 Q.   Okay. Had you known
12 Superintendent Wolf prior to working at
13 Cambridge Springs?
14 A.   No, sir.
15 Q.   What about Deputy Superintendent
16 Utts?
17 A.   No, sir.
18 Q.   Let me refer you to Exhibit Six.
19 Exhibit Six is a report from the special
20 investigations office. You'll see on the
21 second page of this exhibit --- it's
22 marked Two. This report is dated
23 December 5th, 1994. You'll see four
24 paragraphs from the bottom --- do you see
25 where it refers to you?

Page 174

1 A.   Uh-huh (yes).
2 Q.   **It says, Sandra Wolfgang,**
3 **psychologist, states Lambert did not show**
4 **her the bruises from the alleged assault**
5 **by Raun until October 12, 1994. Wolfgang**
6 **described Lambert as a person who, quote,**
7 **stalks their victims, end quote, and**
8 **admitted to her of being involved in a**
9 **sexual relationship with CO-1 Icker.**
10 **Now, did you describe Lisa Lambert to**
11 **anybody with the Department of**
12 **Corrections as a person who stalks their**
13 **victims?**
14 A.   I don't recall saying that, but
15 since it's quotes, it's possible that I
16 did say that.
17 Q.   **And then it says and admitted of**
18 **her being involved in a sexual**
19 **relationship with CO-1 Icker?**
20 A.   I don't remember ever saying
21 that.
22 Q.   **Are you clear in your mind that**
23 **you didn't say that?**
24 A.   I'm as clear as I can be.
25 Q.   **Which means what?  On the scale**

Page 175

1 **from one to ten, are you clear all the**
2 **way up to a ten or a nine?**
3 A.   Yes, sir.
4 Q.   **A ten?**
5 A.   Yes, sir.
6 Q.   **Okay.**
7 A.   Alluded to, suggested.
8 Q.   **I'm sorry, suggested what?**
9 A.   Suggested being involved in a
10 sexual relationship, alluded to.
11 Q.   **Okay.  Are you saying that you**
12 **told somebody from the Department of**
13 **Corrections in the context of this**
14 **investigation that Lambert alluded to**
15 **being involved in a sexual relationship**
16 **with Icker?**
17 A.   I don't know what I said verbatim
18 to the man who wrote this report, okay.
19 I do know that everything that I told you
20 so far is the truth here.  And that
21 because her language was such that I felt
22 that the reporting was going to be
23 mandatory.  At some point, I stopped her
24 and I said, look, these are the rules.
25 This is what I have to do.  Understand

Page 176

1 that if you tell me X, Y or Z, I have to
2 go and report that to authorities.  So if
3 you want to talk to me about this, you
4 have to look at these relationships as X,
5 Y and Z.  And the reason why I did that
6 was because she was moving towards
7 content that was very much suggestive
8 that she was engaging in sexual activity
9 with officers.
10     As I've said to you before, I did
11 not find her particularly credible.  In
12 fact, I did not believe 60 to 70 percent
13 of what this lady told me.  Okay.  And
14 that my purpose in this whole thing was
15 to get to focus on the sexual
16 preoccupation, this compulsive sexuality
17 that I was seeing and to be able to deal
18 with that in the context of counseling
19 without getting bogged down, okay, and a
20 lot of reporting to the powers that be.
21 Okay.  At no point up until the point of
22 her coming to me alleging assault by
23 Officer Raun did this woman indicate any
24 imminent fears on the part of herself as
25 far as officers.  My impression up to

Page 177

1 that point was that she was in pursuit of
2 sexual interaction with officers, not
3 that she was being pursued or that they
4 were after her.
5 Q.   **Did you go to Superintendent Wolf**
6 **or to Utts or to Karmanic or to anybody**
7 **else at this prison and say we have ---**
8 **there's a woman in here who I'm seeing**
9 **who's in pursuit of officers in a sexual**
10 **way?**
11 A.   I think I probably did have
12 conversations with staff members that
13 were involved in the case regarding my
14 concerns about Lisa Lambert's
15 hypersexuality or apparent
16 hypersexuality.  I don't think that it
17 was anything that was not known in a kind
18 of a pervasive way in this institution.
19 Q.   **Well, you said officers involved**
20 **in this case.  Who are you referring to?**
21 **Who did you tell?**
22 A.   Sorry, sir, I don't understand.
23 Q.   **Who did you go to and say, I'm**
24 **talking with an inmate who is in a sexual**
25 **way pursuing members of the staff?  Who**

