# ATTACHMENT K

## Deposition of Keith Bartlett

1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

LISA LAMBERT,                \*

    Plaintiff           \*   NO.:

        vs               \*   C.A. 96-247-ERIE

SUPERINTENDENT               \*

WILLIAM WOLFE, et.al.,\*

    Defendants           \*

\*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

KEITH R. BARTLETT

JUNE 9, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

## Multi-Page™

Page 2

```
1              DEPOSITION
2                  OF
3   KEITH R. BARTLETT taken on behalf of the
4   Plaintiff herein, pursuant to the Rules
5   of Civil Procedure, taken before me, the
6   undersigned, Shannon C. Hagerty, a Court
7   Reporter and Notary Public in and for the
8   Commonwealth of Pennsylvania, at
9   Commonwealth of Pennsylvania Department
10  of Corrections, SCI-Cambridge Springs,
11  Cambridge Springs, Pennsylvania, on
12  Tuesday, June 9, 1998, at 9:36 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              I N D E X
2
3   WITNESS:  Keith R. Bartlett
4   DIRECT EXAMINATION
5        By Attorney Krakoff       11 - 163
6   CERTIFICATE                     164
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            A P P E A R A N C E S
2
3   ANGUS R. LOVE, ESQUIRE
4   924 Cherry Street
5   Suite 523
6   Philadelphia, PA  19107
7        COUNSEL FOR PLAINTIFF
8
9   JERE KRAKOFF, ESQUIRE
10  1705 Allegheny Building
11  Pittsburgh, PA  15219
12       COUNSEL FOR PLAINTIFF
13
14  THOMAS HALLORAN, ESQUIRE
15  Sr. Deputy Attorney General
16  Litigation Section
17  6th Floor - Manor Company
18  564 Forbes Avenue
19  Pittsburgh, PA  15219
20       COUNSEL FOR DEFENDANTS
21
22  ALSO PRESENT: Deputy Victoria L. Kormanic
23
24
25
```

Page 5

```
1          E X H I B I T   P A G E
2
3                              PAGE
4   NUMBER    DESCRIPTION      IDENTIFIED
5              NONE MARKED
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1        O B J E C T I O N   P A G E
 2
 3   ATTORNEY              PAGE
 4   Halloran          24, 38, 61, 75, 78,
 5                     79, 90, 94, 97, 107,
 6                     109, 120, 121, 129,
 7                     130, 144, 147, 149,
 8                     159
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

1    PROCEEDINGS
2  ----------------------------------------
3  KEITH R. BARTLETT, HAVING FIRST BEEN DULY
4  SWORN, TESTIFIED AS FOLLOWS:
5  ----------------------------------------
6        ATTORNEY KRAKOFF:
7            Before I begin the
8  examination of Lieutenant
9  Bartlett I'd like to note that we
10 have two volumes of deposition
11 exhibits. Many of which I'm
12 going to question the Lieutenant
13 and later Captain Lazenby about.
14 Virtually all of these documents
15 have been obtained in the course
16 of pre-trial discovery, in
17 response to the Request for
18 Production of Documents.
19            The first set of
20 depositions that we took was
21 ironically approximately a year
22 ago, a little bit more than a
23 year ago in June of 1997. At
24 that point, the depositions were
25 taken within the frame work of

Page 8

1  Lambert versus Wolfe. As you may
2  recall, there had been an order
3  of court which stayed discovery
4  in the Vasquez case. And the
5  Phillips versus Wolfe had not
6  been filed yet, as Civil Action
7  98-59, Vasquez is 96-429 and
8  Lambert is 96-247.
9            What I'd like to clarify
10 at this point, Mr. Halloran, is
11 that I'm going to be examining
12 the two witnesses today and the
13 witnesses tomorrow within the
14 frame work of the three cases.
15 It seems to me that we don't know
16 how these cases are going to be
17 tried, whether there is going to
18 be a consolidated trial or not.
19 Obviously, we haven't even
20 discussed that and certainly the
21 court hasn't made a decision
22 because it's not been proposed.
23 But it seems to me that
24 logistically, the best course is
25 for us to take these depositions

Page 9

1  within the frame work of the
2  three cases you obviously are
3  reserving your objections on
4  relevance and other grounds,
5  except to as to the form of the
6  question. In these depositions,
7  and certainly some questions that
8  I ask today may or may not have
9  relevance to all three cases.
10 And I understand that. Does that
11 meet with your approval?
12           ATTORNEY HALLORAN:
13            We're not waiving ---
14 we're not taking any position at
15 this point on whether the cases
16 should be consolidated. And if
17 you choose to proceed in this
18 manner, it will be your
19 obligation, should the cases not
20 be consolidated to be able to
21 sever the document to make it
22 relevant to whatever it's used
23 in. And with that understanding,
24 I have no objection to the
25 questions on all three cases.

Page 10

1    ATTORNEY KRAKOFF:
2         Otherwise, we're looking
3 at a title page perhaps, separate
4 title page for all three and then
5 replicating the deposition
6 transcripts which can be an
7 expense. And certainly not an
8 efficient way to proceed.
9    ATTORNEY HALLORAN:
10        In light of that, it
11 might be more efficient to at
12 least carve the questions with
13 regard to each case, as much as
14 possible.
15    ATTORNEY KRAKOFF:
16        Obviously, it's our
17 position that a lot of the
18 historical questions about
19 investigations of other
20 allegations of sexual abuse or
21 sexual exploitation may be
22 relevant to all three cases.
23 Obviously, that's something
24 that's going to be decided down
25 the road.

Page 11

1 DIRECT EXAMINATION
2 BY ATTORNEY KRAKOFF:
3 Q.   You're Lieutenant Bartlett?
4 A.   Yes, sir.
5 Q.   What is your full name, sir?
6 A.   Keith Richard Bartlett.
7 Q.   How old are you?
8 A.   Forty-two (42).
9 Q.   Where are you now employed?
10 A.  SCI-Albion.
11 Q.  And at one point you were
12 employed at SCI-Cambridge Springs; is
13 that correct?
14 A.  Yes, sir.
15 Q.  By the way, when I --- in the
16 future I'm probably not going to say SCI-
17 Cambridge Springs. I'm going to refer to
18 it as simply as Cambridge Springs, so
19 that you understand.
20      When did you begin working at
21 Cambridge Springs and when did you last
22 work at Cambridge Springs?
23 A.  I came to Cambridge Springs the
24 first week of May 1992, and I was here
25 until the last week of July 1997.

Page 12

1 Q.   When you came, what was your job
2 position?
3 A.   I was a lieutenant.
4 Q.   Did you have a specific area of
5 responsibility as a lieutenant?
6 A.   Many areas of responsibility,
7 when we first opened up. I was shift
8 commander, as well as emergency
9 preparedness coordinator, the security
10 lieutenant and any other little odds.
11 These were all jobs that we all had to do
12 to get the place opened.
13 Q.   Were you here before inmates
14 actually ---?
15 A.   No, there was already somewhere
16 between 50 and 70 inmates.
17    ATTORNEY KRAKOFF:
18        I think what he probably
19 told you was to wait for me to
20 finish the question. That's hard
21 to do sometimes.
22 BY ATTORNEY KRAKOFF:
23 Q.   Did the inmates come in stages?
24 A.   Yes, sir.
25 Q.   Eventually, the Zenith was

Page 13

1 reached. The maximum population in the
2 prison? The high point was reached?
3 A.   Yeah, I would say better what
4 would be a high point. I don't think we
5 ever really got to our maximum because of
6 different phases of construction.
7 Q.   What was the high point and when
8 was that high point reached?
9 A.   I really can't recall, sir.
10 Q.  Was it in excess of 500 inmates?
11 A.  Yeah, I do believe we did go over
12 500 to a point.
13 Q.  Now, at some point you became a
14 captain; is that correct?
15 A.  Yes, sir.
16 Q.  And that's why you were at
17 Cambridge Springs?
18 A.  Yes, sir.
19 Q.  And what was --- you were the
20 captain of intelligence; is that correct
21 or the intelligence captain, at some
22 point?
23 A.  Yeah, when I first was promoted
24 to captain, I was the intelligence
25 captain.

Page 14

1 Q. And when did you become the
2 intelligence captain?
3 A. That would have been December of
4 '93.
5 Q. How long did you hold that
6 position?
7 A. Until approximately March of '95.
8 Q. Without going into detail because
9 we're going to touch upon that later,
10 what happened in March of 1995?
11 A. My duties were changed from
12 intelligence captain to captain of the
13 guard.
14 Q. Were you told why you were being
15 relieved of your --- I shouldn't use the
16 word relieved, that has a charge. Were
17 you told why your position was being
18 changed from intelligence captain to
19 captain of the guard?
20 A. No, sir.
21 Q. Did you draw any inferences or
22 reach any conclusions as to why the
23 change was made in your position?
24 A. No, sir.
25 Q. And you eventually left Cambridge

Page 15

1 Springs and went to Albion in 1997;
2 correct?
3 A. Yes, sir.
4 Q. What was your position when you
5 left Cambridge Springs, what was your
6 rank?
7 A. Lieutenant.
8 Q. And that had been the result of
9 some disciplinary action that had been
10 taken against you; is that correct?
11 A. Yes, sir.
12 Q. Now, when you were working as the
13 intelligence captain, were there any
14 other officers who were assigned to work
15 on intelligence matters on more or less a
16 permanent basis? Did you have other
17 officers who were on some sort of an
18 intelligent staff?
19 A. I wouldn't say they were on
20 staff. There was other staff that used
21 to assist me.
22 Q. Who were the officers who you
23 used to assist you generally?
24 A. Usually Lieutenant Scott or
25 Lieutenant Beck.

Page 16

1 Q. And did you begin using both
2 Lieutenant Scott and Lieutenant Beck back
3 in December of 1993, when you became the
4 intelligence captain?
5 A. Actually sir, I used them prior
6 to that because I was in the capacity ---
7 I was a lieutenant prior to that and I
8 was doing the intelligence job as a
9 lieutenant.
10 Q. Was there a captain over you who
11 was functioning as an intelligence
12 captain?
13 A. Not at that point, no sir.
14 Q. So while you were a lieutenant
15 before you became the intelligence
16 captain, you were essentially the highest
17 ranking officer responsible for
18 intelligence in the institution?
19 A. Actually, that would be the
20 superintendent. He would delegate to me
21 and as far as actually ---.
22 Q. What I was referring to Officer
23 --- I wasn't clear enough perhaps. What
24 I meant was, I was distinguishing that
25 from administrative staff. Uniformed

Page 17

1 officer. You were the highest rank ---
2 A. Yes.
3 Q. --- uniform officer responsible
4 for intelligence matters?
5 A. Yes.
6 Q. And when did you become
7 functioning as the lieutenant in the area
8 of intelligence?
9 A. Pretty much from when I first
10 came here, sir.
11 Q. In the Spring of 1992?
12 A. Uh-huh (yes).
13 Q. Where have you worked before
14 coming to Cambridge Springs, anywhere
15 within ---?
16 A. Yeah, the State Regional
17 Correctional Facility at Mercer and prior
18 to that SCI-Camp Hill.
19 Q. Had your responsibilities at
20 either of those institutions concerned
21 intelligent matters?
22 A. No, sir.
23 Q. What training did you receive, if
24 any, prior to assuming your duties first
25 as a lieutenant responsible for

Page 18

1 intelligence and then the intelligence
2 captain; did you receive any training?
3 A.    Prior to assuming those duties?
4 Q.    That's right.
5 A.    None.
6 Q.    After assuming the duty --- your
7 duties as lieutenant responsible for
8 intelligence, did you receive any
9 training?
10 A.    I can't recall the exact date,
11 when I went to the training.  I can't
12 recall if I was already a captain or if
13 it was while a was lieutenant, I did go
14 to some training, at some point.
15 Q.    So I take it that might have been
16 in the latter part of the time that you
17 were a lieutenant or at the early stages,
18 when you became captain?
19 A.    Yes, sir.
20 Q.    And what did that training
21 consist of?  Where did you have it?
22 A.    There was various training.
23 There was interviewing and interrogation
24 techniques.  Crime scene investigations.
25 There was varied things that was usually

Page 19

1 either down at the training academy in
2 Elizabethtown.  Sometimes it was at
3 different institutions.  I can recall
4 going to SCI-Somerset, where we met at a
5 conference room at a motel, outside of
6 --- I can't think of the name of the
7 town, now.  Down in the general
8 Harrisburg area.  Camp Hill area, but it
9 was ---.
10 Q.    Some other town?
11 A.    Yeah, some other town.  I can't
12 remember the name of the town, now.  But
13 there was a hotel conference room we
14 utilized.
15 Q.    If you put all of your hours of
16 training together in eight hour segments,
17 calling that a day.  If you put all those
18 together, how many days of training did
19 you receive when you first --- by the
20 time --- in your early stages of you
21 being the captain?
22 A.    It's hard to say.  We had one
23 class on the interviewing interrogation
24 techniques, which was not even quite a
25 full eight hours.  And then it was a year

Page 20

1 or so later, where they developed that we
2 went into a full course, which was I
3 believe three or four days, at that
4 point.  It's hard to put everything
5 together into exactly how many hours.
6 Q.    So you received four or five days
7 worth of training in interview
8 techniques?
9 A.    Yes, sir.
10 Q.    What other training did you
11 receive?  You said something about crime
12 scene.
13 A.    There was crime scene
14 investigations, yes.
15 Q.    How many hours of that?
16 A.    I can't recall.
17 Q.    Was it a day?
18 A.    It was at least a day.  That was
19 when we were at Somerset.  There was
20 fingerprinting and crime scene
21 investigation.
22 Q.    Didn't any other areas of
23 training come to mind, that you received?
24 And I'm not limiting that to when you
25 first assumed the duties.

Page 21

1 A.    I'm trying to remember off the
2 top of my head because there was so much
3 that we --- I remember we had to enter an
4 agency training down at the academy where
5 we had other law enforcement agencies
6 there as well.
7 Q.    Yes.
8 A.    There was a cadria (phonetic) of
9 different things there and I, you know,
10 can't recall all of it.
11 Q.    Did you feel comfortable that you
12 were equipped to adequately conduct
13 intelligence interviews?
14 A.    Yes, sir.
15 Q.    Now, what are your respons ---
16 what were your responsibilities as the
17 intelligence captain and I'm including in
18 at the time period that you were the
19 intelligence lieutenant; what were your
20 responsibilities?
21 A.    To conduct any internal
22 investigations assigned to me the
23 superintendent.  To oversee and direct
24 the searches of the entire institution.
25 To maintain the random urine screen

Page 22

1 testing procedures. Direct the search
2 team. I'm sure there's more duties than
3 that involved but those are the main
4 ones.
5 Q.   Prime duties. Were they the
6 primary duties?
7 A.   Yes.
8 Q.   And the first on the list that
9 you mentioned was conducting any
10 investigations assigned by the
11 superintendent. Did anybody else either
12 at the institutional level, meaning
13 Cambridge Springs or at the central
14 office level, and by that I mean, the
15 commissioner's office or the office of
16 special investigations. Did anybody else
17 have the authority to assign
18 investigation for you to conduct?
19 A.   You mean in absence of the
20 superintendent, Deputy Kormanic would
21 have that capacity.
22 Q.   Where did most of the orders to
23 conduct an investigation occur from on
24 the institutional level?
25 A.   From the superintendent.

Page 23

1 Q.   Now, could you be ordered to
2 conduct an investigation by the
3 commissioner?
4 A.   Through the superintendent, yes.
5 Q.   So it would be through the chain
6 of command?
7 A.   Yes, sir.
8 Q.   And were there any occasions when
9 you were told by the superintendent that
10 this investigation was at the request or
11 the direction of the commissioner?
12 A.   I can't recall the specifics.
13 Usually when we got orders from the
14 central office, it was through, at that
15 time it was called the Special
16 Investigations Office and now it's OPR.
17 Q.   What does OPR stand for?
18 A.   Office of Professional
19 Responsibility. They change the --- same
20 job different title.
21 Q.   Were there occasions when you
22 were told by the superintendent that this
23 investigation that you were to conduct
24 was at the request or order of the office
25 of special investigation?

Page 24

1 A.   I can't recall if I was ordered
2 directly at their order or not, sir.
3 Q.   Now, did your responsibilities in
4 the context of investigations, include
5 the investigation of possible misconduct
6 on the part of prison personnel, in their
7 dealings with Cambridge Springs inmates?
8 A.   Most definitely, yes.
9 Q.   And did the training that you
10 referred to previously, to any extent,
11 address the issue of investigating
12 possible misconduct by prison personnel
13 against inmates?
14       ATTORNEY HALLORAN:
15             I'm going to object to
16 that form of the question, as
17 being without foundation. Just
18 seems the training he already
19 received didn't include that.
20       ATTORNEY KRAKOFF:
21             Well, I'm asking him
22 whether it did.
23 BY ATTORNEY KRAKOFF:
24 Q.   Let me draw distinctions, so that
25 you understand why I'm asking that

Page 25

1 question. It seems to me the one area of
2 possible investigation would be
3 investigating inmate-on-inmate acts of
4 misconduct. Where one inmate does
5 something to another inmate would I be
6 fair in saying that?
