# ATTACHMENT P

## Deposition of Victoria Kormanic

U.S.  DISTRICT  COURT

FOR THE WESTERN  DISTRICT  OF PENNSYLVANIA

\*  \*  \*  \*  \*  \*   \*  \*  \*

\*

LISA LAMBERT,                    \*

    Plaintiff                 \*NO.  C.A. 96-247  ERIE

      vs                        \*

SUPERINTENDENT                   \*

WILLIAM  WOLFE, et  al.,  \*

    Defendants                \*

\*

\*  \*  \*  \*  \*  \*   \*  \*  \*

DEPOSITION   OF

VICTORIA  KORMANIC

JUNE  3, 1997

Any reproduction  of  this transcript  is

prohibited  without  authorization  by  the

certifying  agency

Page 2

```
 1                    DEPOSITION
 2                        OF
 3
 4   VICTORIA  KORMANIC,  taken on  behalf of  the
 5   Plaintiff  herein,  pursuant  to the Rules  of Civil
 6   Procedure,  taken  before me,  the undersigned,
 7   Mary Jane  Spagel,  a Court Reporter  and  Notary
 8   Public  in and for  the Commonwealth  of
 9   Pennsylvania,  at  Cambridge  Springs State
10   Corrections  Institute,  Cambridge  Springs,  PA, on
11   Tuesday,  June 3,  1997, at 10:00  a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3   JERE KRAKOFF,  ESQUIRE
 4   1705 Allegheny  Building
 5   Pittsburgh,  PA  15219
 6       COUNSEL  FOR PLAINTIFF
 7
 8   THOMAS  HALLORAN,  ESQUIRE
 9   Sr. Deputy  Attorney  General,  Litigation  Section
10   Sixth Floor,  Manor  Complex
11   564 Forbes  Avenue
12   Pittsburgh,  PA  15219
13       COUNSEL  FOR DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  I N D E X
 2
 3   WITNESS:   Victoria  Kormanic
 4   EXAMINATION
 5      By Attorney  Krakoff              7 - 123
 6
 7   CERTIFICATE                          124
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1           E X H I B I T    P A G E
 2
 3                                      PAGE
 4   NUMBER         IDENTIFICATION     IDENTIFIED
 5
 6             NONE  OFFERED
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

O B J E C T I O N   P A G E

| ATTORNEY | PAGE |
|---|---|
| Halloran | 13 |
| Halloran | 20 |
| Halloran | 27 |
| Halloran | 31 |
| Halloran | 32 |
| Halloran | 46 |
| Halloran | 67 |

---

Page 7

PROCEEDINGS
-------------------------------------------------

3 VICTORIA KORMANIC, HAVING FIRST BEEN DULY SWORN,

4 TESTIFIED AS FOLLOWS:

-------------------------------------------------

6 EXAMINATION

7 BY ATTORNEY KRAKOFF:

8 Q.    What is your name?

9 A.    Victoria L. Kormanic, the last name is

10 spelled K-O-R-M-A-N-I-C.

11 Q.    And you're the Deputy Superintendent --

12 - one of the Deputy Superintendents, at SCI

13 Cambridge Springs?

14 A.    That's correct, sir.

15 Q.    And what is your title? I know that

16 there are Deputy Superintendents in charge of

17 operations and in charge of various other

18 things, depending upon what institution you're

19 in. What are you called?

20 A.    It was the Deputy Superintendent for

21 Operations. It is now currently the Deputy

22 Superintendent for Facilities Management.

23 Q.    Is it a different title, but

24 essentially the same function?

25 A.    Correct.

---

Page 8

1 Q.    And when did you become employed in

2 that capacity at Cambridge Springs?

3 A.    March 2nd of 1992.

4 Q.    Were there already women housed at

5 Cambridge Springs or was this just before the

6 inmates got there?

7 A.    Prior to inmates coming.

8 Q.    It's my recollection, I could be wrong,

9 but I believe Superintendent Wolfe said that the

10 inmates began to come here around March of '92?

11 A.    March 30th of '92.

12 Q.    Were you the only --- were you called

13 Deputy Superintendent in charge of operations at

14 that time?

15 A.    No. Deputy Superintendent for

16 Facilities Management.

17 Q.    Were you the only one who held that

18 position, who has held that position at

19 Cambridge Springs?

20 A.    That is correct.

21 Q.    Now, before assuming your position at

22 Cambridge Springs, had you been employed by the

23 Pennsylvania Department of Corrections?

24 A.    Yes.

25 Q.    Where and in what capacity?

---

Page 9

1 A.    At the State Correctional Institution

2 at Rockview, located in Bellefonte,

3 Pennsylvania. I was employed as a lieutenant.

4 Q.    And how long had you been a lieutenant

5 at Rockview, approximately, in terms of years?

6 A.    Approximately three years. I've been

7 an employee of the Department of Corrections for

8 15.

9 Q.    What was your experience before that,

10 in what capacity before you became a lieutenant?

11 A.    I was a sergeant. Prior to that I was

12 a corrections officer, prior to that I was a

13 corrections officer trainee.

14 Q.    So your route to your position was

15 through security?

16 A.    That's correct.

17 Q.    Would you please outline your

18 responsibilities as the Deputy Superintendent,

19 and if they varied in any way, prior to now, let

20 me know about that. If they were the same, just

21 provide me with what your basic responsibilities

22 have been.

23        ATTORNEY HALLORAN:

24        Answer the question to the

25        best of your recollection. We'll refer

---

Page 10

1       you to the documents provided, which
2       provides the job description for the
3       Deputy Superintendent.
4  BY ATTORNEY KRAKOFF:
5  Q.      Right.  My purpose for asking that
6  isn't to see if you left anything out.  I'm just
7  trying to get you to summarize for me what your
8  basic areas of responsibilities were.
9  A.      I oversee the security aspect of the
10 institution, as well as, the unit management
11 which integrates the counselors and the unit
12 managers.
13 Q.      Was Deputy Superintendent Utz basically
14 in charge of programming or was that his area,
15 programming?
16 A.      That's correct.
17 Q.      And within the framework of the
18 security aspect of the institution, was training
19 one of the areas of your responsibility,
20 training of officers?  Did that fall within your
21 jurisdiction?
22 A.      That's correct.
23 Q.      When I ask these questions, I'm not
24 asking are you the one who was ultimately
25 responsible or are you the one who was --- the

Page 11

1  only one who was responsible.  I'm just trying
2  to see whether these are areas that fell within
3  your jurisdiction.  Did investigations of
4  alleged wrongdoing by officers fall within your
5  jurisdiction?
6  A.      They do not.  May I clarify?
7  Q.      Sure.  You can clarify, any time I ask
8  a question.  I'm not going to cut you off, you
9  can clarify whatever you want.
10 A.      The Intelligence Captain falls directly
11 under the Superintendent in our table of
12 organization.  The Superintendent is the one who
13 has the only authority to authorize an
14 investigation.  It may be, he may authorize
15 anyone under his chain of command, to conduct an
16 investigation.
17 Q.      All right.  And have there been
18 occasions where Superintendent Wolfe has asked
19 you to oversee investigations of officers, with
20 respect, and I'll be very specific, with respect
21 to allegations or suspicions that those officers
22 might have engaged in some sort of sexual
23 improprieties with inmates?
24 A.      Not that I can recall.
25 Q.      What about assignments of officers, did

Page 12

1  that fall within your jurisdiction in terms of
2  assigning them to various posts, or, posts,
3  first of all?  Or is that strictly done by
4  bidding?
5  A.      It is --- I oversee that area, but my
6  shift commanders assign officers to those posts
7  and to clarify, we do have both bid posts and
8  non-bid posts.
9  Q.      So the person who is most immediately
10 responsible for making post assignments would be
11 who?
12 A.      Shift commander.
13 Q.      Shift commander.  And you can review
14 those assignments?
15 A.      That's correct.
16 Q.      What I'd like to do at this point is to
17 focus first on an incident that occurred on
18 November 22nd, 1994, when Lisa Lambert returned
19 from an authorized temporary absence to
20 Cambridge Springs.  And I'd like you to describe
21 in as much detail as possible, what you
22 recollect about the incident.  Now, we've
23 watched a videotape, I realize that.  And to
24 some extent that videotape speaks for itself.
25 But I'd like you to provide me with some

Page 13

1  background in terms of what led up to the
2  photographing or videotaping of Lisa Lambert?
3         ATTORNEY HALLORAN:
4         I'm going to object to the
5         form of the question.  I believe you
6         indicated, it sounded like in the
7         question, that Lisa Lambert was ATA to
8         Cambridge Springs.  She's not, she was
9         ---.  You need to clarify that, clarify
10        what it was.
11 BY ATTORNEY KRAKOFF:
12 Q.      Okay.  Well, let's clarify that.  Do
13 you recall that Lisa Lambert returned to
14 Cambridge Springs on the 22nd of November, after
15 being away from the prison for Court purposes in
16 Lancaster County?
17 A.      That's correct.
18 Q.      And do you recall that on that day Lisa
19 Lambert was photographed and also was videotaped
20 by security officers after her return to
21 Cambridge Springs?
22 A.      That's correct.
23 Q.      And do you recall what precipitated ---
24 what circumstances precipitated her being
25 photographed and videotaped after returning to

Page 14

1 Cambridge Springs?
2 A.    They were precipitated on our concerns,
3 based on her allegations of staff abuse a few
4 days prior to going ATA to Lancaster County.
5 Q.    Okay. So if you can elaborate on that.
6 You were concerned, here at the prison, and
7 those concerns arose from allegations made by
8 Lisa Lambert about staff abuse aimed at her; is
9 that correct?
10 A.    Correct.
11 Q.    And do you recall whom she had alleged
12 had abused her?
13 A.    Sergeant Raun --- Sergeant John Raun.
14 Q.    Was Eicher also alleged to have abused
15 her? Was that part of the abuse, or only Raun?
16 A.    I can --- only her allegations of abuse
17 against John Raun, prior to her going to
18 Lancaster County, ATA.
19 Q.    And what the nature of the abuse that
20 she said Sergeant Raun had inflicted on her?
21 What had Sergeant Raun allegedly done to her?
22 A.    Caused --- caused some bruising,
23 allegedly in a stairwell.
24 Q.    Bruising of her body?
25 A.    Correct.

Page 15

1 Q.    Do you recall more specifically how she
2 said she came to be bruised and where she
3 allegedly --- what part of her body, or what
4 parts of her body were allegedly bruised?
5 A.    No, sir, I do not recall that.
6 Q.    Do you believe that you were familiar,
7 as of the 22nd of November, with the specifics
8 of her allegation, i.e., how Raun abused her and
9 what parts of her body allegedly were bruised?
10 Do you think you had that information as of the
11 22nd of November?
12 A.    I can't recall.
13 Q.    Do you understand what I was asking?
14 A.    Yes.
15 Q.    I know as you sit here today, you don't
16 have a recollection more specifically, of where
17 she was bruised or how Sergeant Raun allegedly
18 had abused her. And as I take your response to
19 my follow-up question, you're not sure as you
20 sit here today, that you had any more specific
21 information ---
22 A.    That's correct.
23 Q.    --- as of the 22nd; is that correct?
24 A.    That's correct.
25 Q.    Now, do you know --- was there an order

Page 16

1 that was issued from somebody in the prison
2 administration for Lisa Lambert to be
3 photographed and/or videotaped upon her return
4 to Cambridge Springs?
5 A.    Yes, sir, the Superintendent.
6 Q.    And do you know whether that order had
7 been issued in writing?
8 A.    It was --- it was oral. I had --- upon
9 her arrival back, I had phoned the
10 Superintendent and expressed my concern to
11 establish a baseline coming back from ATA. And
12 he gave me the direction over the phone, and
13 authority, the authorization over the phone to
14 go ahead and videotape and take the photographs.
15 Q.    So the decision to photograph and to
16 videotape Lisa Lambert was expressed by
17 Superintendent Wolfe on the 22nd, after you had
18 learned of her return to the prison; is that
19 correct?
20 A.    That's correct.
21 Q.    And prior to that, had you been
22 involved in any discussions with anybody about
23 the possibility of taking photographs. And I'm
24 going to use the term, photographs, so that I
25 don't always have to --- photographs and/or

Page 17

1 videotaping. I'm meaning both of them when I
2 pose the question. Had you discussed with
3 anybody on the Cambridge Springs' staff the
4 issue of photographing Lisa Lambert? Had you
5 had a discussion prior to your discussion or
6 your telephone, I don't know if it was a
7 discussion, when you spoke with Superintendent
8 Wolfe?
9 A.    I don't recall one.
10 Q.    As I take it, you learned from somebody
11 that Lisa Lambert was back at Cambridge Springs;
12 correct?
13 A.    Correct.
14 Q.    Then you telephoned Superintendent
15 Wolfe, and you told him that you thought that a
16 baseline should be established by taking
17 photographs of Lisa; is that correct?
18 A.    Correct.
19 Q.    And by baseline, what did you mean by
20 that? How would taking photographs establish a
21 base line?
22 A.    To digress. Whenever she made the
23 allegations of abuse by Sergeant Raun, she was
24 taken to medical and examined. And there was no
25 evidentiary ---?

Page 18

1 Q.    Uh-huh (yes).
2 A.    --- bruises found.
3 Q.    There were no bruises found?
4 A.    No. Two days later, she went ATA, was
5 gone a week. When she came back, we wanted to
6 establish, again, that in the process of
7 bringing here back from the administration
8 building to the RHU, that there were no --- that
9 we had documentation of no inappropriate
10 behavior.
11 Q.    And as I understand Superintendent
12 Wolfe's testimony yesterday, custody would have
13 been turned over to Cambridge Springs in the
14 administration building; correct?
15 A.    That's correct.
16 Q.    And so you wanted a video camera to be
17 on Lisa Lambert as she proceeded from the
18 administration building into the grounds of
19 Cambridge Springs, and then, ultimately, on to
20 the restrictive housing unit?
21 A.    That's correct.
22 Q.    Now, how had you learned that no
23 bruises had been found on Lisa Lambert the first
24 time she had --- when she had been examined, I
25 believe you said two days before she left for,

Page 19

1 when she Cambridge Springs for Lancaster, that
2 was your testimony?
3 A.    That's correct.
4 Q.    How had you learned that? Did somebody
5 tell you that, did you examine her --- the
6 medical records? How did you learn that?
7 A.    I don't recall. It was a report. I
8 don't recall ---
9 Q.    Who reported it?
10 A.    --- specifically which report.
