# ATTACHMENT T

## Cover Sheet of OPR Investigation of John Raun – June 24, 1994



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA DEPARTMENT OF CORRECTIONS
Special Investigation Office

June 15, 1994

---

Case Number:          94-F-032
Report Prepared by:   Mike Wolanin, Special Investigator
Allegation:           Sexual Harassment

---

SUBJECT:

John Raun, CO II
DOB: 12/04/63

COMPLAINANT / VICTIM:

Lisa Lambert, OB-6416
DOB:  09/09/72

State Correctional Institution Cambridge Springs

---

APPROVED:

Vaughn L. Davis
Director
Special Investigations Office

DISTRIBUTION:

Commissioner Lehman
File



# ATTACHMENT U

## Deposition of Lisa Lambert

1          UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2


3     - - - - - - - - - - - - - - - - - - - - - - - -
                                    :
4     LISA MICHELLE LAMBERT,        :
                                    :
5                    PLAINTIFF,     :
                                    :
6          - v -                    :
                                    :
7     SUPERINTENDENT WILLIAM        :    DOCKET CA 96-247 ERIE
      WOLFE, in his individual      :
8     capacity,                     :
                                    :              - - -
9            and                    :
                                    :
10    DEPUTY SUPERINTENDENT         :         DEPOSITION   UPON
      CHARLES UTZ, in his           :
11    individual capacity,          :         ORAL EXAMINATION
                                    :
12           and                    :                OF:
                                    :
13    CAPTAIN KEITH BARTLETT,       :    LISA MICHELLE LAMBERT
      in his individual             :
14    capacity,                     :
                                    :
15           and                    :
                                    :
16    JOHN RAUN, in his             :
      individual capacity,          :
17                                  :
             and                    :
18                                  :
      JAMES EICHER, in his          :
19    individual capacity,          :
                                    :
20           and                    :
                                    :
21    DEPUTY SUPERINTENDENT         :
      VICTORIA KORMANIC,            :
22    in her individual             :
      capacity,                     :
23                                  :
                     DEFENDANTS.    :
24    - - - - - - - - - - - - - - - - - - - - - - - -

25

        JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
                    1-609-890-7033

```
 1          TRANSCRIPT of the stenographic notes of the

 2    proceedings taken in the above-entitled matter, as

 3    taken by PASQUALE F. CORVINE, a Certified Shorthand

 4    Reporter and Notary Public of the State of New Jersey,

 5    at the EDNA MAHAN CORRECTIONAL FACILITY FOR WOMEN,

 6    P.O. Box 4004, Clinton, New Jersey 08809-4004, on

 7    Thursday, July 22, 1999, commencing at 10:00 a.m.

 8

 9

10                    A P P E A R A N C E S

11

12          PENNSYLVANIA INSTITUTIONAL LAW PROJECT
            BY:  ANGUS R. LOVE, ESQ.
13               EXECUTIVE DIRECTOR
            924 Cherry Street
14          Suite 523
            Philadelphia, Pennsylvania 19107
15          ON BEHALF OF THE PLAINTIFF

16          MIKE FISHER, ESQ.
            ATTORNEY GENERAL
17          BY:  THOMAS F. HALLORAN, ESQ.
                 SENIOR DEPUTY ATTORNEY GENERAL
18          Commonwealth of Pennsylvania
            Office of the Attorney General
19          Litigation Section
            6th Floor, Manor Complex
20          564 Forbes Avenue
            Pittsburgh, Pennsylvania 15219
21          ON BEHALF OF THE DEFENDANTS

22

23
                         JOHN F. TRAINOR, INC.
24                       BY:  PASQUALE F. CORVINE
                         CERTIFIED SHORTHAND REPORTER
25                       LICENSE NO.:  XI00645
```

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

**3**

I N D E X

Witness                                          Page

LISA MICHELLE LAMBERT
    BY MR. HALLORAN                                 4

E X H I B I T S

Number                                           Page

1        Affidavit of Lisa Michelle Lambert      54

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

**4**

LAMBERT

1                    L I S A    M I C H E L L E
2              L A M B E R T, having first been duly
3              sworn, was examined and testified as
4              follows:
5
6    EXAMINATION BY
7    MR. HALLORAN:
8
9         Q     Ms. Lambert, would you state your name
10   for the record.
11   A     Lisa Michelle Lambert.
12        Q     Ms. Lambert, I'm Tom Halloran. I'm with
13   the Pennsylvania Attorney General's Office, and I
14   represent the defendants in a lawsuit that you filed
15   in the United States District Court, Western Section
16   of Pennsylvania, Civil Action No. 96-247 ERIE.
17        In that lawsuit you have named Superintendent
18   William Wolfe, Deputy Superintendent Charles Utz,
19   Captain Keith Bartlett, John Raun, James Eicher, and
20   Deputy Superintendent Victoria Kormanic as defendants.
21        Are you familiar with that lawsuit?
22   A     Yes.
23        Q     I'm going to ask you some questions about
24   that lawsuit and some of the facts underlying it.
25        And if you don't understand my question, ask me

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

**5**

LAMBERT

1    to rephrase it so you do understand it. Please make
2    sure you answer my questions verbally. The court
3    reporter has to have a "yes" or "no" response or a
4    verbal response to take down.
5         Are you under medication or are there any other
6    reasons you won't be truthful or you might not
7    understand my questions?
8    A     No. I'm not on any medication.
9         Q     Are you currently receiving any medical
10   or psychiatric or psychological treatment?
11   A     No, I'm not.
12        Q     Prior to the filing of the complaint in
13   your lawsuit, did you have an opportunity to review
14   the statements of fact contained in it with your
15   lawyer?
16   A     Yes.
17        Q     And is it your testimony that those
18   allegations in the complaint are true?
19   A     Yes.
20        Q     You have alleged in your complaint
21   generally that Superintendent William Wolfe has failed
22   to carry out his responsibilities as the
23   superintendent with regard to protection of female
24   inmates, including yourself. What's the basis of that
25   allegation?

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

**6**

LAMBERT

1    A     I don't understand the question.
2         Q     Okay. Let me rephrase.
3         Your lawsuit suggests that Superintendent Wolfe
4    failed to properly supervise the institution as it
5    relates to the allegations in your lawsuit.
6         What information do you have that would
7    indicate that Superintendent Wolfe failed to do that
8    as it relates to the allegations that you have made in
9    your lawsuit, particularly as they relate to John Raun
10   and James Eicher?
11   A     I feel that he repeatedly disregarded
12   complaints that I made against the officers. I feel
13   that he repeatedly took their word and did not listen
14   to me because I was an inmate.
15        Q     Okay. And with regard to Captain
16   Bartlett, you have indicated that you attempted to
17   institute a claim against him. What's the basis of
18   the complaint you have against Captain Bartlett?
19   A     I feel that Captain Bartlett repeatedly used
20   intimidation to keep me from making complaints against
21   his fellow officers. I feel he repeatedly disregarded
22   my complaints. I feel that he used every tactic he
23   could to keep me quiet.
24        Q     To the best of your knowledge, did
25   Superintendent Wolfe direct Captain Bartlett to

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                                  7

1   investigate allegations of sexual abuse, as they
2   related to you?
3   A      I have no knowledge of that. I have never seen
4   Superintendent Wolfe speaking to Captain Bartlett.
5       Q      Okay. Did Captain Bartlett come to you
6   and ask you questions about your allegations regarding
7   either John Raun or James Eicher?
8   A      Yes.
9       Q      You have also named as defendant Deputy
10  Superintendent Victoria Kormanic, and what is the
11  basis of your allegation against Deputy Superintendent
12  Kormanic?
13  A      I feel she repeatedly disregarded my
14  complaints. I feel that she used humiliation and
15  intimidation when she videotaped me. I feel that she
16  purposely verbally abused me. She ignored my plight.
17  I feel that she took the word of her officers over my
18  word just because they were officers.
19      Q      Now, you make some specific allegations
20  with regard to Ms. Kormanic as it relates to the
21  videotaping. Do you recall those?
22  A      Yes.
23      Q      All right. Are those true allegations?
24  A      Yes.
25      Q      Now, in your complaint you indicated you

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                                  8

