# ATTACHMENT V

**Lancaster County Court of Common Pleas Order**

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
C R I M I N A L

COMMONWEALTH OF PENNSYLVANIA        :        No. 0423-1992
                                    :
              v.                    :
                                    :
LISA MICHELLE LAMBERT               :

ORDER TO TRANSPORT

AND NOW, this 18th day of October, 1994, the Sheriff of Lancaster County is hereby directed to transport the defendant from the State Correctional Institution at Cambridge Springs, Pennsylvania, to the Lancaster County Prison by Tuesday, November 15, 1994. The Sheriff is also directed to return the defendant to Cambridge Springs after the hearing of November 18, 1994.

BY THE COURT:

LAWRENCE F. STENGEL
JUDGE

ATTEST: KAREN L. ADAMS
        CCC    DEP.

Copies to:  John A. Kenneff, Esquire
            Jules Epstein, Esquire
            Sheriff of Lancaster County

# ATTACHMENT W

## A.T.A. Paperwork

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs

SUBJECT: **Authorized Temporary Absence (A.T.A.)**

TO:      All Concerned Personnel

FROM:    Dominic J. White, Records Specialist

DATE:    November 10, 1994

**** INMATE WILL NOT BE NOTIFIED UNTIL DAY OF TRANSPORT DUE TO SECURITY PURPOSES****

Inmate Name: LAMBERT, Lisa                         Number: OB6416

Court: Lancaster County

Reason: Hearing (PCRA)

Custody: Lancaster County Sheriff's

Date of A.T.A.: Nov 14, 1994      Time of Pick-up: 1200

Court Order: **Will be supplied at the date and time of pick up.**

**** INMATE WILL NOT BE NOTIFIED UNTIL DAY OF TRANSPORT DUE TO SECURITY PURPOSES****

cc: Captain          Employement Coord    Property
    Commissary       Harry Stewart        Psychology
    Control          Health Care          Records Office
    Counselor        Inmate Accounting    Sgts
    DATS             Mail                 Shift Commander
    Deputy Kormanic  Mr. Roberts          Superintendent
    Deputy Utz       Parole               Unit Manager
    Dental Office    Education            Housing Unit
    Activities Mgr   Job Supervisor

ATA 07/07/94 (REV.)

SUBJECT:  A.T.A. (LAMBERT, Lisa M OB6416)

    TO:  All Concerned

        *Dominic J. White* 11/12/94

    FROM:  Dominic J. White,
           Records Specialist II


Inmate LAMBERT was scheduled for 11-14-94 at 1200, this has been changed to 11-15-94 to accommodate the travel time for the Sheriff's Department.  Again this A.T.A. notice should not be given to the inmate until the day of departure.  Any questions please call my office.


cc:  Supt Wolfe
     Deputy Utz
     Deputy Kormanic
     Shift Commanders
     Captain
     Kulasa
     Employment Coord
     Health Care
     RHU
     Mail
     Mr Roberts
     Education
     Property
     Unit Manager

# <u>ATTACHMENT X</u>

## November 22, 1994 Videotape of Plaintiff's Return to SCI-Cambridge Springs

# ATTACHMENT Y

## DC Form 78

Dispensary Card - Continued

| Date | Medication or Treatment | Signature |
|------|------------------------|-----------|
| 11/12/94 | 1600 + 2000 no c/o | S. Puetzkoue |
| 11-13-94 | no complaints - Skibquitich | |
| 11/13/94 | 1600, 2000 RHU c̄ no complaints | Crandallen |
| 11-14-94 | 1008 i.s. ted - Patient not in cell - Lu.v.s turfate | Skibquitich CFCulquie 11/14/94 |
| 11/14/94 | not in RHU - @ Visitor room - Dawson | |
| 11/14/94 | ᶜ 1600-1700 medical no complaints | Crandallen |
| | 2000 R 9t U no complaints | Crandallen |
| 11/15 | Jan laugui in RHU - Skibquitich | ATA |
| 11/15/94 | RHU 0930 Inmate ATA | Cdwellle |
| 11/22/94 | 1500 ⑤ Brought back from ATA to medical accompanied by Lt Beck, Sgt Chase COTs B. Jones + COT Howard Later joined by Deputy Kormanic. Inmate cuffed @ Requested to remove clothing down to underwear bra + panties. Inmate initially refused stating "You don't do this to everyone who comes back from ATA" Deputy Kormanic gave direct order Inmate resistant t being videotaped or photographed Given ultimatum of removing clothing within 30 seconds or being strip searched. Inmate tearful but cooperative in removing clothing except for black bra + panties. No bruises, abrasions or interruption in skin integrity observed | cont S. Puetzkoue |

