# IN THE UNITED STATED DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA LAMBERT                       )
                                   )
                                   )
               v.                  )
                                   )    Civil Action No. 96-247
                                   )    Judge Sean J. McLaughlin
WILLIAM WOLFE; KEITH               )    Magistrate Judge Susan Paradise Baxter
BARLETT, JOHN RAUN;                )
JAMES EICHER; and VICTORIA         )
KORMANIC                           )
                                   )
                                   )    Electronically Filed

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.  STATEMENT OF THE CASE

Plaintiff, Lisa Lambert, is an inmate currently housed in a correctional facility in Massachusetts. At all times relevant to this suit, she was an inmate incarcerated at the Pennsylvania State Correctional Institution-Cambridge Springs (hereinafter SCI-Cambridge Springs).

Plaintiff filed her complaint in this matter on August 20, 1996 (*See* Doc. # 1). She sued the above named Defendants under 42 U.S.C. §1983 for purported violations of her 4th, 8th, and 14th Amendment rights (*Id.,* ¶¶ 1, 26-29).[1] Specifically, she contends that

---

[1]    Plaintiff originally sued two additional Defendants - Deputy Superintendent Charles Utz and Captain Keith Bartlett.  Utz and Bartlett have since passed away (*See* Doc. #'s 6, 53).  By Order dated June 2, 1998 Defendant Utz was dismissed from this action. By Order dated October 18, 2006, this Court permitted Plaintiff to substitute Bartlett's estate for Bartlett (*See* Doc. # 54). Plaintiff identifies Defendant Kormanic as "Dormanic." The Office of the Attorney General does not represent Defendant Eicher.

she was admitted into SCI-Cambridge Springs in January of 1993.[2] Plaintiff alleges that between May 1993 and October 1994, "on several occasions," Correctional Officer (hereinafter "CO") Raun "kissed and fondled [her] against her will…He also maliciously and sadistically beat her several times." (*Id.,* ¶ 11). Defendant Eicher also physically and sexually abused Plaintiff, in fact, she claims that on three (3) occasions between August 20, 1994 and October of 1994 he had sexual intercourse with her (*Id.,* ¶ 13). According to Plaintiff, on numerous other occasions Defendant Eicher either sexually assaulted or beat her (*Id.*).  Eicher was later convicted in criminal court for various sexual offenses (*Id.,* ¶ 15).

Plaintiff contends that Defendants Raun and Eicher were "encouraged" and able to do these things because of the deliberate indifference of Defendants Wolfe and Bartlett (*Id.,* ¶ 16).  Other SCI-Cambridge Springs inmates were similarly abused but Wolfe and Bartlett "acquiesced" in this treatment (*Id.,* ¶ 17).

Plaintiff writes that Wolfe:

…did not establish or implement adequate policies, practices and procedures to protect female prisoners from sexual or physical abuse at the hands of male guards; did not adequately train male guards in the management and care of female prisoners in ways that would avoid the sexual or physical exploitation of such prisoners; did not have in place adequate mechanisms to monitor or supervise male guards while they interacted with female inmates; did not see to it that complaints of sexual

---

[2]    Plaintiff was convicted for "the brutal murder of Laurie Show.  Show died from knife wounds- stabs to her back and slashes to her throat – inflicted on her by intruders in her home on the morning of December 20, 1991.  She was fifteen years old at the time of her death.  The investigations of Show's murder quickly zeroed in on three individuals: [Plaintiff], Tabitha Faith Buck, and Lawrence Yunkin.  The police arrested Lambert and Yunkin on outstanding warrants the day of Show's murder.  Upon questioning, they both admitted their involvement in the attack on Show; and they both implicated Buck." *Lambert v. Blackwell,* 387 F.3d 210, 218-219 (3d Cir. 2004) *certiorari denied* 544 U.S. 1063, 125 S.Ct. 2516, 161 l.Ed.2d 114 (2005)

> or physical abuse or possible incidents of such abuse were adequately investigated; and did not take necessary and appropriate steps to discipline guards who were engaging in such activities with female prisoners.

(*Id.,* ¶ 18).   All this, according to Plaintiff, amounted to deliberate indifference on Wolfe's part and "had the effect of tacitly authorizing and encouraging" Raun's and Eicher's misconduct (*Id.,* ¶ 19).

Plaintiff contends that Defendant Bartlett was deliberately indifferent to the inmates at SCI-Cambridge Springs because he failed to "meaningfully investigate complaints of sexual and physical abuse by guards against other female inmates and against" Plaintiff (*Id.,* ¶ 22).   Once again, Plaintiff characterizes this purported indifference as "tacitly" encouraging Raun and Eicher to abuse her (*Id.,* ¶ 23).

The allegation against Defendant Kormanic is of a different nature.   When Plaintiff returned to SCI-Cambridge Springs from another facility, Kormanic supposedly "forced her to remove her clothing and to be videotaped and photographed in the presence of several other female officers without a legitimate penological or institutional reason for doing so." (*Id.,* ¶ 23).   Plaintiff alleges that "pictures of the most private areas of [her] body were taken" *(Id.,* ¶ 24), that she was "required to expose her genitals and other private parts of her body" (*Id.,* ¶ 28), and that "[p]hotographing and videotaping [her] naked body" (*Id.,* ¶ 29) violated her rights.

Plaintiff challenged her underlying first degree Murder conviction in both the Federal and Pennsylvania Courts after the filing of her complaint.[3]   Both the Plaintiff and Defendants agreed to administratively close the case while the underlying criminal

---

[3]    A more complete procedural history of Plaintiff's challenges to her murder conviction can be found in *Lambert v. Blackwell,* 387 F.3d 210, 227-230 (3d Cir. 2004) *certiorari denied* 544 U.S. 1063, 125 S.Ct. 2516, 161 l.Ed.2d 114 (2005).
.

conviction was reviewed (*See* Doc. #'s 32, 33).  By Order dated July 14, 2000, this Court administratively closed this case stating that it could be reopened by either party.  The Murder conviction was ultimately upheld and Plaintiff moved to reopen this case on January 25, 2006 (*See* Doc. # 35).  By Order dated that same day, this Court granted the motion and reopened the case.  Discovery has been ongoing since that time (*See* Doc. #'s 46-49).  The Defendants requested and this Court granted two Motions to Extend Time for Filing Motion for Summary Judgment (*See* Doc. #'s 50, 51).  The Defendants' Motion for Summary Judgment, Brief in Support thereof, and Statement of Material Facts not in Dispute followed.

