## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

LISA LAMBERT,                 :
                                         :              CIVIL ACTION NO:
             Plaintiff,        :                  96 CV. 247 Erie
                                           :
             v.                        :         Judge Sean J. McLaughlin
                                           :       Magistrate Judge BAXTER
SUPERINTENDENT WILLIAM WOLFE, :
et al.,                                :              (Filed via ECF)
                                           :
                    Defendants.        :

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Lisa Lambert brings this lawsuit pursuant to 42 U.S.C. § 1983 due to violations of her Fourth and Eighth Amendment rights. As reflected in the Statement Of Material Facts In Opposition To Defendants' Motion For Partial Summary Judgment (incorporated into this brief by reference), the staff-on-inmate abuses that engendered this action were inflicted on Lambert at the State Correctional Institution at Cambridge Springs ("Cambridge Springs"), an all women's minimum security prison operated by the Pennsylvania Department of Corrections ("Department"). The abuses consisted of: (1) a series of rapes and other sexual assaults of Lambert by defendant James Eicher, a Cambridge Springs guard; (2) a number of sexually-tainted assaults administered by defendant John Raun, also a prison guard; and (3) the filming of Lambert by guards while she was naked due to the direction of defendant Victoria Kormanic, a deputy superintendent at SCI Cambridge Springs, and William Wolfe, the prison's superintendent.

Lambert is seeking monetary damages against officers Eicher and Raun stemming from their systematic abuse of her; against Superintendent Wolfe, whose deliberate indifference enabled the abuse to occur; and against both Wolfe and deputy superintendent Kormanic who authorized members of the prison staff to film her while naked.

## I.     FACTS

The abuses inflicted on Lambert by Eicher and Raun occurred between May and October of 1994 in isolated settings when those officers were alone with her, and occurred in areas where there were no surveillance cameras to monitor the behavior of the guards.  Defendants created an environment in which staff-against-inmate predatory behavior was only perfunctorily "investigated" by the prison's Intelligence Office.  Lambert's sexual abuse occurred in a context where prison personnel were not informed when co-workers were terminated or permitted to resign for reasons related to the abuse of inmates, and took place under an administration that was deliberately indifferent to the protection of inmates from harm at the hands of staff members.  The abuses at issue occurred during the second and third years of the prison's operation when Cambridge Springs housed between approximately 200 and 320 inmates.  (A 22; 45.)  The evidence shows that the November 1994 filming of Lambert occurred in a Cambridge Springs stripsearch room while she was naked and while she was wearing a bra and panties.

Beginning in October 1993, Eicher began stalking Lambert, following her around and offering her repeated gifts.  He authored numerous "love letters."  (A 772, 209-10, 232; 238.)  His harassment escalated to grabbing, fondling, and kissing her against her will.  (A 772, 232-233.)  On March 19, 1994, Eicher raped Lambert for the first time in the inmate music practice room located in Curry Hall.  (A 772-73, 232-237, 273.)  Another guard, James Merry, told her that she was there to do what Eicher wanted, grabbed her arm, pushed her into the room, and locked her in with Eicher.  (A 773, 273.)  Eicher then performed oral sex and forced her to engage in sexual intercourse.  (A 273.)  Eicher then raped Lambert five more times, on March 23, 1994; April 7, 1994; August 20, 1994; September 9, 1994; and October 1994.  (A 273-74, 773-74.)  Each time Eicher raped Lambert in a secluded area.  On March 23, 1994, Eicher told Lambert, "You know you

want it you fucking bitch, you whore," and on later dates, Eicher threatened to "get her" if Lambert told prison officials what he had done.  (Id.)

On April 7, 1994, Captain Bartlett, the intelligence captain at that time (A 3; 11), questioned Lambert about being in an unauthorized area.  Bartlett was hostile, stating, "I know you are, I know how you girls are, I know you're F'ing officer Eicher."  (A 244.)  Lambert explained, "He didn't ask me.  He screamed at me and slammed his fist down on the table.  I was scared of death of him he was five times the size of me – and I couldn't tell him anything."  (A 243.)  Due to both Bartlett's antagonistic interview and Eicher's threats to "get her," Lambert denied to Bartlett that anything had happened with Eicher.  (A 244-45.)  Not until one year later, on May 24, 1994, when the Department of Corrections ("Department") Office of Special Investigation ("OSI") (formerly the Office of Professional Responsibility) commenced an investigation did Eicher's rapes come to light.  (A 271.)  Eicher was terminated from employment on September 27, 1995 (A 268-69), and on May 23, 1996, he was criminally convicted of aggravated indecent assault, indecent assault, and official oppression.[1]  (A 311.)

Raun's abuse of Lambert occurred between May 1993 and October 1994.  (A 207-08.)  At first, Raun's "advances" included seeking Lambert out when she was isolated during her work shift, putting his thumb on her lips, backing her in a corner and hugging her.  (See A 212, 213-214, 215-17.)  Raun frequently located her in the stairway of Luter Hall, a half unoccupied building.  (A 213.)  In May 2003, Lambert reported Raun's inappropriate advances to Deputy Superintendent Utz, who responded that Raun was a "healthy young man" and laughed it off.  (A 212-13, 218-19.)  The next day, Captain Ronald Lazenby, assigned to conduct internal investigations of sexual abuse, summoned Lambert into his office, asked her about Raun, and then warned her that she "better not

---

[1] At that time, the Pennsylvania Institutional Sexual Assault Statute had not yet been enacted, which charges correctional staff who engage in any sexual contact with an inmate with a felony act.  The statute was passed in 2000.  See 18 Pa. Cons. Stat. § 3124.2.

get Raun into trouble." (A 219.) After these discussions, Raun began to stare at her, grab her hair, and push his body against her. (A 220.)

In 1994, Lambert complained through grievances to Martha Miller about Raun's further escalations. Raun "flipped out and went into a rage over that" (A 220-22), and assaulted Lambert, who recounted, "I was walking, but he had me by my hair, and I kept tripping on the stairs. He pulled me up there and had me by my hair, and he flung me really hard into the wall, and he hurt my mouth really bad. He bruised me and he kept ramming himself into me and smashing me into the wall." (A 220-21.) This degrading abuse continued from June to October 1994, several times a week. (Id.)

