IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA LAMBERT,

     Plaintiff,

     v.

SUPERINTENDENT WILLIAM WOLFE,
in his individual capacity, et al.,

     Defendants.

Civil Action No. 96-247 Erie

Judge Sean J. McLaughlin
Magistrate Judge Baxter

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR A PARTIAL SUMMARY JUDGMENT**

*I.*    *Background*

1.    The staff-on-inmate abuses that engendered this Section 1983 action were inflicted against Lisa Lambert on the grounds of the State Correctional Institution at Cambridge Springs, an all women's minimum security prison operated by the Pennsylvania Department of Corrections. (See A 4; A 12.)[1]

2.    The abuses consisted of a series of rapes and other sexual assaults of Lisa Lambert by defendant James Eicher, a Cambridge Springs guard; a number of sexually-tinged assaults administered by defendant John Raun, also a guard at the prison; and the filming of Lisa Lambert by guards while she was naked pursuant to the directions of defendant Victoria Kormanic, a deputy superintendent at SCI Cambridge Springs, and William Wolfe, the prison's superintendent.

---

[1] These citations refer to pages in the Appendix.

3.      As detailed below, the abuses inflicted by Eicher and Raun against Lisa Lambert occurred between May and October of 1994 in isolated settings when those officers were alone with her; occurred in areas where there were no surveillance cameras to monitor the behavior of the guards; occurred in an environment in which staff-against-inmate predatory behavior was only perfunctorily "investigated" by the prison's Intelligence Office; occurred in a context where prison personnel were not informed when co-workers were either terminated or permitted to resign for reasons related to the abuse of inmates; and took place under an administration that was deliberately indifferent to the protection of inmates from harm at the hands of staff members.

4.      As discussed below, the filming of Lisa Lambert with video and still cameras while she was naked occurred in November of 1994 in a Cambridge Springs stripsearch room.

5.      The abuses at issue in this case occurred during the second and third years of Cambridge Springs' operation, when the institution housed between approximately 200 and 320 inmates.  (A 22; A 45.)  The first wave of 25 inmates came to the prison in March of 1992.  (A 22.)

6.      Throughout the time period encompassed by this action, a significant number of men were employed at Cambridge Springs both as guards and maintenance personnel.  (A 25-26.)  Male employees routinely had direct supervisory contact with the women prisoners and were permitted, as a matter of policy, to enter any building or facility on the institution's grounds alone with a female inmate.  (A 26; A 29; A 31.)  Many of the employees had no experience working in a prison setting when Cambridge Springs opened in 1992. (A 33.)

7.      Approximately two-thirds of the cases of alleged sexual contact by a staff member and a Cambridge Springs inmate involved male employees.  (A 32.)

8.    Lisa Lambert was admitted to Cambridge Springs in January of 1993, ten months after the prison opened. (A 4; A 12; A 22.)

9.    James Eicher was a Cambridge Springs guard throughout the time period encompassed by Lambert's civil rights complaint.  (A 772-774; A 271.)

10.    John Raun was a Cambridge Springs guard throughout the time period covered by Lambert's complaint.  (A 3; A 11.)

11.    William Wolfe was the superintendent of the prison throughout the time period encompassed by Lisa Lambert's complaint.  (A 2; A 11.)  In that capacity, he was responsible for establishing and implementing policies, practices, and procedures to protect prisoners from physical or sexual exploitation of inmates by staff members; for the training of staff members in the management and care of female prisoners in ways that avoided the exploitation of the inmates; for the monitoring and supervision of prison personnel while they interacted with inmates; for the investigation of possible exploitation of inmates by prison employees; and for the disciplining of personnel who engaged in such activities.  (A 2; A 11.)  Wolfe became the prison's superintendent in January of 1991, more than a year before inmates were admitted to the institution.  (A 22.)  This afforded him approximately fifteen months to establish policies and practices to address those matters.

12.    Keith Bartlett was the intelligence captain at the prison throughout the time period covered by Lambert's complaint.  (A 3; A 11.)  In that capacity, he was responsible for investigating instances of possible physical or sexual exploitation of Cambridge Springs inmates by Cambridge Springs personnel and for identifying staff members to the Cambridge Springs administration who were engaging in such activities.  (See A 3; A 11.)  Bartlett was the prison's intelligence officer from the Spring of 1992 until March of 1995.  (A 66-67.)

13.    Victoria Kormanic was the deputy superintendent of operations at the prison during the time period relevant to Lambert's complaint.  (A 3; A 11; A 49.)  In that capacity, she oversaw the security aspect of the institution.  (A 49-50.)

## II. *Officer James Eicher's Abuse of Lisa Lambert*

14.    In October of 1993 and over the course of the next several months, Eicher followed Lisa Lambert around the institution and repeatedly offered her gifts.  In addition to stalking Lambert, he authored "love letters" to her.  (A 772; A 209-210; A 232; A 238.)

15.    Eicher later escalated his harassment of Lambert by grabbing, fondling, and kissing her against her will.  (A 772; A 232-233.)

16.    On March 19, 1994, Eicher raped Lambert for the first time in the inmate music practice room located in Curry Hall.  (A 772-773; A 234-237; A 273.)  Earlier that day, Eicher had told her to meet him there.  (A 772; A 273.)  When she arrived, Eicher and another guard, James Merry, met her at the music room door.  (A 773; A 273.)  Merry told her that she was there to do what Eicher wanted, grabbed her arm, pushed her into the room, and locked her in with Eicher.  (A 773; A 273.)  Inside the room, Eicher pulled Lambert's sweatpants down and kissed her.  (A 773; A 273.)  He then performed oral sex on her and forced her to engage in sexual intercourse.  (A 273.)  After Merry unlocked the music room door, Lambert left.  (A 773; A 273.)

