U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * * * * * * * *

|  |  |
|---|---|
| LISA LAMBERT, | * |
| Plaintiff | *NO. C.A. 96-247 ERIE |
| vs | * |
| SUPERINTENDENT | * |
| WILLIAM WOLFE, et al., | * |
| Defendants | * |
|  | * |

* * * * * * * * *

DEPOSITION OF

VICTORIA KORMANIC

JUNE 3, 1997


Any reproduction of this transcript is

prohibited without authorization by the

certifying agency

A 47

Sargent's Court Reporting Service, Inc.

Page 2

```
 1              DEPOSITION
 2                  OF
 3
 4  VICTORIA KORMANIC, taken on behalf of the
 5  Plaintiff herein, pursuant to the Rules of Civil
 6  Procedure, taken before me, the undersigned,
 7  Mary Jane Spagel, a Court Reporter and Notary
 8  Public in and for the Commonwealth of
 9  Pennsylvania, at Cambridge Springs State
10  Corrections Institute, Cambridge Springs, PA, on
11  Tuesday, June 3, 1997, at 10:00 a.m.
```

Page 4

```
 1                   I N D E X
 2
 3  WITNESS:   Victoria Kormanic
 4  EXAMINATION
 5      By Attorney Krakoff               7 - 123
 6
 7  CERTIFICATE                              124
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3  JERE KRAKOFF, ESQUIRE
 4  1705 Allegheny Building
 5  Pittsburgh, PA  15219
 6      COUNSEL FOR PLAINTIFF
 7
 8  THOMAS HALLORAN, ESQUIRE
 9  Sr. Deputy Attorney General, Litigation Section
10  Sixth Floor, Manor Complex
11  564 Forbes Avenue
12  Pittsburgh, PA  15219
13      COUNSEL FOR DEFENDANTS
```

Page 5

```
 1              E X H I B I T   P A G E
 2
 3                                            PAGE
 4  NUMBER      IDENTIFICATION             IDENTIFIED
 5
 6              NONE OFFERED
```

A 48

Page 6

1  O B J E C T I O N  P A G E
2
3  ATTORNEY                                              PAGE
4  Halloran                                              13
5  Halloran                                              20
6  Halloran                                              27
7  Halloran                                              31
8  Halloran                                              32
9  Halloran                                              46
10 Halloran                                              67

Page 7

1       PROCEEDINGS
2  ----------------------------------------
3  VICTORIA KORMANIC, HAVING FIRST BEEN DULY SWORN,
4  TESTIFIED AS FOLLOWS:
5  ----------------------------------------
6  EXAMINATION
7  BY ATTORNEY KRAKOFF:
8  Q.   What is your name?
9  A.   Victoria L. Kormanic, the last name is
10 spelled K-O-R-M-A-N-I-C.
11 Q.   And you're the Deputy Superintendent --
12 - one of the Deputy Superintendents, at SCI
13 Cambridge Springs?
14 A.   That's correct, sir.
15 Q.   And what is your title? I know that
16 there are Deputy Superintendents in charge of
17 operations and in charge of various other
18 things, depending upon what institution you're
19 in. What are you called?
20 A.   It was the Deputy Superintendent for
21 Operations. It is now currently the Deputy
22 Superintendent for Facilities Management.
23 Q.   Is it a different title, but
24 essentially the same function?
25 A.   Correct.

Page 8

1  Q.   And when did you become employed in
2  that capacity at Cambridge Springs?
3  A.   March 2nd of 1992.
4  Q.   Were there already women housed at
5  Cambridge Springs or was this just before the
6  inmates got there?
7  A.   Prior to inmates coming.
8  Q.   It's my recollection, I could be wrong,
9  but I believe Superintendent Wolfe said that the
10 inmates began to come here around March of '92?
11 A.   March 30th of '92.
12 Q.   Were you the only --- were you called
13 Deputy Superintendent in charge of operations at
14 that time?
15 A.   No. Deputy Superintendent for
16 Facilities Management.
17 Q.   Were you the only one who held that
18 position, who has held that position at
19 Cambridge Springs?
20 A.   That is correct.
21 Q.   Now, before assuming your position at
22 Cambridge Springs, had you been employed by the
23 Pennsylvania Department of Corrections?
24 A.   Yes.
25 Q.   Where and in what capacity?

Page 9

1  A.   At the State Correctional Institution
2  at Rockview, located in Bellefonte,
3  Pennsylvania. I was employed as a lieutenant.
4  Q.   And how long had you been a lieutenant
5  at Rockview, approximately, in terms of years?
6  A.   Approximately three years. I've been
7  an employee of the Department of Corrections for
8  15.
9  Q.   What was your experience before that,
10 in what capacity before you became a lieutenant?
11 A.   I was a sergeant. Prior to that I was
12 a corrections officer, prior to that I was a
13 corrections officer trainee.
14 Q.   So your route to your position was
15 through security?
16 A.   That's correct.
17 Q.   Would you please outline your
18 responsibilities as the Deputy Superintendent,
19 and if they varied in any way, prior to now, let
20 me know about that. If they were the same, just
21 provide me with what your basic responsibilities
22 have been.
23       ATTORNEY HALLORAN:
24       Answer the question to the
25       best of your recollection. We'll refer

A 49

Page 10

1  you to the documents provided, which
2  provides the job description for the
3  Deputy Superintendent.
4  BY ATTORNEY KRAKOFF:
5  Q. Right. My purpose for asking that
6  isn't to see if you left anything out. I'm just
7  trying to get you to summarize for me what your
8  basic areas of responsibilities were.
9  A. I oversee the security aspect of the
10 institution, as well as, the unit management
11 which integrates the counselors and the unit
12 managers.
13 Q. Was Deputy Superintendent Utz basically
14 in charge of programming or was that his area,
15 programming?
16 A. That's correct.
17 Q. And within the framework of the
18 security aspect of the institution, was training
19 one of the areas of your responsibility,
20 training of officers? Did that fall within your
21 jurisdiction?
22 A. That's correct.
23 Q. When I ask these questions, I'm not
24 asking are you the one who was ultimately
25 responsible or are you the one who was --- the

Page 11

1  only one who was responsible. I'm just trying
2  to see whether these are areas that fell within
3  your jurisdiction. Did investigations of
4  alleged wrongdoing by officers fall within your
5  jurisdiction?
6  A. They do not. May I clarify?
7  Q. Sure. You can clarify, any time I ask
8  a question. I'm not going to cut you off, you
9  can clarify whatever you want.
10 A. The Intelligence Captain falls directly
11 under the Superintendent in our table of
12 organization. The Superintendent is the one who
13 has the only authority to authorize an
14 investigation. It may be, he may authorize
15 anyone under his chain of command, to conduct an
16 investigation.
17 Q. All right. And have there been
18 occasions where Superintendent Wolfe has asked
19 you to oversee investigations of officers, with
20 respect, and I'll be very specific, with respect
21 to allegations or suspicions that those officers
22 might have engaged in some sort of sexual
23 improprieties with inmates?
24 A. Not that I can recall.
25 Q. What about assignments of officers, did

Page 12

1  that fall within your jurisdiction in terms of
2  assigning them to various posts, or, posts,
3  first of all? Or is that strictly done by
4  bidding?
5  A. It is --- I oversee that area, but my
6  shift commanders assign officers to those posts
7  and to clarify, we do have both bid posts and
8  non-bid posts.
9  Q. So the person who is most immediately
10 responsible for making post assignments would be
11 who?
12 A. Shift commander.
13 Q. Shift commander. And you can review
14 those assignments?
15 A. That's correct.
16 Q. What I'd like to do at this point is to
17 focus first on an incident that occurred on
18 November 22nd, 1994, when Lisa Lambert returned
19 from an authorized temporary absence to
20 Cambridge Springs. And I'd like you to describe
21 in as much detail as possible, what you
22 recollect about the incident. Now, we've
23 watched a videotape, I realize that. And to
24 some extent that videotape speaks for itself.
25 But I'd like you to provide me with some

