1

2          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                      - - - - -

4

      LISA LAMBERT,              )
5                                )
           Plaintiff,            )
6                                )
           vs.                   )    Civil Action No.
7                                )        96-247
      SUPERINTENDENT WILLIAM )
8     WOLFE,                     )
                                 )
9          Defendant.            )
      --------------------------)
10    SYLVIA VASQUEZ,            )
                                 )
11         Plaintiff,            )
                                 )
12         vs.                   )    Civil Action No.
                                 )        96-429
13    SUPERINTENDENT WILLIAM )
      WOLFE,                     )
14                               )
           Defendant.            )
15    --------------------------)
      ROBIN PHILLIPS,            )
16                               )
           Plaintiff,            )
17                               )
           vs.                   )    Civil Action No.
18                               )        98-59
      SUPERINTENDENT WILLIAM )
19    WOLFE,                     )
                                 )
20         Defendant.            )

21                     - - - - -

22    COUNSEL PRESENT:

23    For the Plaintiffs:    Jere Krakoff, Esq.

24    For the Defendant:     Thomas F. Halloran, Esq.
                             Senior Deputy Attorney
25                             General

A 126

```
 1              M. Wolanin - by Mr. Krakoff
 2         Q.  And what was the other name prior to
 3    Office of Professional Responsibility?
 4         A.  Special Investigations.
 5         Q.  And I'm going to refer to it at all
 6    times as OPR or the Office of Professional
 7    Responsibility.
 8              What is your specific job title within
 9    that agency?
10         A.  It's presently special investigator III.
11         Q.  And when did you become a special
12    investigator III approximately?
13         A.  That was sometime in the fall of '98.
14    Prior to that, I was a special investigator II.
15         Q.  Going back how far?
16         A.  To when I started.
17         Q.  And when did you begin working for OPR?
18         A.  February 14, 1994.
19         Q.  Did you work with the Department of
20    Corrections prior to the 14th of February 1994?
21         A.  No.
22         Q.  Where were you employed when you began
23    to work -- prior to coming to work with the DOC?
24         A.  I was a police officer for the
25    Blairsville Police Department, and I also --
```

```
1              M. Wolanin - by Mr. Krakoff
2         Q.  For the who?
3         A.  Blairsville Borough Police Department,
4    and I also had a business.
5         Q.  Was that business associated with law
6    enforcement or security?
7         A.  No, no, not at all.
8         Q.  And how long had you been a police
9    officer with Blairsville?
10        A.  Approximately five years or so.
11        Q.  Now, where is the OPR office located?
12        A.  The main office is located in Camp Hill,
13   Pennsylvania.
14        Q.  Are there regional offices or --
15        A.  We have one regional office located here
16   in Pittsburgh.
17        Q.  And where do you work out of?
18        A.  Primarily out of Pittsburgh, even though
19   I'm -- I float back and forth.
20        Q.  You float back and forth between
21   Pittsburgh and Camp Hill?
22        A.  Yeah, primarily in Pittsburgh, though.
23   For meetings and what have you --
24        Q.  Right.
25        A.  -- I go back.  Other than that, I'm
```

```
1              M. Wolanin - by Mr. Krakoff
2      a prison staff aimed at an inmate?
3          A.  Sure.
4          Q.  It could also include alleged or
5      possible misconduct from one inmate to another
6      inmate?  Not generally?
7          A.  Not generally, not generally, no.
8          Q.  So the two primary scenarios would be
9      possible misconduct on the part of a staff
10     member at an inmate, misconduct of a staff
11     member to another staff member?
12         A.  That would be possible.
13         Q.  Or an inmate to a staff member?
14         A.  Correct.
15         Q.  And what are your basic functions, and
16     what were they -- when I ask that, what were
17     they during the time period that this
18     deposition's focusing on?
19         A.  Investigate complaints within the DOC,
20     whatever may surface.
21         Q.  And as a general rule, what kinds of
22     activities do you utilize to investigate
23     complaints?  By that, I mean interviews, et
24     cetera.  I'm speaking in generic terms.  I'm not
25     asking about how you investigated any particular
```

```
 1              M. Wolanin - by Mr. Krakoff
 2    examinations in that context, was it for
 3    purposes of use in court, or was it for some
 4    other purpose that you were requesting it?
 5              MR. HALLORAN:  Let me object.  It
 6    calls for a legal conclusion from the witness.
 7              MR. KRAKOFF:  Well, I'm just
 8    asking --
 9         Q.  Are you taking that polygraph for use in
10    court, or are you taking the polygraph for use
11    in administrative proceedings, possible
12    administrative proceedings?
13         A.  It's used as a tool for our
14    investigations.
15         Q.  To determine credibility or to assist
16    you in determining --
17         A.  To assist us, to assist us in our
18    investigation.  I think I'd probably say it that
19    way.
20         Q.  Now, is one purpose of an investigation
21    of possible abuse or misconduct on the part of a
22    staff member against an inmate to determine
23    whether there might have been a violation of the
24    Department's code of ethics?  Is that one
25    purpose that might be involved in a case?
```

M. Wolanin - by Mr. Krakoff

1

2     A.   Correct.

3     Q.   Is another purpose to determine whether

4     there might be grounds for making a criminal

5     referral for prosecution in the criminal courts?

6     A.   If it reached to that level.

7     Q.   Right.  Other than those two purposes,

8     the first which would be administrative and the

9     other which would be, I guess I can call it,

10    judicial, is there any other purpose that your

11    investigation can be used for in connection with

12    alleged or possible misconduct by a staff member

13    toward an inmate?

14    A.   Could you repeat that?

15    Q.   I think you said that one objective of

16    an investigation could be to determine whether

17    there's been a violation of the code of ethics,

18    correct?

19    A.   Correct, correct.

20    Q.   And the other, if it rises to that

21    level, might be to see whether there's a basis

22    for referring a matter for criminal prosecution,

23    correct?

24    A.   Correct.

25    Q.   Is there any other general objective

M. Wolanin - by Mr. Krakoff

that might be served by an investigation other

than those two?

