U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

LISA LAMBERT,       \*

    Plaintiff    \*NO.:

    vs    \*C.A. 96-247 - ERIE

SUPERINTENDENT,    \*

WILLIAM WOLFE, et.al.,\*

    Defendants    \*

    \*

\* \* \* \* \* \* \* \* \*


DEPOSITION OF

RONALD R. LAZENBY

JUNE 9, 1998


Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

A 187

Page 2

```
 1              DEPOSITION
 2                  OF
 3  RONALD R. LAZENBY, taken on behalf of the
 4  Plaintiff herein, pursuant to the Rules
 5  of Civil Procedure, taken before me, the
 6  undersigned, Shannon C. Hagerty, a Court
 7  Reporter and Notary Public in and for the
 8  Commonwealth of Pennsylvania, at
 9  Commonwealth of Pennsylvania, Department
10  of Corrections, SCI-Cambridge Springs,
11  Cambridge Springs, Pennsylvania, on
12  Tuesday, June 9, 1998, at 2:30 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2
 3  WITNESS:  RONALD R. LAZENBY
 4  EXAMINATION
 5      By Attorney Krakoff      7 - 147
 6  EXAMINATION
 7      By Attorney Love       147 - 154
 8  EXAMINATION
 9      By Attorney Halloran    154 - 155
10  CERTIFICATE                    156
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
 3  ANGUS R. LOVE, ESQUIRE
 4  924 Cherry Street
 5  Suite 523
 6  Philadelphia, PA  19107
 7      COUNSEL FOR PLAINTIFF
 8
 9  JERE KRAKOFF, ESQUIRE
10  1705 Allegheny Building
11  Pittsburgh, PA  15219
12      COUNSEL FOR PLAINTIFF
13
14  THOMAS HALLORAN, ESQUIRE
15  Sr. Deputy Attorney General
16  Litigation Section
17  6th Floor - Manor Complex
18  564 Forbes Avenue
19  Pittsburgh, PA  15219
20      COUNSEL FOR DEFENDANTS
21
22  ALSO PRESENT: Deputy Victoria L. Kormanic
23
24
25
```

