COMMONWEALTH OF PENNSYLVANIA
Pennsylvania Department of Corrections
July 17, 1995

Case No.    95-F-016

SUBJECT:        James Merry, CO II

COMPLAINANT:    Elizabeth Maysonet, OB-4751
                Allegation – Violation Code of Ethics

TO:             William J. Wolfe
                Superintendent
                State Correctional Institution Cambridge Springs

FROM:           Vaughn L. Davis
                Director
                Special Investigations Office

The enclosed report of investigation is being furnished to you for your review and information.

It has been recommended that ongoing training relative to the Department's Code of Ethics and specifically the fraternization with inmates and the section of the Pennsylvania Crimes Code that concerns Indecent Assault and Aggravated Indecent Assault be intensified at Cambridge Springs for all current and new staff.

This report and recommendations have been approved by the Commissioner of Corrections, Martin F. Horn.

This report is CONFIDENTIAL and may not be disseminated to any other agency without the direct approval of the Commissioner.

If you have any questions, please contact me.

VLD/cb

A 497

JUL 2 0



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA DEPARTMENT OF CORRECTIONS
SPECIAL INVESTIGATIONS OFFICE

June 7, 1995

Case No.              95-F-016
Report made by:       Michael Wolanin, Special Investigator
Allegation:           Violation Code of Ethics

SUBJECT:

James Merry, CO II
DOB: 10/22/49

COMPLAINANT/VICTIM:

Elizabeth Maysonet, OB-4751
DOB: 03/28/69
SSN: 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

LOCATION:

State Correctional Institution Cambridge Springs

REVIEWED BY: *Carl Robinson*
Carl Robinson
Senior Investigator
Special Investigations Office

APPROVED BY:
Vaughn L. Davis
Director
Special Investigations Office

DISTRIBUTION:
Commissioner Horn
File

A 498

## SYNOPSIS

This investigation was authorized by Vaughn L. Davis, Director, Special Investigations Office, (SIO), on March 16, 1995 predicated by a complaint initiated by this investigator.

On March 28, 1995 information was revealed to this investigator that Sgt. James Merry was involved in a private relationship with inmate Elizabeth Maysonet, OB-4751.

On March 27, 1995, inmate Elizabeth Maysonet was interviewed. During her interview she said she and Sgt. James Merry were involved in a year long relationship from December 1993 thru November 1994. They kissed intimately and sent cards to each other. Merry also sent her money on two occasions totaling $200.00.

Maysonet further stated that she and Merry also talked on the phone frequently at Merry's friends business. She would call collect and Merry would always accept the charges.

Hilda Maysonet, OB-3187, said that she knew that her sister Elizabeth and Sgt. James Merry were involved in a relationship. Merry asked her to act as a lookout for them on numerous occasions.

Carmel Bynum, OB-1864, said on two occasions Merry forced himself on her and kissed her in Alliance Hall. She said she was terrified of him.

Todd Higham and Jeff Duttry were interviewed. They were part owners of Ultimate Warrior Karate Club in North East, PA. They accepted collect phone calls for Merry from a young Hispanic female and Merry paid the charges. The female's name was "Liz". Phone records from the Karate Club verify this information.

James Merry, during his interview, admitted being in a relationship with inmate Elizabeth Maysonet. He admited to kissing and hugging her, sending her money and having her call him at the Ultimate Warrior Karate Club and paying for the charges.

Subsequent to his interview, James Merry submitted his letter of resignation, dated April 14, 1995.

2

A 499

## TABLE OF CONTENTS

DETAILS:

1.    Request for Investigation

2.    Review of Initial Complaint

INTERVIEWS:                                    PAGE:

1.    Elizabeth Maysonet, OB-4751              4, 5

2.    Hilda Maysonet, OB-3187                  5

3.    Carmel Bynum, OB-1864                    5, 6

4.    Evangelia Garcia, OB-3864                6

5.    Catherine Bowman, OB-3132                6, 7

6.    Todd Higham                             7

7.    Jeff Duttry                             8

8.    James Merry, CO II                      8, 9

ACTION TAKEN:

1.    Review of Maysonet's Institutional File

2.    Review of Two Cash Transaction Slips Payable to Elizabeth Maysonet

3.    Review of Polygraph Examination Performed on Elizabeth Maysonet on March 28, 1995

4.    Review of Telephone Records of Ultimate Warrior Karate Club

5.    Review of Letter of Resignation by Sgt. James Merry

3

A 500

DETAILS:

1.      This investigation was authorized by Vaughn L. Davis, Director, SIO, on March 16, 1995, predicated by a information supplied by this investigator.

2.      On March 28, 1995 information was revealed to this investigator that Sgt. James Merry was involved in a relationship with inmate Elizabeth Maysonet, OB-4751.

INTERVIEWS:

1.      Elizabeth Maysonet, OB-4751
        DOB:  03/28/69
        SSN:  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

Elizabeth Maysonet is a twenty-six year old Hispanic female serving a four year to eight year sentence for Aggravated Assault from Philadelphia. Her minimum expires November 5, 1995, and her maximum expires November 5, 1999. She is a custody level two inmate.

On March 27, 1995, the above inmate was interviewed by this investigator at SCI Cambridge Springs where she is incarcerated. She advised the following:

        She was involved in a year long relationship with Sgt. James Merry from December 1993 thru November 1994.

        In December 1993, Merry sent her a Christmas card with a $100.00 money order enclosed. He used the name "James Mikalean" on the money order.

        On March 28, 1994, she received a birthday card with a $100.00 money order enclosed. He used "Alvin Martes" as the name on the money order.

        Merry french kissed her in the following locations:

                New Women's Dorm, several times in open-rec, Luter 3 and Luter 4, and the field house.

        He sent friendship cards through the mail by putting a small envelope in a large envelope and mailing it to her mother. Her mother mailed the envelope to her.

        Alvin Martes would be the name used for the return address.

4

He told her if anyone ever questioned her, to deny everything and always refuse a polygraph.

Merry told her of wanting to get married and make love to her.

Copies of Elizabeth Maysonet's statements are appended as **ATTACHMENT #1.**

2.  Hilda Maysonet, OB-3187
    DOB: 03/13/67
    SSN: 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

On March 29, 1995 the above inmate was interviewed by this investigator at SCI Cambridge Springs where she is incarcerated. She advised the following:

Sgt. James Merry was involved in a relationship with her sister Elizabeth.

Merry sent her sister many friendship cards and $100.00 on one occasion.

She observed Merry kiss Elizabeth once in open-rec.

She acted as the look-out for them as Merry had requested.

Merry told her once if ever questioned, not to say anything and never take a polygraph.

