

# COMMONWEALTH OF PENNSYLVANIA
## PENNSYLVANIA DEPARTMENT OF CORRECTIONS
### SPECIAL INVESTIGATIONS OFFICE

August 24, 1994

Case No.               94-F-043
Report made by:      Michael Wolanin, Special Investigator
Allegation:           Violation Code of Ethics

### SUBJECTS:

Carl Zimmerman, Facilities Maintenance Manager

### COMPLAINANT:

Deborah Foreman, OA-2684
DOB: 07/20/53
SSN: 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

### LOCATION:

State Correctional Institution Cambridge Springs

APPROVED:
Vaughn L. Davis
Director
Special Investigations Office

DISTRIBUTION:
Commissioner Lehman
File

A 538

CONFIDENTIAL

Case No. 94-F-043

## SYNOPSIS

This investigation was authorized by Vaughn L. Davis, Director, Special Investigations Office, (SIO), on July 5, 1994 predicated by a complaint from Deborah Foreman, OA-2684, who is incarcerated in the State Correctional Institution Cambridge Springs, (SCICS).

Foreman's complaint reveals that Lisa Gunnarson, OA-6877, was sent to a Community Corrections Center in Pittsburgh in February 1994.

Foreman claims Gunnarson was returned to SCICS in mid-June 1994 for an infraction involving alcohol and should have been placed in the Restricted Housing Unit, (RHU), for 30 days but wasn't.

Foreman claims that due to a previous close relationship with Carl Zimmerman, Facilities Maintenance Manager, Gunnarson was released after serving only three days and given her old clerical job in maintenance back.

Foreman also complains that Zimmerman has taken Gunnarson from the housing unit many times after 5:00 P.M. supposedly to work. Foreman feels that SCICS upper management has allowed certain inmates to obtain special privileges.

On July 13, 1994 Foreman was interviewed. During her interview she claimed she has observed Lisa Gunnarson, Clerk in the Maintenance Department, travel everywhere in the institution with Carl Zimmerman.

Foreman claims she observed Zimmerman kissing Gunnarson once in the basement of dietary.

Foreman also claims that due to Gunnarson's close relationship with Zimmerman, this inmate continues to obtain special privileges at SCICS.

William Scheffner, Correctional Counselor was interviewed. He relates he was Gunnarson's counselor at SCICS and observed that the inmate spent a lot of time with Zimmerman more so that other inmates.

Inmate Margaret Groves was interviewed. She said that both Terry Walker, Former Inmate Maintenance Clerk, and Carl Zimmerman had confided in her on separate occasions that there was a relationship going on between the two of them.

Groves observed both Terry Walker and Lisa Gunnarson get called out to work, sometimes all night, to "assist" Zimmerman.

2

A 539

CONFIDENTIAL

An investigation was condcuted by SCICS Security into a finding at Kosciuszko Hall, an abandoned storage facility referred to at the institution as "Freddy's House". A room within this buidling was found with a couch, table, chair and heater with a door that could be locked from the inside. Investigation revealed Zimmerman, on countless occasions, took inmates Terry Walker, Lisa Gunnarson and Dianna Holley into this area alone and unescorted.

On July 14, 1994, Lisa Gunnarson was initially interviewed. She said she worked as a clerk for Zimmerman and they had only a working relationship.

Carl Zimmerman was initially interviewed on July 14, 1994. He denied all allegations made against him.

On August 9, 1994 Lisa Gunnarson voluntarily agreed to Polygraph Testing. This inmates response to all relative questions indicated deception.

During Gunnarson's post-test interview she gave a written statement admitting a relationship with Carl Zimmerman of a sexual nature.

Carl Zimmerman, upon being re-interviewed, on August 9, 1994 admitted to violating Department of Corrections Code of Ethics section 30, that he misled an investigator during an internal investigation and also section 6, and admitted he had been having an improper physical relationship with inmate Gunnarson for over one year.

Zimmerman's actions also violated the Pennsylvania Crimes Code Section 3126 relating to indecent assault.

This interview culminated with Carl Zimmerman rendering his letter of resignation terminating his employment with the Department of Corrections.

It is a recommendation of this investigator that a log be established documenting inmate movement from the housing units at abnormal times, other than scheduled activities. Also security should maintain access for all lock and keyed entries within the institution.

It is also recommended the Office of Inspector General be advised as to the findings of this inquiry.

4

A 540

CONFIDENTIAL

Case No. 94-F-043

## TABLE OF CONTENTS

DETAILS:

1.    Request for Investigation

2.    Review of Foreman's Complaint


INTERVIEWS:

1.    Deborah Foreman, OA-2684

2.    Diana Holley, OB-8137

3.    Terry Walker, OA-1742

4.    Lisa Gunnarson, OA-6877

5.    Margaret Groves, OO-8707

6.    Charles Utz, Deputy for Specialized Services

7.    William Scheffner, Correctional Counselor

8.    Carl Zimmerman, Facilities Maintenance Manager

9.    Carl Zimmerman, Facilities Maintenance Manager, (Re-Interview)


ACTION TAKEN:

1.    Review of Investigative Report by Captain Bartlett

2.    Review of RHU Log Book

3.    Polygraph Examination for Lisa Gunnarson

5

A 541

CONFIDENTIAL

Case No. 94-F-043

DETAILS:

1.   This investigation was authorized by Vaughn L. Davis, Director, Special Investigations
     Office, (SIO), on July 5, 1994 predicated by a complaint from Deborah Foreman, OA-
     2684 who is incarcerated at the State Correctional Institution Cambridge Springs,
     (SCICS).

     Foreman's complaint was referred to the director by the Office of Inspector General.

2.   On July 8, 1994 Foreman's complaint was reviewed.   The review disclosed the
     following:

          Lisa Gunnarson, OA-6877 was sent to a Community Corrections Center in
          Pittsburgh from the SCICS in February 1994.

          Gunnarson  was returned to SCICS in mid June 1994 for an infraction involving
          alcohol and should have been placed in the Restricted Housing Unit, (RHU), for
          thirty days but wasn't.

          Due to a previous close relationship with Carl Zimmerman, Facilities
          Maintenance Manager, Gunnarson was released after serving only three days and
          given her old clerical job in maintenance back.

          Zimmerman takes Gunnarson from her housing unit many times after 5:00 P.M.
          supposedly to work.

          SCICS's upper management had allowed certain inmates to obtain special
          privileges.

A copy of Foreman's complaint is appended as **ATTACHMENT #1.**

INTERVIEWS:

1.   Deborah Foreman, OA-2684
     DOB:  07/20/53
     SSN:  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

Deborah Foreman is a 41 year old black female serving a 5 to 10 year sentence for violation of
the controlled drug act from Allegheny County.  Her minimum sentence expired on June 19,
1994 and her maximum sentence expires on June 19, 1999.  She is a custody level 2
classification.

6   A 542

CONFIDENTIAL

On July 13, 1994 the above inmate was interviewed by this investigator at SCICS where she is incarcerated.  She advised the following:

> She worked under Carl Zimmerman, Facilities Maintenance Manager, until late last year when she came back from a furlough with a dirty urine that the institution claimed was drug related.  She did forty-five days in the RHU and was given a job in dietary.

> She said Lisa Gunnarson was a clerk in Maintenance then and this inmate traveled everywhere with Zimmerman.  Gunnarson got called out at all hours and seemed to be more than friends with Zimmerman.

> She was on a job once in dietary last fall and came upon Zimmerman kissing Gunnarson in a dark secluded area in the basement.

> Before going to the center in Pittsburgh this year.  She heard Gunnarson scream at Zimmerman in front of the new inmate clerk Diane Holly that "how could he do this to her after they were having sex all this time".

> Gunnarson was returned from the center in mid June and only served three days in the RHU.  She said policy states that Gunnarson should have served a minimum of 30 days.

> She said SCICS administration continues to allow Gunnarson to have special privileges due to her close relationship with Carl Zimmerman.

2.    Diana Holley, OB-8137
       DOB:  05/24/69
       SSN:  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

On July 13, 1994 the above inmate was interviewed by this investigator at SCICS where she is incarcerated.  She advised the following:

> She worked as a clerk for two months this year under Carl Zimmerman in the Maintenance Office.

> Although hearing various rumors about Gunnarson and Zimmerman before arriving, she never observed anything that would lead her to believe there was any type of relationship.

