

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA DEPARTMENT OF CORRECTIONS
OFFICE OF PROFESSIONAL RESPONSIBILITY

October 30, 1996

---

Case Number              96-F-088
Report Prepared By:      Michael Dodson, Special Investigator
Allegation:              Violation of Code of Ethics

---

**SUBJECT:**
Keith R. Bartlett, CO IV
DOB: 11/14/55

**COMPLAINANT/VICTIM:**
Sherman Morrison, CO I
DOB: 11/4/51

**LOCATION:**
State Correctional Institution Cambridge Springs

---

APPROVED BY:
Vaughn L. Davis
Director
Office of Professional Responsibility

DISTRIBUTION:
Commissioner Horn
File

A 586



## SYNOPSIS

This investigation was authorized by Vaughn L. Davis, Director, Office of Professional Responsibility, on 9/12/96. It was predicated on a letter forwarded through Deputy Commissioner Fulcomer.

The letter of complaint was from Sherman Morrison, a CO I at SCI Cambridge Springs and was dated 8/24/96. Morrison advised that the Captain of the Guard at SCI Cambridge Springs "preys" on, dates and socializes with trainees. He claimed this created problems with the guard force.

Morrison was interviewed. He advised that he has been caught between Captain Bartlett and a female officer named Rennor. He was accused of being too "knit-picky" when he made an inmate put her shoes on in the yard. There was a minor squabble involving him and Rennor. A meeting was held between himself, Bartlett and Rennor. Bartlett referred to Rennor as "hon" and "dear". He was told "if he didn't like it, he could find another job".

It was reported by numerous staff that Bartlett was dating Sgt. Montejo's wife. Sgt. Emanuel "Nello" Montejo was interviewed. He advised that in November or December of 1995 Bartlett called him into the captain's office and told him that he (Bartlett) was seeing his (Montejo's) estranged wife. He reported wanting to tell Bartlett to discontinue this, but was intimidated by Bartlett's rank. Shortly after this, he had a nervous breakdown and became an inpatient at a local mental health facility. The fact that Bartlett was dating his wife added to his stress.

CO I Brenda Erickson was interviewed. She advised that in July, 1995 she was a trainee. Bartlett approached her while on duty, in uniform, and asked her to go to a party that night. She understood that she was to be his date. She did not attend the party. That evening two messages were left on her answering machine, from Bartlett, inquiring as to where she was. The following day Bartlett approached her again and asked why she didn't show up.

Other staff members were interviewed. Several female officers reported being asked out by Bartlett. One female trainee reported that, while she was not asked out by Bartlett, she had been warned by other staff to beware of him.

Three female officers reported an incident three years ago in which Bartlett stuck his tongue in one of their ears. This occurred while they were all out drinking together and resulted in a confrontation.

Several commissioned officers were interviewed. They reported that Bartlett does not instill respect or leadership confidence in a large part of the guard force. He has reputation for dating female officers. This leads to allegations of favoritism.

A 587

2

Deputy Superintendent Victoria Kormanic was interviewed. Over the past two years she has heard that Bartlett dated officers and other H bargaining unit staff. She has counselled Bartlett twice about dating subordinate staff. She also counselled Bartlett about dating Sgt. Montejo's estranged wife. She ordered him to discontinue this relationship.

An allegation surfaced that, when a firearms qualification trip to SCI Albion was rained out, Bartlett had everyone go to a local bar/restaurant for lunch and they were paid overtime. The time cards and STD-929 Time and Attendance Records for the date in question were reviewed. The review indicated that on 4/8/96, CO I Joan Ledford, CO I Mischele Howard and CO IV Bartlett did not punch out for or back in from lunch. Several staff members substantiated that all three attended a gathering at Crossbow Bar/Restaurant in Cambridge Springs on that date. Bartlett acknowledged that he did not seek nor was he given permission to leave the institution for lunch. He acknowledged his failure to punch out and the inappropriateness of allowing subordinate staff to do the same. Bartlett indicated that the lunch period lasted longer than one half hour. According to another witness who did punch out, it lasted approximately one hour. Bartlett stated that it was not his intent to defraud the Commonwealth.

A total of twenty staff members were interviewed during this investigation. It was apparent that Captain Bartlett's propensity to socialize, drink and date with subordinate members of the staff has become a negative issue in the management of SCI Cambridge Springs.

Captain Bartlett himself acknowledged that he dated subordinate staff in the past. He also admitted seeing Sgt. Montejo's estranged wife. He acknowledged an incident in which he shared photographs of himself and Electrical Trades Instructor Becky Tann (together on a date) with Tann's inmates.

Bartlett admitted that he sometimes referred to subordinate female employees as "hon" or "dear". In retrospect, Bartlett expressed regret for his past conduct and the impact it has had on the institution.

3

A 588

# TABLE OF CONTENTS

<u>DETAILS</u>:

1.  Investigation Authorization

2.  Review of Morrison's Letter

<u>INTERVIEWS</u>:                          <u>PAGE</u>:

1.  Sherman Morrison, CO I               6,7

2.  Victoria Kormanic, Deputy Superintendent for Facility Management  7,8

3.  Emanuel R. Montejo, CO II            8,9

4.  Rebecca Tann, Electrical Trades Instructor  9

5.  Martha Brown, CO I                   9

6.  Brenda Erickson, CO I                10

7.  Deborah Chason, CO Trainee           11

8.  Mary Wnukowski, CO I                 11

9.  Mischele Cerami, CO I                11,12

10. Terri Pelletier, CO II              12

11. Darlene McQuaid, CO I               12,13

12. James W. Myers, CO I                13

13. Barbara Hargett, Food Service Instructor  13,14

14. Richard Baun, CO III                14

15. John Raun, CO III                   14

16. Darrell Stuyvesant, CO I            15

A 589

| | | |
|---|---|---|
| 17. | Clara Jones, OB-0825 | 15 |
| 18. | Crystal Henderson, OC-1083 | 15,16 |
| 19. | Keith Bartlett, CO IV | 16,17 |
| 20. | Deb Foster, CO III | 17,18 |

## ACTION TAKEN:

1. Review of Bartlett's Investigative Report on Time Clock Incident Involving Baun, Myers and Erickson

2. Review of the Time and Attendance Records and Time Cards for 4/8/96.

3. Review of Montejo's Psychiatric Progress Notes

4. Review of Kormanic's Supervisory Notes on Bartlett

A 590

DETAILS:

1.    This investigation was authorized by Vaughn L. Davis, Director, Office of
      Professional Responsibility, (OPR), on 9/12/96, predicated by a letter forwarded
      through Deputy Commissioner Fulcomer.  The letter of complaint was from CO I
      Sherman Morrison and was dated 8/24/96.

2.    On 9/13/96 Morrison's letter was reviewed.  The review revealed the following:

          Morrison is employed as a CO I at SCI Cambridge Springs.  The Captain of
          the Guard "preys on trainees".  He dates and socializes with them.  When
          the chips are down he defends them against other staff.

          This situation occurred with him.  He was enforcing rules in the inmate
          handbook.  A female CO thought he was too "Knit-Picky".  This female
          officer went to the captain and he (Morrison) was told that "if he didn't like it
          find another job".  The captain had been dating this female officer.

A copy of Morrison's letter is appended as ATTACHMENT # 1.

INTERVIEWS:

1.    Sherman D. Morrison, CO I
      DOB: 11/4/51

On 9/24/96, the above officer was interviewed by this investigator at his residence in
Franklin, PA.  He has worked at SCI Cambridge Springs for two years.  He advised the
following:

          About one year ago he was a phase 3 trainee.  He was assigned to afternoon yard.
          Officer Rayburg told inmate Blountz to put her shoes on.  Blountz advised the CO
          Rennor said it was okay not to wear them.  The three officers discussed it and
          Rennor told Blountz to put her shoes on.

          Two days later Bartlett asked him into his office and questioned him about the
          incident.  Bartlett said there was no place for his leadership abilities at SCI CBS.
          Bartlett said he was just a trainee.  Bartlett said he spoke to Rennor about the
          incident and he (Morrison) was too "Knit-Picky".  Bartlett said, "If you don't like it,
          find another job".  This upset him and he shared his feeling with CO Myers, CO
          Towney and CO Robin Bell.  Bell was a friend of Rennor's.

          The following Tuesday Rennor approached him in Curry building.  She accused him
          of telling people she was a snitch.  She said that someone called her Friday night

6

A 591

and advised her of his comments.

He went to Bartlett and told him that he did not want to get caught between Bartlett and Rennor. Bartlett set up a three way meeting between himself, Bartlett and Rennor for Wednesday at 1:15 PM.

He went to Bartlett's office at the appointed time. Rennor was not there. Bartlett called Rennor on the telephone. Bartlett said to Rennor, "Hey hon, can you come over here? We have to get something ironed out dear". Bartlett referred to Rennor as "dear" more than once during the call.

When Rennor arrived, he began trying to explain the situation to Rennor. Bartlett blew up and asked Rennor to leave. He told Bartlett that he did not want to be caught between him and someone he dated. Bartlett responded that if he didn't like it he could find another job. Bartlett did not admit that he was dating Rennor.