Page 178

1  did you tell that to?
2  A.   I talked with her assigned
3  corrections counselor about it, Ms. Joan
4  Kalasa (phonetic).  I may have had
5  discussions with Deputy Karmanic about
6  it.  I don't remember exactly.
7  Q.   What about with Wolf?
8  A.   I don't remember ever talking to
9  Superintendent Wolf about it?
10 Q.   What about Utts?
11 A.   I may have had discussions with
12 Deputy Superintendent Utts about it.
13 Again, it was not in my opinion any
14 secret.  There was nothing secretive
15 about the fact that Lisa Lambert was
16 flamboyant and seductive in her
17 interactions with the officers.
18 Q.   You said something earlier though
19 alluded to --- did Lisa Lambert allude to
20 a sexual relationship with Icker to you?
21 A.   Yes.
22 Q.   Now, turning to page nine ---
23 you'll see on page eight Walanon
24 identifies --- this is what his summary
25 is of an interview with you.

Page 179

1  A.   Page nine or page eight?
2  Q.   Page eight.
3  A.   Okay.
4  Q.   This says that on November 2nd,
5  1994, the above employee was interviewed
6  by this investigator with the State
7  Correctional Institution Cambridge
8  Springs where she has been employed for
9  20 months.  He advised the following.
10 Now, does this refresh your recollection
11 as to the time that you were interviewed
12 by Mike, the person you referred to as
13 Mike?
14 A.   Yes, it does.
15 Q.   Okay.  You'll see in the next to
16 the last paragraph on page nine according
17 to this report you related that there had
18 been an admitted relationship with Icker.
19 That the officer and Lambert had met for
20 sex, were alone in the field house once
21 when inmate Lisa Wazel (phonetic) stood
22 watch and recently had sex in the
23 bathroom of Luder.  Do you have any
24 recollection of telling ---
25 A.   No, I do not.

Page 180

1  Q.   --- the investigator from the OC
2  this information?
3  A.   No, I don't.
4  Q.   Is it your testimony that you
5  didn't tell him that?
6  A.   It's my testimony that I don't
7  have any recollection of telling him that
8  and I honestly don't.
9  Q.   Are you denying that you didn't?
10 A.   I don't know why he would write
11 it down if I didn't say it, but I don't
12 have any recall of saying that to him,
13 no.
14 Q.   Did you tell anybody --- strike
15 that.
16     Had Lisa told you that she had a
17 relationship with Icker?
18 A.   Yes.  She told me that she had a
19 relationship with Icker.  I've already
20 testified to that.
21 Q.   Did she tell you that Icker and
22 she had met for sex?
23 A.   Not unless she dealt with A, Bs
24 and Cs.
25 Q.   Did she tell you that she and

Page 181

1  Icker had been alone in the field house
2  once when Lisa Wazel stood watch?
3  A.   For some reason Lisa Wazel
4  standing watch rings a bell in my head.
5  Q.   Did she tell you that she had
6  recently had sex in the bathroom of Luder
7  with Icker?
8  A.   That I don't have any recall of.
9  Q.   Did you go to anybody in the
10 administration in this institution,
11 Cambridge Springs, to report that Lisa
12 and Icker had been alone in the field
13 house once when Lisa Wazel stood watch?
14 A.   Say that again.
15 Q.   Did you tell anybody in this
16 administration from Superintendent Wolf
17 on down --- let me limit the question
18 first to the superintendent or either of
19 the deputy superintendents that Lisa told
20 you that she had been alone in the field
21 house once when Lisa Wazel stood watch?
22 A.   No.
23 Q.   Now, wouldn't that have
24 constituted a breach of security if that
25 had occurred?