7 A.   Yes.
8 Q.   I take it that in another area of
9 investigation might involve allegations
10 of an inmate engaging in misconduct
11 against a member of the staff. An
12 assault or threat or something of that
13 sort. Am I correct in that assumption?
14 A.   Yes, sir.
15 Q.   And then it seems to me the third
16 area of investigation might be a
17 situation where there are allegations or
18 suggestions or rumors, that a member of
19 the staff has engaged in some form of
20 misconduct against an inmate. Am I
21 correct on that score?
22 A.   Yes, sir.
23 Q.   And I take it that in your --- in
24 the course of your investigations that
25 you investigated at one time or another

Multi-Page™

Page 26

1 all three of those categories?
2 A.   Pretty much yes, sir.
3 Q.   And the question I'm going to ask
4 you is did you receive training with
5 respect the third category that I
6 mentioned. The situation where there's
7 an allegation or a suggestion that a
8 member of the staff has engaged in
9 misconduct against an inmate?
10 A.   Not specifically for that no,
11 sir.
12 Q.   Now, as you may be aware from the
13 complaints that were filed against you,
14 you're a party to this lawsuit, you're
15 aware of that?
16 A.   Yes, sir.
17 Q.   And you're aware that there are
18 actually three lawsuits involving this
19 case. One brought by Lisa Lambert; is
20 that correct?
21 A.   Yes.
22 Q.   One brought by Sylvia Vasquez?
23 A.   Yes.
24 Q.   And a third by --- are you aware
25 of the lawsuit that was more recently

Page 27

1 brought by Robin Phillips?
2 A.   Not until today, sir.
3 Q.   Now, you're aware that those
4 complaints alleged that prison personnel
5 sexually --- these are the allegations.
6 That the allegations in the complaints
7 that you have seen. The Lambert and the
8 Vasquez alleged that prison personnel
9 sexually exploited and abused those
10 inmates on the grounds of the prison.
11 Are you aware of that fact?
12 A.   Could you repeat that, sir?
13 Q.   Are you aware that the complaints
14 --- you know what a complaint is?
15 A.   Yes.
16 Q.   Filed with the court alleged that
17 specific prison personnel sexually
18 exploited and abused Vasquez and Lambert.
19 They're alleging that aren't they?
20 A.   Yes.
21 Q.   Now, the primary focus of my
22 examination you today, and by the way
23 there is no allegation that you sexually
24 abused any of the prisoners involved in
25 these lawsuits. But what I want to do

Page 28

1 today is to try to reconstruct to the
2 best of your memory, based upon what
3 you've read, what you've heard, what
4 you've observed, what you've been told by
5 members of the staff or inmates. Try to
6 reconstruct situations where there had
7 been allegations of sexual abuse or
8 sexual exploitation against not only the
9 named Plaintiffs, the three women that
10 have brought suit. I'm trying to get a
11 complete picture of what you know about
12 allegations involving other inmates and
13 other prison personnel. We know that ---
14 you know that Eicher, is one of the
15 officers is alleged to have abused Lisa
16 Lambert; aren't you?
17 A.   Yes.
18 Q.   And you're also aware that Martin
19 Miller is alleged to have sexually abused
20 Sylvia Vasquez?
21 A.   Yes.
22 Q.   What I want to do is go beyond
23 Martin Miller. Go beyond Mr. Eicher and
24 find out as much as possible from you,
25 since you were an intelligence officer

Page 29

1 here for a long time.
2       Now, just so that you know what I
3 mean because I've used the expression
4 sexual abuse, sexual exploitation. Those
5 words may mean different things to
6 different people. So that you're clear
7 of what I mean when I use those words,
8 I'm going to define those terms for you.
9 And if you forget what those terms mean,
10 just ask me and I'll repeat it or if you
11 don't understand it the first time I give
12 you the definition; is that understood?
13 A.   Yes, sir.
14 Q.   Here's what I mean by sexual
15 abuse or exploitation. It encompasses
16 such activities as the touching of
17 breasts, buttocks, legs and other private
18 parts. The kissing, caressing or
19 fondling of inmates by members of the
20 staff and attempts by prison personnel to
21 force or encourage inmates to engage in
22 sexual acts, either by words, threats or
23 physical force. You understand that?
24 A.   Uh-huh (yes).
25 Q.   You have to say yes or no.

Page 30

1 A.   Yes. Sorry.

2 Q.   **Now, I assume and I would like**
3 **for you to correct me if I'm mistaken.**
4 **Since you're no longer employed at**
5 **Cambridge Springs, that you haven't**
6 **brought any investigative files or other**
7 **documents that were generated here at**
8 **Cambridge Springs with you today; is that**
9 **correct?**

10 A.   That is correct.

11 Q.   **Have you reviewed any**
12 **investigative files or other documents to**
13 **assist you in the preparation of this**
14 **deposition today?**

15 A.   Yes, I have.

16 Q.   **What documents or files did you**
17 **review?**

18 A.   There's a time line on the Lisa
19 Lambert investigation and my initial
20 investigation on her and Officer Eicher.

21 Q.   **Any other documents?**

22 A.   Not that I can recall, no.

23 Q.   **Have you read any portions of the**
24 **transcripts --- that of the depositions**
25 **that I took last year? I believe that**

Page 31

1 **you were present during most, if not all**
2 **of the depositions of Superintendent**
3 **Wolfe and Deputy Superintendent Kormanic.**
4 **Have you reviewed any of those**
5 **transcripts in preparation for the**
6 **deposition today?**

7 A.   No, sir I have not.

8 Q.   **Now, is it accurate to say that**
9 **investigations about alleged sexual abuse**
10 **or exploitation by staff members against**
11 **inmates can be conducted either on the**
12 **institutional level by Cambridge Springs**
13 **staff or by the central office or by a**
14 **combination of central office and**
15 **Cambridge Springs staff members; would**
16 **that be accurate?**

17 A.   Yes, sir.

18 Q.   **Now, do you know who makes the**
19 **determination as to whether a particular**
20 **investigation into allegations of sexual**
21 **abuse or exploitation will occur at the**
22 **--- will be conducted by members of the**
23 **staff, by members of the central office**
24 **with the Office of Special Investigation,**
25 **do you know who makes that decision?**

Page 32

1 A.   I'm not sure I quite fully
2 understand you. Do you want me to
3 differentiate between institutional
4 investigation and central office
5 investigation?

6 Q.   Yes, I was going to get to that
7 next. But my first question was, do you
8 know who decides yes, this will be
9 conducted strictly or solely by
10 institutional staff or no, I want this to
11 be conducted by the Office of Special
12 Investigation?

13 A.   Yes, sir.

14 Q.   And who makes that decision?

15 A.   Between the superintendent and
16 the commissioner and the director of OPR.

17 Q.   Which used to be the Office of
18 Special Investigation?

19 A.   Right.

20 Q.   Now, during --- as a result of
21 your experiences as the intelligence
22 captain at this institution, were you
23 able to determine either a difference in
24 techniques or a difference in
25 thoroughness between investigations

Page 33

1 conducted on the institutional level,
2 investigations conducted by the Office of
3 Special Investigations?

4 A.   Speaking personally for myself?

5 Q.   Yes.

6 A.   Yes, because the investigators I
7 worked with are highly trained
8 professionals, that's what they strictly
9 do for a living. And they know right
10 away exactly how --- they're trained in
11 different techniques. I only had so many
12 days of training on that where they have
13 continuous training. That's their area
14 of expertise.

15 Q.   When you say they, you mean the
16 Office of Special Investigation?

17 A.   Yes, sir.

18 Q.   Now, was it your perception then
19 that the thoroughness of the
20 investigations conducted by the central
21 office was greater as a rule than the
22 thoroughness of investigations conducted
23 on the institutional level? Because of
24 the fact the people in the central office
25 were trained and specialized in

Page 34

1 investigations.
2 A.   I don't know if I want to go that
3 far. I know investigations that we
4 handled at a local level, I was as
5 thorough as I could possibly be. And I
6 felt that I did my job to the utmost of
7 my ability.
8 Q.   Right.
9 A.   Where as investigations that were
10 assigned to SIO or OPR, whatever you want
11 to call it. They were done definitely
12 more thoroughly than I could do. But the
13 ones I did on my own, I did to the best
14 of my capability.
15 Q.   Was there a difference that you
16 were able to determine between the
17 techniques that were utilized by you and
18 members of the Cambridge Springs Security
19 Staff and by members of the Office of
20 Special Investigations? Differences in
21 techniques I'm asking about.
22 A.   That would be hard for me to
23 determine because when they did their
24 interviewing nobody else was in the room.
25 I might be out in the hallway or in

Page 35

1 another office close by. But they didn't
2 have us --- unless they needed something
3 specific, we weren't in there.
4 Q.   Do you know why that was the
5 case? Did anybody ever tell you?
6 A.   No.
7 Q.   Were you given notes of the
8 interviews conducted by the Office of
9 Special Investigation?
10 A.   No, sir.
11 Q.   So I take it that you didn't know
12 what the --- what information they
13 obtained in the course of an interview
14 unless and until the Office of Special
15 Investigation issued a report in
16 conjunction with the investigation; is
17 that fair to say?
18 A.   Yes, for the most part, yes.
19 Q.   Now, did that occur namely that
20 you being outside of the interview room
21 when OSI investigators were conducting
22 investigations, did that occur not only
23 when OCI was solely conducting an
24 investigation, did that also occur when
25 you were, meaning you and members of your

Page 36

1 Cambridge Springs staff were assisting
2 OSI in an investigation. Did I confuse
3 you?
4 A.   Yes, you did.
5 Q.   You acknowledged earlier that
6 some investigations of sexual abuse or
7 exploitations were conducted exclusively
8 only by the Office of Special
9 Investigation staff; is that correct?
10 A.   Yes, sir.
11 Q.   And then there were other
12 investigations where you, meaning you and
13 your local staff, lent assistance to the
14 Office of Special Investigations; is that
15 correct?
16 A.   Let me straighten that out.
17 Q.   Sure.
18 A.   Even in the ones where they ---
19 whenever they're involved they are more
20 or less exclusive --- I was more a less
21 an assistant to them, in the fact, that
22 if they needed records pulled, if they
23 needed witnesses called over. I was
24 there to direct. I was an institutional
25 liaison for them. So even when they were

Page 37

1 working strictly on their own, there was
2 never a time when I was really working in
3 the interrogation room with them or
4 anything like that.
5 Q.   Or even outside the
6 interrogation?
7 A.   Yeah, I was the institutional
8 liaison, is the best way to say my
9 position with them, when they were there.
10 Q.   Now, after becoming the security
11 lieutenant, I take it that you had an
12 occasion to participate in investigating
13 alleged or possible sexual abuse or
14 exploitation by an inmate on the part of
15 the Cambridge Springs staff member; is
16 that accurate?
17 A.   Yes.
18 Q.   And what I'd like you to do now
19 is to sit, think as carefully as you can
20 and identify for me, every investigation
21 that you can recall involving allegations
22 of possible sexual abuse or exploitation
23 by Cambridge Spring staff member against
24 a Cambridge Spring inmate. And when I
25 say staff member, I'm including members

Page 38

1 of the administration, I'm including
2 correctional officers. I'm also
3 including members of the maintenance
4 staff and the trade staff. You
5 understand?
6 A.   Yes, sir.
7 Q.   So very carefully and as
8 completely as possible, I'm not going to
9 ask you right off the bat the detail of
10 what those investigations, the specifics,
11 but I'd like you to identify each one you
12 can recall.
13 A.   I would say ---
14        ATTORNEY HALLORAN:
15              Let me object to the form
16 of the question, to the extent
17 that obviously he may not recall
18 all the investigations.
19        ATTORNEY KRAKOFF:
20              I understand that.
21 A.   I would say the Eicher, Lambert
22 investigation, Sargent Merry and the
23 inmate's last name was Maysonet. I can't
24 remember what her first name was. There
25 was two sisters and I can't remember

Page 39

1 which one it was. The last name is
2 Maysonet. I'm at a blank on the other
3 ones.
4 Q.   Okay.
5 A.   I need something to refresh my
6 memory.
7 Q.   Yes, let me give you some names.
8 First, we're going to --- I want to
9 explore with you every investigation of
10 allegations against these people that I
11 will identify them. Then I want --- and
12 by the way, let me broaden that somewhat
13 to include investigations that you're
14 aware of the Office of Special
15 Investigation conducting on these
16 individuals; okay? Not just you in other
17 words, because I originally asked you
18 about yourself. We're going to broaden
19 that a bit to include investigations that
20 were conducted by the Office of Special
21 Investigation. And then after we review
22 that, I'm going to --- because this is
23 part of discovery, I'm going to want to
24 extend it even further and ask you about
25 allegations that you became aware of as a

Page 40

1 result of that were not investigated as
2 such. No investigation was open but you
3 were aware of some allegations or rumors
4 involving these people. But let's focus
5 on the first issue. Carl Zimmerman. Do
6 you recall who Carl Zimmerman was?
7 A.   Yeah, yes, he was our facility
8 maintenance manager.
9 Q.   And do you remember his being
10 investigated either at Cambridge Springs
11 or by the Office of Special
12 Investigation?
13 A.   Yes, sir.
14 Q.   Which --- where did the
15 investigation occur?
16 A.   I believe that was done by
17 Special Investigations.
18 Q.   Do you believe that there was a
19 document that was generated --- a report
20 that was generated on Mr. Zimmerman?
21 A.   Yes, sir.
22 Q.   Did you see such a report?
23 A.   I probably did. I can't recall
24 all of it. I'm sure I did.
25 Q.   I haven't received anything in

Page 41

1 connection with Mr. Zimmerman.
2        ATTORNEY KRAKOFF:
3              And I'm going to ask you
4 Mr. Halloran, if you could follow
5 that up and get that to me, if
6 you can locate it.
7 BY ATTORNEY KRAKOFF:
8 Q.   Do you recall that the
9 investigation of Carl Zimmerman involved
10 a woman by the name of Lisa Gunnarson or
11 a name like that?
12 A.   Yes.
13 Q.   And do you recall what Carl
14 Zimmerman, what his involvement or
15 relationship involved --- allegedly
16 involved with Lisa Gunnarson?
17 A.   I can't recall all the specifics,
18 but vaguely.
19 Q.   Tell me what you recall.
20 A.   More his --- specifically wasn't
21 intimate I believe it was more of
22 hugging, kissing type of involvement.
23 Q.   Fondling?
24 A.   I was not --- if I remember
25 correctly, I was not directly involved

Multi-Page™

Page 42

1  with that investigation.

2  Q.  Do you know what --- whether Mr.

3  Zimmerman was investigated for alleged

4  sexual abuse or exploitation with any

5  inmates, in addition to Lisa Gunnarson?

6  A.  I believe there were a couple of

7  other inmates involved with that

8  investigation.

9  Q.  You remember what their names

10  were?

11  A.  Not off the top of my head, no.

12  Q.  What --- were they white or

13  black; do you recall?

14  A.  I know Lisa Gunnarson was white.

15  I can't --- I really can't recall, sir.

16  Q.  And do you know what became of

17  Mr. Zimmerman?

18  A.  He resigned.

19  Q.  And do you recall approximately

20  when that occurred?

21  A.  I can't remember the date on

22  that. No, sir.

23  Q.  Well, was it during the early

24  years that you were here, '92, '93, '94?

25  A.  It was somewhere around '94,

Page 43

1  somewhere around in there.

2  Q.  Was it before the Lisa

3  Lambert/Eicher investigation was

4  launched?

5  A.  I can't really recall, sir.  I

6  can't remember if they coincided or if

7  they were separate.  If --- I can't

8  remember the time frame on that.  I know

9  the Lisa/Eicher one was early on and it

10  started somewhere in '93, somewhere

11  around in there.

12  Q.  Now, do you recall whether any

13  announcement was made in conjunction with

14  Zimmerman's resignation, an announcement

15  made to the staff as to the general

16  circumstances that led to his

17  resignation?

18  A.  I can't recall that. No, sir.

19  Q.  You can't recall an announcement

20  from Superintendent Wolfe or others at

21  the prison or the central office saying

22  in effect that Mr. Zimmerman had resigned

23  as a result of allegations that he had

24  been involved with members of the inmate

25  community; is that right?

Page 44

1  A.  To me personally or as ---

2  Q.  No, to the staff?

3  A.  Not to the staff that I'm aware

4  of, sir.

5  Q.  Do you know whether there is a

6  policy one way or another.  When I say

7  is, I mean going back to the time you

8  came here, to the time you left.  Was

9  there a policy or practice in connection

10  with whether the administration would

11  announce when a member of the staff was

12  resigning in conjunction with allegations

13  of sexual abuse or exploitation of

14  inmates?

15  A.  Not that I'm aware of, sir.

16  Q.  You're not aware of a policy one

17  way or another?