11 Q.    So I take it that when --- and this was
12 a written report?
13 A.    Yes, sir.
14 Q.    I take it that when you received the
15 written report that said there were no bruises
16 found on Lisa Lambert in connection with her
17 allegations against Officer Raun, you must have
18 reached the conclusion that she had fabricated
19 those allegations about being abused by Officer
20 Raun. Did that tell you that --- did you reach
21 any conclusions when ---?
22 A.    No.
23 Q.    No? But Lisa had alleged that she had
24 been injured --- did she allege she had been
25 bruised or just that she had been somehow

Page 20

1 physically abused by Officer Raun?
2        ATTORNEY  HALLORAN:
3        Are you asking what she knew
4    then or what she knows now?
5 BY ATTORNEY  KRAKOFF:
6 Q.    I'm talking about back then. Was it
7 your understanding that Lisa had accused Officer
8 Raun, not only of physically abusing her, but,
9 in fact, of bruising her? Do you recall?
10 A.    I recall her making the allegation that
11 he had caused bruises.
12 Q.    All right. So there were no bruises
13 according to the information, the report that
14 you received, were found on Lisa Lambert. Did
15 you draw any conclusions about her credibility?
16        ATTORNEY  HALLORAN:
17        Objection. Asked and
18    answered.
19        ATTORNEY  KRAKOFF:
20        It was?
21        ATTORNEY  HALLORAN:
22        You just asked her.
23        ATTORNEY  KRAKOFF:
24        About her drawing conclusions?
25 A.    And I said no.

Page 21

1 BY ATTORNEY  KRAKOFF:
2 Q.    Okay, I'm sorry. I didn't hear the
3 answer. Now, then did you relay the
4 Superintendent Wolfe's order to have Lisa
5 Lambert photographed on the 22nd of November,
6 did you relay that information to somebody on
7 the staff? Do you recall?
8 A.    That would probably a correct
9 conclusion because they were videotaping when I
10 came down, yes. Who it was, I don't recall.
11 Q.    That's all right. When you arrived, at
12 some point in the course of the incident, and
13 I'm using the incident not as a charge word, I'm
14 just saying it was a transaction, okay? When
15 you arrived in the course of the incident, where
16 did you arrive and what did you see when you
17 first arrived? You said that they were already
18 videotaping Lisa when you arrived; is that
19 correct?
20 A.    Correct.
21 Q.    Where did you arrive, where was it that
22 ---?
23 A.    In the --- in the strip room, shower
24 area, next to property, located in Alliance
25 Hall.

Page 22

1 Q.    And there was an officer who had a
2 video camera trained on Lisa when you arrived,
3 or aimed toward Lisa when you arrived?
4 A.    I'm relying on the tape for that --- to
5 recall it. I don't know.
6 Q.    But it's your recollection that when
7 you arrived ---?
8 A.    Yes.
9        ATTORNEY HALLORAN:
10       You can answer it, you can
11 answer the question, based upon your
12 recollection ---
13       ATTORNEY KRAKOFF:
14       It was refreshed.
15       ATTORNEY HALLORAN:
16       --- then, and also that it's
17 refreshed from the video. So if you
18 recall from seeing the video, you can
19 answer the question.
20 A.    Okay.
21 BY ATTORNEY KRAKOFF:
22 Q.    Were you called down to that room? Did
23 somebody call you to come over?
24 A.    That's correct. Lieutenant Beck came
25 up to my office and advised me that Lisa was

Page 23

1 refusing to be shower --- to be medically
2 examined, with her bra and panties on.
3 Q.    Were you told that she refused to be
4 medically examined, or were you told that she
5 had refused to be photographed with her bra and
6 panties on?
7 A.    She was refusing to be videotaped
8 during the medical examination.
9 Q.    And so you then went to the scene and
10 what transpired after you arrived? What
11 occurred?
12 A.    I think this videotape speaks for
13 itself. I spoke to Ms. Lambert, advised her
14 that it was standard procedure, that she would
15 not be videotaped naked. It would be done with
16 her bra and panties on and I would retain
17 possession of the videotape and photographs.
18 Q.    Now, you told her that it was standard
19 procedure, what did you mean by that?
20 A.    At that time, it was standard procedure
21 for the Department of Corrections that any time
22 we had an inmate that we thought was going to be
23 a behavioral problem, or --- and when I say
24 behavioral problem, I'm speaking of cases like
25 Lisa where they alleged assault in the past.

Page 24

1 Q.    Uh-huh (yes).
2 A.    Then we would videotape them. Most
3 commonly it was whenever they received a
4 misconduct and were being sent to the restricted
5 housing unit.
6 Q.    They would be videotaped with articles
7 of their clothing removed, or that they would be
8 videotaped while they were being moved to the
9 restricted housing unit while dressed?
10 A.    While they were being moved to the RHU.
11 Normally the procedure is, if you're coming from
12 --- they're either coming from the hearing
13 examiner's or the housing unit, and being moved
14 to the RHU.
15 Q.    And they would be --- the standard
16 procedure that you spoke about was photographing
17 the movement of the inmate from the hearing to
18 the restricted housing unit, while the inmate
19 was fully clothed; isn't that correct?
20 A.    Repeat your question, Mr. Krakoff.
21 Q.    The procedure that you referred to, was
22 that not a procedure involving the videotaping
23 of the inmate from the hearing to the restricted
24 housing unit, while the inmate was fully
25 clothed?

Page 25

1 A.    That's correct.
2 Q.    Go ahead.
3 A.    The institution had the discretionary
4 power of when to use the videotaping. If was
5 based upon the inmate's past behavior, or if we
6 believed they were going to present a problem
7 for us during the reception process in RHU. The
8 issue of clothing depended on the circumstances.
9 If we had an inmate who was being a behavior
10 problem while being --- we thought would be a
11 behavior problem while being strip searched,
12 which is the practice prior to being admitted to
13 the RHU, then we would videotape it. If they
14 were placed in a cell, or removed from a cell,
15 because they posed a threat to themselves, they
16 may be clothed or unclothed. And we had the
17 discretionary authority to videotape any time we
18 thought that the inmate was going to be a
19 behavioral problem.
20 Q.    And was that videotaping the inmate
21 while the inmate was in panties and a bra, if
22 the inmate was a woman, it included ---
23 A.    It depended on the circumstances. They
24 could be completely naked.
25 Q.    Uh-huh (yes). Had you ever, from the

Page 22 - Page 25

Page 26

1 time that Cambridge Springs opened until
2 November 22nd, had you ever been involved or
3 been made aware of an incident where an inmate
4 was videotaped in a bra and underpants?
5 A.    I do not recall.
6 Q.    As you sit here today, you cannot
7 recall, you cannot tell me about another
8 incident; is that correct? That's a fair
9 question.
10           ATTORNEY HALLORAN:
11           Another incident of an inmate
12      being videotaped in a bra and
13      underpants?
14           ATTORNEY KRAKOFF:
15           Right.
16 A.    I do not recall.
17 BY ATTORNEY KRAKOFF:
18 Q.    So in answer to my question, you can't
19 provide me with another instance where this has
20 occurred?
21 A.    I cannot recall.
22 Q.    Now, do you have any recollection of an
23 inmate ever being videotaped while completely
24 naked, at Cambridge Springs?
25 A.    I can't recall.

Page 27

1 Q.    Is there a document that you can point
2 to which gives the Superintendent the discretion
3 to have an inmate photographed while in bra and
4 panties?
5           ATTORNEY HALLORAN:
6           I'm going to object to the
7      form of the question. It's --- I
8      gather by your question, that would
9      mean anywhere from naked, all the way
10      up?
11           ATTORNEY KRAKOFF:
12           I wanted to specifically focus
13      on that and then I was going to ask the
14      second question, in terms of naked.
15 BY ATTORNEY KRAKOFF:
16 Q.    Are you aware of any document that
17 gives the Superintendent the authority or the
18 discretion to have an inmate photographed while
19 in bra and panties? I'm talking about the time
20 period as of the 22nd of November.
21 A.    I believe it's covered in our reception
22 policy.
23 Q.    Is that the local policy or that a
24 policy statement from the Department of
25 Corrections?

Page 28

1 A.    I believe it's a policy statement from
2 the Department of Corrections. And I also
3 believe it's the inherent authority of the
4 Superintendent, and his ability to run the
5 institution.
6 Q.    But in terms of the document, you think
7 that there is a document and that would be the
8 reception policy?
9 A.    That's correct.
10           ATTORNEY KRAKOFF:
11           I'd like to have a copy of
12      that.
13 BY ATTORNEY KRAKOFF:
14 Q.    And does the reception policy authorize
15 the Superintendent to have an inmate
16 photographed while naked, either breasts exposed
17 or the genital area exposed or the buttocks
18 exposed?
19 A.    I believe it's covered in the reception
20 policy.
21 Q.    And you also believe that it's within
22 the discretion of the Superintendent, the
23 inherent authority of the Superintendent, to
24 order that?
25 A.    Yes. May I make one more

Page 29

1 clarification?
2 Q.    You can always make ---.
3 A.    As far as the videotaping, in my
4 Interrogatory, I stated that Officer Brenda
5 Jones was doing the photographing, the polaroid
6 photographing, and it was not. It was Officer
7 Michelle Howard.
8 Q.    I was going to ask you that. You had
9 reminded me of that earlier when we were
10 watching the video this morning, so I appreciate
11 that. When you arrived, how was Lisa Lambert
12 attired?
13 A.    She had on her state-issued browns.
14 They're given to the inmates in the institution.
15 Q.    Is that how she arrived at the
16 institution? Is that how inmates arrive from
17 the outside into the institution? They don't
18 travel in their civilian clothing, do they?
19 A.    I don't recall.
20 Q.    In any event, was she fully clothed
21 when ---?
22 A.    Yes.
23 Q.    And I did observe and listen to the
24 video, but there were some things that I
25 couldn't --- I couldn't hear everything. And

Multi-Page™

Page 30

1 I'd like you to help me with your recollection,
2 and I'm not asking you for a verbatim, but your
3 recollection of the thrust or the sum and
4 substance of what you told Lisa and then what
5 her response, if any, was to that? Do you
6 recall generally what you told Lisa after you
7 arrived? You did talk with her, didn't you?
8 A.    That's correct.
9 Q.    And essentially, what did you tell
10 Lisa?
11 A.    I believe I testified earlier that she
12 was refusing to be videotaped during the medical
13 examination in her bra and panties. I told her
14 that it was necessary for her to comply, that it
15 was standard procedure and that I would retain
16 the videotape and photographs in my possession.
17 Q.    When you arrived, was Lisa crying?
18 A.    Not that I can recall.
19 Q.    Did Lisa resist, at first?
20 A.    Yes.
21 Q.    And then at some point, and if I may, I
22 realize, I'll just paraphrase it, I think I
23 heard you say something to the effect, you've
24 got, you know, I'm going to give you 30 seconds,
25 we don't have all day, or something along those

Page 31

1 lines. You have 30 seconds to make a decision,
2 and if you don't comply, the officers will strip
3 search you. Do you recall that?
4 A.    That's correct.
5          ATTORNEY  HALLORAN:
6          Objection. I don't think
7    that's what the tape said.
8          ATTORNEY  KRAKOFF:
9          Okay.
10          ATTORNEY  HALLORAN:
11          I think they said that if she
12    didn't comply, she would carry out the
13    order, which was the videotaping, not
14    the strip search.
15 BY ATTORNEY  KRAKOFF:
16 Q.    Didn't you at some point tell her that
17 the officers would strip search her if she
18 didn't agree?
19 A.    (No response).
20 Q.    Okay. Did you say something to her
21 about she would be strip searched?
22 A.    Yes.
23 Q.    What did you tell her about being strip
24 searched, if you recall?
25          ATTORNEY  HALLORAN:

Page 32

1          I'm going to object to that,
2    whatever she says on the tape.
3 BY ATTORNEY  KRAKOFF:
4 Q.    Let me ask it this way. Wasn't she
5 going to be strip searched in any event?
6 A.    Yes.
7 Q.    If she didn't comply, would she have
8 been photographed while being strip searched?
9 A.    No.
10 Q.    Well, then, her being strip searched
11 had nothing to do with having 30 seconds to make
12 a decision, is that your testimony?
13 A.    That's correct.
14 Q.    If she hadn't complied, what would have
15 occurred?
16 A.    I think that calls for ---
17 Q.    What are you objecting?
18 A.    Yeah.
19          ATTORNEY  HALLORAN:
20          I'm going to object. Calls
21    for speculation ---.
22 BY ATTORNEY  KRAKOFF:
23 Q.    You gave her 30 seconds to comply, you
24 did, didn't you?
25 A.    Correct.

Page 33

1 Q.    And did you not know at that point or
2 have an understanding of what you were going to
3 do if she didn't comply?
4 A.    Had she not complied, we probably would
5 have stopped and then gone to the Superintendent
6 for more direction.
7 Q.    All right. So you were giving her 30
8 seconds to make a decision and then it was your
9 intention to go to the Superintendent?
10 A.    And make him aware of the
11 circumstances.
12 Q.    But you weren't going to carry it out?
13 You weren't going to continue dealing with Lisa
14 yourself, if she didn't comply. You were going
15 to then have the Superintendent make the
16 decision about how to proceed --- I mean the
17 Superintendent make a decision about how to
18 proceed; is that correct?
19 A.    That's correct.
20 Q.    Did Lisa finally tell you that she
21 would comply? She did comply, didn't she?
22 A.    Yes.
23 Q.    And then there were still photographs
24 that were taken of Lisa?
25 A.    Correct.

Page 34

1  Q.    And how many photographs were taken?
2  A.    Five.
3  Q.    Okay. You were there throughout the
4  photographing of Lisa?
5  A.    That's correct.
6  Q.    Were you --- ultimately Lisa, after the
7  videotaping and then after the photographing,
8  ultimately, Lisa then went into the shower area
9  and was strip searched and then was dressed; is
10 that correct?
11 A.    That's correct.
12 Q.    And were you there when Lisa emerged
13 from the shower area with her clothing?
14 A.    That's correct.
15 Q.    And you never left, at all?
16 A.    No, sir, I did not.
17 Q.    And the photographs were the polaroid