1   arrived at SCI Cambridge Springs, two words, in
2   January 1993, and then in May 1993 through October
3   1994 you allege that Officer Raun, R-a-u-n, kissed and
4   fondled you against your will in the prison, and did
5   so several times.
6       When was the last incident between you and
7   Officer Raun that you're complaining about?
8   A      On October 4th or 5th.
9       Q      October 4th or 5th of 1994?
10  A      I'm not -- I'm a little confused about the
11  year. That would have been '94.
12      Q      And did you keep any written records or
13  notes regarding the alleged events between you and
14  Officer Raun?
15  A      I kept a calendar, which I believe that the
16  attorney in Pennsylvania has in evidence. I turned
17  that over for pretrial evidence for the trial against
18  Officer Raun.
19      Q      Did that calendar contain indications for
20  both Eicher and Raun or just Raun?
21  A      It contained notations for numerous people.
22      Q      Are you making allegations of sexual
23  misconduct against any other officers other than Raun
24  and Eicher?
25  A      Officer -- no. He was -- Sergeant Merry

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                                  9

1   participated in helping Officer Eicher do things to
2   me.
3       Q      Was that on one occasion?
4   A      Yes.
5       Q      And was that in May of 1993?
6   A      Yes -- no. I think it was March, March 19th.
7       Q      March 19, 1994?
8   A      Yes.
9       Q      With regard to Officer Eicher, you allege
10  ongoing victimization. When was the first incident
11  that you recall with Officer Eicher?
12  A      He started following me around in October of
13  '93, and that was basically just general sexual
14  harassment. He tried to offer me gifts. He basically
15  followed me around everywhere I went and kept
16  complementing me, kept writing me letters telling me
17  he was in love with me, and that's as far as it went
18  for two months until Christmas Eve. I just
19  basically --
20      Q      Christmas Eve nineteen ninety --
21  A      '93, I think. I'm confused about these years
22  because it's been so long.
23      Q      And so from October 1993 to December 1993
24  you perceived him following you around and he offered
25  you gifts. What gifts did he offer you?

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                                 10

1   A      Chocolate, perfume, lace panties. I can't
2   remember. He would just try to slip things into my
3   hand. I can't remember everything, it was so many
4   different things. He would try and put things into my
5   hands, and sometimes I would look at them and
6   sometimes I wouldn't and I would just push his hand
7   back and say I wouldn't want it. I didn't take
8   anything from him.
9       Q      When you came into the institution, were
10  you advised of the rules and regulations of the
11  institution?
12  A      Yes.
13      Q      And you were aware that it was a
14  violation of those rules for a staff member or
15  corrections officer to fraternize with inmates?
16  A      There was nothing about that in the rule book.
17  I don't recall.
18      Q      Did you understand that it would be
19  improper for an inmate to receive contraband from a
20  staff member?
21  A      That was never discussed. That was common
22  practice, for male officers to bring things to the
23  women. I had no knowledge it was against the rules.
24      Q      Did you receive an inmate handbook?
25  A      Yes.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          11

1       Q       Did you understand that it was your
2  responsibility as an inmate to be familiar with the
3  inmate handbook?
4  A    Yes.
5       Q       And did you understand it would be
6  improper conduct for an officer to engage in sexual
7  harassment of an inmate?
8  A    I don't recall ever seeing that.
9       Q       I understand you don't recall seeing it.
10  Did you understand that would be improper conduct?
11  Did you understand that would be conduct that you
12  would be expected to report to the administration?
13  A    Not at Cambridge Springs.  I saw that type of
14  thing every day, officers doing that to women.
15       Q       And what type of sexual misconduct are
16  you alleging against Officer Raun?
17  A    Officer Raun?
18       Q       Yes.
19  A    Basically, I feel that he enjoyed humiliating
20  me, he enjoyed terrorizing me.  He knocked me around.
21  I don't believe at all that he even believed that I
22  was a person, that I was a human being.  I believe
23  that he just enjoyed hurting me and making me afraid
24  and slapping me and pushing me and just basically
25  making me very afraid of him.

LAMBERT                                                          13

1  to Deputy Utz?
2  A    Yes.
3       Q       You said he hadn't physically abused you.
4  He hadn't hit you at that point?
5  A    No.
6       Q       After he struck you or pushed you around,
7  did you then make another complaint to anyone in the
8  administration?
9  A    Yes.  I went to Martha Miller.
10       Q       Okay.  And how many times did you go to
11  Martha Miller?
12  A    One time.
13       Q       And what did you report to her?
14  A    I wrote a four-page grievance on Raun.  I wrote
15  everything he had done to me -- that he pushed me,
16  that he sought me out while I was cleaning on my
17  isolated detail, that he repeatedly found me in places
18  where there were no staff members or inmates around,
19  that he had knocked me around, that I felt that he was
20  threatening me.
21       Q       What were the locations or what was the
22  location of the areas he found you where there were no
23  other persons around?
24  A    There's a building called Louter.  There are
25  four floors.  The only floors that were occupied were

LAMBERT                                                          12

1       Q       So your testimony, as I gather, is that
2  he physically assaulted you, he beat you; is that
3  correct?
4  A    He pulled me by my hair.  He pushed me.  He
5  left marks on me.
6       Q       Did you understand that if a staff person
7  or corrections officer did that to you, that would be
8  something you as an inmate could and should report to
9  the administration?
10  A    I thought that I could report it.
11       Q       Did you report it?
12  A    Yes.
13       Q       When did you first report it?
14  A    I went to Deputy Utz, and at that point I had
15  just told him about Raun making advances towards me,
16  because he hadn't started knocking me around yet, and
17  Deputy Utz just basically laughed it off.  He said
18  Raun was a healthy young man, and he basically laughed
19  it off.
20       Q       When you made that first complaint to
21  Officer Utz, Raun had not physically touched you in
22  any way?
23  A    Yes.  He kept putting his thumb across my mouth
24  and backed me into a corner.
25       Q       Did you report that conduct specifically

LAMBERT                                                          14

1  Floors One and Two.  Floors Three and Four were very
2  damaged from the rioting at the college campus years
3  ago, and my detail was to clean the stairways on all
4  four floors and to clean Louter Three and Four.  There
5  was a lot of debris and graffiti, and I was supposed
6  to try and clean it off as much as I could.  I was
7  supposed to pick up pieces of wood and glass and get
8  them picked up.
9       Q       Who was on that detail with you?
10  A    I was by myself.
11       Q       Who assigned you to that detail?
12  A    Deborah Sauers.
13       Q       And when did you have that
14  responsibility?
15  A    From January of '93 until October of '93
16  when -- I'm trying to think.  They put me in the
17  laundry in October and November of '93, and then I was
18  in the laundry for a while, and then they put me back
19  on the detail.
20       Q       Do you recall when you went back on the
21  detail?
22  A    I think April or May of '94, when I came out of
23  RHU.
24       Q       And when you went back on the detail the
25  second time, was it Ms. Sauers that put you on the

LAMBERT                                                      15

1  detail the second time?
2  A      I don't know.  I was told by the
3  administration, by Superintendent Wolfe, that he was
4  taking my job away from me and putting me back on the
5  detail.
6         Q      You mean your laundry job?
7  A      No.  First they had me on the detail, then I
8  was in the laundry, and then they moved me from the
9  laundry to the -- I was -- I can't remember what they
10 called it.  I had a desk in the property office.  I
11 processed incoming/outgoing packages, and I worked in
12 the office with Ms. Lazenby for quite a while.  I used
13 to file things for her and type things, and I think I
14 worked in there for about six weeks, and then I went
15 to RHU.
16        Q      And when was your last day at SCI
17 Cambridge Springs?
18 A      June 27th.
19        Q      Nineteen ninety --
20 A      '95.
21        Q      So what were your assignments?  You got
22 out of the RHU unit in approximately April 1994?
23 A      April or May.
24        Q      And your assignment when you got out
25 initially was still with Ms. Lazenby?