**DC-78**

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

**DISPENSARY CARD**

_Smoke Bees_
Hypersensitivity

Inmate Identification

D.O.B.  9/9/72

SSN  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

Inst. No.  036416

Name  Lambet, Lisa

| Date | Medication or Treatment | Signature |
|------|------------------------|-----------|
| 11/22/94 | 1500 cont © Denies illness or injury while on ATA. Video Cameras stopped when clothing removed. Polaroid photographs taken by COT Howard. Inmate then given Kwell shampoo + directed in its use. Compliant but tearful during shower) Ⓐ As described above/Security observed ATA return Ⓟ Following Kwell use, inmate dressed in RHU garb, cuffed + taken to Operations for urine drug screen. Videophotographed while leaving medical + during escort to Operations —— J. Rietapham) | |
| 11-22-94 | 2030 Seen in RHU - No C/O. No meds - A Chapman pa | |
| 11-23-94 | No complaint - A Kulzykihill S — A Vaubeu 11/23/94 1215 | |
| 11/23/94 | S No Complaints —— A Vaubeu | |
| 11/23/94 | 2100 RNU no complaints CLandau RN | |
| 11-24-94 | No complaints - A Kulzykihill S mo | |
| 11/24/94 | 0930 noted A Vaubeu | |
| 11/24/94 | 1555 no complaints seen in RHU today K Serdinca | |
| 11-24-94 | no complaints - A Kulzykihill S | Noted Gel 11:00 M Cardell RP 11/25/94 |

# ATTACHMENT Z

## BC-ADM 203, Searches of Inmates and Cells

| BC-ADM 203 **Administrative Directive** | **COMMONWEALTH OF PENNSYLVANIA** |
|---|---|
| Subject:<br><br>SEARCHES OF INMATES AND CELLS |   BUREAU OF CORRECTION |

## I.  PURPOSE

The introduction and presence of unauthorized weapons and other contraband present serious threats to the security and proper management of a correctional facility. Therefore, all persons and property coming into, leaving from or present on the property of any Bureau of Correction institution, facility, center or other property are subject to search at any time. Searches will be conducted in a reasonable manner so as to avoid embarrassment to the person searched and to protect the property searched. Searches will not be conducted for the purposes of harassment or punishment.

## II.  CONTRABAND

A.  Any contraband discovered on the grounds of any Bureau of Correction property is subject to immediate seizure.

B.  Contraband is defined by BC-ADM 801, the Inmate Handbook, 18 P.S. 5123 and the local policies of the individual institutions. It is the responsibillity of each inmate and staff members to become familiar with the restrictions upon property permitted for inmates.

## III.  SEARCHES OF INMATES' CELLS

A.  General Guidelines for all Cell Searches

1.  Personnel conducting the search will not subject the cell or housing quarters to purposeful or unnecessary disruption.

2.  During the search, all precautions will be taken to avoid damage to any items. If television sets, radios or other appliances become suspect as a storage area for contraband and cannot be readily inspected, assistance may be requested from the engineering or maintenance department to gain access and minimize the chance of damage to the item or injury to oneself.

3.  Any item which is contraband or evidence of a crime or misconduct may be confiscated.

4.  When there is excessive personal property in a cell, the inmate owner may designate to whom such items are to be shipped. The inmate will pay the shipping cost. If this is not possible, such items will be removed and the inmate provided a copy of a written list of the items and their disposition. Confiscated money will be deposited in the Inmate General Welfare Fund. Excessive State issued items will be confiscated by the institution for appropriate disposition.

BC-ADM 203

5.  To minimize the possibility of an inmate's radio, television or typewriter being lost or stolen, the institution provides a means to engrave the item with the inmate's committed name. Due to the variations in design of these items the engraving will be placed at a readily visible location on the back of the item. All radios, televisions and typewriters must be so engraved. When any of these items is not so engraved, the item may be confiscated until true ownership can be determined. The item will then be properly engraved and returned to the owner.