## II.  STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) reads in pertinent part that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  "The moving party [on a motion for summary judgment] has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable fact finder could only find for the moving party." *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir. 2000).  Rule 56 does not allow the non-moving party to rely merely upon bare assertions, conclusory allegations or suspicion. *See Fireman's Insurance Company of Newark v. DeFresne,* 676 F.2d 965, 969 (3d Cir. 1982).  There is no issue for trial unless evidence in the record would permit a jury to return a verdict of the non-moving party.  *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III.  ARGUMENT

### A.  Plaintiff Fails to Allege the Personal Involvement of Superintendent Wolfe and Captain Bartlett and Cannot Show that She Faced a Substantial Risk of Harm to Which Wolfe and Bartlett Were Deliberately Indifferent.

Plaintiff does not contend that Superintendent Wolfe or Captain Bartlett sexually and/or physically assaulted her.  Instead, Plaintiff tries to hold these two responsible in their supervisory capacities.  Plaintiff writes that Wolfe:

> …did not establish or implement adequate policies, practices and procedures to protect female prisoners from sexual or physical abuse at the hands of male guards; did not adequately train male guards in the management and care of female prisoners in ways that would avoid the sexual or physical exploitation of such prisoners; did not have in place adequate mechanisms to monitor or supervise male guards while they interacted with female inmates; did not see to it that complaints of sexual or physical abuse or possible incidents of such abuse were adequately investigated; and did not take necessary and appropriate steps to discipline guards who were engaging in such activities with female prisoners.

(*See* Doc. # 1, ¶ 18).  All this, according to Plaintiff, amounted to deliberate indifference on Wolfe's part and "had the effect of tacitly authorizing and encouraging" those who did have personal involvement in the abuse, Raun and Eicher.  (*Id.,* ¶ 19).

Plaintiff contends that Defendant Bartlett was deliberately indifferent to the inmates of SCI-Cambridge Springs because he failed to "meaningfully investigate complaints of sexual and physical abuse by guards against other female inmates and against" Plaintiff (*Id.,* ¶ 22).  Once again, Plaintiff characterizes this purported indifference as "tacitly" encouraging Raun and Eicher to abuse her (*Id.,* ¶ 23).

In order to establish a §1983 claim, the Plaintiff must show a direct causal link between the wrong and the Defendant.  *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).  Liability can only be imposed when that Defendant played an "affirmative part" in the alleged misconduct.  *Chinchello v. Fenton,* 805 F.2d 126, 133-

134 (3d Cir. 1986). To the extent any Plaintiff tries to hold Department of Corrections (hereinafter DOC) Defendants liable in their supervisory capacities, that Plaintiff must show the supervisor Defendant's direct involvement in the alleged wrong. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). It is not enough to simply state that a Defendant is a supervisor therefore he/she is responsible for the alleged misconduct. A §1983 claim cannot be predicated upon a theory of vicarious liability or *respondeat superior. See Rizzo, supra,* 423 U.S. 362. Moreover, "…while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have no affirmative constitutional duty to train, supervise, or discipline so as to prevent such conduct." *Chinchello, supra*, 805 F.2d at 133.

The Defendants respectfully submit that the very language Plaintiff chose to use in her complaint necessarily precludes judgment against Superintendent Wolfe and Captain Bartlett. Alleged failures to "adequately train," to adequately "monitor or supervise male guards," and to adequately "discipline guards" for misconduct, Plaintiff's own words, as a matter of law are not cognizable under §1983. Summary judgment as to Superintendent Wolfe and Captain Bartlett should be granted.

Plaintiff is trying to show "both (1) contemporaneous knowledge [on Wolfe's and Bartlett's part] of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3rd Cir. 1988) *cert. denied* 489 U.S. 1065 (1989). Plaintiff "must show that [she] faced a 'substantial risk of harm' to which the…Defendants acted with 'deliberate indifference.'" *Heggenmiller v. Edna Mahan*

*Correctional Institution for Women,* 128 Fed.Appx. 240, 245 (3rd Cir. 2005) *citing to Farmer v. Brennen,* 511 U.S. 825, 832,114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In *Heggenmiller,* female inmates claimed, *inter alia,* that prison officials were deliberately indifferent to the risk of sexual assaults by prison staff just as Plaintiff does in the instant case.  The Third Circuit held, in part, that the inmates had not proven a "substantial risk of harm."  In so holding, the Court looked at various numbers that were produced during the discovery process.  This Honorable Court has the benefit of more extensive statistics in this case than the Court had in *Heggenmiller*.  Plaintiff will come before this Court and try to give the impression that there was an epidemic of sexual abuse at SCI-Cambridge Springs but the numbers prove otherwise.  SCI-Cambridge Springs opened in 1992 and started accepting inmates on March 30th of that year (*See* Deposition of William Wolfe, attached hereto as Attachment A, hereinafter Wolfe Depo., pp. 10, 11).  On September 25, 1992, Cambridge Springs had a population of 148 inmates (*See* Attachment B)(*See also* Wolfe Depo. p. 209).  That is the lowest figure produced during discovery.  By the time of Superintendent Wolfe's deposition in the Summer of 1997, the daily average population of SCI-Cambridge Springs had swelled to approximately 580 inmates (*Id.,* p. 12).

Plaintiff will come before this Court and cite the number twenty-four (24).  During Plaintiff's deposition of CO Raun, Plaintiff's counsel listed "people whose names have come up in one fashion or another in connection with allegations of inappropriate conduct, not always sexual, in relation to an inmate…." prior to the time of Raun's deposition in 1998 (*See* Deposition of John Raun, attached hereto as Attachment C, hereinafter Raun Depo., p. 23).  This list complied by the Plaintiff contained twenty-four

names (*Id.,* p. 23).  Setting aside for the moment that by Plaintiff's own admission not all of these twenty-four were alleged to have had sexual contact with inmates, and setting aside for the moment that this list of twenty-four includes both founded and unfounded allegations of all manner and degree of fraternization, at most that is twenty-four allegations in six years (1992-1998) or an average of just four (4) a year.  If we take the lowest inmate population of 148, four allegations per year amounts to approximately 2.7% of the inmates lodging fraternization allegations of all manner and degree, unfounded and founded, against prison staff every year. We know, however, that the SCI-Cambridge Springs inmate population grew larger through the years than 148 (Wolfe Depo. p. 209-213). If we take the highest population figure of record, 580, that amounts to a miniscule .7% of the inmates lodging fraternization claims against the staff on a yearly basis.  Whether one uses the high figure of 2.7% or the low figure of .7%, neither number qualifies as an epidemic.