Eicher and Raun's deplorable actions were a pattern of sexually predatory behavior by Cambridge Springs personnel against inmates during the early years of the prison's operation, enabled and sanctioned by Superintendent Wolfe's policies. Despite Wolfe's purported "zero tolerance policy," there were twelve "confirmed" cases of sexually predatory behavior by staff on inmates in the prison's first five years, i.e. that there were a dozen staff members sexually exploiting inmates between March 1992 to June 1997. (A 39-40; 42.) Furthermore, at least 36 staff members in addition to Eicher and Raun were alleged to have had inappropriate social or sexual contact with an inmate (A 572-73), and deputy superintendent Kormanic estimated that during her tenure there could have been nearly "a hundred" reports of sexual improprieties and sexual abuse by staff against inmates. (A 60-61.) These included a food service instructor who repeatedly forced an inmate to perform oral sex on him (A 322-351); a plumbing trades instructor who forced an inmate to perform oral sex, inserted his fingers into her vagina, and told her he wanted to "fuck her" (A 482-91); a correctional officer who had a year long "relationship" with an inmate (A 499-508); and a maintenance manager who would escort inmates to an abandoned storage facility known as "Freddy's Place," with a couch, chair, heater, and door that could be locked from the inside, and

would engage in sexual activities with them inside. (A 540-48, A 731-32.) (See Plaintiff's Statement Of Material Facts In Opposition To Defendants' Motion For A Partial Summary Judgment (" P Material Facts") ¶ 45.)

Wolfe established no policies specifically prohibiting sexual harassment of inmates, failed to train internal investigators, concealed when a staff member resigned or was fired due to predatory behavior, and employed an investigator, Keith Bartlett, who himself was a sexual predator. (A 3, 11, 68.) A later investigation revealed that Bartlett had a propensity to socialize, date, and have sex with subordinate staff members and make inappropriate sexual comments, setting a tone that encouraged staff to prey on inmates. (See A 586-641.) As Commissioner Martin Horne stated, "I . . . ultimately hold the chief security supervisor responsible for an attitude about sex and sexuality and fraternization." (A 698-99.) Bartlett frequently dismissed complaints by inmates, and Mirandize victims before interviewing them. (A 95-96, 720, 722-24.)

On November 22, 1994, Lambert was returned to Cambridge Springs from a court appearance (A 51), and was forced to remove all her clothing to be photographed as well as videotaped while naked. (A 774.) Kormanic requested, and Wolfe approved, permission to photograph and videotape Lambert to establish a pictorial record (baseline) of the condition of Lambert's body at her readmission. (A 52-53.) Having pictures taken of the most private areas of her body caused Lambert extreme embarrassment and humiliation. (A 775).

## II.   ARGUMENT

A.   SUPERINTENDENT WOLFE WAS DELIBERATELY INDIFFERENT TO LAMBERT'S SEXUAL EXPLOITATION IN HIS FAILURE TO SUPERVISE AND TRAIN PRISON OFFICIALS AND FAILURE TO HAVE CLAIMS OF SEXUAL ABUSE PROPERLY INVESTIGATED

Lisa Lambert was sexually harassed, abused and assaulted while in Defendants' custody. "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotations

omitted). More particularly, sexual assault on an inmate by a prison guard "is deeply offensive to human dignity." Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000). Courts therefore find that sexual assaults by correctional staff on inmates are cognizable claims under the Eighth Amendment. See, e.g., Wright v. O'Hara, No. 00-1557, 2002 U.S. Dist. Lexis 15327, at *20 (E.D. Pa. Aug. 14, 2002) (finding that an allegation that a correctional officer had sexually assaulted prisoner adequately stated a claim).

A prison official may be liable through personal involvement in the committed wrongs, either through personal direction or through his knowledge and acquiescence. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). To be liable for the acts of subordinates, the record must contain evidence that the official was deliberately indifferent to the health or safety of inmates. Farmer, 511 U.S. at 837. "[A] defendant's knowledge of a risk can be proved indirectly by circumstantial evidence." Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001). Moreover, "policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). In Beers-Capitol, the Third Circuit outlined a four-prong test for supervisory liability: "(1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."[2] Beers-Capitol, 256 F.3d at 134, citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); see

---

[2] Defendants argue that the only way Defendants can be found liable is if they had "direct involvement" in the alleged wrong. (D. Mem. 6.) As discussed above, this is only one way liability will attach. Defendants ignore the Third Circuit principle that liability may also attach through deliberate indifference. See also Kimble v. Tennis, CV-05-1871, 2006 WL 1548950 (M.D. Pa. June 6, 2006) (explaining that in addition to personal involvement, "[s]upervisory liability will also attach if plaintiff identifies 'a specific supervisory practice or procedure' that the defendants failed to employ which created an unreasonable risk of harm to plaintiff, for which the defendants were aware and indifferent.").

also <u>Savage v. Bonavitacola</u>, 2005 WL 568045 (E.D. Pa. March 9, 2005) ("There is a second theory of supervisory liability under Section 1983 . . . . Under this theory, a supervisor may be liable as a policy maker for failing to exercise his supervisory authority if he "exhibited deliberate indifference to the plight of the person deprived.")

A plaintiff "can make out a supervisory liability claim by showing that 'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries." <u>Id.</u> Moreover, supervisory liability may also exist where "there are situations in which the risk of constitutionally recognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." <u>Beers-Capitol</u>, 256 F.3d at 134. Therefore, "when dealing with supervisory defendants, as opposed to defendants who allegedly had direct knowledge of a serious threat to inmate safety, the standard for deliberate indifference is not the 'actual knowledge' standard required in Farmer," but rather, the four-prong test outlined in <u>Beers-Capitol</u>. <u>Ward v. Taylor</u>, Civ. A. No. 04-1391-KAJ, 2006 U.S. Dist. Lexis 14135, at *16 (D. Del. March 30, 2006).

As the Superintendent of Cambridge Springs, Wolfe established, implemented and approved practices and policies that cultivated and sanctioned an atmosphere of predatory behavior by guards on female inmates.  (A 2; 11.)  Specifically, Wolfe failed to train and supervise correctional staff, and failed to investigate sex abuse claims resulted in a pattern of sexual harassment and sexual abuse of numerous female inmates by Cambridge Springs staff.

Defendants incorrectly argue that "[a]lleged failures to 'adequately train,' to adequately 'monitor or supervise male guards,' and to adequately 'discipline guards' for misconduct . . . as a matter of law are not cognizable under § 1983."  (D. Mem. 6.)  Based on <u>Monell v. N.Y. City Dept. of Social Servs.</u>, 436 U.S. 658 (1978), the Third Circuit has clearly explained that a prison official

will be liable for "causing" a plaintiff to be subjected to a constitutional violation.  Sample v. Dieks,

885 F.2d 1099, 1113 (3d Cir. 1989).  In reviewing constitutional claim by an inmate, the court

stated:

> We think the rubric "supervision" entails, among other things,
> training, defining expected performance by promulgating rules or
> otherwise, monitoring adherence to performance standards, and
> responding to unacceptable performance whether through
> individualized discipline or further rulemaking.  For the purpose of
> defining the standard for liability of a supervisor under § 1983, the
> characterization of a particular aspect of supervision is unimportant.