17.    Eicher next raped Lambert on March 23, 1994.  (A 273.)  That rape also took place in the music room at Curry Hall.  (A 273.)  During the assault, Eicher ejaculated on Lambert's clothes, on a carpet, and on choir robes that were hanging nearby.  (A 274.)  In the course of the incident, Eicher told her:  "You know you want it you fucking bitch, you whore."  (A 773; A 274.)

18.    On April 7, 1994, Eicher twice forced Lambert to engage in sexual intercourse with him inside the prison's fieldhouse. (A 773; A 274.) The first time , he pushed her down onto a laundry table, pulled her sweatpants down, and entered her. (A 773; A 274.) During the second rape, he pushed her down onto a carpet, ejaculated on the carpet, and smeared the semen with his boot. (A 773; A 274.) After the assault, Eicher threatened to "get her" if Lambert told prison officials what he had done. (A773; A 274.)

19.    On August 20, 1994, Eicher followed Lambert into a bathroom in a prison recreation area, pushed her into a toilet stall, pulled her pants down, performed oral sex on her, then pushed her over and raped her. (A 773; A 274.) After ejaculating, he repeated the abuse. (A 773-774; A 274.) During the August 20th encounter, Eicher was "rough" with Lambert and told her: "I want to fuck you, you fucking whore. You know you want it you slut." (A 774; A 274.)

20.    On September 9, 1994, Eicher took Lambert to the second floor of Alliance Hall where he performed oral sex and forced her to engage in sexual intercourse. (A 774; A 274.) Knowing it was Lambert's birthday, Eicher said: "How's that for a birthday present?" (A 774; A 274.)

21.    A month later, on October 10, 1994, Eicher again took Lambert to Alliance Hall's second floor and raped her. (A 274.)

22.    On April 7, 1994, (the day Eicher twice raped Lambert in the prison's fieldhouse), Lambert was accused by a prison guard of being in an unauthorized area, the unoccupied fourth floor of Luter Hall. (A 255.) Captain Bartlett, when questioning Lambert about the matter, accused her of being on Luter Four in order to meet with Eicher. (A 243.) When deposed, Lambert described the encounter with Bartlett. "He didn't ask me. He screamed at me and

slammed his fist down on the table.  I was scared to death of him he was five times the size of

me – and I couldn't tell him anything."  (A 243.) Bartlett asked Lambert whether she was "F'ing

officer Eicher.  He said, I know you are, I know how you girls are, I know you're F'ing officer

Eicher". (A 244.)

      23.    Lambert denied during the meeting with Bartlett that anything had happened with

Eicher in Luter Four.  (A 244-245.)  She did so because of Eicher's threat to "get" her if she

informed on him and because of the malignant way Bartlett had questioned her.  (A 244-245.)

      24.    On May 24, 1995, a year after Bartlett asked Lambert whether she was "fucking"

Eicher told her that he knew how "you girls are," the Department's Office of Special

Investigation (OSI) commenced an investigation into Eicher's activities.  (A 271.)  In a criminal

affidavit of probable cause executed after a three month OSI investigation, an OSI investigator

stated the following:

> On May 24, 1995, a situation was brought to my attention that was
> occurring at the State Correctional Institution at Cambridge
> springs, 451 Fullerton Avenue, Cambridge Springs, Crawford
> County.  This situation involves a relationship, sexual in nature,
> between a Corrections Officer and an inmate.  The Corrections
> Officer is James Eicher, listed as the Defendant.  The inmate is
> Lisa Lambert.
>
> On May 30, 1995, inmate Lisa Lambert was interviewed, and
> advised this investigator that on or about March 19, 1994, until on
> or about October 10, 1994 she and Corrections Officer Eicher were
> sexually involved.  Eicher, for his own personal sexual
> gratification on numerous occasions had sexual intercourse,
> performed oral sex on Lambert, and kissed the inmate.
>
> On June 22, 1995, a confidential informant was interviewed.  This
> individual indicated in a signed statement observing James Eicher
> grab and passionately kiss Lambert.
>
> Several writings and poems, most of a sexual nature were obtained
> from Lambert.  These documents were submitted for an expert
> handwriting analysis opinion.  It was verified on August 11, 1995,

by expert opinion that Eicher did write the submitted documents. (A 263.)

25.     On September 27, 1995, Eicher was terminated from his employment with the Department of Corrections for violating a provision of the Department's Code of Ethics that prohibits prison personnel from fraternizing with inmates.  (A 268-269.)  The letter of termination sent to Eicher stated that "information was presented [at a pre-disciplinary conference] which established that between March 19, 1994 and October 10, 1994, on at least six occasions, you had a relationship of a sexual nature with [Lisa Lambert], from which you performed oral sex, as well as, had sexual intercourse with her."  (A 268.)

26.     On May 23, 1996, Eicher was convicted in the Court of Common Pleas of Crawford County of aggravated indecent assault, indecent assault, and official oppression in conjunction with his serial assaults of Lisa Lambert.  (A 311.)

27.     Eicher's abuse of Lambert engendered "a great deal of emotional distress and humiliation," adversely affected her ability to eat and sleep, and caused "large chunks" of her hair to fall out.  (A 774.)

### III. *Officer Raun's Abuse of Lisa Lambert*

28.     Raun's abuse of Lisa Lambert began in May of 1993 and continued until early October of 1994.  (A 207-208.)

29.     At first, Raun made "advances" toward Lambert.  (See A 212.)  He would seek Lambert out when she was isolated on a cleaning detail, (Lambert worked as an inmate janitor), put his thumb on her lips, back her into a corner, and hug her.  (A 213-214; A 216-217.)  Lambert noted in her deposition testimony how Raun repeatedly found her in places where there were no staff members or other inmates around.  (A 213.)  One such place was in the stairway of Luter Hall, a four story building that was occupied on only the first two floors.  (A 213-214.)