Page 13

1  background in terms of what led up to the
2  photographing or videotaping of Lisa Lambert?
3      ATTORNEY HALLORAN:
4      I'm going to object to the
5      form of the question. I believe you
6      indicated, it sounded like in the
7      question, that Lisa Lambert was ATA to
8      Cambridge Springs. She's not, she was
9      ---. You need to clarify that, clarify
10     what it was.
11 BY ATTORNEY KRAKOFF:
12 Q. Okay. Well, let's clarify that. Do
13 you recall that Lisa Lambert returned to
14 Cambridge Springs on the 22nd of November, after
15 being away from the prison for Court purposes in
16 Lancaster County?
17 A. That's correct.
18 Q. And do you recall that on that day Lisa
19 Lambert was photographed and also was videotaped
20 by security officers after her return to
21 Cambridge Springs?                    A 50
22 A. That's correct.
23 Q. And do you recall what precipitated ---
24 what circumstances precipitated her being
25 photographed and videotaped after returning to

Page 14

1 Cambridge Springs?
2 A. They were precipitated on our concerns,
3 based on her allegations of staff abuse a few
4 days prior to going ATA to Lancaster County.
5 Q. Okay. So if you can elaborate on that.
6 You were concerned, here at the prison, and
7 those concerns arose from allegations made by
8 Lisa Lambert about staff abuse aimed at her; is
9 that correct?
10 A. Correct.
11 Q. And do you recall whom she had alleged
12 had abused her?
13 A. Sergeant Raun --- Sergeant John Raun.
14 Q. Was Eicher also alleged to have abused
15 her? Was that part of the abuse, or only Raun?
16 A. I can --- only her allegations of abuse
17 against John Raun, prior to her going to
18 Lancaster County, ATA.
19 Q. And what the nature of the abuse that
20 she said Sergeant Raun had inflicted on her?
21 What had Sergeant Raun allegedly done to her?
22 A. Caused --- caused some bruising,
23 allegedly in a stairwell.
24 Q. Bruising of her body?
25 A. Correct.

Page 15

1 Q. Do you recall more specifically how she
2 said she came to be bruised and where she
3 allegedly --- what part of her body, or what
4 parts of her body were allegedly bruised?
5 A. No, sir, I do not recall that.
6 Q. Do you believe that you were familiar,
7 as of the 22nd of November, with the specifics
8 of her allegation, i.e., how Raun abused her and
9 what parts of her body allegedly were bruised?
10 Do you think you had that information as of the
11 22nd of November?
12 A. I can't recall.
13 Q. Do you understand what I was asking?
14 A. Yes.
15 Q. I know as you sit here today, you don't
16 have a recollection more specifically, of where
17 she was bruised or how Sergeant Raun allegedly
18 had abused her. And as I take your response to
19 my follow-up question, you're not sure as you
20 sit here today, that you had any more specific
21 information ---
22 A. That's correct.
23 Q. --- as of the 22nd; is that correct?
24 A. That's correct.
25 Q. Now, do you know --- was there an order

Page 16

1 that was issued from somebody in the prison
2 administration for Lisa Lambert to be
3 photographed and/or videotaped upon her return
4 to Cambridge Springs?
5 A. Yes, sir, the Superintendent.
6 Q. And do you know whether that order had
7 been issued in writing?
8 A. It was --- it was oral. I had --- upon
9 her arrival back, I had phoned the
10 Superintendent and expressed my concern to
11 establish a baseline coming back from ATA. And
12 he gave me the direction over the phone, the
13 authority, the authorization over the phone to
14 go ahead and videotape and take the photographs.
15 Q. So the decision to photograph and to
16 videotape Lisa Lambert was expressed by
17 Superintendent Wolfe on the 22nd, after you had
18 learned of her return to the prison; is that
19 correct?
20 A. That's correct.
21 Q. And prior to that, had you been
22 involved in any discussions with anybody about
23 the possibility of taking photographs. And I'm
24 going to use the term, photographs, so that I
25 don't always have to --- photographs and/or

Page 17

1 videotaping. I'm meaning both of them when I
2 pose the question. Had you discussed with
3 anybody on the Cambridge Springs' staff the
4 issue of photographing Lisa Lambert? Had you
5 had a discussion prior to your discussion or
6 your telephone, I don't know if it was a
7 discussion, when you spoke with Superintendent
8 Wolfe?
9 A. I don't recall one.
10 Q. As I take it, you learned from somebody
11 that Lisa Lambert was back at Cambridge Springs;
12 correct?
13 A. Correct.
14 Q. Then you telephoned Superintendent
15 Wolfe, and you told him that you thought that a
16 baseline should be established by taking
17 photographs of Lisa; is that correct?
18 A. Correct.
19 Q. And by baseline, what did you mean by
20 that? How would taking photographs establish a
21 base line?
22 A. To digress. Whenever she made the
23 allegations of abuse by Sergeant Raun, she was
24 taken to medical and examined. And there was no
25 evidentiary ---?

A 51

Page 18

1 Q. Uh-huh (yes).
2 A. --- bruises found.
3 Q. There were no bruises found?
4 A. No. Two days later, she went ATA, was
5 gone a week. When she came back, we wanted to
6 establish, again, that in the process of
7 bringing here back from the administration
8 building to the RHU, that there were no --- that
9 we had documentation of no inappropriate
10 behavior.
11 Q. And as I understand Superintendent
12 Wolfe's testimony yesterday, custody would have
13 been turned over to Cambridge Springs in the
14 administration building; correct?
15 A. That's correct.
16 Q. And so you wanted a video camera to be
17 on Lisa Lambert as she proceeded from the
18 administration building into the grounds of
19 Cambridge Springs, and then, ultimately, on to
20 the restrictive housing unit?
21 A. That's correct.
22 Q. Now, how had you learned that no
23 bruises had been found on Lisa Lambert the first
24 time she had --- when she had been examined, I
25 believe you said two days before she left for,

Page 19

1 when she Cambridge Springs for Lancaster, that
2 was your testimony?
3 A. That's correct.
4 Q. How had you learned that? Did somebody
5 tell you that, did you examine her --- the
6 medical records? How did you learn that?
7 A. I don't recall. It was a report. I
8 don't recall ---
9 Q. Who reported it?
10 A. --- specifically which report.
11 Q. So I take it that when --- and this was
12 a written report?
13 A. Yes, sir.
14 Q. I take it that when you received the
15 written report that said there were no bruises
16 found on Lisa Lambert in connection with her
17 allegations against Officer Raun, you must have
18 reached the conclusion that she had fabricated
19 those allegations about being abused by Officer
20 Raun. Did that tell you that --- did you reach
21 any conclusions when ---?
22 A. No.
23 Q. No? But Lisa had alleged that she had
24 been injured --- did she allege she had been
25 bruised or just that she had been somehow

Page 20

1 physically abused by Officer Raun?
2   ATTORNEY HALLORAN:
3   Are you asking what she knew
4   then or what she knows now?
5 BY ATTORNEY KRAKOFF:
6 Q. I'm talking about back then. Was it
7 your understanding that Lisa had accused Officer
8 Raun, not only of physically abusing her, but,
9 in fact, of bruising her? Do you recall?
10 A. I recall her making the allegation that
11 he had caused bruises.
12 Q. All right. So there were no bruises
13 according to the information, the report that
14 you received, were found on Lisa Lambert. Did
15 you draw any conclusions about her credibility?
16   ATTORNEY HALLORAN:
17   Objection. Asked and
18   answered.
19   ATTORNEY KRAKOFF:
20   It was?
21   ATTORNEY HALLORAN:
22   You just asked her.
23   ATTORNEY KRAKOFF:
24   About her drawing conclusions?
25 A. And I said no.