A.  Or to find out that the facts are

unsubstantiated.

Q.  Now, during that period prior to April

of 1996, were you assigned to investigate any

particular prison or prisons, clusters of

prisons, or might you investigate any of the

prisons in the Department?

A.  Statewide.

Q.  Was SCI-Cambridge Springs among the

prisons after it opened that you had

jurisdiction over to investigate?

A.  It was.  It was one of many.

Q.  Right.  In fact, there are now in excess

of 20-something prisons, correct?

A.  That would be correct.

Q.  And at that time in 1994 when you began

to work at the Department, do you recall

approximately how many prisons there were?

A.  Probably 20, 20 or so or in excess of

20.  There had been several that opened up.

Q.  Right.  Certainly Cambridge Springs was

not the sole focus of your investigations; is

```
1                    M. Wolanin - by Mr. Krakoff
2        who was certified?
3            A.  I believe Robinson may have been, but I
4        don't know for sure.
5            Q.  Are you aware of -- first of all, did
6        you conduct some investigations of alleged
7        misconduct on the part of Cambridge Springs'
8        staff members toward Cambridge Springs' inmates
9        during this time period?
10           A.  Did I conduct?
11           Q.  Investigations.
12           A.  Yes.
13           Q.  And to the best of your recollection,
14       did any of those other names that you mentioned
15       conduct investigations of that sort?
16                        MR. HALLORAN:  Do you mean at
17       Cambridge Springs?
18                        MR. KRAKOFF:  At Cambridge
19       Springs.
20           A.  I know Dodson was involved.  Whether the
21       others were, I cannot recall specifically.
22           Q.  Well, let me represent to you, and this
23       is not your testimony, but let me represent to
24       you that of the documents that I received, I saw
25       your name on -- whenever there is a report
```

16

M. Wolanin - by Mr. Krakoff

1

2    issued from OPR, you were the person who issued

3    the report, and I did see some reference to Mr.

4    Dodson administering polygraphs.

5        A.   Okay.

6        Q.   But I didn't see any other of the names

7    that you've mentioned on any of those reports.

8    Is there some reason or some explanation that

9    you have as to why you appear to be the person

10   who conducted if not all of the investigations

11   at least most of them?

12       A.   An explanation of why I did most of

13   them?

14       Q.   Yes.

15       A.   It's probably the -- the best

16   explanation would be I'm from Western

17   Pennsylvania.  The other individuals are from

18   the -- Harrisburg or Eastern Pennsylvania, and

19   it was easier for me to do them because I was

20   here.

21       Q.   So it was logistical?

22       A.   Correct.

23       Q.   Now, what training, if any, did you

24   receive either by -- from the Department of

25   Corrections or through arrangements made by the

STEFFAN & STAUFFER, LTD.        **A 134**
(412) 391-6685

```
 1              M. Wolanin - by Mr. Krakoff

 2      employee misconduct toward inmates is

 3      investigated by prison-level staff without being

 4      referred to OPR for investigation?

 5           A.   Yes.   That would be correct.

 6           Q.   Is there a written policy that you're

 7      aware of, either within OPR specifically or the

 8      Department of Corrections more generally, a

 9      written policy, that governs whether a case

10      should be investigated by OPR or whether it can

11      be investigated solely at -- by prison-level

12      officials?

13           A.   There is no written policy that I am

14      aware of.

15           Q.   Are you aware of any unwritten policy

16      where criteria exists or guidelines exist as to

17      when a case of possible staff-against-inmate

18      misconduct should be referred to OPR or when it

19      should be -- or when an investigation can be

20      conducted at the prison level by prison-level

21      employees?  Is there a practice -- was there a

22      practice during the time period that we're

23      concerned with?

24           A.   There's no unwritten policy that I'm

25      aware of.  It's just on the institution.
```

```
1              M. Wolanin - by Mr. Krakoff
2       Q.  Their judgment?
3       A.  It's their judgment or depending on what
4   level the offense may rise to.
5       Q.  Now, how do the OPR referrals ordinarily
6   come into the agency?
7       A.  How we receive complaints or referrals?
8       Q.  Referrals.  ,
9       A.  Referrals usually -- will usually come
10  through the superintendent, through a regional
11  deputy or through the commissioner to our
12  office.
13      Q.  You have to receive a request, though,
14  by either the superintendent or by the regional
15  deputy commissioner or the superintendent; is
16  that right?  There has to be a --
17      A.  Yeah, yeah.  We just don't go in on our
18  own.
19      Q.  Right.  So it would come generally from
20  one of those three sources?
21      A.  Right.
22      Q.  Are referrals to OPR in the form of
23  something in writing, or are they orally made?
24      A.  Either.
25      Q.  Either.  And I noted as I went through
```

M. Wolanin - by Mr. Krakoff

1  investigations you were involved in?

2     A.  I can't say that I recall that.

3     Q.  Now, I asked you earlier about how

4  referrals come in.  You said that you all don't

5  just reach down and make your own referral.  It

6  either comes from the superintendent or from the

7  regional commissioner or from the

8  superintendent.

9     A.  It comes through a channel.

10    Q.  Right.  And do you know who has the

11 authority to decide whether an investigation

12 will be conducted?  Who makes that decision?

13    A.  Who makes the decision to conduct an

14 investigation?

15    Q.  Right.

16    A.  It could either be the director of OPR.

17 It could be the regional deputy.  It could be

18 the commissioner.  It could be a number of

19 people.