Page 5

```
 1          E X H I B I T   P A G E
 2
 3                          PAGE
 4  NUMBER   DESCRIPTION      IDENTIFIED
 5              NONE MARKED
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

A 188

Page 10

1 Correctional Facility in Mercer, PA.
2 Q. Where were you before you came to
3 Cambridge Springs?
4 A. I came from SCI-Waynesburg. I
5 worked there from February of '88, to the
6 time I came in here which was February of
7 '92.
8 Q. All right. And then you were
9 somewhere before that?
10 A. Yeah, I started my career in
11 December of 1973 until February of '88 at
12 SCI-Pittsburgh. I was there, what, 14
13 years, 15 years, something like that.
14 Q. And did you make your way up from
15 a CO eventually to a captain?
16 A. Yes, I did.
17 Q. Now, it's my understanding that
18 at one time you were the Intelligence
19 Captain here at Cambridge Springs?
20 A. That is correct.
21 Q. And when did you assume that
22 position?
23 A. It would be somewhere late March
24 of 1995 until I left in October of '97.
25 Q. I understand that you succeeded

Page 11

1 Captain Bartlett?
2 A. That's correct.
3 Q. Do you know who succeeded you?
4 A. There was an acting Captain Beck
5 took my place. That's my understanding .
6 it was.
7 Q. Beck?
8 A. Beck.
9 Q. And he had been Lieutenant Beck
10 at one point here at Cambridge Springs?
11 A. Yes, yes. My understanding was
12 he was an acting captain. He took my
13 position when I left.
14 Q. Now, at the time you were
15 appointed to the position as Intelligence
16 Captain, what had your assignment been?
17 A. I was basically captain of the
18 guard.
19 Q. And just very generally what did
20 your function as captain of the guard
21 include? And I don't need a lot of
22 detail.
23 A. Yeah. Basically, I oversaw the
24 lieutenants to make sure they were at
25 their jobs and staff. And assigned

Page 12

1 people to shifts and stuff like that.
2 Q. Now, before becoming Intelligence
3 Captain, had you had any direct
4 involvement in investigations at
5 Cambridge Springs? And I'm not limiting
6 it to investigations of alleged sexual
7 misconduct on the part of staff members.
8 A. Before I became Intelligence
9 Captain? No, basically no. That would
10 have been the --- at first it was the
11 security lieutenant then the Intelligence
12 Captain. No, it'd still be no.
13 Q. Now, did you receive --- how much
14 notice did you have that you were going
15 to be appointed captain, intelligence
16 captain?
17 A. They brought me up here, I'd like
18 to say, sometime late March, early April
19 and just said it's your --- you know,
20 you're going to be --- now be
21 Intelligence Captain. Bartlett will be
22 the captain of the guards.
23 Q. So you switched positions
24 essentially?
25 A. Yes.

Page 13

1 Q. And how much --- you learned that
2 one day and how much after that did you
3 begin to function as the intelligence
4 captain? According to what period of
5 time?
6 A. We had like a transitional
7 period. Where he put me up to speed what
8 he was, you know, what he was doing and
9 told me to look over his files and stuff
10 like that.
11 Q. Did you receive any training
12 either on the job or more formal training
13 off site or on site in the nature of kind
14 of classroom instruction?
15 A. Oh, I'll go back. I have a
16 degree in ---
17 Q. We'll get to that.
18 A. Okay.
19 Q. But let me narrow it because that
20 was too broad of a question. And then
21 I'd like you to continue with what you    A 189
22 were saying. With respect to the new
23 position as intelligence captain, did you
24 receive any training either on site or
25 off site?

Page 14

1  A.  No.
2  Q.  But I take it that you had some,
3  what you consider to be some background
4  to prepare you for that position?
5  A.  Any experience as you grow ---
6  what 24 or what was it 23 years, you
7  know, you pick it up watching other
8  people do it.
9  Q.  Right.  Okay.  Now, after
10  assuming your position, did you receive
11  any training?
12  A.  I had to after.  Some formal
13  training, it would have been September,
14  1997 and what I picked up from Special
15  Investigator Mike Wolanin and I sort of
16  --- he's the professional.  And so when
17  he came in to talk I would watch what he
18  would do and we'd go over stuff, how he
19  did things.
20  Q.  Now, did you, when Wolanin was
21  conducting investigations at Cambridge
22  Springs, in the course of those
23  investigations, did you ever observe him
24  while he interviewed either staff member
25  or inmates?

Page 15

1  A.  Yes, I did.
2  Q.  Now, let me represent to you what
3  Lieutenant, what I believe Lieutenant
4  Bartlett told me and ask you whether your
5  experience ordinarily differed from his.
6  I asked Lieutenant Bartlett whether, when
7  Mr. Wolanin was interviewing either
8  witnesses or a person about whom
9  allegations had been made, that it was
10  Wolanin's practice not to have Lieutenant
11  or Captain Bartlett in the room with him.
12  Wolanin's practice, in Captain Bartlett's
13  experience, was to conduct the interviews
14  with Bartlett elsewhere, not inside the
15  room.  Now, I gathered from your response
16  to my previous question that wasn't quite
17  your experience; is that right?
18  A.  No, sometime --- what we'd do
19  we'd start out, he'd do the interviewing.
20  I would put my input into it.  And if we
21  got to a point where he felt my being
22  there, he couldn't get what he was
23  looking for I would, he would sometimes
24  ask me to leave the room.
25  Q.  So it wasn't that uncommon for

Page 16

1  you to be there during at least a portion
2  of Wolanin's interrogation?
3  A.  No, it was not.
4  Q.  Could you summarize for me what
5  your function was in connection with
6  investigations of --- and I'm going to
7  give you a definition so that you
8  understand what I'm asking.  I gave
9  Lieutenant Bartlett the same definition.
10  What I'm going to be asking you about are
11  either allegations or investigations of
12  alleged sexual abuse or sexual
13  exploitation.  And I --- when I'm asking
14  about that, I'm asking about abuse and
15  exploitation by a staff member which can
16  include either a CO or somebody in the
17  trades or ---.
18  A.  I'm confused but go ahead and
19  I'll try to work with it.
20  Q.  Let me define what I mean by
21  sexual abuse and sexual exploitation.
22  This phrase encompasses activities such
23  as the touching of breasts by Cambridge
24  Springs personnel, buttocks, legs and
25  other private parts of the body of an

Page 17

1  inmate.  The kissing, caressing or
2  fondling of an inmate.  Attempts by
3  prison personnel to force or encourage
4  inmates to engage in sexual acts either
5  by words, threats or physical force.  Do
6  you understand that definition?
7  A.  Yes.
8  Q.  So that the definition is far
9  broader than sexual intercourse.
10  A.  Absolutely.
11  Q.  And when I ask you --- I may also
12  use a short term phrase which I used when
13  I questioned Lieutenant Bartlett.
14  Instead of always repeating sexual abuse
15  and exploitation I would use something
16  like sexual misconduct or allegations of
17  sexual misconduct.  They're
18  interchangeable.
19  A.  If I'm confused I'll ask you just
20  in case.
21  Q.  Yes, and I'd be glad to review
22  that definition with you again either now
23  or later.
24  A.  Okay.
25  Q.  Do you want me to review it now?

A 190

Page 18

1  A.   No, it's okay.
2  Q.   Now, have you brought any
3  institutional files with you today?
4  A.   No, I'm no longer at the
5  institution. I no longer have access to
6  any files.
7  Q.   Have you reviewed any
8  institutional files including but not
9  limited to investigative files,
10 misconduct records, fact-finding ---
11 notes of fact-finding sessions or any
12 other documents before this deposition?
13 A.   I talked to Mr. Halloran and a
14 few light things. Nothing big.
15 Q.   I have no right to even inquire
16 about --- I don't want to inquire about
17 what you discussed with him. I might
18 have a right.
19 A.   I didn't look at the file, you
20 know what I mean?
21 Q.   Now, have you reviewed any
22 portions of the transcript of the
23 depositions of Deputy Kormanic or
24 Superintendent Wolfe? I'll represent to
25 you that I deposed him about a year ago.

Page 19

1  A.   No, I have not in either case.
2  Anybody's.
3  Q.   Now, who at the prison level ---
4  and I'm always going to be asking, if I
5  speak in present tense, I know you're
6  gone from there but sometimes I may use
7  the present. You understand that means
8  when you were here?
9  A.   Yes.
10 Q.   Who at the prison level had the
11 authority to either order or authorize an
12 investigation into possible sexual abuse
13 or exploitation on the part of Cambridge
14 Springs personnel?
15 A.   Superintendent.
16 Q.   Did anybody --- did you have any
17 occasions where somebody at the Central
18 Office level either Mr. Wolanin or
19 others, Mr. Davis or others at the
20 Central Office contacted you and either
21 ordered or asked you to conduct an
22 investigation, or did that always come
23 through the Superintendent?
24 A.   It always came through the
25 Superintendent. You know, whether they

Page 20

1  went to him and it filtered down through
2  me. I never got anything directly from
3  the OPR's office that said do this. It
4  would come from the Superintendent's
5  office.
6  Q.   And OPR is just a new way of
7  referring to ---
8  A.   Office of Professional
9  Responsibilities.
10 Q.   OSI or something?
11 A.   Office of Special Investigations.
12 They just changed the name recently.
13 Q.   That's correct. Now, am I ---
14 are there occasions where you, meaning
15 you or your lieutenant or others on your
16 behalf conducted an investigation on the
17 local level without the assistance of
18 anybody from the Central Office?
19 A.   Yes, we have.
20 Q.   And were there occasions when the
21 Central Office conducted an
22 investigation, by Central Office you know
23 what I mean?
24 A.   Yes, I understand.
25 Q.   Was the Central Office conducting

Page 21

1  an investigation without any
2  participation on the part of local
3  people, other than acting as a liaison or
4  facilitator?
5  A.   Not to my memory, no.
6  Q.   Were there occasions when the
7  Central Office did conduct investigations
8  into alleged sexual misconduct in the
9  part of a staff member against an inmate?
10 A.   You mean had they come in here
11 and done the ---
12 Q.   Yes.
13 A.   Yes, they have.
14 Q.   And I take it that on the
15 occasions that they came here they were
16 assisted by members of your staff?
17 Either you or ---?
18 A.   Yes, we usually help.
19 Q.   And what was the nature of the
20 assistance that either you or members of
21 the Cambridge Springs staff forwarded the
22 Central Office investigators?          A 191
23 A.   If I understand your question,
24 basically, we collected maybe statements
25 and that and handed everything over to

Page 26

1 was --- something was happening. If they
2 were exonerated and nothing took place
3 and they didn't have any PDC you knew
4 that they were ---
5 Q.    You draw the inference?
6 A.    Yeah, you draw the conclusion
7 that there was nothing there.
8 Q.    Now, what about when --- are you
9 ever aware of a situation where the
10 conclusion of the investigation was that
11 a staff member had engaged in sexual
12 misconduct?
13 A.    Not quite --- I don't understand
14 the question. If you could ---?
15 Q.    Are you aware of any staff member
16 from 1992 until the time you assumed your
17 duties as an intelligence captain, were
18 you aware of either the Central Office or
19 local investigators concluding that a
20 member of the staff had engaged in sexual
21 misconduct?
22 A.    Yes.
23 Q.    And how did you become aware of
24 that?
25 A.    Basically, you just hear rumors

Page 27

1 going on. Nobody actually came to me and
2 said, we're doing an investigation on
3 such and such this person. But, you
4 know, you see things going on. You hear
5 rumors.
6 Q.    And nobody came to you and said
7 ---
8 A.    No.
9 Q.    --- such and such we found that
10 Mr. X had engaged in sexual misconduct?
11 A.    No, they didn't come and tell me
12 that.
13 Q.    To your knowledge was this
14 published, you know, in the form of a
15 memo or anything else of that sort to the
16 staff?
17 A.    No, not to my knowledge.
18 Q.    Now, okay, let me throw these
19 names --- let me preface this with ---
20 this is information that has been related
21 to me from various sources. And then
22 when I ask you whether you heard anything
23 about that doesn't necessarily mean that
24 it occurred. Okay. Does the name Carl
25 Zimmerman sound familiar?

Page 28

1 A.    Yes.
2 Q.    And what was his position when
3 ---?
4 A.    He was a maintenance
5 superintendent, I believe was his title.
6 Q.    Are you aware of any
7 investigation occurring on Carl
8 Zimmerman's relationship with Cambridge
9 Springs ---
10 A.    I heard the rumors.
11 Q.    --- with a Cambridge Spring
12 inmate or inmates?
13 A.    I had heard the rumors.
14 Q.    Are you aware of what happened to
15 Mr. Zimmerman?
16 A.    No.
17 Q.    You know at some point there came
18 a time where he no longer worked here?
19 A.    Yes.
20 Q.    Do you know whether he resigned
21 or whether he was discharged?
22 A.    I have no idea.
23 Q.    You had heard rumors that he was
24 being investigated?
25 A.    Yes, like I said people talk.

Page 29

1 But I wasn't made privy to the
2 investigation or anything else.
3 Q.    And so with respect to Carl
4 Zimmerman, you never received any
5 information of a solid nature that there
6 had been any sort of a determination that
7 he had engaged in sexual misconduct?
8 A.    No, I never saw anything.
9 Q.    According to the rumor mill were
10 any inmates mentioned in connection with
11 Carl Zimmerman?
12 A.    Oh, I'm sure there were but I
13 have no idea who they would be.
14 Q.    You don't have any --- okay.
15 A.    No, I wouldn't.
16 Q.    Paul Walton?
17 A.    Yes.
18 Q.    Are you familiar with him being
19 investigated?
20 A.    Yes, I was.
21 Q.    Did this happen during the time
22 that you were the intelligence captain?
23 A.    No.
24 Q.    Before right?
25 A.    Before.

A 192

Page 34

1 Q.   But there was something that in
2 your mind led some credence to
3 allegations that Eicher had somehow ---?
4 A.   Yes, that was inappropriate
5 behavior.  At the time, that's was what
6 my feeling was.
7 Q.   And now that ultimately then, was
8 the --- at the time that you spoke with
9 Lisa was there an ongoing investigation?
10 A.   Not to my knowledge.
11 Q.   Did a new investigation begin
12 after you saw the calendar?
13 A.   Yes, yes.
14 Q.   And how was that triggered?
15 A.   Basically, ---
16 Q.   I know you told me you got some
17 information ---
18 A.   Yes, and I notified the
19 Superintendent.  I believe it was one or
20 two days after that I went to National
21 Guard.  I was in the Pennsylvania
22 International Guard.  I went to summer
23 camp out in Nevada and I never saw
24 anything more about it but it was the end
25 of mine and OPR came in and Lieutenant

Page 35

1 Beck.  And I was never involved in it
2 again.
3 Q.   Did Lieutenant Beck on the
4 institutional level have some
5 involvement?
6 A.   Yes, he did.  That's my
7 understanding any ways.  Evidently,
8 you're looking for the --- she said she
9 had more because I asked her, do you have
10 anymore.  She said she had more.  Her
11 attorney had it and she was trying to get
12 transferred and all that.  I said, Lisa,
13 you know, I'm not in a position --- I
14 can't make deals.
15 Q.   Okay.
16 A.   If there was more evidence than
17 that, I never did see it.
18 Q.   I'm going to come back to the
19 Lambert situation a little later.  Let me
20 refer you to Exhibit 27.  And you have a
21 copy of that there.  You'll notice I have
22 the numbers of the pages on the bottom
23 (indicating).  If you can turn to page
24 29?
25 A.   Does it start off with I ---?

Page 36

1 Q.   I can't ---.
2 A.   Okay.  I'm on the same page.
3 Q.   Can you flip through these pages,
4 29 onward, and tell me were there any of
5 ---?