A copy of Hilda Maysonet's statement is appended as **ATTACHMENT #2.**

3.  Carmel Bynum, OB-1864
    DOB: 01/02/64
    SSN: 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

On April 4, 1995 the above inmate was interviewed by this investigator at SCI Cambridge Springs where she is incarcerated. She advised the following:

She met Officer Jim Merry at Cambridge Springs in the Spring of 1992.

Merry payed more attention to her than other inmates and followed her around.

Once she was in the basement of Alliance working. Merry came down, started talking to her, and french kissed her. She did not want him to do this.

In June 1993, she was working on the second floor in Alliance Hall doing electrical work when Merry walked in. Merry walked up and french kissed her. She was terrified and pushed Merry away. She walked briskly out of the building.

5

In November 1993 when she was at Crossroads Rehabilitation Center in Erie she observed Merry sitting in the parking lot across the street waving at her. She had a friend go to the window and wave back. Then Merry left.

To this day, she is still terrified of Merry.

A copy of Bynum's statement is appended as **ATTACHMENT #3**.

4.    Evangelia Garcia, OB-3864
      DOB:  08/31/54
      SSN:  Unknown

On March 28, 1995, the above inmate was interviewed at SCI Cambridge Springs where she is incarcerated. She advised the following:

She is a friend of inmate Elizabeth Maysonet.

She knew Maysonet received cards and letters from Jim Merry and one time kept them in her room as requested by Maysonet.

A copy of Garcia's written statement is appended as **ATTACHMENT #4**.

5.    Catherine Bowman, OB-3132
      DOB:  03/27/65
      SSN:  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

On March 29, 1995 the above inmate was interviewed at SCI Cambridge Springs where she is incarcerated. She advised the following:

She is Elizabeth Maysonet's former room-mate.

She knew James Merry and Maysonet were involved in a relationship and observed many "love" cards sent by Merry to this inmate.

She knew Merry sent Maysonet money through the mail.

Maysonet told her of calling Merry calling her on Saturdays at a friends business.

Maysonet told her Mery was going to marry her when she was released.

6

6.    Todd Higham
      109 S. Lake Street
      North East, PA  16428
      PHONE (814) 889-4493

On April 6, 1995, the above individual was interviewed by this investigator at his residence. He advised the following:

He is the owner/operator of the Ultimate Warrior Karate Club in North East, PA.

He has known Jim Merry since 1992 when they both worked at Great Lakes Armored Car Company. They worked together for two years.

In March 1993, he opened the Ultimate Warrior Karate Club. Jim Merry was ne of his students.

Merry took a few classes on Thursday nights but showed up every Saturday.

Merry arrived on Saturdays at 11:30 am and stayed and answer the phone.

Merry received a lot of collect calls from a Hispanic girl named "Liz".

Merry told him to accept the collect phone calls and he would pay for the calls.

Merry would also answer the phone from an Hispanic female and talk for an hour and a half while class was going on.

Merry payed him $30.00 monthly for club dues and $20.00 to $30.00 for phone calls.

Merry told him once of going through a divorce and that he had a $310,000.00 settlement coming. Merry said he didn't want anyone to know about the phone calls to mess it up.

Merry admitted to being in love with this girl, that she had a nice body and that he had slept with her.

Two weeks prior to this interview, Merry phoned him and said if anyone came asking questions he was not to say anything.

He said he would not lie for anyone.

A 504

7.    Jeff Duttry
      10765 W. Main Rd Lot 16
      North East, PA  16428
      PHONE: (814) 725-1046

On April 7, 1995 the above individual was interviewed by this investigator.  He advised the
following:

> He is a former instructor and part owner at Ultimate Warrior Karate Club in North East,
> PA.

> He knew Jim Merry was a friend of his former partner, Todd Higham.

> He knew Merry received collect phone calls from a young girl at the club, mostly on
> Saturdays.  Merry said this was a girlfriend and she was in jail.

> He personally accepted some calls for Merry from this girl or Merry would answer the
> phone.

> He would let Merry know what the calls cost and would receive money for them.

> Merry would come to the club on Saturday's just to use the phone.  He does not personally
> know if Merry ever received Karate instruction from Todd Higham.

> Merry told him once if anybody came around asking questions, not to say anything.

8.    James Frederick Merry, CO II
      DOB:  10/22/49

On April 12, 1995, the above officer was interviewed by this investigator at SCI Cambridge
Springs where he has been employed for three years.  Also present was Captain Keith Bartlett,
and AFSCME Representative Jerome Coffee.

> He knew inmate Elizabeth Maysonet and admited being too friendly with her.

> On Christmas 1993 he admitted sending Maysonet a Christmas card with a money order
> for $100.00 enclosed.  He used the name "James Mikalean" on the money order.

> He admitted that for Maysonet's March 28, 1994 birthday, he sent her a birthday card with
> a $100.00 money order enclosed.  He used the name "Alvin Martes" on the money order.
> Martes was an ex-boyfriend of Maysonet and she told him to use this name to send cards
> through the mail to her through Maysonet's mother.

8

He admitted hugging her, kissing her and touching her in the following locations:

    Open-rec, Luter 4, New Woman's dorm.

He told Maysonet to call him collect on Saturday's at a friends Karate School in North East, PA. The calls would be accepted and he would pay the owner, Todd Higham, when the bills came in.

He told inmates Elizabeth Maysonet, Hilda Maysonet and friends of Todd Higham and Jeff Duttry from the Ultimate Warrior Karate School if ever questioned, to deny everything.

Maysonet visited him in the Currie basement gym in the mornings and once stood in her doorway wearing a nightie for him.

He admitted getting involved in this year long relationship with Maysonet during a bad time in his life.

A 506

## ACTION TAKEN:

1.    Reviewed Maysonet's institutional file. The file revealed no relevant information.

2.    Reviewed two cash transaction slips payable to inmate Elizabeth Maysonet. The review revealed the following:

> Elizabeth Maysonet received two money orders from Merry. The first one dated December 21, 1993 using the name James Mikalean and April 8, 1993 using the name Alvin Martes. Each were for $100.00.

Copies of these cash transaction slips are appended as **ATTACHMENT #5.**

3.    Polygraph examination performed on Elizabeth Maysonet, OB-4751, by Special Investigator Michael Dodson on March 28, 1995. The examination revealed the following:

> On March 28, 1995, inmate Elizabeth Maysonet voluntarily agreed to polygraph testing. Her cooperation was voluntary and no promises were made to her.
>
> During the testing four relevant questions were asked. They are as follows:
>
> 1.    Are you lying when you say Merry sent you money orders?
> 2.    Did you have any sexual contact with Merry?
> 3.    Are you lying when you say Merry kissed you?
> 4.    Are you withholding any information from the investigator in this case?
>
> Maysonet answered "No" to all questions.
>
> Results of this test showed Maysonet was truthful in her response to question #1 and responses to questions #2, #3 and #4 were indicative of deception. However there was conflict between questions #2 and #3 as to the wording as to who kissed who.