> She was never bothered sexually nor were any comments of a sexual nature directed at her by Zimmerman during her employment there.

6

7

CONFIDENTIAL

3.     Terry Walker                              DOB: 03/10/55
       1369 Newport Avenue                       SSN: 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
       Northampton, PA 18067                     PHONE: (215) 262-7640

On August 4, 1994 the above individual was interviewed by phone by this investigator. She
advised the following:

> She worked for one year as Carl Zimmerman's Inmate Clerk in 1992 when she was
> incarcerated at SCICS. They had a social relationship with no physical contact.

> She considers Zimmerman a very flirtatious person.

> She claims nothing happened between her and Zimmerman and she just wants to get on
> with her life.

> She is reluctant to take a polygraph examination and doesn't want involved.

4.     Lisa Gunnarson, OA-6877
       DOB: 08/05/67
       SSN: 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

On July 14, 1994 the above inmate was interviewed by this investigator at SCICS where she is
incarcerated. She advised the following:

> She worked as a clerk in the Maintenance Office under Carl Zimmerman in 1993 and
> early 1994.

> She believes inmates and staff hold a grudge against her because of her attitude.

> While working in Maintenance she worked long hours and was called out late at night
> to do clerical work.

> She and Zimmerman have a good working relationship and there has never been any
> sexual contact.

> Upon returning to SCICS from the center she said the Program Review Committee,
> (PRC), released her from the RHU after serving 3 days and not because she receives
> special privileges from the administration.

8   A 544

CONFIDENTIAL

5.   Margaret Groves, OO-8707
     DOB: 05/04/46
     SSN:  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

On July 25, 1994 the above inmate was interviewed by this investigator at Pittsburgh Community Corrections Center #3 where she is currently housed.  She advised the following:

She observed, during her two year stay at SCICS, Carl Zimmerman take inmates Terry Walker, Lisa Gunnarson and Diane Holley into Kosciuszko Hall, a Maintenance Storage Building on separate occasions.   This building is referred to at the institution as "Freddy's House".

Zimmerman spent an excess amount of time in "Freddy's House" with all three inmates numerous times.

Terry Walker and Carl Zimmerman, both on separate occasions, confided in her that there was indeed a relationship going on between them.

She observed Zimmerman call out on late evenings both Terry Walker and Lisa Gunnarson to "assist" him.  Several times they were out all night.

When Gunnarson was in the Pittsburgh Community Corrections Center she knows without a doubt Zimmerman was calling for this inmate.  She recognized his voice on the phone.  Zimmerman used the name "Bill" when he called.

She believes Zimmerman to be guilty of sexual indiscretion with inmates Terry Walker and Lisa Gunnarson and knows he made passes at two other inmates, (at least).

A copy of Margaret Groves statement is appended as **ATTACHMENT #2.**

6.   Charles Utz, Deputy for Specialized Services        DOB: 08/12/41
     RD #3 Box 8-L                                       SSN:  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
     Saegertown, PA  16433                               PHONE: (814) 398-5100

On July 13, 1994 the above employee was interviewed by this investigator at SCICS.  He advised the following:

He said Carl Zimmerman is the Facilities Maintenance Manager at SCICS who has numerous staff and inmate employees reporting to him.

Due to the various maintenance projects going on, Zimmerman works long hours and utilizes any inmate or staff to get the work done.

There was never a meeting between himself, Gunnarson and Zimmerman regarding her

8

9  A 545



release from the RHU, the PRC made the decision to release her, however, he is on this committee.

He is not aware of any relationship between Zimmerman and Gunnarson.

| 7. | William Scheffner, Correctional Counselor<br>RD #1 Box 53 A<br>Cambridge Springs, PA  16403 | DOB: 12/27/44<br>SSN:  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<br>PHONE: (814) 398-4934 |
|----|----|----|

On July 13, 1994 the above employee was interviewed by this investigator at SCICS where he has been employed for 2 years. He advised the following:

He has been the counselor of Lisa Gunnarson for 2 years.

He observed that Zimmerman spent a lot of time with Gunnarson, more so than other inmates.

Gunnarson was the type of person that involved herself where she shouldn't be.

He said when Gunnarson was having problems with her pre-release, Zimmerman tried to help out.

He said just by knowing the situation at SCICS, he believes there is something going on between Gunnarson and Zimmerman.

| 8. | Carl Zimmerman, Facilities Maintenance Manager<br>420 Rainey Avenue<br>Grove City, PA  16127 | DOB: 11/28/57<br>SSN:  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<br>PHONE: (412) 458-1676 |
|----|----|----|

On July 14, 1994 the above employee was interviewed by this investigator at SCICS where he is employed. He advised the following:

His job is to over see the entire maintenance function at SCICS.

He supervises staff employees together with inmates. He treats them fair and utilizes them as to their ability.

He takes no special interest in any inmate although it may appear so at times.

His family life has been hampered by the long hours he puts in.

Gunnarson is a clerk in maintenance who is called out late evening only for clerical work.

9

10

A 546

CONFIDENTIAL

He has never brought her in any gifts.

He has never directed any sexual comments toward her.

He has never kissed her.

He has never had any type of sexual contact with her.

He went to the RHU on June 20, 1994 only to check the phone system and not specifically to talk to Gunnarson.

When asked if he would consent to a polygraph, he said he felt personally attacked and his answers in the interview should be sufficient.

9.     Carl Zimmerman, Facilities Maintenance Manager
       (Re-interview)

On August 9, 1994 the above employee was re-interviewed by this investigator and Special Investigator Michael Dodson at SCICS where he is employed. He advised the following:

During his interview, Zimmerman gave a voluntary signed statement to investigators which revealed the following:

He admitted violating the Department of Corrections Code of Ethics, Section #30, by misleading an investigator during an internal investigation.

He also admits to violation of Section 6 by having an improper physical relationship with inmate Lisa Gunnarson from April 1993 to the present.

His actions also are in violation of the Pennsylvania Crimes Code, Section 3126 pertaining to Indecent Assault.

He rendered his letter of resignation directed to Superintendent Wolfe dated August 9, 1994.

A copy of Zimmerman's voluntary statement is appended as **ATTACHMENT #5.**

A copy of Zimmerman's letter of resignation is appended as **ATTACHMENT #6.**

10

A 547

CONFIDENTIAL

ACTION TAKEN:

1.    Reviewed investigative report by Capt. Bartlett dated November 29, 1992. The review revealed the following:

>    An investigation was performed by staff at SCICS concerning a finding at Kosciuszko Hall, (Freddy's House). In a first floor room was found a couch, chairs, table and heater with a door that could be locked from the inside.

>    Security did not have a key for this area, only maintenance.

A copy of investigative report by Capt. Barlett is appended as **ATTACHMENT #3.**

2.    Reviewed RHU log book. The review revealed the following:

>    Carl Zimmerman visited the RHU on June 20, 1994 from 10:47 AM to 11:05 AM, the last day that Gunnarson was housed there.

3.    Polygraph examination performed on Lisa Gunnarson, OA-6877, by Special Investigator Michael Dodson on August 9, 1994. The examination revealed the following:

>    On August 9, 1994 inmate Lisa Gunnarson voluntarily agreed to polygraph testing. Her cooperation was voluntary and no promises were made to her.

>    During testing four relevant issue questions were asked:

>    1.    Did you ever kiss Carl Zimmerman?

>    2.    Did you ever have any type of sex with Carl Zimmerman?

>    3.    Did you ever fondle or caress Carl Zimmerman?

>    4.    Are you lying about any part of that statement you signed?

>    Gunnarson answered no to all questions.

>    Results of this test showed inmate Gunnarson was deceptive in all her answers.

>    During the post-test interview, Gunnarson gave a written statement admitting a relationship of a sexual nature with Carl Zimmerman.