Recently Co Myers punched CO Erickson out at the time clock. This took place after a CERT practice from which Erickson was excused an hour early. He heard that Bartlett tried to order CO Myers to implicate Lt. Baun.

Bartlett has called the control desk and talked to CO McQuaid for up to 30 minutes at a time.

Bartlett was dating Sgt. Nello Montejo's estranged wife. Montejo may have attempted suicide.

He would like to see the fraternization between Bartlett and officers stopped. It is damaging to the operation of the institution.

2.    Victoria L. Kormanic, DSFM
      DOB: 9/21/57

On 9/25/96, the above deputy superintendent was interviewed by this investigator at SCI Cambridge Springs where she is employed. She has worked for the Department for 14 years. She advised the following:

Keith Bartlett is the administrative captain. He oversees the administration of the guard force. He reports to her.

When Bartlett was made the administrative captain, she told him not to date subordinate staff. She told him it would damage their collective management credibility.

A 592

About three years ago she heard that Bartlett hit on trainees.

Two years ago she heard that Bartlett dated CO Deb Rennor. One year ago Bartlett was dating Becky Tann. Bartlett was dating the estranged wife of Sgt. Montejo. She told Bartlett to stop dating Montejo's wife and he did.

She recalled counselling Bartlett three (3) times about dating junior staff.

CO I Erickson made a sexual harassment complaint against Lt. Wagner. It was investigated and Wagner was suspended.

There was a recent incident where Erickson was permitted to leave CERT training one hour early. Officer Myers punched her out.

She spends a great deal of time trying to straighten out problems caused by rivalries over who's sleeping with whom. She would like to see a section placed in the Code of Ethics that deals with dating/fraternization within the chain-of-command. She would also like to see parolees restored to section B-6 of the Code of Ethics.

3.    Emanuel R. Montejo, CO II AKA: Nello
      DOB: 7/14/60

On 9/2/96, the above sergeant was interviewed by this investigator at SCI Cambridge Springs where he has been employed for 4 years. He advised the following:

He has been separated from his wife for approximately one year. In November or December, 1995, Bartlett called him into his office. Bartlett advised him that he (Bartlett) was dating his (Montejo's) wife. He wanted to tell Bartlett not to date his wife, but he could not because Bartlett was the Captain of the Guard.

He did not write a letter of complaint to anyone because he feared it would hurt his career. He did try to call Gene Smith. Smith did not return his call.

He saw Bartlett's car at his home several times when he was dropping off his children. His children told him that "Keith" was spending a lot of time there.

He had a nervous breakdown. He was an inpatient in a mental health facility in Hemot. He told a psychiatrist that Bartlett's activities with his wife caused him additional stress.

Bartlett has also dated Martha Brown and CO Rennor.

8

A 593

Bartlett once stuck his tongue in CO Mary Wnukowski's ear. This occurred in a bar in Waterford, PA. CO Cerami got very upset about that.

4.    Rebecca M. Tann, Electrical Trades Instructor
      DOB: 12/13/56

On 9/25/96, the above employee was interviewed by this investigator at SCI Cambridge Springs where she has been employed for 2 1/2 years. She advised the following:

She was familiar with Bartlett. She and Bartlett dated for four or five months in 1995.

She and Bartlett met at work. In March, 1994, Bartlett stopped her in a hallway and asked her to go out with him. She refused. At that time she was only on the job for two weeks.

In February or March, 1995 she agreed to date him. This occurred at "DOC Night" in a local bar. Bart wanted the relationship to be sexual and she did not. This seemed to hurt his feelings and they drifted apart.

On one occasion they did kiss in Bartlett's office.

They went to a formal dance together at the Erie Yacht Club. They had a picture taken. She was upset when she found out that Bartlett was showing this picture to staff and inmates. Some of the inmates worked for her. They were Clara Jones, OB-0825, and Crystal Henderson, OC-1083. She resented having her personal business shared with inmates.

5.    Martha L. Brown, CO I
      DOB: 5/23/70

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge Springs where she has been employed for 2 years. She advised the following:

She was familiar with Captain Bartlett. They are friends, but never dated.

Bartlett did date CO Rennor, and Becky Tann.

Bartlett is currently dating Ms. Cornell, a unit manager's secretary.

Bartlett has been professional in his dealings with her.

9

A 594

6.    Brenda J. Erickson, CO I
      DOB: 5/24/66

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge
Springs where she has been employed for 2 years. She advised the following:

She was familiar with Bartlett. She had no respect for him.

In July, 1995, when she was a trainee, Bartlett approached her in Alliance Hall. He
asked her to meet him at a party that night. He wanted her to be his date. She did
not turn him down flat because he was the Captain of the Guard and he could
influence her career. She did not attend the party.

Bartlett got her telephone number from the control desk at SCI Cambridge Springs.
He called twice that night and left messages inquiring why she wasn't at the party.
She let Food Service Instructor Hargett listen to the messages before erasing them.

When she was at work the next day, Bartlett questioned her about why she didn't
come to the party. She told him she did not have a sitter and did not party with co-
workers, so why would she attend that party. Bartlett's response was "because I
invited you". This made her uncomfortable.

There was a similar incident involving Lt. Wagner harassing her at home. Wagner
was disciplined for it.

Since then her evaluations have gotten worse. They used to be excellent and now
they are fair or needs improvement.

She has transferred to the 10-6 shift. She did this to stay away from Bartlett. She
feels over scrutinized and attributes it to her refusal to date Bartlett. She now
avoids contact with Bartlett unless there are witnesses present.

She has no respect for Bartlett. He does not carry himself professionally, drinks too
much and plays favorites.

She was recently investigated for leaving CERT training one hour early. Lt. Baun
excused her. CO Myers punched her out. Baun did not know that Myers punched
her out.

Erickson's signed statement is appended as ATTACHMENT # 2.

10

A 595

7.    Deborah Chason, CO Trainee
      DOB: 3/14/62

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge
Springs where she has been employed for two months. She advised the following:

    She was familiar with Bartlett.

    After starting at SCI Cambridge Springs, she was told by several staff members to
    lookout for Bartlett because he would hit on her. She was unable to recall the
    names of these staff members.

    She has made it clear to everyone that she is happily married. Bartlett has not hit
    on her.

8.    Mary Wnukowski, CO I
      DOB: 9/17/66

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge
Springs where she has been employed for 4 1/2 years. She advised the following:

    She was assigned to the 6:00 AM - 2:00 PM shift. She was familiar with Bartlett.

    She attended a social gathering at a bar in Waterford, PA with other officers from
    SCI Cambridge Springs about three years ago. Bartlett also attended. Bartlett
    stuck his tongue in her ear. This disgusted her and she felt it was rude. She felt
    this was an attempt to make CO Cerami and Sgt. Pelletier angry.

    She could not recall what she said to Bartlett when he did this.

    She could not recall Bartlett asking her out on a date.

9.    Mischele M. Cerami, CO I
      DOB: 1/21/63

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge
Springs where she has been employed for 4 1/2 years. She advised the following:

    She was familiar with Wnukowski and Bartlett.

    About three years ago she attended a gathering at the Lakeside Bar in Waterford,
    PA. Wnukowski and Bartlett also attended. Everyone was drinking.

11

Bartlett stuck his tongue in Wnukowski's ear. This upset her (Cerami). Pelletier confronted Bartlett. Bartlett left.

Bartlett has not asked her out.

10.   Terri Pettier, CO II
      DOB: 5/12/59

On 9/25/96, the above Sergeant was interviewed by this investigator at SCI Cambridge Springs where she has been employed for 4 1/2 years. She advised the following:

She was familiar with Bartlett.

Three years ago she attended a gathering of D.O.C. employees at the Lakeside Bar in Waterford, PA. Bartlett, Wnukowski and Cerami were also there.

She saw Bartlett stick his tongue in Wnukowski's ear. It was evident that Wnukowski was displeased by this action. She confronted Bartlett about it. They had both been drinking. Bartlett got angry and stormed out.

Bartlett plays favorites. She recalled that, when she was a trainee, she was one of Bartlett's pets. Bartlett would get her relieved so she could come and sit in his office. They would discuss personal things.

When this first began Bartlett asked her out on a date. She turned him down. When she was a trainee this intimidated her. She would not be intimidated now. After that, she avoided contact with him.

11.   Darlene McQuaid, CO I
      DOB: 2/14/65

On 9/25/96, the above officer was  ·  rviewed by this investigator at SCI Cambridge Springs where she has been employe  for 3 years. She advised the following:

She was familiar with Bartlett. She has socialized with Bartlett away from the institution. They have a beer together now and then.

She worked various posts throughout the institution. She has worked in control as an acting sergeant.

Bartlett calls her from time to time at work. These calls last as long as 15 minutes. They discuss some business then regress to personal items.

12

A 597

Bartlett has dated Deb Cornell, Co Rennor and Electrician Tann.