Page 182

1 A.   Yes, it would have, sir.
2 Q.   **Do you have any explanation as to**
3 **why --- then you didn't follow**
4 **Superintendent Wolf's instruction to**
5 **report that information?**
6 A.   The only explanation I have is
7 that we were --- again, we were dealing
8 with letters rather than names, okay.
9 Affective the session that I told her
10 what I told you I told her. It is quite
11 possible, okay, that I knew who B was.
12 Q.   **Okay.**
13 A.   Okay. And that this was what I
14 was thinking that she was telling me,
15 but, again, her credibility was such,
16 okay, that, you know, under the
17 circumstances I was going to gather data
18 before I went running with this because
19 of the fact that we had established the
20 letter things.
21 Q.   **Okay. So --- I'm sorry.**
22 A.   And again, honestly I had
23 absolutely no confidence in this woman's
24 credibility, absolutely none.
25 Q.   **So that I understand what you're**

Page 183

1 **saying, Lisa might have told you that she**
2 **was alone in the field house once with**
3 **officer B, without naming the officer,**
4 **when Lisa Wazel stood watch. Is that**
5 **your testimony?**
6 A.   That's a possibility, yes. I
7 would like to add that at no point, okay,
8 in my sessions with Lisa Lambert did she
9 indicate to me that any of what she was
10 coming up with in terms of sexual
11 interactions with officers was unwanted.
12 Okay. Or was in any way assaultive never
13 ever once.
14 Q.   **Well, did you view the prison as**
15 **a setting --- your being a psychologist,**
16 **as a setting where Lisa really was in**
17 **control of the situation and was**
18 **consenting to these things?**
19 A.   First of all, an inmate is not in
20 control of the situation when they were
21 incarcerated. Okay.
22 Q.   **Because I'm trying to understand**
23 **---.**
24 A.   I do believe that Ms. Lisa
25 Lambert was a highly seductive person,

Page 184

1 okay, who had a mission to engage
2 selected male officers in sex with her,
3 yes.
4         ATTORNEY KRAKOFF:
5         Mr. Halloran, this refers
6 to attachments, this exhibit,
7 attachment one through six.
8 Superintendent Wolf's referral, a
9 copy of Lambert's signed
10 statement refusing to allow the
11 taping of her interview, a copy
12 of the housing unit logs, a copy
13 of Lambert's medical incident
14 reports, colored photographs of
15 Lambert, copy of polygraph report
16 for CO to John Raun. Now, I
17 believe that I have received some
18 of this. We had photographs. I
19 don't think they were color, but
20 we received the photocopy of the
21 photographs. I believe we
22 received the copy of housing unit
23 logs. I don't believe that I
24 have a copy of Superintendent
25 Wolf's referral, although I

Page 185

1 might. But I'm quite sure that
2 we don't have a copy of the
3 polygraph report for John Raun.
4 And in any event, I don't need it
5 next week or anything of that
6 sort. But I think that if we do
7 proceed to trial on this, that we
8 should have that whole exhibit as
9 it --- as it originally --- the
10 whole document as it originally
11 was with the attachments. So
12 we're requesting that.
13         ATTORNEY HALLORAN:
14         Your requesting it. Yes.
15 We'll get it for the exhibit.
16         ATTORNEY KRAKOFF:
17         Thank you. And I think
18 for purposes, since I have a
19 photocopy of Lisa's --- when they
20 took pictures of her thigh and
21 that sort of thing, it's a very
22 bad copy. If you have ---
23 somebody probably has the
24 originals and we'll pay for that
25 obviously. But what I'd like

Page 186

1 would be as it was like a clear
2 --- they can do photocopying of
3 ---.
4 A.    That would be in her medical
5 file.
6          ATTORNEY KRAKOFF:
7          Just a clear colored
8 photograph so that we have what
9 it --- basically what it looked
10 like. I'd appreciate that. And
11 that brings to an end this
12 deposition. I don't have any
13 other questions. You might.
14 OFF RECORD DISCUSSION
15 CROSS EXAMINATION
16 BY ATTORNEY HALLORAN:
17 Q.    Ms. Wolfgang, earlier in your
18 deposition you were discussing the
19 procedures followed in your prior
20 employment as it relates to taking notes
21 of interviews with individuals that you
22 were seeing. In those situations, that
23 you generally follow whatever the format
24 was that the employer indicated you
25 should follow?