18  A.  No, sir.

19  Q.  Or a practice one way or the

20  other?

21  A.  No, sir.

22  Q.  Can you ever recall a situation

23  where a member of the staff either

24  resigned or was fired in connection with

25  allegations of sexual abuse or sexual

Page 45

1  exploitation of inmates and it was

2  explicitly announced to members of the

3  staff this is why this is occurring?  We

4  won't tolerate abuse or words to that

5  effect.

6  A.  Yes, I can't remember the

7  specifics.  But I --- from my

8  recollection I don't believe we named

9  names.

10  Q.  Uh-huh (yes).

11  A.  Because I don't believe that

12  would be appropriate.  But in trying to

13  get things in order, we were definitely

14  highlighting that type of behavior in

15  letting staff know that this was not

16  appropriate.  I know there was memos

17  generated and to let staff know, and I

18  know it's part of our security

19  orientation, when new staff were hired to

20  be very specific with them.

21  Q.  Now, who generated these ---

22      ATTORNEY HALLORAN:

23          Let him finish his

24  answer.

25      ATTORNEY KRAKOFF:

Page 46

1        Oh, I thought he had.
2   I'm sorry.
3   A.   Yeah, I'm done.
4   BY ATTORNEY KRAKOFF:
5   Q.   Do you recall who under who's
6   name the memos were issued?
7   A.   I believe either Deputy Kormanic
8   or the superintendent.
9   Q.   Did those memos say the
10  administration wouldn't tolerate acts of
11  sexual abuse or exploitation or did they
12  also say that sexual abuse and
13  exploitation was occurring at the prison?
14  A.   My recollection was it would not
15  be tolerated. I don't believe it went
16  into specifics that it was already
17  occurring at the institution. But it was
18  pretty much known by the staff.
19  Q.   Do you recall an investigation
20  associated with Paul Walton?
21  A.   Yes, sir.
22  Q.   And that involved an inmate by
23  the name of Emma Gleckal (phonetic); is
24  that correct?
25  A.   Yes, sir.

Page 47

1   Q.   And who was Mr. Walton? What was
2   his position?
3   A.   He was a food service supervisor
4   or instructor. One of the two. He
5   worked in the Food Service Department.
6   Q.   And Emma Gleckal was working in
7   his department as an inmate worker; isn't
8   that right?
9   A.   Yes, sir.
10  Q.   And do you recall what the sexual
11  abuse or exploitation involved in that
12  issue concerned?
13  A.   Yes, sir.
14  Q.   What was it?
15  A.   There was alleged oral sex
16  involved in that.
17  Q.   Kissing?
18  A.   I can't recall the kissing.
19  Again, I was not --- I was involved in
20  that investigation but it was conducted
21  by SOI.
22  Q.   What was your involvement in this
23  investigation?
24  A.   Again, as institutional liaison.
25  Q.   You didn't interview anybody; is

Page 48

1   that correct?
2   A.   I don't believe I did, sir.
3   Q.   And were any other inmates
4   identified as having been subjected to
5   sexual abuse or exploitation by Mr.
6   Walton?
7   A.   From my recollection it was just
8   Emma.
9   Q.   Now, James Eicher you mentioned
10  already in connection with Lisa Lambert.
11  What about in connection with Paula
12  Hoover? Was there an investigation of
13  that?
14  A.   I can't recall was there an
15  investigation or a fact finding.
16  Something rings a bell. Paula Hoover was
17  one of our veteran inmates from my
18  recollection. I know I disciplined her
19  once myself. And I can't recall if there
20  was a specific investigation with Eicher
21  and Paula Hoover.
22  Q.   Were there allegations that Paula
23  Hoover --- that James Eicher was involved
24  in sexual abuse or exploitation of Paula
25  Hoover?

Page 49

1   A.   I can't recall that specifically,
2   sir.
3   Q.   Elizabeth Jones, was James Eicher
4   investigated in connection with sexual
5   misconduct in relation to Elizabeth
6   Jones?
7   A.   I believe there was some sort of
8   investigation. I can't remember if it
9   was sexual in nature or not.
10  Q.   Had you heard or read anything
11  alleging that Eicher had been involved
12  sexual misconduct in connection with
13  Elizabeth Jones?
14  A.   I think I just answered that. I
15  don't believe so. I can't recall.
16  Q.   Now, what about the Maysonet
17  sisters. Do you know whether or not
18  James Eicher was ever investigated for
19  sexual misconduct in connection with the
20  Maysonet sisters?
21  A.   I don't recall with the Maysonet
22  sisters. I remember Jim Merry.
23  Q.   Do you recall any rumors or
24  allegations that Eicher had been involved
25  in sexual misconduct toward the Maysonet

Page 50

1 sisters?
2 A.   Not that I can recall.
3 Q.   And that is either of the
4 Maysonet sisters?
5 A.   Correct.
6 Q.   Not that you can recall; is that
7 correct?
8 A.   Yes.
9 Q.   Jim Merry, was there an
10 investigation of sexual misconduct on the
11 part of Jim Merry?
12 A.   Yes, sir.
13 Q.   And what was Jim Merry's position
14 on the staff?  Was he a corrections
15 officer?
16 A.   He was a corrections officer,
17 too.  He was a sergeant.
18 Q.   And what did that investigation
19 involve?  What inmates?
20 A.   That was --- I believe was
21 strictly with one of the Maysonet
22 sisters.  I can't remember which one.  I
23 can't remember either one.
24 Q.   Elizabeth?
25 A.   Elizabeth, was one of them.  I

Page 51

1 don't even remember the ones name.  I
2 can't remember which one specifically it
3 was.
4 Q.   Now, what about Carmella Vienam
5 (phonetic)?  Was Sergeant Merry
6 investigated for sexual misconduct toward
7 Carmella Vienam?
8 A.   Her name is familiar but I can't
9 recall whether it was a specific
10 investigation involving the two of them.
11 Q.   What about allegations?  Did you
12 hear allegations about them?
13 A.   I really can't recall, sir.
14 Q.   Roger Beck, what was his position
15 in the institution?
16 A.   He was a lieutenant.  Still is a
17 lieutenant here.
18 Q.   And are you aware of any
19 investigation of Roger Beck in connection
20 with allegations with sexual misconduct
21 toward inmates?
22 A.   Not that I recall, sir.
23 Q.   Were you aware of any
24 investigation or allegations that Beck
25 had been involved sexually with, I

Page 52

1 believe her name is Marjoline DeBello
2 (phonetic)?
3 A.   I can't recall, sir.
4 Q.   Jerome Coffee, do you recall any
5 investigation of Jerome Coffee?
6 A.   No, I can't recall anything on
7 Sergeant Coffee.
8 Q.   Had you heard any allegations of
9 sexual misconduct by Coffee against
10 Marita Diaz (phonetic)?
11 A.   Not that I can recall, sir.
12 Q.   Do you know --- does the name
13 Marita Diaz ring a bell?
14 A.   Yeah, Diaz.  That name rings a
15 bell.
16 Q.   Had she been linked in a sexual
17 way according to anything you read or
18 heard with any of the officers?
19 A.   Not that I can recall, sir.
20 Q.   What about Phillip David Schmidt;
21 do you know him?
22 A.   Yes, sir.
23 Q.   What is his position?  What was
24 his position?
25 A.   Corrections officer.

Page 53

1 Q.   And was he investigated as a
2 result of allegations of sexual
3 misconduct toward Lisa Lambert?
4 A.   I don't recall --- I can't
5 remember if it was with Lisa Lambert or
6 not.  I know --- if I remember correctly,
7 there was some type of either a fact
8 finder investigation with Mr. Schmidt but
9 I can't recall the specifics.
10 Q.   You can't recall anything about
11 the specifics?
12 A.   No, sir.
13 Q.   Can you recall that it involved
14 allegations of sexual misconduct toward
15 an inmate?
16 A.   I believe there was that.
17 Q.   Bob Rogers, who is Bob Rogers?
18 A.   Bob Rogers was here as a
19 lieutenant.
20 Q.   Are you aware of any
21 investigation of Lieutenant Rogers in
22 connection with allegations of sexual
23 misconduct toward Lisa Lambert?
24 A.   No, sir.
25 Q.   Toward any other inmate?

Page 54

1 A.   Not that I'm aware of, sir.
2 Q.   Had you heard any rumors or
3 allegations to that effect?
4 A.   No, sir.
5 Q.   Wayne Young, what was his
6 position at the prison?
7 A.   He was a plumbing trades
8 instructor, if I remember correctly.
9 Q.   Are you aware of any
10 investigation being conducted in
11 connection with Wayne Young involving
12 allegations of sexual misconduct toward
13 inmates?
14 A.   I believe there was something
15 there. I can't remember what it was or
16 what the results were.
17 Q.   Did that involve, to the best of
18 your recollection, an inmate by the name
19 of LeAnn Jafka?
20 A.   That name sounds familiar. It's
21 a possibility.
22 Q.   Do you recall an officer by the
23 name of Stone?
24 A.   Yes.
25 Q.   What was his first name?

Page 55

1 A.   Oh, jeez. I don't remember.
2 Q.   What was his rank?
3 A.   He was a corrections officer I.
4 Q.   And do you recall any
5 investigation of Officer Stone in
6 connection with allegations of sexual
7 misconduct toward a Cambridge Spring
8 prisoner?
9 A.   I believe there was inmate
10 Johnson.
11 Q.   Right. Erica Johnson?
12 A.   Yes.
13 Q.   Do you recall what happened as a
14 result of that?
15 A.   I believe there was an
16 investigation and if I remember correctly
17 there was --- it was unfounded. It
18 didn't --- he resigned anyway. He didn't
19 come back to work. He was suspended and
20 then came back to work when the
21 investigation was concluded and then he
22 resigned.
23 Q.   Do you recall what the
24 allegations involved?
25 A.   No, sir, I don't.

Page 56

1 Q.   Harry Stewart, is that name
2 familiar?
3 A.   Yes.
4 Q.   And what was his position?
5 A.   He was the --- I can't remember
6 what the title is. Food service manager
7 in charge of the dietary department.
8 Q.   Was that the same department that
9 Paul Walton had worked in?
10 A.   Yes, sir.
11 Q.   And do you recall Mr. Stewart
12 having been investigated for sexual
13 misconduct toward any Cambridge Spring
14 inmates?
15 A.   I don't recall that, sir.
16 Q.   What about Marjoline DeBello?
17 A.   She worked in food service as an
18 inmate.
19 Q.   But you don't recall any
20 allegations that Mr. Stewart had done
21 something?
22 A.   I don't recall that. No, sir.
23 Q.   John Raun, do you recall any
24 allegations of sexual misconduct on his
25 part?

Page 57

1 A.   Yes, sir.
2 Q.   What inmate or inmates were
3 involved in that investigation?
4 A.   I believe that was with Lisa
5 Lambert.
6 Q.   Any other inmates?
7 A.   Not that I can recall.
8 Q.   Do you recall an officer by the
9 name of Montejo. I believe it's
10 M-O-N-T-E-G-J-O.
11 A.   Yes.
12 Q.   And do you recall his first name?
13 A.   Emmanuel.
14 Q.   What was his rank?
15 A.   He started out here as a trainee
16 and eventually made --- now he's a
17 lieutenant, now. But he made sergeant
18 while I was here.
19 Q.   And do you recall any
20 investigation of Emmanuel Montejo in
21 connection with allegations of sexual
22 misconduct?
23 A.   I think there was something but I
24 can't recall the specifics of that one
25 either.

Page 58

1 Q.   Did that involve Lisa Lambert?
2 A.   I really can't recall, sir.
3 Q.   Phil Free, do you recall any
4 investigation of allegations that he had
5 engaged in sexual misconduct toward an
6 inmate?
7 A.   I believe there was something
8 there with Mr. Free as well.
9 Q.   Do you believe that those were
10 associated with Lisa Lambert and/or
11 inmate LeAnne Jafka?
12 A.   I can't recall the specifics on
13 that case, sir.
14 Q.   Do you recall an employee at
15 Cambridge Springs by the name of Arnold
16 Requine. I'm not sure if I'm pronouncing
17 that correctly. I believe it's
18 R-E-Q-U-I-N-E, who I am told was a
19 laundry supervisor at the prison, at one
20 time.
21 A.   No, that name doesn't sound
22 familiar at all.
23 Q.   What about --- do you recall any
24 investigation regardless of the name of
25 the laundry supervisor at Cambridge

Page 59

1 Springs involving allegations of sexual
2 misconduct toward an inmate?
3 A.   Not that I can recall, sir.
4 Q.   Richard Hammers, do you recall an
5 investigation of Richard Hammers
6 involving allegations of sexual
7 misconduct toward an inmate?
8 A.   Yes, sir, I do.
9 Q.   And what was Mr. Hammers
10 position?
11 A.   He was a trainee. I'm not sure
12 if he completed his training phases as a
13 CO1 or not.
14 Q.   And do you recall who he
15 allegedly had engaged in sexual
16 misconduct with?
17 A.   No, sir, I don't.
18 Q.   What about a person by the name
19 of Randolph, R-A-N-D-O-L-P-H?
20 A.   There's two Randolph's that were
21 here.
22 Q.   Were either of them, while you
23 were here to the best of your knowledge,
24 investigated for sexual misconduct toward
25 an inmate?

Page 60

1 A.   I know Ron Randolph was
2 investigated but I don't believe it was
3 for sexual contact in anyway.
4 Q.   Was he investigated for giving an
5 inmate presents?
6 A.   I can't recall the specifics of
7 the investigation. I wasn't involved in
8 it.
9 Q.   Was giving --- were there ever
10 circumstances where you had heard about
11 either an officer or another staff member
12 bringing in things for inmates.
13 Cigarettes, hosiery, other items.
14 A.   I don't recall that, no, sir.
15 Q.   You don't ever recall any
16 allegations that a staff member had been
17 bringing in gifts for inmates; is that
18 correct?
19 A.   I can't recall that, no, sir.
20 Q.   In the course of your training,
21 were you ever advised that a staff member
22 bringing in gifts for an inmate was a red
23 flag and might indicate that there's a
24 sexual relationship between the staff
25 member and an inmate? The inmate who

Page 61

1 received the gifts.
2 A.   As far as it being a red flag, no
3 sir, not specifically. That's part of
4 our of code of ethics. You don't bring
5 in anything for an inmate.
6 Q.   Right. But did you see --- I
7 won't use the word red flag. Did you ---
8 do you see a relationship between an
9 officer bringing in gifts for an inmate?
10 Do you see a relationship between that
11 and the possibility that that officer is
12 having a sexual relationship with an
13 inmate?
14        ATTORNEY HALLORAN:
15             Let me object to the form
16 of the question. I think that
17 he's testified that the bringing
18 in of gifts in itself is a
19 violation, which could lead to an
20 investigation independent of
21 anything.
22        ATTORNEY KRAKOFF:
23             Right. I understand
24 that.
25 BY ATTORNEY KRAKOFF:

Page 62

1 Q.   Do you see a relationship between
2 or is that irrelevant in your mind?
3 A.    There's the possibility that if I
4 was given an investigation for somebody
5 bringing in gifts for an inmate, that
6 would definitely, in your words, put a
7 red flag up. It would make me curious as
8 to why, you know, that would definitely
9 ---
10 Q.   And in your mind the why could be
11 that there's something sexual going on.
12 Either kissing, hugging, fondling or
13 something more extensive?
14 A.    That would be a possibility.
15 Q.   What about --- is there a
16 Lieutenant Mort? M-O-R-T, I believe it
17 is or ---
18 A.   He's no longer employed.
19 Q.   Do you know whether there was any
20 investigation of Lieutenant Mort for
21 allegations of sexual misconduct toward
22 an inmate?
23 A.   He resigned before the
24 investigation could be started.
25 Q.   And what were the allegations ---

Page 63

1 were there plans to launch an
2 investigation associated with Lieutenant
3 Mort?
4 A.   At that stage we were at a fact
5 finding. I can remember that one. It
6 was alleged that he had kissed an inmate
7 on the cheek.
8 Q.   Okay.
9 A.   I never even got to interview
10 him. He resigned before we could conduct
11 any kind of investigation.
12 Q.   Is the fact finding considered to
13 be part of an investigation?
14 A.   It's a preliminary ---
15 Q.   Okay.
16 A.   --- to see if there is facts or
17 evidence to continue with an
18 investigation.
19 Q.   And the allegation was limited to
20 his kissing an inmate on the cheek and no
21 more extensive?
22 A.   From my recollection, yeah.
23 Q.   What about Officer Jennifer
24 Ledford, do you recall any investigations
25 of Officer Ledford in connection with

Page 64

1 sexual misconduct either toward an inmate
2 who is currently at Cambridge Springs or
3 had been in Cambridge Springs?
4 A.    That was involving an inmate that
5 would have been on parole.
6 Q.   Uh-huh (yes).
7 A.    And there wasn't any sexual
8 allegations in that investigation.
9 Q.   Wasn't there an allegation that
10 she was living with that person?