18 sort; is that correct?
19 A.    That's correct.
20 Q.    And that means that they would have
21 developed by themselves, without taking them to
22 somebody to have them developed; correct?
23 A.    That's correct.
24 Q.    And I take it that the photographs that
25 were taken of Lisa did develop by the time Lisa

Page 35

1  was dressed again, and ready to move from there,
2  the photographs had been developed?
3  A.    I don't recall.
4  Q.    What happened to the photographs after
5  the pictures were taken, immediately after the
6  pictures were taken?
7  A.    They were given to me.
8  Q.    Did you not look at them to see whether
9  they had developed?
10 A.    I don't recall. In however long a
11 polaroid takes to develop, a couple --- what, a
12 minute, two minutes? So before I left they had
13 been developed.
14 Q.    Yeah, that's what I was asking.
15 A.    Yes.
16 Q.    Did you look to see whether there were
17 photographs that had come out or that had
18 developed?
19 A.    Yes.
20 Q.    As you sit here today, can you
21 specifically recall that there were only five
22 photographs?
23 A.    Yes, sir.
24 Q.    You're absolutely sure?
25 A.    Absolutely sure.

Page 36

1  Q.    And what did you do with the
2  photographs once you had them in hand?
3  A.    I secured them in my one file cabinet,
4  in my office.
5  Q.    Did you carry the photographs back with
6  you, though ---
7  A.    Yes, sir.
8  Q.    --- from the medical area?
9  A.    They never left my possession. They
10 have never left my possession.
11 Q.    And at some point, did you put them in
12 an envelope?
13 A.    Yes.
14 Q.    When did you do that? Was it the same
15 day?
16 A.    I don't recall.
17 Q.    You do recall taking the photographs
18 back and putting them in a file?
19 A.    Yes.
20 Q.    But you're not sure whether they were
21 first placed in an envelope and then put in the
22 file. As you sit here today, you're not sure?
23 A.    No, I don't recall.
24 Q.    Now, at some point, though, you did put
25 them in an envelope?

Page 37

1  A.    Yes.
2  Q.    And was that envelope sealed?
3  A.    Yes.
4  Q.    And did that envelope remain in the
5  file that you referred to?
6  A.    Yes.
7  Q.    Is that a file that was called the
8  Lambert file?
9  A.    Yes.
10 Q.    And what about the videotape, what
11 happened to that, did you take that back
12 immediately, also?
13 A.    Correct.
14 Q.    And was that placed in the file or
15 somewhere else?
16 A.    Also in the file.
17 Q.    And this particular file, you were the
18 only person who had the key to the cabinet in
19 which it was contained? That's a question, now,
20 it wasn't a statement. Were you the only person
21 who had the key to the --- was it in a cabinet
22 that you kept the file?
23 A.    It's a file cabinet, a regular file
24 cabinet.
25 Q.    And that cabinet was kept locked?

Page 38

1 A.   Yes.
2 Q.   And did the cabinet contain other files
3 other than Lisa Lambert's?
4 A.   Yes.
5 Q.   Did other persons have --- did anybody
6 else in the institution have access to the
7 interior of the filing cabinet?
8 A.   My secretary.
9 Q.   Other than your secretary?
10 A.   No.
11 Q.   And who else had --- was there only one
12 key to it?
13 A.   I had a key and my secretary had a key.
14 Q.   Now, to the best of your recollection,
15 did the photographs or the videotape, at any
16 point, ever leave that filing cabinet prior to
17 today?
18 A.   Never.
19 Q.   You didn't get the answer, so why don't
20 you just answer.
21 A.   They were removed last night.
22 Q.   And that was the first time?
23 A.   Yes, sir.
24 Q.   And when you removed them, was the
25 envelope still sealed?

Page 39

1 A.   No, it had been opened and that was
2 because I had to answer my Interrogatory and I
3 had to go back and refresh my memory.
4 Q.   And you counted the number of
5 photographs back then?
6 A.   Yes. There's a notation on the
7 envelope that says that.
8 Q.   Opened May 27, 1997, at 16:30 hours for
9 deposition response, and then your signature,
10 correct?
11 A.   Correct.
12 Q.   Okay. Thank you.
13 A.   I guess it's interrogatory, not
14 deposition.
15 Q.   Okay, the written questions?
16 A.   Correct.
17 Q.   And there was a nurse present at the
18 time that the photographs and videotapes were
19 taken?
20 A.   That's correct.
21 Q.   And the nurse's name was Sandy
22 P-I-E-T-Z-A-K.
23 A.   That's correct, Sandy Pietrak.
24 Q.   Pietrak. Is that an R-A-K, then
25 P-I-E-R-A-K, maybe?

Page 40

1 A.   I'm not sure, sir.
2 Q.   And Sergeant Chase was on the video; is
3 that correct?
4 A.   That's correct.
5 Q.   And Sergeant Chase, like the nurse, was
6 a woman, correct?
7 A.   Correct.
8 Q.   And then Brenda Jones was the name of
9 the officer who was there throughout the time,
10 as well; is that correct?
11 A.   That's correct.
12 Q.   And then there was a lieutenant by the
13 name of Beck, who was there for part of the
14 time, as part of the escort, but wasn't present
15 when any of the photographing was occurring?
16 A.   That's correct.
17 Q.   Now, were any incident reports or
18 extraordinary occurrence reports, as far as you
19 know, prepared by anybody in connection with the
20 photographing of Lisa Lambert on the 22nd of
21 November?
22 A.   I don't recall, sir.
23 Q.   You have no recollection, as you sit
24 here today, though, do you of seeing an incident
25 report or an extraordinary occurrence report

Page 41

1 about that incident?
2 A.   I don't recall, no.
3 Q.   I'm having difficulty with the I don't
4 recall, because I think that that was a fair
5 question. As you sit here today, are you aware
6 of any incident report or extraordinary
7 occurrence report, memorializing that incident
8 of November 22nd, 1995?
9 A.   I wasn't being flippant with you. As I
10 sit here today, I don't recall ever seeing one.
11 That's what I meant to say.
12 Q.   Now, under what circumstances according
13 to DOC rules is an extraordinary occurrence
14 report supposed to be prepared and by whom, in
15 general terms? What is the purpose of an
16 extraordinary occurrence report.
17       ATTORNEY HALLORAN:
18       Are we done with the content
19 of the videotape, do you think?
20       ATTORNEY KRAKOFF:
21       I think so. I may have one
22 other question, which is about ---.
23 BY ATTORNEY KRAKOFF:
24 Q.   Before I get to the question about the
25 extraordinary occurrence report, there was a

Page 42

1 period of about eight minutes, is that correct,
2 when the video camera was turned off.
3 A.    I believe Mr. Halloran said nine
4 minutes, from 1333 to 1402.
5 Q.    Nine minutes.
6 A.    Or 1353 to 1402.
7        ATTORNEY  HALLORAN:
8        Let's use --- how about from
9        3:33 p.m. to 4:02 p.m.
10 BY ATTORNEY KRAKOFF:
11 Q.    Right, so it was nine minutes.  It was
12 turned off; is that correct?
13 A.    Correct.
14 Q.    And what was the purpose of having that
15 turned off during that time?
16 A.    So that Ms. Lambert could shower and
17 get redressed.
18        ATTORNEY  HALLORAN:
19        Just so we clarify for the
20        record that there was also a period
21        from about 4:02 p.m. to 4:27 p.m.,
22        where the camera was also off, during
23        the urine sample.
24 BY ATTORNEY KRAKOFF:
25 Q.    Now, for what purpose is an

Page 43

1 extraordinary occurrence report ---?
2        ATTORNEY  HALLORAN:
3        Are we now done with the ---
4        ATTORNEY  KRAKOFF:
5        Yeah, oh, yeah.
6        ATTORNEY  HALLORAN:
7        Can I ask one --- I think
8        there's one question here about the
9        ---.  When the videotape was taken at
10        the time during which Ms. Lambert
11        removing her prison clothing, was there
12        any male officer in the room?
13 A.    No, there was not.
14        ATTORNEY  KRAKOFF:
15        As far as I know, we're not
16        alleging that a male was in the room
17        when ---.
18 BY ATTORNEY KRAKOFF:
19 Q.    And I ask this question generically,
20 I'm not focusing on this particular incident.
21 But I'm interesting in knowing, in general, when
22 is an extraordinary occurrence report supposed
23 to be filed?  What kinds of, generically
24 speaking, what kinds of information,  or
25 incidents, are supposed to be memorialized in an

Page 44

1 extraordinary occurrence report?
2 A.    Any event or incident that would
3 disrupt the normal running of the institution.
4 Q.    All right.  So that's the basic
5 standard; is that correct?
6 A.    Yes.
7 Q.    What about an incident report?  Does
8 this institution  have --- some institutions have
9 a difference.  They have one report which is
10 called extraordinary occurrence, and then
11 there's another category of reports called
12 incident reports.  Does that exist in Cambridge
13 Springs?
14 A.    No, sir.
15 Q.    So for purposes of reporting, is it
16 either an extraordinary occurrence report or no
17 written report, or is there some other kind of
18 report that can be submitted to memorialize an
19 event or a transaction at the prison, involving
20 inmates and/or staff?
21 A.    Repeat your question.  Excluding inmate
22 grievances, that's my understanding?
23 Q.    Oh, yeah.
24 A.    Okay.
25 Q.    I'm talking about for purposes of an

Page 45

1 officer or an administrator reporting on an
2 event.  We know that there's such a thing as an
3 extraordinary occurrence report.  And you just,
4 essentially, told me when an extraordinary
5 occurrence report is expected to be filed;
6 correct?
7 A.    Correct.
8 Q.    Is there any other kind of a --- there
9 are also investigative reports, I know that;
10 correct?
11 A.    Correct.
12 Q.    Is there any other species of report
13 that officers or administrators can use to
14 memorialize an event?
15 A.    They can use a to/from.  It's not a
16 required procedure.
17 Q.    Is that more like a memorandum?
18 A.    Yes.
19 Q.    Now, did the events --- did the
20 incident of November 22nd, where Lisa was
21 photographed according to your testimony, in her
22 bra and panties, and according to --- there was,
23 you know, photographs --- I viewed the
24 videotape.  And there were photographs taken in
25 her undergarments.  Would that not be the kind

Page 46

1 of occurrence that would be expected to be in an
2 extraordinary report?
3 A.    No.
4 Q.    And that's because ---?
5 A.    Didn't disrupt the normal running of
6 the institution.
7 Q.    Now, what about when she refused to be
8 photographed and was protesting and is saying,
9 you people are crazy, that kind of thing, you
10 know, wanting to take photographs of me. That
11 also wouldn't --- that's not disruptive of the
12 institution?
13        ATTORNEY  HALLORAN:
14            Objection.  Asked and
15        answered.
16 BY ATTORNEY  KRAKOFF:
17 Q.    Is that your answer?
18 A.    Yes.
19 Q.    So there's nothing in writing which
20 reflects the event, the incident of the 22nd of
21 November, in terms of a report; is that correct?
22 A.    As I testified earlier, I do not
23 recall.
24        ATTORNEY  KRAKOFF:
25            Well, if there is something in

Page 47

1        writing, I would like to receive a copy
2        of that.
3            ATTORNEY  HALLORAN:
4                We have searched.  We will
5        search again and make sure there is not
6        a written report.  At this point in
7        time we do not believe that there is
8        any written report relative to the
9        videotaping and photographs.
10 BY ATTORNEY  KRAKOFF:
11 Q.    Now, did you prepare anything in
12 writing, or did you have somebody, your
13 secretary or anybody else, prepare something in
14 writing which reflected how many photographs you
15 placed in Lisa Lambert's file?
16 A.    No, sir.
17 Q.    So there was no written inventory, as
18 such, that you made, saying in effect, it's
19 November 22nd, and I've placed five photographs
20 of Lisa Lambert in a file in my cabinet;
21 correct?
22 A.    No, sir.
23 Q.    Is there anything you're aware of in
24 writing which reflects that only five
25 photographs were taken of Lisa Lambert that day?

Page 48

1 I'm talking about still photographs.
2 A.    Not that I can recall.
3 Q.    I'd like to refer you to a document.
4 I'm not going to mark this as an exhibit, but
5 it's an inmate's request to staff member.  And
6 it appears to be dated --- I can't tell what
7 month that is for sure, perhaps you can on the
8 bottom?
9 A.    I believe it's February 14th, '95.
10 Q.    And this is an inmate's request to
11 staff member, and on the bottom of that appears
12 to be your signature.  Is that your signature?
13 A.    That's correct.
14 Q.    And this was produced in the course of
15 discovery.  Is that your handwriting in, I
16 believe that's section eight?
17 A.    That's correct.
18 Q.    And you see on the top, there, it says
19 cc, or does it say cc's?
20 A.    It says file.  You're talking there?
21 Q.    I'm sorry.  It's at the bottom of the
22 page.
23 A.    Oh, okay.
24 Q.    Does that say cc?
25 A.    Correct.

Page 49

1 Q.    To Superintendent?
2 A.    Correct and Deputy Utz.
3        ATTORNEY  HALLORAN:
4            To Superintendent Wolfe?
5 A.    Correct.
6 BY ATTORNEY  KRAKOFF:
7 Q.    And can you describe how cc's to the
8 Superintendent were routinely transmitted from
9 your office to him?
10 A.    My secretary would make copies, then
11 they're placed in the interinstitutional mail
12 and sent to the various offices.
13 Q.    Was his office near yours at the time,
14 or was it in a different building?
15 A.    It would have been in a different
16 building.
17 Q.    And I take it from the cc that as far
18 as you know, a copy was transmitted --- a copy
19 of your response was transmitted to
20 Superintendent Wolfe, assuming that nothing
21 interfered, under ordinary circumstances that
22 would have been transmitted?
23 A.    Correct.
24 Q.    Now, on the top, that's the reference
25 to file; is that correct?

Page 50

1 A.    That's correct.

2 Q.    **Is that your handwriting?**

3 A.    No, sir, it's not.

4 Q.    **Do you know whose handwriting that is?**

5 A.    It appears to be that of the

6 Superintendent.

7 Q.    **And what does that say?**

8 A.    Lisa Lambert file, in my office.

9 Q.    **You had a Lisa Lambert file; correct?**

10 A.    Correct.

11 Q.    **And do you know whether Superintendent**

12 **Wolfe also had a Lisa Lambert file? Did you**

13 **ever have an opportunity to ---?**

14 A.    I'm recalling through his testimony

15 yesterday, yes.

16 Q.    **But that was --- you don't have any**

17 **independent knowledge of the existence of such a**

18 **file?**

19 A.    I believe he does.

20 Q.    **Have you reviewed the Lambert file in**

21 **preparation for this deposition?**