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                      16

1  A      No.  They told me Superintendent Wolfe -- I was
2  released from the RHU on a Monday.  He came and told
3  me the Friday before that he would release me on
4  Monday before five o'clock, that he was taking my
5  property job away from me, and that he was putting me
6  back on cleaning detail.
7         Q      And when you were back on cleaning
8  detail, what were your responsibilities?
9  A      At that point it was to clean Louter Two.  That
10 was where my room was.  I had to clean all the
11 bathrooms, the hallways, the bathrooms.  Basically, I
12 was responsible for the upkeep of the entire unit
13 where the women lived.
14        And then also when I had extra time, when I had
15 my major responsibility done, I was sent upstairs to
16 do things like wash screens on the windows, sweep, try
17 to get a lot of the debris off the floor.
18        Q      And who determined when you had your
19 Louter Two responsibility completed and then sent you
20 to Louter Three?
21 A      It depended on the officer.  If they felt
22 that -- if it was a nice officer and they felt that I
23 had worked enough, they would just let me go for the
24 day, but some officers would say, well, go upstairs
25 and work for a couple hours.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                      17

1         Q      What officers assigned you to go upstairs
2  and work on Louter Three?
3  A      Oh, my gosh.  I don't remember.  It was just
4  the unit -- whoever was working in the unit.  It was
5  just like an offhand thing.  They would just tell me
6  go up and work for a couple hours.
7         Q      And did you ever go up to Louter Three
8  without being directed to do so or without that being
9  part of your job responsibility?
10 A      Sometimes I would go up there to get a broom
11 and a dustpan if I couldn't find one.  There were a
12 lot of times people would take things up there.  There
13 would be things that were left up there.  Sometimes we
14 couldn't find the mop buckets and things, and it
15 turned out maintenance supervisors would have taken
16 them upstairs and I would have to go upstairs and get
17 them.
18        Q      And did that happen from the first time
19 you began to work on Louter Three or did that happen
20 after you got out of the RHU and were working on
21 Louter Two?
22 A      That happened all the time.  That was a
23 constant thing.  I couldn't find the proper equipment
24 to clean the unit, and I had to go upstairs and get
25 it.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                      18

1         Q      Now, you make a number of allegations
2  against Officer Raun, beginning, as you indicate, in
3  May of 1993, and continuing till October 1994.  That
4  was the last incident you're making an allegation
5  about, is October of 1994?
6  A      Yes.
7         Q      Could you tell me when was the first
8  incident that you recall with Officer Raun?
9  A      The first time that he became angry with me was
10 right after I had gone to Deputy Utz.
11        Q      I understand that's the first time he
12 became angry with you.  What's the first time that you
13 and Officer Raun had sexual contact or inappropriate
14 touching contact?
15 A      It was that day.
16        Q      In May of 1993?
17 A      Well, actually, I consider what he did, putting
18 his thumb across my lip and cornering me and hugging
19 me, I consider that inappropriate.
20        Q      When did that happen?
21 A      That was happening before.  That's why I went
22 to Deputy Utz.
23        Q      When you reported that to Deputy Utz, did
24 you report anything else to him in that period of
25 time?

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                                    19

1    A     I just told him about him cornering me and
2    hugging me and touching my lip with his thumb.
3         Q     Was that the extent of the inappropriate
4    touching that you were complaining about with regard
5    to Officer Raun up until May of '93?
6    A     Yes.
7         Q     So when you went to Deputy Utz, it was
8    sometime after May of 1993, and that's when you
9    complained about his brushing against you and touching
10   your lips with his thumb?
11   A     That was in May, and I went to Deputy Utz, and
12   then --
13        Q     Go ahead.
14   A     -- the next day Captain Lazenby called me into
15   his office and asked me about it, and I told him
16   again, and he basically intimidated me and told me
17   that I'd better not get Raun in trouble.
18        Q     And who was present at that meeting with
19   Captain Lazenby?
20   A     That was -- that time it was by himself. He
21   called me into his office, and I only told him what
22   happened with Raun because I believed he was asking
23   out of concern for my welfare. I didn't realize he
24   was a friend of Raun's and that he was asking because
25   he wanted to know how much I would say to somebody.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                                    20

1         Q     Okay. And then as it relates to Officer
2    Raun, what were the next events that occurred with
3    him?
4    A     He basically started getting very -- I don't
5    know what you would call it. He started staring at
6    me. He became very menacing after that time.
7         Q     Now, the menacing that you're describing,
8    that was based upon him staring at you?
9    A     Staring at me, following me around. He kept
10   grabbing me by my hair. He kept pushing himself into
11   me.
12        Q     This is after you have complained to
13   Deputy Utz?
14   A     Yes.
15        Q     And when he was doing this, over what
16   period of time are we talking about? I know we're
17   into May 1993. Was it a month? two months?
18   A     No. It was constant. It went on and on and on
19   and on every time he was there.
20        Q     At some point I think you allege that he
21   sadistically beat you several times. When was the
22   first time that you allege he sadistically beat you?
23   A     After I went to Martha Miller and I told her I
24   thought Raun was going to try and rape me. He dragged
25   me up the stairs, basically by my hair. I was

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                                    21

1    walking, but he had me by my hair, and I kept tripping
2    on the stairs. He pulled me up there and he had me by
3    my hair, and he flung me really hard into the wall,
4    and he hurt my mouth really bad. He bruised me and he
5    kept ramming himself into me and smashing me into the
6    wall.
7         Q     Now, when you say "stairs," which stairs
8    are we talking about?
9    A     He dragged me upstairs to Louter Four.
10        Q     This is from Louter Three to Louter Four?
11   A     No. I was in the stairway. I don't know what
12   landing I was on. The landings aren't marked.
13   They're just landings and stairs and stairs and
14   stairs.
15        Q     And did you, when you met with Martha
16   Miller, did you report to her Raun's actions toward
17   you?
18   A     I told her everything that had happened up to
19   that point.
20        Q     And that included him rubbing his thumb
21   on your lips? Was he pulling your hair at that point?
22   A     By the time I had gone to Martha Miller, he
23   pulled my hair. He also had been grinding himself
24   against me. He bruised my mouth really bad. I had --
25   he had left marks on me that was teeth, and he had

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                                    22

1    smashed me, like rammed me into the wall.
2         Q     So you told Ms. Miller all that?
3    A     Yes.
4         Q     And then after he grabbed you on the
5    stairwell, did you then go back to any staff member?
6    A     No, not after what happened with Martha Miller.
7    I was petrified. I eventually went to Sandra
8    Wolfgang, but after that -- I had already gone to
9    Deputy Utz. Raun had reacted very badly to that.
10   Then I had gone to Martha Miller. He flipped out and
11   went into a rage over that, and I was terrified to try
12   and go to anybody else.
13        Q     Do you understand it was a violation of
14   the rules to pass notes to officers and receive notes
15   from officers?
16   A     No, not at Cambridge Springs. I saw people get
17   handed notes all the time.
18        Q     Do you recall that you were called in for
19   possible discipline regarding a note you attempted to
20   pass to Officer Raun?
21   A     They -- I think Captain Lazenby called me in
22   and asked me about a note, because I gave a note to a
23   girl to give to a girl that worked in dietary, and
24   somehow Raun confiscated it or got hold of it somehow,
25   and Captain Lazenby asked me who the note was for, and

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          23

1  I told him a girl in dietary, and he told me I
2  shouldn't be passing notes to other inmates, and that
3  was pretty much the end of it.
4        Q    Was that the same meeting that you
5  referred to before with Captain Lazenby?
6  A    No.
7        Q    This is a different meeting?
8  A    Yes.
9        Q    And did Captain Lazenby tell you it was
10 inappropriate for you to be passing notes to other
11 inmates or staff members?
12 A    He said I shouldn't pass notes to other
13 inmates.  He said it wasn't specifically against the
14 rules, but he told me it wasn't a good idea, and he
15 said that he just wanted to clarify who the note was
16 to.
17       Q    And was anyone else present at that
18 meeting with Captain Lazenby?
19 A    No.
20       Q    When were you called in by Captain
21 Lazenby regarding that note?
22 A    Maybe April or May or June of '93.  I don't
23 remember.  It was sometime in the summer.
24       Q    Okay.  Was it before or after the time
25 that you allege that Raun first grabbed you by the

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          24

1  hair and dragged you upstairs to Louter Hall?
2  A    I don't remember.
3        Q    Now, you were in the RHU for some period
4  of time in '94?
5  A    Yes.  Two different times.
6        Q    Okay.  Do you recall the times you were
7  in the RHU?
8  A    The first time was, I think, March of '94, till
9  April or May or June of '94.  There was a two- or
10 three-month period the first time.
11       And then the second time, I believe, was from
12 October 10th or sometime around there until -- that
13 was in '94 -- until June 27th of '95.
14       Q    Okay.  Are you making any allegations
15 against Officer Raun or Officer Eicher for that period
16 of time that you were in RHU?
17 A    They both at different times came back and they
18 said ignorant things to me, but nothing.  They were
19 not able to physically have access to me because there
20 was a steel door there.
21       Q    And do you recall whether those events
22 happened during the first time you were in the RHU or
23 the second time you were in the RHU?
24 A    The first time I was in the RHU, Raun would
25 come in there and he would just look at me through the