6.  Internal logs, forms, etc. for the scheduling and recording of searches of cells may be utilized. Whenever an item is confiscated, Form BC-154 CONFISCATED ITEMS RECEIPT will be issued to the inmate from whom the property is confiscated.

7.  Confiscated property will be placed in a separately secured area until final disposition is made.

B.  Presence of Inmate During Cell Searches

1.  The inmate is permitted to be present whenever his cell is searched UNLESS the ranking officer conducting the search determines: (1) the presence of the inmate owner would present an immediate threat to the security of the institution; (2) the search is being conducted under emergency conditions; or (3) the inmate's presence will impair an ongoing investigation of criminal activity or violation of institutional regulations. Such determination by the ranking officer will be in writing, setting forth the factual basis for this determination.

2.  The inmate shall at the time of notification be given the option of remaining during the search.

    a.  An inmate whose cell has been randomly chosen will be asked to sign a record to show that he was present during the search or if he chooses not to be present to show that he wishes not to be present.

    b.  If an inmate refuses to sign the record, his refusal will be noted on the record by the officer.

C.  Random Cell Searches:

1.  The selection of cells to be randomly searched will take place at a location removed from the block or blocks where the searches are to take place. The selection will be randomly made and performed by a staff member unassociated with the administration of any block or blocks.

2.  Random searches may be conducted at any time except no later than one hour after the institution is locked up for the evening.

3.  The inmate whose cell has been randomly chosen will be notified by the block officer before the search.

4.  Any material taken during a cell search shall be duly noted on a property receipt and a copy will be supplied to the inmate.

BC-ADM 203

D.  Investigative Cell Searches

For the purposes of this directive, an investigative cell search is any search other than the random search and general search after an unusual incident. Absent exigent circumstances, approval for investigative searches will requested in advance by the ranking officer on duty.   The inmate has a right to be present during an investigative search except as provided by Section II B.

## IV.  SECURITY INSPECTIONS OF INMATE CELLS

Security inspections of inmate cells are not cell searches and are excepted from Section III of this directive. They may be conducted by institution personnel for health, safety, and security reasons. A security inspection may include observation and testing of the structural components of the cell, such as doors, windows, bars, electrical fixtures, and plumbing. Inmate personal property will not be searched or disturbed during a security inspection except to the extent necessary to gain access to the structural components of the cell. A record of the location of the cells inspected and the name of the staff member who conducted the inspection will be entered in the cell block log. Presence of the inmate occupant(s) is not required during a security inspection. Receipts for any property confiscated will be issued.

## V.  GENERAL SEARCHES

After any unusual incident, the Superintendent of an institution or his designee may order a general search of the institution property. Cell searches conducted under these conditions are subject to the provisions of Sections III A and B. Such searches will be reported to the Commissioner of Correction.

## VI.  SEARCHES OF OTHER AREAS OF THE INSTITUTION PROPERTY

Searches of areas of the institution other than inmate cells may be ordered at any time. Inmates have no right to be present during the searches of these areas.

## VII.  SEARCHES OF INMATE'S PERSON

A.  General Guidelines

Non-contact and frisk searches may be conducted in any area of the institution by authorized personnel of either sex. They will be conducted in a professional manner with tact and proper attitude displayed.

B.  Frisk Searches

The following procedures shall be utilized in conducting a full frisk search:

1.  The inmate will:

a.  Remove all items from pockets and place them in a hat or on a shelf, desk or other suitable place. They should be placed in an area away from the inmate. These items will be examined to determine if they are contraband.

3

BC-ADM 203

area away from the inmate. These items will be examined to determine if they are contraband.

    b. Stand still with feet apart and arms extended outward.