And this is utilizing the number, twenty-four, most favorable to Plaintiff. It is more accurate to use the number twelve (12) as in the total number of confirmed cases of staff on inmate sexual activity, of all kinds and degrees, from 1992 up to Superintendent Wolfe's deposition in 1997 (*Id.,* p. 109).  This amounts to approximately 2.4 confirmed cases of sexual abuse a year or 1.6% of the inmate population of 148 and .4% of the inmate population of 580.

The allegations of misconduct outlined in the Complaint end in 1994.  The numbers cited above run until 1997 (12) and 1998 (24), three and four years after the misconduct alleged in the Complaint.  It is even more accurate to use the number seven (7) as in the number of allegations of inappropriate social or sexual contacts between staff

and inmates from 1992 until January of 1995 (*See* Attachment D). This is an average of 2.3 allegations a year giving us numbers very close to the 2.4 allegations a year cited above. No matter which figure one chooses, Plaintiff's twenty-four or the more accurate seven, the fact remains that the incidents of inappropriate social and sexual contact of all kinds and degree between staff and inmates at SCI-Cambridge Springs was tiny. Plaintiff cannot even show that she was subjected to a "substantial risk of harm."

*Assuming arguendo* that Plaintiff could show a "substantial risk of harm," she can never prove that Wolfe and Bartlett were inactive in the face of the risk and that this inaction signaled to Cambridge Springs staff that they could abuse prisoners with impunity. Stated another way, Plaintiff can never show that Wolfe and Bartlett were deliberately indifferent to the care of the inmates in their charge. Just the opposite is true.

The Code of Ethics (*See* Attachment E) is the DOC's most significant document on fraternization between staff and inmates (Wolfe Depo. p. 56). Various portions of this document touch upon the relationships between staff and inmates, staff responsibilities in the handling of inmates, and how fraternization between the two groups is strictly prohibited (*Id.,* pp. 56-61). Each and every "Department of Corrections employee receives and signs for the" Code of Ethics at the beginning of their tenure with the Department (*Id.,* p. 61)(*See also* Attachment F). They are also trained and advised in the contents of the Code. (*See* Excerpt of Deposition of Vaughn Davis, attached hereto as

Attachment G, hereinafter Davis Depo., p. 64).[4]   DOC employees are placed on notice as soon as they are hired not to engage in inappropriate relations with inmates.

Wolfe had on-going conversations with Mary Byrd, the Superintendent at SCI-Muncy, on sex abuse of inmates (Wolfe Depo. p. 54).  SCI-Muncy is the only other all female prison in the State.  Wolfe was always concerned about the possibility of such abuse and had zero tolerance for it (*Id.,* pp. 17-19, 51, 52, 53, 69).  He characterized such abuse as "reprehensible" and "one of [his] biggest fears in life." (*Id.,* pp. 19, 53).

We know that Superintendent Wolfe conveyed his very strong feelings about sexual abuse of inmates to other DOC employees both within and without SCI-Cambridge Springs.  Mike Wolanin, one of Vaughn Davis' investigators at OPR, stated, "[m]y take on Wolfe was he had zero tolerance for problems up at Cambridge Springs regarding any kind of sexual" abuse "and [Wolfe's] concern is if its going on, [the offending staff member] shouldn't be there." (*See* Excerpt of Deposition of Mike Wolanin, attached hereto as Attachment H, hereinafter Wolanin Depo., p. 74).  Mr. Wolanin continued, "like I said, [Wolfe] had zero tolerance for fraternization issues at the institution." (*Id.,* p. 75).  When Wolanin informed Wolfe that he had interviewed a staff member suspected of sexually abusing an inmate, Wolfe replied, "if the guy's dirty, he's dirty, he doesn't belong here." (*Id.,* p. 83).

Ronald Lazenby, at one point the Intelligence Captain at SCI-Cambridge Springs responsible for investigating allegations of sexual abuse, said this about Superintendent Wolfe:

---

[4]     Mr. Davis was the Director of Investigations of the Office of Professional Responsibility (OPR), a state-wide internal affairs body that investigated, *inter alia,* allegations of employee misconduct and abuse of inmates (*See* Davis Depo. p. 7).

> Q (KRAKOFF): Now, did you have any discussions with Superintendent Wolfe in connection with how he viewed the level of sexual abuse or exploitation at the prison?
>
> A (LAZENBY): He would not tolerate it whatsoever. He actively went after people, had me actively go after people.
>
> ***
>
> A: This institution has always actively --- I don't know if that's the word I want --- actively went after people. It's never been condoned….

(*See* Deposition of Ronald Lazenby, attached hereto as Attachment I, hereinafter Lazenby Depo., pp. 35, 135-136). When asked whether he felt "any reluctance about investigating fellow officers in connection with possible sexual misconduct," Lazenby echoed Wolfe's exact words when he replied, "[a]bsolutely not. They're dirty then they need to be cleaned out." (*Id.,* p. 145).

The CO's at SCI-Cambridge Springs had no doubt where their Superintendent stood on the issue of sexual abuse of inmates. CO Raun related what he and other CO's were thinking when various members of the Cambridge Springs staff were physically removed from the prison grounds due to confirmed allegations of sexual abuse. Raun explained that such removals were "an indication of what not to do at Cambridge Springs and it was a message that was sent out amongst everybody that was working at Cambridge Springs. That it was like zero tolerance for any type of sexual infractions or stepping across the line is what we call it." (Raun Depo., pp. 16-17). Raun continued:

> Q (KRAKOFF): Now, you had testified earlier that there was zero tolerance at Cambridge Springs in connection with inappropriate relations between --- inappropriate sexual relations between members of the staff and inmates; is that correct?
>
> A (RAUN): Yes I did.
>
> Q: Okay. And when and how did you first become aware of the zero tolerance policy?

11

A: See, I was the sixth one hired at the institution and as far as I can remember back the superintendent at that time, Captain Lazenbee, had worked with female inmates at SCI ---.

Q: Muncy?