Id. at 1116-17; see also Seawright v. Taylor, 2006 WL 694780 (D. Del. March 17, 2006)

("Supervisory liability may attach if the supervisor implemented deficient policies and was

deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the

moving force" behind the harm suffered by the plaintiff.); Wagner v. Pennsylvania, 937 F. Supp.

510, 516 (W.D. Pa. 1995) ("The Third Circuit has construed 'supervision' [in supervisory liability

claims filed pursuant to § 1983] to include training, defining expected performance by promulgating

rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable

performance whether through individualized discipline or further rulemaking.") (internal citations

omitted).

    To establish liability based on a failure-to-train or failure-to-supervise, a plaintiff "must

identify a failure to provide specific training [or supervision] that has a causal nexus with [his]

injuries and must demonstrate that the absence of that specific training [or supervision] can

reasonably be said to reflect a deliberate indifference to whether the alleged constitutional

deprivations occurred."  Odom v. Borough of Taylor, Civ. A. No. 3:05-CV-0341, 2006 U.S. Dist.

LEXIS 77203, at *22 (M.D. Pa. 2006) (internal citations omitted); see also Lindsay v. Dunleavy,

177 F. Supp. 2d 398, 403 (E.D. Pa. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.

1989)) (internal quotations omitted).

1.    <u>**Wolfe's policies created unreasonable risks to Cambridge Springs inmates**</u>

Wolfe has admitted that he was responsible for establishing and implementing policies, practices, and procedures to protect prisoners from physical or sexual exploitation of inmates by staff members; for the training of staff members in the management and care of female prisoners in ways that avoided the exploitation of the inmates; for the monitoring and supervision of prison personnel while they interacted with inmates; for the investigation of possible exploitation of inmates by prison employees; and for the disciplining of personnel who engaged in such activities. (A 2; A 11.)  Wolfe became the prison's superintendent in January of 1991, more than a year before inmates were admitted to the institution.  (A 22.)  This afforded him approximately fifteen months to establish policies and practices to address those matters.  (<u>Id</u>.)  The record contains an abundance of evidence showing that Wolfe failed to establish policies or practices that, in fact, protect female prisoners from exploitation.

First, Wolfe failed to establish any policies or practices that would protect female prisoners from exploitation by guards.  Wolfe alleges that he instituted a "zero tolerance" policy, but in reality this "zero-tolerance policy" was toothless.  Wolfe failed to issue any written policy expressly prohibiting the sexual harassment by prison personnel of Cambridge Springs inmates.  Although the Department had an anti-sexual harassment policy in place by July 1992, it was only applicable to Department employees, not to inmates.  (<u>See</u> A 718, 719.)  Instead, Wolfe relied exclusively on the Department's Code of Ethics to deter staff members from abusing inmates.  (<u>See</u> A 33.)  The Code of Ethics itself, however, was deficient.  Specifically, Section B(6) prohibits fraternization or private relationships between staff members and inmates or members of inmates' families.  The Code of Ethics prohibits transactions such as "trading, bartering or receiving gifts, money and favors from . . . the inmate" or "deliver[ing] gifts or money to inmates' friends, relatives or representatives," but contains no explicit reference to sexual exploitation or sexual contact.  (<u>See</u> A

33, 646, 642-650.)  Wolfe also did not issue a policy statement, administrative director, or any other written protocol on sexual abuse.  (A 35-36.)

Second, Wolfe had a policy and practice of concealing sexual abuse allegations.  It was Wolfe's policy to abort in-house investigations of sexual exploitation when the subject resigned.  Rather than fully investigating a subject that could possibly lead to criminal prosecution, investigations were called to a halt once a subject left.  (See A 716; also A 574-575; A 99.)  Terminating investigations prematurely precluded prison officials from learning the scope and extent of the alleged abuse and manifested Wolfe's indifferent to the protection of the inmates.  As deputy superintendent Kormanic acknowledged, investigating alleged abuse, even if a staff member had left, could serve as a "prophylactic" against future abuse, as a "preventive measure."  (A 62.)

Moreover, when a staff member resigned or was terminated, Wolfe believed that apprising the prison staff of the reason for an employee's separation would be "inappropriate" (A 37-2), and OSI also did not inform prison personnel why a resignation occurred.  (A 162.)  In fact, when issuing notices to the prison's control room to prevent resigned or terminated staff from entering, Wolfe noted in bold letters:  "NOT TO BE READ AT ROLL CALL!"  (A 725-26.)  As a result frequently prison personnel did not know why a staff member had resigned or was discharged.  (See A 192; A 189 (Lazenby, a security captain and internal investigator, became aware of sexually exploitive incidents or staff only through "rumors."))  Thus the extensiveness of sexual abuse was shrouded, communicating a message of approval when the most serious consequences of sexual assault, i.e. criminal prosecution, could be avoided and masked through the resignation of the perpetrator.

In some cases, Wolfe ignored substantial evidence of sexual abuse in favor of correctional staff.  For example, an inmate informed an OSI investigator that correctional officer Michael Stone had kissed, hugged, and petted her, and made very sexual comments.  (A 514.)  Although a

polygraph examination reflected that she was being truthful when she stated that Stone had "oral sex" with her, Wolfe lifted Stone's suspension, concluding that polygraph tests were not one hundred percent reliable. (See A 518-20.)  Thus, Wolfe himself discounted an inmate's testimony.

Similarly, Wolfe had a policy of refraining from reporting allegations of sexual abuse to the Office of Special Investigation, formerly the Office of Professional Responsibility ("OPR").  (A 652-666.)  Because the category "sexual contact with an inmate" was not added to the Department's "review and tracking" system until 2005 (A 667-671), Wolfe was able to approve the termination of in-house investigations without any concern of being overridden by Central Office officials.  In addition, it was up to the prison superintendent to refer a matter to OPR before they would get involved in an investigation, unless possible criminal conduct came to light.  (See A 135.)  This also effectively hid the extent of sexual abuse at Cambridge Springs.