She was assigned to clean the secluded stairway on all the floors, including the unoccupied levels.  (A 214.)

30.    In May of 2003, Lambert reported Raun's inappropriate advances to Charles Utz, the prison's deputy superintendent for programming.  (A 212-213; A 218-219.)  Utz did not take Lambert's complaint about Raun seriously.  (A 212.).  He told her that Raun was "a healthy young man, and…basically laughed it off."  (A 212.)

31.    The day after Lambert informed Utz that Raun had been backing her into a corner, placing his thumb across her lips, and hugging her, captain Ronald Lazenby summoned Lambert into his office, asked her about her allegations against Raun, and "intimidated" her by warning her that she "better not get Raun into trouble."  (A 219.)

32.    Following Lambert's "discussions" with Utz and Lazenby about Raun's behavior, Raun began to stare at her, follow her around the prison, grab her hair, and push his body against her.  (A 220.)  Lambert was menaced by Raun's retaliatory mistreatment.  (A 220.)

33.    Lambert later complained to Martha Miller (the prison's grievance coordinator) about Raun.  (A 220-222.)  By that time, Raun had pulled Lambert's hair, ground himself against her, bruised her mouth, left teeth marks on her, smashed her into a wall, and squeezed her very hard.  (A 220-222.)  Lambert told Miller that she feared Raun was going to rape her.  (A 220.)

34.    After Lambert informed Miller about Raun's behavior, Raun "flipped out and went into a rage over that…"  (A 222.)  In her deposition, she described how Raun dragged her up the stairs of Luter Hall and assaulted her.  "I was walking, but he had me by my hair, and I kept tripping on the stairs.  He pulled me up there and he had me by my hair, and he flung me really hard into the wall, and he hurt my mouth really bad.  He bruised me and he kept ramming himself into me and smashing me into the wall."  (A 220-221.)

35.     Raun's physically and sexually provocative abuse of Lambert occurred several times a week between June of 1994 and October of 1994. (A 229-230.) On the last occasion (October third or fourth), Raun rammed his knee into her while she was in the stairway, leaving large bruises and causing severe pain in her leg. (A 229.)

36.     In Lambert's complaints to Cambridge Springs officials about Raun's abuse, she characterized some of it as "sexual contact." (A 232.) Lambert reasonably viewed a man rubbing himself against her, even with his clothes on, as a "sexual" activity, not only a physical assault. (A 232.)

37.     When recounting Raun's sadistic behavior toward her, Lambert testified: "I don't believe… he believed that I was a person, that I was a human being. I believe that he just enjoyed hurting me and making me afraid and slapping me and pushing me and just basically making me afraid of him." (A 211.)

38.     In the Spring of 1994, when Lambert was segregated in the prison's Restricted Housing Unit, Raun came to her cell, looked at her through the cell door, and said: "You'd better keep your mouth shut" in connection with what he had done to her. (A 224-225.)

39.     Raun's abuse of Lisa Lambert was not only physically painful; the abuse caused emotional distress and humiliation, adversely affected her sleeping and eating, and contributed to the loss of her hair. (See A 774.)

## IV.     *The Pattern of Sexually-Predatory Behavior by Members of the Cambridge Springs Staff Against Inmates*

40.     Eicher's and Raun's sadistic and degrading abuses of Lisa Lambert were part of a pattern of sexually predatory behavior by Cambridge Springs personnel against inmates during the early years of the prison's operation.

41.    In the context of superintendent Wolfe's avowed "zero tolerance" policy with respect to the sexual exploitation of Cambridge Springs inmates, there were twelve "confirmed" cases of sexually predatory behavior by Cambridge Springs personnel against Cambridge Springs prisoners in the first five years of the prison's operation (meaning there was substantial reason to believe that a dozen staff members between March of 1992, when the first twenty women arrived at the institution, and June of 1997, when Wolfe was deposed, sexually exploited inmates).  (A 39-40; A 42.)

42.    A chart prepared by the defendants in conjunction with this lawsuit reflects that during the first five years of the prison's operation, at least thirty-six Cambridge Springs staff members (apart from Eicher and Raun) were alleged by either an inmate or another staff member to have had inappropriate social or sexual contact with an inmate.  (A 572-573.)

43.    When deposed in June of 1997, deputy superintendent Kormanic estimated that the number of reports of "sexual improprieties" and "sexual abuse" by staff members against inmates during her tenure could have been nearly "a hundred."  (A 60-61.)

44.    In his deposition, captain Bartlett indicated that the highest incidence of staff-on-inmate sexual exploitation at the prison occurred prior to 1995 or 1996.  (A 83.)  Bartlett testified that he and Wolfe met to discuss concerns about the level of sexual abuse or exploitation that was occurring at the prison because it "seemed like every time we finished one investigation something else [of that nature] would come up."  (A 81.)  The time period of that meeting "was probably '93, maybe '94"  (A 81.)

45.    Among the most serious cases of sexual exploitation of inmates by Cambridge springs staff members were the following:

- <u>Paul Walton</u>.  The prison's food service instructor who, between filing of 1994 and August of 1994, repeatedly forced his inmate clerk to perform oral sex on him in addition to fondling and kissing her breasts.  (A 322-351.)  The incidents occurred in a dish room, laundry room, and walk-in supply freezer in the institution's dietary department.  (A 325; A 338-339.)  On each occasion, Walton ejaculated in the inmate's mouth.  (A 325.)  Investigative documents show that Walton continually threatened the victim with segregation in the prison's Restricted Housing Unit if she revealed what occurred and told her the victim nobody would believe her if she accused him of wrongdoing (because she was an inmate).  (A 332.)  Walton was later terminated from his employment with the Department of Corrections and convicted of indecent assault in the Court of Common Pleas of Crawford County.  (A 349.)