Page 21

1 BY ATTORNEY KRAKOFF:
2 Q. Okay, I'm sorry. I didn't hear the
3 answer. Now, then did you relay the
4 Superintendent Wolfe's order to have Lisa
5 Lambert photographed on the 22nd of November,
6 did you relay that information to somebody on
7 the staff? Do you recall?
8 A. That would probably a correct
9 conclusion because they were videotaping when I
10 came down, yes. Who it was, I don't recall.
11 Q. That's all right. When you arrived, at
12 some point in the course of the incident, and
13 I'm using the incident not as a charge word, I'm
14 just saying it was a transaction, okay? When
15 you arrived in the course of the incident, where
16 did you arrive and what did you see when you
17 first arrived? You said that they were already
18 videotaping Lisa when you arrived; is that
19 correct?
20 A. Correct.
21 Q. Where did you arrive, where was it that
22 ---?
23 A. In the --- in the strip room, shower
24 area, next to property, located in Alliance
25 Hall.

A 52

Page 22

1 Q. And there was an officer who had a
2 video camera trained on Lisa when you arrived,
3 or aimed toward Lisa when you arrived?
4 A. I'm relying on the tape for that --- to
5 recall it. I don't know.
6 Q. But it's your recollection that when
7 you arrived ---?
8 A. Yes.
9     ATTORNEY HALLORAN:
10     You can answer it, you can
11    answer the question, based upon your
12    recollection ---
13    ATTORNEY KRAKOFF:
14    It was refreshed.
15    ATTORNEY HALLORAN:
16    --- then, and also that it's
17    refreshed from the video. So if you
18    recall from seeing the video, you can
19    answer the question.
20 A. Okay.
21 BY ATTORNEY KRAKOFF:
22 Q. Were you called down to that room? Did
23 somebody call you to come over?
24 A. That's correct. Lieutenant Beck came
25 up to my office and advised me that Lisa was

Page 23

1 refusing to be shower --- to be medically
2 examined, with her bra and panties on.
3 Q. Were you told that she refused to be
4 medically examined, or were you told that she
5 had refused to be photographed with her bra and
6 panties on?
7 A. She was refusing to be videotaped
8 during the medical examination.
9 Q. And so you then went to the scene and
10 what transpired after you arrived? What
11 occurred?
12 A. I think this videotape speaks for
13 itself. I spoke to Ms. Lambert, advised her
14 that it was standard procedure, that she would
15 not be videotaped naked. It would be done with
16 her bra and panties on and I would retain
17 possession of the videotape and photographs.
18 Q. Now, you told her that it was standard
19 procedure, what did you mean by that?
20 A. At that time, it was standard procedure
21 for the Department of Corrections that any time
22 we had an inmate that we thought was going to be
23 a behavioral problem, or --- and when I say
24 behavioral problem, I'm speaking of cases like
25 Lisa where they alleged assault in the past.

Page 24

1 Q. Uh-huh (yes).
2 A. Then we would videotape them. Most
3 commonly it was whenever they received a
4 misconduct and were being sent to the restricted
5 housing unit.
6 Q. They would be videotaped with articles
7 of their clothing removed, or that they would be
8 videotaped while they were being moved to the
9 restricted housing unit while dressed?
10 A. While they were being moved to the RHU.
11 Normally the procedure is, if you're coming from
12 --- they're either coming from the hearing
13 examiner's or the housing unit, and being moved
14 to the RHU.
15 Q. And they would be --- the standard
16 procedure that you spoke about was photographing
17 the movement of the inmate from the hearing to
18 the restricted housing unit, while the inmate
19 was fully clothed; isn't that correct?
20 A. Repeat your question, Mr. Krakoff.
21 Q. The procedure that you referred to, was
22 that not a procedure involving the videotaping
23 of the inmate from the hearing to the restricted
24 housing unit, while the inmate was fully
25 clothed?

Page 25

1 A. That's correct.
2 Q. Go ahead.
3 A. The institution had the discretionary
4 power of when to use the videotaping. If was
5 based upon the inmate's past behavior, or if we
6 believed they were going to present a problem
7 for us during the reception process in RHU. The
8 issue of clothing depended on the circumstances.
9 If we had an inmate who was being a behavior
10 problem while being --- we thought would be a
11 behavior problem while being strip searched,
12 which is the practice prior to being admitted to
13 the RHU, then we would videotape it. If they
14 were placed in a cell, or removed from a cell,
15 because they posed a threat to themselves, they
16 may be clothed or unclothed. And we had the
17 discretionary authority to videotape any time we
18 thought that the inmate was going to be a
19 behavioral problem.
20 Q. And was that videotaping the inmate
21 while the inmate was in panties and a bra, if
22 the inmate was a woman, it included ---
23 A. It depended on the circumstances. They
24 could be completely naked.
25 Q. Uh-huh (yes). Had you ever, from the

A 53

Page 26

1 time that Cambridge Springs opened until
2 November 22nd, had you ever been involved or
3 been made aware of an incident where an inmate
4 was videotaped in a bra and underpants?
5 A.   I do not recall.
6 Q.   As you sit here today, you cannot
7 recall, you cannot tell me about another
8 incident; is that correct? That's a fair
9 question.
10           ATTORNEY HALLORAN:
11              Another incident of an inmate
12           being videotaped in a bra and
13           underpants?
14           ATTORNEY KRAKOFF:
15              Right.
16 A.   I do not recall.
17 BY ATTORNEY KRAKOFF:
18 Q.   So in answer to my question, you can't
19 provide me with another instance where this has
20 occurred?
21 A.   I cannot recall.
22 Q.   Now, do you have any recollection of an
23 inmate ever being videotaped while completely
24 naked, at Cambridge Springs?
25 A.   I can't recall.

Page 27

1 Q.   Is there a document that you can point
2 to which gives the Superintendent the discretion
3 to have an inmate photographed while in bra and
4 panties?
5           ATTORNEY HALLORAN:
6              I'm going to object to the
7           form of the question. It's --- I
8           gather by your question, that would
9           mean anywhere from naked, all the way
10          up?
11          ATTORNEY KRAKOFF:
12             I wanted to specifically focus
13          on that and then I was going to ask the
14          second question, in terms of naked.
15 BY ATTORNEY KRAKOFF:
16 Q.   Are you aware of any document that
17 gives the Superintendent the authority or the
18 discretion to have an inmate photographed while
19 in bra and panties? I'm talking about the time
20 period as of the 22nd of November.
21 A.   I believe it's covered in our reception
22 policy.
23 Q.   Is that the local policy or that a
24 policy statement from the Department of
25 Corrections?

Page 28

1 A.   I believe it's a policy statement from
2 the Department of Corrections. And I also
3 believe it's the inherent authority of the
4 Superintendent, and his ability to run the
5 institution.
6 Q.   But in terms of the document, you think
7 that there is a document and that would be the
8 reception policy?
9 A.   That's correct.
10          ATTORNEY KRAKOFF:
11             I'd like to have a copy of
12          that.
13 BY ATTORNEY KRAKOFF:
14 Q.   And does the reception policy authorize
15 the Superintendent to have an inmate
16 photographed while naked, either breasts exposed
17 or the genital area exposed or the buttocks
18 exposed?
19 A.   I believe it's covered in the reception
20 policy.
21 Q.   And you also believe that it's within
22 the discretion of the Superintendent, the
23 inherent authority of the Superintendent, to
24 order that?
25 A.   Yes. May I make one more

Page 29

1 clarification?
2 Q.   You can always make ---.
3 A.   As far as the videotaping, in my
4 Interrogatory, I stated that Officer Brenda
5 Jones was doing the photographing, the polaroid
6 photographing, and it was not. It was Officer
7 Michelle Howard.
8 Q.   I was going to ask you that. You had
9 reminded me of that earlier when we were
10 watching the video this morning, so I appreciate
11 that. When you arrived, how was Lisa Lambert
12 attired?
13 A.   She had on her state-issued browns.
14 They're given to the inmates in the institution.
15 Q.   Is that how she arrived at the
16 institution? Is that how inmates arrive from
17 the outside into the institution? They don't
18 travel in their civilian clothing, do they?
19 A.   I don't recall.
20 Q.   In any event, was she fully clothed
21 when ---?
22 A.   Yes.
23 Q.   And I did observe and listen to the
24 video, but there were some things that I
25 couldn't --- I couldn't hear everything. And