20    Q.  Now, let me focus you on investigations

21 that are done on the -- by staff level first now

22 as opposed to OPR.  Is there any requirement,

23 either written or unwritten, that you are aware

24 of that OPR be informed of the fact that an

```
1              M. Wolanin - by Mr. Krakoff
2      investigation is being conducted by prison-level
3      personnel?
4          A.  Is there any requirement that we be
5      informed?
6          Q.  Yes.
7          A.  Not that I'm aware of.
8          Q.  And that would include cases of alleged
9      staff against inmate; is that correct?
10         A.  Yes.
11         Q.  Now, if an investigation of possible
12     staff-against-inmate misconduct is conducted, is
13     there any requirement that OPR be informed of
14     the information gathered in such an
15     investigation by prison-level staff?
16         A.  Could you repeat that?
17         Q.  Sure.  Are you aware of any policy,
18     either written or unwritten, that where
19     prison-level staff conduct an investigation of
20     alleged misconduct against an inmate that the
21     information generated during that investigation
22     be shared with OPR?
23         A.  I know there's an abuse policy.  I'm not
24     in the abuse unit.  So I can't really say what
25     the requirements are.
```

1              M. Wolanin - by Mr. Krakoff

2         Q.  Yes, yes.

3         A.  Other than that, nothing that I'm aware

4    of.

5         Q.  By abuse, are -- what do you mean by

6    abuse?

7         A.  Alleged assaults.

8         Q.  If I can use a word, are you talking

9    about excessive force?

10        A.  Excessive force.

11        Q.  There's a --

12                  MR. KRAKOFF:  Oh, go ahead.

13                  (Counsel confers with witness.)

14        Q.  Let me get specific.

15                  MR. HALLORAN:  Jere, he wants to

16    add something.

17        Q.  I'm sorry.

18        A.  Yeah.  If there's an alleged complaint

19    at the institution that there's possible

20    criminal implications, it comes to us

21    automatically because the institution --

22    institutional staff do not have law enforcement

23    powers, per se, and our office does.

24        Q.  So anything that might rise to a level

25    of criminal misconduct has to be referred to

```
 1              M. Wolanin - by Mr. Krakoff
 2      OPR, correct?
 3          A.   Correct.
 4          Q.   At least it has to -- does it have to be
 5      referred for an investigation by OPR, or do you
 6      simply have to be told that they're
 7      investigating it at the local level?
 8          A.   Basically it's referred to us possibly
 9      even for an assist to investigate in conjunction
10      with the institution.
11          Q.   Yes.  But you -- are you saying you have
12      to be at least told about it if it involves
13      possible criminal misbehavior, or are you saying
14      that you actually have to participate in that
15      investigation?  I'm a little bit confused.
16              MR. HALLORAN:  I don't think he
17      said either one.  I think he said in the course
18      of the investigation if the criminal -- if
19      possible criminal conduct comes to light.
20              MR. KRAKOFF:  Yes.
21          Q.   What happens then?  You're told about
22      it, or you're brought into the investigation?
23          A.   We're brought into it.
24              (Counsel confers with witness.)
25          Q.   Let me give you a definition so that
```

```
 1              M. Wolanin - by Mr. Krakoff
 2      the definition I gave you?
 3          A.  Yeah.
 4          Q.  Now, let me focus specifically on
 5      whether you are aware of any written policy or
 6      unwritten policy, which I can also call a
 7      practice, where investigations involving alleged
 8      sexual misconduct of the nature I described are
 9      conducted on the local level by prison-level
10      staff.  Are you aware of any requirement that
11      OPR be told that an investigation was being
12      conducted at the prison level?
13          A.  Is there any requirement that OPR be
14      told --
15          Q.  Yes.
16          A.  -- of an investigation of this nature?
17          Q.  Yes.
18                  MR. HALLORAN:  You mean the --
19                  MR. KRAKOFF:  The initiation of an
20      investigation.
21          A.  There's no requirement that I'm aware
22      of.
23          Q.  And are you aware of any requirement
24      that information gathered during such an
25      investigation be shared with or brought to the
```

```
 1              M. Wolanin - by Mr. Krakoff
 2    attention of OPR?
 3         A.   Nothing that I'm aware of.
 4         Q.   And --
 5              MR. HALLORAN:   You mean other than
 6    he's already answered?
 7              MR. KRAKOFF:   Well, I think what
 8    he said was that if there's a criminal --
 9              MR. HALLORAN:   Right, yes.
10              THE WITNESS:   Criminality.
11              MR. KRAKOFF:   If they think it
12    rises to criminality.
13              THE WITNESS:   Criminality.
14         Q.   At that point, you have to be told about
15    it, correct?
16         A.   Because we have to be involved in that.
17         Q.   Right.  I understand.  And then are you
18    aware of any written policy or unwritten policy
19    or practice in which findings in such an
20    investigation have to be shared with OPR,
21    findings of an investigation conducted by
22    prison-level staff be shared with the OPR?
23         A.   Only if it rises to the level of
24    criminality.
25         Q.   Now, have you ever investigated any
```

```
1              M. Wolanin - by Mr. Krakoff
2      instances of possible staff-against-inmate
3      misconduct of a sexual nature at Cambridge
4      Springs?
5           A.  Have I investigated it?
6           Q.  Yes.
7           A.  Sure.
8           Q.  Before I get into that, let me clarify
9      something.  I think you said a while earlier
10     that there is a special unit within OPR to
11     investigate allegations of possible excessive
12     use of physical force against inmates; is that
13     correct?
14          A.  Yeah.  Now there is.  Back then,
15     everybody did everything to clarify that.
16          Q.  When did that special unit start?
17          A.  In recent times.
18          Q.  Within the last year or so?
19          A.  Yeah.  That would be correct.
20          Q.  Before that, there was no special unit
21     to investigate excessive use of force
22     complaints; is that correct?
23          A.  Everybody did everything.
24          Q.  What I'd like you to do is to tell me by
25     either the name of the inmate or the name of the
```

```
1              M. Wolanin - by Mr. Krakoff
2     staff member or members involved each of the
3     investigations of alleged or possible sexual
4     misconduct, staff against inmate, that you were
5     involved in during the time period that we're
6     talking about between February of '94 and
7     through April of '96.
8         A.  Do you want me to tell you each of the
9     investigations?
10        Q.  Yes.  I'd like -- I want to identify --
11    I want you to -- I'm not going to ask you to
12    tell me the details of the investigation.
13        A.  Yeah.
14        Q.  I'm trying to create a list so that I'll
15    know what to come back with.
16              MR. HALLORAN:  At Cambridge
17    Springs?
18              MR. KRAKOFF:  Oh, yes, yes.
19        Q.  All of these questions that I'm asking
20    you about today are about Cambridge Springs.
21        A.  I'll try.  I can't -- I might miss some.
22        Q.  No.  I just want you to -- I'll tell you
23    what, and it might be beneficial.  I'm going to
24    take about a three-minute break, three or four
25    minutes, so that you can think about them now
```

```
 1              M. Wolanin - by Mr. Krakoff
 2     rather than me asking you to tell them to me
 3     right this second.  Okay?  Think for three or
 4     four minutes, and then I'd like you to tell me
 5     those that you recall, and let me do it this way
 6     so that -- because it may be hard for you to
 7     separate what was in April of 1996 or what was
 8     in May of 1996.
 9          A.  That's true.
10          Q.  So let me go through 1996, okay, through
11     December of '96, so that we're talking about the
12     day that you started through the rest of '94,
13     through all of '95 and all of '96.  Okay?
14          A.  Okay.
15          Q.  And that's what I'd like you to do, and
16     I'll be back in a minute, and you can write them
17     down so -- you know, as you think of them so
18     that --
19                (A brief recess was taken.)
20          A.  Okay.  Would you repeat what the
21     question was?
22          Q.  Yes.
23                MR. HALLORAN:  No.  You don't have
24     to repeat it.
25          A.  Okay.  Do you want the names?
```