6 A.   That does not look familiar.
7 Q.   No?
8 A.   Uh-huh (yes).
9 Q.   Now, do you recall investigating
10 or recommending an investigation of
11 Eicher in connection with any other
12 women, another Cambridge Spring woman?
13 A.   Not that I remember, no.
14 Q.   Let me give you some names and
15 see if any --- if you might have, Paula
16 Hoover?
17 A.   No.
18 Q.   Elizabeth Jones?
19 A.   No.
20 Q.   You heard of the Maysonet sister?
21 A.   No.
22 Q.   Another staff member, Jim Merry,
23 do you know anything about his being
24 investigated?
25 A.   Yeah, I caught the very end.

Page 37

1 That was already an ongoing or they had
2 already did something with it because I
3 remember about the time I took over I
4 went out with Michael Wolanin to
5 interview a person.  He wanted to take me
6 up and show me how, you know, the police
7 powers to track this person down.
8 Q.   Now, was this person a former
9 staff member or current staff member?
10 A.   No, it was somebody that owned a
11 kung fu shop that Merry had used to ---
12 Merry, he was a member of it and he was
13 using --- allegedly using the phone at
14 this person's to call, I think, Maysonet.
15 I'm not sure what sister.  I'm not sure.
16 Like I said, I caught the very end of
17 that.
18 Q.   Do you recall any investigation
19 of Merry in connection with Carmella
20 Bynum?                              A 193
21 A.   No.
22 Q.   Is Merry still here?
23 A.   No, he was gone by the time I ---
24 he was already gone by the time --- when
25 I got involved I think it was April.

Page 38

1  Q.   He was already gone?
2  A.   He was already gone.
3  Q.   Were you told by anybody in the
4  administration why he was gone?
5  A.   Not to my knowledge. I don't
6  remember actually coming and saying this
7  is why Officer Merry is gone, no.
8  Q.   Do you recall any more
9  generalized announcement to other staff
10 members indicating why Merry was gone?
11 A.   No, if you're asking if they put
12 out for publication to let people know.
13 No, that's never been the practice.
14 Q.   To do that?
15 A.   To publish, yeah, to publish
16 stuff like that.
17 Q.   Roger Beck, is that Captain Beck
18 now?
19 A.   No, he's a Lieutenant. He was
20 acting. Now, he's back to Lieutenant
21 Beck.
22 Q.   Are you aware of his being
23 investigated at any point in connection
24 with alleged sexual misconduct?
25 A.   No.

Page 39

1  Q.   Do you know an inmate by the name
2  of Marjoline DeBello?
3  A.   The name's familiar. I do not
4  know, you know, the name. I do not know
5  the inmate personally.
6  Q.   Jerome Coffee, are you aware of
7  his being investigated?
8  A.   No.
9  Q.   Were you aware of any rumors
10 about his being involved with any of the
11 prisoners?
12 A.   Seems like there was something
13 and I don't know --- I know it was looked
14 into. But I remember something about it
15 but I didn't care to know.
16 Q.   Does Marita Diaz sound familiar?
17 A.   Diaz?
18 Q.   Diaz.
19 A.   Her name sounds familiar but ---.
20      DEPUTY KORMANIC:
21           Marissa.
22 A.   Yeah, I was going to say Marissa
23 Diaz.
24 BY ATTORNEY KRAKOFF:
25 Q.   What about Phillip David Schmidt,

Page 40

1  are you aware of any allegations of his
2  being involved in any sexual misconduct
3  toward an inmate?
4  A.   I had heard it or something but
5  I'm not even sure when I heard it.
6  Q.   Do you remember what you heard?
7  A.   No.
8  Q.   And I take it you're not aware of
9  what inmate or inmates he was allegedly -
10 --
11 A.   No, I don't remember details at
12 all. Like I said, you hear stuff.
13 Q.   Bob Rogers, did you hear anything
14 about him?
15 A.   Not right off the top of my head,
16 no. He was a lieutenant here.
17 Q.   Is he still here?
18 A.   No.
19 Q.   Do you know why he left?
20 A.   He asked to be transferred. He
21 took a demotion and transferred to
22 Mercer. He works at Mercer with me.
23 Q.   Wayne Young, plumbing trades
24 instructor, I understand?
25 A.   Yeah, there was something about

Page 41

1  it. I don't remember well. I don't know
2  if it was any sexual allegations or just
3  bringing stuff in for inmates. I'm not
4  sure what it is right off the top of my
5  head.
6  Q.   When you assumed your position or
7  at anytime after you assumed it during
8  that approximately two-year period, were
9  you ever told either by the
10 administration here at Cambridge Springs
11 or the Central Office that bringing ---
12 about the significance if any, of a staff
13 member bringing in gifts for an inmate?
14 A.   That's been since my --- since I
15 started with the department back in '73.
16 That has always been a no-no.
17 Q.   Were you told why?
18 A.   I'm sure I was but common sense
19 would tell you that, you know, it's
20 inappropriate to bring things for
21 inmates. It's been longstanding with the
22 department.
23 Q.   Did you in any of the
24 investigations that you conducted, did
25 any of those investigations involve, I'm

A 194

Page 46

1 Q. You don't remember; is that
2 right?
3 A. It would --- yeah, really.
4 Q. Were you a friend of Officer
5 Raun's?
6 A. No, co-worker.
7 Q. You didn't socialize with him?
8 A. No.
9 Q. Did you at any point in 1993,
10 call Lisa to your office to speak with
11 her about the Raun situation?
12 A. Did I call for her? No, I
13 wouldn't have been involved in it.
14 Q. Did you have her brought to the
15 office?
16 A. Not that I remember.
17 Q. Did Bartlett, while he was in the
18 office have Lisa Lambert brought to your
19 office?
20 A. He could have. That would have
21 been more appropriate for him to call her
22 --- call her over, if he was involved in
23 the investigation than me.
24 Q. Do you recall a meeting, I'm told
25 that it was Bartlett's office. Do you

Page 47

1 recall meeting in Bartlett's office,
2 where Bartlett and you and Raun were
3 present and Lisa Lambert was also
4 present?
5 A. There's a possibility.
6 Q. And can you tell me what you
7 recall about that possible meeting? I'd
8 like you to think very carefully about it
9 and as much detail as possible and tell
10 me what you recall?
11 A. I can't think, Raun, even if he
12 brought her or had her called over.
13 Basically, if he --- if you were talking
14 to an inmate about other staff, you'd
15 want like a witness, to make sure, you
16 know, nothing was misunderstood. Again,
17 you didn't want to get caught in a
18 situations where they could accuse you of
19 doing something. But if you're talking
20 about exactly what took place, no, I'm
21 not sure.
22 Q. Do you remember generally what
23 took place?
24 A. If it was Lisa Lambert, there was
25 an investigation. It probably had to be

Page 48

1 an investigation or ---.
2 Q. Do you know? I don't want you to
3 guess.
4 A. It was a lot of times that I sit
5 in on meetings. If it was particulars, I
6 couldn't tell you. It was particulars I
7 couldn't --- there were a lot times I sit
8 in on meetings.
9 Q. Do you know whether this meeting
10 concerned either Raun's alleged behavior
11 toward Lisa Lambert or Lisa Lambert's
12 alleged behavior toward Raun?
13 A. No, I don't remember.
14 Q. Do you recall Lisa Lambert crying
15 at that time?
16 A. I don't remember Lisa Lambert
17 ever crying.
18 Q. Never?
19 A. No, not right off the top of my
20 head, no.
21 Q. Do you recall getting angry at
22 Lisa Lambert?
23 A. I don't get angry at anybody.
24 Q. Well, whether you were angry or
25 not, did you become harsh in your ---?

Page 49

1 A. No, I wouldn't. That's not my
2 personality.
3 Q. Are you aware of Bartlett being
4 investigated in relation to allegations
5 that he hadn't conducted an inadequate
6 investigation into the Raun situation?
7 A. No. No, there would have been
8 --- I wouldn't have done it. We wouldn't
9 investigate each other. They would have
10 brought someone in from outside if it
11 took place.
12 Q. Did you at any point warn or
13 caution or tell Lisa Lambert that she
14 better not get Raun into any trouble?
15 A. No.
16 Q. Were you at any point ever
17 interviewed as part of an investigation
18 of Officer Raun's alleged behavior toward
19 Lisa Lambert?
20 A. No, no.
21 Q. Were you ever interviewed as part
22 of an investigation of Captain Bartlett?
23 A. Not that I would know.
24 Q. Now, are you aware of an Officer
25 by the name of Emmanuel Montejjo?

A 195

Multi-Page

Page 50

1  A.  Yes.
2  Q.  Did you hear of any allegations
3  of any sexual misconduct on his part
4  toward staff --- toward inmates?
5  A.  Not by your definition, no.
6  Maybe inappropriate behavior, you hear
7  the stuff. It was ---.
8  Q.  Just a rumor?
9  A.  Yeah, I don't remember going
10  anywhere with it.
11  Q.  What about Bill Free?
12  A.  Nothing sexual I remember.
13  Q.  Anything in connection with
14  either Lisa Lambert or an inmate by the
15  name of LeAnn Jafka?
16  A.  No, not that I recall, no.
17  Q.  Had you heard anything of a non-
18  sexual relation that related with his
19  dealings with inmates?
20  A.  No.
21  Q.  Are you aware of a person,
22  laundry supervisor here at the prison one
23  time, his name was Requine?
24  A.  Requine?
25  Q.  Yes.

Page 51

1  A.  Yes.
2  Q.  R-E-Q-U-I-N-E or something like
3  that.
4  A.  Yes, I'm not sure how the
5  spelling is. Yes, he was --- he worked
6  in the laundry.
7  Q.  At any point, did you hear that
8  he was under investigation for alleged
9  sexual misconduct?
10  A.  No, no.
11  Q.  Do you know the circumstances of
12  why he left here?
13  A.  He really had bad health.
14  Q.  Bad health?
15  A.  Uh-huh (yes). I think he's dead.
16  He might be deceased by now, I'm not
17  sure.
18  Q.  What about Richard Hammers? Do
19  you recall anything about his being
20  investigated or allegations made about
21  him?
22  A.  Allegations but I can't remember
23  right off the top of my head what they
24  were.
25  Q.  You weren't involved in the

Page 52

1  investigation associated with Hammers?
2  A.  No.
3  Q.  What about a staff member by the
4  name of Randolph?
5  A.  Yes.
6  Q.  Do you recall, was he an officer?
7  A.  No, he was a maintenance person,
8  an electrician.
9  Q.  And did you hear any allegations
10  of sexual misconduct on his part?
11  A.  No, they weren't sexual in
12  nature.
13  Q.  What about Lieutenant Mort?
14  A.  I was --- I heard them. That's
15  about it.
16  Q.  What were the allegations?
17  A.  I'm not even sure what they were.
18  He like resigned. He come in on Sunday
19  or Saturday and resigned on a Monday.
20  Q.  Jennifer Langford; did you hear
21  any allegations about her?
22  A.  Something about it. I couldn't
23  ---
24  Q.  You don't remember what?
25  A.  No.

Page 53

1  Q.  Martin Miller?
2  A.  Yes, I'm aware of that.
3  Q.  Were you involved in
4  investigating him?
5  A.  Yes, I was, along with OPR or I
6  helped OPR.
7  Q.  And Linda Bisch, from dietary?
8  A.  I heard about that one. I wasn't
9  involved in it.
10  Q.  What did you hear about that?
11  A.  Something with an inmate.
12  Q.  Was it of a sexual nature or
13  romantic nature?
14  A.  Maybe romantic nature. I don't
15  remember hearing anything sexual about
16  it.
17  Q.  Lisa Strickland?
18  A.  That doesn't ring a bell at all.
19  Q.  Bruce Allen?
20  A.  I heard something about him. He
21  resigned. I don't think his was --- he
22  was involved in anything.
23  Q.  CO Lofton?
24  A.  Yes.
25  Q.  What did you hear about him, if

A 196

Page 54

1 anything?
2 A. I'm trying to think if I did the
3 investigation. If I remember right, he
4 was --- he wanted to make a phone call to
5 an inmate or something like that. It was
6 nothing sexual.
7 Q. Okay.
8 A. And I could be ---.
9 Q. Was she a former inmate or
10 current inmate?
11 A. Former.
12 Q. You mean he tried to make a phone
13 call from ---
14 A. If I remember, yeah. He was
15 trying ---.
16 Q. --- from here?
17 A. No, he was going to have her
18 contact him.
19 Q. Okay.
20 A. And that could be --- I'm trying
21 to think if that's the guy.
22 Q. Maybe not?
23 A. No. Yeah.
24 Q. Now, did you have any discussion
25 with Superintendent Wolfe in connection

Page 55

1 with how he viewed the level of sexual
2 abuse or exploitation at the prison?
3 A. He would not tolerate it
4 whatsoever. He actively went after
5 people, had me actively go after people.
6 Q. Did he ever indicate to you or in
7 your presence how significant he thought
8 the scope of any problem was associated
9 with sexual abuse or exploitation of
10 inmates?
11 A. I'm not sure what you're asking.
12 Q. Well, did he ever say like ---
13 I'm trying to get a sense of how serious
14 he thought the problem was of sexual
15 misconduct on the part of officers toward
16 inmates, which could be anything from
17 zero to a hundred.
18      ATTORNEY HALLORAN:
19          I think he already
20 answered the question, that he
21 thought --- he said he wouldn't
22 tolerate it. What you're trying
23 to ask him now is how prevalent
24 he felt the problem was. Which
25 is a different ---.

Page 56

1      ATTORNEY KRAKOFF:
2          That's right. Whether
3 the Superintendent ever expressed
4 to him ---
5      ATTORNEY HALLORAN:
6          One way or the other.
7      ATTORNEY KRAKOFF:
8          --- one way or the other
9 how significant or how prevalent
10 he thought the problem was.
11 A. Not to my knowledge, no.
12 BY ATTORNEY KRAKOFF:
13 Q. Okay.
14 A. I mean he didn't sit down and we
15 have a serious problem and --- if that's
16 what you're asking. No, he never
17 discussed that kind of stuff with me.
18 Q. Did he ever indicate to you
19 without using an adjective, I mean, did
20 he indicate to you in other ways the
21 extent, if any, to which he thought it
22 was a significant problem?
23      ATTORNEY HALLORAN:
24          I'm going to object to
25 the form of the question. You

Page 57

1 can't --- the word significant
2 has two different meanings. You
3 can use it in two different ways.
4 BY ATTORNEY KRAKOFF:
5 Q. The same question that I asked
6 originally about Superintendent Wolfe
7 about whether he ever indicated the
8 magnitude of the problem in his mind to
9 you. Did Deputy Kormanic?
10 A. No.
11 Q. What about Deputy Utz?
12 A. No, I didn't have much contact
13 with Deputy Utz.
14 Q. Did Keith Bartlett during that
15 transition period ever indicate to you
16 how significant he thought the problem
17 was?
18 A. No. Not to my knowledge, no.
19 Q. How long did that transition
20 period last?                      A 197
21 A. It was like two or three weeks.
22 You have to go back once you're doing
23 something like that and you're, you know,
24 what's going on, if I was reading
25 something or heard something, have you

Page 62

1  when they expressed it.  Do you recall
2  any memos or written documents, where
3  they expressed a view of what they
4  thought the magnitude of what the quote,
5  the problem was?
6  A.    Not that I ever read, no.
7  Q.    Let me refer you to Exhibit 27,
8  which is in the first volume.
9  A.    I'm on the page.
10 Q.    This concerns an investigation of
11 James Eicher.
12 A.    Yes.
13 Q.    And the second page, where it
14 says synopsis.  Michael Wolanin states
15 that quote, this investigation was
16 authorized by Vaughn L. Davis, Director
17 of Special Investigations Office, IO on
18 May 24, 1995, predicated by memo to the
19 Director from Captain Ronald Lazenby,
20 State Correctional Institution Cambridge
21 Springs.
22     So does this refresh your
23 recollection that during your tenure
24 there was an investigation of Eicher?
25 A.    Yes.

Page 63

1  Q.    Okay.
2  A.    But I wasn't involved in it.
3  Q.    And this makes reference to a
4  memo and you'll see on page five, if you
5  turn to page five.  Do you see where it
6  says details?  You'll see the last line.
7  It says a copy of Lazenby's memo is
8  appended as attachment number one.
9  A.    Yes.
10 Q.    And then if you turn to page   15
11 of this Exhibit, you'll see on pages 15
12 and 16 a two-page document which is
13 identified as attachment one.
14 A.    Yes, but that's not mine.
15 Q.    That's not yours?
16 A.    No.
17 Q.    Okay.
18 A.    It's not my handwriting.
19 Q.    Why don't you look at the
20 information and tell me whether you
21 remember any of this information coming
22 to your attention in some other form?