A copy of Maysonet's polygraph report is appended as **ATTACHMENT #6.**

4.    Reviewed telephone records of the Ultimate Warrior Karate Club, 109 S. Lake, North East, PA 16428, Phone 814-725-2689, on April 6, 1995. The review revealed the following:

> The following collect phone calls were placed from SCI Cambridge Springs housing unit phones to Merry at the Ultimate Warrior Karate Club:

10

A 507

| Date | From Phone # | Time | Length of Call | Day of Week |
|------|-------------|------|---------------|-------------|
| 5/14/94 | 398-4406 | 12:00 pm | 127 min. | Thursday |
| 6/18/94 | 398-4406 | 12:10 pm | 1 min. | Saturday |
| 6/18/94 | 398-4406 | 12:35 pm | 92 min. | Saturday |
| 6/25/94 | 398-8703 | 12:13 pm | 80 min. | Saturday |
| 7/2/94 | 398-4411 | 12:53 pm | 1 min. | Saturday |
| 7/23/94 | 398-4411 | 12:24 pm | 78 min. | Saturday |
| 7/30/94 | 398-4416 | 12:19 pm | 100 min. | Saturday |
| 8/23/94 | 398-4411 | 6:05 pm | 67 min. | Tuesday |
| 8/30/94 | 398-4411 | 6:01 pm | 62 min. | Wednesday |
| 9/3/94 | 398-4411 | 12:41 pm | 68 min. | Saturday |
| 9/17/94 | 398-4414 | 12:32 pm | 99 min. | Saturday |
| 9/24/94 | 398-4416 | 12:31 pm | 90 min. | Saturday |
| 10/1/94 | 398-4450 | 12:29 pm | 88 min. | Saturday |
| 10/8/94 | 398-4414 | 12:22 pm | 90 min. | Saturday |
| 10/15/94 | 398-4414 | 12:26 pm | 1 min. | Saturday |
| 10/15/94 | 398-4414 | 12:41 pm | 5 min. | Saturday |
| 10/15/94 | 398-4411 | 1:08 pm | 1 min. | Saturday |
| 10/20/94 | 398-4450 | 5:59 pm | 54 min. | Thursday |

Copies of phone records are appended as **ATTACHMENT #7**.

5.    Reviewed Jim Merry's letter of resignation dated April 14, 1995.  The review revealed the following:

On April 14, 1995 Sgt. James Merry submitted his letter of resignation terminating his employment at SCI Cambridge Springs.

A copy of Merry's letter of resignation is appended as **ATTACHMENT #8**.

11

A 508

## ATTACHMENTS

1.  Elizabeth Maysonet's Statement

2.  Hilda Maysonet's Statement

3.  Carmel Bynum's Statement

4.  Evangelia Garcia's Statement

5.  Maysonet's Cash Transaction Slips

6.  Maysonet's Polygraph Report

7.  Phone Records of Ultimate Warrior Karate Club

8.  Merry's Letter of Resignation

Submitted by:

Date:      June 12, 1995

MW/cb

12

A 509

CONFIDENTIAL

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
December 5, 1995

# CONFIDENTIAL

SUBJECT:    **Request of the Assistance of
Special Services**

TO:         Thomas A. Fulcomer
            Deputy Commissioner

FROM:       William J. Wolfe
            Superintendent

I am seeking your approval to receive the assistance of Special
Services to aid us in the investigation of allegations of
fraternization between Officer Michael Stone and inmate Erika
Johnson.

Officer Stone has been under suspicion for improprieties with
inmates for quite some time, however, we have been unable to
substantiate this.  During a recent visit to SCI-Muncy Michael
Wolanin, Special Investigator, obtained additional information
regarding the allegations concerning Officer Stone.

Inmate Erika Johnson has recently agreed to cooperate with our
investigation.

We are requesting the assistance of Special Services to collaborate
information and provide polygraphic services.

WJW:jfh


cc: File

A 510

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**SCI-CAMBRIDGE SPRINGS**
**December 5, 1995**

SUBJECT:   INVESTIGATIVE REPORT/CASE #95-02
           INMATE ERIKA JOHNSON OC4895
           OFFICER MIKE STONE

TO:        R.R. LAZENBY
           INTELLIGENCE CAPTAIN

FROM:      LT. ROGER C. BECK, SR.

The following report is a brief summary of an interview conducted on December 4, 1995 by Lt. Beck with inmate E. Johnson OC4895, at her request, in the privacy of my office.

On December 4, 1995, I received two (2) requests from Johnson to speak to me. Knowing that Captain Lazenby was conducting an ongoing investigation involving this inmate, I immediately spoke to him, as I did not wish to jeopardize or interfere with this. It was the consensus of the Captain to allow me to speak to her and obtain all the information I could regarding allegations between her and Officer Stone.

Johnson entered my office at 12:30 PM on the above date, in a friendly and comfortable manner. I had advised Lt. Scott that Johnson would be in my office and to periodically look in and observe.

The initial conversation was started by Johnson and was basically in relationship to her coming back from the CCC Center and was concerned she would get a "hit" and wondered about her parole.

After a few minutes of this topic, I shifted the conversation to that of Officer Stone. Johnson stated that she was very upset with Captain Lazenby and Mr. Mike Wolanin of SIO for coming to the Center to ask her questions and that she did not like or trust either one. She only respects and trusts Lt. Beck, all the inmates feel this way. She also stated that she was afraid to take a polygraph test. When I asked her why, she replied "Because I'll probably fail it."

This was my basis for the next line of questions and explanations. Although Johnson stated that there was never any sexual contact between herself and Officer Stone, she did admit to physical contact, (i.e. hugging and kissing). Johnson was mostly concerned that if she gave a written statement to these facts that Stone would get fired. She also stated that she would not talk or tell this to anyone else.

I again brought up the polygraph test and confronted her with the fact that I believed at this point that she would fail. I also tried to enter into the conversation that I believed there was a possibility that phone calls and /or gifts were received by her from Officer Stone. She became startled and replied "How would you know that?"

A 511

12

INVESTIGATIVE REPORT/CASE #95-02
INMATE ERIKA JOHNSON OC4895
OFFICER MIKE STONE
PAGE 2

Johnson started becoming nervous and visibly upset. I asked her if she would be willing to make a written statement on the items discussed in this report. She replied, "Well, what if it only happened once?" "What would happen to Mr. Stone?" I replied that it did not make any difference if "it" happened once, or ten times, not indicating what the definition of "it" was. I explained that with all the information collected leading up to these facts and allegations, that she had nothing to lose or gain, and that she must remain truthful. Johnson stated that she needed a day or two to think about this. I stated that I would call her back down to my office on Wednesday, December 6, 1995, and would request that a written statement be given, covering the content of this report. No threats or promises were made, given, or implied by Lt. Beck regarding this request. Johnson agreed to speak to me again on Wednesday. A report on this event will be forthcoming.