A copy of Polygraph report and written statement for Lisa Gunnarson is appended as **ATTACHMENT #4.**

12    A 548



CONFIDENTIAL

Case No. 94-F-043

Submitted by: _____

Date: _____August 24, 1994_____

12

13

A 549

CONFIDENTIAL

Case No. 94-F-043

## ATTACHMENTS

1.    Foreman's Complaint

2.    Margaret Grove's Statement

3.    Capt. Bartlett's Investigative Report

4.    Lisa Gunnarson's Polygraph Report and Written Statement

5.    Carl Zimmerman's Voluntary Statement During the Re-Interview

6.    Carl Zimmerman's Letter of Resignation

14    A 550

CONFIDENTIAL

"ATTACHMENT(s)"

**COMMONWEALTH OF PENNSYLVANIA**
**Office of Inspector General**


**DATE:**    June 29, 1994


**SUBJECT:**  Telephone Complaint
             Inmate Deborah Foreman, OA-2684
             SCI-Cambridge Springs


**TO:**      Richard L. Schulman
             Deputy Inspector General


**FROM:**    Rose Ann Clement
             Special Investigator


On June 29, 1994, this investigator was telephonically contacted by State Correctional Institution-Cambridge Springs (SCICS) Inmate Deborah Foreman, OA-2684. Foreman furnished the following information.

SCICS Inmate Lisa M. Gunnarson, OA-6877 was granted pre-release status in February, 1994. She was sent to a Community Corrections Center in Pittsburgh. She returned to SCICS approximately two weeks ago for a Misconduct/Infraction involving alcohol.

When an inmate returns from a Community Corrections Center due to a violation they are always placed in the Restricted Housing Unit (RHU) for at least 30 days before being released into general population.

15    A 551



Due to Gunnarson's previous "close" relationship with Carl Zimmerman, Facilities Maintenance Manager II, SCICS, Gunnarson meet with Deputy Superintendent Charles Utz and Zimmerman.  Following this meeting Gunnarson after having only served 3 days in the RHU was released into general population.

Zimmerman has once again placed himself in a position where he can be close to Gunnarson.  Gunnarson was given back her old job of working for Zimmerman.

Zimmerman is again coming to Gunnarson's housing unit after 5:00pm and taking her to the maintenance building to supposedly work.  Foreman stated Superintendent William Wolfe and SCICS upper management are again allowing certain inmates to obtain special privileges.

**ATTACHMENT(s)** 2

I, MARGARET GROVES, am giving the following statement to Special Investigator michael WOLANIN of my own free will and it is true and correct to the best of my knowledge and Belief:

From my arrival at S.C.I Cambridge Springs in Spring, 1992, Terry Stalker was Carl Zimmerman's inmate clerk. Ms Stalker & I had known each other for some time in S.C.I Waynesburg and often shared confidences. Ms Stalker confided to me that she & Mr Zimmerman had been involved and were planning to "be together" upon her release. In the 2 weeks prior Ms Walker's release, Ms Lisa Gunnerson was hired by Mr Zimmerman to replace Ms Walker. Ms Walker's comments to me were now rather negative. "How could he treat me this way after all we've been to each other", is one I distinctly remember. He no longer took Ms Walker into "Freddie's House", supposedly to search the storage area. Now Ms Gunnerson went. I observed over my 2 yr stay at Cambridge, Mr Zimmerman take Ms Walker, Miss Gunnerson & Ms. Diane Hally into "Freddie's" — alone & unescorted on many occasions. Upon Ms Walker's release in February, 1991, I had the opportunity to talk with Mr Zimmerman in the basement of Dietary where I worked. This area is now the

17

Staff Dining Room. I had been in touch with Ms Walker & knew he had not sent her the letter of recommendation he promised. I mentioned it to him & the conversation got very personal. He confided that he felt strongly about Miss Walker. He told me they had been involved and that he cared for her. He said he would " never let that happen again". He also mentioned he felt a little guilty, as she was having marital problems now & felt he caused them. He said he had not contacted her yet because he wanted to give her a chance to see if the marriage would work between her & Paul, her husband. Countless times, "Z" (Zimmerman) confided that his wife was ill — having stomach surgery — 2 or 3 operations & that it was very difficult for him. I lived in the same housing unit as Lisa Gunnerson & Terry Walker. And many evenings 9, 10, 11 PM or later, "Z" would come into the Institution & they — one or the other — would be called out of their room, sometimes awakened from sleep, to assist him in whatever chore or job he was. Several times these jobs took all night & the inmates would return to the Kozmo Unit after 4 AM. On one occasion Ms Gunnerson went out

18

A 554

the front gate on supposedly a snow crew. At that temp she had an "R" level & was not permitted outside the fence.

Upon ~~realizing~~ suspecting Zimmerman was now involved w/ Lisa Gunnerson after Terry Stalker's release, I spoke to & wrote to Terry, telling her. She became very upset & realized what a fool she'd been, saying "Z" deserved what he'd eventually get as "there are no secrets in jail".

Upon my transfer to the Center in Pittsburgh I talked to Lisa Gunnerson about "Z". She was talking about returning to Cambridge Institution because she was so unhappy here, I tried to reason w/ her that she'd only be here for a short time & Cambridge was changing - it was much worse & getting even more terrible all the time. She said she had "had it good" with "Z" & missed him taking care of her. She stated she wanted to return to Cambridge & knew she'd get her old job back as "Z"s clerk. During this time I answered the resident phone twice for Lisa. On one occasion I thought perhaps the caller was Mr. Zimmerman, In the second call, I know without a doubt that it was. He asked for Lisa, & when learning she was out, left the name

19

"Bill",

In my mind, I believe Mr. Zimmerman to be guilty of sexual indescritions with inmates on two instances, Ms Walker & Ms Summerson, I have also been made aware of "passes" he made toward 2 other inmates at other times.

The above is true to the best of my knowledge & belief this 25th day of July, 1994,

                                                Margaret Grouis



## COMMONWEALTH OF PENNSYLVANIA
### PENNSYLVANIA DEPARTMENT OF CORRECTIONS
#### Special Investigations Office

Telephone (717)975-0770
Fax (717)975-2243

This cover sheet is the first of _25_ pages

This Fax should be delivered to    _Superintendent Wolfe;_
_SCI Cambridge Springs)_

This Fax was sent by    _H. Rodrigues) / Vaughn Davis)_

Confirm receipt of Fax by phone    Yes _X_             No _____

Time Fax was sent  _2:30 PM / 8-24-94_

A 557

COMMONWEALTH OF PENNSYLVANIA
Pennsylvania Department of Corrections
September 6, 1994

Case No. 94-F-043

SUBJECT:        Carl Zimmerman, Facilities Maintenance Manager
                State Correctional Institution Cambridge Springs

COMPLAINANT:    Deborah Foreman, OA-2684
                Allegation ~ Violation Code of Ethics

TO:             William J. Wolfe
                Superintendent
                State Correctional Institution Cambridge Springs

FROM:           Vaughn L. Davis
                Director
                Special Investigations Office

The enclosed report of investigation is being furnished to you for your review and
implementation of the following recommendations:

1.    Carl Zimmerman should be terminated from employment with the Department
      of Corrections.
2.    Any PDC panel assemble should not be made up of staff from Cambridge
      Springs.  Impartial personnel from elsewhere in the Department should be
      selected for that responsibility.

This report has been approved by the Executive Deputy Commissioner.

The report is **CONFIDENTIAL** and may not be disseminated to any other agency without
the direct approval of the Commissioner.

If you have any questions, please contact me.

VLD/hr

# CONFIDENTIAL

## STATE CORRECTIONAL INSTITUTION AT ALBION
## PRE-DISCIPLINARY CONFERENCE

**DATE:**              Friday, September 9, 1994

**TIME:**              9:00 AM

**PLACE:**             SCI Cambridge Springs, Superintendent's Office

**REGARDING:**         Carl Zimmerman, Facility Maintenance Manager 2

**HEARING PANEL:**     Bruce T. Marquardt, Deputy Superintendent/FM
                       Marilyn S. Brooks, Deputy Superintendent/CS
                       Henry  Powell, Personnel Analyst

**REPRESENTATIVES:**   Mr. Mike Dodson, Special Investigations
                       Mr. Mike Wolanin, Special Investigations

**RECORDER:**          Donna L. Hinkson, Clerk Typist 3

Deputy Marquardt opened the pre-disciplinary conference by advising Mr. Zimmerman that the panel for this pre-disciplinary conference was comprised of himself, Deputy Brooks and Mr. Powell; with Mr. Wolanin and Mr. Dodson from Special Investigations to discuss the charges that were brought against him which are as follows:

> Violation of the Department of Corrections Code of Ethics Section B, Specific Rules and Regulations, Number 6 :  "There shall be no fraternization or private relationship of staff with inmates, parolees, or members of their families.", and Section 30: "All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully."