12.    James W. Myers, SR, CO I
       DOB: 3/14/63

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge
Springs where he has been employed for 2 years. He advised the following:

> He was familiar with Bartlett. Bartlett is on CERT, but is not the commander.

> There was a CERT training in the late summer of 1996. He was uncertain of the
> date. CO I Erickson asked to be excused an hour early because she had worked
> 10:00 PM - 6:00 AM that day. Lt. Baun, CERT commander, excused her. When the
> rest of the team punched out he punched Erickson out. He and Erickson discussed
> it within ear shot of Lt. Baun.

> When he punched Erickson out, two other officers informed Captain Bartlett.
> Bartlett and Baun don't get along. Rumor has it that Bartlett wants to be the CERT
> commander. Bartlett called him in for an interview. During the interview Bartlett
> asked him if Baun ordered him to punch Erickson out. He replied that Baun must
> have known because he was sitting right there. Bartlett said, "that sounds like an
> order to me". He received a formal counseling session from Bartlett.

> Bartlett had been dating Sgt. Montejo's wife. This caused a lot of people to loose
> respect for Bartlett. A lot of people in the institution took Montejo's side.

> There is a rumor that Marty Brown is pregnant with Bartlett's child.

> Not long ago Bartlett was taking officers to Albion to qualify on the range. One
> group was rained out. Instead of punching out they all went to a restaurant for
> lunch. They were paid 4 hours of overtime.

13.    Barbara Hargett, Food Service Instructor
       DOB: 6/9/59

On 9/25/96, the above employee was interviewed by this investigator at SCI Cambridge
Springs where she has been employed for 2 1/2 years. She advised the following:

> She is the night baker.

> She was familiar with Bartlett, though she rarely sees him because of her shift.

> In July, 1995, she was the next door neighbor of CO Erickson.

A 598

Erickson is mistaken about her hearing the recordings left by Bartlett. She heard the recordings left by Lt. Wagner.

She recalled Erickson telling her that Bartlett asked her to go to a party with him.

14.    Richard L. Baun, CO III
       DOB: 10/5/45

On 9/25/96, the above lieutenant was interviewed by this investigator at SCI Cambridge Springs where he is employed. He has been employed by the Department for 9 years. He advised the following:

He is the CERT commander at SCI Cambridge Springs. Bartlett is CERT qualified, but is not a member of the CERT team. He has heard the rumor that Bartlett would like to succeed him as the team leader, but puts little stock in it.

He has no respect for Bartlett as a commissioned officer. He does respect Bartlett's rank. Bartlett plays favorites with the officers. Bartlett dates officers under his supervision.

Bartlett has a reputation for "hitting on" new trainees and officers. CO Erickson approached him and confided that Bartlett had asked her out. He directed Erickson to Deputy Superintendent Kormanic. Erickson told him that Bartlett called her at home.

He heard the rumor that some officers had gone to a local bar/restaurant with Bartlett. He had no first hand knowledge. CO Stuyvesant was one of the officers that went there.

15.    John Raun, CO III
       DOB: 12/4/63

On 9/25/96, the above lieutenant was interviewed by this investigator at SCI Cambridge Springs where he has been employed for 4 years. He advised the following:

Bartlett has not earned his respect. He does respect Bartlett's rank.

Bartlett has a reputation for dating officers and trainees under his supervision. Bartlett once confided to him that he had slept with CO Heather Casco.

He had no knowledge of Bartlett taking CO's to a local restaurant on overtime.

No officer has asked him for guidance in dealing with Bartlett.

14

A 599

16.    Darrell Stuyvesant, CO I
       DOB: 6/1/42

On 9/25/96, the above officer was interviewed by this investigator at SCI Cambridge Springs where he has been employed for 2 1/2 years. The advised the following:

> He works the 2 - 10 shift. In August, 1996, he was part of a crew of officers scheduled for qualification at SCI Albion. Bartlett was the senior officer. The range day was rained out. They all returned to SCI Cambridge Springs. Bartlett, Howard, Ledford, Mitchell and himself went to the Crossbow Bar for lunch.

> Before he went to lunch he punched out. He didn't pay attention to what the other officers did. He did not recall anyone drinking alcohol.

17.    Clara Jones, OB-0825
       DOB: 6/30/55
       SSN: 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

Jones is a 41 year old black female serving a 7 1/2 to 15 year sentence from Allegheny County for Aggravated Assault. Her minimum sentence expires 4/12/98 and her maximum sentence expires 10/12/2005. She is a custody level 2 classification.

On 9/26/96, the above inmate was interviewed by this investigator at SCI Cambridge Springs where she is incarcerated. She advised the following:

> She worked for Ms. Tann in the Electrical Shop. She likes Tann.

> Last year Captain Bartlett showed her a photograph of himself and Tann on a date. This occurred in the hallway of Curray Hall. After that Captain Bartlett asked Ms. Tann if he could show people the photograph and Tann said yes. Bartlett showed the photograph to other inmates also.

18.    Crystal Henderson, OC-1083
       DOB: 4/11/63
       SSN: 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

Henderson is a 33 year old black female serving 2 year 8 month to 7 year sentence for Theft from Berks County. Her minimum date expired 5/15/96 and her maximum date expires 9/15/2000. She is a custody level 3 classification.

On 9/26/96, the above inmate was interviewed by this investigator at SCI Cambridge Springs where she is incarcerated. She advised the following:

A 600

She worked for Ms. Tann in the Electrical Shop. Tann was a good supervisor.

Last year Tann and Bartlett were talking in the shop. Bartlett had a photograph of them on a date. She saw the photograph. Six or seven other inmates also saw the photograph.

She did not recall Bartlett asking Tann if he could show the inmates the photograph.

19.    Keith R. Bartlett, CO IV
       DOB: 11/14/55

On 9/26/96, the above captain was interviewed by this investigator and Deputy Superintendent Victoria Kormanic at SCI Cambridge Springs where he is employed. He has been employed by the Department for 13 years. He advised the following:

He has worked at SCI Cambridge Springs since May, 1992. He became a captain in December, 1993. He was made the Administrative Captain in March, 1995. His responsibilities are to supervise the guard force and the security of the institution.

He does date staff members and did so in the past. He has asked trainees to go to social events, but not on dates. It is possible that a trainee may have misunderstood his intentions.

He did date CO Rennor and they did have consensual sex. They dated from November, 1994 until August, 1995. Rennor was a trainee when they started dating.

He has dated Electrical Trades Instructor Rebecca Tann. He asked her out while both were on duty. He did not recall kissing Tann in the office. He brought a photograph of himself and Tann on a date into the institution. He showed the photograph to inmates in Tann's shop. He did not think it was a good thing to do. He had no explanation for this action.

He admitted calling Sgt. Montejo into his office and informing him that he was counselling Montejo's wife. He did attend a dinner at the Veterans of Foreign Wars. Montejo's estranged wife also attended the dinner. In retrospect he wished he had stayed out of Montejo's personal affairs. It caused a lot of rumors about dating Montejo's wife.

He denied dating CO Brown. He did see her socially away from work. Brown is not pregnant with his child as rumor has it.

16

A 601

He recalled the incident at the Lakeside Bar where he was flirting with CO Wnukowski. She stuck her tongue in his ear and he stuck his tongue in her ear. CO Wnukowski was sitting in his lap and rubbing his head. Sgt. Pelletier told him to knock it off. He got embarrassed and left.

He did not recall asking CO Pelletier out on a date when she was a trainee. He did recall having Pelletier in his office to talk.

He denied asking CO Erickson out on a date. He called a lot of officers to attend parties. It is possible he asked Erickson to attend one. It is possible that he called her at home. He denied approaching her at work the next day to find out why she did not attend.

He socializes with CO McQuaid. They have gone out for beers together. He has discussed aspects of his personal life with her. She helped him through his divorce and he helped her through hers. He acknowledged calling McQuaid and discussing personal items while she was on duty.

On 4/8/96 he took a group of officers to SCI Albion to qualify on the range. It rained and they did not complete the course. The group returned to SCI Cambridge Springs and went to lunch at a local bar/restaurant called the Crossbow. No alcohol was consumed. He was the senior officer present. He did not punch out for lunch. He did not seek permission to leave the institution from Deputy Kormanic. The lunch lasted more than one half hour. The range instructors were paid for this time. He did not feel this was appropriate.

He sometimes refers to female subordinates as "hon" or "dear". In retrospect he did not feel this was appropriate.

He acknowledged that his dating of staff has created a problem. It has a negative effect on how the staff view him as a manager.

A copy of Bartlett's signed statement is appended as ATTACHMENT # 3.

20.    Deb Foster, CO III
       DOB: 9/6/48

On 9/30/96, the above lieutenant was interviewed over the telephone by this investigator. She has been employed by the Department for 14 years. She advised the following:

She was advised by Captain Lazenby to contact the investigator. She has been off on sick leave with high blood pressure. She attributes her high blood pressure to Captain Bartlett.

17

Bartlett befriended her when she transferred to SCI Cambridge Springs. She has counseled Bartlett's daughter and socialized with them. Bartlett confided in her, last year, that he was dating a trainee. Bartlett refused to identify the trainee. Bartlett told her that only Deputy Kormanic knew the trainee's identity.