Page 187

1 A.    Yes, sir.
2 Q.    And when you took your notes
3 regarding interviews with Lisa Lambert
4 that were referred to in Exhibit Ten,
5 were you following what your
6 understanding of the format was generally
7 for interviews that you were conducting?
8 A.    Yes.
9 Q.    And the same format you followed
10 with other inmates you interviewed at
11 that same time?
12 A.    Yes.
13 Q.    Did you also indicate at some
14 point that format changed from being very
15 general, just indicating the date of the
16 meeting, to a format that was more
17 specific as to the events that occurred?
18 A.    Yes, sir.
19 Q.    And as an example of that the
20 notes you took regarding Robin Phillips,
21 which are dated August 24th, 1998?
22 A.    Yes. That's the format that I
23 use routinely now.
24 Q.    In the course of your testimony
25 you indicated that you received

Page 188

1 information from Ms. Lambert that
2 Sergeant Raun was staring at her in the
3 dining room and was stalking her?
4 A.    I don't know if she used the word
5 stalking.
6 Q.    What do you recall that ---?
7 A.    She might have used the word
8 stalking.
9 Q.    What was the actual conduct that
10 she was complaining about?
11 A.    That he was kind of ubiquitous.
12 Everywhere she went he was there.
13 Q.    And later on in your deposition
14 you use the term sexual harassment ---
15 when you used the term sexual harassment,
16 were you specifically referring to the
17 allegations of Ms. Lambert that every
18 time she turned around Raun was there and
19 that he was staring at her in the dining
20 hall?
21 A.    Yeah. And I may have used the
22 term sexual harassment inappropriately.
23 I probably should have stuck to behaviors
24 that she reported.
25 Q.    You also testified regarding the

Page 189

1 time following the allegations made that
2 Sergeant Raun physically assaulted Lisa
3 Lambert in the stairwell and that you had
4 concerns that Lisa Lambert was placed in
5 the RHU, do you recall that?
6 A.    Uh-huh (yes).
7 Q.    Was part of your concern that
8 Superintendent Wolf had overruled what
9 you thought was the decision of Deputy
10 Superintendent Utts and the impact that
11 would have on Lisa Lambert?
12 A.    Yes.
13 Q.    Do you have any reason to doubt
14 the superintendent's concern for
15 Lambert's safety when he placed her in
16 the RHU?
17 A.    No. I think that initially my
18 upset was based on the issue of trust and
19 the trust between Ms. Lambert and myself.
20 And the fact that I had gotten the
21 assurance from Deputy Utts that she
22 wouldn't be locked up and then shortly
23 after that she ended up being locked up
24 and how that may have impacted her trust
25 in me. At the time, I didn't understand

Page 190

1 what I understand now in terms of
2 Superintendent's Wolf rational for making
3 the decision that he made. I do
4 understand very well now his rational for
5 making that decision which was basically
6 about her protection and her safety.
7 **Q.   Earlier in your deposition you**
8 **initially indicated that you were not ---**
9 **or you didn't believe you were**
10 **interviewed by the Office of Professional**
11 **Responsibility.  After reviewing the**
12 **report done by Michael Walanon, does that**
13 **refresh your recollection that you were**
14 **interviewed regarding Lisa Lambert ---**
15 A.   Yes.
16 **Q.   --- and Officer Icker?**
17 A.   Well, obviously ---.
18 **Q.   With regard to Lisa Lambert?**
19 A.   But this is something that I
20 really didn't have any recall of up until
21 just like today.
22 **Q.   And at least according to the**
23 **report you were interviewed on November**
24 **2nd, 1994?**
25 A.   Yes.

Page 191

1 **Q.   You were discussing interviews**
2 **you had with Ms. Vasquez and this one ---**
3 **did you indicate that when she was**
4 **talking to you about the conduct of Mr.**
5 **Miller that initially at least she felt**
6 **that it was a matter that she could take**
7 **care of by herself and she could bring to**
8 **an end?**
9 A.   Yes.
10        ATTORNEY HALLORAN:
11        That's all I have.
12        ATTORNEY KRAKOFF:
13        That ends the deposition.
14 Thank you.  Is she going to read?
15        ATTORNEY HALLORAN:
16        She's going to read.
17 A.   Read.
18
19
20
21
22
23        * * * * * *
24        DEPOSITION CONCLUDED AT 2:45 P.M.
25        * * * * * *