11 A.   At the time, no.
12 Q.   What were the allegations, just
13 that she was ---
14 A.    There was correspondence. She
15 had meant the inmate. The ex-inmate that
16 she was on parole had met with her ---
17 had that person at her home but was not
18 living there.
19 Q.   On more than one occasion?
20 A.   If I recall, this is one specific
21 occasion.
22 Q.   There were no allegations of a
23 sexual relationship between Officer
24 Ledford and the inmate?
25 A.   No.

Page 65

1 Q.   Is there a rule --- was there a
2 rule --- do you recall approximately when
3 that occurred, what year?
4 A.   With Jennifer, that was early on.
5 Q.   Okay.
6 A.   Well, that was late in our first
7 year in '92.
8 Q.   Did that violate the code of
9 ethics, corresponding with a former
10 inmate?
11 A.   Yes.
12 Q.   And meeting with a former inmate?
13 A.   Yes.
14 Q.   Martin Miller, this --- these
15 lawsuits that I'm taking depositions
16 about involve Vasquez Phillips, but there
17 were others that he was investigated for
18 having engaged in sexual misconduct for;
19 isn't that true? Other than Robin
20 Phillips and Sylvia Vasquez.
21 A.   What was the name of the staff
22 member again, sir?
23 Q.   Martin Miller.
24 A.   Martin Miller.
25 Q.   Were you here when he was being

Page 66

1 investigated?
2 A.   Yes, I was.
3 Q.   And were there allegations that
4 he had engaged in sexual misconduct
5 toward some inmates?
6 A.   Yes, there was.
7 Q.   And do you recall the names of
8 the inmates?
9 A.   You just mentioned one, Vasquez.
10 Other than that, I can't recall any
11 other.
12 Q.   What about Pehlman?
13 A.   Yeah, she --- I remember from the
14 court proceedings that Pehlman was part
15 of the case.
16 Q.   There were four women weren't
17 there?
18 A.   I can't recall how many were
19 involved in that, sir. Again, that part
20 of that investigation was handled by SOI.
21 I had investigated Mr. Miller prior to
22 that investigation.
23 Q.   Right. How many times was ---
24 how many investigations were conducted of
25 Martin Miller during the time that you

Page 67

1 were here?
2 A.   I can recall two. The one I did
3 and the one that the Office of
4 Investigations did.
5 Q.   Do you recall the one that you
6 did?
7 A.   Yeah.
8 Q.   What were the allegations?
9 A.   That he had --- there was an
10 inmate sitting in a chair up in the Day
11 Room in Luder Hall and he had come up
12 behind her and was massaging her neck and
13 kind of gave her like a little hug from
14 behind.
15 Q.   And is that the one where Officer
16 Donahue came on the scene?
17 A.   I can't remember the officer's
18 name. I believe it was reported by
19 another staff member but I can't remember
20 who.
21 Q.   And then what was the Office of
22 Special Investigation --- what was that
23 office investigating in connection with
24 Miller?
25 A.   That was just a separate issue

Page 68

1 and didn't --- it was --- I know was a
2 sexual nature with the names that we had
3 mentioned previously, Vasquez. I can't
4 remember all the specifics of that.
5 Q.   Okay.
6 A.   Again, I was --- I can't remember
7 if I was involved altogether with that
8 institutional liaison Lieutenant Beck and
9 Captain Lazenby.
10 Q.   We have some documents that I'm
11 going to review with you later which
12 might refresh some of your recollection.
13 A.   That would help.
14 Q.   What about Linda Bisch
15 (phonetic), from dietary; do you recall
16 any allegations --- any investigation
17 involving her?
18 A.   Yeah, there was something. I
19 can't remember the exact specifics. I
20 think it was she was involved with
21 kissing an inmate or something like that
22 or hugging an inmate. I can't remember
23 the specifics on that case.
24 Q.   What happened to her; do you
25 know?

Page 69

1 A.   I believe she resigned.
2 Q.   And Lisa Strickland?
3 A.   Strickland, no.
4 Q.   Bruce Allen?
5 A.   Bruce Allen, I can't recall that
6 name.
7 Q.   Can you recall him in connection
8 with the Hammers' situation?
9 A.   That name doesn't click with me,
10 sir.
11 Q.   What about an officer by the name
12 of Lofton, L-O-F-T-O-N?
13 A.   No.
14       ATTORNEY KRAKOFF:
15         Okay. Mr. Halloran at
16 least there were a few names on
17 here that I don't have any
18 documents for that Lieutenant
19 Bartlett was able to at least
20 generally recall. Phillip David
21 Schmidt, Wayne Young and an
22 officer by the name of Stone,
23 Bill Free and Lieutenant Mort. I
24 don't have any documentation.
25 And I also would --- Paul Walden.

Case 1:96-cv-00247-SJM   Document 55-7   Filed 10/26/2006   Page 21 of 45

Multi-Page™

Page 70

1    I've obtained some
2 documents from another source
3 that have not received anything
4 from the institution in
5 connection with his
6 investigation. I have some
7 documents reflecting his
8 conviction and a few other
9 documents that are in the
10 Exhibits. So I would like to
11 request those documents related
12 to him as well.
13          And obviously, Lieutenant
14 Bartlett is not able to recall
15 specifically or even generally
16 some of the others. But the
17 names that I've listed I would
18 hope that somebody and I would
19 request that somebody from the
20 staff review them to see whether
21 there were any investigations
22 launched or whether there were
23 any extraordinary occurrence
24 reports or incident reports or
25 other documentation concerning

Page 71

1 allegations of sexual misconduct
2 on their part. All right. And I
3 listed all those names before.
4          ATTORNEY HALLORAN:
5               Okay. We'll review
6 those.
7 A.   Excuse me. Can we take a quick
8 break. I need to use the restroom.
9 SHORT BREAK TAKEN
10 BY ATTORNEY KRAKOFF:
11 Q.   Lieutenant Bartlett, have you
12 ever seen an inmate grievance which was
13 filed through the inmates grievance
14 system, which contained allegations that
15 a member of the staff had engaged in
16 sexual misconduct against the prisoner?
17 A.   I can't recall specifically.
18 Q.   Right. I'm not asking about a
19 specific one. But have you seen
20 grievances used for that purpose?
21 A.   I'm sure I had, but I can't
22 recall, if I specifically seen one.
23 Q.   Now, did you ever see a grievance
24 submitted by Lisa Lambert associated with
25 allegations of sexual misconduct by a

Page 72

1 member of the staff?
2 A.   I can't recall if I saw any
3 grievances from Lisa or not. I might
4 have. I just can't recall.
5 Q.   Now, have you ever participated
6 in a discussion with Superintendent
7 Wolfe, or been present when
8 Superintendent Wolfe expressed concerns
9 about the level of sexual abuse or
10 exploitation that was occurring at the
11 prison?
12 A.   I don't recall any specific
13 meetings. I can recall --- I mean,
14 specifically for that purpose. I can
15 recall being with him where we've
16 discussed the issue because we were
17 having the concern at one point. It
18 seemed like every time we finished one
19 investigation something else would come
20 up.
21 Q.   All right. Of that nature?
22 A.   Yes, sir.
23 Q.   And do you recall what the
24 substance was of what Superintendent
25 Wolfe said?

Page 73

1 A.   Basically, it was like a think
2 tank setting. What can we do to try and
3 help this situation out. I remember one
4 of the things as a result of that is that
5 we had a training tape made up by Juan
6 Davis, who was the director of the
7 Special Investigations Office, on staff
8 professionalism and dealing specifically
9 with contact and dealing with inmates.
10 They made a videotape of that.
11          ATTORNEY KRAKOFF:
12               We've never received a
13 copy of that tape, Mr. Halloran.
14 I remember it was referred to you
15 by the Superintendent or the
16 Deputy superintendent.
17 BY ATTORNEY KRAKOFF:
18 Q.   Was this --- do you recall, the
19 approximate year that this think tank
20 discussion occurred?
21 A.   Oh, it was probably '93, maybe
22 '94.
23 Q.   Okay.
24 A.   We had it a couple of times.
25 Q.   You had it in '95, as well?

Page 70 - Page 73

Page 74

1 A.  Oh, I can't recall, sir.

2 Q.  **And who else was part of that**

3 **think tank discussion?**

4 A.  Deputy Kormanic, I can't remember

5 if Deputy Utz was in there that specific

6 time or not.

7 Q.  **Do you remember anything that**

8 **Deputy Kormanic said on the subject?**

9 A.  Other than all three of us held

10 the same opinion that we wouldn't

11 tolerate --- there was zero tolerance for

12 that type of behavior at this institution

13 and we were trying --- we were discussing

14 ways to convey that to the staff.

15 Q.  **And what were some of the ways**

16 **that you all discussed about conveying**

17 **that to the staff?**

18 A.  Specifically, teaching an ethics

19 class on the code of ethics and to

20 reiterate --- because everybody when they

21 are hired receives a book on the code of

22 ethics and since then it's become a

23 departmental mandatory training on the

24 code of the ethics.  And we did a

25 localized class for the staff that were

Page 75

1 here at that time, as well as the

2 videotape.

3 Q.  **Was that in '94, as well?**

4 **Approximately.**

5 A.  Yeah, somewhere around there sir,

6 yes.

7 Q.  **And how long was that instruction**

8 **on the code of ethics?**

9 A.  I can't recall the exact time.

10 It was at least an hour, if I remember

11 correctly.

12 Q.  **And anything else expressed on**

13 **the subject of sexual abuse or**

14 **exploitation at Cambridge Springs?**

15 A.  I can't recall specifics, sir.

16 Q.  **Was there any discussion about**

17 **changing the way that allegations of**

18 **sexual misconduct by staff against**

19 **inmates would be conducted?**

20        ATTORNEY HALLORAN:

21            Object to the form of the

22 question.

23        ATTORNEY KRAKOFF:

24            Why?

25        ATTORNEY HALLORAN:

Page 76

1            Tell her to read it back.

2 Was that confusing?

3 BY ATTORNEY KRAKOFF:

4 Q.  **In the course of the --- I think**

5 **you said that there was more than one**

6 **think tank discussion; is that right?**

7 A.  Yes, sir.

8 Q.  **And in the course of any of those**

9 **discussions, was there any discussion**

10 **about possibly changing the way**

11 **allegations of staff sexual misconduct**

12 **against inmates would be investigated?**

13 A.  Not that I can recall because

14 they were handled the same way.  We

15 again, zero tolerance and we took any

16 accusation serious in either fact finding

17 or investigate any allegations that came

18 forward.

19 Q.  **Now, in the course of your**

20 **investigations, in terms of taking the**

21 **allegations seriously, what was your**

22 **practice, if you had a practice, when**

23 **there were no witnesses other than the**

24 **inmate who was making allegations and the**

25 **officer who was involved?  What was your**

Page 77

1 **practice when the inmate said it happened**

2 **and the officer said it didn't?**

3 A.  I would conduct my investigation

4 and ask questions of both parties and

5 submit my report to the superintendent.

6 Q.  **You wouldn't make a decision?**

7 A.  No, sir.  I was not in a position

8 to make a decision.

9 Q.  **Would you make any**

10 **characterizations in your report to the**

11 **superintendent about the apparent**

12 **credibility of either the officer or the**

13 **inmate?**

14 A.  Yes.

15 Q.  **And how would you make those**

16 **judgements?**

17 A.  From past experience.  Part of my

18 training was on reading body language.

19 People's reactions to questions.

20 Q.  **When you first began the**

21 **investigation of Eicher, in connection**

22 **with Lisa Lambert, you read his body**

23 **language as being honest when he denied**

24 **that he was having a sexual relationship**

25 **with Lisa Lambert; didn't you?**

Page 78

1  A.    Yes, sir, I did.
2  Q.    And as it turned out your review
3  of his body language wasn't correct; was
4  it?
5  A.    That's correct. Again, I'm not a
6  professional in aspect of minimal
7  training and some people are better at
8  lying than others.
9  Q.    Now, as you sit here today
10 looking back in general on the
11 investigations that you conducted, do you
12 believe that there were things, as a
13 matter of practice, that you didn't do in
14 investigation after investigation that
15 you should have done in order to
16 adequately assess the issues?
17          ATTORNEY HALLORAN:
18              Objection. Irrelevant.
19 You can answer.
20 A.    Pardon me?
21          ATTORNEY HALLORAN:
22              You can go ahead and
23 answer.
24 BY ATTORNEY KRAKOFF:
25 Q.    Were there things that you

Page 79

1  believe that you should have been doing
2  between 1992 and 1997 in the course of
3  your investigations ---
4          ATTORNEY HALLORAN:
5              Let me object to the form
6  of the question. There was no
7  evidence that he was doing any
8  investigations after March of
9  1995.
10 BY ATTORNEY KRAKOFF:
11 Q.    I'm sorry, I meant March of 1995?
12 Thank you.
13 A.    No, not that I can think of
14 specifically.
15          ATTORNEY KRAKOFF:
16              Now, I believe that
17 Lieutenant Bartlett made
18 reference earlier to a memo from
19 Superintendent Wolfe, on the
20 subject of sexual misconduct by
21 members of the staff. What I
22 would like to do is to request
23 that if such a memo exits that
24 you look for it and give it to
25 me. Okay?

Page 80

1  BY ATTORNEY KRAKOFF:
2  Q.    Now, did you ever issue a memo to
3  members of the staff under you expressing
4  concerns about the level of sexual
5  exploitation or abuse that appeared to
6  have existed at the prison?
7  A.    I can't recall if I did or not,
8  sir.
9  Q.    But you were concerned; weren't
10 you?
11 A.    Yes, I was.
12 Q.    And that concern continued until
13 the day you left the institution; didn't
14 it?
15 A.    No, not really because again, in
16 March of '95, I changed duties and things
17 started to taper off. There wasn't
18 nearly the level of investigations that
19 we had before.
20 Q.    By the time that you ---
21 A.    By the time I left to go to
22 Albion.
23 Q.    When did they start --- they
24 started leveling off between March '95
25 and the time you left for Albion?

Page 81

1  A.    If I recall, yes.
2  Q.    Was that in '95, that they
3  started tapering off or in '96, or '97?
4  A.    '95, '96, somewhere in there. I
5  can't recall the exact time frame where
6  they started to taper off. I think
7  people were finally getting the hint.
8  Q.    Do you know how many
9  investigations you conducted involving
10 allegations of sexual misconduct or
11 exploitation on the part of staff members
12 against inmates?
13 A.    Not off the top of my head. I
14 can't recall specific numbers.
15 Q.    Well, give me your best sense.
16 20?
17 A.    I don't think I did that many.
18 Q.    15?
19 A.    Less than 10.
20 Q.    Fewer than 10?
21 A.    Me personally, yes.
22 Q.    And how many investigations are
23 you aware of of a similar nature being
24 conducted by the central office?
25 A.    Somewhere between 15 and 20.

Page 82

1 Q.  Okay.

2 A.  I can't recall specific numbers.

3 Q.  So now that would be

4 approximately 25 to 30 total; is that

5 right?

6 A.  Some of those were --- some are

7 duplicated. I think in total there might

8 have been 18 to 20.

9 Q.  You mean different officers

10 involved --- or different staff members?

11 A.  Yes.

12 Q.  So that I have that cleared, did

13 you say between 18 and 20?

14 A.  Yes.

15 Q.  So between 18 and 20 members of

16 the staff during the time that you were

17 an officer of the prison were either

18 investigated by the institutional level,

19 central office level or by some

20 combination of both; is that correct?

21 A.  From when I got here in May of

22 '92, until I left ---

23 Q.  That's right.

24 A.  --- in '97, yes.

25 Q.  Right. Okay. Now, ---

Page 83

1        ATTORNEY HALLORAN:

2           He also testified that

3 was his recollection.

4        ATTORNEY KRAKOFF:

5           I understand that.

6 BY ATTORNEY KRAKOFF:

7 Q.  Now, I would like to call your

8 attention to some of the Exhibits that I

9 have. And you have --- actually it might

10 be easier to use the Court Reporter's

11 copy. I'd like you to refer to Exhibit

12 27, Lieutenant Bartlett. It's

13 approximately half way into the first

14 volume. I didn't number each of the

15 pages unfortunately, I'm sorry.

16 A.  Some of them are. There it is

17 (indicating).

18 Q.  You see it?

19 A.  Yes.

20 Q.  Once you locate that Exhibit ---

21 I have the Exhibits when their multiple

22 pages are usually numbered. Okay. This

23 is the report dated September 11, 1995,

24 concerning allegations that Eicher had

25 violated the code of ethics in connection

Page 84

1 with Lisa Lambert; is that true.

2 A.  Yes.

3 Q.  And if you turn to page five of

4 the report you'll see that the report

5 made reference to a memo from Captain

6 Lazenby; do you see that?

7 A.  Toward the top of the page?

8 Q.  Yes.

9 A.  Uh-huh (yes).

10 Q.  Now, I take it that you were no

11 longer the intelligence captain as of the

12 25th of May; is that correct, 1995?