22 A.    Which Lambert file?

23 Q.    **Your Lambert file.**

24 A.    Yes.

25 Q.    **And I take it as part of the review,**

Page 51

1 **you read through the entire --- did you look**

2 **through the entire file, at the various**

3 **documents that were in the file? Did you look**

4 **through each document to see what it was and**

5 **whether it appeared to have pertinence? I'll**

6 **ask it in a third way. Did you thoroughly look**

7 **through the file to identify the documents that**

8 **were in the file?**

9 A.    Yes.

10 Q.    **And were investigative documents**

11 **included in that file?**

12 A.    Yes.

13 Q.    **Extraordinary occurrence reports?**

14 A.    Yes.

15 Q.    **The Metzger report, meaning the report**

16 **from Officer Metzger?**

17 A.    No.

18 Q.    **Did you have any handwritten notes?**

19 A.    Yes.

20 Q.    **Did you have any typed notes? That**

21 **would be notes to the file.**

22 A.    When you say typewritten, personal

23 typewritten notes?

24 Q.    **I don't mean that you typed them, but**

25 **some people, when they take notes --- like**

Page 52

1 myself, I'll just handwrite notes and throw them

2 into a file. Some other people will have their

3 secretary or they themselves might type the

4 notes.

5 A.    Yes, in answer to your question.

6 Q.    **And were there any memos, either from**

7 **you --- were there any memos from you in**

8 **connection with Lisa Lambert?**

9 A.    In reference to ---?

10 Q.    **Anything involved in this case. Either**

11 **the issue of alleged sexual abuse or the**

12 **photographing incident of the 22nd. And by**

13 **memos, I would mean perhaps something you sent**

14 **to the Superintendent, or sent to the central**

15 **office, sent to the security captain. You know,**

16 **just sent to anybody who you felt might have an**

17 **interest in the information? If you don't**

18 **recall, I'll accept that.**

19 A.    Yeah, I don't recall.

20 Q.    **Did you review that file, however, in**

21 **an effort to identify documents that had been**

22 **requested by the Plaintiff in pretrial**

23 **discovery?**

24 A.    When you request --- when the

25 information was requested, I sent my file over

Page 53

1 to Mr. Barr (phonetic), who reviewed the

2 material and then forwarded in on to whomever.

3 Q.    **Who is Mr. Barr?**

4 A.    He's our administrative assistant.

5 Q.    **Do you know whether any inmate**

6 **grievances were reviewed in an attempt to**

7 **identify documents, inmate administrative**

8 **grievances?**

9 A.    I don't know that, sir.

10          ATTORNEY HALLORAN:

11          Just for the sake of

12      clarification, does your file contain

13      any inmate grievances?

14 A.    Lambert's file contain any inmate

15 grievances?

16          ATTORNEY HALLORAN:

17          If you recall?

18 A.    Not that I recall.

19 BY ATTORNEY KRAKOFF:

20 Q.    **It does contain some inmate requests,**

21 **though, at least one inmate request?**

22 A.    Yes.

23 Q.    **Do you know where that file is now?**

24 **Your file?**

25 A.    It's in my cabinet, in my office.

Page 54

1    ATTORNEY KRAKOFF:
2        I would just ask that Mr.
3    Halloran review that file and see if
4    there's anything in there that would be
5    pertinent. Mr. Halloran is nodding his
6    head.
7        ATTORNEY HALLORAN:
8        We will review the file again
9    to make sure that we've complied with
10   your requests. There has been one
11   review of the file already done.
12 BY ATTORNEY KRAKOFF:
13 Q.    I think I can read your response, but
14 would you just please read the response?
15 A.    The entire ---
16 Q.    Yes.
17 A.    --- entire response. Ms. Lambert,
18 prior our discussion on 2/14 of '95, I can
19 assure you that the items in question are
20 secured in my office and I retain the only key
21 at all times. I'm quite disappointed that
22 you're unwilling to provide the sergeant's name.
23 Without it, I cannot investigate the situation
24 you speak of. Once again, the tapes and
25 photographs are secured in my office area, and

Page 55

1    no one has access to them, without the express
2    authorization of administrative staff. I hope
3    this allays your concerns. Deputy Kormanic,
4    2/14 of '95.
5    Q.    Thank you. Now, let's turn to the
6    issue of alleged incidents of sexual abuse by
7    Cambridge Springs personnel against Cambridge
8    Spring inmates. And what I'd like to do is to
9    give you a definition of what I mean by --- when
10   I ask questions about sexual abuse. Here's the
11   definition that will --- this is what I mean
12   when I say sexual abuse or alleged sexual abuse.
13   It will include activities such as the touching
14   of breasts, buttocks, legs and other private
15   areas of the body; the kissing, caressing, the
16   fondling of inmates; sexual acts performed on
17   inmate by prison personnel, including, but not
18   limited to intercourse, oral sex, and digital
19   penetration of an inmate's vagina or anus;
20   sexual acts performed by an inmate on prison
21   personnel; attempts by prison personnel to force
22   or encourage inmates to engage in sexual acts,
23   either by words, threats, or physical force; and
24   references to sexual issues in the presence of
25   inmates.

Page 56

1 A.    May I ask for you to repeat the next to
2    the last sentence, after the sexual acts
3    performed on staff and prior to references to
4    sexual ---.
5    Q.    Right. Attempts by prison personnel to
6    coerce, I think I said force, attempts by prison
7    personnel to force or encourage inmates to
8    engage in sexual acts, either by words, threats
9    or physical force.
10 A.    Okay.
11 Q.    Do you understand the definition?
12 A.    Yes, sir, I do.
13 Q.    And should you lose sight of the
14 definition, I notice that you took notes, I'd be
15 glad to repeat it. Now, I'll show you a copy of
16 an extraordinary occurrence report. It's dated
17 May 6th, 1995, from Officer Jane Metzger to
18 Deputy Kormanic, and I think that you're at
19 least familiar with this document from
20 yesterday's deposition, because I was
21 questioning the Superintendent about it, to some
22 extent. Now, have you seen this document before
23 these depositions?
24 A.    I don't recall seeing it.
25 Q.    There's handwriting on top, which

Page 57

1    appears to say, place Lambert file, cc, I forget
2    his name --- Lazen ---.
3    A.    Lazenby.
4    Q.    Lazenby. And then it says, supt. under
5    that. Do you recognize the handwriting?
6    A.    The cc for Lazenby and the
7    Superintendent is my handwriting. I believe the
8    notation of place Lambert file is Captain
9    Lazenby's handwriting.
10 Q.    Now, do you know whether Captain
11 Lazenby had a Lambert file that was separate
12 from yours?
13 A.    Yes.
14 Q.    He did have a separate one?
15 A.    Yes.
16 Q.    Now, does the fact that the cc to
17 Lazenby and Superintendent appears on this
18 document, make you feel confident that at some
19 point prior to the deposition, you saw this ---
20 A.    Yes.
21 Q.    --- this extraordinary occurrence
22 report?
23 A.    Yes.
24 Q.    Now, what is Officer Metzger's first
25 name?

Multi-Page

Page 58

1  A.    Julie Ann.
2  Q.    Now, it says inmates involved named in
3  the C number, and under that it says, Lambert,
4  L., then parenthesis, OB 6416, then on the next
5  line there a parenthesis that says, within the
6  parenthesis, says, confidential source. Now,
7  are you able to determine whether, just based
8  upon practice at this institution, whether
9  Office Metzger, when writing confidential
10 source, was referring to Lambert, or was
11 referring to a second inmate?
12 A.    I believe she was referring to a second
13 individual. I don't know whether it was an
14 inmate or not. I don't recall.
15 Q.    A second individual.
16 A.    May I clarify something else?
17 Q.    Yes.
18 A.    That term, confidential source, for the
19 purposes of that document, and I believe if the
20 language --- my terminology is a misnomer, the
21 only person who can establish a confidential
22 source is the Intelligence Captain.
23 Q.    All right.
24 A.    I believe she's using that --- using
25 that out of context.

Page 59

1  Q.    To basically say, I'm not using the
2  name at this point?
3  A.    Correct.
4  Q.    But the only one who can get a CSI
5  designation is the person who had been approved,
6  who is it --- who has the authority?
7  A.    The Intelligence Captain.
8  Q.    Can either an inmate or a staff member
9  become a confidential source?
10 A.    That's correct.
11 Q.    Now, this says, while I have no
12 opinion, on the bottom it says, description of
13 incident in detail. In handwriting it says,
14 while I hold no opinion, I feel these
15 allegations should be brought to your attention
16 so that all parties may be cleared of these
17 alleged infractions. And then below that, in
18 parenthesis, it says statement attached. And
19 then there's a two-page statement which is
20 actually on legal size paper, which is printed.
21 Now, do you recall ever having seen the two-page
22 attachment before these depositions?
23 A.    I don't recall sir.
24 Q.    You have no recollection?
25 A.    No recollection.

Page 60

1  Q.    Do you have any idea where this
2  particular document was retrieved from, prior to
3  my receiving a copy of it?
4  A.    No, I don't.
5  Q.    Now, the report, the two-page
6  attachment, as you can see, contains allegations
7  that Eicher had physical contact with inmate, E.
8  Jones, that Eicher --- these are all allegations
9  --- had contact with E. Masonette and H.
10 Masonette, that Eicher had contact with an
11 inmate named P. Hoover, first initial is P.
12 A.    That's Paula.
13 Q.    Paula, that Eicher, at this point,
14 allegedly had contact with Lisa Lambert and it
15 goes on to describe a number of different
16 alleged contacts. That Officer Montaho
17 (phonetic) had physical contact with Ms.
18 Lambert, that Merry, that's M-E-R-R-Y, Officer
19 Merry had contact with an inmate, C. Binam.
20 A.    That's Carnell Binam. (phonetic)
21 Q.    That Officer Rogers had contact with
22 Lisa Lambert while Eicher was present, that
23 Officer Coffee had contact with M. Diaz, that
24 Officer Free had contact with an inmate named
25 Jafka, J-A-F-K-A, that a maintenance worker ---

Page 61

1  A.    Wayne Young.
2  Q.    Yeah, Wayne Young, had contact with
3  Jafka, that M. Stewart, food supervisor, M.
4  Stewart, allegedly had contact with an inmate
5  DiBello, D-I-B-E-L-L-O, that Officer Beck had
6  contact with Dibello in the Chaplin's office,
7  and that Officer Schmidt allegedly had contact
8  with Lambert, and also supposedly sent a letter
9  at the end of January into the institution.
10 Now, do you agree that these are serious
11 allegations?
12 A.    Yes.
13 Q.    And I take it that you didn't receive
14 allegations of several officers having
15 inappropriate contact with inmates, you know,
16 every day. That wasn't something that came into
17 your office in forms of extraordinary occurrence
18 reports every day, was it?
19 A.    No.
20 Q.    So if you saw this two-page attachment
21 ---?
22 A.    I'm sorry, sir.
23 Q.    Now, did you have any occasions, any
24 other occasions where you received extraordinary
25 occurrence reports or other kinds of reports,

Page 62

1 from a staff member, which communicated
2 allegations of inappropriate sexual contact
3 between a member of the staff or members of the
4 staff and inmates?
5          ATTORNEY HALLORAN:
6              You mean ones different then
7          these or including these?
8 BY ATTORNEY KRAKOFF:
9 Q.    I think that you don't recall whether
10 you received this. Isn't that your testimony?
11          ATTORNEY HALLORAN:
12              This document?
13 BY ATTORNEY KRAKOFF:
14 Q.    This document; is that correct?
15 A.    I don't recall it. I think you asked
16 me earlier if it was --- that I acknowledged
17 that at some point I had received it because of
18 my signature.
19          ATTORNEY HALLORAN:
20              Yeah, you haven't asked her
21          whether she's familiar with the
22          incidents?
23          ATTORNEY KRAKOFF:
24              Right, I haven't gotten into
25          that, but ---.

Page 63

1          ATTORNEY HALLORAN:
2              I guess I just want to make
3          sure, unless you're asking this
4          question.
5 BY ATTORNEY KRAKOFF:
6 Q.    I guess what I'm wondering is, if you
7 received a document like this, why you wouldn't
8 have a recollection of it as you sit here today.
9 Because it seems to be a fairly serious
10 document. You agreed that these are serious
11 allegations?
12 A.    That's correct, sir.
13 Q.    Do you have an explanation as to how
14 you can, as of today, have no recollection of
15 this document?
16          ATTORNEY HALLORAN:
17              You're asking her why she
18          doesn't recall it?
19 A.    Which doc ---.
20 BY ATTORNEY KRAKOFF:
21 Q.    Well, I meant that there's an
22 attachment to the extraordinary occurrence
23 report and it explicitly says, statement
24 attached; correct?
25 A.    Correct.

Page 64

1 Q.    I'm referring to this document as,
2 these three as a single document, because it
3 makes reference to the attachment and my
4 assumption is that the three-page document was
5 delivered to your office.
6          ATTORNEY HALLORAN:
7              I think her testimony is that
8          in all likelihood it was delivered,
9          because of the reference to the cc.
10 BY ATTORNEY KRAKOFF:
11 Q.    Right. And what I'd like to know is if
12 you have any explanation as to why you have no
13 recollection as you sit here, independent of
14 seeing the cc, of having received this document?
15 A.    I don't have an explanation for that,
16 sir.
17 Q.    Now, had you received, either prior to
18 May of 1995, let's limit it to that at this
19 point. Prior to May of 1995, which is the date
20 of this document, this extraordinary occurrence
21 report, had you ever received communications
22 from a staff member, of a similar nature, which
23 informed the person to whom the report was
24 addressed. That was to you, this report was to
25 you, directly. Did you receive any other

Page 65

1 reports of alleged --- any other extraordinary
2 occurrence reports of alleged sexual abuse on
3 the part of staff members against Cambridge
4 Spring inmates?
5 A.    Let me correct something, also. All
6 extraordinary occurrence reports go to me.
7 Q.    Right.
8 A.    All extraordinary occurrence reports.
9 Not just ones alleging improprieties by staff.
10 If we lose a tool, if we lose a key, if a water