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          25

1  door, or he would just say something to me like you'd
2  better keep your mouth shut, or just something
3  offhanded and he would keep on walking.
4        And then the second time I was in the RHU, I
5  don't remember him coming in the second time, but
6  Eicher came in.
7        Q    And Eicher didn't come in the first time?
8  A    No.  He didn't work there then, Eicher didn't.
9  I didn't know him then.
10       Q    Okay.  And when you got out of the RHU
11 the first time, what allegations are you making with
12 regard to Officer Raun?  That would be, I guess, in
13 June of '94.
14 A    When I got out, he -- basically, things just
15 started up as usual.  He started staring at me again.
16 He started grabbing me by my hair.  He just started
17 being typically nasty to me again, following me
18 around, yelling at me.
19       One time when I was in the cafeteria with a
20 table full of people, he was staring at us and then he
21 just screamed at us to get out.  He just basically did
22 things that were menacing and threatening and
23 intimidating in nature.
24       Q    Did he ever have any inappropriate sexual
25 activities with you from January of '94 to October of

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          26

1  '94?
2  A    Yes.  He periodically, repeatedly, would grab
3  me whenever he found me in deserted areas of Louter.
4        Q    Let's go back.  Did these incidents occur
5  anywhere other than Louter Hall?
6  A    I don't remember.  I believe that they all
7  pretty much happened in Louter because that's always
8  where I was.
9        Q    And you made some allegations regarding
10 the stairwell at Louter Hall.  Is that where most of
11 these incidents were occurring?
12 A    Yes.  Usually there's only one stairway.  At
13 that time only part of Louter One was used, and there
14 is one stairway that inmates and staff have access to.
15 There are four other stairways.  There is one stairway
16 to the left part of the building that's totally
17 deserted, and the main stairway is the second one.
18 The third and fourth stairways at the other parts of
19 the building are totally deserted and nobody uses
20 them.  Inmates and officers are not supposed to have
21 access to them.
22       Q    Are they kept locked?
23 A    Sometimes they are; sometimes they're not.
24       Q    All right.  Now, you recall the first
25 event after you were released from the RHU as being a

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                    27

1  time when he pulled your hair in Louter Hall.  Was
2  that in the stairway?
3  A    I'm not sure right when I got out of RHU.  I'm
4  not -- it's hard to remember.  It was five years ago.
5  I just know that things started right back up.
6      Q    Okay.  And when you got out and things
7  started back up again, did you then make a complaint
8  to anyone in the administration?
9  A    I started going to Ms. Wolfgang, to Sandra
10 Wolfgang.
11     Q    Do you recall the first time you went to
12 Ms. Wolfgang?
13 A    I believe in July or August of '94.
14     Q    And when you first went to Ms. Wolfgang,
15 did you report conduct involving Officer Raun?
16 A    Yes.  Officer Raun and Officer Eicher.
17     Q    In the complaint you indicate, I believe,
18 that the time period before the events with Officer
19 Eicher were between August of '94 and October of '94.
20 Does that mean when you first went to Ms. Wolfgang it
21 was after you were having trouble with Officer Eicher
22 also?
23 A    Yes.  I began having trouble with him
24 because -- well, actually, October of '93 things
25 really started to get bad.  Christmas Eve, that was

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                    28

1  the first time he told me -- he said I haven't hurt
2  you yet, but I could, and that was when things started
3  to get out of line with him.
4      Q    That was before you were put in the RHU?
5  A    Yes.
6      Q    All right.  At some point after you got
7  out of the RHU, you went to Ms. Wolfgang and you
8  reported an incident involving Officer Raun and
9  Officer Eicher; is that correct?
10 A    Yes.
11     Q    And you don't recall exactly when that
12 was, but it was sometime after you got out of the RHU?
13 A    Right.
14     Q    And then you were telling me that you
15 were placed in the RHU a second time?
16 A    Yes.
17     Q    And that was approximately when?
18 A    October of '94.
19     Q    Okay.  And that from October of '94 you
20 didn't have any problems with either -- well, you had
21 no problems at all with Officer Raun, and the only
22 problem you had with Officer Eicher, he would
23 occasionally walk by in the RHU?
24 A    Yes.  And he would come outside my window on
25 third shift, I guess to do building checks, and he

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                    29

1  said something ignorant to me one time about that he
2  had gotten -- and I can't remember what the word is.
3  He said something about he had gotten an operation so
4  he couldn't have children anymore, and he said the
5  name of it.  I can't remember what it's called.  And
6  he said now you don't have to worry about getting
7  pregnant, and he kept on walking.
8      Q    That happened while you were in the RHU?
9  A    Yes.
10     Q    And when you were released from the RHU
11 the second time, okay, I think you indicated you
12 left -- when did you indicate you left Cambridge
13 Springs?
14 A    June 27th.
15     Q    '95?
16 A    Yes.
17     Q    How much time was it between the time
18 that you got out of the RHU the second time and you
19 were transferred to another institution, or were you
20 transferred from the RHU?
21 A    I was taken from the RHU.  I was put in a
22 transport jumpsuit.  I was handcuffed behind my back
23 and I was turned over to central transport.  They
24 videotaped me leaving the institution, and I was given
25 directly to central transport.  And then I was with

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                                    30

1  them for about a week and a half, driving all over who
2  knows where, and then they finally delivered me to
3  Delaware, to WCI, Women's Correctional Institution, in
4  Delaware.
5      Q    So other than the verbal comment from
6  Officer Eicher when you were in the RHU the second
7  time, there were no other contacts with him, and no
8  contacts at all with Officer Raun after October 1994?
9  A    Eicher came in a couple times and said
10 something smart to me, and they were just basically
11 vulgar comments.
12     And then I saw him twice when I went out to the
13 yard they have.  It's not a yard there.  Basically
14 they lock like a dog pound, and they put you out there
15 so you could get fresh air.  They put you out there
16 for an hour or two.
17     And twice when I went out there, he was the
18 officer out there, so I stopped going out there for a
19 while.  I told the officers I didn't want to go out.
20 But twice when I was out there, I was out there with
21 him, and I think there might have been another inmate
22 present, and it just made me feel really disgusting
23 and uncomfortable.
24     Q    Did anything happen?
25 A    No.  There was another inmate there.  I just

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                    31

1  remember there was somebody else there that he
2  couldn't say anything. He just looked at me and I
3  felt really uncomfortable.
4      The dog pounds there, they have chains, and
5  there was two layers of fence between he and I, so
6  there was no way that anything could have happened.
7      Q    So he's not inside the fence anyway; he's
8  outside?
9  A    No. The dog pounds are like this, and then
10 there's the fence where the door closes, and then
11 there's another fence in front of that, so you're
12 basically behind two layers of fencing.
13     Q    Okay. I want to go back to the period of
14 time when you were released from RHU the first time
15 before you went in the second time, and I want to ask
16 you a few more questions about Officer Raun.
17     You indicated that at some point you did
18 complain to Ms. Wolfgang about Officer Raun, and when
19 was the next event that you can recall with Officer
20 Raun after you complained to Ms. Wolfgang?
21 A    I don't think he found out about that, that I
22 told her. I'm sure he knows now, but I don't think at
23 that point he found out about that because he didn't
24 say anything to me about it the next time, and he kept
25 doing things, like pulling my hair. And he would just

LAMBERT                                                    32

1  grab me, I think just to let me know that he could do
2  it.
3      But the next time that was really bad was in
4  October when he rammed his knee into me in the
5  stairway. That was the time that he really, really
6  hurt me. I had big marks on me and my leg hurt really
7  bad.
8      Q    That was one time in October of 1994?
9  A    Yes.
10     Q    And were there any times prior to that
11 where he beat you to the point where you felt the same
12 kind of pain you say you did in October of '94?
13 A    Yes. When he would ram me into the wall and he
14 would grind himself into me, he would leave bruises on
15 me, on my legs and down across my pubic bone and on my
16 lower stomach, and he would like squeeze me really
17 hard here and pull my hair, and like I had bruises on
18 my mouth from his teeth.
19     Q    How many times did that conduct occur
20 between June of '94 and October of '94?
21 A    I don't know. Every chance he got, every
22 chance where he found me alone or where he ran into me
23 at work.
24     Q    Was it once a month?
25 A    No. It was far more than that. It was several

LAMBERT                                                    33

1  times a week.
2      Q    Now, you're saying on many of those
3  occasions he grabbed your arms?
4  A    That's how he would hold me. Sometimes he
5  would grab me here. When he had me against the wall,
6  he would put his hands and push my shoulder back.
7      Q    And did that conduct cause bruising on
8  your body?
9  A    Yes.
10     Q    And that happened, would you say, at
11 least once a week?
12 A    More than once a week.
13     Q    More than once a week?
14 A    Yes. It was bad enough to the point that I
15 basically had to schedule my visits around when I
16 didn't have marks on me. I would call my parents and
17 say you can come tomorrow, because I knew if the
18 officer saw it, that they would call the
19 administration, and Raun would get in trouble and it
20 would be a lot worse.
21     Q    How many times, from June through October
22 1994, did you seek medical attention for those
23 bruises?
24 A    None. The doctor saw me one time, and that was
25 in October when Ms. Wolfgang saw the bruises and she