2. The staff person conducting the search will:

    a. Run the inmate's shirt collar between the fingers, carefully feel for small hidden wires, hacksaw blades, etc.

    b. Move the hands downward, running them over the shoulders, down the outside of the inmate's arms to the shirt cuffs. Move the hands up the inside of the arms to the armpits.

    c. Run the hands down the shirt front, checking the pocket and stop at the inmate's belt line.

    d. Check the waistline by running the fingers around the waistline, feeling for small articles.

    e From the waistline, run the hands down the inmate's buttocks, all the time feeling the places that might contain contraband.

    f. Then move both hands to one leg and run them carefully down the leg. At the bottom of the leg, make a point of checking the trouser cuff for concealed articles. Repeat the process on the other leg.

    g. As the last step to the frisk search, run the hand over the inmate's lower abdomen and crotch carefully, looking for concealed articles that may be taped to these areas.

C. Strip Search:

1. A strip search may be conducted when necessary to the security and good order of the institution, including the following situations:

    a. Before and after every contact visit.

    b. Upon an inmate's return from outside activities, supervised outside leave and furloughs.

    c. Upon reception, return from court and return after inmate has left the institution reservation for any other reason.

    d. Following activities where inmates have the opportunity to mingle with outside groups, particularly where there are large numbers of people under minimal supervision.

    e. Periodically for inmates who are permitted to move in and out of the gate areas.

    f. When there is a reason to believe that an inmate is in an escape plot or in possession of contraband.

4

BC-ADM 203

g. When an inmate enters or leaves any restricted area.

2. Strip searches should be conducted in an area separate from other inmates and to assure privacy and minimum embarrassment. Absent exigent circumstances, female inmates shall be searched by female correctional personnel and males, by male correctional personnel. The staff person conducting the search will avoid touching the inmate except as required to control the inmate. The search shall be conducted in a tactful, professional manner.

3. The staff person conducting the search will:

a. Have the inmate remove all clothing.

b. Examine inmate's head. Fingers or a large, wide-toothed comb may be run through the hair.

c. Using a flashlight, look behind the ears, into the mouth, under the tongue and into nostrils.

d. Request inmate to lift arms and then carefully examine armpit area.

e. Request inmate to open hands and carefully examine backs, palms and between fingers.

f. Look over inmate's body. If pieces of tape or bandages are present, have inmate remove them and replace with fresh ones (removal and replacement by medical staff when originally applied by medical staff wherever practicable).

g. Using a flashlight, examine inmate's groin area.

h. Require inmate to turn around, bend over and spread buttocks. Then, with flashlight, examine buttocks for contraband.

i. Require inmate to lift the feet so that the soles and between the toes can be carefully examined.

j. Carefully search each item of clothing before it is returned to the inmate or placed in storage.

D. Internal Examination or Search

Internal examinations of body cavities may be conducted only by a medical doctor or registered nurse, within the confines of the institution dispensary or hospital.

## VIII.  RIGHTS UNDER THIS DIRECTIVE

This directive sets out policy and procedure. It does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. The directive should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the

BC-ADM 203

accomplishment of the purpose of the directives and policies of the Bureau of Correction.

## IX.    EFFECTIVE DATE

The foregoing has been approved by the Bureau of Correction and shall be effective May 1, 1984. This supersedes all previous directives and policies on this subject and shall apply to all state correctional institutions and regional corrrectional facilities.

Glen R. Jeffes
Acting Commissioner

6

# <u>ATTACHMENT AA</u>

## Epstein, Wolfe, and Fulcomer Correspondence

**KAIRYS, RUDOVSKY, KALMAN & EPSTEIN**

Law Offices
Fifth Floor
924 Cherry Street
Philadelphia, Pennsylvania 19107 USA

Phone  215 925.4400
Fax      215 925.4933

*Tom F*
*Pls look into these*
*allegations and discuss*
*w/ me Jr*

David Kairys*
David Rudovsky
Ilene Kalman
Jules Epstein

*Of counsel*

December 1, 1994

Joseph Lehman
Commissioner
Pa. Department of Corrections
P.O. Box 598
Camp Hill, Pa. 17001-4859

William J. Wolfe
Superintendent
S.C.I. Cambridge Springs
451 Fullerton Avenue
Cambridge Springs, Pa. 16403-1238

   re:  Lisa Michelle Lambert
        OB-6416
        <u>S.C.I. Cambridge Springs</u>

Gentlemen:

I am counsel for the above-named inmate on her pending criminal
matter in Lancaster County. I send this letter to protest and
seek redress for the violations of Ms. Lambert's rights at
Cambridge Springs.