A: Nope, Waynesburg.  That was a female institution.  He was then the captain in charge and with his experience and his policies that he had been through --- us being new off the streets it was stressed from that point.  From the time I started in corrections and which I continued on telling the officers that were hired as an area training Sergeant, Sergeant Coffee, all the sergeants that were on there.  It was always part of the criteria that we went ahead and we told these people that there was zero tolerance for it. (Raun Depo. pp. 24-25)

*** 

Q: Do you remember any efforts by the administration, meaning Superintendent Wolf[e], Deputy Superintendent [Utz], Deputy Superintendent [Kormanic], with respect to announcing and reinforcing the policy of zero tolerance?

A: I believe that it was designated that we get the information relayed to us through the captain of the guard that this is the institution's policy that there is zero tolerance for sexual harassment. (Raun Depo, pp. 27-28)

*** 

A:…like I said, prior to this, the sexual harassment policy was read to us at role call on numerous occasions.  The code of ethics books was --- they were assigned to us, yes, and we were told that we were to adhere to those policies. (Raun Depo. p. 28)

The best example of Superintendent Wolfe communicating to his staff a zero tolerance policy are his dealings with Sandra Wolfgang, a psychologist at SCI-Cambridge Springs.  Wolfgang had information about alleged staff on inmate abuse but did not alert prison authorities.  Wolfe was furious:

…when [Wolfgang] first started with the department, I had learned later on that she had received information on a case, and I don't remember the specific details of it.  And I was infuriated that she did not pass this information along to us.  I very firmly told her that within the confines of this institution, that the client/therapist relationship does not exist…when it comes to the safety and security of this institution…She was very dismayed at me.  She was hired from the street.  As I said, and I don't remember the exact investigation, but it came to my attention early in her

> career here, that she had information through therapy sessions or
> counseling sessions with people on her caseload, that she had some
> knowledge…I was extremely upset.  I gave her holy hell and told her
> under no uncertain circumstances that anything related to the safety and
> security of this institution is not governed by therapist/client relationship.

(Wolfe Depo. pp. 174-175).   Wolfgang confirmed Wolfe's testimony, "[t]he
Superintendent made it crystal clear, okay.  That in any case like this if you hear in any
way, shape or form in any context that staff are engaged in sexual behavior with inmates,
it is your duty to report to [Wolfe], that that is a breach of security to the institution." (*See*
Deposition of Sandra Wolfgang, attached hereto at Attachment J, hereinafter Wolfgang
Depo., p. 170).

Superintendent Wolfe did not just believe in and communicate to his staff a zero
tolerance policy. He enforced that policy.  In order to show deliberate indifference,
Plaintiff must show that when confronted with allegations of sexual abuse/fraternization
amongst members of his staff, Wolfe did nothing but sit on his hands.  Nothing could be
further from the truth.   Attachment D is "a list by name and job title, every SCI-
Cambridge Springs staff member who was alleged by an inmate or another staff member
to have had inappropriate social or sexual contact with a SCI-Cambridge Springs
inmate."  The list runs from 1993 to 1998.  Attachment D shows that every one of these
allegations was investigated by either Cambridge Springs staff (Bartlett, Lazenby,
Lieutenant Beck, Captain Scott) and/or referred to OPR for investigation.

Bartlett, at one time an Intelligence Captain like Lazenby, testified that it was
Superintendent Wolfe who would assign investigations to him (*See* Deposition of Keith
Bartlett, attached hereto as Attachment K, hereinafter Bartlett Depo., pp. 21-22).
Lazenby testified that Wolfe assigned him investigations (Lazenby Depo. pp. 19-20).

Attached for this Court's review in chronological order are several examples of internal SCI-Cambridge Springs memoranda showing Wolfe ordering his investigative staff to look into allegations of sexual abuse (*See* Attachment L).

There are four documents included in Attachment L not from Wolfe but still showing that Wolfe ordered investigations. Bartlett states in his December 20, 1994 memo to Wolfe, "[p]er your memo 'Request for Investigation' dated December 5, 1994…." Beck notes in his March 25, 1996 memo, "[i]nitial investigation ordered and authorized by Supt. Wolfe…." At the end of the second paragraph of his March 26, 1996 memo, Beck notes "that the Superintendent wanted an official investigation conducted at once to be done by Lt. Beck." Finally, Wolfe wrote on the bottom of Lazenby's May 29, 1997 memo, "Capt L. Please interview Lt Manski ASAP and keep me advised." Whenever Superintendent Wolfe felt for whatever reason that an investigation into allegations of sexual abuse would be better handled by OPR as opposed to his own Cambridge Springs investigators, he did not hesitate to request OPR support through his superiors (*See* Attachment M).

Wolfe did more than just order investigations. He took decisive disciplinary action once allegations of misconduct were confirmed. Wolfe testified, "certainly part of our strategy, too, as a department, was to take and investigate. Based on the results of the investigation take very swift and decisive action and prosecute where we believed that there was sufficient evidence to file criminal charges with the District Attorney's office." (Wolfe Depo. p. 69). Attachment D shows that some employees resigned, Wolfe fired others, and in some instances, he had them criminally prosecuted. The

documentation included at Attachment N gives this Court a sense of some of the actions

Superintendent Wolfe took:

> 1. Wolfe barred CO Eicher from the prison grounds.   Any contact with Eicher was to be documented and reported immediately.  Wolfe suspended Eicher pending the investigation that Wolfe had put in motion, subsequently fired him, then ultimately had him criminally charged resulting in a one and half (1 ½) to three (3) year period of incarceration.

> 2.  Wolfe barred Food Service Supervisor Walton from prison grounds. Wolfe suspended Walton pending the investigation that Wolfe had put in motion.  He fired Walton, Walton was criminally charged and convicted, and ordered to serve a three (3) to twenty-four (24) month prison term.

> 3.  Wolfe barred CO Trainee Hammers from prison grounds.

> 4.   Wolfe barred staff member Miller from prison grounds then fired him. Miller was ultimately criminally charged, convicted, and ordered to serve a three (3) to twenty-four (24) months less one day term of incarceration.

Staff within the Institution certainly knew when an employee was fired or escorted off the

grounds (*See e.g.* Wolfe Depo. p. 94-95)(Raun Depo. pp. 15-17) and such disciplinary

action obviously "reaffirmed the code of ethics" in Superintendent Wolfe's words (Wolfe

Depo. p. 95).  As CO Raun stated, when people were escorted off the grounds it certainly

"was an indication of what not to do at Cambridge Springs and it was a message that was

sent out amongst everybody that was working at Cambridge Springs." (Raun Depo. pp.

16-17).