Third, Wolfe implemented other policies and procedures that created and enabled opportunities for staff exploitation of inmates.  For example, male officers were permitted to escort female prisoners across the prison to any non-restricted area without the presence of a female officer (A 26, 29, 31) even though the prison contained numerous secluded non-monitored areas.  Wolfe also failed to establish any clear guidelines of how inmates were to report the incidents, and in particular, had no way to report the incidents in a safe and confidential manner, a necessity as sexual abuse is by nature a sensitive matter.[3]  Wolfe failed to ensure that inmates were told during orientation that if anybody on staff attempted to sexually abuse them, they could complaint through a prescribed procedure.  Furthermore, the inmate handbook also said nothing specific about sexual abuse.  (A 65.)  Instead, sexual abuse allegations had to be reported in the normal grievance procedure.  Thus, when Lisa attempted to report Raun's harassment, she was met with disbelief,

---

[3] Bartlett acknowledged that it was not unusual for an inmate who was having prohibited contact with a correctional officer to deny the contact.  (A 104.)  For example, Lambert did not tell Bartlett about Eicher's sexual assaults due to threats from Eicher and Bartlett's antagonism.

retaliation by Raun, and then had no other recourse to address the abuse.  The training of prison

personnel regarding sexual exploitation of inmates was inadequate, and no specific effort was made

to train staff on this issue until September 1994.[4]  (A 37.)

Wolfe's failure to train and supervise staff in how to receive and investigate complaints of

sexual abuse in a sensitive manner only exacerbated these problems.  Due to the lack of training,

complaints were frequently disregarded or not taken seriously.  Lambert spoke with three high-

ranking corrections staff in an effort to report Raun's abuse.  She first approached Utz in May 1993,

who "basically laughed it off," saying that "Raun was a healthy young man."  (A 212.)  She then

wrote a four-page grievance regarding Raun to Martha Miller.  (A 213.)  Later, she spoke to Captain

Lazenby, but this only resulted in further retaliatory acts by Raun.  (A 219-20.)  At no point was a

full investigation conducted of Raun.

Keith Bartlett, who later was the chief in-house investigator of Lambert's allegations,

acknowledged that he received minimal training and had no expertise in conducting internal

investigations, and had received no specific training in how to investigate situations where staff are

engaged in misconduct with an inmate.  (A 70.)  Thus, Bartlett frequently discounted statements

from inmates indicating sexual exploitation by staff members, relying on fanciful reasons for

rejecting statements, and thus conducting ineffective investigations.[5]  Bartlett ignored key

---

[4] That training, however, was also not enough, as reflected in a July 176, 1995 memo from Vaughn
Davis, which recommended that the training be "intensified."  (A 497.)  This intensified training
was ultimately approved by Commissioner Horn (A 497), and later bore fruit, as sexual exploitation
began to "taper off" in 1995 or 1996.  (A 83.)  According to Bartlett, members of the staff "were
finally getting the hint."  (A 83.)

[5] Lazenby was the other main investigator of sexual abuse allegations, and he too was also
dismissive of inmates who reported sexual abuse.  In an investigation of Martin Miller, several
inmates complained that Miller made sexual remarks to inmates and brought contraband in for
inmates.  Lazenby found the allegations "hard to believe," and believed that the inmates were
complaining because they were upset at Miller's favoritism to certain inmate workers, and in
retaliation for filing a misconduct against another inmate.  (A 373, 380.)

information regarding Eicher's abuse of Lambert.  One inmate reported to Bartlett that:  (1) she overhead Eicher telling Lambert to meet him at a certain location; (2) Eicher and Lambert had met previously at Curry Hall; (3) on April 7,  "Eicher made several flirtatious and sexual comments to [Lambert]" and then told the witness that "I hope what I'm saying stays between us;" (4) Eicher said he was "hot" being around Lambert; (5) Eicher said that he was eager to take Lambert to the fieldhouse when other prisoners weren't around.  Despite all this, Bartlett told Wolfe that he believed Eicher's denials regarding the witness's claim.  In his deposition, Bartlett admitted that he incorrectly read Eicher's body language as honest, even though Eicher was lying when he denied any sexual involvement with Lambert, stating, "I'm not a professional in aspect of minimal training."[6]  (A 82.)

Bartlett also routinely gave Miranda warnings to inmates when investigating alleged sexual interactions, warnings which are used against criminal defendants.  (A 95-96.)  Bartlett would sometimes explain to the inmate that he was mirandizing her because she could be prosecuted for filing a false report.  (A 96.)  This suggested that inmates who reported sexual abuse would themselves be charged criminally, not only creating a chilling effect on reporting of sexual abuse, but encouraging those that perpetrated it.  It was not the practice or procedure of OSI to give Miranda warnings to the witness.  (A 117-120; 147)  Wolfe was aware that Bartlett mirandized victim inmates as early as December 1994 (see A 720), yet there is no evidence that he asked or ordered Bartlett to discontinue the practice.

---

In another report, Lazenby reported that Miller was simply an "overly, friendly, touchy person."  However, on April 25, 1996, OPR was called to investigation charges that Miller had sexually harassed several inmates, and it was later confirmed that Miller had forced one inmate to perform oral sex on him, having physical sexual contact with three other inmates, and frequently brought gifts for inmates.  (A 540.)

[6] Bartlett also failed to properly investigate the sexual abuse by Paul Walton and Martin Miller.  See infra Part II.C.

Wolfe's failure to supervise extended to employing a sexual predator to conduct in-house investigations of sexual abuse. Wolfe was responsible for evaluating employees' performances. As noted, the record confirms that Bartlett himself preyed on females in subordinate positions. Bartlett admitted to having sex with a probationary trainee under his command, telling sexual jokes in front of female staff members, and inducing a male officer in the presence of a female officer to crawl under his desk, to suggest that the guard was performing oral sex on him in order to induce Bartlett to give him the day off. A November 15, 1994 note in Bartlett's personnel file by Kormanic stated: "Discussed concerns about [Bartlett] dating subordinate staff and poss. compromising his integrity as a manager." (A 583, 604, 584.) Bartlett became was the subject of an OSI investigation, which concluded that Bartlett's propensity to socialize and date subordinate staff and trainees had "become a negative issue in the management of Cambridge Springs." (A 588.) The Pennsylvania Commissioner of Corrections, Martin Horn, when testifying before a state legislative subcommittee looking into the treatment of female inmates, drew a link between Bartlett's behavior with Cambridge Springs employees and the behavior of prison employees toward inmates. Horne testified that Bartlett's actions "explains a lot of the attitudes that subordinate employees have." (A 700-01.) Considering Bartlett's *modus operandi*, it is reasonable to infer that he failed to meaningfully investigate possible incidents of sexual exploitation, in deliberate indifference to any harm that they would experience.