- <u>Martin Miller</u>.  A criminal complaint filed by the Department of Corrections Office of Special Investigation against Miller, the plumbing trades instructor at Cambridge Springs, alleged, among other things, that between June of 1995 and February of 1996, Miller forced inmate S.V. to perform oral sex on him against her will; inserted his fingers in S.V.'s vagina during that time period; pushed S.V. over a table, attempted to pull down her pants and (while his penis was exposed) told her that he wanted to "fuck" her; repeatedly touched S.V.'s breasts and genitals; mistreated and took advantage of inmate C.D. during March of 1996, by touching her breasts; grabbed inmate L.P.'s breasts and buttocks between July of 1994 and January of 1995; and, between January and April of 1996, had indecent contact with inmate R.P. by fondling her breasts and touching her genitalia.  (A 482-491.)  In March of 1996, when initially requesting the Office of Special Investigation to look into the Miller matter (after the prison-level investigations of Miller

twice concluded that he was merely a "touchy" person) (See A 352; A 380), superintendent Wolfe noted that there were "numerous inmate allegations of sexual misconduct by Martin Miller" underling his request and that "[d]uring the past several years we have received similar allegations concerning Mr. Miller…" (A 399.) Miller (who over an extensive period of time had preyed upon the women working in his labor pool) was ultimately terminated by the Department of Corrections and convicted of crimes associated with his molestation of those women. (A 494-495.)

- Sgt. James Merry. This officer had a "year long relationship" with inmate E.M., from December 1993 through November of 1994. (A 499; A 501.) Merry tongue-kissed her in Luter Hall's unoccupied third and fourth floors, in the prison's recreation hall, and in the New Women's Dorm. (A 501.) A civilian who had once worked with Merry in a non-prison setting informed an OSI investigator that Merry admitted that he had "slept" with the inmate. (A 504.) Another prisoner, C.B., told an OSI investigator that in June of 1993, while she was working on the second floor of Alliance Hall, Merry tongue-kissed her against her will and had done that on another occasion while she was working in the basement of another building. (A 502.) On April 14, 1995, Merry submitted his letter of resignation, ending his employment at the prison. (A 508.)

- Officer Michael Stone. A polygraph examination administered by OSI on inmate E.J. in conjunction with an investigation of Stone's molestation the inmate reflected that the prisoner was not being deceptive when stating that Stone engaged in "oral sex" with her and had other forms of physical contact with her in 1995. (A 516-518.) E.J. also informed an OSI investigator that on approximately a dozen occasions, beginning in early 1995, Stone came to her room in Luter Hall; kissed, hugged, and petted her; made some

very sexual comments;" and "expressed the desire to have sex with her…"  (A 514.) Although Stone was initially suspended from his employment at Cambridge Springs, the suspension was later lifted and he was reinstated because Wolfe concluded that a polygraph test was not one hundred percent reliable.  (See A 518-520.)

- <u>Officer Richard Hammers</u>.  Although Hammers was not prosecuted (in light of his resignation as a Cambridge Springs guard), the Department's OSI investigator concluded that his investigation had revealed violations of the Pennsylvania Crimes Code by Hammers, namely, aggravated indecent assault and indecent assault in conjunction with his molestation of an inmate in early 1995.  (A 530; A 536.)  The investigator learned the following from inmate E.M. in the context of an interview:

> She was involved in a relationship, around January 1995, with Officer Richard Hammers. Kosmor Hall on February 7, 1995 while in the library and stayed with her sisters Officer and Childress in front of how Christine the library for

In addition, a fellow officer told captain Dorsett that he had knowledge of Hammers having physical contact with the inmate in a bathroom and elsewhere in the institution."  (A 524; A 534.)  Hammers told the officer that although February 15,

13

1995, he manually stimulated E.M. in an inmate bathroom and received oral sex from her.  (A 534.)

- <u>Carl Zimmerman</u>.  Zimmerman, the facilities maintenance manager at Cambridge Springs, on "countless occasions" during 1993 and early 1994 took inmates T.W., L.G. and D.H. "alone and unescorted" into a room in an abandoned storage facility in Kosciuszko Hall known as "Freddy's Place".  (A 540.)  The room contained a couch, a chair, a heater, and a door that could be locked from the inside.  (A 540.)  The prison's security staff did not have a key to the room.  (A 548.)  Only Zimmerman did.  (A 548.)  Zimmerman's relationship with inmate L.G. was "sexual" in nature, began in early 1993, and persisted for more than a year.  (A 540; A 547.)  Zimmerman inserted his tongue into L.G.'s mouth, ran his hands over her body, and touched her breasts.  (A 730-731.)  Inmates L.G. and T.W. were often called out by Zimmerman to "assist" him," sometimes all night…"  (A 539.)  Both Zimmerman and inmate T.W. acknowledged to an inmate witness that there was "a relationship- going on between them."  (A 548.)  When confronted by L.G.'s statement to investigators that Zimmerman's activities with her were "sexual" in nature, Zimmerman prepared a letter of resignation which, according to an O.S.I. investigator, contained a statement that "went far beyond what we had uncovered."  (A 731-732.)  Zimmerman later rescinded his resignation and was fired.  (A 564; A 566.)  Prior to the OSI investigation, Wolfe had been aware of rumors circulating in the prison regarding Zimmerman's "possible sexual relationships with inmates."  (A 747.)  According to Wolfe, the rumors were "non-specific in nature" and he "implicitly trusted…Zimmerman."  (A 747-748.)  An investigation of Zimmerman was eventually authorized by the director of the Special Investigation Office, Vaughn Davis, after

receiving a written complaint from a Cambridge Springs inmate. (A 539.) There is no evidence in the summary judgment record that Wolfe made any effort to have the rumors investigated by either captain Bartlett or OSI.