A 54

Page 30

1  I'd like you to help me with your recollection,
2  and I'm not asking you for a verbatim, but your
3  recollection of the thrust or the sum and
4  substance of what you told Lisa and then what
5  her response, if any, was to that? Do you
6  recall generally what you told Lisa after you
7  arrived? You did talk with her, didn't you?
8  A.  That's correct.
9  Q.  And essentially, what did you tell
10 Lisa?
11 A.  I believe I testified earlier that she
12 was refusing to be videotaped during the medical
13 examination in her bra and panties. I told her
14 that it was necessary for her to comply, that it
15 was standard procedure and that I would retain
16 the videotape and photographs in my possession.
17 Q.  When you arrived, was Lisa crying?
18 A.  Not that I can recall.
19 Q.  Did Lisa resist, at first?
20 A.  Yes.
21 Q.  And then at some point, and if I may, I
22 realize, I'll just paraphrase it, I think I
23 heard you say something to the effect, you've
24 got, you know, I'm going to give you 30 seconds,
25 we don't have all day, or something along those

Page 31

1  lines. You have 30 seconds to make a decision,
2  and if you don't comply, the officers will strip
3  search you. Do you recall that?
4  A.  That's correct.
5       ATTORNEY HALLORAN:
6       Objection. I don't think
7  that's what the tape said.
8       ATTORNEY KRAKOFF:
9       Okay.
10      ATTORNEY HALLORAN:
11      I think they said that if she
12 didn't comply, she would carry out the
13 order, which was the videotaping, not
14 the strip search.
15 BY ATTORNEY KRAKOFF:
16 Q.  Didn't you at some point tell her that
17 the officers would strip search her if she
18 didn't agree?
19 A.  (No response).
20 Q.  Okay. Did you say something to her
21 about she would be strip searched?
22 A.  Yes.
23 Q.  What did you tell her about being strip
24 searched, if you recall?
25      ATTORNEY HALLORAN:

Page 32

1       I'm going to object to that,
2  whatever she says on the tape.
3  BY ATTORNEY KRAKOFF:
4  Q.  Let me ask it this way. Wasn't she
5  going to be strip searched in any event?
6  A.  Yes.
7  Q.  If she didn't comply, would she have
8  been photographed while being strip searched?
9  A.  No.
10 Q.  Well, then, her being strip searched
11 had nothing to do with having 30 seconds to make
12 a decision, is that your testimony?
13 A.  That's correct.
14 Q.  If she hadn't complied, what would have
15 occurred?
16 A.  I think that calls for ---
17 Q.  What are you objecting?
18 A.  Yeah.
19      ATTORNEY HALLORAN:
20      I'm going to object. Calls
21 for speculation ---.
22 BY ATTORNEY KRAKOFF:
23 Q.  You gave her 30 seconds to comply, you
24 did, didn't you?
25 A.  Correct.

Page 33

1  Q.  And did you not know at that point or
2  have an understanding of what you were going to
3  do if she didn't comply?
4  A.  Had she not complied, we probably would
5  have stopped and then gone to the Superintendent
6  for more direction.
7  Q.  All right. So you were giving her 30
8  seconds to make a decision and then it was your
9  intention to go to the Superintendent?
10 A.  And make him aware of the
11 circumstances.
12 Q.  But you weren't going to carry it out?
13 You weren't going to continue dealing with Lisa
14 yourself, if she didn't comply. You were going
15 to then have the Superintendent make the
16 decision about how to proceed --- I mean the
17 Superintendent make a decision about how to
18 proceed; is that correct?
19 A.  That's correct.
20 Q.  Did Lisa finally tell you that she
21 would comply? She did comply, didn't she?
22 A.  Yes.
23 Q.  And then there were still photographs
24 that were taken of Lisa?
25 A.  Correct.

A 55

Page 34

1  Q. And how many photographs were taken?
2  A. Five.
3  Q. Okay. You were there throughout the
4  photographing of Lisa?
5  A. That's correct.
6  Q. Were you — ultimately Lisa, after the
7  videotaping and then after the photographing,
8  ultimately, Lisa then went into the shower area
9  and was strip searched and then was dressed; is
10 that correct?
11 A. That's correct.
12 Q. And were you there when Lisa emerged
13 from the shower area with her clothing?
14 A. That's correct.
15 Q. And you never left, at all?
16 A. No, sir, I did not.
17 Q. And the photographs were the polaroid
18 sort; is that correct?
19 A. That's correct.
20 Q. And that means that they would have
21 developed by themselves, without taking them to
22 somebody to have them developed; correct?
23 A. That's correct.
24 Q. And I take it that the photographs that
25 were taken of Lisa did develop by the time Lisa

Page 35

1  was dressed again, and ready to move from there,
2  the photographs had been developed?
3  A. I don't recall.
4  Q. What happened to the photographs after
5  the pictures were taken, immediately after the
6  pictures were taken?
7  A. They were given to me.
8  Q. Did you not look at them to see whether
9  they had developed?
10 A. I don't recall. In however long a
11 polaroid takes to develop, a couple — what, a
12 minute, two minutes? So before I left they had
13 been developed.
14 Q. Yeah, that's what I was asking.
15 A. Yes.
16 Q. Did you look to see whether there were
17 photographs that had come out or that had
18 developed?
19 A. Yes.
20 Q. As you sit here today, can you
21 specifically recall that there were only five
22 photographs?
23 A. Yes, sir.
24 Q. You're absolutely sure?
25 A. Absolutely sure.

Page 36

1  Q. And what did you do with the
2  photographs once you had them in hand?
3  A. I secured them in my one file cabinet,
4  in my office.
5  Q. Did you carry the photographs back with
6  you, though —
7  A. Yes, sir.
8  Q. — from the medical area?
9  A. They never left my possession. They
10 have never left my possession.
11 Q. And at some point, did you put them in
12 an envelope?
13 A. Yes.
14 Q. When did you do that? Was it the same
15 day?
16 A. I don't recall.
17 Q. You do recall taking the photographs
18 back and putting them in a file?
19 A. Yes.
20 Q. But you're not sure whether they were
21 first placed in an envelope and then put in the
22 file. As you sit here today, you're not sure?
23 A. No, I don't recall.
24 Q. Now, at some point, though, you did put
25 them in an envelope?

Page 37

1  A. Yes.
2  Q. And was that envelope sealed?
3  A. Yes.
4  Q. And did that envelope remain in the
5  file that you referred to?
6  A. Yes.
7  Q. Is that a file that was called the
8  Lambert file?
9  A. Yes.
10 Q. And what about the videotape, what
11 happened to that, did you take that back
12 immediately, also?
13 A. Correct.
14 Q. And was that placed in the file or
15 somewhere else?
16 A. Also in the file.
17 Q. And this particular file, you were the
18 only person who had the key to the cabinet in
19 which it was contained? That's a question, now,
20 it wasn't a statement. Were you the only person
21 who had the key to the — was it in a cabinet
22 that you kept the file?
23 A. It's a file cabinet, a regular file
24 cabinet.
25 Q. And that cabinet was kept locked?

A 56

Page 38

1  A.  Yes.
2  Q.  And did the cabinet contain other files
3  other than Lisa Lambert's?
4  A.  Yes.
5  Q.  Did other persons have --- did anybody
6  else in the institution have access to the
7  interior of the filing cabinet?
8  A.  My secretary.
9  Q.  Other than your secretary?
10 A.  No.
11 Q.  And who else had --- was there only one
12 key to it?
13 A.  I had a key and my secretary had a key.
14 Q.  Now, to the best of your recollection,
15 did the photographs or the videotape, at any
16 point, ever leave that filing cabinet prior to
17 today?
18 A.  Never.
19 Q.  You didn't get the answer, so why don't
20 you just answer.
21 A.  They were removed last night.
22 Q.  And that was the first time?
23 A.  Yes, sir.
24 Q.  And when you removed them, was the
25 envelope still sealed?