M. Wolanin - by Mr. Krakoff

Q.   Yes.

A.   The ones that I can recall, an

individual by the name of Zimmerman.

Q.   Yes.

A.   Paul Walton, Jim Eicher.  Martin Miller

was in that time frame.  Whether it was prior to

'96 or '97, I can't recall.  Jim Merry and an

individual by the name of Hammer or Hammers I

was briefly involved in, which he resigned

before I got to him.  So it was minimal.  Any --

if there's anybody else, I cannot recall right

now.

Q.   Stones, either Stone or Stones, does

that ring a bell?

A.   Mike Stone?

Q.   Right.

A.   I can't recall the specifics.  I believe

it was unsub -- if I can recall, I might be

wrong, I think it was unsubstantiated.  He was

brought back to work.  What happened --

Q.   What we'll do is we'll go through -- I'm

going to go through most of these with you and

ask you some specific questions, or those --

some of those documents might assist you in

79

1          M. Wolanin - by Mr. Krakoff

2     alleged victim, not a situation where you were

3     investigating to see if an inmate had harmed a

4     staff member or property.

5          A.   Okay.   That's fine.

6          Q.   Do you understand that?

7          A.   Yes.

8          Q.   So -- and I think your answer -- would

9     your answer hold that where the inmates were the

10    possible victims of abuse, it was not your

11    practice to mirandize them, but there might have

12    been an occasion that you did?

13         A.   Where the inmates were a victim, they

14    were not mirandized.

15         Q.   Yes.

16              MR. HALLORAN:   Did you include

17    witness in that question?

18              MR. KRAKOFF:   Yes, both witnesses

19    and possible victims.

20         Q.   Is that true?   You did not mirandize?

21         A.   Correct.   That's --

22         Q.   Now, would there have been in your

23    opinion as an investigator a negative

24    consequence, a potential negative consequence,

25    to mirandizing either the witnesses, the inmate

```
1              M. Wolanin - by Mr. Krakoff
2       investigations that you conducted, like in
3       Lambert, in Phillips and Vasquez, meaning the
4       Miller case that Phillips and Vasquez were
5       involved in, the Eicher case that Lambert was
6       involved in and the other cases that you
7       investigated, was it your practice not to
8       mirandize the inmates that you interviewed?
9          A.   The inmates?
10         Q.   Yes.
11         A.   That would be correct.
12         Q.   Do you have a recollection of ever
13      mirandizing any of the inmates that you
14      interviewed?  And that would include both the
15      possible victim of the guard-on-inmate abuse or
16      the -- just witnesses who might provide you
17      information.  Was it your practice not to
18      mirandize them?
19         A.   I cannot recall mirandizing, you know,
20      any inmates, not to say that it hadn't been
21      done, but I cannot recall specifically any that
22      comes to mind that I mirandized.
23         Q.   Yes.  And, of course, I'm distinguishing
24      that from a situation where you're -- we're only
25      talking about situations where the inmate was an
```

```
1                M. Wolanin - by Mr. Krakoff
2      witnesses, or the possible inmate victim?  Would
3      there have been a negative -- a downside to
4      mirandizing them?
5          A.  The potential is there.  When you
6      mirandize them, you advise them of their
7      rights.  At that point, they don't have to speak
8      to us.
9          Q.  Right.
10         A.  Without an attorney.
11         Q.  Right.  So there is a -- there was a
12     possibility, then, that if you mirandize
13     witnesses that the witnesses are not going to
14     talk to you, correct?
15         A.  The potential is there.  They are not
16     accused, but the potential is there.
17         Q.  But so that this is a clear answer, is
18     it your testimony --
19                MR. HALLORAN:  I'm going to
20     object.  The answer is clear.
21                MR. KRAKOFF:  Is it clear?  What
22     is it?  The potential of what?  That's what I'm
23     not clear on when he said the potential is
24     there.
25                MR. HALLORAN:  That they would
```

1              M. Wolanin - by Mr. Krakoff

2      exercise their right to remain silent.

3          Q.   Is that what you meant?

4          A.   Yeah, that's what I meant.

5          Q.   Did you ever suggest to either Captain

6      Bartlett or to Captain Lazenby that they should

7      mirandize witnesses or potential victims in

8      cases of this sort?

9          A.   Not that I can recall.

10         Q.   Did they ever ask you whether you

11     believed that they should mirandize either

12     witness -- an inmate witness or a possible

13     inmate victim?