23     Well, had you seen these
24 allegations in either this document or in
25 some other document more or less during

Page 64

1  that time period?
2  A.    It doesn't ring a bell, no.
3  Q.    Now, do you recognize the
4  printing or do you believe that you
5  recognize the printing?
6  A.    No, I just know it's not mine.
7  I'm not a very good printer.
8  Q.    Now, let me refer you to Exhibit
9  125.  It's the very last document.
10 A.    Yes.
11 Q.    This is a document dated the 6th
12 of May 1995.
13 A.    Uh-huh (yes).
14 Q.    6th of May 1995.  It's apparently
15 from J. Metzger --- is that Officer Jill
16 Metzger?
17 A.    I'm not --- it's a female
18 officer.
19 Q.    And do you see on the very top of
20 the right hand corner it says cc Lazenby?
21 A.    That's correct.
22 Q.    And also S-U-P-T, which I assume
23 is superintendent?
24 A.    Uh-huh (yes).
25 Q.    And you'll see on the second page

Page 65

1  of this document, which I think might be
2  the same, looks similar.
3  A.    Yes, it does.
4  Q.    Now that you see Exhibit 125, do
5  you have a recollection of ever reviewing
6  this document?
7  A.    No.
8  Q.    You became the intelligence
9  captain at the end of March, so you ---
10 A.    Yes.
11 Q.    --- by May 6th, you would have
12 been the intelligence ---?
13 A.    That's correct.
14 Q.    Were you working at the prison on
15 or about the 6th of May 1995?
16 A.    I'd have to look at a calendar.
17 Q.    I mean, you weren't ---?
18 A.    Yeah, I was here.  If it was the
19 next day or something I got vacation.
20 Q.    You'll notice it says actions
21 taken.  It says, reviewed, previously
22 brought to my attention and turned over
23 to Deputy Kormanic and Captain Lazenby.
24 A.    Yes.
25 Q.    This is signed by Lieutenant

A 198

Page 66

1 Foster?
2 A.  Yes.
3 Q.  Do you have any recollection of
4 Lieutenant Foster giving you a document
5 of this sort?
6 A.  No, not right off the top of my
7 head.  I did not always get things that
8 were --- that would be cc'd to me.  I
9 just didn't get them all the time.
10 Q.  So --- you can see the various
11 officers and other personnel who were
12 named in this two-page attachment to
13 Officer Metzger's report, ---
14 A.  Yes.
15 Q.  --- that these concerned Eicher,
16 not only in connection with Lisa Lambert,
17 but other allegations that Eicher had
18 contact with other female prisoners in
19 1993 and 1994; isn't that ---?
20 A.  That's what it says.
21 Q.  Isn't that what it says?
22 A.  Yes, that's what it says.
23 Q.  And this document also reflects
24 that there were other officers other than
25 Eicher who allegedly had contact with

Page 67

1 inmates of, you know, involving alleged
2 sexual abuse or exploitation; isn't that
3 correct?
4 A.  Well, it says contact.  I'm not
5 sure what they meant by contact.
6 Q.  Okay.
7 A.  Some of it says physical contact.
8 Some of it just says alleged contact.
9 Q.  Right.
10 A.  And that was all before my time.
11 Q.  But in any event, this
12 information just never came to you
13 anyway?
14 A.  It doesn't, no.
15 Q.  It didn't?
16 A.  It could have been placed --- no.
17 Q.  What about the report itself?
18 What about Wolanin's report itself, which
19 did contain that memo on September 11,
20 1995, were you in the chain of
21 distribution?
22 A.  Would I ever have received a
23 letter from Michael Wolanin?
24 Q.  Well, would you have received in
25 the ordinary course of events as the

Page 68

1 intelligence captain, were you in the
2 chain of distribution when the Office of
3 Special Investigations issued a report of
4 this sort?
5 A.  No, it wouldn't come to me.
6 Q.  It wouldn't come to you?  Then
7 how would you --- was there some other
8 way that you had become aware of the
9 report?
10 A.  Not unless the Superintendent
11 shared the information with me.
12 Q.  Do you have any recollection of
13 receiving a copy of this report?
14 A.  No.  Like I said, I didn't
15 investigate it so I really, you know ---.
16 Q.  Right.  And I take it that you
17 have no recollection of ever discussing
18 the incidents that were alleged in the
19 Metzger memo with Deputy Kormanic; is
20 that correct?
21 A.  No, I don't remember.
22 Q.  Okay.
23          ATTORNEY KRAKOFF:
24          We'll take a break.
25 SHORT BREAK

Page 69

1 BY ATTORNEY KRAKOFF:
2 Q.  Did you at some point become
3 aware of the fact that an investigation
4 concluded that in 1995 that Eicher had
5 engaged in misconduct, sexual misconduct
6 of an abusive nature toward Lisa Lambert?
7 A.  Was I made aware of it, yes.
8 Q.  How did you become aware of that?
9 A.  I saw --- well, I watched them
10 escort Mr. Eicher off grounds and, you
11 know, I was probably told somewhere along
12 there.  I mean it's common sense that
13 something's wrong.
14 Q.  I take it that you weren't ---
15 that the Superintendent didn't inform you
16 of that or ---
17 A.  No, not that I remember, no.
18 Q.  --- or the Deputy?
19 A.  Not that they called me up and
20 tell me, no, not that I remember, no.
21 Q.  And I take it that neither the
22 Superintendent nor anybody else in
23 administration said to you, why don't you
24 come and read the --- or suggested that
25 you read the report issued by the Office

A 199

Page 70

1  of Special Investigation in connection
2  with Eicher; is that so?
3  A.  No, that's true.
4  Q.  Do you believe that having that
5  information would have been worthwhile in
6  any way in connection with any efforts to
7  either to fair it out or to preclude
8  sexual misconduct against inmates?
9       ATTORNEY HALLORAN:
10           Objection. He testified
11  that he never saw the report.
12       ATTORNEY KRAKOFF:
13           I understand that but I'm
14  asking since he was the
15  intelligence captain whether
16  having such a report would have
17  been in your view, of any value
18  to you either in connection with
19  your efforts to investigate
20  sexual abuse at the prison.
21  A.  Well, the case was over so it
22  wouldn't --- not unless there was
23  something in the report that reflected on
24  some other that we should investigate,
25  no. It wouldn't have been any help to

Page 71

1  me.
2  BY ATTORNEY KRAKOFF:
3  Q.  But in fact, you've learned today
4  that this report did have something?
5  A.  Yes.
6  Q.  It had attachment one which had
7  been attributed to you but in any event
8  did make reference to other alleged acts
9  of abuse against other inmates by Eicher;
10  correct?
11  A.  That's true.
12  Q.  And also alleged acts of abuse by
13  other personnel?
14  A.  That's true.
15  Q.  So that knowing this now, in your
16  view, would knowing that two years ago or
17  three years ago have been any value to
18  you?
19  A.  It could have.
20  Q.  In what way?
21  A.  Just to make sure that it was
22  followed up on.
23  Q.  Followed up in what respect?
24  A.  If there was an investigation
25  completed on it, I'd have probably looked

Page 72

1  at it and said, make sure that somebody
2  followed it up, you know. Because it was
3  before my time I'd make sure that ---
4  what happened, what happened to the case,
5  did anybody look into it.
6  Q.  With the other inmates?
7  A.  Yes.
8  Q.  And with Eicher's other ---?
9  A.  This was done so I don't know how
10  much more would help you. It's already
11  gone and prosecuted. I don't know if
12  that would help you follow through.
13  Books were closed.
14  Q.  Now, I'm going to turn now to
15  Martin Miller. At what point did you
16  become involved with the investigation of
17  Martin Miller? And let me ask that
18  first.
19  A.  With who?
20  Q.  The investigation with Miller
21  concerning allegations of misconduct
22  against any Cambridge Spring inmate?
23  A.  There was a couple of times where
24  they went nowhere, until this last time
25  in, what was it, March of '96. I think

Page 73

1  it was March of '96. And that happened
2  when I was out of the institution, I
3  think I was training or something, when I
4  was made aware of it. And when I
5  returned I think they already --- Marty
6  Miller had already been suspended and OPR
7  or Michael Wolanin came in and I helped
8  him work on it, assisted him I guess is a
9  better word.
10  Q.  All right. Was the Miller case
11  open when you became the intelligence
12  captain?
13  A.  No, not that I can remember, no.
14  It was closed.
15  Q.  Okay.
16  A.  We still had the --- you don't
17  never throw the stuff away so it was in a
18  file.
19  Q.  Where are those files kept?
20  A.  Oh, when I got them they were
21  kept in my office, locked up in my
22  office.
23  Q.  Was there any sort of list
24  maintained either on a computer or
25  otherwise that reflected each of the

A 200

Page 70 - Page 73

Page 134

1 Q.   Now, on page 25 you will see that
2 your name is crossed out and Roger Beck,
3 Sr.'s name appears on the first two ---
4 page 25 and 26 to Miranda. These are ---
5 I don't think these --- at least one of
6 these doesn't fit here. It's the wrong
7 date, 12/30/94. Okay.
8     While I have this, why don't I
9 ask you. There's an article that
10 appeared in the local newspaper. What is
11 that number?
12 A.   Exhibit 122.
13 Q.   Okay, 122. Were you here when I
14 was questioning Mr. Bartlett about this
15 article?
16 A.   No.
17 Q.   The long and short of it is, the
18 article --- and I'm not testifying to
19 this, I'm just trying to summarize this
20 for you, two inmates, one by the name of
21 Boyd and the other by the name of Ronka
22 Wright (phonetic) ---
23     DEPUTY KORMANIC:
24     Boyd.
25 BY ATTORNEY KRAKOFF:

Page 135

1 Q.   --- Ronka Boyd and another inmate
2 by the name of Wright --- do we have her
3 name?
4     DEPUTY KORMANIC:
5     Yvonne Wright.
6 BY ATTORNEY KRAKOFF:
7 Q.   Yvonne Wright. The reporter
8 says that Boyd and Wright said that they
9 witnessed no change in policy and
10 procedures after charges were brought
11 against employees. However, Sergeant
12 Terry Pelitere (phonetic), president of
13 the local union for officers at Cambridge
14 Springs, said changes were made.
15 Surveillance cameras were installed and a
16 policy adopted that prohibits male
17 employees from being with only one inmate
18 at a time.
19     Now, are you aware of either of
20 those two things taking place after any
21 of the criminal prosecutions that we've
22 discussed today?
23 A.   Like how? This institution has
24 always actively --- I don't know if
25 that's the word I want to --- actively

Page 136

1 went after people. It's never been
2 condoned. And I believe the cameras and
3 stuff, you know --- they purchased more
4 cameras --- or they purchased cameras and
5 installed them in the maintenance area
6 during that time.
7 Q.   The maintenance area was in what
8 building?
9 A.   It's in Curry, first and second
10 floor. All three floors, I believe, they
11 installed cameras.
12 Q.   And the cameras had not existed
13 before that?
14 A.   No.
15 Q.   And what do the cameras --- what
16 are they able to ---- have you ever seen
17 the cameras?
18 A.   Basically, because I left shortly
19 thereafter. Basically, they showed the
20 hallways. You could see people moving in
21 --- I believe they're in the stairwells.
22 Q.   But you would be able to see
23 whether a person or persons left the
24 hallways to go into a stairway?
25 A.   Yeah.

Page 137

1 Q.   Is there a basement?
2 A.   Yeah, there's a basement. The
3 cameras are on all three floors.
4 Q.   And the cameras would also
5 reflect --- are there lavatories,
6 bathrooms on those floors?
7 A.   Yeah, yes, there are.
8 Q.   And I take it the cameras would
9 be able to show who enters and exits the
10 bathrooms? I don't mean inside the
11 bathrooms.
12 A.   Yes, I understand that. I
13 believe they show the hallway. I think
14 they point in both directions in the
15 hallway.
16 Q.   Were you involved in the decision
17 to purchase and install those cameras?
18 A.   I was probably asked about it.
19 Q.   Who asked you?
20 A.   It was probably the
21 Superintendent at a meeting or something.
22 I don't think, you know, it was not my
23 idea. It was ongoing.
24 Q.   What did you tell them?
25 A.   Yes, I was in favor of cameras.

A 201

Page 138

1  Q.   And why was that?

2  A.   You could see more. You don't

3  have --- a staff cannot be on all floors

4  and see everything all at once. It's

5  just impossible. Camera helps the job.

6  Q.   Right. And do you remember when

7  it was, what year it was that --- you

8  said it was shortly before you left?

9  A.   I believe it was --- well, it had

10 to be in the summer of '96, fall,

11 somewhere around there. They were

12 installed before I left.

13 Q.   Was it your view that this

14 installing cameras might be able to

15 prevent acts of sexual misconduct by

16 staff members against inmates?

17 A.   I don't know about preventing it.

18 Yeah, it probably would. It would help

19 --- it's easier to see that way. You're

20 being watched. At least there's cameras

21 and nobody knows if somebody is watching

22 the cameras. So you're going to be a

23 little bit leery around a camera.

24 Q.   Right. Okay. And I did ask you

25 about the one on one or maybe I didn't.

Page 139

1  I'm getting confused as to who I asked

2  what of. But has there ever been --- if

3  I asked you this, I apologize, but has

4  there ever been a policy at this

5  institution which prohibited male

6  employees from being with only one

7  inmate?

8  A.   That's a department policy.

9  Yeah, you're not supposed to be. I mean,

10 there's times it happens but it's ---

11 that's not the general rule.

12 Q.   Now, is that limited to cross

13 gender or does that relate to both

14 genders?

15 A.   No, cross genders. A male and

16 female shouldn't --- male and male or

17 female and female, no.

18 Q.   I'm sorry. So that I understand

19 it, the one to one, did that relate to a

20 male officer with a female or vice versa?

21 A.   The department policy, it's male

22 or female or male and a female. A female

23 inmate, a male staff member. Or if

24 you're at a male institution, a female

25 officer.

Page 140

1  Q.   Right. But if you're the same

2  gender ---

3  A.   Yeah.

4  Q.   --- it could be one on one?

5  A.   Yes, yes.

6  Q.   And do you know how far back that

7  policy goes back?

8  A.   No, I don't. It goes back a

9  ways. I couldn't tell you.

10 Q.   Is that something that existed in

11 other institutions ---

12 A.   Yes, yes.

13 Q.   --- before you came here?

14 A.   Yes.

15 Q.   A little while back I reviewed

16 with you a report from Ms. Wolfgang ---

17 A.   Uh-huh (yes).

18 Q.   --- concerning Inmate Pelman.

19 Did Ms. Wolfgang ever bring to your

20 attention or discuss in your presence any

21 allegations of sexual exploitation or

22 abuse she had received from Cambridge

23 Springs inmates?

24 A.   No.

25 Q.   What about Mr. Barr, the

Page 141

1  assistant to the Superintendent? I

2  understand that he received grievance

3  complaints from inmates. Did he ever

4  bring to your attention the grievances he

5  had received?

6  A.   On what?

7  Q.   In connection with allegations?

8  A.   Well, if it was allegations he

9  would ask me --- if anything he'd go to

10 the superintendent who would in turn

11 shoot him down to me. He wouldn't just

12 pick up the phone and say, I want you to

13 look into it. No, he'd go through the

14 Superintendent.

15 Q.   I see. Do you recall any

16 situations where the Superintendent

17 contacted you and said, we have a

18 grievance complaint from an inmate

19 alleging sexual misconduct by a member of

20 the staff?                          A 202

21 A.   I'm sure there's been one.

22 Q.   Do you think there's just been

23 one?

24 A.   I'm --- it's happened. I have no

25 idea what ---.

1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

LISA LAMBERT,          \*

    Plaintiff      \*   NO.: C.A.96-247-ERIE

      vs            \*

SUPERINTENDENT,    \*

WILLIAM WOLF,      \*

et al.,            \*

    Defendants      \*

\*

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

ROGER BECK

SEPTEMBER 10, 1998

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency

Page 4