Superintendent Wolfe was briefed by Captain Lazenby on this event on the morning of December 5, 1995, and it has been requested to entertain the support of the Office of Professional Responsibility with Mr. Mike Wolanin and Director Vaughn Davis.


RCB/sy

CC:    File

A 512

13

# Confidential

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
December 19, 1995

SUBJECT:   ONGOING INVESTIGATION # 95-02

TO:        WILLIAM J. WOLFE
           SUPERINTENDENT

*File*
*Officer Stone*

FROM:      LT. ROGER C. BECK, Sr.
           EMERGENCY PREPAREDNESS
           COORDINATOR

On December 19, 1995 this writer and Mr. Mike Wolanin interviewed inmate E. Johnson OC4895 once again about her involvement with Officer Stone.  Mr. Wolanin and myself started off with reviewing Johnson's written statement of December 6, 1995, and questioned her as to why she had written what we believed as a very defensive statement.  We also informed Johnson that we did not believe that she was being truthful.

Mr. Wolanin made aware the fact that Johnson had lied to him during an interview with her at the Pittsburgh CCC Center.

Johnson admitted verbally during both investigations that there was more going on between her and Stone, but refused to reveal any further details, again stating that she did not want anything to happen to Stone.

After speaking with Ms. Johnson for an extended period of time, it was decided to place Johnson in the RHU in AC custody to ensure the investigation would not be contaminated in any way.  Mr. Wolanin, after conferring with Mr. Vaughn Davis, recommended that a polygraph test be arranged for Johnson, and consideration given to possibly having her transferred to Muncy.

Should you have any questions or need further clarification, please let me know.

RCB/sy

CC:  Deputy Kormanic
     File:  ...\12/22

A 513

14

# Confidential

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
December 22, 1995

SUBJECT:   CASE #95-02 CONTINUATION

TO:        WILLIAM J. WOLFE
           SUPERINTENDENT

FROM:      LT. ROGER C. BECK, Sr.
           EMERGENCY PREPAREDNESS
           COORDINATOR

At 1300 hours on December 21, 1995, E. Johnson OC4895 requested to
speak with me. I met with Deputy Kormanic as to my plan of action,
as Johnson had indicated to me that she wanted to provide more
information on the Stone investigation.

Johnson was escorted from the RHU at approximately 1340 hours this
date. During the meeting Johnson indicated that she wished to
come clean and wanted to give a revised statement. She explained
her reasoning for this action was that she had come to the
realization that she had been the victim in this relationship, and
felt no need to try to protect Officer Stone any longer.

In the verbal interview exchange with this writer and Johnson, I
tried to verify and get truthful facts as to the physical
attraction and personal relationship that Johnson and Stone engaged
in, and how, over a period of time, these actions grew stronger and
more meaningful.

Johnson, as her written statement indicates, stated that Officer
Stone was indeed attracted to her and sought her out and showed
favoritism toward her. Johnson further stated on approximately a
dozen separate occasions Officer Stone would come to her room in
Luter 3, and they would engage in physical contact, such as
kissing, hugging, and petting. Johnson also indicated in her
statement that during the course of this physical contact, Officer
Stone had made some very sexual comments and had expressed the
desire to have sex with her and also requested a phone number
and/or address of how to contact her once she was released from
Cambridge Springs.

1

A 514

15

Ms. Johnson revealed the initial contact happened while Officer Stone was assigned to the 2-10 shift and that Stone always entered her room whenever her roommates were away. The first time, he grabbed her quite suddenly and kissed her on the mouth. She stated she felt really weird about the whole thing and she guessed Stone was taken back by her reaction because he avoided her for most of the evening. He did eventually come back to ask her if she was okay and she told him she wasnt sure, that she just felt really weird.

Sometime after that Officer Stone was then changed to the 6-2 shift due to the training rotations and nothing further occurred between them until his reassignment to 2-10 shift later in the year. At that time, Ms. Johnson said she had been going through a very difficult relationship on the outside and Officer Stone was supportive in his actions towards her, patting her on the shoulder, giving her a peck on the cheek and reassuring her everything would be okay.

After that occurrence, Ms. Johnson stated she felt the mood of the relationship changed from one of friendship to one of sexual interest. She admitted that she enjoyed the attraction but was also troubled by it because she thought that he (Stone) was a friend and a friend would not have put her in that position.

When asked why she did not report it, Ms. Johnson said she knew she would be leaving soon and she was satisfied to dismiss the issue from her life at that point so that no one would get hurt.

At the conclusion of Johnsons written statement, she agreed to take a polygraph test as to the truthfulness of her statement.

Deputy Kormanic was contacted at 1415 hours and was requested to witness Johnsons statement.

Then I contacted Mr. Wolanin of O.P.R. He requested I fax Johnsons statement to him for review with Mr. Vaughn Davis. It was agreed, after the review, to set up a polygraph test for Johnson. Mr. Wolanin will get back to me as to a date and time for this test.

Johnson was returned to the RHU and Deputy Kormanic advised Johnson that she would have to remain in AC custody pending this investigation.

RCB/sy

CC:  Deputy Kormanic
     File:  ...\12/22

A 515

16

# Confidential

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**SCI-CAMBRIDGE SPRINGS**
**December 28, 1995**

**SUBJECT:    INVESTIGATIVE REPORT/CASE #95-02**
            **OFFICER STONE/INMATE E. JOHNSON OC4895**

**TO:    WILLIAM J. WOLFE**
        **SUPERINTENDENT**

**FROM:    LT. ROGER C. BECK, Sr.**
          **EMERGENCY PREPAREDNESS**
          **COORDINATOR**

On December 28, 1995, Mr. Mike Dodson from the office of Professional Responsibility came to SCI-CBS at 0830 hours for the purpose of conducting a polygraph test on inmate E. Johnson OC4895. This test was requested to determine the truthfulness in Johnson's statements of alleged physical contact and relationship with Officer Mike Stone, and to also determine if any other pertinent information could be obtained relative to this investigation.

From 0830 to 1000 hours, this investigator and Mr. Dodson reviewed the complete investigative file, all reports, statements, and built a profile of inmate Johnson, and developed questions to be used for the polygraph test. The control questions used were to determine only if Johnson was being truthful in her allegations, if in fact there was physical contact, and if there was any sexual contact between the two.

At 1000 hours, inmate E. Johnson OC4895 was brought to Lt. Beck's office. Johnson was put in the office alone with Mr. Dodson, who, at this time, conducted his pre-polygraph interview, and explained to Johnson how the test was to be conducted. During this interview, information was obtained from Johnson to Mr. Dodson that Johnson did in fact have sexual contact with Officer Stone in the form of oral sex. A signed written statement from Johnson was obtained in regards to this allegation, and was to be used during the polygraph examination.