> Specifically, to violation of Department of Corrections Code of Ethics, Section B, Number 6, inmate Gunnarson gave a written statement admitting a relationship with you of a sexual nature, whereas, on several occasions from April 1993 to August 09, 1994 you "kissed, hugged, and ran your hands over her body and touched her breasts". Violation of Department of Corrections Code of Ethics, Section 30, on August 09, 1994 upon being re-interviewed, you admitted to violation of Department of Corrections Code of Ethics Section 30, that you misled an investigator during an internal investigation.  You also admitted that you were in violation of the Department of Corrections Code of Ethics, Section B, Number 6:  that you had been having an improper physical relationship with inmate Gunnarson between April 1993 and August 09, 1994.

Mr. Zimmerman was asked if he accepted or rejected the charges as stated above to which he answered he rejected them.

Mr. Zimmerman was asked if he denied that he had a relationship with inmate Lisa Gunnarson to which he stated yes. He was asked if he was interviewed on July 14, 1994 by Special Investigator Wolanin to which he answered yes. Deputy Marquardt asked him if he signed an admission of guilt and then a resignation on August 9, 1994 to which he answered yes, but that he was coerced and signed the confession under duress. He stated that at 1:30 PM he was taken from a staff meeting and told by Captain Bartlett that he was not to leave work as he had to talk with investigators. At 2:30 PM that day, he received a call from his wife that his son was hurt and needed to be taken to the hospital. He was under a lot of personal pressure as he just sold his house and a lot of work related responsibilities and when he went in for the interview with the investigators they told him he had no rights to representation due to his management status and every inmate had signed affidavits on this so he would have signed anything to get out of there and take his son to the hospital. He added that he was told his name would be in the newspapers and was concerned about the harassment his daughter would have to take at school. He also said that the way the investigators said things he felt there was no way around it and he could go to jail.

Mr. Wolanin, Special Investigations, was asked to review his investigation of this incident. He stated that on June 29, 1994, information was turned over to him that was received from a confidential informant at SCI Cambridge Springs in regard to this incident. He interviewed several inmates. The confidential informant observed Mr. Zimmerman and inmate Lisa Gunnarson kissing in a dark, secluded area in Dietary.

Deputy Marquardt asked Mr. Zimmerman if this had happened, to which he answered no.

Mr. Wolanin continued, stating that inmate Gunnarson was Mr. Zimmerman's clerk and Mr. Zimmerman called her out to work in the evening hours, sometimes until 4:00 AM and was out all night on a couple of occasions.

Deputy Marquardt asked Mr. Zimmerman if he indeed had inmate Gunnarson out in the evenings until 2, 3, 4 AM. He answered yes, but he never worked without the Shift Commander's knowledge. If there were problems to be taken care of (i.e. rain storms) he would need inmate Gunnarson to take care of paperwork that would be needed for the Superintendent the next morning (i.e. APRs for emergency purchases, etc) as he did not know how to do the paperwork himself and it was routine to do this. He was asked if he would work alone often with inmate Gunnarson to which he stated yes, in the office.

Mr. Wolanin stated that he interviewed inmate Lisa Gunnarson on July 14, 1994 and she admitted that she worked in the maintenance office as a clerk and worked long hours. She added that Mr. Zimmerman would call her out of the housing unit to do clerical work.

On July 14, 1994, Mr. Wolanin interviewed Mr. Zimmerman, who was asked several questions. He stated he supervised staff employees together with inmates and showed no special interest with inmates. He admitted that inmate Gunnarson was called out late evening only for clerical work. He stated that he never brought her in any gifts, never directed any sexual comments toward her, never kissed her and never had any type of sexual contact with her. Mr. Wolanin stated that inmate Gunnarson went to the Pittsburgh CCC on February 14, 1994 and returned on June 16, 1994 due to an alcohol violation. When she returned to SCI Cambridge Springs, she was in the RHU. The log book in the RHU for June 16 through June 20 showed that Mr. Zimmerman visited the RHU and during the interview he admitted he had spoken with her. At this time, with the information that was presented, I asked Mr. Zimmerman if he would submit to a polygraph test and he stated that he was not thrilled with this request and felt he was being personally attacked. He added that his answers should be sufficient for the report and then left. The following Tuesday, more information was presented to his office and he re-opened the investigation due to information from another informant with a written statement. The informant stated that Mr. Zimmerman's inmate clerk prior to inmate Gunnarson stated that they were involved. She added that after her release, they were planning on being together and Mr. Zimmerman planned on transferring to the Pittsburgh area. Superintendent White verified that Mr. Zimmerman wanted to transfer to SCI Pittsburgh, he had been offered the job, but at the last minute, he changed his mind and turned the job down.

Mr. Zimmerman asked if this was true. He stated that he wanted to transfer due to a pay raised involved and when it was offered to him, he contacted Superintendent White and advised him that his wife had three surgeries and wasn't well and he wasn't prepared to make the move. Deputy Marquardt asked him if he told any inmates of his plans. He stated that everyone knew about it.

Mr. Wolanin further stated that the informant had observed Mr. Zimmerman take inmate Gunnarson, his prior inmate clerk, and another inmate to Kosciuszko Hall (Freddy's House), which is used for storage, on a number of occasions. Captain Bartlett, SCI-Cambridge Springs conducted an investigation into this and told Mr. Wolanin that in this area he found a room on the first floor with a couch, chair, table and heater inside. He also found that the door had a latch to lock it from the inside and that only Maintenance had a key to this room.

Deputy Marquardt asked Mr. Zimmerman if he was aware that security did not have a key to the room. He stated that this was not true, as security had access to the keys and anyone with an old grandmaster key could gain access. Mr. Dodson asked Mr. Zimmerman if he was aware that the lock on the door was a slide lock to which he answered he was not aware of this. Mr. Zimmerman was asked what was stored in this building. He stated surplus equipment, furniture from the science building, sand and salt, and that each trade has a separate room to store their specific equipment. He added that this room was set up for the snow crews to get in out of the cold. He was asked how many times he went into the building with inmates. He stated that initially it was weekly to do weekly fire/safety inspections, as he was the acting Fire/Safety Manager. Later it

**A 561**

30

was not so often, only when he was looking for something. He was asked why he would take inmates with him on the fire/safety inspections to which he stated they filled out the paperwork. He stated that he would take two or three with him to compile the information from the inspection. He was asked why he did not have his maintenance staff do the inspections and he stated that, at the time, they were very short-handed.

Deputy Marquardt asked Mr. Zimmerman if anything improper had occurred while in "Freddy's House" to which he answered no.

Mr .Wolanin continued by stating that the inmate informant observed Mr. Zimmerman spending excess time with all three inmate clerks. The first inmate clerk confided in one of the informants that there was a relationship between her and Mr. Zimmerman and, on one occasion, Mr. Zimmerman also confided in this individual that he was involved with his clerk and he cared for her and he would not let that (a relationship) happen again as he felt guilty and also felt sorry for her.

Mr. Zimmerman was asked if he ever told anyone about a relationship with his clerk to which he answered no, other than his signed confession. He added that he cares for all of the people that work for him but he always maintained a professional relationship with everyone.

Mr. Powell asked Mr. Zimmerman if he discussed his wife's surgery with his inmate workers. He stated not intentionally, that the inmates may have overheard or, if they asked how his wife was, he would answer them. Deputy Marquardt stated that the inmate clerk claims that he discussed personal problems with her and asked if this was this true. Mr. Zimmerman stated no, she must be making it up to be vindictive because once he got his civilian clerk, she was not needed anymore. Up until February or April, inmates were all he had for clerical support.

Mr. Wolanin stated that he asked Mr. Zimmerman if he had ever been in contact with inmate Gunnarson while she was at the Pittsburgh CCC and he said no. An informant stated that Mr. Zimmerman's voice was recognized calling for inmate Gunnarson probably sometime after 4 PM on two occasions during her stay at the CCC.

Mr. Zimmerman was asked if he ever called the CCC to which he answered no, never.

Mr. Wolanin stated that inmate Gunnarson told the informant at the CCC that she wanted to return to SCI Cambridge Springs because she was unhappy and she had it good with Mr. Zimmerman and missed him taking care of her. She also knew she would get her old job back as his clerk. The informant concluded by claiming knowledge of Mr. Zimmerman being guilty of sexual indiscretions with his inmate clerks and knows he made passes at two other inmates, (at least).