Last year, over the Christmas holiday season, Bartlett called the institution at night and told her to put Marty Brown on the telephone. Personal calls to staff are frowned upon unless it is an emergency. On one occasion Bartlett ordered her to allow Brown to leave early because they were going out.

During a trip to a local mall Bartlett was purchasing sex gels and silk scarves. She commented to him that this trainee must be kinky. Bartlett replied that she was, but would not identify her.

Bartlett tells sexual jokes in front of male and female staff.

Bartlett has never asked her out.

She once respected Bartlett, but no longer does. This was due to Bartlett's dating of subordinate staff. The superintendent has instructed the lieutenants not to date trainees, CO I's or CO II's. She felt Bartlett was a poor example. Bartlett frequently consumes alcohol with subordinate officers.

ACTION TAKEN:

1. On 9/25/96, an attempt was made to review Bartlett's investigative report on the time clock situation dealing with CO's Erickson, Myers and Lt. Baun. The attempt revealed the following:

   No investigative report was prepared.

2. On 9/26/96, the STD-929 Time and Attendance Records and time cards were reviewed for 4/8/96. the review revealed the following:

   CO I Carla Mitchell did not punch in at the beginning of her shift. She did not punch out or back in for lunch. She did not punch out at the end of her shift. She was paid from 10:00 - 12:30 and from 1400 - 2200 hours.

   CO I Joan Ledford punched in at 0600 hours. She did not punch out for lunch or back in after lunch. She did not punch out at the end of her shift. She was paid from 0600 - 1400 hours and from 1400 hours to 1545 hours.

   CO I Michelle Howard punched in at 0550 hours. She did not punch out or

18

in for lunch. She did not punch out at the end of her shift. She was paid from 0600 - 1400 hours and from 1400 - 1545 hours.

CO I Darrell Stuyvesant punched in at 0949 hours. He punched out for lunch at 1235 hours and back in at 1349 hours. He punched out at the end of his shift at 2205 hours. He was paid from 1000 to 1230 hours and from 1400 - 2200 hours.

CO IV Keith Bartlett punched in at 0551 hours. He did not punch out or in for lunch. He punched out at the end of his shift at 1540 hours. He was credited with working from 0600 - 1400 hours and from 1400 to 1540 hours.

Copies of the STD-929 Time and Attendance Record forms and time cards are collectively appended as ATTACHMENT # 4.

3.      On 10/3/96, psychiatric progress notes pertaining to Sgt. Montejo where reviewed. The review revealed the following:

In January, 1996 Montejo was an in-patient at Hamot Institute for Behavioral Health.

Montejo reported to his treating physician, Dr. Ziga, that he had a "PFA against him...and she is dating one of his supervisor".

A copy of the progress notes are appended as ATTACHMENT # 5.

4.      On 10/3/96, supervisory file notes kept by Deputy Superintendent Kormanic on Bartlett were reviewed. The review revealed the following:

On 11/15/94 Bartlett was told to "distance himself from becoming involved in off. personal issues". Concerns were discussed "about dating subordinate staff and poss. compromising his integrity as a manager".

On 3/28/95, Bartlett was made the Administrative Captain.

On 4/4/95, Bartlett was advised, by her and the superintendent, that "he is to be held to a higher standard and not to date subordinate officers". Bartlett was advised that it is "extremely important that staff be able to trust his judgement and decisions w/o any hint of bias".

on 1/2/96, Bartlett was ordered to discontinue seeing or dating Montejo's wife. This was ordered "due to the instability of Montejo and impact it may have on the institution".

A copy of the supervisory notes are appended as ATTACHMENT # 6.

Submitted by:    _____

Date:            ___ 10/24/96 _____

MD/bb

ATTACHMENTS:

1.    Morrison's Letter.

2.    Erickson's Statement.

3.    Bartlett's Statement.

4.    Time and Attendance Records and Time Cards from 4/8/96.

5.    Psychiatric Progress Notes on Montejo.

6.    Kormanic's Supervisory Notes on Bartlett.

20

A 605

CONFIDENTIAL

Commonwealth of Pennsylvania
Department of Corrections
SCI-Cambridge Springs
April 25, 1997

SUBJECT:    CASE 97-15
            Ref: Lieutenant Manski and Captain Bartlett

TO:         WILLIAM J. WOLFE
            SUPERINTENDENT

FROM:       R.R. Lazenby
            Intelligence Captain


As requested I investigated the complaint filed by Lieutenant Manski, that on April 9, 1997, Captain Bartlett embarrassed and intimidated him, when Captain Bartlett put his arm around Lieutenant's Manski's shoulder and told Lieutenant Manski that he looked like a person in a McDonald's commercial.


Deputy Kormanic took statements from some of the witness's mentioned in Lieutenant Manski's letter. The overall consensus of the witness's was that Capt. Bartlett was just stating that Lieutenant Manski looked like an actor from a television commercial. The witness's thought it was all in good humor. Lieutenant Wagner thought Captain Bartlett was telling a joke to Lieutenant Manski, but did see Captain Bartlett put his arm around Lieutenant Manski's shoulder. Sergeant Montejo thought it was done in a joking manner, since Lieutenant Manski had recently did the same thing to him(Sergeant Montejo) by taking a picture of an ad of a Realtor and had placed Sergeant Montejo's name below one of the frames because it reminded Lieutenant Manski of Montejo. Sergeant Crowe was unfamiliar with the commercial, but states that Lieutenant Manski was laughing with everyone else.


I Interviewed Captain Bartlett who claimed that it was nothing more then joking with Lieutenant Manski, because the person on television looked like Lieutenant Manski.



A 606

PAGE II

CONCLUSION:

I find no evidence to show that Captain Bartlett's actions were intimidating in anyway or done to embarrass Lt. Manski. Captain Bartlett's actions were no different then the actions that Lt. Manski did to Sergeant Montejo a few weeks before. I find no evidence that Lt. Manski was physically violated by Captain Bartlett. There is no reasoning, for a person to be embarrassed, by having another person tell them they resemble an actor from television.

See attached statements:
      Lieutenant Manski
      Captain Bartlett
      Lieutenant Wagner
      Sergeant Gross
      Sergeant Pelletier
      Sergeant Coffee
      Sergeant Montejo
      Sergeant Crowe

2

*Confidential*

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**SCI-CAMBRIDGE SPRINGS**
April 11, 1997

SUBJECT:    LT MANSKI

TO:    WILLIAM J. WOLFE
SUPERINTENDENT

FROM:    ROGER CYR
PERSONNEL OFFICER

*cc: Capt L*

*Please investigate this complaint & advise me of your findings ASAP*

*WJW*
*4-11-97*

Regarding the attached letter from Lt. Manski, he has indicated to me this date that he intends to pursue this as a violation of the Code of Ethics, harassment and intimidation for the last five (5) years. I informed him that his avenue of appeals are: Civil Service, PHRC, and EEOC.

I am recommending an investigation into the contents of the attached letter.

cc: Deputy Kormanic

*4-11-97 150*

**3**

A 608

COMMONWEALTH OF PENNSYLVANIA

DATE: 4/10/97

SUBJECT INTIMIDATION AND EMBRASSMENT

TO: ROGER CYR

FROM: LT MANSKI

AT 0800 4/9/97 I WAS STANDING IN THE SHIFT COMMANDERS OFFICE WAITING FOR THE SGT MEETING
TO BEGIN. PRESENT WERE THE FOLLOWING LT WAGNER,SGT PELLETIER,SGT CROWE,SGT COFFEE.SGT
MONTEJO SGT GROSS.
CAPTAIN BARTLETT WALKED INTO THE OFFICE,PLACED HIS ARM AROUND MY SHOULDERS,POINTED
HIS FINGER IN MY FACE AND SAID ,I WANT ALL OF YOU TO THINK OF HIM(MEANING ME) WHEN
YOU SEE THE NEW MCDONALDS COMMERCIAL
I WAS VERY EMBRASSED INFRONT OF SGTS WORKING UNDER MY SUPERVISION AND PHYSICALLY VIOLATED
AND INTIMIDATED BY CAPTAIN BARTLETTS COMMENTS AND TOUCHING ME.

4

HANDOUT #1

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

    The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On Wednesday, April 9, 1997 at approximately 0830 while sitting at my desk in the Shift Commanders Office, I observed Captain Bartlett tell a joke. While telling the joke Captain Bartlett put one hand on Lt. Manski's upper left arm and one hand on the back of Lt. Manski's neck. Lt. Manski then pulled away to the right. Lt. Manski said nothing at this time in regard to Captain Bartlett's actions. I do not recall the joke that was told.

_4/17-97_
Date

_W.S. Wagner_
Signature

_4/17/97_
Date

_Susan Yonel_
Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, it must be read and signed by the employe. In the event the statement is typed, the party typing the statement must sign and date the document.