13 A.  It was March of '95 when our

14 duties changed.

15 Q.  Now, if you turn to page 15 of

16 the document, it refers to Attachment

17 One.

18 A.  Okay.

19 Q.  Now, do you recall --- you'll see

20 that this document identifies various

21 officers, including, but not limited to

22 Eicher. It mentions Montegjo and Merry

23 and Rogers and Coffee and Young and

24 Stewart and Beck and Schmidt. It's a

25 two-page document. Do you recall ever

Page 85

1 seeing this document before?

2 A.  No, sir.

3 Q.  Were you involved in the

4 investigation from March on of the

5 Eicher/Lambert relationship?

6 A.  Briefly, only as in securing

7 places for them to talk, to do their

8 interviews and things like that. I was

9 not directly involved with this

10 investigation at all.

11 Q.  Now, if I can just call your

12 attention to page 15. It mentions

13 allegations of physical contact and it

14 doesn't define what that means, with

15 Inmate E. Jones in October, early

16 November of '93. Had you heard any

17 allegations of that sort?

18 A.  If I remember correctly ---

19        ATTORNEY HALLORAN:

20           You've already asked him

21 all these questions.

22 A.  Yeah, you asked me a question

23 about that earlier.

24 BY ATTORNEY KRAKOFF:

25 Q.  Okay.

Page 86

1 A.   Yeah, there was --- I can't
2 recall the specifics, but there was
3 something involving him and Elizabeth
4 Jones.
5 Q.   Well, what I'm doing now --- this
6 has more specifics because some of these
7 things, I don't believe the Lieutenant
8 would recall. I'm just trying to see if
9 by referring him to this memo whether
10 this refreshes his recollection on any of
11 these memos.
12 A.   That part really doesn't help a
13 whole lot.
14 Q.   You'll see it says CO Eicher
15 allegedly had contact with E. Maysonet.
16 That's Elizabeth Maysonet I take it and
17 H. Maysonet, in the autumn of '93. Does
18 that reflect any recollection about such
19 allegations?
20 A.   No, sir.
21        ATTORNEY HALLORAN:
22        Just that we're clear.
23 You're using this document to
24 refresh his recollection,
25 understanding he had never seen

Page 87

1 ---
2        ATTORNEY KRAKOFF:
3        He did not author this
4 document and he testified that he
5 had never seen it before.
6 BY ATTORNEY KRAKOFF:
7 Q.   And then what about Eicher and
8 Inmate P. Hoover; is that Paula Hoover?
9 Was there a Paula Hoover?
10 A.   Yes, Paula Hoover.
11 Q.   In late 1993 in the field house
12 and yard and basement of Currie Hall.
13 Does that --- let me refer you to Exhibit
14 101. You see, it says Bruce Allen
15 3/10/95 and then it has a signature under
16 that Keith A. Bartlett, Captain 3/10 ---
17 A.   Keith R. Bartlett.
18 Q.   Keith R. Bartlett. Is that your
19 signature?
20 A.   Yes, it is.
21 Q.   And the actual text of this is
22 that written by Mr. Allen or was that
23 your --- is that your printing?
24 A.   That's Mr. Allen.
25 Q.   And is this a statement you took

Page 88

1 from him?
2 A.   Yes.
3 Q.   And in this statement as you look
4 this over he, Mr. Allen informed you that
5 Hammers had engaged in oral sex and
6 manual stimulation with Maysonet; is that
7 correct?
8 A.   I haven't read the whole thing
9 yet, sir.
10 Q.   Do any of those things ---
11 whether any of them clarify things in
12 your mind about allegations you had
13 heard?
14 A.   Mary and Coffee, no. Free, no.
15 It really doesn't recall any specifics
16 for me.
17 Q.   Okay.
18        ATTORNEY HALLORAN:
19        When you say, you're
20 saying it doesn't give you any
21 additional ---
22 A.   It doesn't give me additional
23 ---.
24        ATTORNEY HALLORAN:
25        --- information.

Page 89

1 A.   Right. The same with Mr. Young.
2 I can't recall any more specific on that.
3 The same with Mr. Stewart, I can't recall
4 that. The same with Lieutenant Beck, I
5 can't recall that.
6 BY ATTORNEY KRAKOFF:
7 Q.   And Schmidt, I believe you
8 testified that you had some recollection
9 of some allegations ---
10 A.   Yeah, but I can't recall if it
11 involved Lambert or not. And I don't ---
12 Q.   This doesn't refresh ---
13 A.   It doesn't help, no.
14 Q.   Do you recall at some point
15 investigating allegations that condoms
16 had been found in the dietary department?
17 A.   I can't recall that.
18 Q.   Do you recall hearing about
19 condoms being found in either the dietary
20 department or in some other location on
21 prison grounds, during the time that you
22 were employed at this prison?
23 A.   Again, I don't recall that.
24 Q.   Okay.
25 A.   It's a possibility but I can't

Page 90

1 recall it.

2 Q. Let me refer to Exhibit 29. You
3 were at 27 so it's shortly after that.
4 It's an affidavit of probable cause. Do
5 you have that?

6 A. Yes, I do.

7 Q. And I'll represent to you that I
8 received this document from some other
9 source so I'm not vouching for it's
10 authenticity. But in any event, you'll
11 see in the third paragraph it notes on
12 November 9, it's in the first paragraph
13 of the text. On November 9, 1994, Emma
14 Gleckal was interviewed and advised as
15 investigator ---

16        ATTORNEY HALLORAN:

17             I'm going to object. The
18 document speaks for itself.

19 BY ATTORNEY KRAKOFF:

20 Q. Why don't you review the
21 document.

22 A. Okay.

23        ATTORNEY HALLORAN:

24             That paragraph or the
25 whole document?

Page 91

1        ATTORNEY KRAKOFF:

2             That paragraph.

3 Actually, why don't you review
4 the two paragraphs above it and
5 then the second page so that you
6 read the entire text.

7 BY ATTORNEY KRAKOFF:

8 Q. Now, can you tell me whether you
9 were involved in the collection of any of
10 the substantive allegations that are
11 contained in the affidavit of probable
12 cause?

13 A. No, that was done by Michael
14 Wolanin, Office of Investigations.

15 Q. Were you informed as this
16 investigation was proceeding by Mr.
17 Wolanin or by anybody else associated
18 with the central office as to the
19 information they had received about the
20 Gleckel/Walton situation?

21 A. Yes.

22 Q. And how were you informed?

23 A. By Mr. Wolanin.

24 Q. And would he inform you in
25 writing or by phone or by ---

Page 92

1 A. In conversation.

2 Q. Did he --- before the filing of
3 the affidavit of probable cause, did he
4 share this information with you that
5 appears in this affidavit?

6 A. Yes, sir.

7 Q. Had any of the individuals --- I
8 know you said that Mr. Wolanin conducted
9 this investigation. Had any of the
10 members of your staff assisted him in
11 securing any of the information, that you
12 know of?

13 A. Not that I'm aware of, sir.

14 Q. And you knew before this
15 complaint was filed that it was going to
16 be filed; is that correct? The criminal
17 complaint which is in Exhibit 30.

18 A. I knew the criminal complaint was
19 going to be filed, yes. I knew they were
20 going to file charges on this.

21 Q. And did you learn later that Mr.
22 Walton had been criminally convicted in
23 connection with misconduct toward Emma
24 Gleckal?

25 A. Yes, I was at that trial.

Page 93

1 Q. Did you testify in the trial?

2 A. I can't remember if I testified
3 or not. I might have.

4 Q. Do you recall --- I take it that
5 if you're not sure that you testified
6 that you're not sure what you testified
7 about?

8 A. Correct.

9 Q. What did you know that you could
10 have --- nothing about the investigation;
11 correct?

12 A. Again, I can't recall.

13 Q. Had you ever heard anything about
14 Paul Walton prior to this Gleckal
15 situation involving --- being involved in
16 sexual misconduct toward inmates?

17 A. Not that I'm aware, no.

18 Q. What about toward staff members?

19 A. Not that I can recall.

20 Q. How many trials of staff members
21 --- how many criminal trials of staff
22 members at Cambridge Springs have you
23 appeared in --- strike that.

24     Have you attended?

25 A. Two that I can recall.

Page 94

1 Q. And those are?
2 A. Paul Walton and James Eicher.
3 Q. So now you do recall that you
4 attended, I think you had said
5 originally, but you're not sure if you
6 testified ---
7 A. Correct.
8 Q. --- in Walton. Did you testify
9 in Eicher?
10 A. I believe I did but I'm not
11 really sure.
12 Q. Aren't those --- isn't testifying
13 in court a pretty significant event in
14 your mind?
15     ATTORNEY HALLORAN:
16         Objection to the form of
17 the question. Argumentative. He
18 already testified that he can't
19 recall.
20 BY ATTORNEY KRAKOFF:
21 Q. Now, do you know whether Paul
22 Walton was investigated at the
23 institutional level, meaning by
24 institutional personnel, after the
25 Gleckal allegations surfaced. Do you

Page 95

1 know whether either you or anybody under
2 your command investigated to determine
3 whether Mr. Walton had engaged in sexual
4 misconduct toward any other inmate?
5 A. I don't recall that, no, sir.
6 Q. Do you have any information that
7 the central office investigated to see
8 --- to determine whether Mr. Walton might
9 have engaged in sexual misconduct toward
10 any other Cambridge Spring inmate?
11 A. I can't recall. It would be an
12 assumption on my part if I said anything.
13 Q. Do you recall him telling you
14 that he had --- was in the process or was
15 engaging in an investigation to determine
16 just how extensive Mr. Walton's alleged
17 misconduct was?
18 A. Who?
19 Q. Wolanin.
20 A. No. He was conducting the
21 investigation and he was interviewing the
22 two inmates that were giving the
23 information, as well as Ms. Gleckal and I
24 believe that there was another inmate
25 involved.

Page 96

1 Q. At SCI. A confidential source of
2 information?
3 A. Right.
4 Q. Okay.
5 A. And as far as how far he went
6 with it whether he just dealt
7 specifically with Emma Gleckal situation
8 or whether --- I know working with Mr.
9 Wolanin, he's very thorough. Whether he
10 pursued other avenues other than that. I
11 know from working with him if more
12 information comes up during an
13 investigation he does follow through with
14 that.
15 Q. And how do you know that?
16 A. Again, I can't recall specifics
17 but I know in the course of an
18 investigation he was conducting other
19 information that came up about other
20 staff and he followed through in
21 conducting and started a subsequent
22 investigation.
23 Q. Went down other roads?
24 A. Yes, sir.
25 Q. Were you surprised and I'm only

Page 97

1 asking about you. Were you surprised
2 when you first heard allegations about
3 Paul Walton being involved in ---
4 alleging being involved in misconduct
5 toward an inmate of a sexual inmate?
6     ATTORNEY HALLORAN:
7         Objection. Irrelevant.
8 You can answer it.
9 A. I'm not sure true surprise would be an
10 appropriate word. I guess in any of
11 these cases I still sit back and wonder
12 why, how somebody in our profession could
13 do this type of behavior. And just pin
14 it down to any one specific individual
15 and be surprised that they did it because
16 I really couldn't sit there and say, you
17 know, oh this person here looks like they
18 could be capable of that. So to say yeah
19 I would be surprised at anybody because
20 that's something that I could never
21 fathom.
22 BY ATTORNEY KRAKOFF:
23 Q. But there wasn't anything that
24 you had heard that had given you reason
25 before ---

Page 94 - Page 97

Multi-Page™

Page 98

1 A.   No, sir.
2 Q.   --- believe that Walton was
3 engaging in sexual misconduct?
4 A.   Not that I can recall.
5 Q.   Now, I'm going to take you back
6 to the investigation of Eicher. I'm
7 going to refer you to Exhibit 18, which I
8 believe were identified previously by
9 Deputy Kormanic as her notes. The first
10 date on the first page is 11/9/94 and it
11 goes on for four pages. By the way, page
12 four should have been page three and page
13 three should have been page four. I put
14 them out of order. But I'm going to
15 refer you to the note of 11/23/94. Now,
16 this was during the time period that you
17 were still intelligence captain it's on
18 the ---
19 A.   Last page.
20 Q.   It should have been on page three
21 but it's marked paged four. It says,
22 Eicher doesn't understand why staff
23 aren't telling same story. P. Jones
24 present when I don't Wright said, quote
25 watch I'm going to get Eicher ---

Page 99

1      ATTORNEY HALLORAN:
2           What page are you on?
3      ATTORNEY KRAKOFF:
4           Page four. I'm sorry.
5 A.   Could you be specific to the
6 paragraph?
7 BY ATTORNEY KRAKOFF:
8 Q.   I'm sorry. It's the bottom. I'm
9 on the marked page four of the bottom
10 paragraph, which I didn't identify for
11 you, which starts with Eicher doesn't
12 understand.
13      Eicher doesn't understand why
14 staff aren't telling the same story. P.
15 Jones present when Wright said, quote,
16 watch I'm going to get Eicher, close
17 quote, and flashed him, said Wright. And
18 he always had decent relationships but
19 when she did that he thought he better
20 let Super know because he, and then turn
21 to page three, says caught hell last
22 time. Quote Hoover incident in stairway,
23 close quote.
24      ATTORNEY HALLORAN:
25           The initial is D.

Page 100

1 A.   D. Jones.
2 BY ATTORNEY KRAKOFF:
3 Q.   Oh, I'm sorry, D. Jones. And
4 I've not received any documents
5 associated with an incident between
6 Hoover in the stairway involving Eicher
7 when apparently Eicher told somebody,
8 according to the Deputy Superintendent's
9 notes, that he had caught hell over
10 Hoover incident in the stairway. Do you
11 know anything about that incident?
12 A.   I can't recall it, sir.
13 Q.   Do you recall an incident where
14 Hoover might have lifted her clothing and
15 flashed her breasts or anything of that
16 sort?
17 A.   I can't recall it sir, no. Can I
18 be excused again real quick?
19      ATTORNEY KRAKOFF:
20           Sure.
21 SHORT BREAK TAKEN
22      ATTORNEY KRAKOFF:
23           I may be wrong Mr.
24 Halloran but you'll note on the
25 marked page four on Exhibit 18 it

Page 101

1 makes reference to a fact finding
2 on November 23rd, 1994, held with
3 Officer Eicher, Union
4 Representative Coffee, present
5 were Lazenby and Bartlett. And
6 there's a summary of that of
7 which that paragraph that
8 referred to was included and I
9 know that I have typed summaries
10 of other fact findings but I
11 don't believe that I have the
12 fact finding typed summary of
13 that fact finding. And I'd like
14 to request to have somebody
15 follow that up and give that to
16 me if it exists.
17      DEPUTY KORMANIC:
18           There was no typed
19 summary.
20      ATTORNEY KRAKOFF:
21           Okay.
22 BY ATTORNEY KRAKOFF:
23 Q.   Now, you recall a situation in
24 July of 1993, approximately of July of
25 1993 meeting with Lisa Lambert in the

Page 102

1  presence of Captain Lazenby who might not
2  had been a captain and I'm not sure what
3  his rank was. And R-A-U-N, who's rank
4  I'm not sure of at that point. Do you
5  recall bringing her into an office and
6  then the three of you saying something to
7  Lisa Lambert?
8  A.   Yes.
9  Q.   And can you explain what
10 transpired and --- do you recall ---
11 A.   I want to clarify on that. I
12 believe just Captain Lazenby and myself
13 to be speaking at that.
14 Q.   Was Raun present?
15 A.   John Raun was present.
16 Q.   And where did you encounter Lisa
17 Lambert immediately before going into an
18 office and where was the office?
19 A.   Could you restate that?
20 Q.   How did you first see Lisa
21 Lambert prior to going into that office
22 with her? Where was it? What office did
23 you go into, let me ask you that?
24 A.   I believe we went into my office.
25 Q.   Where was that located?

Page 103

1  A.   I can't remember because I
2  changed offices here so many times. I
3  can't remember what specific office it
4  was.
5  Q.   Did you change halls?
6  A.   Yeah, I've changed buildings.
7  Q.   So you don't remember what
8  building this meeting was in; is that
9  right?
10 A.   I'm thinking it might have been
11 in Currie Hall. I can't recall exactly.
12 Q.   And do you recall how you and
13 Lazenby and Raun happen to be together?
14 A.   Well, we obviously planned this
15 meeting. If I remember correctly this
16 was over a letter or a card or a note of
17 some kind that the inmate was trying to
18 get to Officer Raun or some staring
19 involved, where the inmate was staring at
20 Officer Raun and we were cautioning her,
21 warning her that this wasn't appropriate.
22 Q.   Had Officer Raun come to you with
23 this?
24 A.   Yes, he did.
25 Q.   Now, where was Lisa --- you're

Page 104

1  saying --- your testimony is that Lisa
2  Lambert was summoned to the office?
3  A.   Yes.
4  Q.   You didn't meet her outside the
5  office?