11 line breaks. Anything, any time an
12 extraordinary occurrence report is written, it
13 comes to my office.
14 Q.    So there are a lot of extraordinary
15 occurrence reports that come through your
16 office?
17 A.    That's correct, sir.
18 Q.    Are there a lot of extraordinary
19 occurrence reports that come to your office
20 containing allegations of sexual abuse by
21 members of the staff against inmates?
22 A.    The only reason I hesitate in answering
23 in that is, are you --- on the sheer volume of
24 the extraordinary occurrence reports I get, or
25 ---?

Page 66

1 Q.    Why don't you give me --- I'm not
2 comparing the two.  Why don't you give me
3 independent, not making any comparison.
4 A.    By the sheer volume of the
5 extraordinary occurrence reports that I get in
6 the five and a half years I've been here,
7 extraordinary occurrence reports that allege
8 staff improprieties with inmates, there is not a
9 disproportionate, a large disproportionate
10 number.
11 Q.    How many reports of sexual
12 improprieties, sexual abuse, have you received
13 during the time that you've been Deputy
14 Superintendent?
15 A.    I would not be able to give you a
16 specific number.  I could not tell you that.
17 Q.    You can't give me a ballpark number?
18 A.    No, sir.
19 Q.    A thousand?
20 A.    No.
21 Q.    More than 500?
22 A.    No.
23 Q.    More than 300?
24 A.    No.
25 Q.    More than 200?

Page 67

1 A.    No.
2 Q.    More than 150?
3 A.    No.  Less than a hundred?
4 Q.    Less than a hundred?
5 A.    Yes.
6 Q.    Approximately a hundred?
7 A.    I didn't say that.  I said less than a
8 hundred.
9 Q.    Approximately how many?
10 A.    I don't know, sir.
11 Q.    More than 75?
12 A.    I don't know.
13        ATTORNEY HALLORAN:
14        Objective.  Argumentative.
15        ATTORNEY KRAKOFF:
16        I think I have a ---.
17        ATTORNEY HALLORAN:
18        She said she doesn't recall
19        and she said now less than a hundred.
20 BY ATTORNEY KRAKOFF:
21 Q.    Well, you recall enough to say less
22 than a hundred?
23 A.    I'm guessing.  I'm estimating.  You
24 asked me for a ballpark figure.
25 Q.    Give me an estimate of the number of

Page 68

1 ---.
2 A.    Less than a hundred.
3 Q.    Now, prior to receiving the
4 extraordinary occurrence report, which was May
5 6th, 1995, I take it you had received other
6 reports of sexual improprieties occurring at
7 Cambridge Springs, involving staff members and
8 inmates; is that correct?
9 A.    That's correct.
10 Q.    Now, I'd like you to give me some of
11 your earliest recollections, after you came here
12 in 1992, of reports involving staff members,
13 involving alleged sexual abuse.
14 A.    Do we have a list, the list of inmates?
15 The list of staff that we had prior?
16 Q.    But I don't want you to limit it to
17 that if there is.
18 A.    I understand.  Carl Zimmerman, Martin
19 Miller.  And we are going by reports received of
20 alleged sexual abuse.
21 Q.    Yeah, just allegations.
22 A.    Allegations.  Jim Merry, Richard
23 Hammers, Paul Walton, James Eicher.  Prior to
24 1995?
25 Q.    Yes. Now, what about Officer Raun.

Page 69

1 Did that involve allegations of sexual abuse?
2 A.    I don't recall.
3 Q.    You're not sure?
4 A.    I'm not sure.
5 Q.    Do you recall what the allegations were
6 about Carl Zimmerman?
7 A.    Kissing, fondling, I believe that was
8 it, to the best of my knowledge.
9 Q.    By fondling, was that the breasts?
10 A.    I don't recall, sir.
11 Q.    How did you first become aware of these
12 allegations?
13        ATTORNEY HALLORAN:
14        Zimmerman's?
15 BY ATTORNEY KRAKOFF:
16 Q.    Zimmerman's.
17 A.    I don't recall.  I'm not sure.
18 Q.    Had there been rumors circulating
19 around the prison for a while about Zimmerman
20 and an inmate or inmates?
21 A.    I don't recall.
22 Q.    You know what I mean?  What I mean is,
23 I guess the two poles of this would be, there
24 were rumors for awhile, and then they led up to
25 his termination or one day we received this

Page 70

1 allegation, and in short order, he was out of
2 here.
3 A.    The reason I hesitate, oftentimes in
4 the course of an investigation, or at the ---
5 after an investigation has been completed, staff
6 or inmates will come forward and say, oh, well,
7 I knew this. I don't recall if that happened
8 prior to Mr. Zimmerman's investigation. I don't
9 recall. Everybody has good memory, after the
10 fact.
11 Q.    Was it learned that Zimmerman had been
12 involved in kissing and fondling with one inmate
13 or with more than one inmate?
14 A.    I'm aware of one.
15 Q.    And that inmate was?
16 A.    Lisa Gunnerson.
17 Q.    And Martin Miller, how did you become
18 aware of that? Was that through a staff member,
19 was that from an inmate, was that from some
20 other source?
21 A.    I don't recall, sir. Normally,
22 whenever something like this hap --- normally,
23 whenever there's something like that, obviously,
24 because I'm the Superintendent's deputy, I'm
25 privy to conversations that he has. I get

Page 71

1 conclusionary reports from Captain Lazenby. So
2 I'm not avoiding your question, I'm not sure, I
3 don't recall.
4 Q.    How many inmates was Martin Miller
5 allegedly involved in from the information you
6 obtained?
7 A.    I don't remember, sir. I remember one.
8 Q.    And that was --- who was that?
9 A.    Vasquez (phonetic).
10 Q.    What about Jim Merry? What were the
11 allegations involving Jim Merry?
12 A.    Inappropriate activity with inmate
13 Elizabeth Masonette. I don't recall the
14 activity.
15 Q.    Richard Hammers?
16 A.    Kissing and --- kissing, oral sex, with
17 Elizabeth Masonette.
18 Q.    Mr. Walton?
19 A.    Oral sex, fondling, and I don't recall
20 the inmate.
21 Q.    And Eicher? We know Lambert. Did you
22 receive allegations about Eicher involving other
23 inmates?
24 A.    Not that I can recall.
25 Q.    Now, when you cc'd the extraordinary

Page 72

1 occurrence report to Captain Lazenby, what was
2 the purpose of your cc-ing it to him?
3 A.    To provide him with the information.
4 Q.    And what was your expectation, if any,
5 that Lazenby would do with the report?
6 A.    Not so much what he would do, because
7 the cc's were to the Superintendent and to him,
8 specifically, to make sure that they were aware
9 of these allegations and then the Superintendent
10 could direct an investigation, if he so chose.
11 Q.    But you couldn't direct an
12 investigation?
13 A.    No.
14 Q.    Do you have any recollection after
15 having reviewed, and you can look through it if
16 you want to, now, in further detail. Do you
17 have any recollection discussing any of these
18 allegations either with the Superintendent or
19 with Lazenby?
20 A.    I remember discuss --- I remember the
21 incident involving Eicher and Lambert ---
22 Q.    All right.
23 A.    --- in the music room at Curry Hall,
24 the field house, and the second floor bathroom
25 at Curry Hall, only.

Page 73

1 Q.    You had a discussion with the
2 Superintendent about those allegations?
3 A.    Yes.
4 Q.    Do you recall what ---.
5         ATTORNEY HALLORAN:
6         I'm sorry. I think she was in
7     the middle of an answer.
8         ATTORNEY KRAKOFF:
9         Oh, I'm sorry.
10 A.    No.
11 BY ATTORNEY KRAKOFF:
12 Q.    Do you recall what the nature of that
13 discussion was?
14 A.    To the best of my memory, we were
15 making sure we had received the same information
16 and what he was planning on doing with it, to
17 the best of my ---.
18 Q.    That's the Superintendent?
19 A.    Yes.
20 Q.    And as you go down, beginning with
21 Eicher and Jones, through these two pages, do
22 you have any recollection of having discussions
23 ---?
24 A.    Okay, I'm sorry, Mr. Krakoff.
25 Q.    That's all right. Do you have any

Page 74

1 recollection of having discussions with the
2 Superintendent about any of these other
3 allegations?
4 A.    I do not recall receiving, to digress a
5 minute, this report was made in May of 1995.
6 Officer Eicher was no longer employed by the
7 institution at that time, to the best of my
8 memory. I do not recall every receiving any
9 information prior to this report, of Officer
10 Eicher and Elizabeth Jones. I do not recall any
11 report prior of Officer Eicher and Masonette. I
12 do recall something, I'm not sure if it was a
13 report, if it was an EO, or a rumor, about Paula
14 Hoover and Officer Eicher, but it was not sexual
15 contact. It was alleging assault in Curry Hall.
16 Q.    A physical assault?
17 A.    Yes.
18 Q.    All right.
19 A.    Do you want me to proceed ---?
20 Q.    That would have been before May of
21 1995?
22 A.    That's correct. Paula Hoover was not
23 longer in the institution in May of '95.
24 Q.    All right, right. And they said this
25 occurred in late 1993.

Page 75

1 A.    Do you want me to go down to Monteo?
2 Q.    Sure. Yes.
3 A.    I don't recall any reference to Monteo
4 and inmate Lambert. . I do not recall anything
5 with Merry and inmate Binam.
6 Q.    Having any discussions with anybody
7 about them after the date of this memo, or of
8 the extraordinary occurrence report.
9 A.    I'm saying before. I don't recall this
10 memo. I've already testified to that.
11 Q.    Now, I'm trying to determine whether
12 you had any discussions, after the day of this
13 memo, with the Superintendent or with Captain
14 Lazenby about any of these allegations?
15         ATTORNEY HALLORAN:
16         I think her answer to that was
17         none, but there were discussions that
18         occurred prior to the date of this memo
19         regarding certain of these incidents.
20 BY ATTORNEY KRAKOFF:
21 Q.    Right. Is that your answer, that after
22 the date of this incident, you have no
23 recollection of having any discussions with the
24 Superintendent or with Captain Lazenby about the
25 various ---

Page 76

1 A.    That's correct.
2 Q.    --- allegations.
3 A.    That's correct, sir.
4 Q.    Now, focusing on before, I believe your
5 testimony is, that you have some recollection
6 prior to the date of this memo, of hearing
7 something about Officer Eicher and Hoover, and
8 that involved some sort of a physical abuse of a
9 non-sexual nature.
10 A.    Correct.
11 Q.    What about prior to, do you recall any
12 of the other incidents that are alleged?
13         ATTORNEY HALLORAN:
14         Well, she's going through
15         those allegations.
16 BY ATTORNEY KRAKOFF:
17 Q.    Right. I wanted to clarify ---.
18 A.    That's what I was responding to
19 previously. Monteo, I don't recall being
20 informed of any allegation. Officer Merry,
21 other than the allegations with Masonette, I
22 don't recall anything with inmate Binam.
23 Q.    All right. That could be confusing a
24 little bit, the answer. You're not saying that
25 Biman was involved with Masonette and Merry, do

Page 77

1 you?
2 A.    No.
3 Q.    You have a recollect --- go ahead.
4 A.    There was an incident, there was an
5 allegation of Merry involved with Masonette and
6 I have an allegation in front of me that says he
7 was involved with Binam. I remember the
8 Masonette incident.
9 Q.    Right. That's what I thought you were
10 saying.
11         ATTORNEY HALLORAN:
12         Is Merry still employed at the
13         institution as of ---?
14 A.    '95, no. And inmate Binam was not here
15 in '95, that I can recall.
16 BY ATTORNEY KRAKOFF:
17 Q.    What about Rogers?
18 A.    Rogers was not employed here in 1995.
19         ATTORNEY HALLORAN:
20         Did you have any recollection
21         of Rogers having any contact with
22         Lambert?
23 A.    Yes.
24 BY ATTORNEY KRAKOFF:
25 Q.    You had heard something about that

Page 78

1 prior to May of 1995?
2 A.    Yes.
3 Q.    You're not sure when?
4 A.    No, sir.
5 Q.    Coffee?
6         ATTORNEY  HALLORAN:
7         Mind if I clarify?  And Rogers
8    was no longer employed at the
9    institution as of May of 1995?
10 A.   Correct.  Sergeant Coffee, I recall
11 something.
12 BY ATTORNEY  KRAKOFF:
13 Q.    Uh-huh (yes).
14 A.    But I'm not --- I don't recall the
15 inmate or the location or the date.
16 Q.    Was it something of sexual nature?
17 A.    I don't recall that, sir.
18 Q.    Meaning, you're not sure if it was a
19 sexual nature or not?
20 A.    I'm not sure.
21 Q.    And then --- is Coffee still here?
22 A.    Yes, he is.
23 Q.    What about Free?
24 A.    I don't remember anything on Sergeant
25 Free.

Page 79

1 Q.    Young?
2 A.    I don't remember, sir.
3 Q.    Okay.  And what about Stewart?
4 A.    I don't remember.  I do remember the
5 issue of gum and perfumes being brought in as
6 gifts.
7 Q.    Uh-huh (yes).
8 A.    But that was in relation to the Paul
9 Walton incident, not Mr. Stewart.
10 Q.    All right.
11 A.    And that was part of the investigation,
12 I believe.  I do recall something with
13 Lieutenant Beck, but again it's the same as
14 Sergeant Coffee.  I don't recall the inmate, the
15 circumstances, the times.
16 Q.    Okay.  Or even the time period?
17 A.    No, sir.
18 Q.    When you found out ---?
19 A.    No.  And Lieutenant Beck is still here.
20 Q.    What about Schmidt?
21 A.    Yes, I do remember.  I remember the
22 allegation of having contact with Lambert.  I
23 don't recall ever hearing anything about a
24 letter.  And Officer Schmidt is still here.
25 Q.    Let me show you a copy of something

Page 80

1 that I believe I received yesterday from Mr.
2 Halloran.  It's dated October 21st, 1994, and
3 it's addressed to ---.
4 A.    Dearest Aunt Frankie.
5 Q.    Yeah, right.  And it appears to have
6 nonsense words, or some sort of code.  Have you
7 seen this before?
8 A.    Yes, sir.
9 Q.    And do you remember how you saw that
10 and when you saw it?
11 A.    To the best of my memory, it was
12 brought to me by my search team in late October,
13 early November of '94.
14 Q.    And did you reach any determinations as
15 to who had written that letter?
16 A.    Ms. Lambert had written it.
17 Q.    To whom she had written it?
18 A.    To an inmate, Frankie Latham, Valeria
19 Latham (phonetic) is her real name.
20 Q.    But not to Officer Schmidt?
21 A.    No, sir.
22 Q.    And the last question before we break
23 for lunch, have you --- or to your knowledge,
24 has anybody at the institution, reviewed the
25 extraordinary occurrence reports for the period

Page 81

1 between 1992, onward, to determine whether, and
2 to what extent, reports concerning alleged
3 sexual abuse by prison personnel exists?
4 A.    Extraordinary occurrence reports?
5 Q.    Yes.
6 A.    I don't know that, sir.
7 Q.    Are they retained in the institution?
8 A.    They are retained in my storage room.
9 Q.    All right.  And they go back since the
10 beginning?