LAMBERT                                                    34

1  went and told Deputy Utz and Superintendent Wolfe.
2      Q    Did you ever receive any notes from
3  Officer Raun?
4  A    Yes.
5      Q    Did you keep those notes?
6  A    No. I tore them up and flushed them down the
7  toilet.
8      Q    And did you ever send any notes to
9  Officer Raun?
10 A    No.
11     Q    The times that you indicated that Officer
12 Raun assaulted you in the stairwell or in areas in
13 Louter Hall, did you ever obtain any articles of his
14 clothing or parts of his uniform?
15 A    Did I ever what?
16     Q    Did you ever get possession of any
17 articles of his clothing or his uniform?
18 A    No.
19     Q    Did you ever have in your possession his
20 name tag or any parts of his name tag?
21 A    Did he ever give me his name tag?
22     Q    Did he ever give it to you or did you
23 ever take it or did you ever have it in your
24 possession, his name tag, or any parts of his name
25 tag?

LAMBERT                                                    35

1  A     Absolutely not.
2        Q     Did you ever have sexual intercourse with
3  Officer Raun?
4        I'm sorry. I didn't hear you. You have to
5  give a verbal response.
6  A     No.
7        Q     Did you ever report that you had sexual
8  intercourse with Officer Raun to anyone?
9  A     I said that -- I think I said "sexual contact."
10 That's -- I'm pretty sure that's the wording I used.
11 I consider that sexual conduct -- I don't know if
12 other people do, but I consider a man rubbing himself,
13 even with clothes on, I consider that sexual contact.
14       Q     And did you ever have any type of oral
15 sexual relationship with Officer Raun?
16 A     Absolutely not.
17       Q     All right. You indicated that, with
18 regard to Officer Eicher, that in December of '93, I
19 believe, he was bringing you gifts or offering you
20 gifts, and then you were in the RHU for a period of
21 time?
22 A     Yes.
23       Q     And after you came out of the RHU, when
24 was the first incident you recall with Officer Eicher?
25 A     He started pretty much when I got right out. I

                JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
                            1-609-890-7033

LAMBERT                                                    36

1  remember he grabbed me and kissed me in front of my
2  friend Leanne.
3        Q     What was Leanne's last name?
4  A     Giaffco. He basically just started fondling
5  me, grabbing me, kissing me.
6        Q     Was that in front of Leanne Giaffco, what
7  you just described, or just a kiss?
8  A     He grabbed me, he grabbed me, like he put his
9  hand, he grabbed me by the butt and like pulled me
10 against him and kicked me in front of Leanne, and I
11 think that happened two or three times.
12       It was when we would go to "creams and things,"
13 because I had an operation on my feet because I ran a
14 26-mile marathon at the prison, and when I was done
15 running the marathon, my toenails had turned black and
16 blue because the nurses sprayed us with water, and the
17 water was in my shoes, and my toenails peeled back
18 when I was running.
19       And when my toenails came in, they came in
20 under my skin, and I had to go to the doctor. And he
21 had to go -- he had to cut into my toes, and he had to
22 burn the roots with acid to make the toenails come
23 back in properly.
24       And my feet were bandaged, and I think they
25 were stitched too, and we had to go to "creams and

                JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
                            1-609-890-7033

LAMBERT                                                    37

1  things" every night because I had to get Epsom salts
2  to clean my feet and ointment and all kinds of things,
3  and this would happen when we went to "creams and
4  things."
5        Q     And Leanne Giaffco would go with you?
6  A     Yes.
7        Q     Was anyone else present?
8  A     There might have been, but nobody I
9  specifically recall. That's a big hall. It has
10 basically I guess what you would consider cathedral
11 ceilings, and it's very huge and open. It's just very
12 big. There's a lot of space in there.
13       Q     Okay. You allege in your complaint you
14 had sexual intercourse with Officer Eicher on three
15 occasions?
16 A     No. That he made me have sexual intercourse.
17       Q     What you allege in your complaint --
18 A     Excuse me?
19       Q     Never mind.
20       Is that accurate, that there were three
21 occasions you had sexual intercourse with Officer
22 Eicher?
23 A     Far more than three occasions.
24       Q     Far more than three occasions?
25 A     Yes.

                JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
                            1-609-890-7033

LAMBERT                                                    38

1        Q     What was the first occasion?
2  A     It was March 19th of 1994.
3        Q     Didn't you indicate that you were in the
4  RHU in March of '94?
5  A     It must have been later than that. It must
6  have been later than March.
7        Q     And the first time this happened, where
8  was it?
9  A     It was in the music room.
10       Q     And was anyone else involved other than
11 Officer Eicher?
12 A     Yes. Sergeant Merry, Jim Merry.
13       Q     Anyone besides the two of them?
14 A     No.
15       Q     And after this happened, you're alleging,
16 I assume, that Officer Eicher forcibly raped you on
17 March 19, 1994?
18 A     Yes.
19       Q     And that he --
20             MR. LOVE:  Excuse me. I think she
21       said it might have been later. You said
22       March, and you said she was in RHU, and
23       she said it might have been later.
24             THE WITNESS:  No. The RHU.
25             MR. HALLORAN:  The RHU might have

                JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
                            1-609-890-7033

LAMBERT                                          39

1   been later.
2          THE WITNESS:  I think I went to
3   the RHU in April.  I know it was warm
4   out, and I get confused about the months
5   when it's warm out.
6
7   BY MR. HALLORAN:
8
9   Q     Okay.  Did you report that particular
10  event to anyone at SCI Cambridge Springs?
11  A    No.
12  Q     And sexual intercourse occurred on some
13  other times also?
14  A    Yes.
15  Q     When was the first time that you reported
16  those events?
17  A    I believe to Ms. Wolfgang.
18  Q     Did you report to her that Officer Eicher
19  was raping you in these events?
20  A    I told her that he was making me do things, and
21  then I told her what the things were.
22  Q     What did you tell her he was making you
23  do?
24  A    I told her that he was making me have sex with
25  him, that he was taking my clothes off.  And she said

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                          40

1   wait a minute, how can he make you do something.  And
2   I said you don't understand, Sergeant Merry was in on
3   it, Sergeant Merry made me go in there, there's
4   nothing I can do about it.
5          And she was really shocked.  She didn't
6   understand how he could find the time, I guess, when
7   she was in there.  She didn't understand how something
8   like that could happen.
9          And then I told her that Sergeant Merry had
10  taken me in there and put me in there and locked the
11  door, and then he made me go in there.
12  Q     Was Sergeant Merry involved in any of
13  these events other than the first one?
14  A    I think that he stood watch.  That's what
15  Eicher told me.  He would say that Merry was outside
16  the door.  But I don't know if that was true or not.
17  I remember sometimes I would see him like in the
18  vicinity of the area before or after something
19  happened, but I never knew.  That was the only time
20  that he physically grabbed me, took me down the
21  hallway, shoved me in a room and locked the door.
22  That was the only time he was there when I came out.
23  Q     That was the first time?
24  A    Yes.
25  Q     And how long after the first event was it

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                          41

1   before you told Ms. Wolfgang?
2   A    That happened in March.  I'm sure that's when
3   it happened, because it was my daughter's birthday.  I
4   had a visit that day, and I remember that very
5   clearly.
6          I believe I went to RHU April 7th, now that I
7   think about it.  I reported it to her in July or
8   August.
9   Q     And were you eventually interviewed by a
10  representative of the Department of Corrections
11  Internal Affairs Section, Michael Wolanin?
12  A    Michael Wolanin, yes.
13  Q     And following those interviews, were
14  criminal charges filed against Officer Eicher?
15  A    I saw Michael Wolanin several times.  We did
16  not have a good rapport at first at all.  It took him
17  several times of coming to see me and then my taking
18  or passing a polygraph test for him to actually begin
19  to lend credibility to what I was telling him.
20         And then after I gave him the letters that
21  Officer Eicher had written to me and he had a
22  handwriting analysis done and it proved to be Officer
23  Eicher's handwriting, that's when he believed me, and
24  that's when he started doing things to get me
25  transferred, and that's when he had Officer Eicher