Ms. Lambert has in the past complained of being physically abused
by a male corrections officer at Cambridge Springs. Although the
physical abuse has been visited upon her person, and she has
never been alleged to have engaged in any violent or threatening
behavior, she has repeatedly been placed in restrictive housing.

Most recently, upon her return to Cambridge Springs from
Lancaster County, where she was brought for one week for a post-
verdict hearing, she was strip and cavity searched by several
guards **and the process was recorded in several photographs and in
a video.** This occurred even though Ms. Lambert had been in
complete and continuous custody of the Lancaster County Sheriffs
Department, which turned her over to Cambridge Springs personnel,
and in the absence of any complaint by Ms. Lambert that she was
injured or physically mistreated by the sheriffs or by any other

-2-

individual. There had been no contact between Ms. Lambert and the corrections officer she had previously complained about (a male) that would warrant the videotaping by female officers. In other words, the treatment was completely unwarranted, as there was no allegation by Ms. Lambert that she had been injured (thereby necessitating photographs to depict the wounds) and there was no opportunity for her to have brought contraband into the prison.

Three concerns must be addressed. Ms. Lambert should not have her housing restricted because of abuse by a corrections officer. Ms. Lambert should not be subjected to unreasonable searches of her person. And, the photographs and video must be destroyed or safeguarded completely to ensure her right to privacy; there should be absolutely no access to these photographs by any male prison personnel.

It is my hope that your offices can take the necessary and appropriate steps to ensure that there are no further violations of Ms. Lambert's rights. Please notify me of your intentions in this regard.

Very truly yours,

Jules Epstein

cc:  Leonard and Judy Lambert

JOSEPH D. LEHMAN
COMMISSIONER
DEPARTMENT OF CORRECTIONS

**COMMONWEALTH OF PENNSYLVANIA**

**STATE CORRECTIONAL INSTITUTION**

WILLIAM J. WOLFE
SUPERINTENDENT

**AT CAMBRIDGE SPRINGS**

FULLERTON AVENUE
Cambridge Springs, PA 16403-1229
Telephone 814-398-5100
Network: 8 684-5100

Address All Replies
To Superintendent

December 7, 1994

Mr. Thomas A. Fulcomer
Deputy Commissioner
Department of Corrections
P.O. Box 598
Camp Hill, PA 17001-0598

Dear Mr. Epstein:

As per your request the following is our response to Mr. Epstein's letter dated December 1, 1994.

First of all, I wish to clarify the appropriateness of placing Ms. Lambert in Protective Custody Status under the authority of DC-ADM 802, Administrative Custody Procedures. In accordance with this directive, as outlined in Section VI., Procedures, Subsection 1., item d, inmates may be transferred to Administrative Custody if "placement in general population would endanger the inmate's safety or welfare when it is not possible to protect him/her by other means."

As a point of further clarification, Section VII, Administrative Custody Housing Status, Subsection C, states "Inmates placed in Administrative Custody status at the initiative of the institution administration for protection reasons that are not a result of their behavior or the need for more secure control over that inmate will be given all of the available RHU privileges outlined in sections VII.A., and VII.B., except freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, the use of items specifically found by the Program Review Committee to be a security hazard and commissary special order privileges. Inmate Lambert was granted those additional privileges upon her confinement to the R.H.U..

Based upon inmate Lambert's allegations and pursuant to an ongoing investigation, the administration at SCI Cambridge Springs acted in a prudent manner in compliance with Department of Corrections policy by reporting the alleged abuse, requesting an investigation, and placing inmate Lambert in an environment which would protect her from any possible abuse or retaliation until the facts in this case can be properly ascertained.

In regards to Mr. Epstein's concerns that Inmate Lambert was unreasonably searched upon her return from court, it is noted that she was ATA from November 15th to the 22nd. In accordance with Department of Corrections policy, Inmate Lambert was appropriately searched.

Mr. Thomas A. Fulcomer
Deputy Commissioner
Page 2.

Strip search procedures are under the authority of DC-ADM 203., Searches of Inmates, Section VII., Searches of Inmate's Person, Subsection C., Item 1.C., which states - a strip search may be conducted when necessary to the security and good order of the institution including the following situation:

> Upon reception, return from court and return after inmate has left the institution reservation for any other reason.