Wolfe did more than simply react to allegations of sexual abuse when he became

aware of them. He took a proactive approach in preventing the abuse from occurring in

the first place.  Superintendent Wolfe expressed to several members of his staff his desire

to confront the issue of staff on inmate sexual abuse.  Lieutenant Beck explained that

Wolfe would raise this issue at staff and operations meetings as well as when he was

talking to Beck one-on-one (*See* Deposition of Roger Beck, attached hereto as

Attachment O, hereinafter Beck Depo., p. 78). Wolfe told Beck that there should be "[m]ore training on sexual harassment. The introduction of cameras…" (*Id.,* p. 78). Bartlett remembers speaking with Wolfe about the issue of sexual abuse. He remembered that "it was like a think tank setting. What can we do to try and help this situation out." (Bartlett Depo. p. 73). There was more than one of these "think tank" sessions (*Id.,* p. 76). A "dialogue…had developed between [Vaughn Davis] and the Deputy Commissioner Tom Fulcomer, including Superintendent Wolfe and Deputy Kormanic" about developing and presenting some type of ethics training emphasizing sexual misconduct concerns to the staff at SCI-Cambridge Springs (Davis Depo, pp. 115-116).

Wolfe's efforts came to fruition. Mr. Davis came to SCI-Cambridge Springs several times to present an hour long block of instruction specifically tailored to the code of ethics as it related to fraternization/sexual relations between staff and inmates (Wolfe Depo, pp. 66-67)(Davis Depo, pp. 113-114)(*See* Deposition of Victoria Kormanic, attached hereto at Attachment P, hereinafter Kormanic Depo., p. 121). Davis' presentation was videotaped and the Defendants have attached for this Court's review a tape of the presentation (*See* Attachment Q). Attendance at Mr. Davis' lectures was mandatory for all staff at SCI-Cambridge Springs (Wolfe Depo. p. 67). Moreover, all new incoming staff were required to watch the tape of Davis' lecture (*Id.,* p. 68), the same tape this Court has, and were required to sign a form that they have viewed the tape, had read the code of conduct, understood both, and that they would abide by the code (*See* Attachment R).

Davis' tape was not the only tape Wolfe used in training his staff. Deputy Kormanic explained that Wolfe had approved the purchase of other training tapes including, but not limited to, ones on "Professionalism in Ethics" and Cross-Gender Supervision." (Kormanic Depo. p. 114-115). Wolfe was able to have cameras installed at various places in the prison by 1997 (*See* Attachment S)(Beck Depo. pp. 79-81). Beck reported Wolfe as correctly noting that the cameras "would enhance our ability to monitor staff and inmate movement." (*Id.,* p. 81).

The Defendants respectfully submit that under no circumstances can it be said that Superintendent Wolfe was deliberately indifferent to the safety of the inmates under his care. On the contrary, Wolfe did an outstanding job as Superintendent. The Defendants further submit that there is no issue for trial in this case because the evidence of record would never permit a jury to return a verdict against Superintendent Wolfe.

The same is true of Captain Bartlett. It must be noted that Bartlett is being sued in his capacity as Intelligence Captain, that is, the person who investigates alleged malfeasance at the prison. He is not even in a "supervisory" position, *per se*, over the SCI-Cambridge Springs staff. A Defendant cannot be held liable in his supervisory capacity when he is not a supervisor. That said, Plaintiff finds fault with the way in which Bartlett conducted his investigations claiming that it rise to the level of deliberate indifference. All one has to do is look at Attachment D to see how ludicrous this assertion is. Bartlett was the investigator in eight (8) of these cases. In four (4) of these, the target of the investigation resigned and was no further danger to anyone in the Institution. In one (1), the case of CO Eicher, criminal charges were filed and the target went to jail. In another, the staff member was fired leaving just two (2) allegations of

staff misconduct that Bartlett investigated as unfounded. It escapes the Defendants how six (6) out of eight (8) Bartlett investigations resulting in the removal of the alleged perpetrator from the Institution constitutes deliberate indifference on Bartlett's part.

The first document in Attachment M is an October 12, 1994 memo from Wolfe to the DOC Commissioner. Wolfe writes that an investigation involving one of Plaintiff's many allegations of sexual abuse was closed. Wolfe continued, however, "[s]ince that time Captain Bartlett has received information that has had me reconsider this case and reopen the investigation." Bartlett going to the Superintendent with information that calls into question a prior finding is the height of responsibility, not deliberate indifference. Wolfe explained to the Commissioner that "[a]fter meeting with Deputy Kormanic and Captain Bartlett, we believe it would be in the best interest of the institution that we get" OPR involved. In the February 8, 1995 memo included with Attachment M, Wolfe writes, "I concur with Captain Bartlett's recommendation to have all parties involved polygraphed. As Captain Bartlett pointed out, we have an eyewitness who has made a sworn statement as well as sworn statements from both the staff member and inmate involved." That is not deliberate indifference on Bartlett's part.

### B. Visual Strip Searches are Constitutional. The November 22, 1994 Search of Plaintiff was Done in a Reasonable Manner, was not Maliciously or Sadistically Motivated, and was Done for Obvious Penological and Institutional Reasons.

Plaintiff alleges in her complaint that when she returned to SCI-Cambridge Springs from another facility, Deputy Kormanic "forced her to remove her clothing and to be videotaped and photographed in the presence of several other female officers without a legitimate penological or institutional reason for doing so." (*Id.,* ¶ 23). Plaintiff claims that "pictures of the most private areas of [her] body were taken" (*Id.,* ¶ 24), that she was "required to expose her genitals and other private parts of her body" (*Id.,* ¶ 28),

and that this "[p]hotographing and videotaping [of her] naked body" (*Id.,* ¶ 29) violated her rights.

Discovery has revealed that Plaintiff has the facts wrong. Plaintiff made allegations of sexual harassment against CO Raun in April/May of 1994, OPR investigated those allegations, and it was determined that those allegations were unfounded (*See* Attachment T)(Raun Depo. pp. 60, 64, 98, 112). Plaintiff lodged a second set of allegations against CO Raun that he had assaulted her on October 4 or 5, 1994 leaving her with bruises (*See* Deposition of Lisa Lambert, attached hereto as Attachment U, hereinafter Lambert Depo., p. 8). She reported this alleged assault eight (8) or nine (9) days later to Sandra Wolfgang, an SCI-Cambridge Springs psychologist, who in turn altered prison authorities of Plaintiff's allegations (Wolfgang Depo., pp. 90, 95).