Wolfe even failed to adequately supervise his direct supervisees. Wolfe directly supervised Carl Zimmerman, the head of maintenance. (A 747.) An August 1994 report found Zimmerman guilty of improper sexual abuse of two or three women from early 1993 to August 1994. (A 727-762; see P Material Facts ¶ 45 at 14-15.) Wolfe's complete lack of proper supervision over Zimmerman emboldened Zimmerman to set up a secret lounge-like room in an abandoned storage facility, commonly known as "Freddy's Place." This room contained a couch, chair, heater, and a

door that could be locked from the inside, and prison security did not have a key to the room. (A 540, 548.) In contrast to his purported "zero tolerance," Zimmerman was aware that there "were rumors going around regarding [Zimmerman's] possible sexual relationships with inmates. However, he stated that the rumors were nonspecific in nature and that he implicitly trusted . . . Zimmerman." (A 747-48.) An investigation of Zimmerman was eventually authorized by the Special Investigation Office, after receiving a written complaint from a Cambridge Springs inmate. (A 539.) Zimmerman's own statements indicated that his actions "went far beyond what [the investigators] had uncovered." (A 731-732.) There is no evidence in the summary judgment record that Wolfe made any effort to have the rumors investigated by either captain Bartlett or OSI. Therefore, Wolfe's failure to implement protective policies and practices, failure to train, and failure to supervise staff created unreasonable risks to female inmates like Lambert.

### 2. <u>Wolfe had knowledge and was aware of the unreasonable risks of staff exploitation of Cambridge Springs inmates</u>

Wolfe was aware that Cambridge Springs was a new facility, recently converted from a college with a distinct configuration from a penal facility, with new and inexperienced staff. Prior to the arrival of the first inmates, he spoke with Mary Byrd, Superintendent of SCI-Muncy, Pennsylvania's other women's prison, and discussed the inherent problems of sexual exploitation in women's prisons. (Wolfe Dep. 54.) Wolfe acknowledged that having many inexperienced employees probably contributed to the proliferations of abuse, and admitted that he was aware of the "great risk" that there would be sexual exploitation and sexual abuse by members of the inmates. (See A 33 ("It's always a risk . . . . It's probably one of my biggest fears in my life."). Yet, despite this knowledge, he failed to implement any meaningful policies to combat sexual exploitation of the female inmate.

Wolfe was also aware specifically that Cambridge Springs inmates were at great risk of sexual abuse. In the first five years of the prison's operation, at least 36 Cambridge Springs staff

members were alleged, either by an inmate or another staff member, to have inappropriate sexual or social contact with an inmate, and twelve staff members were confirmed to have sexually abused inmates, some with multiple inmates and multiple instances.  Deputy Superintendent Kormanic estimated that the number of reports of sexual improprieties and sexual abuse could have been much higher than the numbers listed in Defendants' chart, approaching about a hundred.  (A 60-61.)

Several of these allegations surfaced prior to or during Eicher and Raun's abuse of Lambert, such as the egregious sexual exploitation by Zimmerman.[7]  Critically, the investigative report on Zimmerman, dated August 24, 1994, linked the lack of certain policies and practices and staff-inmate abuse.  Specifically, the report made recommendations that a security log be set up to document inmate movement from the housing unit at odd times and that security maintain better access to certain areas.  (A 540.)  This report put Wolfe on notice not only of the rampant sexual abuse at Cambridge Springs, but of potential remedies to address these risks.  Therefore, Wolfe was aware of the unreasonable risks.

### 3.     Wolfe was indifferent to these risks

Wolfe's continued failure to establish affirmative policies prohibiting sexual abuse and exploitation sanctioned the unsupervised access to female inmates by correctional staff.  Supervisory liability may be imposed where a supervisor's inaction along with contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents could be found to have "communicated a message of approval to the offending subordinate."  See Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988).  In Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia, 877 F. Supp. 634 (D.D.C. 1994), vacated on other grounds, 3 F.3d

---

[7] Additional examples of perpetrators who were sexually exploiting inmates in 1993 and 1994 include Kenneth Mort (prison lieutenant), Martin Miller (plumbing trades instructor), Paul Walton (food service instructor), James Merry (prison sergeant), Michael Stone (corrections officer), and Linda Bish (food service instructor).

910 (D.C. Cir. 1996), the court found that even though a District of Columbia prison had policies

and procedures advising employees not to become intimate with inmates, and had a sexual

harassment policy for the workplace, these policies and procedures were "of little value" because

the defendants provided "no specific staff training . . ., inconsistent reporting practices, cursory

investigations and timid sanctions." Id. at 640. In disputes between an employee's version and an

inmate's allegations, the prison officials generally sided with the employee. Id. at 642. Ultimately,

the court found that the prison's lack of staff training on sexual harassment of prisoners and lack of

procedures for reporting harassment of female prisoners demonstrated prison officials' disregard

and indifference to the risks posed to inmates. Id. at 666. Similarly here, the continued lack of

adequate training and policies demonstrate Wolfe's disregard for the risks posed to the Cambridge

Springs inmates. Even after a pattern of rampant abuse emerged, Wolfe still failed to order any

comprehensive investigation to determine the scope and cause of the abuse, subjecting the women

in his custody to further risk and injury. (A 62.)

Wolfe knew that a number of inmates were sexually molested in secluded areas. (See A

577-579; A 580-82 (investigative reports that were cc'd to Wolfe). Lambert was raped in isolated

settings by Eicher, such as the music room and the fieldhouse. She was sadistically abused in

another isolated setting by Raun, the stairwell of a partially vacant dormitory. Numerous other

isolated settings also served as the location for the sexual assault and abuse of other inmates, such

as "Freddy's' Place, a bathroom in an inmate recreation area, a basement, the dietary department's

dish room, laundry room, and unoccupied floors of dormitories. Because the prison was a

converted college, Defendants admit that "there were numerous buildings and grounds located on

the prison compound where two could be unobserved . . . ." (A 399.) Despite Wolfe's knowledge,

he failed to take concrete steps would have reduced the risk that the secluded areas created. Perhaps

the most glaring failure was the failure to install surveillance cameras in a facility that was riddled

with numerous isolated settings where abuse could occur. Wolfe did not request installation of surveillance cameras until 1996, four years after the institution received it first wave of inmates. Cameras were not installed until 1997. (A 676.) This by itself demonstrates Wolfe's deliberate indifference.

### 4.    Wolfe's indifference to the risks caused injury to Lambert, and Wolfe's response to the risks were unreasoanble

Wolfe's failure to adequately supervise staff, failure to create policies that would protect the inmates, and failure to investigate claims, all directly resulted in the ability of Eicher to rape Lambert and for Raun to sexually harass and assault her. Wolfe's policies granted an unspoken approval for sexual abuse, and provided the logistical ability to perpetrate the physical and sexual assaults.