## V.    *The Factors that Enabled Staff-Against-Inmate Predatory Behavior to Flourish at Cambridge Springs*

A.    Captain Bartlett, the Official Who Was Assigned to Conduct In-House Investigations at Cambridge Springs During the Relevant time Period Was, Himself, a Sexual Predator

46.    Investigations of alleged staff-on-inmate sexual misconduct could either be conducted by Cambridge springs intelligence office (under the command of the prison's intelligence captain) or by the Department's Office of Special Investigations (also known as the Office of Professional Responsibility). (A 71; A 135.)

47.    An order for the Cambridge Springs intelligence captain to conduct an internal investigation generally came through the superintendent, pursuant to the chain of command. (A 69.) Whether an investigation would be conducted by the intelligence office (as opposed to OSI) ordinarily was determined on the institutional level. (See A 135.)

48.    Keith Bartlett in his capacity as the prison's intelligence captain, was the institution's chief investigator of staff-on-inmate abuse during the height of the abusive incidents, including the time period when officers Eicher and Raun were preying on Lambert. (A 3; A 11; A 68.)

49.    Bartlett's serving as the prisoner's chief in-house investigator was tantamount to assigning the proverbial fox to guard the henhouse inasmuch as Bartlett himself was a serial predator. the record confirms that Bartlett repeatedly sexually harassed and even slept with female officers under his command. (See A 586-641.)

50.     A November 15, 1994 note in Bartlett's personnel file prepared by deputy superintendent Kormanic stated:  "Discussed concerns about [Bartlett] dating subordinate staff and poss. compromising his integrity as a manager."  (A 583; A 604.  See also A 584.)

51.     An April 4, 1995 entry in Bartlett's personnel file by Komanic documented that Bartlett was "advised not to date officers." (A 583.)

52.     After The Deputy Commissioner of Corrections received a written complaint from an officer alleging that Bartlett preyed upon, dated, and socialized with guard trainees, an OSI investigation was launched.  (A 587.)  The investigation concluded that it was apparent Bartlett's propensity to socialize and date subordinate members of the staff had "become a negative issue in the management of SCI Cambridge Springs."  (A 588.)  Among other things, the investigative report cited deputy Komanic's statement that "[a]bout three years ago she heard that Bartlett hit on trainees;" Bartlett's acknowledgment to a fellow officer that he had "slept" with an officer under his command; Bartlett's admission that he had "sex" with another officer trainee under his command; a statement from a subordinate that Bartlett had stuck his tongue in her ear (which disgusted her); Bartlett's admission that he told sexual jokes in front of female staff members; and an incident where Bartlett induced a male officer (in the presence of a female staff member) to crawl under his desk to suggest that the guard was performing oral sex on him in order to induce Bartlett to give him a day off.  (See A 593; A 599; A 601; A 603; A 624-627.)

B.     Captain Bartlett Set a Tone at the Prison that Tacitly Encouraged Members of the Cambridge Springs Staff to Prey Upon Inmates

53.     When testifying in 1997 before a subcommittee of the State Senate Judiciary Committee on issues related to the Department of Corrections' female prisoners, the Department's Commissioner, Martin Horne, linked Bartlett's predatory toward Cambridge

Springs female personnel to the predatory activities of Cambridge springs staff members toward

inmates of the prison.  (See A 698-701.)

54.    Commissioner Horne told members of the subcommittee:

> I want to point out that last month [July of 1997] we demoted the
> senior security supervisor here [Captain Bartlett].  One of the
> reasons….we took that action was because we had lost confidence
> in the overall tone that was being set.  Because I believe that the
> way the staff responds to this set at the top, and I was not satisfied
> nor was the superintendent with the tone that was being set.  And
> while it's very difficult to pin, as the superintendent said, the
> individual actor is responsible, you know, on the night shift we
> have 600 inmates and 25 uniformed staff.  They are spread thin.
> **It's very difficult to hold an individual sergeant or lieutenant
> responsible for what an individual maintenance worker or
> clerical worker or teacher or CO or dietary worker does.  But
> it is possible, I think, ultimately to hold the chief security
> supervisor responsible for an attitude about sex and sexuality
> and fraternization.**  And after having previously been warned and
> counseled, another instance of behavior that suggested to me bad
> judgment and immaturity about this issue arose, based upon which
> the superintendent and I consulted and that person was removed.
> (A 698-699.)  … My point is that we do try to assess that over a
> period of time, and I've been here two and a half years, and **I had
> come to believe that when I saw this kind of behavior by this
> individual in this role, when I saw it a second time I said, that
> explains a lot of the attitudes that subordinate employees have**.
> (emphasis added)  (A 700-701.)

55.    In light of Bartlett's *modus operandi*, it is reasonable to infer that he did not

<u>meaningfully</u> investigate possible incidents of sexual exploitation of Cambridge springs inmates

by prison personnel and was <u>indifferent</u> to the protection inmates from such harm.

C.    <u>Captain Bartlett Received Virtually No Training In Conjunction With the Investigation of
Staff-on-Inmate Abuse and Engaged in Practices That Actually Hindered the Uncovering of
Such Abuse</u>

56.    When deposed, Bartlett acknowledged that he received minimal training with

respect to the investigation of alleged staff-on-inmate abuse of inmates and, unlike OSI

investigators, had no expertise in conducting internal investigations.  (A 69-70; A 71-72; A 82-

83.)  He conceded that SIO investigations "were done definitely more thoroughly than I could do"; that those he did on his own were merely done to the best of his capacity.  (A 72.)