Page 39

1  A.  No, it had been opened and that was
2  because I had to answer my Interrogatory and I
3  had to go back and refresh my memory.
4  Q.  And you counted the number of
5  photographs back then?
6  A.  Yes. There's a notation on the
7  envelope that says that.
8  Q.  Opened May 27, 1997, at 16:30 hours for
9  deposition response, and then your signature,
10 correct?
11 A.  Correct.
12 Q.  Okay. Thank you.
13 A.  I guess it's interrogatory, not
14 deposition.
15 Q.  Okay, the written questions?
16 A.  Correct.
17 Q.  And there was a nurse present at the
18 time that the photographs and videotapes were
19 taken?
20 A.  That's correct.
21 Q.  And the nurse's name was Sandy
22 P-I-E-T-Z-A-K.
23 A.  That's correct, Sandy Pietrak.
24 Q.  Pietrak. Is that an R-A-K, then
25 P-I-E-R-A-K, maybe?

Page 40

1  A.  I'm not sure, sir.
2  Q.  And Sergeant Chase was on the video; is
3  that correct?
4  A.  That's correct.
5  Q.  And Sergeant Chase, like the nurse, was
6  a woman, correct?
7  A.  Correct.
8  Q.  And then Brenda Jones was the name of
9  the officer who was there throughout the time,
10 as well; is that correct?
11 A.  That's correct.
12 Q.  And then there was a lieutenant by the
13 name of Beck, who was there for part of the
14 time, as part of the escort, but wasn't present
15 when any of the photographing was occurring?
16 A.  That's correct.
17 Q.  Now, were any incident reports or
18 extraordinary occurrence reports, as far as you
19 know, prepared by anybody in connection with the
20 photographing of Lisa Lambert on the 22nd of
21 November?
22 A.  I don't recall, sir.
23 Q.  You have no recollection, as you sit
24 here today, though, do you of seeing an incident
25 report or an extraordinary occurrence report

Page 41

1  about that incident?
2  A.  I don't recall, no.
3  Q.  I'm having difficulty with the I don't
4  recall, because I think that that was a fair
5  question. As you sit here today, are you aware
6  of any incident report or extraordinary
7  occurrence report, memorializing that incident
8  of November 22nd, 1995?
9  A.  I wasn't being flippant with you. As I
10 sit here today, I don't recall ever seeing one.
11 That's what I meant to say.
12 Q.  Now, under what circumstances according
13 to DOC rules is an extraordinary occurrence
14 report supposed to be prepared and by whom, in
15 general terms? What is the purpose of an
16 extraordinary occurrence report.
17         ATTORNEY HALLORAN:
18         Are we done with the content
19     of the videotape, do you think?
20         ATTORNEY KRAKOFF:
21         I think so. I may have one
22     other question, which is about ---.        A 57
23 BY ATTORNEY KRAKOFF:
24 Q.  Before I get to the question about the
25 extraordinary occurrence report, there was a

1 period of about eight minutes, is that correct,
2 when the video camera was turned off.
3 A. I believe Mr. Halloran said nine
4 minutes, from 1333 to 1402.
5 Q. Nine minutes.
6 A. Or 1353 to 1402.
7    ATTORNEY HALLORAN:
8       Let's use --- how about from
9       3:33 p.m. to 4:02 p.m.
10 BY ATTORNEY KRAKOFF:
11 Q. Right, so it was nine minutes. It was
12 turned off; is that correct?
13 A. Correct.
14 Q. And what was the purpose of having that
15 turned off during that time?
16 A. So that Ms. Lambert could shower and
17 get redressed.
18    ATTORNEY HALLORAN:
19       Just so we clarify for the
20       record that there was also a period
21       from about 4:02 p.m. to 4:27 p.m.,
22       where the camera was also off, during
23       the urine sample.
24 BY ATTORNEY KRAKOFF:
25 Q. Now, for what purpose is an

Page 43

1 extraordinary occurrence report ---?
2    ATTORNEY HALLORAN:
3       Are we now done with the ---
4    ATTORNEY KRAKOFF:
5       Yeah, oh, yeah.
6    ATTORNEY HALLORAN:
7       Can I ask one --- I think
8       there's one question here about the
9       ---. When the videotape was taken at
10      the time during which Ms. Lambert
11      removing her prison clothing, was there
12      any male officer in the room?
13 A. No, there was not.
14    ATTORNEY KRAKOFF:
15       As far as I know, we're not
16       alleging that a male was in the room
17       when ---.
18 BY ATTORNEY KRAKOFF:
19 Q. And I ask this question generically,
20 I'm not focusing on this particular incident.
21 But I'm interesting in knowing, in general, when
22 is an extraordinary occurrence report supposed
23 to be filed? What kinds of, generically
24 speaking, what kinds of information, or
25 incidents, are supposed to be memorialized in an

Page 44

1 extraordinary occurrence report?
2 A. Any event or incident that would
3 disrupt the normal running of the institution.
4 Q. All right. So that's the basic
5 standard; is that correct?
6 A. Yes.
7 Q. What about an incident report? Does
8 this institution have --- some institutions have
9 a difference. They have one report which is
10 called extraordinary occurrence, and then
11 there's another category of reports called
12 incident reports. Does that exist in Cambridge
13 Springs?
14 A. No, sir.
15 Q. So for purposes of reporting, is it
16 either an extraordinary occurrence report or no
17 written report, or is there some other kind of
18 report that can be submitted to memorialize an
19 event or a transaction at the prison, involving
20 inmates and/or staff?
21 A. Repeat your question. Excluding inmate
22 grievances, that's my understanding?
23 Q. Oh, yeah.
24 A. Okay.
25 Q. I'm talking about for purposes of an

Page 45

1 officer or an administrator reporting on an
2 event. We know that there's such a thing as an
3 extraordinary occurrence report. And you just,
4 essentially, told me when an extraordinary
5 occurrence report is expected to be filed;
6 correct?
7 A. Correct.
8 Q. Is there any other kind of a --- there
9 are also investigative reports, I know that;
10 correct?
11 A. Correct.
12 Q. Is there any other species of report
13 that officers or administrators can use to
14 memorialize an event?
15 A. They can use a to/from. It's not a
16 required procedure.
17 Q. Is that more like a memorandum?
18 A. Yes.
19 Q. Now, did the events --- did the
20 incident of November 22nd, where Lisa was
21 photographed according to your testimony, in her
22 bra and panties, and according to --- there was,
23 you know, photographs --- I viewed the
24 videotape. And there were photographs taken in
25 her undergarments. Would that not be the kind

A 58

Page 46

1 of occurrence that would be expected to be in an
2 extraordinary report?
3 A. No.
4 Q. And that's because —?
5 A. Didn't disrupt the normal running of
6 the institution.
7 Q. Now, what about when she refused to be
8 photographed and was protesting and is saying,
9 you people are crazy, that kind of thing, you
10 know, wanting to take photographs of me. That
11 also wouldn't — that's not disruptive of the
12 institution?
13        ATTORNEY HALLORAN:
14            Objection. Asked and
15        answered.
16 BY ATTORNEY KRAKOFF:
17 Q. Is that your answer?
18 A. Yes.
19 Q. So there's nothing in writing which
20 reflects the event, the incident of the 22nd of
21 November, in terms of a report; is that correct?
22 A. As I testified earlier, I do not
23 recall.
24        ATTORNEY KRAKOFF:
25            Well, if there is something in

Page 47

1 writing, I would like to receive a copy
2 of that.
3        ATTORNEY HALLORAN:
4            We have searched. We will
5        search again and make sure there is not
6        a written report. At this point in
7        time we do not believe that there is
8        any written report relating to the
9        videotaping and photographs.
10 BY ATTORNEY KRAKOFF:
11 Q. Now, did you prepare anything in
12 writing, or did you have somebody, your
13 secretary or anybody else, prepare something in
14 writing which reflected how many photographs you
15 placed in Lisa Lambert's file?
16 A. No, sir.
17 Q. So there was no written inventory, as
18 such, that you made, saying in effect, it's
19 November 22nd, and I've placed five photographs
20 of Lisa Lambert in a file in my cabinet;
21 correct?
22 A. No, sir.
23 Q. Is there anything you're aware of in
24 writing which reflects that only five
25 photographs were taken of Lisa Lambert that day?