14         A.   Not that I can recall, sir.

15         Q.   And was there an OPR policy, either

16     written or unwritten, that addressed the

17     question of whether or not an inmate victim or

18     an inmate witness should be mirandized in the

19     context of an investigation?  Was there any

20     policy?

21         A.   Not that I'm aware of.

22              (Counsel confers with witness.)

23              MR. KRAKOFF:  Do you have

24     something to add or --

25              MR. HALLORAN:  No.

```
1              M. Wolanin - by Mr. Krakoff
2    before that?
3         A.   Nobody knew.
4         Q.   Did you ask any of the inmates when the
5    room had been cleared out?
6         A.   I don't recall if I did or not, no.
7         Q.   Now, let me refer you to paragraph 30
8    which is on page 74 of the same exhibit, Exhibit
9    127.
10        A.   Okay.
11        Q.   Do you see that?
12        A.   Yep.
13        Q.   In further -- it reads, in further
14   rebuttal, the Department presented the testimony
15   of Carmel Bynum.  Ms. Bynum currently lives in
16   McKees Rocks and works as a data processor with
17   File Express.  She testified that she was an
18   inmate at SCI-Cambridge Springs from April 1992
19   until October 1993.  Ms. Bynum testified that
20   she worked on the electrical crew and that her
21   supervisor was Ronald Randolph.  In August 1993,
22   she was helping to rewire the Alliance
23   Building.  On one particular day in August 1993,
24   appellant, and that would be Zimmerman, was
25   supervising her during the rewiring of the
```

```
1              M. Wolanin - by Mr. Krakoff
2      Alliance Building.  She testified that at one
3      point, he directed her to the corner of the
4      attic in order to show her how to run the wire
5      in the attic, and after he showed her, he moved
6      very close to her and made a pass at her.  Ms.
7      Bynum testified that after appellant had made a
8      pass at her, he told her that if things were
9      only different, he would like to take her to
10     bed.  Ms. Bynum also testified that after this
11     incident whenever she walked past him, he would
12     emit a sexual groan, and then it goes on from
13     there, and there's -- and it goes on two
14     sentences later to say, for the record, Ms.
15     Bynum's -- her hair is blonde.
16          Now, was there some information that you
17     had received that Zimmerman had focused on
18     blonde inmates to prey upon?
19       A.  I believe all of his inmate clerks were
20     blonde.
21       Q.  Yes.  And did you relate the information
22     about Bynum's hair to somebody?
23              MR. HALLORAN:  I'm going to
24     object.  There's no -- Bynum's information
25     refers to the instance that occurred in 1992 and
```

M. Wolanin - by Mr. Krakoff

1

2          If I can recall back to the criminal

3    trial that we went through, I believe he was

4    convicted on -- I don't have the transcript in

5    front of me.  So I don't --

6          Q.  I'm not asking what he was convicted

7    of.  I'm asking you what conclusion you reached

8    as of the time that you generated this report.

9          A.  That the acts occurred.

10         Q.  And what were the acts that you believed

11    occurred?

12         A.  Emma basically took -- or Walton took

13    Emma Gleckl into a cooler at SCI-Cambridge

14    Springs and intimidated her into performing oral

15    sex on him.

16         Q.  And did he also -- and that occurred on

17    several occasions; is that correct?

18         A.  Correct.

19         Q.  And did he -- was there also -- did you

20    also conclude that he had fondled her?

21         A.  Yes.

22         Q.  And that he kissed her breasts?

23         A.  Correct.

24         Q.  Now, when conducting this investigation,

25    did you focus at all on the issue of whether

```
1                M. Wolanin - by Mr. Krakoff
2      the inmate?
3           A.   In determining a code of ethics
4      violation?
5           Q.   Yes.
6           A.   No.   It just was an issue of
7      fraternization period.
8           Q.   And in terms of -- and in some of the --
9      in the Walton case, you recommended the filing
10     of criminal charges, didn't you?   Didn't you
11     sign a probable cause?
12          A.   Yes, I did.
13          Q.   Is that -- can amount to recommending
14     that the criminal process at least be initiated
15     by the DOC?
16          A.   Correct.
17          Q.   And in filing these criminal -- before
18     signing the probable cause, did you consider
19     whether or not what occurred to Gleckl was
20     consensual on her part?
21          A.   To reconsider if it was consensual?
22               MR. HALLORAN:   I'm going to object
23     to the form of the question.
24               MR. KRAKOFF:   I'm asking whether
25     that's an issue.
```

```
1                    M. Wolanin - by Mr. Krakoff
2         Q.   When you were conducting your
3    investigations, do you work under a premise one
4    way or another whether it is possible for an
5    inmate to actually give consent to sexual
6    activity with an office -- with a staff member?
7         A.   No.  An inmate has -- if she's
8    incarcerated or he's incarcerated, consent does
9    not enter the picture.
10        Q.   Why not?
11        A.   Because they're incarcerated, and that's
12   the way the section read.
13        Q.   Does the --
14        A.   The inmate's incapable of consenting.
15        Q.   Now, let me take you back to Exhibit 29
16   of Volume I.  That's an affidavit of probable
17   cause?
18        A.   That would be correct.
19        Q.   And if you can review that and tell me
20   if that was your -- the affidavit that you
21   executed in connection with the Walton/Gleckl
22   matter.
23        A.   It was.
24        Q.   And as a matter of OPR policy, did you
25   have to obtain somebody's authorization to
```

1              M. Wolanin - by Mr. Krakoff

2         A.   Correct.

3         Q.   And you also -- referring to Exhibit 30,

4    you also signed the criminal complaint?

5         A.   Correct.

6         Q.   Now, during -- in the course of the

7    investigation of Paul Walton, did you make any

8    effort to see whether his sexual activities in

9    relation to inmates included any inmates in

10   addition to Emma Gleckl, or was your

11   investigation limited to Emma Gleckl?

12        A.   I think we focused just on Emma Gleckl.

13        Q.   Now, either before you submitted the

14   report, the special investigation report, or

15   after, did you have a discussion with

16   Superintendent Wolfe about the substance of the

17   report?