```
 1              DEPOSITION
 2                  OF
 3
 4   ROGER BECK, taken on behalf of the
 5   Plaintiffs herein, pursuant to the Rules
 6   of Civil Procedure, taken before me, the
 7   undersigned, Shannon Hagerty, a Court
 8   Reporter and Notary Public in and for the
 9   Commonwealth of Pennsylvania, at SCI
10   Cambridge Springs, Cambridge Springs,
11   Pennsylvania, on Thursday, September 10,
12   1998, at 1:22 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                I N D E X
 2
 3   WITNESS:  ROGER BECK
 4   EXAMINATION
 5      By Attorney Krakoff          7 - 110
 6   CERTIFICATE                          111
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1         A P P E A R A N C E S
 2
 3   JERE KRAKOFF, ESQUIRE
 4   1705 Allegheny Building
 5   429 Forbes Avenue
 6   Pittsburgh, PA  15219
 7      Counsel for Plaintiffs
 8
 9   THOMAS HALLORAN, ESQUIRE
10   PA Office of Attorney General
11   Litigation Section
12   564 Forbes Avenue
13   6th Floor
14   Pittsburgh, PA  15219
15      Counsel for Defendants
16
17   Also Present: Angus R. Love
18              924 Cherry Street
19              Suite 523
20              Philadelphia, PA  19107
21
22              Deputy Superintendent
23              Karmanic
24
25
```

Page 7