At 1200 hours this date, Johnson was attached to the polygraph and the examination started. The test was conducted at 1300 hours this date.

**A 516**

17

Mr. Dodson called Lt. Beck into the office to advise the results of the test.  Mr. Dodson, in his professional opinion, stated that Johnson was non-deceptive.  In other words, she was truthful in all the facts obtained through her statements, including the physical contact and sexual contact with Officer Stone.

Johnson was then returned to the RHU.  Deputy Kormanic, Acting Superintendent, was advised by Mr. Dodson and Lt. Beck of the results of the polygraph, for final determination and assessment to be done by Deputy Kormanic.

Mr. Dodson agreed to send Lt. Beck a complete copy of his report, interview, and polygraph results as soon as possible.


RCB/sy

CC:  Deputy Kormanic
     File:  ...\12/29

A 517

18

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
January 22, 1996

CONFIDENTIAL INFORMATION

SUBJECT:    INVESTIGATION CASE NUMBER 95-02
            Ref: Officer Michael Stone & Inmate Erike Johnson
            OC4895

TO:     WILLIAM J. WOLFE
        SUPERINTENDENT

FROM:   R.R. LAZENBY
        INTELLIGENCE CAPTAIN

As per your request, I have reviewed the information relating to
allegations on Case Number 95-02 involving the alleged personal
relationship, between Officer Michael Stone and Inmate Erika
Johnson D.C. number OC4895.

In March of 1995, Captain Bartlett received information
allegations that Officer Michael Stone may be involved in an
unprofessional personal relationship with Inmate Erika Johnson.
Captain Bartlett forwarded this information on to me, when I was
assigned to the duties of Intelligence Captain. At this time, you
authorized me to initiate an investigation of the allegation.
During that time, I as unable to establish any validity to the
allegation made, hence forth, the case was closed.

In the late summer of 1995, Mr. Wolanin received information from
an inmate at SCI-Muny, again allegations Officer Stone and Inmate
Johnson were involved in a personal relationship, with each other
at SCI-Cambridge Springs. Around the same time frame, in which
the allegations were received by Mr. Wolanin, inmate Johnson was
paroled to the C.C.C. in Pittsburgh.

In November of 1995, Mr. Wolanin and myself interviewed Inmate
Johnson at the C.C.C. in Pittsburgh. Inmate Johnson denied any
involvement with anyone at SCI-Cambridge Springs. Later that month,
Inmate Johnson was returned to SCI-Cambridge Springs as a result of
a misconduct.

Upon Inmate Johnson return to SCI-Cambridge, Lieutenant Beck
became involved with the investigation. Lieutenant Beck  & Mr.
Wolanin interviewed her about the alleged relationship with Officer
Stone, and she denied the allegations. After several interviews,
she admitted to the allegations. She was administered a polygraph
test and passed exam.  As a result of the polygraph test, Officer
Stone was suspended.

A 518

26

page II

The only evidence which has been obtained is a written statement
made by Inmate E. Johnson and the result of the polygraph test.
At this time, there is no concrete evidence nor is there a
witness to confirm the allegations. Further more, Officer M.
Stone denies all allegations.

I strongly feel that the allegations which were made are factual.
However, the evidence is insufficient.  The only evidence
available at this time is a statement made by Inmate E. Johnson
and the polygraph test results.  Polygraph test are administered
with a margin of error and may not be one hundred percent (100%)
reliable.  The credibility of the inmate's statement is based on
the result of the polygraph test.  Official reports which help
verify some of Officer M. Stone's accounts to the allegations are
on file.  In addition, an Extraordinary Report dated June of 1995
informs the administration that inmates housed in the Luter 3
maybe conspiring to "set-up" Officer M. Stone is also on file.

As of this date, there is insufficient evidence to support the
allegation that Officer M. Stone was involved in an
unprofessional personal relationship with Inmate E. Johnson.

A 519

27

December 1995

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-Cambridge Springs
January 22, 1996

## CONFIDENTIAL

**SUBJECT:**    Investigation Case Number 95-02
Ref: Officer Michael Stone & Inmate Erika Johnson. OC-4895

**TO:**    Thomas A. Fulcomer
Deputy Commissioner

**FROM:**    William J. Wolfe
Superintendent

For your information, please find attached a copy of Captain Lazenby's investigative summary on Officer Michael Stone. Pursuant to our discussions concerning this case, Officer Stone was reinstated and returned to work January 21, 1996. Shortly after reporting to work he tendered his resignation effective immediately without completing his shift.

By copy of this memo, I am updating Mr. Vaughn Davis who I wish to thank for the continued support and assistance from the Office of Professional Responsibility.


WJW/jfh

cc: Mr. Vaughn Davis
      File


A 520

28

# CONFIDENTIAL

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
March 7, 1995

SUBJECT: **Request for Investigation**

TO:      Captain Bartlett

FROM:    William J. Wolfe
         Superintendent

Based upon the information you recently provided to me regarding an allegation that COT Hammers was observed by an unidentified Corrections Officer Trainee engaging in a sexual act with an unidentified inmate, I am hereby directing you to conduct a formal investigation into this matter.

Please keep me updated on your progress.


WJW/jfh

cc: Superintendent's File

**DEPARTMENT OF CORRECTIONS EMPLOYEE**
**REPORT OF EXTRAORDINARY OCCURRENCE**

To: _Deputy Kormanic_    Institution: _SCI-CBS_
From: _D. Foster_    Date: _3/9/95_
Title: _COIII_    Time: _2245 HRS._
Date: _3/9/95_    Area: _OPERATIONS/PHONE CAL_
Signature: _Lt. N. Foster_    Occurrence: _ALLEGED - Violations of the_
_CODE OF ETHICS / SECT. B #1?_

Inmates Involved:    Staff Involved:
Name & DC No.    Name & Title    Witnesses:

_MAYSONET, ELIZABETH (OB4751)_    _ALLEN - COT_    _LT. GARDNER_
_HAMMERS - COT_

Actions Taken:

_THIS REPORT - CONFIDENTIAL_

_REVIEWED:_
_H. Gardner_
_ONLY HEARD ONE SIDE OF_
_CONVERSATION: THAT OF LT. FOSTER'S._

_CC: CAPTAIN BARTLETT_

A 522

Description of Incident, in detail: (Use other side if necessary):

_At approx. 2245 hrs, while consulting with the Shift Commander, Ofc._
_Allen called the office to state that he was calling to find out how_
_to go about terminating his employment immediately. I asked_
_him if there was a problem he needed to discuss. He went_
_on to say he had knowledge of Ofc. Hammers having physical_
_contact with inmate Maysonet, OB4751 at "Open Rec" in the_
_bathroom and other places in the institution. He stated that_
_Hammers admitted it and told Manville he couldn't believe Allen you_
_switch him out. Manville went back and told Allen what he knew_
_and he mentioned Martin had knowledge (OPEN REC/Yd. 3/3/95)._

_(over)_

(2/15/)

Allen states when this happened was approx. a couple of weeks ago. When he went to the Union, Local 3940 Board they told him not to tell on a fellow grey shirt. When he refused to violate the Code of Ethics, he was intimidated and physically confronted after work on 3/5/95 by fellow officers (he wouldn't give names). He stated that other officers have knowledge of what's going on but won't tell on Hammers because of Ofc. Pelletier, and Novajon- and a Sgt. whose name he was afraid to give to me. He hasn't been back to work and has obtained a lawyer be- cause he said he reported this and was ignored by the Union and a Commissioned Officer. He said he received a call from Deputy Karnacic because of his attendance and was going to terminate his employment because he couldn't trust anybody to investigate it and he's labeled a snitch now by his fellow officers. I told him to follow up the chain of command and to file a full report with Captain Bartlett before deciding to terminate his employment, and that he could trust he and the Deputy's judgement before he pursues legal proceedings.