Deputy Marquardt asked Mr. Zimmerman if he had any improper contact with any inmates at SCI Cambridge Springs to which he answered "never".

Mr. Wolanin stated that during an interview on July 14, 1994, inmate Gunnarson was asked to take a polygraph test and she stated that she might do so. On August 9, 1994, he and Mr. Dodson, polygraph examiner, talked with inmate Gunnarson and she agreed to take the test and she cooperated fully with no promises made. Inmate Gunnarson was asked four relevant questions: Did you ever kiss Carl Zimmerman?; did you ever have any type of sex with Mr. Zimmerman?; did you ever fondle or caress Carl Zimmerman?; and are you lying about any part of that statement you signed?. She answered no to all of these questions and failed miserably.

Mr. Dodson, Special Investigator and polygraph examiner stated that he gave Ms. Gunnarson a total of eleven modified general questions which is the most accurate technique used. Prior to the test, there is a three hour interview between the examiner and the person taking the test. This allows for them to get to know each other. Each questions to be asked is gone over so that the individual knows what they will be asked during the test. A known truth question is added which is used to give the individual the maximum ability to pass the test. Inmate Gunnarson's test results were confirmed by another polygraph examiner. Each question is given a numerical grading of +1 or -1. Any score over +6 is truthful and anything over -6 is deceptive. Inmate Gunnarson was at -17, which is extremely deceptive. During the pre-test interview, inmate Gunnarson was extremely defensive of Mr. Zimmerman and categorically denied that anything happened. As a result of the test, she made a truthful statement.

Deputy Marquardt stated that inmate Gunnarson said she had a physical relationship, sexual in nature, beginning in April 1993, with Mr. Zimmerman putting his arms around her and that he had also kissed her fully on the mouth, put his tongue in her mouth, kissed and hugged her and touched her breasts. Mr. Zimmerman was asked if this was true, to which he answered it was not. He added that he was given her psychological report to read, by the Deputies, prior to her being hired as his clerk due to the fact that she was very manipulative toward men and the fact that she lied under oath when she was in court.

Deputy Brooks asked if Mr. Zimmerman was very professional with staff and inmates and treated everyone fairly. He answered yes. She asked him if this was so, why would she lie, to which he stated he did not know; that he could only figure that she was upset about being phased out because of the civilian clerk. Deputy Brooks asked if inmate Gunnarson could be jealous and Mr. Zimmerman stated that he thought maybe she could have been jealous of the job. She stated that other inmates overheard inmate Gunnarson consoling him because of his wife's problems. He stated that she was not consoling as much as a polite, how is your wife. She asked if inmate Gunnarson had ever tried to kiss him when others were not around to which he answered no.

Mr. Wolanin stated that he spoke with her counselor and the counselor stated that inmate Gunnarson and Mr. Zimmerman spent a lot of time together. At this point, Mr. Zimmerman asked if inmate Gunnarson was written up for having sexual intercourse because there had to be a reason for her changing her statement. Mr. Dodson stated that inmate Gunnarson is the victim in this case. Mr. Wolanin stated that she was given the

A 563

32

opportunity to leave prior to her giving the statement. At that time, she stated that she wanted her cigarettes and once she was given them, she said OK, what do I do, and proceeded to give her statement.

Mr. Zimmerman stated that he could not understand how inmate Gunnarson could change her mind from denying that anything happened to saying that it did. Deputy Marquardt asked Mr. Zimmerman how he could change his mind and sign a confession and resignation and then withdraw the resignation and state that he had lied about the confession.

Mr. Dodson stated that he wrote the confession and Mr. Zimmerman read and signed it, only after Mr. Zimmerman approved it and stated that it all was the truth.

Mr. Zimmerman was asked if he realized that this signed confession was a legal document to which he stated he didn't care. He was promised that if he resigned nothing more would be said about this incident and then he resigned. He was asked why he rescinded his resignation and he stated because he signed it under duress. He was asked how long it was before he turned in the letter to rescind his resignation, to which he stated nine days later because he did not know what to do, so he checked with a lawyer.

Mr. Zimmerman was asked how long he was with the investigators on the day he signed the confession. He stated one half hour. He wanted to leave because he was worried about his son being hurt and would have signed anything to get home. Deputy Marquardt asked who he told about the emergency at home with his son. He stated he didn't tell anyone. Deputy Marquardt asked him if he told Deputy Utz, with whom he spoke face-to-face at 5:30 PM; or Superintendent Wolfe, with whom he spoke telephonically at 6:30 PM; or the investigators, when he talked to them at 8:00 PM. Mr. Zimmerman answered no to all of these questions.

Mr. Zimmerman was asked what was discussed during the interview with the investigators. He stated that it was pointed out that he was management and therefore he was not permitted union representation, they stated the charges and I read them. They said that this is considered a criminal offense, I could go to jail and it could be in all the newspapers. I was given three choices, of which there are only two I can remember; confess and resign or be arrested and prosecuted. He stated that signing the confession and resigning was the biggest mistake he has made in life. He was asked what he offered during the one half hour interview. He stated that he told them he never had any sexual contact with inmate Gunnarson and then I said no more, I gave up. He did not protest or challenge the statement or proceedings. Mr. Wolanin stated that during the interview Mr. Zimmerman asked to make a phone call to his wife at which time himself and Mr. Dodson left the room. Later Mr. Zimmerman called them into the room and said that he would sign a statement and resign. At that time, he read and corrected the confession and signed, then he wrote his own resignation, signed it and left the room.

Mr. Dodson was asked if he had given Mr. Zimmerman his choices in the situation to which he stated yes and there was no coercion or threats made. I read the criminal code and pointed out to him his options which were simple statements of fact. Deputy Marquardt asked if he was mirandized, to which Mr. Dodson stated no. What Mr. Zimmerman calls coercion is just pointing out to him he has committed a criminal act. Mr. Wolanin stated that Mr. Zimmerman was given an opportunity to walk out of the interview to which Mr. Zimmerman stated that he did not remember and thought he would be arrested if he did. Mr. Dodson stated that he knows Mr. Zimmerman feels like he was being harassed but it is really just good investigative techniques. Mr. Wolanin stated that during the interview, Mr. Zimmerman stated that this went beyond what was uncovered during the investigation.

Mr. Powell asked Mr. Zimmerman if he was close to being with the state for ten years, to which he stated he was short of ten years. He was asked if him rescinding his resignation had anything to do with trying to make the ten year mark so that, if he was let go, he could still draw his retirement. He stated yes, and that he had already applied to purchase back his military time.

No further questions were asked. Deputy Marquardt advised Mr. Zimmerman that the panel members would make a recommendation to the Superintendent who, in turn, would have the final decision on the outcome of the hearing and he will be advised of the results as soon as possible.

BTM/dlh

cc:    Superintendent Wolfe; Deputy Marquardt; Deputy Brooks; Mr. Powell/Nwokeji; File

34

_confidential file_

DEPARTMENT OF CORRECTIONS
SCI Cambridge Springs
September 12, 1994


**Subject:   CARL L. ZIMMERMAN   SS#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**


**To:**        Donna M. Luhman
            Job Center Manager
            Department of Labor and Industry


**From:**      Roger Cyr
            Personnel Officer
            SCI-Cambridge Springs

            A Pre-Disciplinary Conference was held on 09 September 1994
            regarding violations of the Department of Corrections Code
            of Ethics.  Mr. Zimmerman was terminated from his position
            as Facility Maintenance Manager 2 effective close of business
            13 September 1994.  Please reference the attached.


cc: Supt Wolfe
     file


**A 566**

35

**CONFIDENTIAL**

**COMMONWEALTH OF PENNSYLVANIA**
**State Correctional Institution at**
**Albion, PA  16475-0001**
**September 12, 1994**

**SUBJECT:  RECOMMENDATION OF PDC PANEL**
**RE: CARL L. ZIMMERMAN, 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**

**TO:**    William J. Wolfe
Superintendent
SCI-Cambridge Springs

**FROM:**  Bruce T. Marquardt          Marilyn S. Brooks          Henry Powell
Deputy Superintendent     Deputy Superintendent     Personnel Analyst
SCI-Albion                SCI-Albion                SCI-Albion

On September 9, 1994, a pre-disciplinary conference (PDC) was conducted on Carl L. Zimmerman, Facility Maintenance Manager 2, SCI-Cambridge Springs.  Mr. Zimmerman was charged with violating the Department of Corrections Code of Ethics, Sections B.6. and B.30.  The PDC panel was comprised of Bruce T. Marquardt, Deputy Superintendent for Facility Management; Marilyn S. Brooks, Deputy Superintendent for Centralized Services; and Henry Powell, Personnel Analyst 2, all from SCI-Albion.  The findings and recommendation of the panel were as follows:

Mr. Zimmerman denied that he ever kissed, hugged, or ran his hands over the body and breasts of inmate Lisa Gunnarson, OA-6877.  The panel believed that this **did** occur, sometime between April 1993 and August 1994.