5

A 610

HANDOUT #1

### COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

*April 9th at the end of Sgt meeting Cap Bartlett stepped to door way of Brief after Lt Manski was there. Capt Bartlett put his hand on Lt's shoulder. He said something like look who do we have here as he held up a picture with different persons. Lt Manski said the same picture making Joke that some of the pictures located like Sgt Meeting*

_____
4-11-97
Date

_____
[Signature]
Signature

_____
Date

_____
Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, it must be read and signed by the employe. In the event the statement is typed, the party typing the statement must sign and date the document.

HANDOUT #1

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and
without coercion for official Commonwealth business and will be
considered for all purposes, including actions under the Statutes
of this Commonwealth, just as though it had been sworn or affirmed
before a court of law or formal arbitration panel.

On April 9, 1997 approx. 0800 I attended
a Sgts meeting. There was a conversation
going on with Capt. Bartlett & some
other people. I got up to get a cup
of coffee so I was no longer in view
of the individuals having the conversation.
I heard something about "look at this
face, doesn't it look like that guy on the
McDonald's commercial. Capt Bartlett said
made the statement.

_____4-16-97_____          _____Terri L. Pelletier_____
        Date                              Signature


_____          _____
        Date                          Typist's Signature


NOTE: This form is to be completed and signed by an employe who is
a witness to an incident involving employes of the Commonwealth.
If the text is typed by someone other than the employe giving the
statement, it must be read and signed by the employe. In the event
the statement is typed, the party typing the statement must sign
and date the document.

7

HANDOUT #1

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

During the week of 7april '97 (I'm not sure, but I think on 9april 97) I attended a Sgts meeting in operations. The main topic of Discussion was the Policy for Inmate Movement and Pass System Policy, and other security issues. Although there were some private conversations during the meeting, I don't recall anyone making racial, ethnic or humiliating statements about anyone else. GBC

_4-16-97_
Date

_G. BC_
Signature

_____
Date

_____
Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, it must be read and signed by the employe. In the event the statement is typed, the party typing the statement must sign and date the document.

**8**  A 613

HANDOUT #1

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On Apr. 9th there was a sgts. meeting held in the shift comm office. Just before the meeting, Capt. Bartlett came into the office. He asked me if I had seen the paper that Lt. Manski had made about me. (A real estate ad) with a picture of a person that resembled me. The person's name had been replaced with my name Nelo Montejo.) I said yes I had seen it. Capt. Bartlett then said "You seen the new McDonald's commercial." Capt. Bartlett then scrunched Lt. Manski's face saying "This is my McDonald's."

4-17-97
_____
Date

_____
Signature

_____
Date

_____
Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, it must be read and signed by the employe. In the event the statement is typed, the party typing the statement must sign and date the document.

9    A 614

HANDOUT #1

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

ON 4-9-97 AT APPROX. 0810 hrs., while in ATTENDANCE at the Sgts meeting in the shift COMMANDER's office, I DID witNess CApt. BArtlett, with his ARm DRAped over LT. MANSKi's shoulder MAKE A funny fAce & A Reference to LARRy ( LT. MANSKi ) & the New McDonAld's Commercial. Since I WAS completely unfamiler with the Commercial, (having Never seeN it), I Really Did Not KNow whAt he WAS tAlKiNg About. However, I LAughed About it, As DiD the Rest of the group, so I guess it wAs funny & certAiNely seemed to Be All in Jest.

| 4-16-97 | *Thomas R. Krause Co II* |
|---|---|
| Date | Signature |

A 615

| | |
|---|---|
| Date | Typist's Signature |

*10*

NOTE:  This form is to be completed and signed by an employe who is a witness to an incident involving employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, it must be read and signed by the employe.  In the event the statement is typed, the party typing the statement must sign and date the document.

NOTE: Also iN AtteNDANce At this meetiNg were: LT. WAgNeR, LT. Scott, Ms. Sue YANg, SgT. GRoss, SgT. Coffee,

PART I
INVESTIGATION

REASON FOR INVESTIGATION: Capt Bartlett put his

arm around Lt Manski shoulders and made

a McDonalds comment.

_____

_____

_____

_____

_____

Inmate(s) involved: None

_____

Staff involved: Lt Manski

Capt. Bartlett

Date: 6-11-97          TIME: 1530

Investigating Staff: Capt Lazenby

Log Number: 7-15

REMARKS: Killip

_____

_____

file/Inv1

A 616

SGT PelleTien

Saw Nothing heard Some about McDonald's And
Lt Marsh. Looking A A guy on

12

A 617

CAPT. LAZENBY'S OFF. —    4/24/97    0810

| Location: | Date: | Time: | Case #: |
|---|---|---|---|
| BARTLETT, KEITH, R. | | 11/14/55 | |
| Last Name, First Name, Middle Initial: | | Date of Birth: | Social Security #: |

Address:

I, _KEITH R. BARTLETT_, hereby state that _RONALD LAZENBY, CAPT._ has identified himself/herself to me as a Correctional Officer IV for the Pennsylvania Department of Corrections. I do hereby voluntarily and of my own free will make the following statement, under penalty of perjury, 18 Pa. C.S. 4904. I have not been subjected to any coercion, unlawful influence or unlawful inducement. I have not been promised any favors or been given any compensation.

ON 4/9/97 AT ABOUT 0815 THERE WAS A SGT.'S MEETING BEING HELD IN THE SHIFT COMMANDER'S OFFICE. LT. WAGNER LT. MANSKI, SGT. COFFEE, SGT. MONTERO, SGT. GROSS, SGT. PELLETIER AND SGT. CROWE WERE PRESENT. I BELIEVE CO PETERSON WAS PRESENT AS WELL. I WALKED INTO THE MEETING AND ASKED SGT. MONTERO IF HE HAD SEEN THE REAL ESTATE AD THAT LT. MANSKI HAD PUT HIS NAME (MONTERO) ON. HE LAUGHED AND SAID YES HE HAD. I PLACED MY LEFT HAND ON LT. MANSKI'S RIGHT SHOULDER AND POINTED AT HIM WITH MY RIGHT INDEX FINGER. I SAID "YOU'VE ALL SEEN THAT NEW MC RONALDS COMMERCIAL, NOW TELL ME DOESN'T HE LOOK LIKE THE GUY THAT SAYS "MY MC RONALDS"." THEY ALL LAUGHED INCLUDING LT. MANSKI. IT WAS A HARMLESS JOKE. MY HAND RESTED ON LT. MANSKI'S SHOULDER. THERE WAS NO INTENT TO HARM HIM OR HUMILIATE HIM. HIM AND I JOKE LIKE THAT ALL THE TIME WITH EACH OTHER

I further state that I have read and understand this entire statement or it has been read and explained to me. I have initialed all pages, corrections and signed this statement. It is true and correct as written.

WITNESSES:                                    4/24/97                    **13**

_____              _____
                                           (Signature of person making statement)

_____

A 618

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
June 23, 1997

**SUBJECT:**   Investigation Performed by
Captain Abramson

**TO:**   Thomas A. Fulcomer
Deputy Commissioner

**FROM:**   William J. Wolfe
Superintendent

Please find the enclosed investigative report which you directed to be performed regarding allegations of discrimination and harassment which were filed by Lt. Foster.

Pursuant to your review, I would appreciate the opportunity to discuss your thoughts.

WJW:jfh

cc: File

EXHIBIT
117

A 619

Commonwealth of Pennsylvania
Department of Corrections
State Correctional Institution
at Albion
June 17, 1997

Subject:    INVESTIGATION REPORT:  SCI-CAMBRIDGE SPRINGS
DISCRIMINATION /HARASSMENT COMPLAINT FILED BY
LT. DEBORAH FOSTER

To:      Mr. William J. Wolfe              **CONFIDENTIAL**
Superintendent
SCI-Cambridge Springs

From:    J.R. Abramson
Intelligence Captain
SCI-Albion

On 5/30/97, Superintendent Brennan advised that I had been assigned to
conduct an investigation at SCI-Cambridge Springs.  The subject of the investigation is
a complaint filed by Lt. Deborah Foster against Capt. Keith Bartlett and Lt. D. Waddell.
On 5/23/97, Lt. Foster filed a Discrimination Complaint with Superintendent
Wolfe and Mr. Robert Cyr, Affirmative Action Officer at Cambridge Springs.  Lt. Foster
made a number of allegations and complaints concerning the conduct of Capt. Bartlett
and Lt. Waddell.  Many of the complaints regarding Lt. Waddell centered on her opinion
of how Lt. Waddell conducts himself as Alternate Shift Commander, and what can best
be describe as interpersonal relationship problems between herself and Lt. Waddell.
To facilitate this investigation, I felt it necessary to concentrate on specific
allegations made by Lt. Foster which I felt warranted independent investigation.  Those
complaints concerning Lt. Waddell's performance as Alternate Shift Commander and
the interpersonal relationship problems between Lt. Foster and Lt. Waddell are viewed
as issues for internal review.
In her complaint, Lt. Foster made the following allegations against Capt. Bartlett
and Lt. Waddell which are considered pertinent to this investigators inquiry, and I quote;
1.    "Lt. Waddell is the 2-10 Alternate Shift Commander and has used this title
to harass and discriminate against me since I returned to the shift in
January."