6  A.   No.
7  Q.   And then take her into the
8  office?
9  A.   I really can't remember if I met
10 her outside. I know that she was brought
11 into the office. I don't know if she
12 walked on her own accord from her housing
13 unit at that or whether escorted. I
14 don't think we escorted her.
15 Q.   Now, wasn't there a discussion
16 during the course of this meeting about
17 Lisa Lambert having complained to Deputy
18 Superintendent Utz about Raun's behavior
19 toward her --- alleged behavior toward
20 her?
21 A.   Not that I can recall sir, no.
22 Q.   Well, weren't you aware, prior to
23 that meeting, that Lisa Lambert had filed
24 a grievance about Raun?
25 A.   I'm not sure if it was before or

Page 105

1  after the situation.
2  Q.   Weren't you aware that she had
3  gone to Utz and complained about Raun's
4  alleged behavior toward her?
5  A.   At that point, no.
6  Q.   When did you become aware of it?
7  A.   After the investigation had
8  already started.
9  Q.   And who did you learn that from?
10 A.   I really don't recall, sir. We
11 were --- obviously there's masses of
12 documents and things I really can't
13 recall. In going through the depositions
14 last year and everything.
15 Q.   Did you turn --- did somebody in
16 the room pull the blinds down during that
17 meeting?
18 A.   No, sir.
19 Q.   You don't recall Raun doing that?
20 A.   No, sir.
21 Q.   Had you spoken with Raun prior to
22 this meeting about his allegations that
23 Lisa Lambert was staring at him?
24 A.   When he reported it, yes.
25 Q.   Is it your testimony that you

Page 106

1 were not aware through a grievance or in
2 any other way that Lisa Lambert had
3 complained about Raun's behavior toward
4 her?
5 A.  Not that I can recall prior to
6 this incident.
7 Q.  Do you recall at any point
8 conducting an investigation related to
9 complaints by Lisa Lambert involving
10 alleged inappropriate behavior on the
11 part of Raun?
12 A.  Yes, sir.
13 Q.  And what were --- what was the
14 complaint or what were the complaints
15 about?
16 A.  To the best of my recollection
17 there was an involved incident on the
18 stairwell of Luder where he was that
19 allegedly had caused physical harm to
20 her.  Grabbed a hold of her.
21 Q.  Anything else?
22 A.  No, there was no sexual
23 connotations in that complaint.
24 Q.  Were there any allegations by
25 Lisa Lambert that she had been injured in

Page 107

1 the course of that incident by Raun?
2 A.  Yes.
3 Q.  And did the investigation involve
4 any other allegations against Raun?
5 A.  Not that I can recall.
6 Q.  Wasn't there an allegation by
7 Lisa Lambert that Raun was harassing Lisa
8 because of her alleged fraternization
9 with male staff?
10 A.  I'm really not sure.  I know
11 there was something along the lines with
12 the hall --- the stairwell incident.
13 There was something about harassment and
14 stuff.  I can't recall what specifically
15 she narrowed it down to whether it was
16 that.
17 Q.  Well, were you aware that one way
18 or the other whether Lisa Lambert was
19 alleging that Raun was romantically
20 interested in her or sexually interested
21 in her either?
22    ATTORNEY HALLORAN:
23       Let me object to the form
24 of the question.  You mean aware
25 before the meeting or ---.

Page 108

1 BY ATTORNEY KRAKOFF:
2 Q.  While you were investigating.
3 During the time --- when were you
4 investigating the allegations brought by
5 Lisa Lambert about Raun's behavior?
6 A.  I can't remember the exact dates
7 on that.
8 Q.  Was it in 1994?
9 A.  It might have been '93, '94.  I
10 can't recall exactly.
11 Q.  Let me show --- this isn't an
12 Exhibit.  Let me show you a copy of a
13 letter dated June 1st, 1994 after I allow
14 Mr. Halloran to review it.  Stated ---
15 it's signed by then Commissioner Joseph
16 Lehman and it's to the Lambert's.  To
17 Leonard Lambert and I'm going to ask you
18 to review that.  Just the first page.
19 Review the text of that, particularly the
20 second paragraph of the letter.
21    Does that refresh your
22 recollection in anyway in connection with
23 what you were investigating?  What
24 allegations of Lisa Lambert were
25 investigating during that time period?

Page 109

1 A.  Well, in this letter here it's
2 specifically referring to the
3 investigation on myself of complaints of
4 harassment by Lisa Lambert against myself
5 and the way I conducted my investigation.
6 Besides recalling any other parts of my
7 investigation, this wouldn't refresh my
8 memory on that.
9 A.  Well, it says the investigation
10 centered on Captain Bartlett because of
11 the claim that he harassed Lisa
12 concerning her alleged fraternization
13 with male staff.  Okay.  I understand
14 what you're saying.  Do you recall that?
15 A.  Do I recall the investigation on
16 myself?
17 Q.  Allegations that you had harassed
18 Lisa?
19 A.  Yes.  Yes, I remember that
20 investigation.  I was the subject of the
21 investigation.
22 Q.  Right.  And you denied it?
23 A.  That's true.  I did deny it.
24 Still do.
25 Q.  Were you concerned about Lisa's

Page 110

1 alleged fraternization with male staff?
2      ATTORNEY HALLORAN:
3          I think you
4 mischaracterized ---. Objection to
5 the form of the question.
6 BY ATTORNEY KRAKOFF:
7 Q.   Why don't you clarify. I think I
8 had originally misunderstood it but I
9 think I understand it now.
10     Were you concerned during this
11 time period that Lisa Lambert was
12 fraternizing with the male staff?
13 A.   Yes, sir.
14 Q.   And what did the nature of the
15 fraternization exist --- concern?
16 A.   At this point, it was like I said
17 earlier, notes of some type to Officer
18 Raun and staring at him.
19 Q.   So it was your concern that was
20 limited to her alleged fraternization
21 with one officer, namely Raun?
22 A.   Well, sir. You have to
23 understand this was a very in depth
24 investigation. We're talking about the
25 Eicher/Lambert investigation, also

Page 111

1 involves John Raun. Obviously, I was
2 concerned about any involvement with
3 Officer Eicher as well.
4 Q.   So you were investigating
5 allegations that she had been involved
6 with Eicher at this time?
7 A.   I can recall, if that's what it
8 might have been. I think it was earlier
9 than that. The incident in Luder Hall.
10 Q.   Well, the date of this letter is
11 June 1st, 1994.
12 A.   I understand that, sir.
13 Q.   Yes. And what I'm asking ---
14 what I thought I asked earlier was
15 whether you were concerned as of June
16 1st, 1994 with Lisa Lambert having
17 alleged --- being involved in alleged
18 fraternization with members of the male
19 staff?
20 A.   And I answered you, yes.
21 Q.   And then I think you said that
22 you were concerned about her alleging
23 fraternizing with Raun; is that correct?
24 A.   Correct.
25 Q.   And were you also concerned at

Page 112

1 this time with her alleged fraternization
2 with Eicher? Or are you not sure?
3 A.   I can't recall the time frame
4 there. Like I said, there was an
5 investigation which was concluded without
6 merit. And then it was after my tenor as
7 intelligence captain where another
8 investigation started.
9 Q.   That was in '95?
10 A.   '95.
11 Q.   We're talking about June of '94.
12 A.   At this time here, if my memory
13 serves me correctly I wasn't concerned
14 about Eicher at this point.
15     ATTORNEY KRAKOFF:
16        I'd be interested in
17 receiving the documents
18 associated with the investigation
19 of Captain Bartlett. The
20 allegations that were made by
21 Lisa Lambert. And also any
22 documents associated with
23 investigation of her claims
24 against Raun, I'm not sure that I
25 have all those documents.

Page 113

1      ATTORNEY HALLORAN:
2          I believe that we
3 produced all the ones with Raun.
4 I don't think the investigation
5 of Bartlett was really in the
6 scope of your request.
7      ATTORNEY KRAKOFF:
8          Well, I think it is.
9      ATTORNEY HALLORAN:
10         We'll provide the
11 Bartlett report. I think it
12 would ---.
13 BY ATTORNEY KRAKOFF:
14 Q.   Did you investigate whether Raun
15 had been staring at Lisa Lambert in 1993,
16 early 1994? You remember allegations
17 that she made?
18 A.   The only thing that I can recall
19 is the other way around where she was
20 staring at him. I can't recall.
21 Q.   You don't recall any allegations
22 by her that he was constantly staring at
23 her or frequently staring at her?
24 A.   I can't recall that. It doesn't
25 mean that it didn't happen. I just can't

Page 114

1  recall.
2  Q.   Then I'm going to move off of
3  this.  The only allegation that you can
4  recall investigating in connection with
5  Lisa Lambert was an incident where Raun
6  allegedly came up against her in a
7  hallway; isn't that correct?
8  A.   Stairwell.
9  Q.   In a stairwell I meant.
10 A.   Yes.
11 Q.   Wasn't that in October of 1994?
12 A.   I don't recall the date on that,
13 sir.
14       ATTORNEY HALLORAN:
15            It was our cover in '94.
16       ATTORNEY KRAKOFF:
17            Right.  But I think this
18 whole thing started with what was
19 going on at the meeting.  I'm
20 trying to determine what that
21 meeting was all about.
22 BY ATTORNEY KRAKOFF:
23 Q.   The allegations that were made by
24 Lisa Lambert, if you refer to Exhibit 10,
25 the third page.

Page 115

1        ATTORNEY HALLORAN:
2            Where in the book are
3  you?
4        ATTORNEY KRAKOFF:
5            Exhibit 10, first volume.
6  A.   And what page, sir.
7  BY ATTORNEY KRAKOFF:
8  Q.   If you see a third page, the
9  fourth page, the fifth page and actually
10 most specifically the sixth page.  I
11 think if you review this that confirms,
12 does it not, that this incident occurred
13 in October '94, the alleged encounter
14 with Raun where he --- in the stairwell?
15 Do you see the dates?
16 A.   Yes, you gave me several pages to
17 go through, sir.  Can you please give me
18 time to review that?
19 Q.   Okay, then.
20 A.   The files are hard to read.
21 Q.   I know that.  Do you agree that
22 any investigation of the allegations
23 against Raun involving the stairwell
24 incident would have occurred in October
25 of 1994 or later because the event

Page 116

1  allegedly occurred in October of '94; is
2  that correct?
3  A.   October of '94, that would be
4  correct.
5  Q.   So as of June 1994, and June 1st,
6  1994 is the date that Mr. Lehman writes
7  Leonard Lambert and said that you did a -
8  -- you did your job as an intelligence
9  captain investigating something ---
10 A.   That was prior to ---
11 Q.   --- associated with Lisa Lambert;
12 correct?
13 A.   That was prior to this incident,
14 yes.
15 Q.   What were you investigating?
16 A.   I believe that would have been
17 the initial incident with her and being
18 on the fourth floor of Luder, when she
19 had her blackouts.
20 Q.   With Eicher?
21 A.   Yeah.  I believe.  I'm not 100
22 percent sure.
23 Q.   I understand.  Okay.  I --- let
24 me refer you to Exhibit 11.  I think
25 these are documents associated with her

Page 117

1  being in an unauthorized area.  And this
2  is April of '94; is that correct?  And
3  you can see page 13 is a misconduct
4  report related to that incident.
5  A.   Yes.
6  Q.   And I think you were the charging
7  officer?
8  A.   Yes, I was.
9  Q.   Now, let me refer you to Exhibit
10 Four.  This concerns a complaint by Lisa
11 Lambert against Officer Raun.  You can
12 see that, according to the second page of
13 this document --- the third page of this
14 document.  You see where it says
15 synopsis.
16 A.   Uh-huh (yes).
17 Q.   According to this the
18 investigation was authorized by Vaughn
19 Davis on May 18th predicated on the
20 complaint from Lisa Lambert.  Did you
21 have any involvement --- and you can see
22 what those allegations are.  Among other
23 things he allegedly threw stones at her
24 housing unit window, about them kissing,
25 allegedly, his writing her notes, et

Page 118

1  cetera, et cetera. Did you have any
2  involvement in this investigation?
3  A.    The one on Michael Wolanin. You
4  referring to the one report of Michael
5  Wolanin.
6  Q.    That's right. I know that he
7  conducted an investigation and what I
8  want to know is whether you were involved
9  in that investigation?
10  A.    I don't believe that I was
11  directly involved in that investigation.
12  Q.    Were you indirectly involved
13  other than acting as liaison?
14  A.    Not that I can recall, sir.
15  Q.    Let me refer you to Exhibit 35.
16  It's toward the end. It's marked
17  confidential. I think it's further back.
18  A.    I have it.
19  Q.    Do you have it? This document is
20  dated the 19th of September 1994. This
21  document was issued under your name. Is
22  that your signature?
23  A.    Yes, it is.
24  Q.    And what was your reason for
25  writing Superintendent Wolfe? What did

Page 119

1  this incident concern?
2  A.    If you can let me review that and
3  then ask me questions?
4  Q.    Sure. Now, this memo that you
5  sent to Superintendent Wolfe actually
6  concerned two people. One was a staff
7  member. That was Officer Donahue and
8  then the other concerned an inmate who
9  was working with Mr. Miller; isn't that
10  correct?
11  A.    Uh-huh (yes). Yes.
12  Q.    And Officer Donahue had
13  --- you were describing or at least
14  summarizing a report issued by Officer
15  Donahue where she stated that she
16  observed an inmate by the name of White
17  with her chest and arm in contact with
18  Mr. Marty Miller. Do you recall the
19  first name of the inmate who's identified
20  as White?
21  A.    No, I do not.
22  Q.    By the way, we do not have a copy
23  of the ---.
24            ATTORNEY KRAKOFF:
25            I don't believe that we

Page 120

1  have a copy of the Donahue
2  incident report describing this.
3  I'd like to request that.
4  BY ATTORNEY KRAKOFF:
5  Q.    In any event, Officer Donahue
6  expressed her concern about what she had
7  observed between White and Miller; hadn't
8  she?
9  A.    Yes.
10  Q.    And you wrote Captain Bartlett
11  (sic) and told him that you thought that
12  Miller was just overly friendly and as I
13  quote, touchy type of person.
14            ATTORNEY HALLORAN:
15            I object. The document
16  speaks for itself.
17            ATTORNEY KRAKOFF:
18            I understand that. But
19  this is a preface to a question.
20  BY ATTORNEY KRAKOFF:
21  Q.    What led you to believe that ---
22  were you writing when you said that he
23  was just overly friendly. Were you
24  referring to the Donahue --- what
25  happened between Miller and Donahue

Page 121

1  allegedly happen or about what Donahue
2  had observed happening between White and
3  Miller?
4  A.    You confused me with that
5  question.
6  Q.    Well, Donahue thought that ---
7  she said that she backed out of the room
8  running into Mr. Miller who put his arm
9  around her and pulled her to him. So
10  there were two things. One was White's
11  chest against Miller.
12  A.    Uh-huh (yes). Yes, sir.
13  Q.    And an arm came in contact with
14  him and the other was Miller pushing
15  Donahue toward him. Two things; correct?
16  A.    I don't believe it says pushing
17  her towards me. He put his arm around
18  her.
19  Q.    Well, he pulled her to him;
20  right? He put his arm around her and
21  pulled him to her.
22  A.    Okay.
23  Q.    Now, when you were characterizing
24  Miller as just overly friendly and a
25  touchy-type of person, were you ---.

Page 122

1    ATTORNEY HALLORAN:
2        Now, wait. I'm going to
3 object to the form of question.
4 And read the entire last
5 paragraph. If you're going to
6 read, don't refer to that one
7 sentence.
8    ATTORNEY KRAKOFF:
9        Well, it --- yes, it says
10 that I advised him to leave that
11 part of himself outside the
12 fence. I believe no further
13 action is necessary. I
14 understand that.
15 BY ATTORNEY KRAKOFF:
16 Q.  But when you were saying that he
17 was just overly friendly. He was a
18 touchy-type of person. Were you
19 referring to his pulling the officer
20 toward him or were you referring to White
21 having her chest and arm against Miller
22 or were you referring to both?
23 A.  I believe that it was --- it
24 might have been both and also my own
25 personal dealing with Marty Miller.

Page 123

1 That's the type of person he was. He'd
2 even put his arm around me when he was
3 talking to me.
4 Q.  Right.
5 A.  This is the type that he is.
6 Q.  Did he ever pull you toward him?
7 A.  Oh, yeah. Can I demonstrate?
8 Q.  Yeah.
9 WITNESS DEMONSTRATES
10 A.  He'd come right up and do one of
11 these here, how you doing, type of thing.
12 And that's what Officer Donahue
13 described. And it's what I was trying to
14 explain to him. You can't be doing that
15 in this type of setting, especially with
16 an inmate. An inmate shouldn't feel
17 comfortable enough to come up to you and
18 do that to you because of his behavior
19 where he's a touchy kind of person, you
20 know. There are people that's their
21 personality. They talk to you. They put
22 a hand on you or they put their arm
23 around you, pat you on the back.