11 A.    Yes, sir.
12 Q.    I'm willing to look through those,
13 rather than having the staff, and I would just
14 mark the ones that are pertinent.
15 A.    It is 1994.
16         ATTORNEY  HALLORAN:
17         Just so we can clarify, the
18    document that you were sharing before
19    is dated October 21st, 1994, and it's
20    addressed with some type of code or
21    something to Aunt Frankie, and you
22    identified that inmate as being whom?
23 A.    Valeria Latham.  Her nickname was
24 Frankie.
25         ATTORNEY  HALLORAN:

Page 82

1          And it's a two-page letter?
2 A.   It was a one-page letter, front and
3 back, I believe.
4          ATTORNEY HALLORAN:
5          Did you do the scratching out
6      on a duplicate copy to make it more
7      readable?
8 A.   Yes, I did.I wanted to make you aware
9 that after our conversation and then previous
10 testimony that I gave, I stated that I believed
11 I saw a report that Ms. Lambert did not have
12 bruises after she made the allegation that
13 Sergeant Raun had assaulted her in the
14 stairwell. I went back to my notes and found a
15 medical report which I believe you already have.
16 BY ATTORNEY KRAKOFF:
17 Q.   Uh-huh (yes).
18 A.   And the medical report reflects that
19 there were bruises --- there were bruises. I
20 believe my recollection was, in the report, the
21 alleged incident occurred on October 3rd or 4th,
22 and she never reported it until the 13th, and
23 the investigative report contradicts itself. In
24 one statement it says about the bruises but on
25 the second page, in one of the paragraphs it

Page 83

1 says that there was no evidence on the medical
2 reports to reflect that. And I think that's
3 were I got ---. But regardless of that, we
4 still needed to establish a baseline whenever
5 she came back so that we were positive that no
6 more --- that there were no more injuries or no
7 more cuts, bruises, scrapes, scratches, that
8 type of thing, after she came back from Court.
9 Q.   All right.
10 A.   And so regardless of whether she had
11 the bruises, regardless of that, we still needed
12 to establish that.
13 Q.   In fact, there were photographs of
14 bruises that were taken of her, weren't there?
15 A.   I don't know that, sir.
16 Q.   Can you think of no other officers who
17 were alleged to have contact, officers or other
18 staff members, who were alleged to have had
19 sexual contact, i.e., engaged in alleged sexual
20 abuse with inmates at Cambridge Springs, from
21 the time you came here?
22          ATTORNEY HALLORAN:
23          Your question is excluding the
24      ones that were already discussed this
25      morning ---

Page 84

1          ATTORNEY KRAKOFF:
2          Right.
3          ATTORNEY HALLORAN:
4          --- which reflect both the
5      ones from that list we made from
6      yesterday's deposition, that would be
7      the Superintendent's deposition, and
8      also the memo of May 6th, 1995, the
9      extraordinary occurrence report of May
10      6th, 1995.
11 BY ATTORNEY KRAKOFF:
12 Q.   Well, I don't think that you have any
13 recollections other than there might have been
14 one recollection, in connection with the
15 extraordinary occurrence report; is that
16 correct?
17          ATTORNEY HALLORAN:
18          Right.
19 BY ATTORNEY KRAKOFF:
20 Q.   Whatever you identified as recalling,
21 when I was questioning you about the
22 extraordinary occurrence report; is that right?
23 A.   As I recall your question was, prior to
24 1995, and I don't remember any others.
25          ATTORNEY HALLORAN:

Page 85

1          Others than the ones you've
2      already identified this morning?
3 A.   Correct.
4 BY ATTORNEY KRAKOFF:
5 Q.   I have a memo from Superintendent Wolfe
6 to Captain Bartlett, subject was request for
7 investigation, and this involves a request to
8 investigate Officers Hammers. The memo, which
9 is dated March 7, 1995, reads, based upon the
10 information you've recently provided to me
11 regarding an allegation that COT Hammers was
12 observed by an unidentified corrections officers
13 trainee, engaging in a sexual act with an
14 unidentified inmate, I am hereby directing you
15 to conduct a formal investigation into this
16 matter. Please keep me updated on your
17 progress, and that was to Captain Bartlett.
18 Now, is this your understanding of how requests
19 for investigations ordinarily occur, through a
20 memo of this sort?
21 A.   Not necessarily. They can certainly be
22 in writing, but they can also be verbal from the
23 Superintendent.
24 Q.   Do you recall --- I'm going to be
25 taking the deposition of Captain Bartlett, but

Page 86

1 do you recall approximately when the new captain
2 came on, the investigative captain, when that
3 change came about? When Captain Bartlett
4 discontinued doing such investigations and the,
5 and I keep forgetting his name, the other ---
6 A.     Lazenby.
7 Q.     --- Lazenby, assumed that
8 responsibility. Do you remember the year?
9 A.     No sir, I don't.
10 Q.     Now, let me show you a copy of a
11 document that was furnished yesterday to me by
12 your counsel. It's dated 11/9/94, and it has
13 VL, it appears to be your name on top; is that
14 right?
15 A.     That's correct.
16 Q.     And is this in your handwriting?
17 A.     Yes, sir.
18 Q.     It's a three-page, four-page document,
19 legal size, and what is the nature of this
20 document? How would you --- I'm not asking
21 about the information contained in --- would you
22 call that an investigative document, or what
23 would you call that?
24 A.     To the best of my memory, this was as a
25 result of this letter.

Page 87

1 Q.     Right, the October 21, 1995 letter
2 addressed to Aunt Frankie?
3 A.     Correct.
4           ATTORNEY HALLORAN:
5           Everything except it's October
6      21, 1994.
7           ATTORNEY KRAKOFF:
8           Oh, is that '94, I'm sorry. I
9      wasn't trying to mislead.
10 A.     Yeah.
11 BY ATTORNEY KRAKOFF:
12 Q.     And what was the nature of the document
13 that you prepared on the 9th? Was that it ---
14 what would you call that, I don't want to give
15 it a name?
16 A.     It was a --- it's my note, my interview
17 notes after talking to the various individuals.
18 Q.     Were you part of the --- would it be
19 fair to say you were part of the investigative
20 process?
21 A.     At that point, I don't recall whether
22 or not we were in an investigative mode. I
23 believe it may have been more of a fact-finding,
24 to ascertain what was going on with this letter
25 of October 21st, 1994. Then based on that

Page 88

1 information, it may have been forwarded to the
2 Superintendent for further investigation.
3 Q.     Were you able to, I see you were, you
4 were able to --- somebody was able to decipher
5 what the letter meant by crossing out letters;
6 is that correct?
7 A.     I testified earlier that that was my
8 scratching on the copy.
9 Q.     Right. You broke the code. Well, I'm
10 going to have a hard time reading this. Do you
11 recall, in general terms, after you deciphered
12 this, what Ms. Lambert was saying?
13 A.     Would you like me to read it for you?
14 Q.     Why don't you, that might be the
15 easiest.
16 A.     The document is dated October 24th,
17 1994, and it's addressed to a Dearest Aunt
18 Frankie. Hello, my darling Aunt Frankie. I
19 miss you so much. Hi, it's Lisa. How I miss
20 whining to you. I know you miss your pain in
21 the butt, bend over, Barbie. I miss whining to
22 you so much. I hope I'm writing this so you can
23 read it right. How are you doing, for real? I
24 miss you so much. Listen to me, I'm still in
25 protective custody from that man Raun. He put

Page 89

1 bruises all over me. They took pictures of what
2 he did to me down at medical. I didn't tell on
3 Raun but Ms. Wolfgang told somebody because she
4 was trying to help me. I wish I had never would
5 have told her what he did. I'm scared. Please
6 pray for me. I'm scared. Listen, I saw the PRC
7 today and they said they are keeping me in here
8 until they have an investigation about Raun. I
9 keep praying that everything will be okay. I
10 miss you so much. I keep sending you messages
11 but I don't know if you get them. Hey, does
12 this sound familiar? Ms. Frankie, where's my
13 friend. Or how about this, Ms. Frankie, I want
14 to crawl in a hole and die. I need my friend.
15 Then you say, but honey, baby, you're just too
16 pretty to curl up and die, or you need to lay
17 out all nice and pretty. Are you laughing yet?
18 I hope so. How's my friend. Is he all right?
19 I haven't seen him in seven days. I miss him so
20 much. He doesn't even try to come see me. I
21 don't think he cares about me. I'm so worried
22 about him. I really do love him. I just don't
23 think he feels the same way about me. Can you
24 please make sure my friend's all right. I love
25 you. Please write me and send it to the address

Page 90

1 on the front. My sister will send it to me.
2 Love always, Lisa. P.S. Tell me everything
3 that's going on.
4 Q.    All right. Thank you. Were you able
5 to determine who the friend was that was being
6 alluded to in this letter?
7 A.    Not at that time, to the best of my
8 memory.
9 Q.    Did you later find out, or at least in
10 your own mind, reach some conclusion as to who
11 the friend was? No?
12 A.    No.
13 Q.    And is it your understanding that this
14 is something --- the circumstances that this
15 document was discovered, was this something that
16 was discovered among quote, Aunt Frankie's
17 possessions, or is this something that was
18 discovered coming out of the RHU from Lisa
19 Lambert, or ---. I'm not asking you to give any
20 security, I'm not asking how it was discovered,
21 but do you know on whose possession this was ---
22 A.    To the best of my memory, it was --- we
23 got it coming out of the RHU. It was not in
24 inmate Latham's possession.
25 Q.    And then, with respect to this, then

Page 91

1 you --- was this document that's dated the 9th
2 of November, was this something that --- this
3 document was prepared all in one day? I don't
4 mean were the interviews done in one day, but
5 did you, was this something that you wrote all
6 in one day or were there entries after the 9th?
7 A.    There were entries after the 9th. It
8 was an ongoing, because of the availability of
9 the inmates and the staff involved.
10 Q.    Did this go into the Lambert file, your
11 Lambert file?
12 A.    Yes.
13 Q.    And who is Styvesant,
14 S-T-Y-V-E-S-A-N-T? You said, spoke to
15 Styvesant, recalled Eicher asking him to witness
16 conversation between Jafka and Lambert. Was he
17 an officer, or ---?
18 A.    He was an officer.
19         ATTORNEY HALLORAN:
20         What page are you referring
21 to?
22         ATTORNEY KRAKOFF:
23         It's on the third page.
24         ATTORNEY HALLORAN:
25         I want a clarification. The

Page 92

1         reference you made to Styvesant,
2         appears to be --- occurs on November
3         23, 1994, a fact finding held with
4         Officer Eicher, union representative
5         copy. Also present were Lazenby,
6         Bartlett and Utz.
7 BY ATTORNEY KRAKOFF:
8 Q.    I take it that you have no recollection
9 of personally interviewing any of the officers
10 who were identified, or other staff, who where
11 identified on the May 6th, 1995, extraordinary
12 occurrence report, as persons who allegedly had
13 contact with inmates, other than Eicher,
14 correct? You did have --- you did interview him
15 at some point, but it would have been before May
16 of 1995?
17 A.    Correct.
18 Q.    Did you have --- did you interview any
19 of the officers who are identified in the memo,
20 about any sexual improprieties after May 6th,
21 1995?
22 A.    Did I interview any of them after May
23 ---?
24 Q.    Right.
25 A.    No, sir.

Page 93

1 Q.    Are you aware of anybody interviewing
2 any of these officers after the 6th of May,
3 1995, about sexual, alleged sexual abuse of
4 Cambridge Spring inmates?
5 A.    I don't recall, sir. I don't remember.
6 To clarify, again, some of those officers were
7 not available at that time. They were no longer
8 here. Or the inmate.
9 Q.    And I also take it that you're not
10 aware, as you sit here today, of anybody on the
11 staff at Cambridge Springs or the central
12 office, issuing any sort of report reflecting
13 what, if anything, had been done in response to
14 the extraordinary occurrence report?
15 A.    In answer to your question, sir, I
16 don't --- I don't recall, I don't remember
17 anyone interviewing them after May of '95.
18 Q.    Right. Or issuing a report containing
19 any findings or statements associated with the
20 allegations in the attachment?
21 A.    That's correct.
22 Q.    Was Schmidt gone as of May 6th, 1995?
23 A.    No, sir. He's still an employee here.
24 Q.    And Beck?
25 A.    Yes, he's still an employee here.

Page 94

1 Q. **And Stewart?**
2 A. Harry Stewart, yes, he's still an
3 employee.
4 Q. **And Young?**
5 A. No.
6 Q. **He's gone?**
7 A. He's no longer here.
8 Q. **Was he gone by May 6th, 1995, or did he**
9 **---?**
10 A. I don't believe so.
11 Q. **And Free?**
12 A. Free is still an employee.
13 Q. **Coffee?**
14 A. Still an employee.
15 Q. **Rogers?**
16 A. He was gone prior to '95.
17 Q. **Merry?**
18 A. Prior to '95 he was gone.
19 Q. **Monteo?**
20 A. He is still an employee.
21 Q. **And to complete it, I think you said it**
22 **a couple times, Eicher was gone by May 6th of**
23 **1995, right? Your recollection?**
24 A. My recollection, yes.
25 Q. **And as far as were concerned --- as far**

Page 95

1 **as your memory today, you can't recall having a**
2 **discussion with Superintendent Wolfe about this**
3 **extraordinary occurrence report; is that**
4 **correct?**
5 A. No, sir, I don't.
6 Q. **Or with the security captain?**
7 A. Again, no, I don't recall.
8 Q. **Or with anybody that you can recall; is**
9 **that correct?**
10 A. Correct.
11 Q. **Even if an officer were gone, would you**
12 **agree that there could still be some value in**
13 **investigating and determining whether the**
14 **allegations were accurate, so that in the**
15 **future, sexual abuse could be, as a prophylactic**
16 **of future sexual abuse, would you agree, using a**
17 **poor choice of words, as a preventive measure,**
18 **doesn't find out about what occurred in the past**
19 **have some positive benefit?**
20 A. Of course it does.
21 Q. **Now, I note that your cc didn't refer**
22 **the extraordinary report to the central office.**
23 **Would that have been something that you wouldn't**
24 **do on your own, in the ordinary course --- and**
25 **if an extraordinary occurrence report is to be**

Page 96