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

---

LAMBERT                                          42

1   charged with crimes.
2   Q     And when was the first time that Officer
3   Eicher started writing these letters to you?
4   A    It started in October or November.
5   Q     Of what year?  Was this before he started
6   off with the gifts?
7   A    This was October of '93.
8   Q     And those letters you did keep?
9   A    No.  He would try to give me letters, and I
10  would refuse ones he would try to give me, but he
11  would give them to people to give to me, or he would
12  throw them on my bed and I wouldn't know who they were
13  from, because inmates pass letters all the time.
14         And a lot of them I threw out, but then my
15  friend Candace told me to start keeping them because I
16  told her what was going on, and she told me I'd better
17  keep them in case something ever happens, and she told
18  me I should have kept the ones from Raun.
19         And then I started keeping like the ones that
20  he threw on my bed or the ones he gave to someone else
21  to give to me, then I started keeping them.
22  Q     When did you start keeping the letters?
23  A    After December, because I told her -- I called
24  her and told her about what he had done on Christmas
25  Eve, about how he said he didn't hurt me yet but he

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          43

1   could.
2           Q     Who was this person you called?
3   A     Candace Hill.
4           Q     And is she someone on the outside?
5   A     She was an inmate, but she had gone home.
6         I called her and I told her that, what he said
7   to me, and she told me I'd better start keeping the
8   letters, and she wanted me to send them to her, so
9   that's why I sent some of them to her, and then one or
10  two things I kept in my property.
11          Q     At this point have you turned over all
12  those letters in your possession to your lawyer?
13  A     Excuse me?
14          Q     At this point have you turned over all
15  the letters that you have from Officer Eicher to your
16  attorneys?
17  A     I'm not sure.  I believe so, but there were --
18  I don't know.  There could still be things in my
19  things at home.  I'm not sure.  I had a lot of
20  property.
21          Q     When I say "your attorney," did you turn
22  those over to Mr. Kracov or Mr. Love?
23  A     I believe so.
24          Q     Have you been involved in any other
25  lawsuits, civil lawsuits, other than this one?

LAMBERT                                                          44

1   A     I don't believe so.
2           Q     Do you know Sylvia Vasquez?
3   A     I think I've heard that name, but I can't put a
4   face with it.
5           Q     Have you filed any lawsuits against any
6   other police officers or corrections officers?
7   A     No.
8           Q     Have you ever alleged sexual abuse
9   against any other police officers or corrections
10  officers?
11                MR. LOVE:  I'm going to object as
12          to relevance.
13                MR. HALLORAN:  Okay.
14                MR. LOVE:  Give me one minute.
15
16                (At which time, an off-the-record
17          discussion was held.)
18
19                MR. LOVE:  I'm going to ask her
20          not to answer because this is getting
21          into her ongoing criminal case and I
22          don't feel comfortable allowing her to
23          speak to these issues.
24                She has counsel in the criminal
25          matter, and this is at issue in the

LAMBERT                                                          45

1           criminal matter, and I'm going to
2           instruct her not to answer.
3                 MR. HALLORAN:  Let me clarify.
4           What I'm asking at this point is simply
5           has she alleged sexual abuse or
6           misconduct by any police officers, and I
7           haven't asked any questions about the
8           nature of it or anything else.
9                 I'm just trying to find out if the
10          allegations exist and if it is an issue.
11          I believe it may be a matter of record in
12          the criminal case.
13                MR. LOVE:  It is a matter of
14          record, and we would let the record stand
15          for itself.  But, again, it would open a
16          door to an area that I really don't
17          believe we should be getting into, and I
18          wouldn't want to get into it without the
19          consent of her criminal attorney because
20          this is an issue in that matter.
21                MR. HALLORAN:  I will abide by
22          your instructions, but I'm not accepting
23          the representation.
24                MR. LOVE:  I understand.  The
25          record speaks for itself in the criminal

LAMBERT                                                          46

1           matter.
2
3   BY MR. HALLORAN:
4
5           Q     After you left Cambridge Springs, did you
6   make any allegations of sexual abuse against any
7   police officers or corrections officers?
8                 MR. LOVE:  Same objection.
9                 I will instruct you not to answer.
10                MR. HALLORAN:  How can that be
11          relevant to her criminal proceeding?
12                MR. LOVE:  If you're asking if she
13          had any -- if she made allegations
14          something that happened with a police
15          officer after she left Cambridge Springs,
16          we would answer that.
17                MR. HALLORAN:  That's what I'm
18          asking.  I'm talking about the time frame
19          after she left Cambridge Springs.
20                MR. LOVE:  Do you understand what
21          he's asking?  He's asking if you made
22          allegations regarding incidents with
23          police officers that occurred after you
24          left Cambridge Springs, the incidents and
25          the allegations after you left Cambridge

LAMBERT                                                    47

```
 1                Springs with any police officers?
 2                THE WITNESS:  My federal hearing
 3           was after Cambridge Springs.
 4                MR. LOVE:  He's talking about
 5           incidents that occurred after you left
 6           Cambridge Springs involving police
 7           officers.  In other words, this is
 8           nothing to do with the criminal case.
 9                THE WITNESS:  Not involving
10           myself.  I observed things between other
11           people, but not involving myself.
12
13  BY MR. HALLORAN:
14
15      Q    What did you observe?
16  A    When I was in WCI in Delaware -- I wrote about
17  that in my affidavit -- I observed male officers
18  harassing and doing things to female inmates.
19      Q    And did any of those allegations involve
20  complaints by you about the conduct of those
21  officers --
22  A    No.
23      Q    -- directed toward you?
24  A    No.  I never said anything to anybody about
25  what I observed until I wrote my affidavit about the
```

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                    48

```
 1  things that I saw going on at WCI in Delaware.  They
 2  didn't directly involve me, but it was something that
 3  frightened me.
 4      Q    This affidavit you prepared, what was it
 5  prepared for?
 6                MR. LOVE:  Just, again, I'm going
 7           to make the same objection I made before
 8           about anything regarding her criminal
 9           case.  I'm going to object to any
10           discussions regarding her criminal past
11           or her criminal case.
12                This matter is still in
13           litigation, and we're going to file a
14           motion in limine to keep these things out
15           of the case, but I will allow her to
16           answer.
17                Tell him what the affidavit is
18           about.
19                THE WITNESS:  My attorneys,
20           Christina Rainville and Peter Greenberg,
21           asked me to prepare an affidavit to
22           clarify what happened to me at Cambridge
23           Springs, because numerous administrative
24           staff at Cambridge Springs had made
25           defaming comments about me to the press
```

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                    49

```
 1           stating that I was transferred to WCI in
 2           Delaware because I was an inmate that
 3           misbehaved and caused a lot of trouble in
 4           the institution, and my attorneys wanted
 5           to clarify that I was moved for my
 6           protection and my safety and because
 7           things had happened to me there and not
 8           because I was a behavioral problem.
 9
10  BY MR. HALLORAN:
11
12      Q    And did you prepare that affidavit
13  yourself?
14  A    Yes.
15      Q    And was that affidavit, to the best of
16  your knowledge, a truthful statement of the accounts
17  that happened to you at Cambridge Springs?
18  A    Yes.
19      Q    And in what case was the affidavit used?
20                MR. LOVE:  Just, again, my
21           objection to discussions is ongoing, or
22           my objection to anything regarding the
23           criminal matter is ongoing.
24                But you can go ahead and answer.
25                THE WITNESS:  Could you please
```

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                    50

```
 1           repeat the question?
 2
 3  BY MR. HALLORAN:
 4
 5      Q    In what litigation was the affidavit
 6  used?
 7  A    In my petition for a writ of habeas corpus.
 8      Q    Did you authorize your attorneys to put
 9  that affidavit on the Internet?
10                MR. LOVE:  Same objection.
11                Go ahead and answer, if you know.
12                THE WITNESS:  I had no idea it was
13           on the Internet.  I don't know anything
14           about that.
15
16  BY MR. HALLORAN:
17
18      Q    When was the last time that you received
19  any psychiatric or psychological counseling at any of
20  these institutions?  Well, let's start with the Edna
21  Mahan facility.
22  A    I can't hear you.
23      Q    Have you ever received any psychiatric or
24  psychological treatment at that facility, Edna Mahan?
25  A    I don't believe so.
```