In light of the on going investigation and our need to establish an evidential/informational baseline of her condition upon return to our custody, authorization for the use of the video recorder and photographs were authorized.

This action was also based upon the precautionary rationale that the institution would have no way of ascertaining what did or did not occur to her person during the time she was out of our jurisdiction.

As a point of final clarification, I wish to make you aware of several discrepancies.

The video taping occurred during the initial moments of her return to the R.H.U. prior to the actual strip search procedure in the presence of a registered nurse. Secondly, an invasive body cavity search was not performed. Every effort is routinely made to assure an inmate's privacy and minimize any embarrassment.

Finally, the video tape and photographs were collected by Deputy Kormanic and secured in a locked file cabinet in her office with access limited to only those individuals approved by appropriate administrative staff. To date there has been no need to review this material.

I hope the above information clarifies the rationale and authority under which the Administration at Cambridge Springs acted.

Sincerely,

William J. Wolfe
Superintendent

WJW:jfh

cc: File



**PENNSYLVANIA DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PENNSYLVANIA 17001-0598**
**(717) 975-4859**

*December 23, 1994*

*Jules Epstein, Esquire*
*Kairys, Rudovsky, Kalman & Epstein*
*Fifth Floor*
*924 Cherry Street*
*Philadelphia, PA 19107*

> *RE: Lisa Michelle Lambert*
> *OB-6416*
> *SCI Cambridge Springs*

*This is in response to your letter to Commissioner Joseph Lehman and Superintendent William Wolfe. In your letter, you indicate your concern relative to alleged violations of Ms. Lisa Lambert's rights at the State Correctional Institution at Cambridge Springs.*

*As you are aware, Ms. Lambert made an allegation that she was physically abused by an officer. The staff at Cambridge Springs acted in a prudent manner, in compliance with Department policy, by reporting Ms. Lambert's claim to the Special Investigations Office and requesting an investigation. Ms. Lambert was placed in Administrative Custody pending the outcome of the investigation.*

*I wish to inform you that the investigation has recently been completed. The results indicate that Ms. Lambert's claim of excessive force cannot be substantiated and there is no evidence to indicate Ms. Lambert's allegations were true. Based upon the findings of the investigation, Ms. Lambert will remain in Administrative Custody until a decision is made regarding her future placement.*

*You also expressed concern that Ms. Lambert was unreasonably searched upon her return from court. While Ms. Lambert was searched upon her return, there was nothing unreasonable about it. It is standard procedure that when an inmate leaves the institution for any reason, including court appearances, they are strip searched upon their return. Your statement that the strip search was videotaped is inaccurate. The medical examination conducted by a female registered nurse was videotaped in order to insure Ms. Lambert had no bruises, cuts, scratches, etc., which may have been received while she was away. While I would not accuse Ms. Lambert of any inappropriate action, we have had inmates that self-inflict wounds and later claim abuse by staff. Considering the nature of Ms. Lambert's*

ATTACHMENT C.

*Jules Epstein, Esquire*                                                                    *Page Two*
*Kairys, Rudovsky, Kalman & Epstein*                                      *December 23, 1994*

allegation, it was a wise decision of the staff to videotape the exam. During the taping and photographing, Ms. Lambert was permitted to wear her underclothes. In addition, an invasive body cavity search was not performed. In any event, every effort was made to assure Ms. Lambert's privacy and minimize any embarrassment. The staff was very professional in performing their required duties.

Relative to the videotape and photographs, I can assure you they will remain confidential; however, they will not be destroyed. The material is stored in a locked cabinet in the office of the Deputy for Facility Management, Victoria Kormanic. Access will be limited to only those individuals approved by appropriate administrative staff. To date there has been no need to review the material.

I hope this information clarifies the rationale and authority under which the administration of Cambridge Springs performed their duties.

Sincerely,

**Thomas A. Fulcomer**
**Deputy Commissioner**
**Western Region**

cc:    **Commissioner Lehman**
       **Executive Deputy Commissioner Reid**
       **Chief Counsel Young**
       **Director Davis**
       **Superintendent Wolfe**

RECEIVED

DEC 2 7 1994

OFFICE OF CHIEF COUNSEL

REFERRED