In an unrelated act, on October 18, 1994, the Honorable Lawrence F. Stengel of the Court of Common Pleas of Lancaster County ordered that Plaintiff be produced by November 15, 1994 (*See* Attachment V). Plaintiff was in the process of challenging her Murder conviction in the state courts. Plaintiff had to travel to Lancaster County to attend and testify in her state Post-Conviction Relief Act (PCRA) hearing. SCI-Cambridge Springs issued Plaintiff an Authorized Temporary Absence, or A.T.A., to attend the PCRA hearing pursuant to Judge Stengel's order (*See* Attachment W).

Plaintiff returned to SCI-Cambridge Springs on November 22, 1994 (Kormanic Depo., p. 13). Superintendent Wolfe, on Kormanic's suggestion, ordered that Plaintiff be videotaped and photographed upon her return to the Institution during her routine intake medical exam (*Id.,* p. 16, 23). Wolfe explained, "I believe it was Deputy Kormanic came

to me based upon allegations that Ms. Lambert had made against the institution and our staff, she suggested it would be prudent that we draw a base line and have a documentation for [Plaintiff's] protection, as well as ours." (Wolfe Depo. pp. 220) (*See also Id.,* pp. 222-225). Kormanic explained that one of the reasons this decision was made was because prison officials were concerned about the allegation of abuse Plaintiff had lodged against CO Raun prior to going A.T.A. to Lancaster County (Kormanic Depo. p. 14). Prison authorities wanted to establish an evidentiary "baseline" showing Plaintiff's physical condition upon her return to SCI-Cambridge Springs (*Id.*, pp. 16-18)(Wolfe Depo. pp 222-225).

Plaintiff was taken to a private shower area (Kormanic Depo*., p.* 21). She refused to be medically examined with her brassiere and panties on and refused to be videotaped/photographed (*Id.*, pp. 22-23, 30). Deputy Kormanic was summoned (*Id.*, p. 23). Kormanic informed Plaintiff that she would not be videotaped/photographed completely nude, that she would have her brassier and panties on, that the videotape and photographs would remain in Kormanic's possession, and that Plaintiff must comply (*Id.,* pp. 23, 30-33).

Plaintiff finally complied (*Id.,* p. 34). She was taped/photographed while wearing her undergarments, not while completely nude. As Plaintiff admits in her complaint, there were no men present in the private shower area when Plaintiff undressed down to her undergarments nor when the videotape and photographs were taken (*Id.*, p. 43). Present in the shower area were Deputy Kormanic, Nurse Pietzak, Sergeant Chase (who was holding the video camera), and CO Brenda Jones, all women (*Id.*, pp. 39-40). Lieutenant Beck, a man, did nothing more than escort Plaintiff into the building and escort her from

the building (*Id.,* p. 40).  He was not present in the private shower area.  Deputy Kormanic took possession of the videotape and photographs (instantly developed poloroid photos), and they never left her possession (*Id.,* p. 36).  In fact, they never left a locked file cabinet in her office until she was deposed on June 3, 1997 (*Id.,* p. 38). No videotape or photos were taken while Plaintiff showered and dressed after the visual inspection in her undergarments (*Id.,* p. 42).

The Defendants have provided this Court with a copy of the entire November 22, 1994 videotape (*See* Attachment X).  This tape shows the entirety of Plaintiff's return to SCI-Cambridge Springs including the events in the private shower area and everything before and after that time.  This Court can see for itself that no "pictures of the most private areas of [Plaintiff's] body were taken" *(See* Doc. # 1, ¶ 24), that she was not "required to expose her genitals and other private parts of her body" (*Id.,* ¶ 28), and that no "[p]hotographing and videotaping [of Plaintiff's] naked body" (*Id.,* ¶ 29) ever occurred. Also attached for this Court's review is a copy of Nurse Pietzak's DC 78 form outlining in brief what actually occurred in the private shower area (*See* Attachment Y).

Both Wolfe and Kormanic explained that whenever there was a special or unique situation, such as an inmate who has recently lodged an assault allegation against a staff member returning to the prison, or when an inmate is placed back into the Restricted Housing Unit (RHU) as Plaintiff was upon her return, it was routine to videotape/photograph the inmate (Kormanic Depo*.,* pp. 23-24)(Wolfe Depo., p. 226-230). Department of Corrections Administrative Directive, BC-ADM 203, *Searches of Inmates and Cells,* in effect on November 22, 1994 (Wolfe Depo., p. 217) is attached for this Court's review (*See* Attachment Z).  Paragraphs VII C.1. b & c read:

C.    Strip Search:
        1. A strip search may be conducted when necessary to the security and good order of the institution, including the following situations:

***

        b. Upon an inmate's return from outside activities, supervised outside leave and furloughs.
        c. Upon reception, **return from court** and return after inmate has left the institution reservation for any other reason.

(emphasis added).

Attorney Jules Epstein, who had represented Plaintiff at one point in her criminal proceedings, sent a letter to Superintendent Wolfe and DOC Commissioner Joseph Lehman complaining of, amongst other things, his client's treatment on November 22, 1994. Superintendent Wolfe wrote a letter to Commissioner Lehman explaining what had occurred and why.[5] Lehman in turn sent a letter to Mr. Epstein explaining what had occurred and why (*See* Attachment AA).

Summary judgment on Plaintiff's November 22 ,1994 claim should be granted. It has long been the law that visual strip searches, even those involving cavity searches, do not violate the 4th Amendment. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1884, 60 L.Ed.2d 447 (1979) the Supreme Court approved a jail's practice of requiring pretrial detainees to submit to otherwise noninvasive visual inspection of their body cavities while completely nude following contact visits with outsiders on the basis of a simple showing that the practice was neither patently unreasonable nor irrational in either its justification or its manner of execution in the jail context. The Court indicated that it had strong reservations that an any more restrictive standard of review could ever be utilized

---

[5]    The salutation "Dear Mr. Epstein" found at the beginning of this letter was an error. This particular letter was sent to Commissioner Lehman from Superintendent Wolfe (Wolfe Depo., p. 221).

to evaluate a prison's search practices within a 4th Amendment context. *Bell, supra,* 99 S.Ct. n. 40 at 1885.