Moreover, as a direct result of prison officials' failure to respond, Lambert was subjected to even further abuse and physical violence. Lambert first approached Utz[8] in May 1993, and Raun's abuse did not cease until October 1994. Had proper action been taken when Lambert first approached Utz, some, if not all, of the abuse could have been prevented. Lambert also filed a grievance with Martha Miller (A 220-222), and in retaliation, Raun "dragged me up the stairs, basically by my hair," and then "flung me really hard into the wall, and he hurt my mouth really bad. He bruised me and he kept ramming himself into me and smashing me into the wall." (A 220-21.) Lambert "thought Raun was going to try and rape" her. (Id.) After this incident, Lambert was "terrified to try and go to anybody else." (Id.) After Lambert's attempt to report the prior incidents, Raun subsequently continued to abuse her, and thus, Lambert's injuries were a direct result of Wolfe's policies and inaction.

---

[8] Deputy Superintendent Utz was one of two Deputy Superintendents that worked directly under Wolfe. Kormanic was the other Deputy Superintendent.

While prison officials may be found free from liability if they respond reasonably to a risk

of harm to inmates, <u>Farmer</u>, 511 U.S. at 844, the response here was anything by reasonable.[9]

Lambert "thought [she] could report" Raun's abuse (Lambert Dep. 12), but her first attempts at

reporting Raun's harassment were met with disbelief or retaliatory conduct. When Bartlett was

assigned to investigate Eicher, he harassed Lambert and failed to give any credence to inmates'

statements. After Bartlett's dismissive interview, Eicher raped Lambert two more times.

Defendants' response to Lambert's allegations were lackluster and therefore does not absolve them

of liability. Therefore, the Court should deny summary judgment.

B.    <u>Bartlett's Failure to Investigate Lambert's Claim of Sexual Abuse
        Constitutes Deliberate Indifference</u>

Bartlett's investigation of Eicher's sexual assaults of Lambert were akin to the fox guarding

the henhouse – worthless. "The restriction on cruel and unusual punishment contained in the Eighth

Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of

those who unjustifiably and excessively employ fists, boots or clubs." <u>Smith v. Mensinger</u>, 293

F.3d 641, 651 (3d. Cir. 2002). Bartlett is liable for not only for his pointless and insincere

investigation, but also for his obstructive comments to Lambert which effectively deterred her from

seeking additional recourse.

As discussed above, Bartlett himself was a sexual predator. He set the tone for

investigations at Cambridge Springs, and was unable to conduct any meaningful investigation.

Instead, he went through the motions of an investigation, and in doing so, would even harass the

inmate making the allegations. Lambert testified in her deposition, "[Bartlett] didn't ask me. He

screamed at me and slammed his fist down on the table. I was scared to death of him he was five

---

[9] Defendants argue that in order to show deliberate indifference, "Plaintiff must show that when
confronted with allegations of sexual abuse/fraternization amongst members of his staff, Wolfe did
nothing but sit on his hands." (D. Mem. 6.) This is an overstatement of <u>Farmer v. Brennan</u>.
Rather, the standard to measure Defendants' response is one of "reasonableness." Defendants'
responses were anything but reasonable.

times the size of me --- and I couldn't tell him anything." (A 243.) Lambert also recounts Bartlett telling her, "I know you are, I know how you girls are, I know you're F'ing officer Eicher." (A 244.) In addition, despite interviewing an inmate who gave multiple accounts of Eicher's sexual oppression of Lambert, Bartlett believed Eicher's denials because. Eicher "maintained good eye contact, sat with his feet on the floor, appeared relaxed, and answered all questions directly and confidently." (A 256; see P Material Facts ¶ 59.) Bartlett gave lip service to conducting an investigation that were tantamount to inaction. Therefore, Bartlett was aware of Eicher's sexual abuse of Lambert, based on the statements of another inmate, yet deliberately ignored these statements, resulting in the further rapes by Eicher.

Defendants argue that Bartlett conducted eight investigations, and six resulted in resignations, terminations or criminal prosecution. However, merely because Bartlett was assigned to an investigation does not mean that he was the cause of an individual's resignation, termination, or criminal investigation. In the case of Eicher, Bartlett found that the allegations were unfounded, and it was not until the OSI commenced an activity into Eicher's activities were Lambert's allegations confirmed.

In two other examples of his failure to investigate, Bartlett wrote a memo to Wolfe regarding allegations of sexual abuse by Paul Walton, recommending that the investigation be discontinued as there was no "real victim." (A 317.) Yet later, it was confirmed that Walton had repeatedly forced an inmate to perform oral sex on him, and fondled and kissed her breasts. (A 322-51.) He also threatened the victim with segregation in the Restricted Housing Unit if she complained. (Id.) Walton was later terminated and convicted of indecent assault. (A 349.) Similarly, after a cursory investigation of Martin Miller, Bartlett opined that Miller was merely a "touchy" person and recommended that the investigation be terminated. (A 352.) Yet two years

later, an external investigation revealed multiple instances of sexual assaults by Miller on inmates, both before and after Bartlett's investigation.

Bartlett set a tone that tacitly encouraged staff to prey on inmates. As Commissioner Martin Horne stated, "I . . . ultimately hold the chief security supervisor responsible for an attitude about sex and sexuality and fraternization." (A 698-99.) Therefore, Bartlett is liable for his failure to investigate and his verbal attack on Lambert.

C.   RAUN'S SEXUAL HARASSMENT AND ABUSE OF LAMBERT CONSTITUTES A CONTINUING VIOLATION AND ARE NOT BARRED BY STATUTE OF LIMITATIONS

Raun's constant harassment of Lambert constitute a continuing violation of Lambert's Eighth Amendment rights and are not barred by statute of limitations. Actions brought under 42 U.S.C. § 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued. Conner v. City of Newark, 440 F.3d 125, 126 (3d Cir. 2006). This case is governed by a two-year statute of limitations. See 42 Pa. Cons. Stat. § 5524. "[T]he limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis for the section 1983 action." Cooper v. Beard, Civ. A. No. 06-0171, 2006 U.S. Dist. Lexis 80655, at *24-25 (E.D. Pa. Jan. 18, 2006) (citing Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991)). In federal causes of action, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuous practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Brenner v. Local 514, United Bd. of Carpenters, 927 F.2d 1283, 1295 (3d Cir.1991). While the continuing violation doctrine is most frequently applied in the Title VII context, it has been applied in other contexts as well, including claims brought under section 1983. See Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001). Raun's initial harassment, which included putting his thumb on Lambert's lips, backing her in a corner, hugging her, and finding her in secluded areas in Louter Hall, began in May 1993. (A 208, 218-19.)