57.    In contrast to OSI investigators, Bartlett routinely <u>Mirandized</u> inmates when investigating alleged sexual interaction between staff members and inmates.  (A 95-96; A 720; A 722-724.)  His practice of warning victims that anything they told him could be used against them in a criminal prosecution was likely to discourage inmates from coming forward with information about sexually exploitative misconduct on the part of prison personnel and impede the uncovering of staff-on-inmate abuse at the Cambridge Springs.  (See A 120-121; A 148-149.)  Unless an inmate might potentially incriminate himself or herself in the context of providing information related to staff-on-inmate abuse, it was not the practice in the Office of Special Investigation to Mirandize the witness.  (A 117-120; A 147.)

58.    As early as December of 1994, Wolfe was aware that Bartlett Mirandized inmates in the context of his investigations of possible sexual exploitation by Cambridge Springs personnel.  (See A 720.)  There is no evidence that he asked or ordered Bartlett to discontinue the practice.

59.    It was Bartlett's practice to <u>discount</u> statements from inmates indicating sexual exploitation by staff members and to rely on fanciful reasons for rejecting such statements.  For example:

- On April 7, 1994, (in the context of investigating why Lisa Lambert was on the abandoned fourth floor of Luter Hall that day), another inmate reported that she overheard Eicher telling Lambert to meet him at that location; that she was aware of Eicher and Lambert meeting at Curry Hall previously; that on that day, "Eicher made several flirtatious and sexual comments to [Lambert] and said to [the witness] that 'I hope

what I'm says stays between us';" that Eicher said he was 'hot' being around Lambert, adding that he was eager to take Lambert to the fieldhouse when other prisoners weren't around.  (A 254.)  Bartlett, however, essentially ignored that information.  In an April 14, 1994 memo, he informed Wolfe that there was no "concrete proof" to support the inmate witness' claim. (A 256.)  In addition, Bartlett told Wolfe that he believed Eicher's denials regarding the witness' statement because when questioning Eicher, Eicher "maintained good eye contact, sat with his feet on the floor, appeared relaxed, and answered all questions directly and confidently."  (A 256.)  Bartlett was also impressed by the fact that Eicher appeared surprised when asked about meeting Lambert because his eyes were dilated and his mouth dropped open.  (A 256.)  Bartlett's advice to Eicher was to be "careful around inmates" and not to hesitate "reporting any concerns he may have of inmates trying to lead him into compromising situations."  (A 256.)   As noted, months later, OSI concluded that Eicher had forced Lambert to engage in sex with him on the fourth floor of Luter on April 7, 1994, and in the fieldhouse the same day.

- <u>Miller Case</u>:  On September 15, 1994, female officer submitted an incident report to Bartlett informing him that she had seen inmate W's chest and arm "in contact" with plumbing supervisor Martin Miller's body.  (A 352.)  According to the report, when the officer continued to approach Miller and the inmate, the inmate backed away and the officer continued walking down the hall, later stopping to talk with another staff member in a room.  (A 352.)  Later, when the officer backed out of the room, she bumped into Miller who then "put his arm around her and pulled her to him."  (A 352.)  The officer addressed Miller "very curtly" about what he had done to her.  (A 352.)  Although the officer informed Bartlett, when discussing the incident, that she didn't wish to file sexual

harassment charges against Miller (feeling that she handled that part of the situation to her satisfaction), she told Bartlett that she was "concerned" about the initial encounter between the inmate and Miller.  (A 352.)  Miller later admitted to Bartlett that the officer's incident report was accurate.  (A 352.)  Bartlett's advice to Miller was "to be careful to never let an inmate get that close."  (A 352.)  In his report to Wolfe about the incident, Bartlett opined that Miller was "just overly friendly, and is a 'touchy' type of person."  (A 352.) Bartlett told Wolfe that he advised Miller to leave the overly friendly, touchy aspect of himself "outside the fence" and that he believed no further action was necessary.  (A 352.)  A subsequent OSI investigation confirmed that Miller had routinely touched inmate members of his work crew in inappropriate ways and that the man who, according Bartlett was merely "overly friendly", sexually assaulted inmates who worked under his supervision."  (See A 429-450; A 482-491.) [Note:  Despite witness statements (including one from another officer) indicating that Miller was touching and perhaps sexually exploiting inmates in other ways, Ronald Lazenby (Bartlett's successor) had also told superintendent Wolfe prior to the OSI investigation that Miller was simply an overly friendly, touchy person.]  (See A 380; A 354-381.)

D.    Superintendent Wolfe's Policy of Concealing From Prison Personnel the Fact That a Co-worker Either Resigned or was Fired as a Result of Predatory Behavior.

60.    The summary judgment record confirms that Wolfe deliberately and systematically concealed from Cambridge springs staff members the fact that a member of the staff had either resigned or been terminated as a result of sexually predatory behavior.  (A 37-2.) Wolfe believed that apprising the prison staff of the reason for an employee's separation would be "inappropriate."  (A 37-2.)

61.    The Office of Special Investigation also did not inform prison personnel why a resignation occurred in circumstances when an employee was terminated or resigned due to allegations of sexual misconduct against inmates.  (A 162.)

62.    In fact, when issuing notices to the prison's control room that not to permit a resigned or terminated staff member to enter the institution without his approval, Wolfe expressly noted in bold letters:  "**NOT TO BE READ AT ROLL CALL!**"  (A 725-726.)

63.    Because of Wolfe's policy of concealment, prison personnel often did not know why a predatory staff member resigned or was discharged, relying, instead, on rumors.  As noted by captain Lazenby (who was the prison's security captain prior to replacing Bartlett as the intelligence captain in March of 1995); he became "aware" of prison-level or Central Office OSI investigators concluding that a Cambridge Springs employee had only sexually exploited an inmate through "rumors."  (A 192; A 189.)  There was no memo published or other announcement to prison personnel.  (A 192.)