Page 48

1 I'm talking about still photographs.
2 A. Not that I can recall.
3 Q. I'd like to refer you to a document.
4 I'm not going to mark this as an exhibit, but
5 it's an inmate's request to staff member. And
6 it appears to be dated — I can't tell what
7 month that is for sure, perhaps you can on the
8 bottom?
9 A. I believe it's February 14th, '95.
10 Q. And this is an inmate's request to
11 staff member, and on the bottom of that appears
12 to be your signature. Is that your signature?
13 A. That's correct.
14 Q. And this was produced in the course of
15 discovery. Is that your handwriting in, I
16 believe that's section eight?
17 A. That's correct.
18 Q. And you see on the top, there, it says
19 cc, or does it say cc's?
20 A. It says file. You're talking there?
21 Q. I'm sorry. It's at the bottom of the
22 page.
23 A. Oh, okay.
24 Q. Does that say cc?
25 A. Correct.

Page 49

1 Q. To Superintendent?
2 A. Correct and Deputy Utz.
3        ATTORNEY HALLORAN:
4            To Superintendent Wolfe?
5 A. Correct.
6 BY ATTORNEY KRAKOFF:
7 Q. And can you describe how cc's to the
8 Superintendent were routinely transmitted from
9 your office to him?
10 A. My secretary would make copies, then
11 they're placed in the interinstitutional mail
12 and sent to the various offices.
13 Q. Was his office near yours at the time,
14 or was it in a different building?
15 A. It would have been in a different
16 building.
17 Q. And I take it from the cc that as far
18 as you know, a copy was transmitted — a copy
19 of your response was transmitted to
20 Superintendent Wolfe, assuming that nothing
21 interfered, under ordinary circumstances that
22 would have been transmitted?
23 A. Correct.
24 Q. Now, on the top, that's the reference
25 to file; is that correct?

A 59

Page 62

1 from a staff member, which communicated
2 allegations of inappropriate sexual contact
3 between a member of the staff or members of the
4 staff and inmates?
5        ATTORNEY HALLORAN:
6            You mean ones different then
7      these or including these?
8 BY ATTORNEY KRAKOFF:
9 Q.   I think that you don't recall whether
10 you received this. Isn't that your testimony?
11       ATTORNEY HALLORAN:
12           This document?
13 BY ATTORNEY KRAKOFF:
14 Q.   This document; is that correct?
15 A.   I don't recall it. I think you asked
16 me earlier if it was --- that I acknowledged
17 that at some point I had received it because of
18 my signature.
19       ATTORNEY HALLORAN:
20           Yeah, you haven't asked her
21      whether she's familiar with the
22      incidents?
23       ATTORNEY KRAKOFF:
24           Right, I haven't gotten into
25      that, but ---.

Page 63

1        ATTORNEY HALLORAN:
2            I guess I just want to make
3      sure, unless you're asking this
4      question.
5 BY ATTORNEY KRAKOFF:
6 Q.   I guess what I'm wondering is, if you
7 received a document like this, why you wouldn't
8 have a recollection of it as you sit here today.
9 Because it seems to be a fairly serious
10 document. You agreed that these are serious
11 allegations?
12 A.   That's correct, sir.
13 Q.   Do you have an explanation as to how
14 you can, as of today, have no recollection of
15 this document?
16       ATTORNEY HALLORAN:
17           You're asking her why she
18      doesn't recall it?
19 A.   Which doc ---.
20 BY ATTORNEY KRAKOFF:
21 Q.   Well, I meant that there's an
22 attachment to the extraordinary occurrence
23 report and it explicitly says, statement
24 attached; correct?
25 A.   Correct.

Page 64

1 Q.   I'm referring to this document as,
2 these three as a single document, because it
3 makes reference to the attachment and my
4 assumption is that the three-page document was
5 delivered to your office.
6        ATTORNEY HALLORAN:
7            I think her testimony is that
8      in all likelihood it was delivered,
9      because of the reference to the cc.
10 BY ATTORNEY KRAKOFF:
11 Q.   Right. And what I'd like to know is if
12 you have any explanation as to why you have no
13 recollection as you sit here, independent of
14 seeing the cc, of having received this document?
15 A.   I don't have an explanation for that,
16 sir.
17 Q.   Now, had you received, either prior to
18 May of 1995, let's limit it to that at this
19 point. Prior to May of 1995, which is the date
20 of this document, this extraordinary occurrence
21 report, had you ever received communications
22 from a staff member, of a similar nature, which
23 informed the person to whom the report was
24 addressed. That was to you, this report was to
25 you, directly. Did you receive any other

Page 65

1 reports of alleged --- any other extraordinary
2 occurrence reports of alleged sexual abuse on
3 the part of staff members against Cambridge
4 Spring inmates?
5 A.   Let me correct something, also. All
6 extraordinary occurrence reports go to me.
7 Q.   Right.
8 A.   All extraordinary occurrence reports.
9 Not just ones alleging improprieties by staff.
10 If we lose a tool, if we lose a key, if a water
11 line breaks. Anything, any time an
12 extraordinary occurrence report is written, it
13 comes to my office.
14 Q.   So there are a lot of extraordinary
15 occurrence reports that come through your
16 office?
17 A.   That's correct, sir.
18 Q.   Are there a lot of extraordinary
19 occurrence reports that come to your office
20 containing allegations of sexual abuse by
21 members of the staff against inmates?
22 A.   The only reason I hesitate in answering
23 in that is, are you --- on the sheer volume of
24 the extraordinary occurrence reports I get, or
25 ---?

A 60

Page 68

1  Q.  Why don't you give me --- I'm not
2  comparing the two. Why don't you give me
3  independent, not making any comparison.
4  A.  By the sheer volume of the
5  extraordinary occurrence reports that I get in
6  the five and a half years I've been here,
7  extraordinary occurrence reports that allege
8  staff improprieties with inmates, there is not a
9  disproportionate, a large disproportionate
10 number.
11 Q.  How many reports of sexual
12 improprieties, sexual abuse, have you received
13 during the time that you've been Deputy
14 Superintendent?
15 A.  I would not be able to give you a
16 specific number. I could not tell you that.
17 Q.  You can't give me a ballpark number?
18 A.  No, sir.
19 Q.  A thousand?
20 A.  No.
21 Q.  More than 500?
22 A.  No.
23 Q.  More than 300?
24 A.  No.
25 Q.  More than 200?

Page 67

1  A.  No.
2  Q.  More than 150?
3  A.  No. Less than a hundred?
4  Q.  Less than a hundred?
5  A.  Yes.
6  Q.  Approximately a hundred?
7  A.  I didn't say that. I said less than a
8  hundred.
9  Q.  Approximately how many?
10 A.  I don't know, sir.
11 Q.  More than 75?
12 A.  I don't know.
13         ATTORNEY HALLORAN:
14      Objective. Argumentative.
15         ATTORNEY KRAKOFF:
16      I think I have a ---.
17         ATTORNEY HALLORAN:
18      She said she doesn't recall
19      and she said now less than a hundred.
20 BY ATTORNEY KRAKOFF:
21 Q.  Well, you recall enough to say less
22 than a hundred?
23 A.  I'm guessing. I'm estimating. You
24 asked me for a ballpark figure.
25 Q.  Give me an estimate of the number of

Page 68

1  ---.
2  A.  Less than a hundred.
3  Q.  Now, prior to receiving the
4  extraordinary occurrence report, which was May
5  6th, 1995, I take it you had received other
6  reports of sexual improprieties occurring at
7  Cambridge Springs, involving staff members and
8  inmates; is that correct?
9  A.  That's correct.
10 Q.  Now, I'd like you to give me some of
11 your earliest recollections, after you came here
12 in 1992, of reports involving staff members,
13 involving alleged sexual abuse.
14 A.  Do we have a list, the list of inmates?
15 The list of staff that we had prior?
16 Q.  But I don't want you to limit it to
17 that if there is.
18 A.  I understand. Carl Zimmerman, Martin
19 Miller. And we are going by reports received of
20 alleged sexual abuse.
21 Q.  Yeah, just allegations.
22 A.  Allegations. Jim Merry, Richard
23 Hammers, Paul Walton, James Eicher. Prior to
24 1995?
25 Q.  Yes. Now, what about Officer Raun.