18        A.   Did I, no.

19        Q.   And you don't know whether this was

20   distributed to Superintendent Wolfe or not; is

21   that right?

22        A.   I cannot say that.  I didn't.

23        Q.   You would prepare the report and, what,

24   submit it to --                          **A 156**

25        A.   Vaughn Davis.

1          M. Wolanin - by Mr. Krakoff

2      Q.  And then where it would go from there,

3    only Davis would know?

4      A.  Right.  That's beyond my control.

5      Q.  And where did the sex with Emma Gleckl

6    occur?  Where in the institution did you

7    determine that it occurred?

8      A.  Over various instances, it occurred in

9    different locations.  One was in the -- a dish

10   room.  One was in a laundry room and then in a

11   cooler.

12     Q.  Was that a walk-in --

13     A.  That's correct.

14     Q.  -- cooler?

15     A.  Yeah.

16     Q.  And Gleckl, was she mirandized by you?

17   You didn't mirandize her, did you?

18     A.  No.

19     Q.  Now, did you go to that cooler?  Did you

20   actually go down into the cooler and look into

21   it?

22     A.  Uh-huh, sure, yes.

23     Q.  And where were the other areas where you

24   learned that there was sexual activity?

25     A.  A dish room and somewhere else.

M. Wolanin - by Mr. Krakoff

1

2     Q.   You don't recall where?

3     A.   It's in the report.  I don't recall

4  without me reviewing the whole report.

5     Q.   Do you want to look at the report and

6  see if you can find that?

7     A.   In the laundry room.

8     Q.   Now, did you determine whether there was

9  any sort of a camera inside that walk-in cooler?

10     A.   No, there wasn't.

11     Q.   So unless somebody was actually inside

12  of the cooler, if the door was closed, couldn't

13  -- somebody from the outside couldn't see what

14  was going on in the inside?

15     A.   Correct.

16     Q.   Now, after the discovery that there had

17  been sexual activity in a cooler, did you or, to

18  your knowledge, anybody at OPR recommend that a

19  surveillance camera be installed in the cooler?

20     A.   No, not that I'm aware of.

21     Q.   Did OPR have any role in making

22  recommendations with respect to the improvement

23  of security in relation to its investigations?

24     A.   I'm sure the director could have made

25  suggestions.

```
1              M. Wolanin - by Mr. Krakoff

2      special investigations --

3         A.  Correct.

4         Q.  -- office assistance?  And this notes

5      that "on March 10, 1995, a preliminary

6      investigation was started on COT Richard Hammers

7      in regard to sexual contact with an inmate," and

8      it goes on from there, and then --

9                   MR. HALLORAN:  Can we indicate

10     that as a result of the preliminary

11     investigation, he was suspended pending a final

12     outcome?

13                  MR. KRAKOFF:  Yes, yes, sure.  I'm

14     not trying to hide that.   I'm -- that wasn't my

15     gear.

16                  MR. HALLORAN:  Oh, I know.  I just

17     wanted to state that.

18                  MR. KRAKOFF:  Right.

19        Q.  So that started on the 10th.  And then

20     on page nine of this document, which is part of

21     your report --

22        A.  Okay.

23        Q.  -- this notes, this investigation was

24     authorized by Vaughn Davis on March 16th,

25     correct?
```

1              M. Wolanin - by Mr. Krakoff

2         A.   Okay.  That was the standard format.

3         Q.   Right.  And then -- so you would have --

4    according to your summary of the interviews, you

5    interviewed Maysonet, Elizabeth Maysonet, on the

6    20th of March 1995, correct?

7         A.   Right.

8         Q.   And then she relates what occurred,

9    correct?

10        A.   Correct.

11        Q.   According to Maysonet, on the 17th of

12   January 1995 or thereabouts, she was in a room

13   in Kosmor Hall, and at some point, Hammers leans

14   into the room French-kissing her, feeling her

15   butt, thighs and breasts.  She did not want him

16   to do this, according to her; is that correct?

17        A.   Correct.

18        Q.   And then on February 7, 1995 while in

19   dietary, and dietary means the food service

20   area?

21        A.   That's correct.

22        Q.   With her sister, Officer Hammers came

23   in, saw her and motioned for her to meet him.

24   They met in the inmate bathroom.  Hammers was

25   crouching on the toilet, and they French-kissed.

1          M. Wolanin - by Mr. Krakoff

2    Hammers put his right hand down the front of her

3    pants and inserted his fingers into her vagina,

4    and then on the 16th, according to this, they

5    again kissed.

6          A.   That's according to Maysonet.

7          Q.   Yes.   Well, did you draw -- did you

8    reach any conclusions with respect to what

9    occurred here?

10         A.   Basically in the midst of this

11   investigation, Hammers resigned, and he refused

12   to be interviewed, and the case was -- due to

13   him resigning, that was sufficient for the DOC,

14   and it went no further; so actually no

15   conclusion whether he did these things or not.

16         Q.   Was reached?

17         A.   Right.   Okay.

18         Q.   Didn't you actually get to the point of

19   consulting with the District Attorney's Office

20   in Crawford County about the possibility of

21   bringing criminal charges?

22         A.   Yeah.   We identified a couple of

23   criminal charges, aggravated indecent assault

24   and indecent assault, under Subsection (a)(5) or

25   5, which indicates that the Maysonets were in

1    M. Wolanin - by Mr. Krakoff

2    He had already -- I believe he resigned.

3        Q.   Do you know whether that had any -- his

4    resignation had anything to do with allegations

5    that he had been involved in sexual misconduct

6    with an inmate?

7        A.   I'm not aware of that.

8        Q.   Does OPR take the position one way or

9    another with respect to when staff members

10   resign due to allegations of sexual misconduct

11   whether other members of the staff should be

12   told about why their resignation was occurring?

13       A.   Do we get involved in that?

14       Q.   Yes.

15       A.   No.  I don't.

16       Q.   Does OPR have a position with respect to

17   whether that information should be made known to

18   the staff?