```
 1          E X H I B I T   P A G E
 2
 3                              PAGE
 4   NUMBER   DESCRIPTION      IDENTIFIED
 5
 6               NONE OFFERED
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

OBJECTION PAGE

| ATTORNEY | PAGE |
|---|---|
| Halloran | 30, 31, 38, 53, |
| | 104, 106 |

Page 9

PROCEEDINGS

-------------------------------------

ROGER BECK, HAVING FIRST BEEN DULY SWORN,
TESTIFIED AS FOLLOWS:

-------------------------------------

EXAMINATION
BY ATTORNEY KRAKOFF:

Q.    Lieutenant Beck, I assume that you probably know why you're here, but let me just explain briefly. I represent and Mr. Love as Co-counsel represent three women, Silvia Vasquez, Robin Phillips and Lisa Lambert, who have filed separate lawsuits against officials at this prison alleging that their civil rights were violated as a result of what I'll characterize as inappropriate sexual conduct toward them. These are their allegations.

You're not named --- you're not a Defendant, but you're somebody whose deposition I want to take because I've seen your name on documents that have been furnished in discovery and because I know that at least at one point you were

Page 10

involved with investigating some issues.

If you don't understand a question just tell me so and I'll rephrase it until you understand it, okay?

A.    Understood.

Q.    What year did you begin working at Cambridge Springs?

A.    February of '94, I believe.

Q.    What was that about a --- a little bit over --- somewhat over a year after the institution actually opened?

A.    Correct, sir.

Q.    What was your position when you came here?

A.    My position when I came here was a training sergeant.

Q.    At some point were you promoted?

A.    Correct, sir.

Q.    What were you promoted to?

A.    I was promoted to a lieutenant.

Q.    When did that promotion take place? And by the way, when I ask you when I'm not asking you for a precise date if you don't remember the precise

Page 11

date, but give me your best recollection of when it was.

A.    I believe it was approximately two years later.

Q.    Okay. So sometime perhaps in early 1996?

A.    I believe so, yes.

Q.    Did any of your responsibilities while you were a training sergeant involve engaging in investigations at the institution?

A.    As a training sergeant?

Q.    Yes.

A.    No, sir.

Q.    Okay. Between the time that you were a training sergeant and appointed a lieutenant, did you have any other positions?

A.    No, sir. When I was training sergeant what I did was just training sergeant.

Q.    Okay. So you remained a training sergeant until the time you became a lieutenant?

A.    Correct, sir.

A 177

Page 12

1  Q.   At some point after you were
2  appointed to the position of lieutenant
3  here, did you have involvement with
4  investigations of incidents that occurred
5  or allegedly occurred at the institution?
6  A.   As a lieutenant, yes, I did.
7  Q.   Okay.  Did you --- was there an
8  investigative unit or office within this
9  institution?
10 A.   Yes, sir.
11 Q.   Okay.  Was there a name for that?
12 A.   It would be the intelligence
13 captain's office or the security
14 lieutenant's office.
15 Q.   Okay.  Who was the intelligence
16 captain at the time you were appointed
17 lieutenant?  Was it Bartlet (phonetic) or
18 was it Lazenbee (phonetic)?
19 A.   I believe at that time it was
20 Captain Bartlet.
21 Q.   Then at some point after that,
22 Lazenbee became the captain?
23 A.   Correct, sir.  I don't have dates
24 or ---
25 Q.   Sure.

Page 13

1  A.   --- on that.
2  Q.   Did you become --- and who else
3  was in that office working on
4  investigative matters other than the
5  intelligence captain?  Were there any
6  other personnel who assisted on a routine
7  basis in investigations?
8  A.   I was security lieutenant which
9  was my title also.
10 Q.   When you became lieutenant --- at
11 the time you became a lieutenant were you
12 named the security lieutenant?
13 A.   I was named an emergency
14 preparedness coordinator and security
15 lieutenant.
16 Q.   Okay.  You had two hats that you
17 were wearing?
18 A.   Yes, sir.
19 Q.   But at the time of your
20 appointment or your promotion to
21 lieutenant one of your pos --- one of
22 your responsibilities was in the area of
23 security lieutenant?
24 A.   That was one, yes.
25 Q.   Within that framework as a

Page 14

1  security lieutenant, you had some
2  responsibilities in connection with
3  investigations?
4  A.   Correct, sir.
5  Q.   Now, did your responsibilities in
6  the area of investigations extend to both
7  investigating inmates for possible
8  inappropriate conduct as well as
9  personnel or was it limited to one or the
10 other?
11 A.   It was both, sir.
12 Q.   How much of your time and it may
13 have changed over time --- strike that
14 before I complete that thought.
15      Are you still the security
16 lieutenant at this institution?
17 A.   Basically, yes.
18 Q.   Approximately how much of your
19 time was spent as a security lieutenant
20 as opposed to the emergency preparedness
21 lieutenant?
22 A.   It varies depending on what was
23 ---
24 Q.   Going on.
25 A.   --- going on.  Yes, sir.

Page 15

1  Q.   Was there anybody else other than
2  the intelligence captain and the security
3  lieutenant who routinely was assigned to
4  investigations?
5  A.   Not that I'm aware of, sir.
6  Q.   So it was basically you and the
7  captain?
8  A.   Yes, sir.  As directed by, you
9  know, my supervisor.
10 Q.   Exactly.  You, on your own, did
11 not have the authority to begin or to
12 trigger to begin an investigation.  You
13 had to ---.
14 A.   Not unless directed by my
15 supervisor.
16 Q.   I was just going to say, in every
17 day conversation a lot of us know what
18 the end of the question is and we talk
19 over each other, whatever.  But it will
20 be clearer if you wait for me.  I'm not
21 offended by it, but we just need a clear
22 record.
23 A.   Sorry.
24 Q.   Why don't you in a general sense
25 give me an idea through a description of

A 178

Page 24

1 conducted. And these investigations are
2 going to be focusing on the alleged
3 sexual exploitation or sexual abuse of
4 women, women inmates at the prison. So
5 that you'll know what I'm talking about
6 when I'm asking you about sexual
7 exploitation or sexual abuse, I'm talking
8 about such things as the touching of
9 breasts, the genital areas of an inmate
10 or the buttocks, kissing, caressing or
11 fondling of an inmate and also attempts
12 by prison personnel to either force or
13 encourage inmates either by threats or by
14 words, by promises to give them gifts, to
15 do those things to encourage or force
16 them to engage in sexual acts with them.
17 Do you understand the definition?
18 A.   Yes, sir.
19 Q.   Now, you weren't subpoenaed to
20 bring anything with you. I'm going to
21 ask whether you had brought any
22 investigative files with you today?
23 A.   No, sir, I haven't.
24 Q.   Have you reviewed any
25 investigative files in order to prepare

Page 25

1 for this deposition?
2 A.   Absolutely not, sir.
3 Q.   You seem to be proud of that fact
4 the way you said it.
5 A.   No, sir, being truthful.
6 Q.   Okay. Have you reviewed any
7 documents prior to the deposition in
8 order to assist you in recalling events
9 and persons and dates?
10 A.   No, sir, I have not.
11 Q.   Have you read any portions of the
12 transcripts taken in this case of
13 Superintendent Wolf, Deputy Karmanic,
14 Captain Lazenbee, Captain Bartlet or
15 anybody else?
16 A.   I have not seen any transcripts,
17 sir.
18 Q.   Have you discussed with any of
19 those persons the testimony that they
20 gave at depositions in this case?
21 A.   No, sir.
22 Q.   Has anybody relayed it to you the
23 sum or substance of either the entirety
24 or part of the testimony that has been
25 given in depositions in this case?

Page 26

1           ATTORNEY HALLORAN:
2           Excluding me.
3           ATTORNEY KRAKOFF:
4           Are you claiming
5 attorney/client privilege or
6 ---?
7           ATTORNEY HALLORAN:
8           Yes.
9           ATTORNEY KRAKOFF:
10           Is there an objection
11 here?
12           ATTORNEY HALLORAN:
13           He can say whether or not
14 he discussed it. The content is
15 the privilege.
16           ATTORNEY KRAKOFF:
17           I'm going to ask that he
18 answer that.
19           ATTORNEY HALLORAN:
20           He can answer it.
21 A.   I'm sorry, would you repeat it?
22 BY ATTORNEY KRAKOFF:
23 Q.   Have you discussed with anybody
24 the content of any part of the testimony
25 given in the context of depositions in

Page 27

1 this lawsuit?
2 A.   I have not talked to anyone about
3 the content or depositions. No, sir.
4 Q.   When, if you have, and how did
5 you learn about the existence of this
6 lawsuit for the first time?
7 A.   How did I learn about it?
8 Q.   Yes. Did you know about this
9 lawsuit at some point prior to today?
10 A.   Yes, sir. I read it in the
11 newspaper.
12 Q.   Is that how you originally became
13 aware of it?
14 A.   Yes, sir.
15 Q.   Now, who at the prison level has
16 the authority to authorize an
17 investigation of prison personnel?
18 A.   The superintendent.
19 Q.   Is he the only person?
20 A.   In his absence the deputy can do
21 that.
22 Q.   Okay. But assuming that he's not
23 absent, it's the superintendent's call?
24 A.   Yes, sir.
25 Q.   Are the authorizations to conduct

A 179

Page 32

1 comes to the security office, assuming
2 that everybody is here from the
3 superintendent on down.
4 A.    The superintendent can authorize
5 an investigation ---
6 Q.    You made that clear earlier.
7 A.    --- directly to the security
8 office.
9 Q.    Directly to you?
10 A.    Yes.
11 Q.    Okay.  Can authorizations for an
12 investigation also occur at the central
13 office level?  Authorizations for an
14 in-house investigation at Cambridge
15 Springs, can that come from the central
16 office?
17 A.    Yes, I believe.
18 Q.    Has that ever happened since
19 you've been here?
20         ATTORNEY HALLORAN:
21         Let me object to the form
22 of ---.  Do you mean without the
23 superintendent's ---?
24         ATTORNEY KRAKOFF:
25         No.  The decision to

Page 33

1 authorize an investigation, can
2 that come from the central
3 office?
4         ATTORNEY HALLORAN:
5         Do you know the answer to
6 that question?
7 A.    I don't know.
8 BY ATTORNEY KRAKOFF:
9 Q.    So you don't have a recollection
10 of that ever occurring since you've been
11 the lieutenant, the security lieutenant?
12         ATTORNEY HALLORAN:
13         I'm going to object.  He
14 can't answer the question of
15 whether he knows the source of
16 how the office ---.
17         ATTORNEY KRAKOFF:
18         He's not aware of it
19 since he's been here.  He can
20 testify to that.
21         ATTORNEY HALLORAN:
22         He's obviously aware ---.
23 A.    I guess it's never happened.
24         ATTORNEY KRAKOFF:
25         Well, he won't know.