S

SCI-Cambridge Springs

March 10, 1995                                                    Time 0937 to 10:00

Present        Captain Keith R. Bartlett, Correctional Officer Trainee Bruce Allen, Deputy
               Superintendent Victoria Kormanic, Secretary Sue Yanc

This is a recording of interview with Officer Allen regarding allegations with Officer Hammers
and an inmate.

Captain Bartlett:     I received an incident report from Lieutenant Foster in regards to a phone
                      conversation you had with her the evening of the 9th of March, 1995 at
                      about 2245 hours. Is that correct? Did you call in and talk to her?

Officer Allen:        Correct.

Captain Bartlett:     The incident report states while consulting with Shift Commander, Officer
                      Allen called the office to state he was calling to find out how to terminate
                      his employment immediately. I asked him if there was a problem he needed
                      to discuss . He went on to say he had knowledge of Officer Hammers
                      having physical contact with inmate Maysonet OB4751 at Open Rec.in the
                      bathroom and other places in the institution. He stated that Hammers
                      admitted it and told Manville that he could not believe Allen would snitch
                      him out. Manville went back and told Allen what he knew and mentioned
                      Martin had knowledge (Open Rec/Yard 3-3-95) . Allen states when this
                      happened it was approximately a couple of weeks ago 2-15-95, when he
                      went to Union 3740 board, they told him not to tell on any fellow gray
                      shirt. When he refused to violate the Code of Ethics he was intimated and
                      physically confronted after work on 3-5-95 by Officers and he would not
                      give any names. He stated that other Officers have knowledge of what is
                      going on but will not tell on Hammers because of Officer Pelletier,
                      Novakowski, and a Sergeant who's name he is afraid to give me. He hasn't
                      been back to work and has obtained a lawyer because he said he reported
                      this and was ignored by the Union and a Commissioned Officer. He
                      received a call from Deputy Kormanic because of his attendance and was
                      going to terminate his employment because he could not trust anybody to
                      investigate it, and he has been labeled a snitch now by his fellow Officers. I
                      told him to follow up by the Chain of Command and to fill out a full report
                      with Captain Bartlett before deciding to terminating his employment, that
                      he could trust him and the  Deputy's judgement before he pursues legal
                      proceedings . Is this pretty much correct?

Officer Allen:        That's correct.



A 524

Captain Bartlett:    I am going to ask you some questions to follow up on this. First off specifically, what did you know or observe about Officer Hammers and inmate Maysonet?

Officer Allen:    I had first heard when I wasn't working, he stopped over at my house after work one night, him and Officer Manville, ...

Captain Bartlett:    Him meaning Officer Hammers?

Officer Allen:    Officer Hammers, myself, my girlfriend, Officer Manville, Officer Hammers at my apartment. Hammers was changing, they were going out, he kept saying he had something to tell me, something happened at work I wouldn't believe it. He called me out in the hallway of my apartment and told me that he had been on O/P and he was doing a check around Kozmor, as he was going around back that the....

Captain Bartlett:    Excuse me, you said O/P, O/P is outside.

Officer Allen:    Or I/P, excuse me. He was going around the back of Kozmor, and he noticed one of the Maysonet sisters windows was stuck and they called him over to ask if he could help shut it. He said yea, he came over and they had a conversation basically, she said "Officer Hammers, you know I been thinking about you, but there's things you can't get in prison", he told me "he asked her what's that", "could you kiss me?", and he kissed her and he told me he fondled her a little bit, and that was the first incidence and after that it happened at open rec when I was working it and two other Officers, they were suspicious, but they did not want to say anything , but they noticed his absence after he was at their table cause just the two Maysonet sisters always sit together at open rec. The little game was at 7:00 they make the movement to come to open rec, he goes over to their table, the way he told me it happens is the inmates have to have that restroom pass. The one Maysonet sister would get the pass and go down to the inmate restroom and make sure no one else was around, he would go back down the back steps sit up on the back of the toilet, in the stall and wait for them.

Captain Bartlett:    And he told you that?

Officer Allen:    Right.

Captain Bartlett:    O.K.. Are you aware of any other incidents?

Officer Allen:    Well, only after I mentioned it to another Officer who worked with him in

# CONFIDENTIAL

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
March 13, 1995

SUBJECT:   **Request for Special Investigations
Office Assistance**

TO:        Thomas A. Fulcomer
           Deputy Commissioner

FROM:      William J. Wolfe          BY: K.B. Bartlett
           Superintendent               Intelligence Captain

On March 10, 1995, a preliminary investigation was started on
C.O.T. Richard Hammers in regards to sexual contact with an inmate.

As a result, C.O.T. Hammers was suspended pending the final
outcome.   C.O.T. Allen came forward and advised us that Officer
Hammers told him of several occasions of sexual contact including
one occasion when Officer Allen observed both Officer Hammers and
the inmate disappear for a period of time from open recreation.
Both Officer Hammers and the inmate deny any wrong doing.

Officer Hammers is willing to polygraph even after discussion with
the union.   The inmate refused to polygraph.

At this time, we are requesting the assistance of the Special
Investigations Office not only to conduct the polygraph but to
assist Captain Bartlett in concluding this investigation as soon as
possible as we can only suspend Officer Hammers for thirty (30)
days pending this investigation.

We are also requesting an outside investigator be assigned a sexual
harassment investigation involving Office Hammers as the
complainant.   We believe this would be a conflict of interest for
Captain Bartlett.

Any questions can be directed to my office or to Captain Bartlett.