Mr. Zimmerman denied kissing inmate Gunnarson in the basement of the Dietary Department.  The panel believed that this incident occurred, as reported by a witness.

Mr. Zimmerman acknowledged that he had been in Kosciuszko Hall, commonly referred to as "Freddy's House", with three female inmates, including Lisa Gunnarson, on numerous occasions.  His explanation that, initially, he conducted weekly fire/safety inspections with three inmate helpers was very questionable.  He claimed he needed assistance because his handwriting was not very legible.  The panel did not believe Mr. Zimmerman when he stated he was unaware that the door leading into a room with a couch, chair, table, and heater could be locked from the inside with a slide lock.  The panel believed he would have been aware of this since he performed weekly inspections in this building.

A 567

36

Page 2
Carl Zimmerman, 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

Mr. Zimmerman denied that he ever told any inmate that he had a personal relationship with his first clerk, inmate Terry Walker. The panel believed that Mr. Zimmerman did make this known to an inmate, as reported in the investigation.

Mr. Zimmerman denied ever calling the Pittsburgh Community Corrections Center for any reason. The panel believed that, more likely than not, Mr. Zimmerman called the Pittsburgh Community Corrections Center in an attempt to contact Lisa Gunnarson when she was housed there.

The panel found it implausible that Mr. Zimmerman had a maintenance clerk out on numerous occasions "to do clerical work" until 2, 3, or 4 o'clock in the morning, as he contended.

Mr. Zimmerman claimed that he was coerced into signing a statement admitting that he violated the Code of Ethics and was pressured to sign a letter of resignation. He stated that at 1:30 PM on August 9, 1994, he was told by Captain Bartlett that he could not leave the institution. At 2:30 PM, Mr. Zimmerman stated he received a phone call regarding an emergency at home with his son, who needed to be taken to the hospital. Mr. Zimmerman claimed that when the investigators spoke with him at approximately 8:00 PM, he was so shocked and concerned about the family emergency, he would have signed anything to get out of there.

Upon further questioning, the panel found that Mr. Zimmerman never said anything about a family emergency to Deputy Superintendent Utz, with whom he spoke face-to-face at 5:30 PM; never said anything about a family emergency to Superintendent Wolfe, with whom he spoke telephonically at about 6:30 PM; and he never said anything to Special Investigators Wolanin or Dodson when he was interviewed by them at approximately 8:00 PM.

Mr. Zimmerman claimed that he was told by Special Investigators Wolanin and Dodson that, if he did not sign a confession and resign, he would be charged criminally. Mr. Zimmerman stated that he was afraid he would be arrested if he just walked out of the room. Investigators Wolanin and Dodson testified that Mr. Zimmerman was told he could get up and walk out of the room anytime he wanted to. Mr. Zimmerman asked, if he could call his wife and he was permitted to do this. It was after the phone call to his wife that Mr. Zimmerman said he would sign a statement and resign.

Page 3
Carl Zimmerman, 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

The panel finds Mr. Zimmerman's claim that he was coerced and pressured into signing a confession and resigning totally incredible. It is the panel's opinion that Mr. Zimmerman was not truthful with investigators during his first interview on July 14, 1994.

It is the unanimous recommendation of the PDC panel that Mr. Zimmerman be terminated from his employment with the Department of Corrections.

BTM/MSB/HP/dlh

cc:    File

**JOSEPH D. LEHMAN**
COMMISSIONER
DEPARTMENT OF CORRECTIONS

**COMMONWEALTH OF PENNSYLVANIA**

451 FULLERTON AVENUE
Cambridge Springs, PA 16403-1238
Telephone 814-398-5100
Network: 8 684-5100

**STATE CORRECTIONAL INSTITUTION**

**WILLIAM J. WOLFE**
SUPERINTENDENT

**AT CAMBRIDGE SPRINGS**

Address All Replies
To Superintendent

September 12, 1994

Mr. Carl L. Zimmerman
5302 Windward Dr.
Erie, PA 16505

Dear Mr. Zimmerman:                                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

This is to advise you that effective 4:30 p.m. on September 13, 1994, you are terminated from your position as Facility Maintenance Manager 2, regular status, at the State Correctional Institution at Cambridge Springs.

On September 09, 1994 a Pre-Disciplinary Conference was held to afford you an opportunity to respond to the charges of violation of the Department of Corrections Code of Ethics, Section B, Specific Rules and Regulations, Number 6: "There shall be no fraternization or private relationship of staff with inmates, parolees, or members of their families.", and Section 30: "All employes shall comply and cooperate with internal investigations conducted under the Department of Corrections, and respond to questions completely and truthfully." During the course of the hearing, information was presented which established the fact that you became romantically involved with an inmate within this institution and during the internal investigation you misled the investigator.

Violations of the Department of Corrections Code of Ethics of this nature causes irreparable harm to the operation of SCI-Cambridge Springs, as well as, the Department of Corrections.

Please return any state property including, but not limited to the following items:  identification cards, keys, tools, equipment, books, reports, or uniforms to the Superintendent before September 13, 1994.

Your Group Life Insurance Policy may be converted to an individual policy. You must contact the personnel office at SCI-Cambridge Springs for the necessary information within thirty-one (31) days of your termination.

Blue Cross/Blue Shield will contact you directly concerning continuation of policies on a direct pay basis.

You are to return your Prescription Drug Card to the Pennsylvania Public Employes Health and Welfare Fund, 4031 Executive Park Drive, Harrisburg, PA 17111-1599.  After September 13, 1994 you are no longer permitted to use this or any other employe benefit.

A 570

39

Carl L. Zimmerman
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
Page 2

It will be necessary to contact The Regional State Employes Retirement System at P.O. Box 01561, Seneca, PA 16346 regarding lump sum withdrawal of your retirement contribution.

You will be paid by supplemental check for any accrued, unused, annual or personal leave.

Your rights in this personnel action are explained in Part C, Appeal Request, form SCSC-4112, copies of which are attached.

A copy of this letter will be placed in your official personnel file.

                              Sincerely,

                              *William J. Wolfe*
                              William J. Wolfe
                              Superintendent for
                              Joseph D. Lehman, Commissioner


cc:   Deputy Fulcomer
      Mr. Tepsic, Director BHR
      Department of Correction Personnel File
      State Civil Service Commission, SS 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


A 571

40

Inappropriate Social or Sexual Contact
with a SCI-Cambridge Springs Inmate

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Cambridge Springs**

**SUBJECT:**  *Inappropriate Social or Sexual Contact with a SCI-Cambridge Springs Inmate*

The following is a list by name and job title, every SCI-Cambridge Springs staff member who was alleged by an inmate or another staff member to have had inappropriate social or sexual contact with a SCI-Cambridge Springs inmate.

| NAME | CLASSIFICAITON | DATE OF INVESTIGATION |
|------|----------------|------------------------|
| Amato, Barbara | Correction Officer | April 1996 |
| Bailey, Joel | Food Service Instructor | November 1996 |
| Basile, Scott | Correction Officer | June 1996 |
| Basile, Scott | Correction Officer | December 1996 |
| Bish, Linda | Food Service Instructor | February 1995 |
| Chase, Lori | Sergeant | January 1997 |
| Coffee, Jerome | Sergeant | August 1996 |
| Eicher, James | Correction Officer | November 1994 |
| Free, William | Correction Officer | August 1996 |
| Graves, Peter | Correction Officer | June 1995 |
| Hargett, Barbara | Food Service Instructor | November 1997 |
| Hammers, Richard | Correction Officer Trainee | January 1995 |
| Horoschuck Norma | Religious Advisor | November 1996 |
| Hargett, Barbara | Food Service Instructor | January 1996 |
| Hull, Mary | Correction Officer | January 1997 |
| Jones, Brenda | Correction Officer | January 1996 |
| Lawton, Donald | Correction Officer Trainee | July 1995 |