A 620

Page 2,     INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

2.    "I have been the subject of petty arguments to display authority and had to
view blatant sexual harassing incidents between he and Capt. Bartlett on a
daily basis, such as touching, blowing kisses, use of affectionate words
and nicknames to each other and insubordination."

3.    "On Tuesday, May 20, 1997, when Lt. Waddell asked for approval for a
day off and Captain Bartlett gestured for him to get under his desk to give
him oral sex and Lt. Waddell crawled under his desk and Captain Bartlett
pulled his chair up to the desk. Also present were Lt. Saunders and Lt.
Beck who witnessed it all."

The staff members identified as either directly or indirectly involved in Lt. Foster's
complaint are: Capt. Bartlett, Lt. Waddell, Lt. Saunders, Lt. Beck, Lt. Miller and Mr. Cyr.
Each was asked various questions concerning their knowledge of, or involvement in, the
allegations made by Lt. Foster. Below I have noted the questions asked of each of
these officers and their responses to the questions.

**6/9/97**
Interviewed Lt. Foster. I advised Lt. Foster that I was assigned by Central Office
to conduct an investigation into her Equal Employment Opportunity Discrimination
Complaint filed 5/23/97. The questions asked of Lt. Foster, and her responses to the
questions, are noted below.

1.    Are all of your allegations true and accurate? Yes.

2.    In your complaint you state that Lt. Waddell has discriminated against you. What
is the basis for the discrimination allegation, on what grounds has he
discriminated? He has discriminated against me as a female, and as a black
female, because he uses his authority to belittle me. He makes negative
comments about female officers and I take offense with this.
(No specific explanation was given on how Lt. Waddell belittles her, or what
comments he makes about females which Lt. Foster considers offensive.)

3.    How has Lt. Waddell discriminated against you? He physically came at me one
night. He was complaining about my arrival time for shift. He got mad and
slammed the door. Then he came at me with his finger in my face, yelling at me.
He does not do this to anyone else.

4.    In your complaint you state that Lt. Waddell has harassed you. How has Lt.
Waddell harassed you? Lt. Waddell gives me orders. He directs most of the
work load on me instead of other lieutenants. It's the way he asks me and he
doesn't assign work to others like he does me.

5.    Has Capt. Bartlett discriminated against you? Yes. When I transferred here he
told me I wouldn't be accepted here because I was black. He would not help

Page 3,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

resolve problems between me and other lieutenants. He refused to discuss them with me. If anybody else has a problem, he will sit down and help then resolve the problem.

6. Has Capt. Bartlett harassed you? No, other than the jokes that go around in the office and the redneck jokes. I feel it is harassing to me when I have to hear the jokes. I have been disciplined by him for attendance. No one else has been disciplined.

7. Has either Capt. Bartlett or Lt. Waddell ever tried to directly involve you in any of their alleged behaviors which you consider sexual in nature? No, not to involve me personally, but they brag about what they do. They play games and I don't think that is professional.

8. Has anyone else ever harassed or discriminated against you at Cambridge? Lt. Manski, but he is gone. Lt. Saunders made a racial joke to me one time. He was reprimanded. Women are held to a different standard.

9. Have you ever reported to your superiors incidents in which you believed you were the victim of sexual harassment? Yes, I have reported the jokes and stuff to Deputy Kormanic. She would like to blame me as if it was my fault. She told me to deal with it.

10. Have you ever reported to your superiors incidents in which you believed you were the victim of discrimination? Yes, I have reported all these things because I feel I was the victim of discrimination, like the redneck jokes posted around.

11. Concerning the incident of 5/20/97, did you tell anyone present that you took offense at what Capt. Bartlett and Lt. Waddell were doing? I was not present when the incident occurred. (In her complaint, Lt. Foster's wording implied that she was present during the incident)
a. If you were not present, how did you find out about the incident? I was told about it by Capt. Bartlett, who was bragging about it. My problem was with him telling me this. He offended me by telling me what he did. (Capt. Bartlett denied telling Lt. Foster of the incident. Lt. Saunders stated he told Lt. Foster about the incident)

12. Prior to submitting your official complaint, did you discuss the events of 5/20/97 with anyone? Yes, I told Lt. Miller. She said he (Bartlett) told her too.

13. In your complaint you state that when you transferred to Cambridge, Capt. Bartlett told you that you would not be accepted here because you are black. Did he give you an explanation why he was telling you this? Yes.

A 622

Page 4,     INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

    a. What was his explanation?  Only that because I was black people would not accept me here.  No specific reason, only the statement about being black.

    b. Did you tell anyone about Capt. Bartlett's comment?  I don't remember, but I remember telling Mr. Cyr.

14.    Why have you waited until now to file allegations of harassment and discrimination, when you state that these violations have been ongoing?  My biggest concern is I feel the men are treated much better than the females here. I should not be subjected to conduct which I feel is offensive, like the racial jokes, redneck jokes and the captain and lieutenant playing sexual games, and then wanting to brag about what they do.  I would like to see them, supervisors, be professional and role models to us, as we are expected to be with our subordinates.

    Lt. Foster went on to talk about "Redneck Jokes" that are posted around the office area.  She showed me two samples of the redneck jokes, which are small calendar sheets with jokes by Jeff Foxworthy.  She feels the jokes are discriminatory, because she believes that "Rednecks" do not like blacks.

**6/9/97**

    Interviewed Lt. Beck.  I advised Lt. Beck that I was assigned by Central Office to investigate harassment/discrimination allegations made by Lt. Foster against Capt. Bartlett and Lt. Waddell.  The questions asked of Lt. Beck, and his responses to the questions are noted below.

1.    Were you present on 5/20/97, when Lt. Waddell asked Capt. Bartlett for a day off?  Yes.

2.    Who was present when Lt. Waddell asked Capt. Bartlett about the day off?  Myself, Capt. Bartlett, Lt. Waddell, and I believe Lt. Saunders.

3.    During the conversation between Capt. Bartlett and Lt. Waddell about the day off, did Capt. Bartlett gesture for Lt. Waddell to get under the desk?  Yes.

    a. Do you know why he made this gesture?  Apparently it was a joke, at least I am sure it was just a joke, even though it would be unprofessional.

4.    Did Lt. Waddell get under the desk?  Yes, Bartlett backed up his chair and Waddell crawled under the desk.  When he did that, Bartlett said get out of there.

5.    Did Lt. Foster tell anyone that she took offense at what took place?  She was not there.

Page 5,    **INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS**

6.    Have you ever seen Lt. Waddell and Capt. Bartlett engage in conduct such as;
      a.  Blowing kisses?  No.
      b.  Touching in a sexual way?  No.
      c.  One referring to the other by affectionate words or nicknames?  Yes, in a
          joking manner.

7.    Has Lt. Foster ever made a complaint to you about sexual harassment or
      discrimination?  Yes, she has discussed it with me several times.
      a.  What was her complaint?  She said people are out to get her because
          she is black.
      b.  What action did you take?  I listened to her and walked away.

**6/10/97**
      Interviewed Capt. Bartlett.  I advised Capt. Bartlett that I was assigned by
Central Office to investigate a harassment/discrimination complaint filed by Lt. Foster
which involved allegations against him.  Below I have listed the questions asked of
Capt. Bartlett and his responses to the questions.

1.    Have you ever harassed Lt. Foster?  No.

2.    Have you ever discriminated against Lt. Foster?  No.

3.    Have you ever subjected Lt. Foster to any situations which could be considered
      sexual in nature?  Not to my knowledge.

4.    On 5/20/97, did Lt. Waddell ask you for a day off?  Yes.

5.    When Lt. Waddell asked you for the day off, did you gesture for him to get
      under the desk?  Yes and no.  He laid a leave slip on my desk.  I was leaning
      back in my chair.  I gestured with my finger, pointing to the desk.
      a.  Why did you make this gesture?  It was a joke to imply he needed
          to get under the desk.  Lt. Waddell and I have a history of playing
          around.

6.    Did Lt. Waddell get under the desk?  Yes he did.

7.    Who was present when Lt. Waddell got under the desk?  Lt. Beck and Lt.
      Saunders.

8.    Did Lt. Foster make you aware that she took offense at what was happening?
      She was not present when this occurred.

9.    In the presence of Lt. Foster, have you ever been involved with Lt. Waddell in;
      a.  Touching each other in a sexual way?  We've patted each other on the butt.

A 624

Page 6,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

    b.  Blowing kisses to each other?  Yes.
    c.  Referred to each other by affectionate words or nicknames?  Yes, fluffy
       and stud muffin.

10.  Did Lt. Foster discuss with you problems she was having with Lt. Waddell?  Yes.
    a.  What problems did she bring to your attention?  Once she called me at
       home.  She was very upset and swearing.  She told me that Lt. Waddell
       wanted her to silence an alarm in Luter.  She couldn't because she
       claimed she was in the bathroom.  Supposedly, Lt. Waddell was
       hollering at her over the radio and this made her mad.  Lt. Waddell
       admits to hollering at her over the radio.  I have spoken to him about
       this.