24 BY ATTORNEY KRAKOFF:
25 Q.  Well, there's a big difference

Page 124

1 between having that sort of contact and
2 having an inmate who's chest is against
3 them; isn't there?
4 A.  She was fully clothed at this
5 point, you have to recall. It wasn't
6 like she was --- I don't think there was
7 any sexual connotation involved in this.
8 She had come from behind him with her
9 chest and put her arm on the guy.
10 Q.  Right. And her chest was against
11 Miller; isn't that --- is that something
12 that is permitted under the code of
13 ethics?
14 A.  No, that's contact, you know,
15 that's the exact point I was trying to
16 make with the man. You shouldn't allow
17 this type of behavior to take place. At
18 that point, if an inmate makes a contact
19 with you, you should stop. Don't do this
20 and report it.
21 Q.  Let me refer to Exhibits 37 ---
22 A.  Can I clarify. This was from
23 behind (indicating). They only came up
24 from behind them. It wasn't like chest
25 to chest. It was --- she came up from

Page 125

1 behind him.
2 Q.  What did she do?
3 A.  I guess leaned up against him and
4 put her arm on him.
5 Q.  While they were working?
6 A.  Yes.
7 Q.  Was she in the process of doing
8 something in connection with work when
9 she put her chest up against him?
10 A.  From what I can recall, no. It
11 was just a friendly gesture. She just
12 went up there. Went up to him but it was
13 --- just to clarify that, you know. You
14 keep stressing chest. It was her chest
15 to his back. And her arm.
16 Q.  Now, Exhibit 37. You see where
17 you said paragraph three. This is a memo
18 from you to Wolfe, to Superintendent
19 Wolfe.
20 A.  Uh-huh (yes).
21 Q.  The third paragraph. The third
22 number paragraph. You wrote on December
23 30, 1994, I also spoke to Mr. Marty
24 Miller an inmate J. White in regard to
25 sexual contact allegations. I gave both

Page 126

1 parties their miranda rights and advised
2 Mr. Miller of his duty under the code of
3 ethics to cooperate with an
4 investigation. And then it goes on,
5 inmate Miller denies any sexual contact.
6 She admits that they joke around and that
7 Mr. Miller pats them parenthesis the
8 whole crew close paren, on the back when
9 they do a good job.
10     Now, and then it goes on to say
11 that she was going to be removed ---
12 she'd like to be removed from the crew to
13 avoid her name being brought up again.
14     Now, you had already spoken with
15 Miller before September 19, 1994 about
16 the incident that Donahue had reported;
17 correct?
18 A.   Yes.
19 Q.   Now, why did you speak with on
20 December 30th, about three months later
21 --- why did you speak with Miller and
22 White again, in regard to sexual contact
23 allegations and what did those
24 allegations consist of?
25 A.   I really can't recall what

Page 127

1 brought that on again.
2 Q.   It was something else though
3 wasn't it?
4 A.   I'm not sure.
5 Q.   Well, was the first allegation
6 the one of sexual contact? What occurred
7 on September 15, 1994 according to
8 Officer Donahue's report. Was that
9 sexual contact?
10 A.   No, there ---
11 Q.   But now on the December 30th,
12 you're speaking with Miller and White
13 about allegations of sexual contact;
14 correct?
15 A.   That's what it says but I can't
16 recall if it was referring back to the
17 Donahue incident or if there's a separate
18 incident. I don't recall. And it's an
19 investigation that was ordered by the
20 Superintendent and I can't recall if
21 there was an order to do a separate
22 investigation or not.
23 Q.   Were there any other documents
24 generated in connection with that, to
25 your knowledge?

Page 128

1 A.   I just said I don't recall that.
2         ATTORNEY KRAKOFF:
3         I'd like to ask if there
4 are any other documents
5 associated with this December
6 30th discussion with Miller and
7 White. I'd like to see those
8 documents.
9 BY ATTORNEY KRAKOFF:
10 Q.   Now, something that I noticed was
11 that you gave both parties the miranda
12 rights. Why was White mirandarized?
13 A.   That was something we were told
14 to do at our training.
15 Q.   To mirandarize the alleged victim
16 as well as the staff member?
17 A.   And the possibility that there
18 might be criminal charges either way.
19 Q.   Now, if there's alleged sexual
20 contact between an inmate and a member of
21 the staff, it was my impression that as a
22 matter of policy criminal charges aren't
23 brought against the female inmate. I'm
24 excluding the situation where an inmate's
25 alleged --- has allegedly raped or

Page 129

1 somehow engaged in some sort of a
2 physical or sexual assault, you know,
3 with a knife or does something like that.
4 Was there something about this incident
5 that gave you reason to believe that Ms.
6 White might be the subject of criminal
7 charges?
8         ATTORNEY HALLORAN:
9         Objection. Asked and
10 answered.
11         ATTORNEY KRAKOFF:
12         I don't think I asked him
13 that.
14         ATTORNEY HALLORAN:
15         He answered. He was
16 trained to give --- to
17 mirandarize both the complaintive
18 and the ---
19 BY ATTORNEY KRAKOFF:
20 Q.   That's in all situations
21 involving alleged sexual interaction
22 between a staff member and an inmate?
23 A.   Should be, yes.
24 Q.   You mirandarize both?
25 A.   Yes.

Multi-Page ™

Page 130

1 Q.    And when you mirandarize them you
2 tell the inmate, according to the warning
3 that anything that the inmate says could
4 be used against her; don't you?
5 A.    Yes, that's part of the miranda
6 warning, sir.
7 Q.    Doesn't that discourage inmates
8 from discussing incidents of sexual abuse
9 if you're warning them that they might
10 possibly be criminally charged as a
11 result of what they say?
12          ATTORNEY HALLORAN:
13              Objection. That's for a
14 legal conclusion.
15 BY ATTORNEY KRAKOFF:
16 Q.    Well, you're an investigator,
17 don't you suspect that would have a
18 chilling effect on your interviews of
19 inmates in such situations?
20 A.    That would be conjuncture on my
21 part.
22 Q.    So you don't have an opinion in
23 that regard?
24 A.    No.
25 Q.    Now, what about witnesses to

Page 131

1 alleged conduct of the sexual nature
2 between an inmate and a staff member.
3 Are witnesses ever mirandarized?
4 A.    Not usually, no. Usually, I
5 would, if it were staff members I would
6 advise them of their responsibility of
7 the code of ethics that they would
8 cooperate with an investigation.
9 Q.    As a staff member?
10 A.    Yes.
11 Q.    I'm talking about an inmate?
12 A.    Inmates, no.
13 Q.    They're not mirandarized?
14 A.    Not as witnesses, no.
15 Q.    So the --- okay. So that I
16 understand it, if an inmate --- would you
17 ever have a situation where an inmate
18 came to you and said, in effect I've been
19 the subject of some sort of sexual abuse
20 or exploitation by a staff member?
21 A.    I can't recall an inmate
22 specifically coming to me and reporting
23 it. I always gotten my investigations,
24 you know, from the Superintendent or
25 other sources.

Page 132

1 Q.    Do you know what the purpose is
2 --- was that explained to you during your
3 training the purpose of mirandarizing the
4 alleged victim, i.e. the inmate?
5 A.    I know one of the reasons is the
6 possibility of filing false reports. If
7 the person is outright lying and there's
8 proof that they're filing a false report
9 then they're already --- mirandarizing
10 them at that point lets them know.
11 Q.    Well, do you explain to the
12 inmate that you're mirandarizing her
13 because she could be prosecuted for
14 filing a false report?
15 A.    Not always, no.
16 Q.    Sometimes?
17 A.    Sometimes.
18 Q.    Most of the times?
19 A.    Sometimes.
20 Q.    Do you instruct your staff to
21 warn them as to why they are being
22 mirandarized or advise them as to why
23 they're being mirandarized?
24 A.    No.
25 Q.    And is filing a false grievance

Page 133

1 or filing a false inmate request to
2 staff, is that something that you believe
3 could be the subject of a criminal
4 charge?
5 A.    It could be but I've never seen
6 it done.
7 Q.    Now, let me refer you to Exhibit
8 38. Can you review this document which
9 is a May 22nd, 1995 memo to Lieutenant
10 Beck from CO Laurie Donahue. Okay. I
11 know that you were no longer the
12 intelligence captain at this point, but
13 does what is alleged described by CO
14 Donahue, does that violate any policy or
15 code that was in existence at that time
16 at Cambridge Springs?
17 A.    I don't understand your question.
18 Q.    Well, Donahue was complaining,
19 maybe I shouldn't use the word
20 complaining. She was describing the fact
21 that something didn't add up in her on
22 way, namely that Miller had on at least
23 three occasions that she knew of,
24 personally contacted, had contacted with
25 E. Johnson regarding employment on his

Page 134

1  crew. Now, is there anything --- is
2  there any rule or policy, that you're
3  aware of personally that prohibits a
4  member of the staff from contacting on
5  his or her own an inmate about
6  employment?
7  A.    Recruiting employment for their
8  --- I'm not aware of any.
9  Q.    So what is described by Laurie
10  Donahue, CO Donahue, isn't something that
11  would raise concerns in your mind about
12  Miller and his contact with inmates; is
13  that correct?
14  A.    Well, you're asking a different
15  question there.
16  Q.    Does it raise any concerns?
17  A.    Considering the previous
18  investigations with him being too close
19  to, you know, the touchy, feely stuff.
20  That would raise a concern of why is he
21  partially seeking out. None of this
22  happened previously because it happens
23  where you get, you know, you might get
24  information that this girl had plumbing
25  experience prior to coming to the

Page 135

1  institution. He wants to talk to her and
2  find out if she indeed did and, you know,
3  would she want to be on his crew that's
4  ---.
5  Q.    I think that what you're saying
6  is that in a vacuum that wouldn't raise
7  concerns to you, in your mind.
8  A.    Correct.
9  Q.    But based upon the other
10  allegations about Miller that would raise
11  possible concerns?
12  A.    I would say so, yes.
13  Q.    An officer or another member of
14  this staff by the name of Auxier,
15  A-U-X-I-E-R?
16  A.    Yes.
17  Q.    And who is that person?
18  A.    Jannell Auxier, yes.
19  Q.    Okay.
20  A.    She's a CO1.
21        ATTORNEY LOVE:
22          Jannell.
23  A.    Uh-huh (yes).
24        ATTORNEY LOVE:
25          Do you know how that's

Page 136

1  spelled?
2  A.    J-A-N-N-E-L-L. No E on the end.
3  BY ATTORNEY KRAKOFF:
4  Q.    We talked earlier about this ---
5  a little about the CO Hammers' situation.
6  Let me refer you to Exhibit 96. That's a
7  memo from Superintendent Wolfe to you
8  dated March 7, 1995.
9        And it reads, based upon the
10  information you recently provided to me
11  regarding an allegation of CO2, Hammers
12  was observed by an unidentified
13  corrections officer trainee engaged in a
14  sexual act with an unidentified inmate.
15  I'm hereby directing you to conduct a
16  formal investigation into this matter.
17  Please keep me updated on your progress.
18        And I'm wondering if you can
19  recall being informed by the
20  Superintendent what the nature of the
21  sexual act was?
22  A.    I really don't recall. Again,
23  when you mentioned Hammers earlier, I
24  remembered there was something and I ---
25  this doesn't help me to --- unless you

Page 137

1  can find my report back to the
2  Superintendent. I really can't recall.
3  Q.    You'll see 97, the next date, two
4  days later there's --- it's Exhibit 97.
5  And it's a report of extraordinary
6  occurrence from Foster to Kormanic. And
7  you're cc'd on this. Do you recall any
8  --- and 98 speaks to the same issue. Do
9  you recall anything about alleged
10  harassment on the part of Hammers against
11  another officer? Concerning an alleged
12  snitch about Hammers' alleged sexual
13  misconduct.
14  A.    Give me a minute please.
15  Q.    Okay.
16  A.    Ask the question again, please?
17  Q.    Do you recall investigating
18  allegations by an officer trainee by the
19  name of Bruce Allen that he had been
20  harassed by CO Hammers because Allen
21  allegedly had snitched on him?
22  A.    Yes, the document helps refresh
23  my memory on that.
24  Q.    And in fact, Wolfe had made
25  reference to, in Exhibit 96, to an

Multi-Page™

Page 138

1 unidentified corrections officer trainee
2 having observed Hammers engaging in a
3 sexual act; isn't that true?
4 A.  Yes.
5 Q.  Does this refresh your
6 recollection --- does this help you
7 identify who the trainee was who
8 identified Hammers; was it Allen?
9 A.  I believe it was.
10 Q.  And you'll ---
11 A.  I couldn't remember who Allen
12 was.
13 Q.  And you'll see Exhibit 100.  You
14 see the large paragraph containing a
15 summary of what you said.
16 A.  You want me to review that?
17 Q.  Yes, and tell me if this
18 refreshes your recollection about ---
19 A.  The large paragraph that says
20 Captain Bartlett on it?
21 Q.  Yes, the incident --- where it
22 says the incident report states.
23 A.  Confusing.  It's making it sound
24 like it's coming from somebody else
25 besides me because they're directing

Page 139

1 follow of chain of command.  Talk to me
2 and trust me and the deputy.  But the
3 paragraph ---.
4 Q.  In any event, does this refresh
5 your recollection that Hammers had
6 allegedly been involved with an inmate by
7 the name of Maysonet?
8 A.  Yes.
9 Q.  And the contact described by
10 Allen had occurred in the bathroom and at
11 other places, an open rec in the bathroom
12 and other places in the institution; is
13 that correct?
14 A.  Yes.
15 Q.  What is meant by open rec in the
16 bathroom?  Is that a name of a building?
17 What is that?
18 A.  Open recreation took place in the
19 dietary building.
20 Q.  Okay.
21 A.  And at that time in inclement
22 weather instead of having outside yard
23 we'd have open rec that took place in the
24 inmate dining hall and there are inmate
25 bathrooms there in that area.

Page 140

1 Q.  Did you learn from either officer
2 Hammers or --- let me ask you that first.
3 Did you learn that --- did Officer
4 Hammers admit to you that he had engaged
5 in sexual intercourse with Maysonet?
6 A.  I don't recall.  I believe he
7 denied.
8 Q.  Oral sex?
9 A.  I believe he denied all
10 allegations.
11 Q.  Denied everything?
12 A.  Yeah, if I remember correctly.
13 Q.  What was the result of your
14 investigation?  What was determined?
15 A.  I don't recall.  I'd have to read
16 through all the ---
17 Q.  You have no independent
18 recollection?
19 A.  No, until we started going over
20 this morning, I didn't even remember
21 Allen's name.
22 Q.  Is Hammers still here?
23 A.  No.
24 Q.  Did he resign?
25 A.  He was either terminated or

Page 141

1 resigned.  I can't recall.
2 Q.  Let me refer you to Exhibit 11.
3 You see it says, 3/10/95 and then it has
4 signatures on that Exhibit, Bartlett,
5 Caption 3:10?
6 A.  Right, Bartlett.
7 Q.  Is that your signature.
8 A.  Yes, it is.
9 Q.  Is that your printing, that Mr.
10 Allen ---?
11 A.  Okay.  I see that part, yes.
12 Q.  Is that correct?
13 A.  Yes.
14 Q.  And do you have any idea about
15 how --- first of all do you know whether
16 Bruce Allen was identified as the officer
17 trainee who had quote snitched on
18 Hammers; did that information come out
19 around the institution?
20 A.  I believe it did.
21 Q.  Do you have any idea or
22 information about the source of that
23 leak?
24 A.  Just going back here from Mr.
25 Allen's statements that Officer Hammers

Page 142

1 had told Officer Manville that. It would
2 be an assumption on my part but I'd say
3 it went from there.
4 Q.   Now, as a matter of policy or
5 practice if a staff member --- there had
6 been occasions where a staff member has
7 resigned while allegations of sexual
8 misconduct on his part against an inmate
9 were still being investigated. You
10 testified to that; correct?
11 A.   Yes.
12 Q.   And as a matter of policy or
13 practice, once the investigation --- once
14 a resignation is made does the
15 investigation continue or is the
16 investigation terminated?
17 A.   It's been my experience that it
18 terminates when they resign. And in ---
19 except in the cases where there was
20 criminal prosecution already ongoing.
21        ATTORNEY KRAKOFF:
22             I understand that. I'm
23 going to take just a two minute
24 break. We're in the final
25 stages. I don't see this going

Page 143

1 more than 10 or 15 more minutes.
2 So we're more or less on
3 schedule.
4 SHORT BREAK TAKEN
5 BY ATTORNEY KRAKOFF:
6 Q.   Did you ever have any discussions
7 with Ms. Wolfgang or were you ever
8 present when Ms. Wolfgang discussed
9 allegations of sexual exploitation or
10 abuse on the part of staff members
11 against inmates?
12 A.   I can't recall.
13 Q.   You can't recall ---
14 A.   I believe --- I don't know about
15 sexual. I believe that she was involved
16 with me with the John Raun stairwell
17 incident.
18 Q.   But apart from that you have no
19 recollection?