1 transmitted outside of the institution to the
2 central office, that that would be the
3 **Superintendent's call?**
4 A. That's correct.
5 Q. **And the same thing with orally**
6 **apprising the central office of the**
7 **extraordinary occurrence report and the**
8 **allegations. Is that something that would be up**
9 **to the Superintendent to do, not your function**
10 **or responsibility?**
11 A. I may do it, but it would only be under
12 his direction.
13 Q. **You'd first go to him ---**
14 A. Correct.
15 Q. **--- and then if he said, call them on**
16 **my behalf or call them, then you'd do it, but**
17 **you wouldn't unilaterally do it?**
18 A. Correct.
19 Q. **If an inmate is found to have engaged**
20 **in sexual misconduct with an officer, is that**
21 **inmate subject to disciplinary punishment, do**
22 **you know?**
23 A. It would depend on the circumstances.
24 Simply engaging in sexual misconduct with an
25 officer, I don't believe there would be

Page 97

1 disciplinary action against the inmate because
2 of the interpretation of the Pennsylvania Crimes
3 Code.
4 Q. **And how --- what is that?**
5 A. That says that anybody adjudicated to
6 our care, custody, control, we have authority
7 over. And even though it may be consensual,
8 Pennsylvania Crimes Code does not recognize that
9 because of our realm of authority.
10 Q. **So that even if it appears to be**
11 **consensual, your understanding is that the**
12 **General Assembly has concluded that it can't**
13 **really be consensual because of the relative**
14 **power ---**
15 A. That's correct.
16 Q. **--- between the two; is that correct?**
17 A. That's correct.
18 Q. **I may have this name, and I don't think**
19 **I have it correct, but is there an officer by**
20 **the name of Lillian, or was there an officer by**
21 **the name of Lillian Lathenrock, (phonetic) or**
22 **something to the effect? Does that sound**
23 **familiar?**
24 A. The only thing familiar would be Lee
25 Ann Laverick (phonetic).

Multi-Page™

Page 98

1 Q.    Maybe that's it.  Maybe I didn't hear
2 the name correctly.  Assuming that that was the
3 name, had you ever heard any allegations
4 involving sexual abuse on the part of Lee Ann
5 Laverick?
6 A.    Not that I can remember, sir.
7 Q.    What about Colleen Hughes?
8 A.    I recall the inmate, but I don't recall
9 any allegations.
10 Q.    And what about a Cambridge Springs
11 supervisor by the name of Requine or Requeen?
12 A.    Pequine.
13 Q.    Pequine.  I got it wrong twice.
14 Pequine.
15 A.    I know the individual, but I don't
16 recall any allegations.
17 Q.    And Bruce Allen (phonetic), do you
18 recall any investigation or any allegations
19 about his involvement with a Cambridge Springs,
20 inmate, or a former Cambridge Springs' inmate?
21 A.    I'd like to clarify that.  Mr. Allen,
22 in March of '95, came to us requesting to
23 resign.  I believe the Superintendent was gone
24 and I was in charge of the institution at the
25 time.  We do an exit interview with staff as

Page 99

1 part of normal procedure, and he left us know
2 that he was resigning because he had had a
3 conversation with Richard Hammers, where Richard
4 Hammers had confided in him that Richard Hammers
5 had had a relationship with Elizabeth Masonette.
6 I don't recall any allegations of Mr. Allen
7 having a relationship with an inmate.
8 Q.    All right.  Or a former inmate?
9 A.    Nor a former inmate.  I believe that's
10 how the Hammers' investigation was started.
11 Q.    A lot of my questions have been framed
12 about whether you had heard allegations of
13 sexual abuse on the part of employees, staff
14 members.  If any of the men who are listed on
15 the May 5th, 1995, memo were investigated, as a
16 matter of ordinary protocol, would the
17 investigative captain, whether it was Captain
18 Bartlett at the time, or the person who
19 succeeded Captain Bartlett, would they be
20 notified of the fact that there was an
21 investigation?  They would be the ones who would
22 actually conduct the investigation; is that
23 right?
24 A.    That's correct.  Or at the
25 Superintendent's direction, he may ---

Page 100

1 Q.    Designate somebody else.
2 A.    --- he may designate someone else, or
3 he may determine that it's appropriate for
4 Office of Professional Responsibility to do the
5 investigation, or ask for their assistance.
6 Q.    But as a matter of ordinary protocol,
7 would --- assuming that the target of the
8 investigation isn't the investigative captain,
9 would the investigative captain be routinely
10 apprised of the fact that there is an
11 investigation, whether it's preliminary or more
12 in depth.  But an investigation of an officer is
13 being conducted?  Just as a matter of routine
14 protocol, is that the way it happens?
15 A.    Yes. I need another clarification.  If
16 there's an inmate inquiry or --- and they send
17 it to central office, central office may choose
18 to conduct the investigation themselves, or they
19 also may choose to send it to the Superintendent
20 and have his intelligence captain conduct the
21 investigation.
22 Q.    All right.  The last question on this,
23 and you can hold me to it, on this two-page
24 attachment to the extraordinary occurrence
25 report, of the names listed there, of the

Page 101

1 officers or other staff members who are listed
2 in the attachment, we know that --- you know
3 that Eicher was investigated.  And I'm not
4 limiting this to after that time.  You know that
5 Eicher was at one point investigated for alleged
6 sexual abuse; correct?
7 A.    That's correct.
8 Q.    And you know that --- do you know that
9 Merry at one point, was investigated for alleged
10 sexual abuse?
11 A.    That's correct.
12 Q.    And do you know whether any of the
13 other persons whose names are listed here,
14 Monteo, Rogers, Coffee, Free, Young, Stewart,
15 Beck or Schmidt, were ever investigated?
16 A.    I believe Schmidt was, also.
17 Q.    During 1993 or 1994, or before that, it
18 could have been 1992, as well, did any members
19 of the staff ever come to you, whether they were
20 counselors, Ms. Wolfgang, officers, other types
21 of staff members, and express concerns to you
22 that there might be abuses of a sexual nature
23 against inmates that were occurring at the
24 prison?
25 A.    If I understand your question right,

Page 102

1  you're asking me to recall if I ever had a
2  conversation with any of our staff, from '92 on
3  ---
4 Q.    '92, '93 or '94.
5 A.    --- about their concerns of sexual
6  misconduct by staff with inmates?
7 Q.    Yes. We've already talked about
8  alleged abuses that you've heard, you know,
9  where there was a name to it, a particular
10  officer or a particular maintenance person. The
11  question I'm asking here is different. I'm
12  asking whether somebody, giving you an example,
13  came to your office, sat down across from you,
14  and said, you know, I'm really getting concerned
15  here. I have a feeling that, you know, we have
16  a problem here, some of the inmates are telling
17  me that some of the officers are coming on to
18  the inmates, something of that nature. I'm not
19  limiting it to or even focusing on whether a
20  specific name was given, because you've already
21  answered that question.
22 A.    The only one I can recall was Sandy
23  Wolfgang and her concerns through her therapy
24  sessions with Lambert involving John Raun,
25  Sergeant Raun, at the time.

Page 103

1 Q.    All right. But Ms. Wolfgang, you have
2  no recollection of her coming to you before that
3  time, with expressions of concern that there
4  might be sexual abuses occurring at the prison?
5 A.    No, sir, I don't recall.
6 Q.    Was it you to whom Ms. Wolfgang
7  reported the fact that Lisa had made some
8  complaints about Officer Raun?
9 A.    Are you asking me if she reported it
10  exclusively to me?
11 Q.    Yeah, I'm going to be deposing Ms.
12  Wolfgang. But I was just wondering whether ---
13  what your understanding is of who she contacted
14  initially, about what Lisa had alleged to her?
15  If you don't know, that's fine.
16 A.    I don't remember.
17 Q.    Did you have a conversation with her,
18  face to face, though?
19 A.    Uh-huh (yes).
20 Q.    And do you recall, based upon your
21  review of the materials, when that conversation
22  took place, what month, or ---?
23 A.    No, sir, I don't.
24 Q.    Do you recall --- is it your impression
25  that that conversation took place more or less

Page 104

1  contemporaneously, with Lisa's allegations, or
2  whether it took place at some more distant time,
3  after the invest ---.
4 A.    What does contemporaneous mean?
5 Q.    Well, I mean within a day or two or
6  three, or was it like a month later?
7 A.    Ms. Wolfgang's concern --- conversation
8  with me happened, like six months after Lisa got
9  here, or right around the time --- right around
10  the time of the letter writing that Lisa had ---
11  the letter that John Raun had sent --- had
12  forwarded to the shift commander.
13 Q.    Oh, okay. All right. I think you have
14  a copy of that. Was that '90 ---? Do you have
15  those?
16        ATTORNEY HALLORAN:
17        It was '94.
18        ATTORNEY KRAKOFF:
19        Was it '94? No, that's
20        another letter. That's the one where
21        John Raun was reporting that he ---
22        this is it.
23 A.    Okay. June of '93?
24 BY ATTORNEY KRAKOFF:
25 Q.    There are two from --- are those the

Page 105

1  two?
2 A.    Uh-huh (yes).
3 Q.    And within six months of that is when
4  you had the conversation with --- six months
5  after that ---.
6 A.    No. My reference to six months was six
7  months after Lisa got here.
8 Q.    All right.
9 A.    To the best of my memory, the concerns
10  that Sandy came --- the conversation that Sandy
11  and I had happened about the same time as the
12  letters, in June of '93.
13 Q.    My recollection is that the records
14  will reflect that she arrived here sometime in
15  1992. I think we can --- I have it somewhere.
16  I don't know that we have to pin that down. But
17  your recollection is it was about six months
18  after Lisa arrived at Cambridge Springs?
19 A.    I'm going by the baseline that she
20  arrived in January of '93.
21 Q.    That might have been the time.
22 A.    But I'm not sure of that.
23 Q.    So you think it was roughly, roughly in
24  June --- approximately in June of ---
25 A.    '93.

Page 106

1 Q.  --- '93.  And what did Ms. Wolfgang say
2 to you?  I don't mean verbatim, I mean what was
3 the thrust of what she ---?
4 A.    The context of the conversation was
5 that Lisa was making --- was in her therapy
6 sessions, that she had a fixation on Sergeant
7 Raun.  And she was also alleging that there was
8 sexual contact or some kind of physical contact,
9 and Sandy was expressing concerns about that.
10 Q.    She was alleging that there had been
11 some sort of sexual contact between her and
12 Officer Raun, or between her and --- between
13 Lisa and some other officer.
14              ATTORNEY  HALLORAN:
15              I don't think she said sexual.
16              I thought you said physical.
17 BY ATTORNEY  KRAKOFF:
18 Q.    I'm sorry.  Did you say physical or
19 sexual?
20 A.    I said both.  Some time of contact with
21 Sergeant Raun, not another individual.
22 Q.    So what did you do with that
23 information?  Did you do anything?
24 A.    To the best of my memory, this was
25 after Ms. Wolfgang had talked to Deputy Utz.

Page 107

1 Deputy Utz had advised the Superintendent,
2 Superintendent had the talk with Ms. Wolfgang
3 about reporting that information.  And it
4 happened after that.  She was --- it was a
5 general conversation in the privacy of my office
6 about what had taken place in the therapy
7 sessions.
8 Q.    I think the conversation you're
9 alluding to was what the Superintendent
10 testified to yesterday, that he, at some point,
11 made it clear to Ms. Wolfgang that the privacy
12 that is strictly adhered to in the outside
13 world, can't exist in that same fashion inside
14 of a prison because of security concerns; is
15 that right?
16 A.    That's correct.  That happened in the
17 same time frame, because I can recall her
18 expressing frustration of not understanding that
19 of having difficulty with that.
20 Q.    Or how far she could go to reveal what
21 on the outside world, would be a private
22 communication that couldn't be related to
23 somebody else?
24 A.    Correct.
25 Q.    Which I imagine is a problem for a lot

Page 108

1 of psychologists in a prison setting.  Have you
2 had others who've expressed that same concern?
3 A.    No. No, sir.
4 Q.    Do you know whether the Superintendent
5 took any steps to investigate whether, in fact,
6 Lisa was fixating on Officer Raun or whether, in
7 fact, Officer Raun might be having some sort of
8 inappropriate contact with her?
9 A.    I don't recall, sir.
10 Q.    May I ask, in general, that might be
11 work product, is it?
12              ATTORNEY  HALLORAN:
13              Yes.
14              ATTORNEY  KRAKOFF:
15              Okay, then I won't even ask in
16              general.
17 BY ATTORNEY  KRAKOFF:
18 Q.    Are you familiar with the affidavit
19 that Lisa Lanzel (phonetic) signed in connection
20 with the first investigation of Officer Eicher?
21 Are you generally familiar with that affidavit?
22 A.    I recall seeing it, sir.  I don't --- I
23 would hesitate to say I'm familiar with it.
24 Q.    Did you have any involvement in
25 interviewing Lisa Lanzel about the Eicher and

Page 109

1 Lisa Lambert situation?  Let me show you a copy
2 of the affidavit.
3 A.    I stand corrected.  The one I was
4 thinking of was the Dibello witness statement.
5 I don't recall this one.  And in answer to your
6 question, if I understood you correctly, I was
7 not present for the investigation.
8 Q.    When Lanzel was ---?
9 A.    Correct.
10 Q.    Was Captain Bartlett basically in
11 charge of, on this end, was he the most active
12 person in the investigation?  I know that much
13 of it was done by the central office, the second
14 investigation.
15              ATTORNEY  HALLORAN:
16              Of, of ---.
17              ATTORNEY  KRAKOFF:
18              Eicher.
19              ATTORNEY  HALLORAN:
20              Of Eicher, okay.
21 BY ATTORNEY  KRAKOFF:
22 Q.    Do you know?
23 A.    I don't remember, sir.
24 Q.    Are you aware of a general or a
25 comprehensive file with respect to alleged or

Page 110

1 actual sexual abuse of Cambridge Springs'
2 inmates by staff? What I mean is, so that you
3 understand the question, is there like one
4 comprehensive repository of documents that
5 relate to allegations, alleged or proven, sexual
6 abuse?