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                     51

```
 1        Q     And did you ever receive any psychiatric
 2  or psychological counseling at the Delaware facility?
 3  A     No.
 4        Q     Was there a period of time when you were
 5  not in prison?
 6  A     Yes.
 7        Q     When you were out of prison, did you ever
 8  receive any psychological or psychiatric counseling,
 9  for example?
10  A     Yes.
11        Q     Who did you receive that from?
12              THE WITNESS:  Should I answer
13        that?
14              MR. LOVE:  One second.  I'm going
15        to again ask her not to answer because I
16        think it may go into some areas about the
17        criminal case.
18              MR. HALLORAN:  Off the record for
19        a second.
20
21              (At which time, an off-the-record
22        discussion was held.)
23
24              MR. HALLORAN:  Back on the record.
25        We're back on the record, and
```
JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                     52

```
 1        we're discussing psychiatric and/or
 2        psychological counseling Ms. Lambert
 3        received during the period she was not
 4        incarcerated after she left Cambridge
 5        Springs.
 6              During that period of time,
 7        Ms. Lambert has indicated she did see a
 8        psychiatrist.
 9              THE WITNESS:  Psychiatrist and a
10        psychologist.
11              MR. HALLORAN:  And a psychologist.
12              And approximately how many times?
13        Could we get into that?
14              MR. LOVE:  I don't know.  As for
15        details, as I said, we will admit she had
16        the counseling during that period, but
17        anything beyond that I would have to
18        refer you to the criminal lawyer for
19        details and allow her criminal lawyer to
20        make a decision on what needs to be
21        disclosed and what does not need to be
22        disclosed.
23              MR. HALLORAN:  At this point, this
24        is an action for damages in which
25        Ms. Lambert is making a claim regarding
```
JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                     53

```
 1        emotional distress and trauma, and
 2        plaintiff's counsel has indicated he does
 3        not object to a stay of the proceeding
 4        until such time as we can obtain access
 5        to those records to determine the
 6        correlation, to identify whether or not
 7        they have any relevance to the action for
 8        damages, which it's necessary to arrive
 9        at.
10              Is that accurate?
11              MR. LOVE:  Well, just add it would
12        be Ms. Rainville that would decide
13        whether or not that material should be
14        released.
15              MR. HALLORAN:  Well, I guess what
16        I'm trying to do is remove myself so you
17        and Ms. Rainville can discuss it and
18        decide and let me know what your position
19        is.  I think it's a problem with me
20        dealing directly with Ms. Rainville.
21              MR. LOVE:  I understand that, yes.
22              MR. HALLORAN:  Okay.
23              MR. LOVE:  We could always give
24        her a call, if you want, or we can skip
25        over this and do the rest.
```
JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                     54

```
 1              MR. HALLORAN:  I'm afraid if we
 2        get into that, it's going to take us too
 3        long.
 4              Ms. Lambert, let me show you
 5        what's been marked as deposition
 6        Exhibit 1.
 7
 8              (At which time, an affidavit of
 9        Lisa Michelle Lambert was received and
10        marked as Exhibit 1 for identification.)
11
12  BY MR. HALLORAN:
13
14        Q     Earlier you were referring to an
15  affidavit that you prepared for your habeas corpus
16  proceeding.
17  A     Yes.
18        Q     Is this a true copy of the affidavit that
19  you prepared?
20  A     May I read through this, because this is in
21  different form than the affidavit that I wrote?  It
22  looks different.
23        Q     Sure.
24              MR. LOVE:  Was your affidavit
25        handwritten?
```
JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                55

1         THE WITNESS: Yes, but even when
2    it was typed up, it was larger. This is
3    condensed.
4         Okay.
5
6  BY MR. HALLORAN:
7
8    Q    That is the affidavit?
9  A    Yes.
10    Q    Having had a chance to review it again,
11  is it your testimony today that these allegations --
12  these statements by you are true and accurate?
13  A    Yes.
14    Q    In your affidavit, in Paragraph 8 you
15  talk about a meeting with Martha Miller?
16  A    Yes.
17    Q    And it's your recollection that this
18  meeting occurred on the second floor of an abandoned
19  building?
20  A    Yes. It was wherever. I can't remember. I
21  think it's -- I think it's called Curry. Where
22  medical is, it's over top of medical. The whole
23  second floor of the medical building was abandoned,
24  and it was up there.
25    Q    Okay. And your recollection was the

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                56

1  meeting lasted four hours?
2  A    Yes.
3    Q    And that you indicated to Ms. Miller that
4  you felt that Officer Raun was going to rape you?
5  A    Yes.
6    Q    And in the course of that meeting, did
7  any discussion occur about the note that you had been
8  accused of sending to Officer Raun?
9  A    I don't remember. She might have asked me
10  something. I don't remember. It was a long time ago.
11    Q    And Paragraph 13, you refer to written
12  request to Debbie Sauers?
13  A    Yes.
14    Q    And you indicated that she said to you
15  that "none of the supervisors or the girls wanted to
16  work with a killer"?
17  A    Yes.
18    Q    That's what she said to you?
19  A    Yes.
20    Q    When was the meeting with Debbie Sauers?
21  A    I don't remember exactly when it was. I just
22  know that as soon as I thought of it, I started
23  thinking of --
24         MR. LOVE: Can we wait until they
25         go through? I can't hear.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                57

1
2  BY MR. HALLORAN:
3
4    Q    And Ms. Sauers did ultimately transfer
5  you to laundry detail; is that correct?
6  A    Yes. After I had been going to her for in
7  excess of six months.
8    Q    You indicate in Paragraph 14 that
9  officers were saying you were carrying Raun's baby?
10  A    Yes.
11    Q    What officer said that?
12  A    All of them up at dietary. They would make
13  comments. When I would walk by, they would say that
14  they thought I was pregnant.
15    Q    Could you give me the names of --
16  A    I don't remember who. There are usually
17  anywhere from seven to twelve officers in dietary.
18  Half of the officers, you don't even know their names.
19    Q    Now, in Paragraph 15 you talk about one
20  of the meetings with Debbie Sauers. How many meetings
21  did you have with Debbie Sauers throughout this period
22  of time?
23  A    Several. Because she wouldn't listen to me, I
24  kept repeatedly asking her.
25    Q    The one meeting referred to in

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                58

1  Paragraph 13 where you say she made the comment about
2  working with a killer, and there's another meeting,
3  apparently in October, where you indicate that you
4  were very upset and you wanted to go to her office,
5  and that's when she told you she was going to put you
6  in the laundry?
7  A    That was -- one of the officers called her
8  because I basically was flipping out, and they had
9  never seen me act like that, and I was very
10  hysterical. And Debbie Sauers was marked down as my
11  counselor at that time, and when an inmate has a
12  hysterical problem, the officers are supposed to call
13  a counselor, so that's who they called.
14    Q    And in Paragraph 20 you were talking
15  again about when Officer Eicher first approached you,
16  and I just want to be sure I touched this base. When
17  was the first time that you complained about Officer
18  Eicher?
19  A    To Ms. Wolfgang.
20    Q    And I gather that would have been August
21  of 1994?
22  A    Yes.
23    Q    And when you complained to Ms. Wolfgang,
24  as it relates to at least Eicher and Raun, you had
25  complained in the same manner that you set forth in

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                        59

1   this affidavit; were these basically the complaints
2   you were making about Eicher and Raun?
3   A     Yes. I would tell her. It was in a
4   conversation. I didn't write anything down.
5         I think I should also clarify that I didn't
6   give her this much detail. I didn't go into -- I just
7   would tell her what was happening. I didn't give her
8   all the details.
9         Q     You mean about the locations and things
10  like that?
11  A     No. I would tell her where something happened,
12  and I would say that he pulled my clothes off and he
13  made me do this and things like that, but I didn't go
14  into all the detail about how I felt and exactly what,
15  all of that.
16        Q     Was Ms. Wolfgang upset when you told her
17  your story?
18  A     Yes.
19        Q     Was she crying, too?
20  A     She was -- she started -- she was very upset,
21  but she got really upset and her eyes got really wet
22  when I pulled my clothes down and showed her the
23  bruises.
24        Q     So that was in October of 1994?
25  A     Yes.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                        60

1         Q     Ms. Lambert, you were in the RHU in April
2   of '94. Regarding your being found in an unauthorized
3   area, the fourth floor of Louter Hall, do you recall
4   that?
5   A     Yes.
6         Q     And at that time do you recall what you
7   told the staff people about why you were there or how
8   you were there?
9   A     Yes.
10        Q     What did you tell them?
11  A     I told them that I was dizzy and that I got
12  confused and went up there.
13        Q     Did you indicate you blacked out?
14  A     Yes.
15        Q     And around that time do you recall being
16  interviewed by Captain Bartlett regarding your
17  presence in that area?
18  A     Yes.
19        Q     And did he ask you questions about
20  whether or not your presence there had to do with some
21  meeting with Officer Eicher?
22  A     He didn't ask me. He screamed at me and
23  slammed his fist down on the table. I was scared to
24  death of him -- he was five times the size of me --
25  and I wouldn't tell him anything.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                        61