No legal development has emerged in the intervening decades that would suggest to the Circuit and District Courts that they should no longer be guided by the tenor of the *Bell* Court's observation in this regard, including the advent of the "rational relationship" test of *Turner v. Safely,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A leading commentator in the area of prisoners' rights, Professor Michael B. Mushlin, has offered:

> There is no question about the fact that the current view of an overwhelming majority of the courts is that visual strip searches of prisoners, for virtually any reason or for no reason at all, do not violate the Fourth Amendment and may be conducted almost at will, even where logic defies an answer and where courts go to great lengths to see a legitimate Penological concern or purpose where there is in fact none.

1 M. Mushlin, *Rights of Prisoners* (Clark, Boardman, Callaghan CBC 2d Ed. 1993)(West Group 2001-Supp.), §8-06, "Visual Inspections," at 381. *See also* Howard Friedmond & the Honorable Robert Rufo, "Strip Searches and the Fourth Amendment Rights of Prisoners," Georgetown CLE, 2004 WL 2800491, at 23-24 (reaching same conclusion). The Defendants do not agree with Professor Mushlin's claim that courts are defying logic and finding a penological concern where there is none. That said, the larger point Mushlin makes, that the courts overwhelmingly hold that visual strip searches do not run afoul of the 4th Amendment, is entirely correct. *See e.g. Rickman v. Avanti,* 854 F.2d 327 (9th Cir. 1988)(collecting cases); *Goff v. Nix,* 803 F.2d 358 (8th Cir. 1986) *cert. denied* 108 S.Ct. 115; *Campbell v. Miller,* 787 F.2d 217 (7th Cir. 1986) *cert. denied* 107 S.Ct. 673; *Arruda v. Fair,* 710 F.2d 886 (1st Cir. 1983) *cert. denied* 104 S.Ct. 502; *Del Raine v. Williford,* 32 F.3d 1024 (7th cir. 1994)(collecting cases).

As recently as June of this year, the Third Circuit has reaffirmed that visual body cavity searches of inmates are constitutional. *Brown v. Blaine, et.al.,* 2006 WL 1716772 at 2 (3rd Cir. 2006). Judge Bloch of this Honorable Court held years ago that visual noninvasive strip searches of death row inmates after non-contact legal visits off of the capital case unit were constitutional. *Williams v. Price,* 25 F.Supp.2d 605 (W.D. Pa. 1997). Moreover, it makes no difference whether an inmate is arguing that a strip search violated his 8th, as opposed to his 4th, Amendment rights. Strip searches in and of themselves are not unconstitutional under either Amendment. *See e.g. Peckham v. Wisconsin Department of Corrections, et.al.,* 141 F.3d 694 7th Cir. 1998); *DelRaine, supra,* 32 F.3d 1024.[6]

Even if a visual "strip search" occurred on November 22, 1994 this does not, in and of itself, establish a constitutional violation. The courts time and time again have held that such searches are permissible. Under no circumstances can Plaintiff prevail by simply showing that a visual strip search occurred. She must take the additional and necessary step of proving that the way in which search was conducted was unconstitutional. The only constraint against prison officials in conducting these types of searches under the 4th Amendment is that they "must be conducted in a reasonable

---

[6]     Plaintiff contends that the November 22 ,1994 search violated her 4th, 8th, and 14th Amendment rights (*See* Doc. # 1, ¶¶ 28, 29). In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) *quoting Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) the Supreme Court stated, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Plaintiff cites to the 14th Amendment to support her claim that her privacy rights were violated during the search (*See* Doc. # 1, ¶ 29). These "privacy rights" are already encompassed within the 4th Amendment. S*ee DelRaine, supra,* 32 F.3d at 1040, n.6. Plaintiff's 14th Amendment claim with respect to the visual search is not properly before this Court.

manner." *Brown, supra,* 2006 WL 1716772, at p. 2, *citing to Bell, supra,* 99 S.Ct. at 1884. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it was conducted." *Bell, supra,* 99 S.Ct. at 1884. The only constraint against prison officials in conducting these types of searches under the 8th Amendment is that these searches not be "maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification.'" *DelRaine, supra,* 32 F.3d at 1040 *quoting Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

It must initially be noted that Plaintiff was not even subjected to a "strip search" *per se*. Despite Plaintiff's statements to the contrary, she was never photographed and videotaped in the nude. As the deposition testimony, Nurse Pietzak's statement, and most importantly the videotape conclusively prove, Plaintiff was taped/photographed in the private shower room dressed in her undergarments. As this Court can see from the digital clock at the bottom right hand corner of the videotape, this took no more than a few minutes. Despite Plaintiff's allegations to the contrary, she did she have to expose her genitals and other private parts of her body to the cameras at any time.

Plaintiff was not even subjected to a visual body cavity search. The only thing DOC officials did was tape/photograph Plaintiff in her underwear for a few minutes while she stood there. This despite the fact that they would have been completely justified under the caselaw cited above and under DOC Administrative Directive, BC-

ADM 203, *Searches of Inmates and Cells*, to order Plaintiff to strip completely nude, to make her undergo a visual body cavity search, all the while being videotaped/photographed. This is exactly what DOC officials made the inmate do in *Brown, supra,* 2006 WL 1716772, no less than three times and the Third Circuit held that that was entirely proper.

The "strip search," if it can even be referred to as such, was conducted in the confines of a private shower area away from prying eyes. Only females, and then only those females with a need to be there, were present in the shower area. Despite Plaintiff's contention to the contrary, there were obvious and justifiable penological and institutional reasons for the "strip search." BC-ADM 203 in effect on November 22,1994 specifically states that inmates are subject to a strip search upon returning to the Institution after a court date. This is exactly what occurred in this case. In *Peckham, supra,* 141 F.3d at 695, the 7th Circuit deemed the Wisconsin Department of Correction's policy to strip search inmates after "returns to the jail…from court" constitutional. Moreover, Superintendent Wolfe explained that it is routine to conduct such visual searches of inmates going back onto the RHU. As if those two reasons were not justification enough, Plaintiff had made two sets of sexual harassment allegations against CO Raun, the second involving allegations of bruising being lodged about a month prior to Plaintiff leaving SCI-Cambridge Springs on an A.T.A. A private, quick, no-contact visual search of Plaintiff's body for signs of bruising or lack thereof was entirely permissible and prudent given Plaintiff's penchant for lodging sexual harassment claims against CO's. As both Wolfe and Kormanic correctly state, the visual search protected both Plaintiff and the DOC.

There is no genuine issue as to any material fact concerning the November 22, 1994 search. The Defendants respectfully submit that summary judgment should be granted on that claim because the evidence is such that a reasonable fact finder could only find for the Defendants on that issue.