In October 1993, the harassment escalated, and on December 24, 1993, Raun said to Lambert, "I haven't hurt you yet, but I could."  (A 228.)  Between June to October 1994, Raun's physical intimidation increased to several times a week.  Lambert reported that in October 1994, Raun "rammed his knee me in the stairway.  That was the time that he really really hurt me.  I had big marks on me and my leg hurt really bad."  (A 229.)  This action was filed in August 1996, and therefore, the last acts of Raun's continuous harassment in August-October 1994 fall within the two-year limitations period.

In determining whether events constitute a continuing violation, three main factors are to be considered: (1) subject matter, (2) frequency, and (3) degree of permanence.  Cowell, 263 F.3d at 292.  In this case, Lambert's claims regarding Raun are all related to the same subject matter—his sexual harassment and abuse.  His continuous advances, staring, following her around, putting his thumb on her lips, physical intimidation, pulling her hair, grinding himself against her, and bruising her mouth were a pattern of derogatory actions and discriminatory conduct, similar to valid sexual harassment claims that appear in the workplace and elsewhere.  See also Rush v. Scott Specialty Gases, 113 F.3d 476, 481 (3d Cir. 1997) ("The harassment did not consist of unrelated, isolated incidents, but constituted a continuous pattern of derogatory remarks, rude behavior, and discriminatory conduct.").

Raun's harassment was also frequent.  Between June 1994 and October 1994, "[e]very chance he got, every chance where he found [Lambert] along or where he ran into [Lambert] at work," Raun would grind himself against Lambert, leave bruises, squeeze her hard and pull her hair.  (A 229.)  This occurred several times a week.  (A 229-30.)  Thus, Raun's actions meet the first two prongs of a continuing violation.

The third prong, the degree of permanency, relates to when an action accrues.  "Generally, a claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should

be aware, of the existence of and source of injury, not when the potential claimant knows or should know that the injury constitutes a legal wrong." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) (internal citations omitted). Acts that are considered "discrete" and would "trigger a duty of the plaintiff to assert [her] rights arising from the deprivation." Ebert v. Office of Info. Sys., 1998 U.S. Dist. LEXIS 9100, 24-25 (D. Del. 1998) (quoting West v. PECO, 45 F.3d at 756 (3d Cir. 1995)). Here, many of Raun's actions would not have triggered a reasonable person or prisoner's realization that an actionable claim existed. Raun initial "advances" included sexual innuendo and some physical contact, but his actions did not immediately start with full-fledged violence. For example, at first he would stare at Lambert, put his thumb across Lambert's mouth, and back her into a corner. Although Raun did inappropriately touch Lambert, touching does not per se trigger a duty of a plaintiff to assert her constitutional rights. See Ebert, 1998 U.S. Dist. Lexis 9100 at *24-25 (finding that demeaning comments, rude behavior, and inappropriate touching did not initiate the statute of limitations). Moreover, Lambert never had an oral sexual relationship with Raun.[10] (A 232.)

Whether certain acts trigger a plaintiff's awareness of a violation is based on a "reasonable person" standard.[11] Hicks v. Big Brothers/Big Sisters of Am., 944 F. Supp. 405, 407 (E.D. Pa.

---

[10] The continuing doctrine can create an unfair legal dilemma for plaintiffs. As one court noted, "The logic of the continuing violation doctrine reverses the normal stances of the parties," because "a plaintiff who wants to bring in events under the continuing violation doctrine has to argue that they did not constitute actionable harassment, and could only later be recognized as forming a pattern of illegal conduct." Bowers v. Radiological Soc'y of N. Am., Inc., 98 F. Supp. 2d 951, 955-956 (D. Ill. 2000). The court then explained that it would be unfair for a court to find that a plaintiff had failed to file charges that she would have lost on a motion to dismiss or summary judgment, and then later lose on claims due to statute of limitations that "did indeed ripen into actionable behavior. That would be a genuine Catch-22: heads, defendant wins, tails, plaintiff loses. The law is not so Kafkaesque." Id. at 955.

[11] In considering the reasonableness of whether a person's awareness is triggered, whether a prisoner's constitutional rights have been violated due to sexual harassment can be very complicated. For example, courts have notes that verbal abuse or threats alone do not constitute

1996).  When Raun's harassment of Lambert would have triggered a clear awareness of a constitutional violation is a genuine issue of material fact, and is not appropriate to be decided on summary judgment.  See Berry v. Board of Supervisors, 715 F.2d 971, 981 (5th Cir. 1983).[12]

The continuing violation is an "equitable exception to the timely filing requirement." Cowell, 263 F.3d at 292.  In Wright v. O'Hara, No. 00-1557, 2002 U.S. Dist. Lexis 15327 (E.D. Pa. Aug. 14, 2002), the court found that plaintiff's claims of physical abuse and attempted sexual assault by a corrections officer were not barred by the statute of limitations based on plaintiff's efforts to assert his rights through the grievance process.  The court explained that based on equitable principles, "plaintiff should not be penalized for failing to assert all of his claims within the . . . statute of limitations because he attempted to remedy his situation without involving the courts.  Id. at *11 n.4.  As such, one equitable consideration must be that Raun intentionally intimidated Lambert so that she would be too terrified to report the incidents.  After Lambert reported Raun's behavior to Miller, he "flipped out and went into a rage."  (A 222.)  Therefore, the Court should deny summary judgment as to Raun based on statute of limitations.

D.    KORMANIC'S FILMING OF LAMBERT WITHOUT CLOTHES, AND WOLFE'S AUTHORIZATION, VIOLATED LAMBERT'S RIGHT OF PRIVACY UNDER THE FOURTH AMENDMENT

On November 22, 1994, upon return from a court appearance in Lancaster County, deputy superintendent Kormanic forced Lisa Lambert to remove all her clothing in order to be filmed while naked.[13]  (A 775.)  Pictures were taken both while Lambert was wearing a bra and underwear, and

---

constitutional claims.  See Maclean v. Secor, 876 F. Supp. 695, 698 (E.D. 1995).  Thus, the line demarcating "constitutional" and "unconstitutional" is a fuzzy one.

[12] Even if the Court was to find that there is no continuing violation, these discriminatory acts can still be relevant background evidence.  Ramirez v. v. N.Y. Presbyterian Hosp., 129 F. Supp. 2d 676, 680 (S.D.N.Y. 2001)

[13] Defendants assert that Lambert was "was never photographed and videotaped in the nude," and was partially dressed.  (D. Mem. 25).  Lambert's Declaration and deposition dispute this material fact, and Lambert asserts that she was made to take off all her clothing.  The record shows that there

while she was naked.  The taking of pictures of Lambert's most private areas was authorized by Wolfe pursuant to Kormanic's Request, and executed by Kormanic.  (A 51-52.)  Lambert felt degraded and shamed by the experience.  (A 775.)