64.    The policy of not apprising staff members of the termination or resignation of an employee for sexually exploitive misconduct was at cross-purposes with Wolfe's so-called  "zero tolerance" of such behavior and eroded efforts to deter abusive activities by prison personnel.

E.    The Absence of Surveillance Cameras at Cambridge Springs Created Areas In the Institution Where Sexual Abuses by Prison Personnel Could Occur Without Detection

65.    The summary judgment record reflects that Lisa Lambert was raped in isolated settings by officer Eicher (the music room, the fieldhouse) and sadistically abused in an isolated setting by Raun (the stairwell of a partially vacant dormitory).  The evidence confirms that a number of other inmates were sexually molested in secluded areas of the prison (Freddy's Place, the music room, a bathroom in an inmate recreation area, a basement, the dietary department's

dish room and laundry room, unoccupied floors of dormitories).  (See investigative reports cited above as well as allegations contained in Ex. 125, A 577-579 which was cc'd to Superintendent Wolfe and captain Lazenby; Ex. 579, A 580-582.)  Despite those realities, superintendent Wolfe did not request installation of surveillance cameras at Cambridge Springs until 1996, four years after the institution received its first wave of inmates and five years after Wolfe was appointed superintendent of the prison.  (A 676.)  Cameras were not installed until 1997.  (A 676.)

66.    In the framework of facility maintenance manager Carl Zimmerman's civil service appeal, the Department of Corrections acknowledged that "there are numerous buildings and grounds located on the prison compound where two could be unobserved…."  (A 761.)

67.    In light of the fact that abuses of the sort involved here could and did occur with some in secluded settings, Wolfe's failure to have surveillance cameras installed at Cambridge Springs until 1997 as deterrents to staff-on-inmate exploitation manifested indifference on his part to the safety of the inmates who were consigned to his custody.

F.    Additional Factors That Contributed to the Significant Incidence of Staff-on-Inmate Sexual Exploitation at Cambridge Springs

68.    In-house investigations of alleged sexual abuse by captains Bartlett and Lazenby occurred in a context in which complaints of sexual abuse (in the absence of excessive force, a life-threatening act or a threat by an officer to inflict physical injury) were not routinely reported to the Department's Office of Special Investigation (formerly Office of Professional Responsibility) for review and tracking purposes.  (A 652-666.).

69.    It was not until 2005 that "sexual contact with an inmate" was added to the Department's "review and tracking" system.  (A 667-671.)  The phrase "sexual contact" at that time was defined as "any sexual behavior directed towards an inmate," including rape, attempted

sexual contact, sexual abuse or assault, and the "intentional touching either directly or though clothing, of the genitalia, anus, groin, breast, inner thighs, or buttocks." (A 669.)

70. In that <u>unsupervised</u> context, Wolfe was able to and did approve the termination of in-house investigations without fear or concern of being overridden by the Central Office officials, thus contributing to the proliferation of sexual exploitation by members of his staff against Cambridge Springs inmates.

71. It was Wolfe's policy to abort in-house investigations of sexual exploitation when the subject of the investigation resigned. (See A 716; also A 574-575; A 99.) The only exception was when there was an ongoing criminal prosecution. (A 99.) Terminating investigations precluded prison officials from learning the scope and extent of the alleged abuse and manifested Wolfe's indifference to the protection of Cambridge Springs inmates from predatory behavior by Cambridge Springs personnel and contributed to the proliferation of such behavior. As acknowledged by deputy Kormanic, investigating alleged abuse (even if a staff member was gone) to determine whether the allegations were accurate could serve as a "prop[hylactic" against future abuse, as a "preventive measure." (A 62.)

72. Despite have reason to believe that a significant number of Cambridge Springs personnel were preying upon Cambridge Springs inmates, Wolfe failed to order a <u>comprehensive investigation</u> to determine the scope and causes of the pattern of abuse. Deputy Kormanic, who was in charge of security at the prison, testified that she was not aware of any efforts by the Cambridge Springs administration (or the Department's Central Office) to determine the root causes. (A 63.) The failure to conduct such an investigation manifested indifference on Wolfe's part to the welfare of the women in his custody and contributed to the proliferation of predatory behavior.

73.     Despite the risk of staff-on-inmate sexual abuse and the occurrence of such abuse, Wolfe did not see to it that inmates be told during orientation that if anybody on the staff attempted to sexually abuse them, they could complain about it through a prescribed procedure. Furthermore, the inmate handbook that was given to Cambridge Springs inmates also said nothing specific about sexual abuse.  (A 65.)

74.     As noted, Wolfe has admitted that he was responsible for establishing as well as implementing policies, practices and procedures to protect prisoners from physical or sexual exploitation of inmates by staff members.  (A 2; A 121.)  Wolfe relied exclusively on the Department's Code of Ethics to deter staff members from abusing inmates.  (See A 33.)  Section B(6) of the Code prohibited fraternization or private relationships between staff members and inmates or members of the inmates' families.  (A 33.)  The only examples of prohibited transactions cited in Section B(6) are "trading, bartering or receiving gifts, money, and favors from either the inmate or the inmate's friends, relatives, or representatives" or "deliver[ing] gifts or money to inmates' friends, relatives or representatives."  (A 646.)  At the time in question, there was no explicit reference in Section B(6) or elsewhere in the Code addressing the sexual exploitation/abuse of inmates.  (See A 642-650.)  Nor was there any language in the Code similar to the 2005 tracking system policy's definition of "sexual contact" by a staff member of an inmate.  (See A 642-650.)

75.     Despite the proliferation of staff-on-inmate sexual abuse at Cambridge Springs on Wolfe's watch, Wolfe did not issue a policy statement, administrative directive, or any other written protocol on the subject of sexual abuse.  (A 35-36.)