Page 69

1  Did that involve allegations of sexual abuse?
2  A.  I don't recall.
3  Q.  You're not sure?
4  A.  I'm not sure.
5  Q.  Do you recall what the allegations were
6  about Carl Zimmerman?
7  A.  Kissing, fondling, I believe that was
8  it, to the best of my knowledge.
9  Q.  By fondling, was that the breasts?
10 A.  I don't recall, sir.
11 Q.  How did you first become aware of these
12 allegations?
13         ATTORNEY HALLORAN:
14      Zimmerman's?
15 BY ATTORNEY KRAKOFF:
16 Q.  Zimmerman's.
17 A.  I don't recall. I'm not sure.
18 Q.  Had there been rumors circulating
19 around the prison for a while about Zimmer---
20 and an inmate or inmates?
21 A.  I don't recall.
22 Q.  You know what I mean? What I mean is,
23 I guess the two poles of this would be, there
24 were rumors for awhile, and then they led up to
25 his termination or one day we received this

A 61

Page 94

1  Q.  And Stewart?
2  A.  Harry Stewart, yes, he's still an
3  employee.
4  Q.  And Young?
5  A.  No.
6  Q.  He's gone?
7  A.  He's no longer here.
8  Q.  Was he gone by May 6th, 1995, or did he
9  ---?
10 A.  I don't believe so.
11 Q.  And Free?
12 A.  Free is still an employee.
13 Q.  Coffee?
14 A.  Still an employee.
15 Q.  Rogers?
16 A.  He was gone prior to '95.
17 Q.  Merry?
18 A.  Prior to '95 he was gone.
19 Q.  Monteo?
20 A.  He is still an employee.
21 Q.  And to complete it, I think you said it
22 a couple times, Eicher was gone by May 6th of
23 1995, right?  Your recollection?
24 A.  My recollection, yes.
25 Q.  And as far as were concerned --- as far

Page 95

1  as your memory today, you can't recall having a
2  discussion with Superintendent Wolfe about this
3  extraordinary occurrence report; is that
4  correct?
5  A.  No, sir, I don't.
6  Q.  Or with the security captain?
7  A.  Again, no, I don't recall.
8  Q.  Or with anybody that you can recall; is
9  that correct?
10 A.  Correct.
11 Q.  Even if an officer were gone, would you
12 agree that there could still be some value in
13 investigating and determining whether the
14 allegations were accurate, so that in the
15 future, sexual abuse could be, as a prophylactic
16 of future sexual abuse, would you agree, using a
17 poor choice of words, as a preventive measure,
18 doesn't find out about what occurred in the past
19 have some positive benefit?
20 A.  Of course it does.
21 Q.  Now, I note that your cc didn't refer
22 the extraordinary report to the central office.
23 Would that have been something that you wouldn't
24 do on your own, in the ordinary course --- and
25 if an extraordinary occurrence report is to be

Page 96

1  transmitted outside of the institution to the
2  central office, that that would be the
3  Superintendent's call?
4  A.  That's correct.
5  Q.  And the same thing with orally
6  apprising the central office of the
7  extraordinary occurrence report and the
8  allegations.  Is that something that would be up
9  to the Superintendent to do, not your function
10 or responsibility?
11 A.  I may do it, but it would only be under
12 his direction.
13 Q.  You'd first go to him ---
14 A.  Correct.
15 Q.  --- and then if he said, call them on
16 my behalf or call them, then you'd do it, but
17 you wouldn't unilaterally do it?
18 A.  Correct.
19 Q.  If an inmate is found to have engaged
20 in sexual misconduct with an officer, is that
21 inmate subject to disciplinary punishment, do
22 you know?
23 A.  It would depend on the circumstances.
24 Simply engaging in sexual misconduct with an
25 officer, I don't believe there would be

Page 97

1  disciplinary action against the inmate because
2  of the interpretation of the Pennsylvania Crimes
3  Code.
4  Q.  And how --- what is that?
5  A.  That says that anybody adjudicated to
6  our care, custody, control, we have authority
7  over.  And even though it may be consensual,
8  Pennsylvania Crimes Code does not recognize that
9  because of our realm of authority.
10 Q.  So that even if it appears to be
11 consensual, your understanding is that the
12 General Assembly has concluded that it can't
13 really be consensual because of the relative
14 power ---
15 A.  That's correct.
16 Q.  --- between the two; is that correct?
17 A.  That's correct.
18 Q.  I may have this name, and I don't think
19 I have it correct, but is there an officer by
20 the name of Lillian, or was there an officer by
21 the name of Lillian Lathenrock, (phonetic) or
22 something to the effect?  Does that sound
23 familiar?
24 A.  The only thing familiar would be Lee
25 Ann Laverick (phonetic).

A 62

Page 110

1 actual sexual abuse of Cambridge Springs'
2 inmates by staff? What I mean is, so that you
3 understand the question, is there like one
4 comprehensive repository of documents that
5 relate to allegations, alleged or proven, sexual
6 abuse?
7 A.   I'm not aware of that.
8 Q.   Because we know that you had a Lambert
9 file, Superintendent Wolfe had a Lambert file,
10 it appears that the captain had a Lambert, the
11 investigative captain had a Lambert file. And
12 I'm just wondering, did you have like a Walton
13 file, and did you have a file on Walton, or
14 Zimmerman, or any of the other personnel who
15 were either terminated or resigned?
16 A.   I'm sorry, sir. Please repeat your
17 question.
18 Q.   As far as you know, I think giving an
19 example might be easier. If I wanted to find
20 out about the Allegheny County Jail, I could go
21 to the Carnegie Library in Pittsburgh and I'd
22 say, do you have a Allegheny County Jail file.
23 And they'll have all these articles in a folder,
24 labeled Allegheny County Jail. What I'm trying
25 to gather is whether somebody has collected the

Page 111

1 data, the information, all of the various
2 individual incidents of alleged sexual abuse, or
3 established instances of sexual abuse by staff
4 against employees, and has put it together in
5 some sort of a comprehensive way?
6 A.   No, sir. Not that I'm aware of.
7 Q.   Are you aware of any efforts either by
8 the central office of the Department of
9 Corrections or by Cambridge Springs, to
10 evaluate, try to determine what had --- how the
11 proven cases of sexual abuse had been able to
12 occur? What caused it to happen here? Are you
13 aware of anybody in the central office or here
14 undertaking to find out what the root cause or
15 causes were?
16 A.   You're talking about an encompassing
17 evaluated report, based on the cases?
18 Q.   Right. Was it training, was it
19 recruiting, was it evaluating of recruits, was
20 it discipline or the absence thereof. Was it
21 any number of --- was it policies, the absence
22 of adequate monitoring? Was it none of the
23 above? Has anybody tried to, to your knowledge,
24 at the Cambridge Springs, attempted to have that
25 evaluated?