19       A.   I don't believe.  We don't have the

20   position of going out and telling people what

21   the guy --

22       Q.   Resigned for?

23       A.   -- resigned for or whatever.  We don't

24   do that.  We try to maintain confidentiality.

25       Q.   Now, let me refer you to Exhibit 132.

1          M. Wolanin - by Mr. Krakoff

2    relationship of -- between CO Lawton and

3    Skipper?

4        A.   The only involvement that myself or my

5    office had was obtaining phone records regarding

6    the CO.  Did I ever talk to Skipper?  I don't

7    know her.  That's our only involvement.

8        Q.   And what were those phone records about?

9        A.   Skipper was allegedly making collect

10   phone calls from the institution to this --

11       Q.   Officer?

12       A.   Yes, this officer's location or house or

13   whatever it was at that time.

14       Q.   Exhibit 134, let's -- well, before we

15   get to that, I want to ask you about another

16   matter.  It's in the first volume.  Exhibit 27,

17   which the first page of it is your report in

18   connection with the investigation of James

19   Eicher, the complainant was Lisa Lambert.  And

20   if you turn to page 15, which is the first

21   attachment to your report, do you see that?

22       A.   Correct.  Got it.

23       Q.   Now, do you recall where you received

24   this attachment from or from whom you received

25   it?

1     M. Wolanin - by Mr. Krakoff

2  A.  I believe originally I received it by

3 way of Lazenby.

4  Q.  Do you know who wrote it, prepared this

5 document?  Were you told who prepared this

6 document?

7  A.  I believe another CO I, I can't recall

8 who it was, or CO sergeant or --

9  Q.  Now, you'll see in here -- and I'm not

10 going to go through all of these, but you'll see

11 the -- there are a number of staff members who

12 allegedly had physical contact with either Lisa

13 Lambert or other inmates at Cambridge Springs,

14 one in -- in addition to Eicher, there's

15 Montejo, M-O-N-T-E-A-O -- J-O, Officer Merry,

16 and that one goes back to late 1992 into 1993;

17 CO Rogers, CO Coffee and others.  Even CO Beck

18 was mentioned in connection with an inmate by

19 the name of DiBello (phonetic), and, of course,

20 these are allegations.

21  A.  Right.

22  Q.  But did you undertake to investigate any

23 of these allegations?

24  A.  Some we already looked into.  The

25 institution had the same information.

M. Wolanin - by Mr. Krakoff

Q.  Right.

A.  We did not look into anything on our
own.

Q.  Did anybody at the institution,
including but not limited to Wolfe, Kormanic and
Utz, ask you to investigate -- ask OPR generally
or you specifically to investigate these various
allegations contained in Attachment 1 of your
report?

MR. HALLORAN:  You mean other than
the ones they've already investigated?

MR. KRAKOFF:  That's right.

A.  Did anybody come to me and specifically
say look into this?

Q.  Yes.

A.  No.  They didn't do it to me.

Q.  Did they do it to anybody, to your
knowledge, at OPR?

A.  I can't -- I don't know.  I can't answer
that.

Q.  Did anybody at OPR say to you I want you
to investigation the allegations that are
contained in Attachment 1 of your report?

A.  Eicher, that's how this originally came

1          M. Wolanin - by Mr. Krakoff

2    about.  Any of the other ones, I can't recall.

3    Jim Merry was already looked into.

4         Q.  Was that Merry going back to 1992/'93 or

5    a more recent Jim Merry?

6         A.  That had to be more recent Jim Merry

7    because the Merry was in '94/'95 with Ms.

8    Maysonet.

9         Q.  Right, right.  So it wasn't this one?

10        A.  That's not that one.

11        Q.  Right.

12        A.  And I believe Merry was already gone

13   when we had this paper.

14        Q.  What about Rogers?  Did anybody ask you

15   to look into Rogers?

16        A.  When we got this document, he was

17   already out of Cambridge Springs.

18        Q.  Where was he?

19        A.  Another state institution somewhere.

20        Q.  In Pennsylvania?

21        A.  In Pennsylvania.

22        Q.  Did you -- do you know whether anybody

23   was asked to investigate Rogers at that other

24   institution?

25        A.  I don't know.

1          M. Wolanin - by Mr. Krakoff

2      Q.  But you didn't investigate anything at

3  Cambridge Springs relative to allegations

4  against Rogers; is that correct?

5      A.  No, I did not.

6      Q.  And then Coffee, did anybody ask you to

7  investigate Coffee?

8      A.  No, not myself.

9      Q.  Are -- and that included anybody at

10  Cambridge Springs or at OPR saying to you we

11  want you to investigate this?

12      A.  No.  Nobody at Cambridge Springs would

13  come directly to me.

14      Q.  And nobody at your office, meaning

15  Vaughn Davis or anybody else at your office,

16  asked you to investigate that; is that correct?

17      A.  Correct.

18      Q.  And can -- is the same true with respect

19  to the others; Schmitt, Beck, Stewart and Young?

20      A.  Yeah.

21      Q.  And Free?

22      A.  Correct.

23      Q.  Now, in terms of Eicher, you said you

24  already did investigate Eicher by the time you

25  issued this report, correct?

1          M. Wolanin - by Mr. Krakoff

2      A.   This was part of Eicher's report, I

3   believe.

4      Q.   Right, right.  Now, did you investigate

5   whether Eicher had any sort of physical contact

6   with an inmate by the name of E. Jones in early

7   1993?

8      A.   Did I do it, no, I did not.

9      Q.   Did anybody ask you to?

10     A.   No.

11     Q.   Did you investigate Eicher to see

12   whether he had had any sort of improper contact

13   with Elizabeth Maysonet and Hilda Maysonet in

14   the autumn of '93?

15     A.   Did we -- did our office look into

16   that?

17     Q.   Yes.

18     A.   No.

19     Q.   Were you asked to?

20     A.   No, I was not.

21     Q.   What about allegations that Eicher had

22   had contact with an Inmate P. Hoover in late '93

23   in the field house, at the yard and in the

24   basement of Curie Hall?