Page 34

1         ATTORNEY HALLORAN:
2         What I'm saying is, he's
3 obviously aware of the burden of
4 responsibility as to conducting
5 investigations here.  And the
6 question you're asking him is,
7 whether he's aware of how and
8 what the method was that the
9 officer in professional
10 responsibility ended up being
11 here.
12         ATTORNEY KRAKOFF:
13         No.
14         ATTORNEY HALLORAN:
15         You're not asking him
16 that?
17         ATTORNEY KRAKOFF:
18         No.  I'm asking for a
19 situation not where OPR, or
20 office of special investigations
21 is conducting investigations.
22 I'm asking whether you can go
23 above the superintendent to the
24 commissioner's office and the
25 commissioner's office pronounces

Page 35

1 that they want something
2 investigated by his security
3 office.
4         ATTORNEY HALLORAN:
5         Right.  And that's what
6 he said he didn't know.
7 BY ATTORNEY KRAKOFF:
8 Q.    You don't know?
9 A.    I have no knowledge of it.
10 Q.    Since becoming intelligence ---
11 is it the security lieutenant or the
12 intelligence lieutenant that you're
13 called?  Security lieutenant?
14 A.    Security lieutenant.
15 Q.    Since becoming the security
16 lieutenant at Cambridge Springs, have you
17 participated in any investigations of
18 alleged or possible sexual exploitation
19 or abuse of Cambridge Springs inmates by
20 Cambridge Springs personnel?
21 A.    Yes, sir.
22 Q.    Prior to becoming the
23 intelligence --- the security lieutenant,
24 did you participate in any investigations
25 of alleged or possible sexual

A 180

Page 36

1 exploitation or abuse, sexual abuse that
2 is, of Cambridge Springs inmates by
3 Cambridge Springs personnel?
4 A.    No.
5 Q.    And again, so that I can at least
6 get some idea of when it was that you
7 became the intelligence --- the security
8 lieutenant that is, can you tell me what
9 year you became the security lieutenant?
10         ATTORNEY HALLORAN:
11            You've asked him that
12 already and he said he doesn't
13 know for sure.
14         ATTORNEY KRAKOFF:
15            What I was going to do
16 since we are sitting at Cambridge
17 Springs, I would like to adjourn
18 this deposition for five minutes,
19 because we've been patient all
20 day, and to have the lieutenant
21 contact whoever would have that
22 information so he can tell me.
23         ATTORNEY HALLORAN:
24            Okay.
25 BY ATTORNEY KRAKOFF:

Page 37

1 Q.    What are you reading from?
2 A.    A notebook.
3 Q.    And can you tell me the date that
4 you became the security lieutenant?
5 A.    Yes, sir, I can.
6 Q.    When was that?
7 A.    April 11th of 1994.
8 Q.    '94?
9 A.    Yes, sir.
10 Q.    Now, I would like you to identify
11 by the name of the staff member every
12 investigation of alleged or possible
13 sexual exploitation or sexual abuse of a
14 Cambridge Springs inmate by a Cambridge
15 Springs staff member that you have
16 participated while security lieutenant.
17 A.    I don't believe I could name
18 every single one, sir.
19 Q.    Well, I understand that you might
20 not be able to name --- I would like you
21 to name for me everyone ---
22         ATTORNEY HALLORAN:
23            That you can recall.
24 BY ATTORNEY KRAKOFF:
25 Q.    --- that you can recall.  And I

Page 38

1 want you to think as long as necessary
2 and I can take five minutes, I can walk
3 outside while you're thinking.  I don't
4 want this to be something that you only
5 give five seconds thought to.  You give
6 it as much time as you need.
7         ATTORNEY HALLORAN:
8            I'm not going to have the
9 witness sit here and spend the
10 afternoon trying to remember the
11 names.  You give the ones that
12 you can recall after some
13 consideration and Mr. Krakoff can
14 ask you later if he thinks you
15 were involved in others that you
16 have forgotten at this moment.
17 BY ATTORNEY KRAKOFF:
18 Q.    We're going to take a two minute
19 recess while he kind of thinks.  Here's a
20 piece of paper that you can write down
21 the names if you can recall any such
22 investigations that you participated in.
23 A.    Yes, sir.
24 SHORT BREAK TAKEN
25 BY ATTORNEY KRAKOFF:

Page 39

1 Q.    What were they?
2 A.    The staff name?
3 Q.    Yes.
4 A.    Icker.
5 Q.    Okay.
6 A.    And Marty Miller.
7 Q.    The little --- I don't know that
8 I would call that a booklet --- some sort
9 of a book or whatever it is that you
10 referred to previously to get the date of
11 your promotion to security lieutenant.
12 Would there --- is there anything ---
13 what kind of --- what is that if I may
14 ask?  Is that like a calendar or ---?
15 A.    It's a calendar, sir.
16 Q.    Did you --- would that calendar
17 assist you in identifying the
18 investigations that you participated in?
19 A.    No.  No way, sir.
20 Q.    Do you believe that there are
21 more investigations that you were
22 involved in of the nature that I
23 described and where there were
24 allegations of sexual abuse against an
25 inmate or sexual exploitations or do you

A 181

Page 64

1 questioning Lieutenant Beck
2 rather than calling an end to the
3 deposition until we can get those
4 books. And then we will arrange
5 to --- what we would like to do
6 would be to have a way where we
7 can review the notebooks to see
8 whether there are things that are
9 pertinent. And then after that
10 if we think that it's necessary
11 to recall Lieutenant Beck or
12 whatever, we can do it at that
13 time. Is that agreeable to you?
14         ATTORNEY HALLORAN:
15         Yes.
16         ATTORNEY KRAKOFF:
17         The only thing is, is
18 before when I said whether we did
19 have materials on --- I might
20 have said that we have files or
21 something or documents in
22 connection with, I think, Mary
23 and I think I said Miller and
24 Raun. Much of the documents ---
25 I think Mary's is strictly

Page 65

1 limited to a report from the
2 office of special investigation
3 or OPR and I don't have --- we
4 don't have any other documents.
5         And I guess what we're
6 saying is that if we would like
7 those files to be looked through
8 for each of the people who have
9 been identified in these
10 depositions and to see whether
11 there are files and then
12 obviously to see if there are any
13 other files that would fit within
14 those categories.
15         ATTORNEY HALLORAN:
16         We've looked at some of
17 this --- we've looked through
18 four files. The source of the
19 confusion might be, I believe,
20 some of these matters arose after
21 the fact and related to the
22 coincidence where for which there
23 weren't any files or of course
24 the actions had already been
25 taken without files. I mean, I'm

Page 66

1 not saying --- I'm not
2 guaranteeing that because of the
3 name here that that means there's
4 a file.
5         ATTORNEY KRAKOFF:
6         Well, I understand that,
7 but let me just make it clear.
8 Like for example Carl Zimmerman,
9 we would like whatever documents,
10 if there are --- if there's an
11 extraordinary occurrence report.
12 If there is a written reprimand
13 or written warning. If there are
14 any investigative documents
15 associated with that. If there
16 are notes taken by an
17 investigative officer, talking
18 about Lisa Gunnerson or somebody
19 else, we would like those. Paul
20 Walton, there has to be fairly
21 extensive files for that I would
22 assume because that case was
23 prosecuted in the criminal
24 courts. We've gotten a lot in
25 connection with Icker, Jim Mary,

Page 67

1 I think the OPR.
2         I don't know if there's
3 anything --- Jerome Coffee,
4 Schmidt, Rogers. If there's
5 anything for Lieutenant Beck,
6 Wayne Young, Officer Stone, Harry
7 Stewart. We have --- we received
8 a lot on Raun. I assume that's
9 everything. I don't know if
10 there's anything for Monteho
11 (phonetic). His name was brought
12 up in connection with an
13 interview with the Metzker
14 (phonetic) interview.
15         Lisa Lambert, Bill Free,
16 Arnold Dequine (phonetic), former
17 laundry supervisor. Richard
18 Hammers, I think we have
19 something. I don't know if it's
20 an OPR report or something. We
21 do have something on him, but I
22 don't know that we have
23 everything. Randolf. I think          A 182
24 Lieutenant Morts did come
25 afterwards, but I don't know how

Page 68

1 long afterwards. Jennifer
2 Langford. Marty Miller we
3 received extensive documents on.
4 Linda Vish, Lisa Stollard, Bruce
5 Allen and CO Lawfton (phonetic).
6 Those are the names that have
7 arisen during one deposition or
8 another. And there may be
9 others.
10 BY ATTORNEY KRAKOFF:
11 Q.    Okay, you've heard those names
12 and I think we left off with Zimmerman.
13 Paul Walton --- were you involved in an
14 investigation of Paul Walton and an
15 inmate by the name of Emma Glacko
16 (phonetic)?
17 A.    Yes, sir.
18 Q.    Okay. So I can add that to the
19 list of cases that you investigated?
20 A.    I was involved in that
21 investigation, yes.
22 Q.    You already mentioned Jim Mary.
23 Jerome Coffee, did you hear anything
24 about Jerome Coffee allegations of any
25 sexual proprieties on his part in

Page 69

1 relation to an inmate?
2 A.    I heard his name was mentioned, I
3 have no knowledge of any investigation
4 going on.
5 Q.    Are you familiar with the name
6 Arita --- I'm not sure if I'm pronouncing
7 the first name --- Diaz is her last name.
8 They call her the cat or something of
9 that sort? Marisa Diaz.
10 A.    We have an inmate here named
11 Marisa Diaz.
12 Q.    Right. That's who I'm talking
13 about. Was she the subject of an
14 investigation, her involvement with any
15 officers?
16 A.    I don't know, sir.
17 Q.    Are you aware of any allegations
18 that you were involved with an inmate by
19 the name of Margilene DiBello (phonetic)?
20 Have you heard that before today?
21 A.    Yes.
22 Q.    Do you know whether you were
23 investigated?
24 A.    I don't know that I was.
25 Q.    How did you hear about

Page 70

1 allegations of your having some
2 involvement with Ms. DiBello? How did
3 that come to your attention?
4 A.    Other inmates told me.
5 Q.    Did any officers mention it?
6 A.    I don't really recall.
7 Q.    Were you interviewed by anybody
8 on the staff about the allegations?
9 A.    I don't recall if I was or not,
10 sir.
11 Q.    Philip David Schmitt, are you
12 aware of either any investigation being
13 conducted about him or allegations
14 against Officer Schmitt?
15 A.    Yes, sir.
16 Q.    Since that was a compound
17 question, I'll clarify it. Are you aware
18 of any investigation of Officer Schmidt?
19 A.    Yes, sir.
20 Q.    Was that conducted by your
21 office, by the intelligence office?
22 A.    Yes, sir.
23 Q.    Do you know who conducted that?
24 Was that out of OPR?
25 A.    That's correct, sir.

Page 71

1 Q.    When OPR investigates, do you
2 receive a copy of the report after
3 they've issued a report?
4 A.    No, sir.
5 Q.    Are you apprised of --- I
6 remember you talked about how you would
7 update the superintendent as
8 investigations were going along. Would
9 OPR update you or the captain, to your
10 knowledge, about their investigations and
11 how they were going along?
12 A.    They never updated me, no, sir.
13 Q.    Would you even be officially
14 informed that there was an OPR
15 investigation or is this simply something
16 you would hear through the grapevine?
17 A.    I would probably be apprised of
18 the investigation if we requested them to
19 become involved.
20 Q.    So did your office request that      A 183
21 OPR investigate Officer Schmidt?
22 A.    I don't recall, sir.
23 Q.    What about Officer Rogers? Are
24 you aware of any investigation of Officer
25 Rogers?