WJW/jfh

cc: Deputy Kormanic
    File                                              A 526

                                                        *5*

I Elizabeth Maysonet OB4751 An giving this statement on my own free will. I was not given any promises when we first talk to the officer Hammer I thought he was a nice person. So we talked li normal people do. But on January 18, 1995 I was standing in my window and I saw hammer But I try to close the window But it didn't close. That's when I called him over, so while he was trying to put the window to place. We were talking. So he start to kiss me, he felt my Butt lack and thigh. Then on Feb. 15, 1995 I was at Open-Rec when Hammer first kiss me and felt my Breast. But that was all we we did,

OB4751 Elizabeth Maysonet
3/14/95

Ted R. Bottia, CAPT 3/14/9



PENCAD Bayonne N.J.

EXHIBIT
111

Notarial Seal
Dominic J. White, Notary Public
Cambridge Springs, Crawford County
My Commission Expires Sept 8, 1997

Dominic J. White
3-14-95

A 527

# MIRANDA RIGHTS WAIVER

MY NAME IS KEITH R. BARTLETT OF SCI-CAMBRIDGE SPRINGS.

I WISH TO ADVISE YOU THAT YOU HAVE AN ABSOLUTE RIGHT TO REMAIN
SILENT; THAT ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN
A COURT OF LAW; THAT YOU HAVE A RIGHT TO TALK TO AN ATTORNEY
BEFORE AND HAVE AN ATTORNEY PRESENT WITH YOU DURING QUESTIONING;
THAT IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE
APPOINTED TO REPRESENT YOU WITHOUT CHARGE BEFORE ANY QUESTIONING
IF YOU SO DESIRE; AND IF YOU DECIDE TO ANSWER ANY QUESTIONS, YOU
MAY STOP ANY TIME YOU WISH.

1.    DO YOU UNDERSTAND THESE RIGHTS I HAVE EXPLAINED TO YOU?

2.    WITH THESE RIGHTS IN MIND, DO YOU NOW WISH TO TALK TO
      US?

_Elizabeth Mayhook_  3/10/95

_Witnessed by: Sgt Chase 3-10-95_

EXHIBIT

114

A 528

FPENG-DMG-09818 I.N



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA DEPARTMENT OF CORRECTIONS
SPECIAL INVESTIGATIONS OFFICE

May 16, 1995

Case Number:          95-F-015
Report Prepared by:   Michael Wolanin, Special Investigator
Allegation:           Violation Code of Ethics

SUBJECT:

Richard Hammers, Corrections Officer Trainee
DOB: 05/25/53

COMPLAINANT/VICTIM:

Elizabeth Maysonet, OB-4751
DOB: 03/28/69
SSN: 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

LOCATION:

State Correctional Institution Cambridge Springs

REVIEWED BY: *Carl Robinson*
Carl Robinson
Senior Investigator
Special Investigations Office

APPROVED BY: *Vaughn L. Davis*
Vaughn L. Davis
Director
Special Investigations Office

DISTRIBUTION:
Commissioner Horn
File

A 529

CONFIDENTIAL

## SYNOPSIS

This investigation was authorized by Vaughn L. Davis, Director, Special Investigations Office, (SIO), on March 16, 1995, predicated by information supplied by Thomas A. Fulcomer, Deputy Commissioner of Corrections.

Deputy Fulcomer's information revealed that Correctional Officer Trainee, (COT), Richard Hammers had sexual contact with inmate Elizabeth Maysonet.

Inmate Elizabeth Maysonet, OB-4751, was interviewed on March 20, 1995. She said, on three separate occasions, Officer Hammers french kissed her. On one of these occasions Hammers put his hand down the front of her pants, inserting his fingers into her vagina. She did not want him to do this.

Hilda Maysonet, OB-3187, said she once observed Hammers kiss, feel the breasts, butt and legs of her sister Elizabeth.

Bruce Allen, former COT, said Hammers told him of kissing, fondling and manually stimulating inmate Elizabeth Maysonet within the institution.

Patti Jo Burkhart and Heidi Fleming, both COT's, observed Hammers being extremely friendly with Elizabeth Maysonet, more than other inmates.

When contacted by this investigator on March 20, 1995, Hammers refused to be interviewed with regard to the allegations made against him at SCI Cambridge Springs.

During the course of this investigation, Hammers resigned his position as COT claiming medical reasons.

This investigation revealed the following sections of the Pennsylvania Crimes Code had been violated:

> 3125 (5) Aggravated Indecent Assault, (F3), and 3126 a(5) Indecent Assault, (M2).

Assistant District Attorney Doug Ferguson declined to prosecute; though he acknowledged that criminal implications were present. Ferguson felt Hammers' resignation was sufficient.

A 530

CONFIDENTIAL

TABLE OF CONTENTS

DETAILS:

1.    Request for Investigation

2.    Review of Initial Complaint

INTERVIEWS:                                              PAGE:

1.    Elizabeth Maysonet, OB-4751                    4

2.    Hilda Maysonet, OB-3187                        5

3.    Heidi Fleming, COT                             5

4.    Bruce Allen, Former COT                        5, 6

5.    Patti Burkhart, COT                            6

6.    Frederick Allen Manville, COT                  6

ACTION TAKEN:

1.    Review of Maysonet's Institutional File

2.    Contact of Richard Hammers by Phone

3.    Review of Letter of Resignation by COT Richard Hammers

4.    Review NCIC Check of Richard Hammers

5.    Reviewed the Pennsylvania Crimes Code, Sections 3125 (5) and 3126 a(5)

6.    Consultation with Crawford County Assistant District Attorney Doug Ferguson regarding Criminal Action against Richard Hammers

A 531

8

CONFIDENTIAL

DETAILS:

1.    This investigation was authorized by Vaughn L. Davis, Director, Special Investigations Office, (SIO), on March 16, 1995, predicated by a complaint initiated by Thomas A. Fulcomer, Deputy Commissioner of Corrections.

A copy of Deputy Fulcomer's memo is appended as **ATTACHMENT # 1.**

2.    Deputy Fulcomer's information revealed that COT Richard Hammers had possible sexual contact with inmate Elizabeth Maysonet on several occasions.

INTERVIEWS:

1.    Elizabeth Maysonet, OB-4751
      DOB:  03/28/69
      SSN:  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

Elizabeth Maysonet is a 26 year old Hispanic female serving a 4 year to 8 year sentence for Aggravated Assault from Philadelphia.  Her minimum expires November 5, 1995 and her maximum expires November 5, 1999.  She is a custody level two inmate.

On March 20, 1995, the above inmate was interviewed by this investigator at the State Correctional Institution Cambridge Springs where she is incarcerated.  She advised the following:

> She was involved in a relationship, sexual in nature, with Officer Richard Hammers.

> Around January 17, 1995, she was in her room in Kosmor Hall attempting to close her window and observed Hammers nearby and called him over to help.  At some point, Hammers leaned into the room french kissing her, feeling her butt, thighs and breast. She did not want him to do this.

> On February 7, 1995 while in dietary with her sister Officer Hammers came in, saw her and motioned for her to meet him.  They met in the inmate bathroom, Hammers was crouching on the toilet and they french kissed.  Hammers put his right hand down the front of her pants and inserted his fingers into her vagina.