EXHIBIT
138

A 572

| Leone, Judy | Correctional Industries Foreman | June 1998 |
|---|---|---|
| Manski, Larry | Lieutenant | June 1997 |
| McCloskey, Thomas | Teacher | June 1996 |
| Merry, James | Sergeant | November 1994 |
| Miller, Mike | Facility Maintenance Manager 1 | September 1997 |
| Miller, Martin | Plumbing Trade Instructor | September 1994 |
| Mitchell, Carla | Correction Officer | January 1997 |
| Montejo, Emanuel | Sergeant | June 1997 |
| Mort, Kenneth | Lieutenant | December 1993 |
| Myers, James | Correction Officer | November 1997 |
| Randolph, Ronald | Electrical Trade Instructor | May 1997 |
| Shabazz, Iman | Islamic Advisor | January 1995 |
| Shank, Brian | Correction Officer | April 1997 |
| Shrock, Christine | Correction Officer | March 1997 |
| Sittig, Kimberly | Correction Officer | January 1997 |
| Soboleski, Joseph | HVAC Instructor | January 1997 |
| Soboleski, Joseph | HVAC Instructor | April 1997 |
| Stallard, Lisa | Food Service Instructor | October 1994 |
| Stuyvesant, Darrell | Correction Officer | March 1997 |
| Stone, Michael | Correction Officer | April 1995 |
| Stone, Michael | Correction Officer | December 1995 |
| Tawney, Jeff | Correction Officer | December 1996 |
| Unrue, William | Correction Officer | April 1997 |
| Walton, Paul | Food Service Instructor | September 1994 |
| Zimmerman, Carl | Facility Maintenance Manager | August 1994 |

A 573

#4. Table listing Inappropriate Social or
Sexual Contact.

**SUBJECT:** *Inappropriate Social or Sexual Contact with a SCI-Cambridge Springs Inmate*

The following is a list by name and job title, every SCI-Cambridge Springs staff member who was alleged by an inmate or
another staff member to have had inappropriate social or sexual contact with a SCI-Cambridge Springs inmate.

| NAME | CLASSIFICAITON | DATE OF INVESTIGATION | INMATE (S) INVOLVED | INVESTIGATOR | RESULTS |
|---|---|---|---|---|---|
| Amato, Barbara | Correction Officer | April 1996 | Lisa Lazzel | Captain Lazenby | Unfounded |
| Bailey, Joel | Food Service Instructor | November 1996 | Eggleton, Webb | Captain Lazenby | Unfounded |
| Basile, Scott | Correction Officer | June 1996 | Sprowls,Mayers | Captain Lazenby | Unfounded |
| Basile, Scott | Correction Officer | December 1996 | Hallock | Lt. Beck | Unfounded |
| Bish, Linda | Food Service Instructor | February 1995 | Givler, Woods | Captain Bartlett | Employee resigned |
| Chase, Lori | Sergeant | January 1997 | Albright | Captain Lazenby | Turned over to OPR |
| Coffee, Jerome | Sergeant | August 1996 | Campion | Captain Lazenby | Unfounded |
| Eicher, James | Correction Officer | November 1994 | Lambert, | Captain Bartlett | Criminal charges filed |
| Free, William | Correction Officer | August 1996 | Campion | Captain Lazenby | Unfounded |
| Graves, Peter | Correction Officer | June 1995 | Skipper | Captain Lazenby | Unfounded |

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs

EXHIBIT
139

A 574

| Name | Title | Date | | Authority | Disposition |
|---|---|---|---|---|---|
| Harget, Barbara | Food Service Instructor | November 1997 | Hulbert | Lt. Beck | Unfounded |
| Hammers, Richard | Correction Officer Trainee | January 1995 | Maysonet | OPR | Criminal charges filed |
| Horoschuck, Norma | Religious Advisor | November 1996 | Washington | Captain Lazenby | Confirmed |
| Harget, Barbara | Food Service Instructor | January 1996 | Albright | Captain Lazenby | Unfounded |
| Hull, Mary | Correction Officer | January 1997 | Garrison, Brown, Albright, Nicholson | Captain Lazenby | Employee Termination |
| Jones, Brenda | Correction Officer | January 1996 | Bynum | OPR | Unfounded |
| Lawton, Donald | Correction Officer Trainee | July 1995 | Skipper | Captain Lazenby | Termination |
| Leone, Judy | Correctional Industries Foreman | June 1998 | Foster | Captain Scott | Employee Resignation |
| Manski, Larry | Lieutenant | June 1997 | Pehlman | Captain Lazenby | Unfounded |
| McCloskey, Thomas | Teacher | June 1996 | Stephens | Captain Lazenby | Unfounded |
| Merry, James | Sergeant | November 1994 | Masonette | Captain Bartlett | Employee Resignation |
| Miller, Mike | Facility Maintenance Manager 1 | September 1997 | Bell, Jackson | Captain Lazenby | Unfounded |
| Miller, Martin | Plumbing Trade Instructor | September 1994 | Pehlman | Captain Bartlett | Terminiation |
| Mitchell, Carla | Correction Officer | January 1997 | Green | Lt. Beck | Inmate misconduct |
| Montejo, Emanuel | Sergeant | June 1997 | Deemer | Captain Lazenby | Unfounded |
| Mort, Kenneth | Lieutenant | December 1993 | Groves, Russo, Kloss | Captain Bartlett | Employee Resignation |
| Myers, James | Correction Officer | November 1997 | Skipper | Lt. Beck | Unfounded |
| Randolph, Ronald | Electrical Trade Instructor | May 1997 | Jones | Captain Lazenby | Unfounded |
| Shabazz, Iman | Islamic Advisor | January 1995 | Wilson, Wallace | Captain Bartlett | Unfounded |
| Shank, Brian | Correction Officer | April 1997 | Adams | Captain Lazenby | Unfounded |
| Shrock, | Correction Officer | March 1997 | Graham | Captain Bartlett | Unfounded |

#1. Table listing Inappropriate Social or Sexual Contact.

A 575

| Name | Title | Date | | Disposition |
|---|---|---|---|---|
| Sittig, Kimberly Christine | Correction Officer | January 1997 | Vicheck | Unfounded |
| Soboleski, Joseph | HVAC Instructor | January 1997 | Miller | Unfounded |
| Soboleski, Joseph | HVAC Instructor | April 1997 | Miller | Unfounded |
| Stallard, Lisa | Food Service Instructor | October 1994 | Givler | Captain Bartlett Employee Resignation |
| Stuyvesant, Darrell | Correction Officer | March 1997 | Purdie, Milano, Thompson | Captain Lazenby Counseling session |
| Stone, Michael | Correction Officer | April 1995 | Johnson | Captain Lazenby |
| Stone, Michael | Correction Officer | December 1995 | Johnson | Captain Lazenby |
| Tawney, Jeff | Correction Officer | December 1996 | Huntley | Captain Lazenby Unfounded |
| Unrue, William | Correction Officer | April 1997 | Jones | Captain Lazenby Unfounded |
| Walton, Paul | Food Service Instructor | September 1994 | Glecki | OPR Criminal Charges Filed |
| Zimmerman, Carl | Facility Maintenance Manager | August 1994 | Foreman | OPR Criminal Charges Filed |

#4. Table listing Inappropriate Social or Sexual Contact.

DC-121A

**DEPARTMENT OF CORRECTIONS EMPLOYEE**
**REPORT OF EXTRAORDINARY OCCURRENCE**

Place - Lambert Lee

To: Deputy Komanic                     Institution: SCI Cambridge Springs

From: J. Metzger                       Date: on going

Title: Corrections Officer             Time: on going

Date: 05-06-95                         Area: confidential

Signature: J Metzger                   Occurrence: report

**Inmates Involved:**          **Staff Involved:**
Name & DC No.                  Name & Title              Witnesses:

Lambert, L. (OB6416)
(confidential source)

**Actions Taken:** Reviewed / Previously fought to my attention
and turned over to Deputy Karinanic + Captain
Baronley. Officer instructed to submit
findings in writing as attached. Lt. Foster.