11.  Did any other commissioned officer discuss with you problems brought to them
     by Lt. Foster concerning Lt. Waddell?  No, not that I recall.

12.  Has Lt. Waddell ever discussed Lt. Foster's performance with you?  Other than
     this incident, no.  All the discussions were of a positive nature.  He told me she
     was doing a good job.

13.  Have you evaluated Lt. Foster's performance?  Yes.

14.  Has Lt. Foster ever made a complaint to you about sexual harassment?  No.

15.  Has Lt. Foster ever made a complaint to you about discrimination?  No.

16.  When Lt. Foster transferred to Cambridge, did you tell her she would not be
     accepted because she was black?  No.  On the contrary, she made the comment
     that she did not feel she could make it here because she was out of her element.
     I have never told Lt. Foster that she would not make it here because she is black.

17.  How did Lt. Foster find out about the 5/20/97, incident?  I have no idea, unless
     one of the people present told her.
    a.  I advised Capt. Bartlett that Lt. Foster claimed that he bragged to her
       about the incident.  He stated that he never told her, or bragged to her.
       He stated, the incident was a private joke among those present and I
       would not spread that type of thing around.
       Capt. Bartlett went on to state, Lt. Foster has never approached me about
       harassment or discrimination by others or myself.  She has never told me
       that anything I did or said offended her.  If she did, I would stop whatever it
       was I was doing.

18.  Do you think Lt. Waddell delegates work equally among all of the shift

Page 7,    **INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS**

commissioned officers?  Yes, as far as I know.  I've never heard different.

19.    Are you aware of redneck jokes being posted in the commissioned officers office area?  Yes, I have little calendar sheets with redneck jokes by Jeff Foxworthy.

20.    Has Lt. Foster ever told you that the redneck jokes offended her because she believes "Rednecks" don't like blacks?  No.

21.    Do you respond to Lt. Foster's problems in a positive way?  Yes, I go out of my way to help her.  I have worked with her to help her resolve her problems.

22.    Are female officers held to a higher standard that male officers?  No, all officers are treated equally.

**6/10/97**

Interviewed Lt. Waddell.  I advised Lt. Waddell that I had been assigned by Central Office to investigate a harassment/discrimination complaint filed by Lt. Foster which involved allegations against him.  Below I have noted the questions asked of Lt. Waddell and his responses to the questions.

1.    Have you ever harassed Lt. Foster in any way?  No.  In fact, she has said that Lt. Conti and I have been the nicest to her.

2.    Have you discriminated against Lt. Foster in any way?  No.

3.    In the presence of Lt. Foster, have you ever been involved with Capt. Bartlett in;
    a.    Touching each other in a sexual way?  Yes, we play around with each other.  We'll sometimes rub a leg or pinch a butt.
    b.    Blowing kisses to each other?  Yes.
    c.    Referred to each other by affectionate words or nicknames?  Yes, fluffy and stud muffin.

4.    On 5/20/97, did you approach Capt. Bartlett to ask for a day off?  Yes.

5.    When you asked for the day off, did Capt. Bartlett gesture for you to get under his desk?  Yes, when I gave him the leave slip he pointed under the desk and I got under the desk.

6.    What was the reason for the gesture?  In a joking way, he was implying that I would have to get under his desk and perform sexual favors for the day off.

7.    Did you get under the desk?  Yes.

Page 8,      INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

8.   What was your reason for getting under the desk?  Just joking back with Capt.
     Bartlett.

9.   Were any other commissioned officers, or others, present when Capt. Bartlett
     gestured for you to get under the desk and when you got under the desk?  Yes,
     Lt. Beck and Lt. Saunders.

10.  Did Lt. Foster tell anyone that she took offense at what took place?  No, not that I
     know of.  She was not there.

11.  Has Lt. Foster ever advised you that she took offense with anything you did or
     said that she considered sexually harassing?  No.

12.  Do you know how Lt. Foster found out about the incident of 5/20/97?  No.

13.  When you are Shift Commander, do you treat Lt. Foster differently than other
     commissioned officers on shift?  No, I treat everyone equally.

14.  Do you have any problems working with or under females?  No.

15.  Did you ever threaten Lt. Foster physically?  No.

16.  Have you ever approached Lt. Foster with your finger in her face?  No.

17.  Have you apologized to Lt. Foster for anything you did or said toward her?  No.

18.  Do you make Lt. Foster do more work than other commissioned officers?  No, I
     try to spread the work equally.

19.  Has Lt. Foster ever told you that she took offense at any of the interactions
     between you and Capt. Bartlett?  No.

20.  Have you ever subjected Lt. Foster to racial jokes or jokes that had racial
     implications?  No.

21.  Are you aware of the redneck jokes posted in the office area?  Yes, I have
     seen them.

22.  Has Lt. Foster ever told you that the redneck jokes offended her?  No.

23.  As Alternate Shift Commander, do you ever attempt to show Lt. Foster who
     is in charge by being demanding or aggressive in supervising her?  No, I just try

A 627

Page 9,     INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

to make sure situations are handled. When I do attempt to give her direction, she is quick to challenge me and enjoys reminding me that she makes more money that me. I consider her an equal, and have no desire to treat her differently that the others.

**6/10/97**

Interviewed Lt. Miller. I advised Lt. Miller that I had been assigned by Central Office to investigate a harassment/discrimination complaint filed by Lt. Foster against Capt. Bartlett and Lt. Waddell. Below I have noted the questions asked of Lt. Miller and her responses to the questions.

1.    Has Lt. Foster ever discussed with you problems she has encountered with Lt. Waddell? Yes.

    a.   What was the nature of the problems Lt. Foster discussed with you? She told me about personal disagreements and arguments she had with Lt. Waddell, and said they frequently had words. It basically seemed to be a personality conflict, and to some degree a power struggle.

2.    Has Lt. Foster ever made a complaint to you that she was being harassed by Lt. Waddell? No, not that I recall.

3.    Has Lt. Foster ever made a complaint to you that she was being discriminated against by Lt. Waddell? No.

4.    Have you ever discussed with Capt. Bartlett complaints you received from Lt. Foster? Yes, I try to keep him advised of what occurs on the shift.

5.    Has Capt. Bartlett ever discussed with you problems between Lt. Waddell and Lt. Foster? Not that I recall.

6.    Has Lt. Foster ever made a complaint to you about sexual harassment? She has never made a complaint, but she has discussed with me the fact that she feels women are treated differently here.

7.    Did Lt. Foster tell you about an incident that occurred on 5/20/97, between Capt. Bartlett and Lt. Waddell? Yes, she did discuss it.

8.    What did she tell you about the incident? She said she was told about the incident. I think she said Capt. Bartlett told her.

9.    Did Lt. Foster tell you that she took offense with what happened? Yes, she did. I told her I already heard about it. She felt it was unprofessional and was offended at their conduct. She feels there is unequal treatment when things occur.

A 628

Page 10,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

10.    Has Lt. Foster told you she is discriminated against because she is black?  No. I
       don't believe so.

11.    Did Lt. Foster ever tell you that Capt. Bartlett told her she would not be accepted
       here because she is black?  Yes.

12.    Has Lt. Foster ever spoken to you about Capt. Bartlett and Lt. Waddell;
       a. Blowing kisses to each other?  Yes
       b. Touching each other in a sexual way?  Yes
       c. Referring to each other by affectionate names or words?  Yes, it wasn't a
          complaint, more of a matter of fact discussion.

13.    Are you aware of any harassment or discrimination against Lt. Foster?  No.

14.    Do you believe Lt. Waddell has treated Lt. Foster unjustly in comparison to
       the other commissioned officers on shift?  No.

**6/12/97**
       Interviewed Lt. Saunders.  I advised Lt. Saunders that I was assigned by Central
Office to investigate a harassment/discrimination complaint filed by Lt. Foster against
Capt. Bartlett and Lt. Waddell.  Below I have noted the questions asked of Lt. Saunders
and his responses to the questions.
1.     Were you present on 5/20/97, when Lt. Waddell asked Capt. Bartlett for a day
       off?  Yes.

2.     Who was present when Lt. Waddell asked Capt. Bartlett about the day off?
       Myself and Lt. Beck.

3.     During the conversation between Lt. Waddell and Capt. Bartlett about the day off,
       did Capt. Bartlett gesture for Lt. Waddell to get under the desk?  Yes.
       a. Do you know why Capt. Bartlett made the gesture?  I don't really know
          why.  I believe it was not a serious sexual type incident.  I believe Capt.
          Bartlett made the gesture in jest and Lt. Waddell responded in jest.  I did not
          feel it was appropriate.

4.     Did Lt. Waddell get under the desk?  Yes.

5.     Did Lt. Foster tell anyone that she took offense at what took place?  Yes, she told
       me that if she had been there and witnessed it, she would have surely objected
       to it.
       a. Do you know how she found out about the incident?  Yes, I told her.

6.     Have you ever seen Lt. Waddell and Capt. Bartlett engage in conduct such as;

Page 11,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

      a. Blowing kisses? Yes.
      b. Touching in a sexual way? I don't think so, I don't remember actual contact.
      c. One referring to the other by affectionate words of nicknames? Yes, fluffy and stud muffin.