20 A.   No, sir.
21 Q.   Did Mr. Barr, the Administrative
22 Assistant to the Superintendent ever
23 bring to your attention allegations he
24 had received either through inmate
25 grievances or otherwise of alleged sexual

Page 144

1 misconduct by staff members against
2 inmates?
3 A.   Not that I can recall from Mr.
4 Barr.
5 Q.   Let me refer you to Exhibit 122,
6 which is in the second volume. There's a
7 newspaper article by a Dick Blood.
8        ATTORNEY HALLORAN:
9             I'm going to object to
10 any questions regarding to the
11 transfer and also on basis of
12 hearsay regarding the newspaper
13 article.
14        ATTORNEY KRAKOFF:
15             I'm not going to bring
16 this in for the truth. I'm using
17 this as a launch for question.
18 BY ATTORNEY KRAKOFF:
19 Q.   If you care to, you can read the
20 whole article. But I could summarize.
21 A.   I've read it before.
22 Q.   And basically it's recounting
23 some testimony by Rhonda Boyd and Yvonne
24 Wright, two Cambridge Springs inmates.
25 And then it says and it's attributing

Page 145

1 this. I'm not bringing this in for the
2 truth. It says in the left-hand column
3 of the second page. It says, in the very
4 last paragraph in the left hand column it
5 says, Boyd and Wright said they witnessed
6 no change from policy and procedures
7 after charges were brought against
8 employees. However, Sergeant Terri
9 Pelletier, president of the local union
10 for officers at Cambridge Springs said
11 changes were made. Surveillance cameras
12 were installed and a policy adopted that
13 prohibits male employees from being with
14 only one inmate at a time.
15       So we have, you know, two poles.
16 Two inmates who were representing that no
17 changes have been made and then Terri
18 Pelletier saying yes, there had been
19 changes, two of them. One, surveillance
20 cameras had been installed. And two,
21 there was a policy that prohibited ---
22 male employees from being with only one
23 inmate at a time.
24       And I'm asking you whether you
25 were aware of either of those two changes

Page 146

1 that Terri Pelletier represents occurred
2 and secondly, whether you were aware of
3 any other changes in policy after the
4 prosecutions of Eicher and/or Miller or
5 Walton?
6 A.   I don't recall any specific
7 policy changes. I do recall the fact
8 that we did install security cameras and
9 they were still in the process of doing
10 that when I left. I'm not sure if they
11 finalized all the areas they were going
12 to put them in or not.
13 Q.   **Do you recall some of the areas**
14 **that they were going to install security**
15 **cameras in?**
16 A.   Oh, yeah.
17 Q.   **Can you advise?**
18 A.   Currie Hall, Alliance Hall and
19 the housing units.
20 Q.   **On each of the floors?**
21 A.   Yes.
22 Q.   **Inside rooms or just on the ---**
23 A.   In the hallways. Hallways and
24 dayrooms.
25 Q.   **Any maintenance areas?**

Page 147

1 A.   In the hall --- Currie Hall is
2 partially maintenanced. And the hallways
3 of that area.
4 Q.   **How had those areas been**
5 **monitored before, just by eye?**
6 A.   Yes, visual patrol.
7 Q.   **And what, if anything, do you**
8 **know about a change --- anything about a**
9 **policy prohibiting male employees from**
10 **being with only one inmate at a time. Do**
11 **you know anything about that?**
12 A.   I don't recall any specific
13 policy. I know it was always our advice
14 to staff not to go one-on-one with an
15 inmate.
16 Q.   **And that proceeded those criminal**
17 **prosecutions?**
18 A.   Yes.
19 Q.   **Are you aware of any changes that**
20 **occurred as a result of the criminal**
21 **prosecutions; changes in policies?**
22 A.   No, good policies in relation to
23 this were already there.
24 Q.   **Yes. Okay. Now, you testified**
25 **earlier and I am not going to go into**

Page 148

1 detail. I received a lot of documents
2 associated with disciplinary action that
3 was taken against you. And I ask you ---
4        ATTORNEY HALLORAN:
5             Objection to the
6 relevance. And the relevance is
7 outweighed by prejudicial rule.
8        ATTORNEY KRAKOFF:
9             You can reserve all ---
10 you can make the objections if
11 you want but I understand that
12 we're reserving objections,
13 except as to form.
14 BY ATTORNEY KRAKOFF:
15 Q.   **Did you appeal --- did you file a**
16 **grievance, whatever you call it, after a**
17 **decision was rendered in your case, after**
18 **disciplinary sanctions were empassed?**
19 A.   If you're asking if I appealed
20 the disciplinary action myself, yes, I
21 did.
22 Q.   **And what is the status of that**
23 **now.**
24 A.   Still pending.
25 Q.   **And where is it pending?**

Page 149

1 A.   At the Civil Service Commission.
2 Q.   **Have arguments been made yet?**
3 A.   Yes, everything's --- all the
4 briefs have been filed. It's just ---
5 Q.   **Waiting for the decision?**
6 A.   --- pending the review on their
7 decision.
8 Q.   **Now, I take it that you've not**
9 **--- at least I have no documents --- that**
10 **you've not been accused of any sort of**
11 **form of sexual abuse or exploitation of**
12 **Cambridge Springs inmates while you were**
13 **--- during the entire time you were**
14 **employed here; is that correct?**
15 A.   That is correct, sir.
16 Q.   **Were there any occasions where an**
17 **inmate or it came to your attention that**
18 **an inmate had accused you of physical**
19 **abuse? By physical abuse, I'm talking**
20 **about excessive use of force?**
21 A.   Yes.
22 Q.   **And who did that involve?**
23        ATTORNEY HALLORAN:
24             Objection to the
25 relevancy of the question.

Page 150

1  A.    I can't recall their names.  If I
2  remember correctly.  There's two specific
3  situations.  I can't remember what the
4  inmate's name other than a larger black
5  female.
6  BY ATTORNEY KRAKOFF:
7  Q.    Did they involve two different
8  incidents?
9  A.    Yes.
10 Q.    Do you recall the years?
11 A.    No.
12 Q.    Did one of them involve a Colleen
13 Hughes?
14 A.    Yes.
15 Q.    She wasn't the taller ---
16 A.    No, she was a petite small woman.
17 Q.    And what --- did this occur in
18 July of 1994, the alleged abuse?
19 A.    I really don't recall.  It's ---
20 Q.    Do you recall what the
21 allegations were?
22 A.    In both cases, it was allegations
23 of using excessive force.
24 Q.    Did Ms. Hughes accuse you of
25 picking her up and body slamming her into

Page 151

1  a glass door between Currie Hall and
2  operations?
3  A.    Yes.
4  Q.    And then dragging her up the
5  sidewalk like a dog?
6  A.    That was the allegations.  They
7  were unfounded.
8  Q.    And she alleges that she was
9  handcuffed at the time?
10 A.    Yes, she was handcuffed at the
11 time.
12 Q.    And was an investigation
13 conducted?
14 A.    Yes, what she's failing to tell
15 you is that she just kicked an inmate in
16 the stomach, while she was handcuffed and
17 being escorted to the REQ by myself.
18 Q.    Okay.
19 A.    Another officer.
20 Q.    What --- who investigated --- who
21 conducted the investigation?
22 A.    I can't recall.
23 Q.    Was it central office?
24 A.    I believe it might have been
25 central office, I can't recall.  It might

Page 152

1  have been from another institution.
2  Q.    And you recall what the outcome
3  was?
4  A.    I was cleared.
5  Q.    And what did the second one
6  alleged occurred, in general?
7  A.    During questioning, she alleged
8  that I pushed her into the wall in my
9  office.
10 Q.    Did she allege any injuries?
11 A.    Yes, she alleged that her neck
12 was injured.
13 Q.    Did Ms. Hughes allege any
14 injuries?
15 A.    I can't recall if she alleged
16 injuries or not.
17 Q.    Did you know a former dietary
18 instructor by the name of Lisa Stratton?
19 A.    Stratton?
20 Q.    Yes.
21 A.    No.
22 Q.    Regardless of her name, did you
23 know a female dietary instructor?
24 A.    I think you're referring to Lisa
25 Stallard (phonetic).

Page 153

1  Q.    Oh, okay.  Stallard.  And did she
2  make any allegations about --- regarding
3  your behavior toward her?
4  A.    Not that I can recall.
5  Q.    Did you ever attempt to pressure
6  her into having sex with you?
7  A.    No, sir.
8  Q.    You didn't say, you either sleep
9  with me or you lose your job, or words to
10 those effect?
11 A.    No, sir.
12 Q.    I'd like you --- I'm going to ask
13 you a question or two about Exhibit 13,
14 which is in the first volume.
15      Would you read that to yourself.
16 And then I'm going to ask you this part
17 of the question about the previous
18 Exhibit, which is a statement from Lisa
19 Lazalle, I'm not sure how to pronounce
20 it.  Did you read 12 as well?
21 A.    Yes.
22 Q.    Now, did you interview Eicher?
23 A.    Yes.
24 Q.    That was on the 11th of April;
25 correct?

Page 154

1 A.   Yes.  Right.
2 Q.   And was it your practice when you
3 interviewed a staff member to be one-to-
4 one with the staff member or did you
5 interview him in the presence of somebody
6 else?  I shouldn't ask that.  Was it your
7 practice, as a general rule, to go one-
8 on-one with a staff member who you were
9 investigating?
10 A.   With the staff member, yes.  It
11 usually was one-to-one.
12 Q.   Okay.
13 A.   Sometimes I would have another
14 --- particularly if it was a female staff
15 member.  I would have Lieutenant Scott or
16 somebody else.
17 Q.   Was it your --- but if it was a
18 male you would generally be one-on-one?
19 A.   Generally, yes.
20 Q.   In your office?
21 A.   Yes.
22 Q.   Would you tape record as a
23 general practice?
24 A.   No, I wasn't permitted to.
25 Q.   Would you --- and that was even

Page 155

1 with the permission of the officer; is
2 that right?  You weren't permitted to
3 even if you asked the officer?
4 A.   I was not permitted to have a
5 tape recorder device.  There were times
6 when we were allowed to borrow the
7 dictaphone in some cases.  But for the
8 most part, I wasn't allowed to use the
9 tape recorder.
10 Q.   And why is that?
11 A.   Security of the institution.
12 Superintendent was very specific about
13 wearing --- who could use tape recorders.
14 Q.   He was concerned about, as you
15 understood it.  He was concerned that if
16 you tape recorded something, it might
17 leak out?
18 A.   I'm not sure what his concern
19 was.  I just know that they were very
20 limited.
21 Q.   Did you take notes?
22 A.   Yes.
23 Q.   While --- was it your practice to
24 take notes when you interviewed a staff
25 member who was being investigated for

Page 156

1 possible misconduct of a sexual nature?
2 A.   Yes.
3 Q.   And what would you do with the
4 notes after a case was closed?
5 A.   They were usually put right in
6 the case file.
7 Q.   Then based upon your ordinary
8 practice would there be notes of what you
9 asked Eicher and what he responded to?
10 A.   There should be.
11 Q.   Would they be verbatim notes of
12 your question and the answer or simply a
13 summary?
14 A.   Usually a summary that --- like
15 it would relate to how she's --- the
16 stuff that she's doing that would --- and
17 sometimes I would leave out different
18 words to ---
19 Q.   Right.  But would you be writing
20 it down as your contemporaneously with
21 your question.  You'd write the question
22 down and then the answer.  You'd write
23 the answer down or would you do that at
24 the end of the interview?
25 A.   It depended on the situation.

Page 157

1 Most of the time I had my questions
2 prepared ahead of time.  But if other
3 questions came up in the course of the
4 interview, I might add extra questions to
5 it.  And I would generally be somewhat
6 brief with what I was writing and then
7 would go back after the interview to fill
8 in.
9           ATTORNEY KRAKOFF:
10           What I'd like to do is to
11 receive copies --- the interview
12 notes of this particular
13 interview and any other
14 interviews that would be
15 pertinent, not only with Lambert
16 but with our other people.
17 BY ATTORNEY KRAKOFF:
18 Q.   Now, do you recall whether you
19 read a copy, I assume that if you did,
20 you wouldn't have attributed it to a
21 specific inmate, but I'll ask you that.
22 But do you recall whether you read a copy
23 of the statement that you received from
24 Lisa --- is that Lisa Darzell?
25 A.   Lazalle.

Page 158

1 Q. Lazalle. Right. Did you read a
2 copy of that to Eicher?
3 A. I don't recall. I don't believe
4 I did.
5 Q. Did you inform Eicher of what
6 Dazell --- Lazalle told you?
7 A. I didn't let him know who it was.
8 Q. Right.
9 A. But he knew the allegations of
10 the specific questions of the
11 investigation.
12 Q. And did you --- do you know who
13 obtained --- this was Lieutenant Scott
14 who obtained the Lazalle statement?
15 A. Correct.
16 Q. Did you talk with Lazalle?
17 A. Yes.
18 Q. When did you talk with her? You
19 were --- on April 8th?
20 A. I can't remember.
21 Q. I think your second paragraph of
22 Exhibit 13, says both of you.
23 A. Right.
24 Q. Did you make a determination of
25 what you thought of Lazalle's demeanor

Page 159

1 and her credibility? And if so, is that
2 reflected in any document?
3 A. I don't believe it's reflected in
4 any document. In reflecting back to it,
5 she appeared to be telling the truth.
6 She was willing to make a signed sworn
7 statement.
8 Q. And then you had Eicher who
9 according to the second page of Exhibit
10 13, I think you reached a conclusion that
11 he was telling the truth, as well; is
12 that right?
13 A. Yes. We discussed that earlier.
14 Q. And that was based upon he had
15 good eye contact and he sat with his feet
16 on the floor. He appeared relaxed and
17 answered all questions directly and
18 confidently.
19 Let me ask you. Does sitting
20 with the feet on the floor. What does
21 that --- you mean both of his feet were
22 on the floor?
23 A. Both of his feet were on the
24 floor. He maintained direct eye contact,
25 sat back, was relaxed.

Page 160

1 Q. The feet on the floor is an
2 indication of what, truthfulness?
3 A. Yeah, truthfulness.
4 Q. And you were taught that?
5 A. Yes.
6 Q. So you had an inmate witnessing
7 one thing and you had Eicher an officer,
8 saying another. And what did you
9 conclude?
10 ATTORNEY HALLORAN:
11 Let me object to the form
12 of the question. You also had
13 Lambert's version of passing out
14 in the stairwell.
15 ATTORNEY KRAKOFF:
16 Sure. Right.
17 BY ATTORNEY KRAKOFF:
18 Q. You knew that Lisa Lambert really
19 was up to something when she was --- you
20 knew that she was up to something, namely
21 that she was going to an unauthorized
22 area; didn't you?
23 A. I --- she did not ---.
24 Q. You didn't believe any of her
25 story that she had blacked out and didn't

Page 161

1 know why she was in the stairwell and
2 that sort of thing?
3 A. That's correct. That's right in
4 my report.
5 Q. So you knew that she was away
6 from her home floor without
7 authorization; didn't you?
8 A. Correct.
9 Q. So didn't that tend to support
10 Lazalle's story that she was going to be
11 meeting somebody or doing something on
12 the 4th floor?
13 A. It would lend credibility to it.
14 Q. Right. So do you recall how it
15 was that you determined to send Eicher on
16 his way with a direction that he be
17 careful around inmates, instead of
18 continuing with this investigation and
19 finding out what this possible
20 relationship was all about?
21 A. I'm not sure if I follow you.
22 Q. Why did you decide not to
23 continue with the investigation?
24 A. Mr. Eicher was denying any
25 activity had taken place, that there was

Page 162

1 any type of behavior with him and inmate
2 Lambert. Inmate Lambert denied there was
3 any activity between them. And she was
4 --- the fact that she was lying about how
5 she wound up on the 4th floor of Luder
6 Hall and the circumstances surrounding
7 that, doesn't necessary conclude that
8 there was further activity between her
9 and Officer Eicher.
10 Q.   Well, it's not unusual for an
11 inmate who's had --- conducting ---
12 having some sort of prohibited contact
13 with an officer not to tell you that she
14 was engaging in that contact; isn't that
15 a fact?
16 A.   Yes, sir. But you're asking me
17 to come to a conclusion on something I
18 only have three subjects to deal with.
19 Inmate Lazalle, inmate Lambert, Officer
20 Eicher. In my opinion, Officer Eicher is
21 telling the truth. Inmate Lazalle is
22 possibly telling the truth. Inmate
23 Lambert is obviously one that has proven
24 by medical documentation that she's
25 lying.

Page 163

1 Q.   And she was ---
2 A.   Modern techniques --- we don't
3 use thumb screws for investigations or --
4 - I have to go with I got. I can't force
5 Officer Eicher to tell me the truth.
6 Q.   Right. And she might have been
7 lying when she told you that Eicher and
8 she were --- she and Eicher weren't
9 involved?
10 A.   Correct.
11 Q.   The only disinterested person
12 there was Lazalle; correct? As far as
13 you knew.
14 A.   Yes.
15       ATTORNEY KRAKOFF:
16            I have no other
17 questions. Thank you.
18       * * * * * * *
19       DEPOSITION CONCLUDED AT 1:25 P.M.
20       * * * * * * *
21
22
23
24