7 A.    I'm not aware of that.
8 Q.    Because we know that you had a Lambert
9 file, Superintendent Wolfe had a Lambert file,
10 it appears that the captain had a Lambert, the
11 investigative captain had a Lambert file. And
12 I'm just wondering, did you have like a Walton
13 file, and did you have a file on Walton, or
14 Zimmerman, or any of the other personnel who
15 were either terminated or resigned?
16 A.    I'm sorry, sir. Please repeat your
17 question.
18 Q.    As far as you know, I think giving an
19 example might be easier. If I wanted to find
20 out about the Allegheny County Jail, I could go
21 to the Carnegie Library in Pittsburgh and I'd
22 say, do you have a Allegheny County Jail file.
23 And they'll have all these articles in a folder,
24 labeled Allegheny County Jail. What I'm trying
25 to gather is whether somebody has collected the

Page 111

1 data, the information, all of the various
2 individual incidents of alleged sexual abuse, or
3 established instances of sexual abuse by staff
4 against employees, and has put it together in
5 some sort of a comprehensive way?
6 A.    No, sir. Not that I'm aware of.
7 Q.    Are you aware of any efforts either by
8 the central office of the Department of
9 Corrections or by Cambridge Springs, to
10 evaluate, try to determine what had --- how the
11 proven cases of sexual abuse had been able to
12 occur? What caused it to happen here? Are you
13 aware of anybody in the central office or here
14 undertaking to find out what the root cause or
15 causes were?
16 A.    You're talking about an encompassing
17 evaluated report, based on the cases?
18 Q.    Right. Was it training, was it
19 recruiting, was it evaluating of recruits, was
20 it discipline or the absence thereof. Was it
21 any number of --- was it policies, the absence
22 of adequate monitoring? Was it none of the
23 above? Has anybody tried to, to your knowledge,
24 at the Cambridge Springs, attempted to have that
25 evaluated?

Page 112

1 A.    I don't know. I do know the department
2 has recognized a need for more comprehensive
3 training, as far as cross-gender supervision,
4 and professionalism, staff professionalism. And
5 they have taken steps to incorporate that into
6 mandatory training for the Department of
7 Corrections employees.
8 Q.    When did that development occur,
9 approximately?
10 A.    '96.
11 Q.    Do you know whether --- oh, I'm sorry.
12 A.    I need to mention too, that the
13 institution, itself, and our Superintendent
14 placed an emphasis on additional training for
15 staff in light of the problems that the
16 institution was appearing to have.
17 Q.    And when did that occur, what year?
18 A.    October of '93, additional training.
19 We already had our basic training, where it's
20 addressed as far as involvement with staff and
21 inmates. We had a code of ethics training.
22 Code of ethics --- our code of ethics training
23 by our training lieutenant, and then, to the
24 best of my memory, in October of '93, we started
25 additional training, and we spoke in previous

Page 113

1 testimony about the video.
2 Q.    Right. Was that October of '94 when
3 Mr. --- I believe that the Superintendent
4 testified it was October, '94, when Davis ---?
5 A.    To view the video.
6 Q.    In October of '93 there was a different
7 video, and that was produced or obtained?
8 A.    It was purchased. It was an outside
9 purchase, like a company produces the video for
10 a correctional staff. And we purchased it for
11 training.
12 Q.    Did that become part of mandatory
13 training? Or was that available for any staff
14 who wanted it?
15 A.    We took it upon ourselves to show it to
16 staff. And I'm answering that in response to if
17 I'm an officer and I wanted to go see it. Yes,
18 you can certainly do that, but we felt it was
19 serious enough that we wanted to show it to all
20 of our staff, as part of our required training.
21 Q.    And do you recall, so that I can know
22 what you're talking about, do you recall the
23 title of the video, or where it was produced, or
24 who spoke on it?
25             ATTORNEY HALLORAN:

Page 114

1       We have it. We'll get it for
2 you.
3 A.   I don't remember, specifically.
4 BY ATTORNEY KRAKOFF:
5 Q.   Do you recall having any discussions
6 with the Superintendent about acquiring
7 additional training prior to, either during or
8 prior to October of 1993? I mean, is that
9 something you discussed with him? I don't mean
10 did you initiate it, I mean were you part of
11 discussion with him about that?
12 A.   Prior to '93?
13 Q.   Well, no. You said it was in October
14 of 1993, I think, that you obtained the video?
15 A.   Correct.
16 Q.   And then I take it that the video was
17 shown at some point after October of '90 --- or
18 either during 1993?
19 A.   Correct.
20 Q.   Did the video just show up here one
21 day, as far you were concerned, or were you part
22 of the planning to have additional training?
23 A.   That video in particular, I believe,
24 was obtained by our training coordinator, Mr.
25 Sleighton (phonetic). After that, subsequent

Page 115

1 --- is that the right term ---
2 Q.   Uh-huh (yes).
3 A.   --- I had a conversation with the
4 Superintendent, asking authorization to purchase
5 several other films. One of them was
6 Professionalism in Ethics, and Cross-Gender
7 Supervision, which he gave us permission to do.
8 And I initiated the purchase for that.
9 Q.   What did you tell the Superintendent
10 when you initiated the purchase? Did you give
11 him a rationale for it, did you say this is why
12 I think we should it? Did you just say, I want
13 to purchase this, or did you give him some
14 explanation as to why you thought it would be a
15 good idea?
16 A.   I think, I don't recall the exact
17 conversation.
18 Q.   What about in terms of your mind?
19 Obviously, you decided --- you viewed it as
20 being important to purchase these additional
21 training materials; is that correct?
22 A.   I think it's our responsibility, just
23 like with any, like any corporation, only we're
24 dealing with human beings, that we try to build
25 a better machine. We're never in a position

Page 116

1 where we can say, we're satisfied with what
2 we're doing.
3 Q.   Right.
4 A.   And certainly given, given the number
5 of allegations that we were experiencing, we
6 wanted to do everything that we could to educate
7 staff.
8 Q.   And when was it that you went to the
9 Superintendent and said, I think we should have
10 these additional training films?
11 A.   When was it, sir?
12 Q.   Yes, place or time?
13 A.   I would have to go back and research
14 it. I don't recall. Between '93 and '95.
15 Q.   Go ahead.
16 A.   Can I add something else?
17 Q.   Yes.
18 A.   I think it's also important for people
19 to understand that this simply wasn't based on
20 the allegations that inmates were making. They
21 were also --- it was also a concern that we had
22 from staff. Certainly sexual misconduct occurs
23 between inmates and staff. But certainly it is
24 historically correct that female inmates will
25 use their sexuality to manipulate, and example,

Page 117

1 using your term. If you're inmate and I give
2 you a misconduct and you want to get even with
3 me, what better way than to report to staff that
4 there's been some type of sexual impropriety.
5 And we felt there was a need to educate staff in
6 how to correct --- in how to address that,
7 correctly.
8 Q.   How do you address that correctly?
9 A.   We educate staff, like the
10 Superintendent testified before, a number of
11 ways. If you feel that there may be --- if you
12 feel ---
13 Q.   Pressure?
14       ATTORNEY HALLORAN:
15       What you're about to discuss,
16   is that the content of the videos that
17   you described?
18 A.   Yes.
19 BY ATTORNEY KRAKOFF:
20 Q.   He's throwing you a lifeline, so I'll
21 back off.
22 A.   They would --- the films just more
23 succinctly put it.
24 Q.   How would you be able to determine, you
25 said you would have to research to see when you

Page 118

1 made the suggestion to the Superintendent to
2 obtain the additional videos, and you placed
3 that between 1993 and 1995. Would you be able
4 to determine that by the orders?
5 A.    The outside purchase orders.
6 Q.    That might be an easy way of doing it,
7 if we can have a copy of that, that would be
8 fine.
9 A.    As a further clarification, the
10 Superintendent has to receive justification ---
11 or has to have justification for ---.
12 Q.    For purchase?
13 A.    Yes.
14 Q.    Okay. So your justification would
15 probably provide the rationale for --- would it?
16 A.    Correct.
17 Q.    Because I'd like the justification
18 proposal, too. Now, this is more informational
19 from my standpoint, so that I'm sure that we're
20 getting the documents, that we're not
21 overlooking any documents. The Superintendent
22 identified as the basic policy that prohibits
23 sexual abuse is found in the code of ethics?
24 That's how I recall his testimony. Is that your
25 understanding, that the code of ethics is the

Page 119

1 primary document that prohibits sexual abuse by
2 staff against inmates?
3 A.    That's correct.
4 Q.    Is there any other document that you
5 can think of which prohibits sexual abuse
6 against inmates? Any other DOC level or
7 institutional policy document?
8 A.    No.
9 Q.    No?
10 A.    No, sir.
11 Q.    Does the orientation of inmates, does
12 that come within the jurisdiction of the other
13 Superintendent?
14 A.    No.
15 Q.    Is it within --- it's counseling; is
16 that right? It's a counseling function?
17 A.    It happens within the unit management
18 system, which falls under my jurisdiction.
19 Q.    I've requested a copy at these
20 depositions of the orientation. Is it your
21 understanding that during orientation, inmates
22 are apprised that if there's any attempt to
23 abuse them sexually, that they can complain
24 about it?
25 A.    On this video?

Page 120

1 Q.    Well, either on the video or through a
2 live person saying it to them during
3 orientation? Do you now whether that has been
4 the practice at Cambridge Springs for either a
5 counselor, the unit manager, the video, or some
6 other person to say to inmates during
7 orientation, if you, you know, if anybody on the
8 staff attempts or does sexually abuse you, you
9 can complain about it and this is how you
10 register a complaint?
11 A.    I don't remember it being on the video.
12 I'd have to go back and look at it.
13 Q.    Okay. What about in a live statement?
14 A.    Not that I know of.
15 Q.    And what about the inmate handbook.
16 It's not in there, is it? Specifically?
17 A.    That's correct.
18 Q.    It's my understanding that training
19 sessions would be documented in some fashion by
20 schedules or ---.
21 A.    Training sessions for staff?
22 Q.    For staff. If I wanted to determine
23 when training was given and what the training
24 consisted of, is there a document that I could
25 refer to, going back over the last two or three

Page 121

1 years?
2 A.    Yes.
3 Q.    And what documents would reflect that,
4 what kinds of documents. Would it be the
5 training schedules, themselves, or ---.
6 A.    There would be a sign off sheet for
7 those people that attended what particular
8 training. There would also be a training record
9 for each employee by the training coordinator.
10 Q.    I would imagine that the training
11 coordinator would have some sort of a --- maybe
12 a comprehensive list of what training has
13 occurred in a particular --- over the course of
14 a year? Local, I'm not talking about ---.
15 A.    I believe so.
16 Q.    Were you at all involved in the process
17 of having Vaughn Davis come to Cambridge Springs
18 beginning in September of 1994 to speak with the
19 staff?
20 A.    Yes.
21 Q.    What was the nature of your
22 involvement?
23 A.    To the best of my memory, I had a
24 telephone conversation with Mr. Davis to set up
25 the schedule of when the training would occur,

Page 122

1 times, and the date, and what equipment he would
2 need.
3 Q.    Did you have any discussion with Mr.
4 Davis as to why the administration at Cambridge
5 Springs wanted him to train the staff?
6 A.    I don't remember.
7 Q.    Did the training include more than
8 issues of sexual abuse? If you can recall?
9 A.    I don't recall.
10 Q.    Would it be fair to say that most of
11 what Mr. Davis was training the officers in was
12 dealing, in one form or another, with issues of
13 sexual abuse? Relationships with inmates and
14 staff?
15 A.    The context of the training was to
16 educate staff about the perils and how that
17 relates to the Pennsylvania Crimes Code and
18 civil liability?
19 Q.    Right.
20 A.    Not a criminal liability but civil
21 liability.
22          ATTORNEY KRAKOFF:
23          Give me a minute. I think
24     that might be it.
25

Page 123

1         * * * * * * * *
2     DEPOSITION CONCLUDED AT 2:45 P.M.
3         * * * * * * * *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# ATTACHMENT Q

## Videotape of Vaughn Davis Lecture

# <u>ATTACHMENT R</u>

**Form Confirming that SCI-Cambridge Springs Employee Viewed David Tape, Read Code of Conduct, and Understood Both**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS

*CODE OF ETHICS*
*VAUGHN DAVIS*
*VIDEO 2ND EDITION*

I acknowledge having viewed the video on *Code of Ethics* by Vaughn Davis (2nd Edition).

Also, I have read the Code of Ethics Handbook issued by the Commonwealth of Pennsylvania, Department of Corrections.

I understand the content of the video and The Code of Ethics Handbook and agree to abide by The Department of Corrections Code of Ethics.

SIGNATURE:    _____

DATE:    _____

NAME: (PRINT)    _____

# ATTACHMENT S

## Memorandum Concerning Installation of Cameras at SCI-Cambridge Springs

#1. Video cameras installed 1992-1996.

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**SCI-Cambridge Springs**
**September 2, 1998**

**SUBJECT:**   Surveillance Inquiry

**TO:**        Bill Barr
               Superintendent's Assistant

**FROM:**      Tammy Turner
               Business Manager

    Research and planning of surveillance equipment and usage began in the spring of 1996. A plan was devised to install this equipment in six of the ten buildings within the SCI-Cambridge Springs perimeter. In May of 1996 our plan was supported and approved by Secretary Horne. Cost and product research commenced after the Secretary's approval.

    Purchasing requests were forwarded to the Department of General Services (DGS) in August of 1996. DGS bid out the equipment and issued a PO in March of 1997. The items were received at SCI-Cambridge Springs April 1997 and installed shortly there after.

EXHIBIT
143