1         Q     He was asking you whether or not you were
2   there to have --
3   A     He was screaming at me.
4         Q     And what he screamed was were you there
5   to have a liaison with Corrections Officer Eicher?
6   A     He said are you F'ing Officer Eicher. He said
7   I know you are, I know how you girls are, I know
8   you're F'ing Officer Eicher.
9         Q     What was your response?
10  A     I told him that I don't know what he was
11  talking about, I told him I had nothing to say to him,
12  and I told him I didn't want to talk to him.
13        Q     Now, the truth was that at that time you
14  and Officer Eicher were having sexual intercourse?
15  A     I didn't hear you.
16        Q     At or around that time you and Officer
17  Eicher were having sexual intercourse?
18  A     We were not having sexual intercourse. He was
19  forcing me to do things.
20        Q     And among the things he was forcing you
21  to do was sexual intercourse?
22  A     Yes.
23        Q     And when Officer Eicher was asking you
24  about that, you denied --
25  A     I can't hear you.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                        62

1         Q     When Officer Eicher asked you about your
2   relationship -- I'm sorry. Strike that.
3         When Captain Bartlett asked you about what was
4   going on between you and Officer Eicher, you denied
5   any such conduct?
6   A     I told him that I didn't want to talk to him,
7   number one, because I was afraid of him, and, number
8   two, when Officer Eicher pulled me down the back
9   stairway and put me into my room that night, he told
10  me I'd better keep my mouth shut or he was going to
11  get me.
12        Q     And, therefore, you denied --
13  A     Right.
14        Q     -- that anything happened?
15  A     Right.
16        Q     When you went to Ms. Wolfgang in August
17  of 1994, did you disclose to her the identities of any
18  of the officers that you were complaining about?
19  A     I can't hear you.
20        Q     When you went to Ms. Wolfgang in August
21  of '94, did you disclose the identities of any
22  officers that you were complaining about?
23  A     The first two weeks I talked to her, she had me
24  call them Officer One, Officer Two, Officer Three, in
25  regards to Sergeant Merry, Eicher or Raun. She

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          63

1  appeared to not want to be involved. I think the
2  first time she even seemed a little credulous.
3        But after about the second week she wanted to
4  know names, times, dates. She -- the more that I told
5  her, she realized it was a serious situation and she
6  started taking names.
7        Q    And when did you first disclose to her
8  the names and the dates?
9  A    Probably the end of August or the beginning of
10 September.
11       Q    And at that point did you understand that
12 she was going to disclose that information to the
13 administration?
14 A    Absolutely not. She swore up and down to me.
15 She promised. She told me that it was against her
16 ethical obligations to betray my confidentiality. She
17 explained to me about patient/client privilege. She
18 told me that she would never do that to me, and I
19 believed her, and she never did say anything until
20 October. She didn't say anything for two months. She
21 didn't tell anybody.
22       Q    When she did say something, what was your
23 reaction?
24 A    I was furious.
25       Q    You didn't want her to say anything?

LAMBERT                                                          64

1  A    No. I was very angry because she knew that I
2  was afraid of going to the hole, and I was in there
3  for three months before that, and I can't even explain
4  what it's like to be in the hole, but it's mentally
5  unbelievable. You lose your mind in there.
6        And she knew I was petrified of going in there,
7  and I was very upset with her when they put me in
8  there and they took my clothing from me. I started
9  screaming, and when she came to my door, I was crying,
10 I was screaming, I was yelling at her. I told her she
11 broke her promise.
12       Q    And when you refer to the "hole," you're
13 referring to the restricted housing unit?
14 A    Yes.
15       Q    And when you were in the restricted
16 housing unit, you were extended extra visitation
17 privileges; is that correct?
18 A    Not the first time I was in there, and not -- I
19 had to write several requests to -- usually when
20 you're in the restricted housing unit, you're only
21 allowed one visit a month, and I wanted my -- I didn't
22 feel that it was fair that I was under the obligations
23 that somebody else in the RHU would be under because I
24 was in there for a different reason. Usually the
25 restricting housing unit is for disciplinary actions.

LAMBERT                                                          65

1  And I felt that I should be able to see my daughter
2  and my family as much as I usually did. And then
3  finally they allowed that, they allowed me to have
4  more than one visit a month.
5        Q    Did they allow you to have one visit a
6  week for up to eight hours?
7  A    I believe so.
8        Q    And just so we're clear, you were aware
9  there were two parts of the restricted housing unit,
10 the disciplinary custody section and the
11 administrative custody section?
12 A    No. It's the same, it's the same. It's
13 just -- there are four or five rooms, and they are
14 exactly the same. You don't get any type of different
15 treatment or anything.
16       Q    You're saying if you're in disciplinary
17 custody, you're entitled to the same privileges of
18 someone on administrative custody?
19 A    Well, usually there's a rule from the
20 Department of Corrections that you're supposed to be
21 allowed privileges, but you have to really argue for
22 them.
23       The first time I was in the restricted housing
24 unit, I think I was in there for two months, and I was
25 under administrative custody and not disciplinary

LAMBERT                                                          66

1  custody, and the first month or two I had no special
2  anything.
3        Q    Well, in fact, when you were first placed
4  in the restricted housing unit, weren't you in
5  disciplinary custody for violating the rules, for
6  being in an unauthorized area?
7  A    Yes. For two weeks.
8        Q    And I asked you earlier about the rules
9  in the institution, and you indicated you did receive
10 an inmate handbook. Do you recall that?
11 A    Yes.
12       Q    I show you an inmate handbook from the
13 Department of Corrections. Roman Numeral I, "Rules,"
14 No. 3, did you ever see that before?
15 A    Which one?
16       Q    Number 3.
17 A    I saw this before. This applies to inmates,
18 though.
19       Q    Well, it says any sexual engagement
20 involving another person, doesn't it?
21 A    That's not what they tell us. They tell us
22 it's inmates. It's called sodomy. You're not allowed
23 to have sex with other inmates.
24       Q    And the rule I'm referring to is Roman
25 Numeral I, Paragraph 3, which says: "Any sexual

LAMBERT                                                          67

1   behavior involving another person, whether voluntary
2   or involuntary, is prohibited.  Any such conduct will
3   be treated as misconduct and a violation of law."
4           That's what it says; right?
5   A       That's what it says.
6                       MR. LOVE:  Which one is that
7           again?
8                       MR. HALLORAN:  It's under Roman
9           Numeral I, "Rules," and it's No. 3.
10
11  BY MR. HALLORAN:
12
13      Q    And were you aware that when you had a
14  job assignment, that you were not permitted to leave
15  the place of work without authorization from the work
16  or crew supervisor?
17  A       I didn't have a work or crew supervisor.
18      Q    Under "Work," No. 7, is that what the
19  inmate handbook provided?
20  A       Yes, that's what it says.
21      Q    All right.  And when you were in your
22  work assignments, what were they?
23  A       Cleaning Louter Hall.
24      Q    Who did you report to when you did that?
25  A       Whatever officer was working.

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

LAMBERT                                                          68

1       Q    And when you were in the laundry?
2   A       Mr. Earl.  I don't know his last name.
3       Q    Are you aware of the grievance procedure
4   at the institution?
5   A       Yes.  That's why I attempted to grieve Martha
6   Miller.
7                       MR. HALLORAN:  We'll close the
8               deposition for now and leave the record
9               open for any additional information on
10              psychiatric and psychological reports.
11
12                  (At which time, the witness was
13              excused.)
14
15                  (At which time, the proceeding
16              concluded.)
17
18
19
20
21
22
23
24
25

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033

C E R T I F I C A T E

1
2
3
4           I, PASQUALE F. CORVINE, Certified Shorthand
5   Reporter and Notary Public of the State of New Jersey
6   do hereby swear that the foregoing is a true and
7   accurate record of the testimony taken
8   stenographically by me; and I am neither attorney nor
9   counsel for nor related to or employed by any of the
10  parties to the action in which this matter is taken;
11  and further, that I am not a relative or employee of
12  any attorney or counsel employed by the parties
13  hereto, or financially interested in the action.
14
15
16
17
18
19          PASQUALE F. CORVINE
            CERTIFIED SHORTHAND REPORTER
20          License No.: XI00645
21
22
23
24
25

JOHN F. TRAINOR, INC., TRENTON, NEW JERSEY
1-609-890-7033