### C.  Defendant Raun's alleged misconduct prior to August 20, 1994 is barred by the statute of limitations.

Plaintiff alleges that between May 1993 and October 1994, "on several occasions," CO Raun "kissed and fondled [her] against her will…He also maliciously and sadistically beat her several times." (*See* Doc #. 1, ¶ 11). During her deposition, Plaintiff stated that these separate and distinct assaults occurred several times a week during this time frame (Lambert Depo., p. 32).  These alleged assaults occurred "whenever [Raun] found [Plaintiff] in deserted areas of" Luter Hall, a building on the SCI-Cambridge Springs grounds (Lambert Depo., p. 26). Plaintiff filed her complaint in the instant matter on August 20, 1996. (*See* Doc. # 1).

In *Sameric Corporation of Delaware v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir. 1998) the Third Circuit held that:

> [i]n actions under 42 U.S.C. §1983, federal courts apply the state's statute of limitations for personal injury. *See Wilson v. Garcia,* 471 U.S. 261, 276-278, 105 S.Ct. 1938, 1947-48, 85 L.Ed.2d 254 (1985); *287 Corporate Ctr. Assocs. v. Township of Bridgewater,* 101 F.3d 320, 323 (3d Cir. 1996).  Thus, because Pennsylvania's statute of limitations for personal injury is two years, *see* 42 Pa.Cons.Stat.Ann. §5524 (West Supp. 1997), [plaintiff's] due process claims are subject to a two-year statute of limitations. *See Smith v. City of Pittsburgh,* 764 F.2d 188, 194 (3d Cir. 1985).  A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based. *See de Botton v. Marple Twp.,* 689 F.Supp. 477, 480 (E.D. Pa. 1988).

In the recent case of *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 2006), the Court stated in unequivocal terms that in §1983 cases "discrete acts…are individually actionable" and the two year statute of limitations starts to run upon the occurrence of that discrete act. Discrete acts "are easy to identify." *O'Connor, supra,* 440 F.3d at 127 *quoting National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). They are those acts which in and of themselves give rise to a cause of action as opposed to those "acts which are not individually actionable but may be aggregated to make out" a claim. *O'Connor, supra,* 440 F.3d at 127.

There is no doubt that an assault on an inmate is individually actionable under the 8th Amendment. *See e.g. Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992)(Force by a prison guard violates the 8th Amendment when it is not applied "in a good faith effort to maintain and restore discipline," but instead, applied "maliciously and sadistically to cause harm.") There certainly is no requirement that an inmate wait until she is assaulted numerous times before being able to seek redress in the courts. As such, every time Defendant Raun supposedly assaulted Plaintiff in the isolated confines of Luter Hall the two year statute of limitations began to run on that particular assault. Plaintiff filed her complaint on August 20, 1996. The alleged assaults that occurred prior to August 20, 1994 are barred by the statute of limitations and are not properly before this Court.

In her complaint, Plaintiff contends that Defendant Raun's assaults ended in October of 1994. We know from the various documentation attached to the Defendants' motion for summary judgment that the last alleged assault occurred in a stairwell in Luter Hall on October 4, 1994. That means that only those assaults which allegedly occurred

between August 20 and October 4, 1994, a period of roughly a month and a half, survive this partial motion for summary judgment.

Plaintiff's attempts to distinguish *O'Connor* and *Morgan* will fail. While true *O'Connor* involved a police officer in an employment context and not an inmate, it still was a §1983 case. While true *Morgan* was a racial discrimination and retaliation case under Title VII, this fact makes it no less applicable to the instant matter. The *O'Connor* Court specifically held that, "[t]he principles at work in *Morgan* apply with equal force to §1983 claims. *Morgan* held simply that causes of action that can be brought individually expire with the applicable limitations period." *O'Connor, supra,* 440 F.3d at 128. The Court also stated, "in whatever statutory context the distinction may arise, *Morgan* will control. So far, the Court's of Appeals for the Sixth, Seventh, and Ninth Circuits have applied *Morgan* to §1983 cases. *See Sharpe v. Cureton,* 319 F.3d 259, 267 (6th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.,* 347 F.3d 1014, 1036 (7th Cir. 2003); *RK Ventures, Inc. v. City of Seattle,* 307 F.3d 1045, 1061 (9th Cir. 2002). The Sixth Circuit explained that it could 'find no principled reason upon which to restrict *Morgan* to title VII claims.'" *O'Connor, supra,* 440 F.3d at 128 (footnote omitted).

Plaintiff cannot come before this Court and argue that all of her allegations against Defendant Raun survive under a "continuing violation" theory. That is, since Raun's alleged assaults occurred several times a week for an extended period of time this constitutes a "continuing violation" of her rights. Because some of the alleged assaults did occur within the statute of limitations period (August 20 through October 4, 1994), Plaintiff may contend that those later assaults breathe new life into the earlier time-barred assaults which started in May of 1993. Mr. O'Connor made the same argument with

regard to his particular claims.  "O'Connor argues, however, that the statute of limitations should be deemed equitably tolled because his complaint…involv[es] a continuing violation" which "requires aggregation of acts occurring outside the limitations period with those occurring inside the period."  *O'Connor, supra,* 440 F.3d at 127.  The Third Circuit soundly rejected that position holding that the actions Mr. O'Connor listed were all discrete acts, just as in the instant case, and "under *Morgan*, they cannot be aggregated under a continuing violations theory…the *Morgan* rule [is] that individually actionable allegations cannot be aggregated…."  *O'Connor, supra,* 440 F.3d at 127.

## IV.  CONCLUSION

WHEREFORE, it is respectfully requested that partial summary judgment be entered in favor of the Defendants.

Respectfully submitted,

**Thomas W. Corbett, Jr.**
Attorney General

BY:    /s/ Robert A. Willig
        ROBERT A. WILLIG
        Senior Deputy Attorney General
        PA I.D. No. 53581

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219

Date:  October 26, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within **Brief in Support of Defendants' Motion for Partial Summary Judgment** was served upon the following by ECF this 26th day of October 2006:

Angus Love
Sue Ming Yeh
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106

I hereby certify that a true and correct copy of the within **Brief in Support of Defendants' Motion for Partial Summary Judgment** was served upon the following via first class mail this 26th day of October 2006:

James Eicher
209 McConnell Road
New Wilmington, PA 16142

/s/ Robert A. Willig
ROBERT A. WILLIG
Senior Deputy Attorney General

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219

Date: October 26, 2006