Although prisoners have a more limited right of privacy, nonetheless, they do retain some critical rights to bodily privacy.  "[B]oth convicted prisoners and pretrial detainees[] retain some Fourth Amendment rights upon commitment to a corrections facility," Bell v. Wolfish, 441 U.S. 520, 558 (1979); Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992) ("[W]e believe that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy."); Grummett v. Rushen, 779 F.2d 491, 494-95 (9th Cir. 1985) (explaining that inmates have a Fourth and Fourteenth amendment privacy right in not being viewed naked by members of opposite sex who are employed as prison guards).

The Fourth Amendment prohibits unreasonable searches, and in Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court held that the reasonableness of searches are to be examined by "balancing . . . the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  Id. at 559.  In Turner v. Safely, 482 U.S. 78 (1989), the court outlined a 4-prong test for evaluating prison regulations and practices:  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest;" (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the

---

are significant gaps in the videotape, one for eight minutes and the other spanning 25 minutes.  (A 57-58.)  No written inventory was made by Kormanic or other prison personnel of the number of photographs that were taken in order to confirm that only five photos were taken.  (A 59.)  In light of these facts, and the inability of a court to make credibility determinations in a summary judgment context, it can not be determined as a matter of law that Lambert was not filmed naked.

asserted constitutional right on prison resources; and (4) the absence of alternatives provides evidence that policy is reasonable.  Id. at 89-91.

Situations where prisoners must remove their clothing instinctively raise an issue of privacy. See Bell, 441 U.S. at 558 ("Admittedly, this practice [of strip searches] instinctively gives us the most pause.").  Courts will uphold searches in certain contexts, generally where the prison has demonstrated that the search is directly tied to a justified penalogical goal.  However, courts will also invalidate searches where the scope of invasion by prison officials outweighs the penological interest.  See, e.g., Roberts v. State of R.I., 239 F.3d 107 (1st Cir. 2001) (state department of correction policies requiring correction officers to conduct body cavity searches on all inmates upon incarceration were not reasonable and thus unconstitutional); Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993) (denying summary judgment because officials had no reasonable suspicion of concealing weapons or drugs).  "On occasion a security guard may conduct the search in an abusive fashion" and "such an abuse cannot be condoned."  Bell v. Wolfish, 441 U.S. at 560; see also Brown v. Blaine, 184 Fed. Appx. 166, 169 (3d Cir. 2006) (unpublished) ("[N]ot all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest."); see, e.g. Meriweather v. Faulkner, 821 F.2d 408, 418 (7th Cir. ) (finding that an Eighth Amendment claim was cognizable when a transsexual inmate alleged that she was strip searched before guards and other inmates for purpose of "calculated harassment unrelated to prison needs").

A prisoner's right to bodily privacy extends to protections to improper or unauthorized videotaping or photographs.  See, e.g., Demery v. Arpaio, 378 F.3d 1020, 1033 (9th Cir. 2004) (enjoining the unconstitutional practice of streaming live images of pre-trial detainees over the Internet via webcams set-up in the prison); Waters v. Andrews, 97-CV-407A(F), 2000 U.S. Dist. Lexis 16004, at *11-12 (W.D.N.Y. Sept. 15, 2000) (discussing settlement agreement stemming

from a prison's policy of videotaping strip searches of female inmates, and denying summary

judgment where one of plaintiff's claims included being videotaped while strip searched).  The

unauthorized videotaping of a person's unclothed body by law enforcement where there is no

investigative or proper law-enforcement has also been found to be unconstitutional.  See Poe v.

Leonard, 282 F.3d 123 (2d Cir. 2002).

Kormanic admits that the purpose of the videotaping and photographing was not related to

discovering contraband or for prison security.  Rather, it was to establish a pictorial record

(baseline) of the condition of Lambert's body at the time of her readmission to Cambridge Springs

(A 51-52), in other words, to protect their own liability, a motive insufficient to overcome the

bodily privacy interests of Lambert.  Defendants targeted Lambert in subjecting her to the degrading

searches.  Even though Defendants argue that they had a policy of videotaping certain inmates from

a hearing to the RHU, Kormanic could not recall any occasion between 1992 to 1994 where an

inmate was videotaped while either in a bra or underpants, or completely naked.  (A 53-54.)  Thus,

it was not standard practice to videotape inmates naked, or in just bra and underpants, inferring that

Lambert was singled out for this treatment.  In conjunction with isolating Lambert in the Restricted

Housing Unit for months, Lambert was essentially punished for bringing to light the actions of

Eicher and Raun.  Thus, Defendants' motive was improper and unreasonable.

The filming caused Lambert extreme embarrassment and humiliation.  Publication of a nude

photograph would violate Lambert's right to privacy, see Poe, 282 F.3d at 138, and Lambert's

suspecting that photos or a videotape of her naked body would be kept in the institution, and

concern over their possible dissemination caused additional emotional distress.  (A 775.)  Neither

Kormanic nor anyone else from the Department informed Lambert that the film would be stored in

Kormanic's office, or would not be distributed to anybody other than Kormanic.  Defendants had no

separate penological interest in videotaping or photographing Lambert, and they acted

unconstitutionally.

**III.    CONCLUSION**

For the reasons discussed above, Defendants' Motion for Partial Summary Judgment should

be denied.

<u>/s/ Angus Love</u>
Angus Love
I.D. No. 22392
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966

DATE:  December 15, 2006        Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA LAMBERT, | : | |
| | : | CIVIL ACTION NO: |
| Plaintiff, | : | 96 CV. 247  Erie |
| | : | |
| v. | : | Judge Sean J. McLaughlin |
| | : | Magistrate Judge BAXTER |
| SUPERINTENDENT WILLIAM WOLFE, | : | |
| et al., | : | (Filed via ECF) |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Brief In Opposition To Defendants' Motion For Partial Summary Judgment was served upon the following via ECF on December 15, 2006:

Rob Willig
Office of the Attorney General
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA 15219

I hereby certify that a true and correct copy of Plaintiff's Brief In Opposition To Defendants' Motion For Partial Summary Judgment was served upon the following via ECF on December 15, 2006 was served upon the following via first class mail on December 15, 2006:

James Eicher
209 McConnell Road
New Wilmington, PA 16152

Respectfully submitted,
_____/s/Angus Love_____
Angus Love, ID # 22392
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
(215) 925-2966

Date: December 15, 2006