76.     The Department of Corrections, as early as July of 1992, had an anti-sexual harassment policy in place.  (See A 719.)  The policy, however, was applicable only to

Department employees or persons doing business with the DOC. (See A 718.) It did not apply to or protect inmates. The 1994 version of the sexual harassment policy expressly recognized that "[a]ll employees are entitled to [a] work environment free from sexual harassment" and that all forms of sexual harassment were prohibited. (A 718) Sexual harassment was defined by the policy to encompass: "unwelcome sexual advances, requests for sexual favors, and other forms of verbal or physical conduct of a sexual nature…" (A 717.)

77.     There is no evidence in the summary judgment record that Wolfe ever issued an equivalent policy applicable to Cambridge Springs inmates; one proscribing sexual advances, requests for sexual favors; or other form of verbal or physical conduct of a sexual nature by prison personnel *vis-a-vis* inmates. When deposed, Wolfe was unable to identify such a policy. (A 35-36.)

78.     Wolfe's failure to issue a written policy explicitly proscribing sexual contact, sexual harassment, or sexual exploitation by Cambridge springs staff members of Cambridge Springs inmates (particularly in light of the significant incidence of such abuse at the prison) manifested indifference on his part to the protection of the women in his custody and contributed to the perpetration of sexual abuse by members of Wolfe's staff.

79.     During the time period when Lisa Lambert was abused by officers Eicher and Raun, the training of prison personnel at Cambridge Springs on the subject of sexual exploitation/abuse of inmates was inadequate. there was no effort to specifically train Cambridge Springs staff on the subject of sexual abuse until September of 1994. (A 37.) That training (by OSI official Vaughn Davis) occurred because of "the incidents of staff fraternization and [prison personnel] becoming sexually involved with [inmates], according to Wolfe. (A 37.) The reality that the training was insufficient is reflected in a July 17, 1995 memo from Vaughn

Davis, the director of the department's Office of Special Investigations to superintendent Wolfe which stated: "It has been recommended that the ongoing training relative to the Department's Code of Ethics and specifically the fraternization with inmates and the section of the Crimes Code that concerns Indecent Assault and Aggravated Indecent Assault be intensified at Cambridge Springs for all current and new staff." (A 497.) Davis noted that the recommendation had been "approved by the Commissioner of Corrections, Martin F. Horn." (A 497.)

80.    The "intensified" training ordered by the Departments Central Office in July of 1995 apparently bore some fruit. As noted, captain Bartlett testified that incidents of sexual exploitation by Cambridge Springs personnel began to "taper off" in 1995 or 1996. (A 83.) According to Bartlett, members of the prison staff, by that time, "were finally getting the hint." (A 83.)

81.    Vaughn Davis had no recollection of giving a training lecture on the subject of staff-on-inmate sexual abuses at any of the Department's male institutions. (A 125.)

## VI.    Filming Lisa Lambert While She Was Naked

82.    After being away from Cambridge Springs for a court appearance in Lancaster County in connection with her criminal case, Lambert returned to the prison on November 22, 1994. (A 50.)

83.    Approximately five weeks before leaving Cambridge Springs for the court appearance, Lambert had accused Raun of assaulting her in a prison stairwell and bruising her body. (A 51.)

84.    On the day Lambert returned to Cambridge Springs from Lancaster County, deputy Kormanic asked superintendent Wolfe for permission to have staff members photograph

and/or videotape Lambert in conjunction with her re-admission, purportedly to establish a pictorial record (a baseline) of the condition of Lambert's body at that time. (A 51-52.) Wolfe gave Kormanic permission to do so. (A 51.)

85.    After receiving authorization from Wolfe, Kormanic directed a member or members of the prison's security staff to photograph as well as videotape Lambert in a stripsearch area of Alliance Hall. (A 52-53.)

86.    According to Kormanic, Department of Corrections inmate reception policy explicitly authorizes the photographing of an inmate while naked, including pictures of exposed breasts, genitals, and buttocks exposed. In addition, Kormanic believes that a superintendent in the DOC system has the inherent authority to order the filming of a naked inmate's most intimate body parts. (A 54.)

87.    Without any legitimate reason for doing so, Kormanic in the stripsearch room forced Lambert to remove all of her clothing and to be photographed as well as videotaped while naked. (A 775.)

88.    Pictures were also taken of Lambert while she was wearing a bra and underpants. (See A 53; A 775.) Kormanic could not recall any occasion (from the time the prison opened and November 22, 1994, where an inmate was videotaped either while in a bra and underpants or completely naked. (A 53-54.)

89.    Having pictures taken of the most private areas of her body caused Lambert extreme embarrassment and humiliation and made her feel "degraded". (A 775.)

90.    Suspecting that there would be pictures of her naked body somewhere in the institution and concern over the possible dissemination of the pictures to prison personnel caused Lambert extreme embarrassment, humiliation, and emotional distress. (A 775.)

91.     Neither deputy Kormanic nor anybody else on the Cambridge Springs staff told Lambert that the film would be stored in Kormanic's office, would be kept in a file drawer (or in any other secured area), or that the pictures would not be distributed to anybody other than Kormanic.  She was not told where the filmed pictures would be kept or who would have access to the depictions of her naked body.  (A 775.)

92.     There are two gaps in the videotape of the November 22nd incident:  one for a period of eight minutes; the other spanning twenty-five minutes.  (A 57-58.)

93.     No written inventory was made by Kormanic or other prison personnel of the of the number of photographs that were taken that day of Lisa Lambert.  (A 59.)

/s/ Angus Love
Angus Love
I.D. No. 22392
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966

Counsel for Plaintiff

DATE:  December 15, 2006