Page 112

1 A.   I don't know. I do know the department
2 has recognized a need for more comprehensive
3 training, as far as cross-gender supervision,
4 and professionalism, staff professionalism. And
5 they have taken steps to incorporate that into
6 mandatory training for the Department of
7 Corrections employees.
8 Q.   When did that development occur,
9 approximately?
10 A.   '96.
11 Q.   Do you know whether --- oh, I'm sorry.
12 A.   I need to mention too, that the
13 institution, itself, and our Superintendent
14 placed an emphasis on additional training for
15 staff in light of the problems that the
16 institution was appearing to have.
17 Q.   And when did that occur, what year?
18 A.   October of '93, additional training.
19 We already had our basic training, where it's
20 addressed as far as involvement with staff and
21 inmates. We had a code of ethics training.
22 Code of ethics --- our code of ethics training
23 by our training lieutenant, and then, to the
24 best of my memory, in October of '93, we started
25 additional training, and we spoke in previous

Page 113

1 testimony about the video.
2 Q.   Right. Was that October of '94 when
3 Mr. --- I believe that the Superintendent
4 testified it was October, '94, when Davis ---?
5 A.   To view the video.
6 Q.   In October of '93 there was a different
7 video, and that was produced or obtained?
8 A.   It was purchased. It was an outside
9 purchase, like a company produces the video for
10 a correctional staff. And we purchased it for
11 training.
12 Q.   Did that become part of mandatory
13 training? Or was that available for any staff
14 who wanted it?
15 A.   We took it upon ourselves to show it to
16 staff. And I'm answering that in response to if
17 I'm an officer and I wanted to go see it. Yes,
18 you can certainly do that, but we felt it was
19 serious enough that we wanted to show it to all
20 of our staff, as part of our required training.
21 Q.   And do you recall, so that I can know
22 what you're talking about, do you recall the
23 title of the video, or where it was produced, or
24 who spoke on it?
25         ATTORNEY HALLORAN:

A 63

Page 114

1    We have it. We'll get it for
2 you.
3 A.    I don't remember, specifically.
4 BY ATTORNEY KRAKOFF:
5 Q.    Do you recall having any discussions
6 with the Superintendent about acquiring
7 additional training prior to, either during or
8 prior to October of 1993? I mean, is that
9 something you discussed with him? I don't mean
10 did you initiate it, I mean were you part of
11 discussion with him about that?
12 A.    Prior to '93?
13 Q.    Well, no. You said it was in October
14 of 1993, I think, that you obtained the video?
15 A.    Correct.
16 Q.    And then I take it that the video was
17 shown at some point after October of '90 --- or
18 either during 1993?
19 A.    Correct.
20 Q.    Did the video just show up here one
21 day, as far you were concerned, or were you part
22 of the planning to have additional training?
23 A.    That video in particular, I believe,
24 was obtained by our training coordinator, Mr.
25 Sleighton (phonetic). After that, subsequent

Page 115

1 --- is that the right term ---
2 Q.    Uh-huh (yes).
3 A.    --- I had a conversation with the
4 Superintendent, asking authorization to purchase
5 several other films. One of them was
6 Professionalism in Ethics, and Cross-Gender
7 Supervision, which he gave us permission to do.
8 And I initiated the purchase for that.
9 Q.    What did you tell the Superintendent
10 when you initiated the purchase? Did you give
11 him a rationale for it, did you say this is why
12 I think we should it? Did you just say, I want
13 to purchase this, or did you give him some
14 explanation as to why you thought it would be a
15 good idea?
16 A.    I think, I don't recall the exact
17 conversation.
18 Q.    What about in terms of your mind?
19 Obviously, you decided --- you viewed it as
20 being important to purchase these additional
21 training materials; is that correct?
22 A.    I think it's our responsibility, just
23 like with any, like any corporation, only we're
24 dealing with human beings, that we try to build
25 a better machine. We're never in a position

Page 116

1 where we can say, we're satisfied with what
2 we're doing.
3 Q.    Right.
4 A.    And certainly given, given the number
5 of allegations that we were experiencing, we
6 wanted to do everything that we could to educate
7 staff.
8 Q.    And when was it that you went to the
9 Superintendent and said, I think we should have
10 these additional training films?
11 A.    When was it, sir?
12 Q.    Yes, place or time?
13 A.    I would have to go back and research
14 it. I don't recall. Between '93 and '95.
15 Q.    Go ahead.
16 A.    Can I add something else?
17 Q.    Yes.
18 A.    I think it's also important for people
19 to understand that this simply wasn't based on
20 the allegations that inmates were making. They
21 were also --- it was also a concern that we had
22 from staff. Certainly sexual misconduct occurs
23 between inmates and staff. But certainly it is
24 historically correct that female inmates will
25 use their sexuality to manipulate, and example,

Page 117

1 using your term. If you're inmate and I give
2 you a misconduct and you want to get even with
3 me, what better way than to report to staff that
4 there's been some type of sexual impropriety.
5 And we felt there was a need to educate staff in
6 how to correct --- in how to address that,
7 correctly.
8 Q.    How do you address that correctly?
9 A.    We educate staff, like the
10 Superintendent testified before, a number of
11 ways. If you feel that there may be --- if you
12 feel ---
13 Q.    Pressure?
14         ATTORNEY HALLORAN:
15         What you're about to discuss,
16     is that the content of the videos that
17     you described?                A 64
18 A.    Yes.
19 BY ATTORNEY KRAKOFF:
20 Q.    He's throwing you a lifeline, so I'll
21 back off.
22 A.    They would --- the films just more
23 succinctly put it.
24 Q.    How would you be able to determine, you
25 said you would have to research to see when you

Page 118

1 made the suggestion to the Superintendent to
2 obtain the additional videos, and you placed
3 that between 1993 and 1995. Would you be able
4 to determine that by the orders?
5 A. The outside purchase orders.
6 Q. That might be an easy way of doing it,
7 if we can have a copy of that, that would be
8 fine.
9 A. As a further clarification, the
10 Superintendent has to receive justification ---
11 or has to have justification for ---.
12 Q. For purchase?
13 A. Yes.
14 Q. Okay. So your justification would
15 probably provide the rationale for --- would it?
16 A. Correct.
17 Q. Because I'd like the justification
18 proposal, too. Now, this is more informational
19 from my standpoint, so that I'm sure that we're
20 getting the documents, that we're not
21 overlooking any documents. The Superintendent
22 identified as the basic policy that prohibits
23 sexual abuse is found in the code of ethics?
24 That's how I recall his testimony. Is that your
25 understanding, that the code of ethics is the

Page 119

1 primary document that prohibits sexual abuse by
2 staff against inmates?
3 A. That's correct.
4 Q. Is there any other document that you
5 can think of which prohibits sexual abuse
6 against inmates? Any other DOC level or
7 institutional policy document?
8 A. No.
9 Q. No?
10 A. No, sir.
11 Q. Does the orientation of inmates, does
12 that come within the jurisdiction of the other
13 Superintendent?
14 A. No.
15 Q. Is it within --- it's counseling; is
16 that right? It's a counseling function?
17 A. It happens within the unit management
18 system, which falls under my jurisdiction.
19 Q. I've requested a copy at these
20 depositions of the orientation. Is it your
21 understanding that during orientation, inmates
22 are apprised that if there's any attempt to
23 abuse them sexually, that they can complain
24 about it?
25 A. On this video?

Page 120

1 Q. Well, either on the video or through a
2 live person saying it to them during
3 orientation? Do you now whether that has been
4 the practice at Cambridge Springs for either a
5 counselor, the unit manager, the video, or some
6 other person to say to inmates during
7 orientation, if you, you know, if anybody on the
8 staff attempts or does sexually abuse you, you
9 can complain about it and this is how you
10 register a complaint?
11 A. I don't remember it being on the video.
12 I'd have to go back and look at it.
13 Q. Okay. What about in a live statement?
14 A. Not that I know of.
15 Q. And what about the inmate handbook.
16 It's not in there, is it? Specifically?
17 A. That's correct.
18 Q. It's my understanding that training
19 sessions would be documented in some fashion by
20 schedules or ---.
21 A. Training sessions for staff?
22 Q. For staff. If I wanted to determine
23 when training was given and what the training
24 consisted of, is there a document that I could
25 refer to, going back over the last two or three

Page 121

1 years?
2 A. Yes.
3 Q. And what documents would reflect that,
4 what kinds of documents. Would it be the
5 training schedules, themselves, or ---.
6 A. There would be a sign off sheet for
7 those people that attended what particular
8 training. There would also be a training record
9 for each employee by the training coordinator.
10 Q. I would imagine that the training
11 coordinator would have some sort of a --- maybe
12 a comprehensive list of what training has
13 occurred in a particular --- over the course of
14 a year? Local, I'm not talking about ---.
15 A. I believe so.
16 Q. Were you at all involved in the process
17 of having Vaughn Davis come to Cambridge Springs
18 beginning in September of 1994 to speak with the
19 staff?
A 65
20 A. Yes.
21 Q. What was the nature of your
22 involvement?
23 A. To the best of my memory, I had a
24 telephone conversation with Mr. Davis to set up
25 the schedule of when the training would occur,