25     A.   I didn't look into that.

1          M. Wolanin - by Mr. Krakoff

2      Q.  Did anybody ask you to?

3      A.  No.

4      Q.  Why didn't you investigate to see

5  whether Eicher had as alleged inappropriate

6  contact with the Maysonets, with Hoover, with

7  the Maysonets and Hoover?

8      A.  I was never given a case in that

9  respect.

10     Q.  But you were given a document that said

11  that Eicher allegedly had been involved in

12  inappropriate contact with these other women,

13  the two Maysonets and Hoover, correct?

14     A.  Yeah, because it's part of the report.

15     Q.  Right.  And my question is, why didn't

16  you investigate to see whether Eicher had been

17  involved with those other inmates?

18     A.  I don't initiate investigations on my

19  own.

20     Q.  Did you go to anybody, though, at OPR or

21  at the prison level to say do you want me to

22  look into these as well about Eicher?

23     A.  I can't recall whether that occurred or

24  not.

25     Q.  These attachments, though, were attached

1          M. Wolanin - by Mr. Krakoff

2     to your report; is that correct?

3          A.   Correct.

4          Q.   And when you submitted your report, as

5     far as you know, all of those attachments

6     accompanied it?

7          A.   As far as I know.

8          Q.   Are those attachments routinely stapled

9     to the report?  Are they known as all one

10    document?

11         A.   Stapled or clipped.

12         Q.   Just all one document?

13         A.   Right.  When I submit it, it's all one

14    document, and where it goes from there, it's

15    beyond me.

16         Q.   Now, Exhibit 134 -- no.  Forget that.

17    I'm not going to question you about that.

18    That's after the time period that we're focusing

19    on.

20          Exhibit 135 is a memo from

21    Superintendent Wolfe to Deputy Commissioner

22    Fulcomer dated the 23rd of February 1996.  Do

23    you have that?

24         A.   Got it.

25         Q.   You'll see that he, Mr. Wolfe, reports,

M. Wolanin - by Mr. Krakoff

Q.  Let me ask you this.  Do you see the next page, which is page two of Exhibit 131?

A.  Right.

Q.  It says, Bill, and then it's underlined.  Superintendent Wolfe's name is William Wolfe?

A.  Correct.

Q.  Do you know whether it was customary for Vaughn Davis when sending memos or letters on to Superintendent Wolfe for Vaughn Davis to refer to Superintendent Wolfe as Bill?

A.  I can't answer that.

Q.  So you don't know whether he -- whether this was going on to William Wolfe or to somebody else, is that right, this November 8, 1994 from the desk of Vaughn Davis?

A.  I can't answer that.

Q.  I'll ask Mr. Davis that.  Now, let's turn to the next page of this memo.  You'll see -- it's page three of Exhibit 131.  It's December 5, 1994.  Do you have that?

A.  131, Exhibit 131?

Q.  Yes.

A.  The November 7th?  No?

```
1                M. Wolanin - by Mr. Krakoff

2        Q.  Well, the next one.  It's the last --

3        A.  Okay.

4        Q.  Apparently Wolfe sent the memo to

5   Bartlett.

6        A.  Correct, according to the memo.

7        Q.  According to the memo, right.  Let me

8   refer you to Exhibit 139.  Do you see this?

9        A.  Okay.

10       Q.  This is a --

11                MR. KRAKOFF:  Can we agree, Mr.

12  Halloran, that this exhibit was generated by

13  somebody at Cambridge Springs for this case?

14  Right?

15                MR. HALLORAN:  Yes.

16                MR. KRAKOFF:  Okay.

17       Q.  And these are -- this is kind of a table

18  or a chart that has been prepared, and you'll

19  see on the second page of Exhibit 139, it says

20  Richard Hammers, and if you look all of the way

21  over to the far right column, I think that's

22  supposed to say results.  That's the results

23  column.  It didn't come out in the copying.  Do

24  you see that?

25       A.  Okay.  I don't see Hammers.
```

1          M. Wolanin - by Mr. Krakoff

2      Q.  Hammers is the second from the top on

3  the --

4          MR. HALLORAN:  On the next page,

5  you can see it.

6      A.  Okay.

7      Q.  It says that OPR investigated this, and

8  then it says criminal charges filed.  But they

9  weren't actually charged -- filed in Hammers'

10  case?

11     A.  No.

12     Q.  Did you tell Hammers that you were going

13  to contact the District Attorney's Office to

14  discuss the possibility of criminal charges?

15     A.  I don't believe I did.

16     Q.  Do you have any information as to why

17  Hammers resigned when he did?

18     A.  I believe in the report, it listed

19  something to the effect of possible medical

20  reasons.

21     Q.  Yes.

22     A.  I can't give you a full --

23     Q.  That was the reason that Hammers gave?

24     A.  I think that's what he said.  I'm not --

25  if we could pull it up in a report, we can

```
 1              M. Wolanin - by Mr. Krakoff
 2    the effect of a person losing his or her
 3    pension?
 4         A.  I can't answer that.
 5         Q.  What about in your bargaining unit?  Is
 6    it -- I don't know if it's a bargaining unit.
 7    What about in your classification; do you know?
 8         A.  We're listed as confidential employees.
 9    I've never --
10         Q.  You don't know?
11         A.  I never came across that.
12         Q.  Let me refer you to the last line of
13    Exhibit 139.  It says Carl Zimmerman.
14         A.  Okay.
15         Q.  And then under the -- in the last column
16    where it says results, it says criminal charges
17    filed.  Is that what happened?
18         A.  That's inaccurate.
19         Q.  That's inaccurate?
20         A.  (Witness nodded head.)
21         Q.  Is that right?
22         A.  Correct.  Well, it was filed through
23    civil service, and he lost the appeals.
24         Q.  To the best of your -- oh, I'm sorry.
25                   (Witness confers with counsel.)
```