Page 72

1  A.   I'm not aware there was an
2  investigation.
3  Q.   Did you hear any allegations
4  against Officer Rogers in connection with
5  any supposed sexual improprieties?
6  A.   I believe his name was mentioned,
7  yes, sir.
8  Q.   Do you remember the circumstances
9  of what he allegedly had done?
10  A.   No, sir, I don't recall that.
11  Q.   Wayne Young.  Had you --- do you
12  know whether he was investigated either
13  by your office or by OPR?
14  A.   I don't recall, sir.
15  Q.   Did you hear any allegations
16  about him?
17  A.   Yes, sir.
18  Q.   Do you recall the general nature
19  of those allegations?
20  A.   No, sir, I don't.
21  Q.   Did you just hear this kind of
22  like through the grapevine?  Was it
23  through other staff members, through
24  other inmates or ---?
25  A.   Both, sir.

Page 73

1  Q.   Both.  What about Harry Stewart?
2  Are you aware of any investigation of
3  Harry Stewart either by your office or by
4  OPR?
5  A.   I have no knowledge of that, sir.
6  Q.   Did you hear anything about
7  allegations against Harry Stewart?
8  A.   Yes, sir.
9  Q.   What did you hear?
10  A.   These people that you're
11  mentioning came from a list of names that
12  Lambert wrote saying that these people
13  did certain things.
14  Q.   All of these?
15  A.   Yes.  Most of those names, yes.
16  Q.   Because I can show you the list.
17  A.   I won't say most, but some of the
18  names.
19  Q.   Okay.  Did you receive a --- I'll
20  show you Exhibit 125 and see if this is
21  the list that you're referring to.
22  WITNESS REVIEWS EXHIBIT
23  BY ATTORNEY KRAKOFF:
24  Q.   The next two pages.  Is this the
25  list that you're referring to?

Page 74

1  A.   Yes, sir.  Yes, it is.
2  Q.   How did you --- you saw this at
3  some point?
4  A.   Yes, sir, I did.
5  Q.   And was it something that --- did
6  you get a copy of this in your office or
7  how did you come to see this?
8  A.   It's part of the Lambert file,
9  sir.
10  Q.   Did you conduct any investigation
11  to either confirm or refute allegations
12  about the personnel named in this
13  document?
14  A.   No, sir.  Not that I recall.
15  Q.   Do you know whether Captain
16  Lazenbee conducted an investigation?
17  A.   I have no knowledge of that, sir.
18  Q.   Do you know whether Captain
19  Bartlett conducted an investigation?
20  A.   Again, I have no knowledge of
21  that, sir.
22  Q.   And I take it you would not have
23  knowledge of whether OPR investigated
24  these allegations; is that correct?
25  A.   That's correct, sir.

Page 75

1  Q.   So were you aware --- are you
2  aware of anybody investigating these
3  allegations?
4  A.   No, sir.
5  Q.   Did you become aware of any
6  allegations involving Emanuel Monteho
7  other than the allegations that are
8  contained in Exhibit 125?  Did you hear
9  allegations from any other source?
10  A.   No, sir.
11  Q.   Are you aware of any
12  investigation conducted by your office of
13  Arnold DeQueen (phonetic)?
14  A.   Who?
15  Q.   He might not have been here when
16  you were here.  Arnold DeQueen, a laundry
17  supervisor?
18  A.   I know who you mean.
19  Q.   Are you aware of any
20  investigation conducted?                    A 184
21  A.   Not at all, sir.
22  Q.   Okay.  Now, have you ever
23  participated in a discussion with
24  Superintendent Wolf or been present when
25  Superintendent Wolf expressed concerns

Page 76

1 about the level of sexual exploitation or
2 sexual abuse of inmates by Cambridge
3 Springs personnel?
4 A.   Could you repeat that?
5 Q.   Yes.  Have you ever been present
6 when Superintendent Wolf expressed
7 concern over the level of sexual
8 exploitation or sexual abuse by staff
9 here against inmates?
10 A.   Yes, sir.
11 Q.   Do you remember when that
12 occurred?
13 A.   Not specifically.  No, sir.
14 Q.   Can you give me an estimate of
15 the approximate time period that you
16 recall him expressing that concern?  You
17 came here in April --- I'm sorry.  You
18 became the intelligence captain in April
19 of 1994.  You came to the institution
20 earlier than that.  Was it prior to the
21 time that you became the intelligence
22 captain or the intelligence --- the
23 security lieutenant or was it after that
24 you heard him express his concerns?
25 A.   It was after I became security

Page 77

1 lieutenant.
2 Q.   Do you believe that it occurred
3 between April of 1994 and January of 1996
4 or do you believe it occurred after
5 January of 1996?  I'm giving you the
6 period from the time became a
7 security lieutenant on January 1st, 1996.
8 A.   It occurred during that period.
9 Q.   During which period?  Between
10 April of '94 and January 1st of '96 or
11 the second period?  That would be from
12 January of 1996 later?
13 A.   The first period.
14 Q.   How many times --- strike that.
15     Was it more than once you heard
16 the superintendent express such a
17 concern?
18 A.   Yes.
19 Q.   Do you remember the context when
20 he expressed such a concern?  In other
21 words, was it a meeting of some sort, was
22 it a situation where you were in his
23 office?  Was it some other circumstance?
24 A.   To the best of my knowledge it
25 came up at staff meetings, operations

Page 78

1 meetings, just one on one.
2 Q.   One on one between you and him?
3 A.   Yes, sir.
4 Q.   Did he --- other than expressing
5 that concern, did he say anything else
6 about the level of alleged exploitation
7 or abuse?
8 A.   I'm sorry, I don't understand.
9 Q.   Well, did he --- I don't want to
10 put words in your mouth.  He made that
11 expression, but did he say what should be
12 done or give any directives or whatever?
13 A.   He said that he was quite
14 concerned about it and we often talked
15 about resolutions.
16 Q.   What kinds of resolutions were
17 discussed?
18 A.   More training on sexual
19 harassment.  The introduction of cameras
20 and things of that nature.
21 Q.   In areas --- in what kinds of
22 areas was he talking about the
23 introduction of cameras?
24 A.   In all the areas of the
25 institution.

Page 79

1 Q.   Okay.  Where did they exist when
2 he started talking about cameras?  Did
3 you have cameras anywhere in the
4 institution?
5 A.   Not at that time, no, sir.
6 Q.   Do you know --- at some point in
7 time were cameras introduced at the
8 institution?
9 A.   Yes, sir.
10 Q.   Do you know approximately when
11 the cameras began to be installed?
12 A.   It was this year.
13 Q.   Okay.  Were they installed in any
14 --- why don't you tell me, you know,
15 where they were installed?
16 A.   It's been an ongoing process.
17 Q.   Why don't you tell me about where
18 to date so far the places you can recall
19 where they are now?
20 A.   They're installed in all the        A 185
21 housing units, dietary, visiting room,
22 control, personnel.
23 Q.   Any of the basement areas, where
24 the shops are?
25 A.   No basement areas.  Well, the

Page 80

1 basement of Curry Hall, yes.
2 Q.   That's where the shops are?
3 A.   What, sir?
4 Q.   Are the shops there?
5 A.   No.  The shops are on the first
6 floor?
7 Q.   What's in the basement?
8 A.   A music room, an activity room.
9 Q.   Are they in the hallways of Curry
10 Hall now?
11 A.   Yes, sir.
12 Q.   Are they anywhere else in the
13 basement area?  Are they in the rooms
14 themselves?
15 A.   Not in the rooms themselves, no,
16 sir.
17 Q.   Okay.  Did the superintendent say
18 why cameras --- why he thought cameras
19 were --- why he wanted cameras to be
20 installed?  Did he say what the benefit
21 would be from having cameras installed?
22 A.   Yes.
23 Q.   What did he say?
24 A.   Specifically?
25 Q.   Well, not verbatim, but why

Page 81

1 cameras?  What were they ---?
2 A.   Basically for the security.
3 Q.   Right, I understand that.  How is
4 it according to what he said, how is it
5 going to help security?
6 A.   We would enhance our ability to
7 monitor staff and inmate movement.
8 Q.   You'd be able to see what's going
9 on ---
10 A.   Yes, sir.
11 Q.   --- in areas that you couldn't
12 see unless you were there?
13 A.   Correct.
14 Q.   You said something about more
15 training; is that right?  That was
16 another way that Superintendent Wolf
17 wanted to address the problem; is that
18 correct?
19 A.   Yes, sir.
20 Q.   Was he --- was anything --- did
21 he say anything specific about what kinds
22 of training he was talking about and who
23 for?
24 A.   It was for all staff.
25 Q.   Did he say the kind of training?

Page 82

1 A.   Basically adhere to the mandated
2 training and on the sexual harassment.
3 Q.   Okay.
4 A.   More staff awareness.
5 Q.   Do you recall whether after he
6 first expressed that, the need for more
7 training, did he --- do you know whether
8 anymore --- whether any additional or
9 different training was introduced at
10 Cambridge Springs?
11 A.   In reference just to ---
12 Q.   Yes.  To the issue ---
13 A.   --- sexual?
14 Q.   --- of sexual, exactly.
15 A.   Not that I'm aware of.
16 Q.   Did the superintendent suggest
17 anything else to address the problem of
18 exploitation or sexual harassment with
19 inmates?
20 A.   I think he clarified that he
21 wanted more supervision, more awareness,
22 more documentation.
23 Q.   Documentation of what, movements
24 or ---?
25 A.   Documentation of any of the

Page 83

1 incidents that occurred.
2 Q.   Did he express any criticism of
3 the existing way incidents of that nature
4 were being documented?  Did he say they
5 were too vague, did he say they weren't
6 detailed enough?
7 A.   He didn't reflect that to me,
8 sir.
9 Q.   Okay.  Do you whether any changes
10 in the way incidents were documented
11 occurred after he brought that issue up?
12 A.   No, sir.
13 Q.   Do you know whether there was any
14 training of the staff in connection with
15 the documentation of incidents to improve
16 the documentation after the --- after
17 Superintendent Wolf raised that issue?
18 A.   Not that I'm aware of.  No.
19 Q.   Okay.  Now, did you have any
20 similar discussions with Deputy
21 Superintendent Auts in connection with
22 the exploitation or sexual abuse of
23 inmates by staff?  You've talked about
24 Wolf.  Did you hear any of the same
25 things from Deputy Superintendent Auts?

A 186