> On February 16, 1995, while in the library, Hammers came in and again motioned for her to meet him.  They met in a bathroom where they again kissed.

A copy of Elizabeth Maysonet's statement is appended as **ATTACHMENT # 2.**

A 532

9

CONFIDENTIAL

2.     Hilda Maysonet, OB-3187
       DOB:  03/13/67
       SSN:  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

On March 21, 1995, the above inmate was interviewed at SCI Cambridge Springs where she is incarcerated.  She advised the following:

> On March 21, 1995, she was in her room in Kosmor with her sister Elizabeth when she observed Officer Hammers lean in the window and kiss Elizabeth, feel her breasts, butt and legs.  He was there 15 or 20 minutes before leaving.
>
> In mid February, she and her sister were in open-rec when she observed Hammers motion to Elizabeth to meet him.  Elizabeth and Hammers left and were gone for 15 minutes.
>
> Elizabeth later told her of meeting Hammers in the inmate bathroom.  They kissed and Hammers felt Elizabeth's body, put his hand down the front of her pants and into her sister's vagina.
>
> On February 15 or 16; 1995, she and her sister were in the library when Hammers came in and gave Elizabeth a signal to leave.  They were gone for 15 minutes.  Elizabeth told her later of kissing Hammers in the bathroom.

A copy of Hilda Maysonet's statement is appended as **ATTACHMENT # 3.**

3.     Heidi Fleming, Corrections Officer Trainee
       DOB:  02/18/72

On March 27, 1995, the above employee was interviewed by this investigator at SCI Cambridge Springs where she has been employed for 8 months.  She stated the following:

> On February 7, 1995, she was working open-rec with Officer Hammers.  She observed Hammers paying an excessive amount of attention to Elizabeth and Hilda Maysonet.  Hammers appeared to be trying to impress the inmates.
>
> On another occasion, she and Hammers were working Curie Hall together.  Hammer's asked her "if an officer were going to mess around with an inmate, where would you do it".
>
> She felt this conversation was totally inappropriate.

A copy of Fleming's statement is appended as **ATTACHMENT # 4.**

A 533

10

CONFIDENTIAL

4.    Bruce Allen, Former Corrections Officer Trainee
       DOB: 06/01/65

On March 20, 1995, the above individual was interviewed by this investigator at SCI Cambridge Springs. He advised the following:

> On January 20, 1995, at 11:30 pm, Hammers told him he had messed around with one of the Maysonet sisters.
>
> Hammers told him he kissed and fondled her while at the rear of Kosmor at Elizabeth Maysonet's window.
>
> He observed on or about February 15, 1995, in open-rec, Hammers sitting at the table with the two Maysonet sisters Hammers and Elizabeth Maysonet disappeared for 20 minutes. Hammers told him later of going into the inmate bathroom, manually stimulating Elizabeth Maysonet while receiving oral sex from her.

A copy of Bruce Allen's statement is appended as **ATTACHMENT # 5**.

5.    Patti Jo Burkhart, Corrections Officer Trainee
       DOB: 12/07/53

On March 20, 1995, the above officer was interviewed at SCI Cambridge Springs where she has been employed for 6 months. She advised the following:

> On February 7, 1995, while working open-rec, she observed Officer Richard Hammers talking in a friendly manner with Elizabeth Maysonet.
>
> At one point during the evening, they both disappeared for 20 minutes.
>
> She later spoke to Officer Bruce Allen and was informed that Hammers told him of taking Elizabeth Maysonet into the inmate bathroom kissing and fondling her.

6.    Frederick Allen Manville, Corrections Officer Trainee
       DOB: 08/24/64

On March 20, 1995, the above officer was interviewed by this investigator at SCI Cambridge Springs where he has been employed for 7 months. He advised the following:

> Allen told him in January 1995 that Hammers admitted being involved in a relationship, sexual in nature, with Elizabeth Maysonet in the institution.
>
> It appeared to him that Hammers and Maysonet were "more than friends".

A 534

\\

6

CONFIDENTIAL

ACTION TAKEN:

1.    Reviewed Maysonet's institutional file.  The file revealed no relevant information.

2.    Contacted Richard Hammers by phone, (412) 652-9712, on March 20, 1995, at his
       residence in New Castle, PA.  He stated the following:

              Due to advice from his attorney, he would not consent to being interviewed by
              this investigator concerning these allegations.

3.    Reviewed Richard Hammers letter of resignation dated March 15, 1995.  The review
       revealed the following:

              On March 15, 1995, Richard Hammers voluntarily resigned his position as
              Correctional Officer Trainee.  He stated that after seeking medical care, he was
              instructed by doctors to seek less stressful employment.

A copy of Hammers' resignation is appended as **ATTACHMENT # 6.**

4.    Reviewed NCIC check of Richard Hammers.  The check revealed the following:

              On March 31, 1995, an NCIC check for prior criminal history was conducted for
              Richard Hammers.   This check revealed on June 23, 1974, Hammers was
              arrested by new Castle Police for Burglary and Criminal Trespass.  A plea of
              guilty and one year county probation was imposed.

              On July 5, 1974, Hammers was arrested by the Pennsylvania State Police, New
              Castle, for Receiving Stolen Property.  A plea of guilty and one year county
              probation was imposed.

A copy of NCIC check is appended as **ATTACHMENT # 7.**

5.    Reviewed the Pennsylvania Crimes Code, Sections 3125 (5) and 3126 a(5).  The review
       revealed the following:

              This investigation revealed the following sections of the Pennsylvania Crimes
              Code were violated:

       ◆      3125 (5) Aggravated Indecent Assault, "A person commits a felony of the
              second degree when he engages in penetration, however slight, of the
              genitals or anus of another with a part of the body when the other person
              is in custody of law or detained in an institution".

7

A 535

12

CONFIDENTIAL

◆    3126 a(5) Indecent Assault, "A person who has indecent contact with another, not his spouse, is guilty when the person is in custody of law or detained in an institution".

6.    Consultation with Crawford County Assistant District Attorney Doug Ferguson regarding criminal action against Richard Hammers. This consultation concluded the following:

Assistant District Attorney Doug Ferguson advised that even though criminal implications were present, the DA's office was reluctant to prosecute Richard Hammers due to him resigning. Ferguson felt prosecution would not be appropriate in this case.

Submitted by:    _Michael Dole_

Date:    _June 28, 1995_

MW/hr

8

A 536

13

CONFIDENTIAL

## ATTACHMENTS

1.    Initial Complaint

2.    Elizabeth Maysonet's Statement

3.    Hilda Maysonet's Statement

4.    Heidi Fleming's Statement

5.    Bruce Allen's Statement

6.    Hammers' Resignation

7.    Hammers' NCIC Records Check

A 537

14

CONFIDENTIAL