**Description of Incident, in detail: (Use other side if necessary):**

While I hold no opinion I feel these allegations
should be brought to your attention so that all parties
may be cleared of these alledged infractions.

(statement attached)

EXHIBIT
125

A 577

The following parties were mentioned in these allegations:

C.O.1 Eicher: alledgedly had physical contact with inmate E. Jones (OA4123) in late Oct or early Nov. 1993 during open rec at Currie hall.

CO1 Eicher: alledgedly had contact with E. Maysonet (O848 and H. Maysonet (OB3187) in autumn 1993.

C.O1 Eicher: alledgedly had contact with inmate P. Hoover (OA1731) in late 1993 in the field house at yard and basement of Currie hall.

C.O.1 Eicher: alledgedly had contact with L. Lambert/O8646, october 10, 1994 upstairs Alliace hall during cremes & things; further episodes supposedly occured in Jan.94 in the elevator in Curriehall; March 1994 in the music practice room in Curriehall; April 7th in fieldhouse at yard; in the currie hall 2nd Floor Bath Room during open rec.

C.O.II Montejo: alledgedly had physical contact in music practice room in Jan 1994 with inmate L. Lambert (O8646)

C.O.II Merry: alledgedly had contact with inmate C. Bynum (O81864) in basement of Currie hall in late 1992 into 1993.

C.O.II Rodgers: alledgedly had contact with inmate L. Lambert (O8646, in music practic room in Jan 1994 with c.o. Eicher present

C.O.II Coffee: alledgedly had contact with M. Diaz in early 1994 while the asbestos abatement was occurring in Luter 1.

A 578

C.O. II Free : alledgedly had limited contact with inmate
L. Jafka (OC 2743) in the wight room of the aerobics
studio and music practice room in Summer of 1994.

Maint. W. Young : alledgedly had contact with inmate
L. Jafka (OC 2743) June – Aug. 1994 at work sites
including Luter Boiler Room on a saturday. Supposedly
an entact condom was lost on Luter 4 during on
such occasion.

F.S. M. Stewart : alledgedly had contact with inmate
M. DiBello (OA4576) in dietary office. Supposedly
brought gum and perfume as "gifts".

C.O. II Beck : alledgedly had contact with inmate
M. DiBello in chaplain ofc. in Currie hall in
autumn of 1993.

C.O. I Schmidt : alledgedly had contact with inmate
L. Lambert (086416) in June 1994 – Oct 1994. Supposedly
sent a letter at end of Jan. 1994 into institution.

Pg. 2 of 2

A 579

**DC-135A**

**INMATE'S REQUEST TO STAFF MEMBER**

## COMMONWEALTH OF PENNSYLVANIA

### DEPARTMENT OF CORRECTIONS

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) | | 2. DATE |
| --- | --- | --- |
| 3. BY: (INSTITUTIONAL NAME AND NUMBER) | | 4. COUNSELOR'S NAME |
| 5. WORK ASSIGNMENT | 6. QUARTERS ASSIGNMENT | |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

It is time that you do something with miss Bish and inmate Woods. They are always in the cooler having sex. This has been going on a long time. Bish never washes her hands and then prepares food for the institution. This is a disgrace.

8. DISPOSITION. (DO NOT WRITE IN THIS SPACE)

EXHIBIT 129    580

☐ TO DC-14 CAR ONLY          ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER          A 580          DATE

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
February 8, 1995

SUBJECT:   STAFF INVESTIGATION

TO:        WILLIAM J. WOLFE
           SUPERINTENDENT


           *Keith R. Bartlett, Capt.*

FROM:      KEITH R. BARTLETT
           INTELLIGENCE CAPTAIN

On February 07,1995, I conducted a staff
investigation on Ms. Linda Bish, Food Service
Instructor.

First, I spoke with inmate Givler, OB7819, who is
acting as a confidential source of information.
Inmate Givler provided me with a notarized, sworn
statement, stating that she witnessed Ms. Bish
fondle inmate Woods' breasts and on another occasion
kiss inmate Woods, OA2123.  She also states that
letters and notes are passed between Bish and Woods.
The sexual contact is alleged to have taken place in
July of 1994, between the 12th and 24th.

Second, I spoke to inmate Woods, OA2123, with
Lieutenant V. Scott present.  Ms. Woods denies any
physical or sexual contact, but admits to being very
close friends with Ms. Bish.  They talk about their
personal lives all of the time.  Ms. Woods provided
a sworn, notarized statement, stating she has never
had any physical or sexual contact with Ms. Bish.

Third, I spoke to Ms. Bish, Food Service Instructor,
with Corrections Officer-1 Meilnik present as a Union
representative.  Ms. Bish became visibly upset and
denies any physical or sexual contact with inmate
Woods.  She asked that I speak to Ms. Applebee and
Ms. Carroll about this issue.

All three persons involved are willing to take a
polygraph test in this matter.  Ms. Bish is aware of
the Union's position on polygraph testing, and is
still willing to test.

It is my recommendation that with an eye witness
statement, that we contact the Special Investigations
office to have the polygraph test performed.  At this
point I am unable to determine who is, or is not,
telling the truth.

A 581

KRB/hs

CC:   Mr. Vaughn L. Davis
      Deputy Kormanic

2

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-Cambridge Springs
February 22, 1995

**SUBJECT**:   Linda Bish

**TO**:          All Concerned

**FROM**:      William J. Wolfe
              Superintendent

Please be advised that Linda Bish resigned her position as a Food Service Instructor
and is not permitted to enter the institution without my approval.

WJW/jfh

cc:  Deputies
     Captains
     Shift Commanders
     Control

A 582

*3*

NAME: Lt Bartleh                   S. ..#: _____

DATE OF HIRE: _____   CLASSIFICATION: H3

| DATE | INFORMATION | ACTION TAKEN | NOTIFICATIO |
|------|-------------|--------------|-------------|
| 10-5-92 | Letter of Comm | | Supt Wolfe |
| 5-17-93 | Doing a great job | ___ | ___ |
| 10-7-93 | Lt Bartleh is EPC/ Shift commander position and is a professional at all. | ___ | ___ |
| 11-15-94 | Advised B that he needs to distance himself from becoming involved in off. personal issues. Discussed concerns about dating subordinate staff and poss. compromising his integrity as a manager. (Allegations of favoritism involving secu. of the trainees.) Nothing found but the perception staff may have could weaken his ability to supv/ discipline later | | V.L Kaine |
| 3-28-95 | Change over to Adm. Capt | ___ | ___ |
| 4-4-95 | Discussion held with B in Supt's office. He is to be held to a higher stand and advised not to date sub. officers. As the administ. capt, it's extremely important that staff be able to trust his judgement & decision making | | |

EXHIBIT
117
A 583
PENGAD-Bayonne,N.J

| NAME: | BARTLETT | | S.S.#: | | - |
|-------|----------|-|--------|-|---|

| DATE OF HIRE: | | | CLASSIFICATION: | |

| DATE | INFORMATION | ACTION TAKEN | NOTIFICATION |
|------|-------------|--------------|--------------|
| 1-2-96 | SUBMITTED E.O ON MONTEJO. BARTLETT HAS BEEN SEEING/DATING EX. WIFE WAS ORDERED BY ME TO DISCONTINUE RELATIONSHIP DUE TO INSTABILITY OF MONTEJO AND IMPACT IT MAY HAVE ON INSTITUTION. NOT A WISE IDEA TO HAVE TO SUPERVISE AN EMPLOYEE WHO IS HAVING EMOTIONAL PROBLEMS AND DATING STAFF'S FORMER SPOUSE. | | Ul Kama |
| 10-23-96 | Advised Bartlett per Supr Walker to please refrain from any discussion concerning investigation. Concern has been expressed by some staff our federal intervention due to being cooperative with OPR Dodson | | |

A 584

| NAME: K Bartlett | | S.S.#: | - |
| DATE OF HIRE: | | CLASSIFICATION: | |

| DATE | INFORMATION | ACTION TAKEN | NOTIFICATION |
|------|-------------|--------------|--------------|
| 6 10-97 | | See progress review for —. Situate with Lt Waddell. Counseled again for maintain — approp. level of professional -ism & detachment with subordinate staff. Further advised him any more incidents would result (in) progressive discipline. | |

A 585