7.    Has Lt. Foster ever made a complaint to you about sexual harassment? No, I don't recall anytime she did.

8.    Has Lt. Foster ever made a complaint to you about discrimination? Yes, she told me that when Capt. Bartlett told her she would have problems in this area because she was black, she felt she had to be on the defensive.   She also felt that because two other black female officers transferred out, she also should consider transfer to another institution.

9.    To your knowledge, has Lt. Foster ever made official complaints about harassment or discrimination to upper management? Not that I am aware of.

10.    Has Lt. Foster ever discussed with you problems she has with Lt. Waddell? Yes, she told me she feels he is not competent in his ability to function as a Shift Commander. In particular, she felt he did not know how to delegate responsibilities among staff and she questioned his ability to react properly in an emergency.

11.    Has Lt. Foster ever discussed with you problems she has with Capt. Bartlett? Yes, she told me she feels any complaint she presents to him falls on dead ears.  She also feels he is very laxed in his paper work and decision making.

12.    Has Lt. Foster made any complaint to you about redneck jokes? Yes, the other day she told me there were some copies of jokes posted around that were redneck jokes.  She said they have a lot of nerve putting those around with all this other stuff going on.

13.    In your opinion, does Lt. Waddell assign shift work equally among all commissioned officers? Duties are pre-established by your shift assignment.  It really isn't a matter of one person delegating work to the others.

14.    In your opinion, does Lt. Waddell treat females differently than males? In what I have experienced, he has never challenged me personally, but he has challenged Lt. Foster. I don't know the basis for this.

15.    Are you aware of any direct disparity in the treatment of males and females by Lt. Waddell? No.

A 630

Page 12,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRINGS

16.  Have you ever heard Lt. Waddell speak negatively about female staff?  No, not based on gender.

17.  Have you ever heard Capt. Bartlett speak negatively about female staff?  No, not based on gender.

18.  Are you aware of any incidents when Lt. Waddell or Capt. Bartlett discriminated against Lt. Foster?  Yes. There was a case when Lt. Foster called off sick.  She told me she was chastised for it by Capt. Bartlett.  Another lieutenant has called off numerous times, and as far as I know there was no action taken against him. This was her allegation, not a direct observation by me.

6/12/97

Interviewed Mr. Cyr, Personnel Director.  I advised Mr. Cyr that I was assigned to investigate a discrimination/harassment allegation submitted to Central Office by Lt. Foster.  Mr. Cyr advised that he was aware of the allegations, and had received the complaint from Lt. Foster.  Below I have noted the questions asked of Mr. Cyr and his responses to the questions.

1.  When you received Lt. Foster's complaint what did you do?  I forwarded it to Eugene Smith and the Superintendent.  In talking to Lt. Foster, she expressed her belief that she could not get a fair and impartial investigation if it was done in house.

2.  Has Lt. Foster made similar complaints to you in the past?  Yes, she has made a couple complaints like this one.  Mr. Cyr showed me other complaints submitted by Lt. Foster.  One of the complaints was submitted on an unknown date.  The date of the alleged discriminatory practice was entered as 4/94 through "present".  Additional paperwork indicates that Lt. Foster filed this complaint during June of 1995.  In this complaint Lt. Foster alleged that she was being discriminated against based on sex, race, national origin and retaliation. In this complaint  Lt. Foster documented a conversation she allegedly had with Capt. Bartlett.  She stated that Capt. Bartlett made the following statement to her; " Capt. Bartlett told me I am out of my environment and because I am black people don't accept me here.  He said he accepts me but others don't ".
        I note that in her 1994/95 complaint, Lt. Foster's wording as to what was allegedly said to her by Capt. Bartlett differs from the same allegation made in the matter under investigation.  In her present complaint Lt. Foster stated that Capt. Bartlett only told her that she would "not be accepted because she was black".  This discrepancy causes this investigator to question exactly what was allegedly said by Capt. Bartlett, and the overall validity of the allegation.

3.  Has any other commissioned officer ever been disciplined for sick leave abuse problems?  Not that I know of.  Nothing has come to my office from facility

A 631

Page 13,     INVESTIGATION REPORT:  SCI-CAMBRIDGE SPRINGS

management.  I advised Mr. Cyr that I was told that another commissioned officer had considerable sick leave, but, to the knowledge of the informant, had never been disciplined.  Mr. Cyr stated that he was not familiar with any other commissioned officer having sick leave problems.

SUMMARY

I have interviewed the complainant and those staff members who had direct, or indirect knowledge of the allegations under investigation.  The information provided by the complainant in her written complaint and during the interview was consistent.  The information provided by the other staff members did add credibility to some of the allegations made by Lt. Foster, but failed to provide credibility to other areas of her complaint.  If Lt. Foster was subjected to situations or incidents in which she felt she was the victim of discrimination based on color or gender, there is nothing in the investigation that indicates that she put the responsible person(s) on notice that she was offended by their actions at the time they occured.

(Allegation # 1)

**Lt. Waddell has used his position as Alternate Shift Commander to harass and discriminate against Lt. Foster.**
        The information provided by Lt. Foster is the only supporting information relative to this allegation.  The information provided by the other staff members did not support this allegation.

(Allegation # 2)

**Lt. Foster has had to view blatant sexually harassing incidents between Lt. Waddell and Capt. Bartlett, such as touching, blowing kisses, use of affectionate words and nicknames to each other.**
        Lt. Foster's allegation was generally substantiated by the information provided by the other staff members interviewed.  It is fair to assume that if the other staff members observed or heard Lt. Waddell and Capt. Bartlett in these types of exchanges, Lt. Foster had, more likely than not, also been a witness to similar exchanges.

(Allegation # 3)

**On 5/20/97, Lt. Waddell asked for approval for a day off and Capt. Bartlett gestured for Lt. Waddell to get under his desk to give him oral sex.   Lt. Waddell crawled under his desk and Capt. Bartlett pulled his chair up to the desk.**
        This incident was substantiated by all staff interviewed.  The primary area of concern is Lt. Foster's written account of what took place on 5/20/97, in Capt.

Page 14,    INVESTIGATION REPORT: SCI-CAMBRIDGE SPRING

Bartlett's office. As I noted previously in this report, Lt. Foster's wording as to what took place on 5/20/97 gave the impression she was present. Through the investigation it was found that she was not present in Capt. Bartlett's office on 5/20/97, and did not personally witness the incident between Capt. Bartlett and Lt. Waddell. Lt. Foster alleged that Capt. Bartlett bragged to here about the incident the next day. Capt. Bartlett denied telling Lt. Foster about the incident. Lt. Miller stated that she thinks Lt. Foster told her that Capt. Bartlett told her (Foster) about the incident. Lt. Saunders stated that he told Lt. Foster about the incident. It is not a certainty that Capt. Bartlett told Lt. Foster about the incident. Lt. Foster probably heard about the incident from Lt. Saunders. It is understandable that Lt. Foster might disapprove of, and take offense at, this type of incident, especially if it occurred in her presence. However, the fact that she was not present, and was told about the incident by another person, seems to lessen the severity of the allegation.

The issue of what Capt. Bartlett allegedly told Lt. Foster when she transferred to Cambridge is unclear. In her complaint of 1995, Lt. Foster stated that Capt. Bartlett told her she was out of her environment, and because she is black people don't accept her here. She stated that Capt. Bartlett told her he accepted her but others don't. In the complaint under investigation, Lt. Foster only stated that Capt. Bartlett told her that she would not be accepted because she was black. During the interview, Capt. Bartlett denied making either statement to Lt. Foster. He said, on the contrary, she made the comment that she did not feel she could make it here because she was out of her element. Capt.. Bartlett said he has never told Lt. Foster she would not make it here because she is black. There is considerable difference in the tone of Lt. Foster's two versions of this statement. If the statement was, in fact, made by Capt. Bartlett, and meant to be discriminatory, the tone of her 1995 account of the statement seems less discriminatory than the account written in the complaint under investigation.

The issue of the " Redneck " jokes being posted around the office area has been substantiated. It is a matter of interpretation as to whether these types of jokes are intended to offend black people, or if they are merely a type of American humor pointed at certain types of people in general.

## FINDINGS

**Allegation # 1** - There is insufficient evidence to support the allegation.
**Allegation # 2** - There is sufficient evidence to support the allegation.
**Allegation # 3** - There is sufficient evidence to support the allegation in general, however, the incident did not take place in the presence of Lt. Foster.

**Capt. Bartlett's alleged statement to Lt. Foster about acceptance based on race.**
There is insufficient evidence to support the allegation.

Page 15,    INVESTIGATION REPORT:  SCI-CAMBRIDGE SPRINGS

**Redneck jokes posted about the office area.**
    There is sufficient evidence to support the allegation that these types of jokes are
    posted, however, there is insufficient evidence to establish whether they are
    racially motivated or intended to be racial in nature.


Attachments - # 1 - May 23, 1997 Complaint
            # 2 - 1995 Complaint


pc:    File

A 634