PRE-DISCIPLINARY CONFERENCE
KEITH BARTLETT
SCI-CAMBRIDGE SPRINGS



July 24, 1997

ATTENDANCE:     Roger Cyr, Deputy Good, Deputy Kormanic, ~~Mr. Cyr~~, Major Miller

Pre-Disciplinary Conference opened at 9:15 a.m.

Deputy Good introduced the Committee members.

The purpose of this conference is to investigate the charges and make a report to the Superintendent who will make the final decision. Deputy Kormanic is the charging officer.

**Deputy Good:** Do you wish me to read the charges or would you like me to waive the reading of the charges?

**Keith Bartlett:** I wish to waive the charges.

**Deputy Good:** At this point, I would like to go over the substance of these charges, then, you will have an opportunity to present any statements you would like to make. At this point, does anyone wish to make any comments? The answer from everyone was "no." Deputy Kormanic will read you the charges.

**Deputy Kormanic:** This Pre-Disciplinary Conference involves allegations made by staff members at Cambridge Springs which were sent to Central Office who assigned the investigation to Captain Abramson at SCI-Albion. The findings of the investigation were sent to Superintendent Wolfe. There are two allegations that were found to have substance. The first allegation involved inappropriate behavior between Captain Bartlett and subordinate staff such as, touching, blowing kisses, use of affectionate words and nicknames. The second allegation on May 20, 1997 was where one officer asked for the day off, at which time, the commanding officer told him he could have the day if he performed oral sex on him. The officer put himself under the table, and Captain Bartlett pulled up his chair (allegation #2). We found sufficient evidence that this occurred. Other staff have observed or heard Captain Bartlett in similar situations. In regards to allegation #3 and the May 20, 1997 incident, there has been collaborated by Captain Bartlett's testimony which I will read in a moment along with other witness statements which collaborate the May 20, 1997 events. As a result of the investigation, it was discovered that Captain Bartlett had participated in inappropriate behavior with subordinate staff. He has been counseled on many occasions. Specifically, on November 15, 1994; on April 4, 1995;  on January 2, 1996; and a written reprimand was given to him on December 17, 1996 regarding conduct and lack of professionalism with subordinate staff.  In conclusion I would like to summarize why the Predisciplinary Conference is being held. We need to address the issue of staff being able to trust Captain Bartlett's decision making and judgment which has been undermined by his behavior and compromises his integrity as a Manager. As Commissioned Officers and Administrative Staff, we need to hold higher standards for ourselves if we expect staff

A 635

the District Justice that day. I advised the Major and Deputy and went to talk to the District Justice. I talked to Mr. Zilhaver and told him that I wanted to pay the check. I paid the check, their cost for returning it, a $40.00 fine and court costs.

**Deputy Kormanic:** Don't water bills come out every three months?
**Keith Bartlett:** Mine comes every month.
**Deputy Good:** How overdue was the bill?
**Keith Bartlett:** I paid it in the middle of May when I moved to Saegertown. It was my final notice. I paid it, however, a check from my previous checking account had not cleared.
**Deputy Good:** Have you ever had similar financial problems of this nature?
**Keith Bartlett:** I have never been charged like this.
**Deputy Kormanic:** We have never been informed of anything like this before.
**Deputy Good:** Are there any other questions with regard to the second charge? The committee answered no. Captain Bartlett would you like to make any statement in regards to that charge?
**Captain Bartlett:** Yes, I would. I can see how this would effect people's judgment of me. I really feel that a first time basis to tie this in with the other charges is inappropriate. There was situations involving this, and this has been blown out of proportion. I plan to address these with the Deputy after this meeting. There are more serious things that have happened then me admitting that I had a problem then taking care of it. I cannot help it if they decided to post it in the Meadville Tribune.

**Deputy Good:** With regard to the first charge and the two circumstances, the one on May 20, 1997, as well as the reference to other inappropriate behavior, it boils down to unprofessional behavior. You understand of those counseling sessions and written reprimand previously given to you was regarding similar behavior? Do you acknowledge the dates the Deputy gave you?
**Keith Bartlett:** I am assuming she took these out of the record so I agree with them.
**Deputy Good:** Do you acknowledge similar behavior?
**Keith Bartlett:** Those situations and counseling sessions previous to this and the written reprimand was regarding me dating a subordinate staff. Since then, this has been corrected. It has been over two years since the written reprimand in 1996 resulted with an investigation and a situation that happened prior to that the year before. I understand my position and outlook, however, I do not feel those counseling sessions addressed the situation that is involved here and these charges. As far as the inappropriate behavior, we have two different types of situations. I will wait and explain the whole thing when it is my turn.
**Deputy Good:** Go ahead.

**Keith Bartlett:** Of the fourteen years experience that I have had with the D.O.C. and my experience in two other places, plus five years in the military; it has been common practice to have that type of comradeship with superiors. I am not going to sit here and try to toss crap into the game. I have been subjected to similar things throughout my career. There was no ill intent, and I do not deny it happened. I would have at no time had done this again had someone come to me and say Captain I am offended with your behavior. At no time was there indication that I offended anyone by this type of behavior. I don't see where people would fear me because I have an open rapport with

A 636

my staff. There were two others there and no other staff present. Lieutenant Waddel came in and placed his leave slip, like this (Captain made hand motions). I made the statement, he got under the chair, I told him O.K. he could have the day off. We were laughing, the person who filed the complaint was not even there. I agree that as Captain of the Guard I must hold professionalism at a higher level.   I also understand I cannot be totally rigid in my behavior that is not my personality. Since then, that practice has stopped. I do observe others who joke like that. I do not think it is appropriate to say I do this on a daily basis. I am not sure how that came about. I would say I joke frequently. As far as the kissing. There are two nicknames I use fluffy and studmuffin. This is limited to the operations office. We occasionally throw kisses to one another as a joke. These type of things I have been subjected to from other staff. Let me stress even from Deputy Kormanic. I understand why we have to be here today, but please understand this was not done as ill intent. This also does not compare to the actions I have had in the past. Yes, I have been counseled in private with Deputy Kormanic regarding professional behavior and not falling into others agendas, but not for this type of situation. That is all I have to say.

**Deputy Good:**   It is important that I have to ask these next questions. I would like to summarize for the committee to understand. Your contention is that in previous discipline by Deputy Kormanic and the Superintendent, they dealt with professional behavior in regards with dating—it had to do with relationships with subordinate staff?
**Keith Bartlett:** Yes, sir.
**Deputy Good:** On those occasions, you have not been expressly talk to stop sexual innuendo and humor dealing with this nature. Is that correct?
**Keith Bartlett:** Not to my recollection, yes.
**Deputy Good:**  Do you consider those types of behaviors professional?
**Keith Bartlett:** No I don't consider them professional.   But, again I stress this is a practice that goes on at other institutions. Never once has anyone complained to me. It is just the way things are. I see this done at other institutions. When I go for training, I receive this type of behavior from the bottom to the top. Knowing myself if this was brought to my attention by other means, I would have stopped. I try to do my best. If I know this type of behavior was in any way reflecting on my job which I have done, I would stop it. Since this has been investigated, this behavior has ceased.

**Major Miller:**  Because you are the Captain of the Guard, it is your job to see that the Code of Ethics is followed. You are in violation of the Code of Ethics. Do you feel it is your responsibility to enforce the Code of Ethics?
**Captain Bartlett:** Major, in this situation I really don't know. It was not what I considered blatant sexual harassment. It was male to male between myself and one of my Lieutenants. He never complained, other people have done the same thing. Your absolutely right that I am responsible for enforcing the Code of Ethics. At that time, I did not see this as inappropriate. There has been the same kind of thing going on my whole career, something that always happens. If someone would have told me that it did not look good, I would have stopped. If this comment had been brought to my attention and I was told that I cannot act this way, it would have stopped. At the counselling sessions, they did not address this kind of conduct.

A 637

Mr. Cyr:  You made a comment that if you had been informed in other ways, you would

have stopped the behavior. I am confused. What other ways?

**Captain Bartlett:** I meant dealing with inappropriate behavior and dating other staff are two separate issues. I was trying to separate and make that distinction.

**Mr. Cyr:** So, you are trying to separate the sessions from this behavior?

**Captain Bartlett:** What I am trying to say is if Lieutenant Wadell or Lieutenant Foster were offended, they should tell me so. Lieutenant Foster is involved in this type of behavior too. She mentioned once that she caught her nipple in a strap when she was at training. She didn't think anything about that comment offending me or anyone else.

**Major Miller:** The day this desk incident occurred, you, Lieutenant Waddel, Lieutenant Beck, and Lieutenant Saunders were there. What was the purpose of that conversation?

**Keith Bartlett:** I cannot remember. it was casual. I am not sure what we were talking about.

**Major Miller:** As Captain of the Guard, you stated Lieutenant Foster had participated in this type of behavior before. Did you take any actions in regards to her actions as her supervisor?

**Captain Bartlett:** No sir, I did not.

**Deputy Good:** For the purpose of understanding your reference and clarification on the issue of what constitutes professional behavior. Deputy Kormanic on the occasions when you had counseled and given Captain Bartlett the written reprimand, was professional conduct addressed or was it limited and you did not give the expectations of professional behavior?

**Deputy Kormanic:** I know that it is institutional practice and that our institution has a history of specifically addressing those incidents, but I also can recall having a conversation with Captain Bartlett about putting ourselves in situations where we allow people to put ourselves in shooting range. There were a number of personal discussions between Keith and I about staff's behavior and how we cannot allow ourselves to be subject to the same kind of issues.

**Deputy Good:** Do you feel you conveyed in this case an overall expectation of what professional conduct is?

**Deputy Kormanic:** Yes, in the sense that we have to be extremely careful that we do not fall prey to other people's personal agendas.

**Deputy Good:** Captain, you made reference to years of experience and similar types of behavior. Since there are various levels of harassment, we will not discuss this at this point. I am sure everyone can recall the same type of behavior at sometime in their career. I know how I interpreted them. Did you recognize these things as right or wrong?

**Captain Bartlett:** I did not see them as being sexually inappropriate. As far as right or wrong, no.

**Deputy Good:** Did you recognize these things as being inappropriate professional behavior?

**Captain Bartlett:** I never looked at it that way. I never thought this effected the way I did my job or thought about how it looked to my subordinates or superiors.

A 638

**Mr. Cyr:** What is your definition of professional behavior?

**Captain Bartlett:** To look at it now, I can see how it can be viewed as unprofessional behavior. I did not look at it that way. A lot goes into this. Yes, Deputy Kormanic and I had personal conversations about putting ourselves into other people's agendas. At those times, I did change my behavior. This happened in my office. I didn't think it would have gone any further. Lieutenant Beck was there. I never looked at it that way until this point. Situations like this have stopped. Again, this was in the privacy of my office. I didn't think this would reflect on my behavior or theirs. Since this investigation, this does not take place anymore. Did I answer your question?

**Mr. Cyr:** Not really. What is your philosophy of professional behavior?

**Captain Bartlett:** To do your job to 100% of your ability and to conduct yourself accordingly to policy and procedures.

**Deputy Good:** You do acknowledge that the Code of Ethics is a policy?

**Captain Bartlett:** Yes. I am not trying to be a smart aleck or anything like that  (long pause)  Never mind, I am not going to go there.

**Deputy Good:** Again, in summary, the issue before the committee deals with the professional aspect. We must decide that as the role of Captain of the Guard, a leader of the institution, and from the reference you have made for clarification people did not come to you and say that they were offended by you. Those issues are not being considered at this time. The fact that in the course of the investigation that there was acknowledgement of unprofessional behavior we need to address this type of action.

**Captain Bartlett:** Again, If I am to be held to this level of professionalism, those above me should be held accountable. There are staff at Central Office higher than my level that subject me to this type of behavior. They conduct similar behavior to me in public. I agree there needs to be a level of professionalism set, let us set it all together and not by piecemeal. I can guarantee you will never see this type of behavior again, nor will I allow anyone else to use this type of behavior.

**Deputy Good:** These issues deal with charges that are potential to lead to harassment. I appreciate what you are saying. This committee's job is to look at the circumstances and make a recommendation to the Superintendent. Do you have anything further to state at this time?

**Captain Bartlett:** Yes, people higher than me are this way, why is my head on the chopping block?

**Deputy Good:** Any other questions from the committee? Committee stated no. What we will be doing as a committee is deliberate, make a recommendation to the Superintendent, and give our final determination to the outcome of these charges. Thank you for your cooperation.

Meeting adjourned at 10:00 a.m.

**MARTIN F. HORN**
COMMISSIONER
DEPARTMENT OF CORRECTIONS

**COMMONWEALTH OF PENNSYLVANIA**

**STATE CORRECTIONAL INSTITUTION**

**WILLIAM J. WOLFE**
SUPERINTENDENT

**AT CAMBRIDGE SPRINGS**

FULLERTON AVENUE
Cambridge Springs, PA 16403-1229
Telephone 814-398-5400

Address All Replies
To Superintendent

December 17, 1997

Keith Bartlett
458 Church Street
Cambridge Springs, PA 16403



Mr. Bartlett:

As a result of an investigation conducted in November, 1996 by the Office of Professional Responsibility, you are advised of the following:

Based on all of the information presented, you are being given a written reprimand. This action is being taken as a result of unprofessional conduct between yourself, a supervisor, and your subordinates and the fact that despite being previously counseled on similar behavior, you continued this unwarrantable practice.

It is imperative that as managers we hold ourselves to a higher standard because staff look to us for guidance, objectivity and trust. By becoming personally involved with staff with whom you have direct disciplinary input/control, you undermine not only your credibility but your ability to perform essential job functions.

You are further advised that continuation of such actions or similar behavior may result in progressive disciplinary action up to and including possible dismissal.

If you are experiencing personal problems which you feel may have contributed to your actions, confidential assistance may be available through the SEAP program; you should make arrangements for a referral through your supervisor or telephone 1-800-692-7459 (toll free).

EXHIBIT
**120**

A 640

PENGAD-Bayonne.N.J

Your rights in this personnel action are explained in the instructions and information section of the Appeals Request Form SCSC 4112, copies of which are attached.

A copy of this letter will be placed in your official personnel file.

Sincerely,

William J. Wolfe
Superintendent for
Martin F. Horn Commissioner


cc:    Regional Deputy Commissioner Fulcomer
       State Civil Service SS# 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
       Mr. Musser - Labor Relations
       Mr. Tepsic - Bureau of Human Resources
       Deputy Kormanic
       Acting Deputy Superintendent Richard Learn
       File/bartlett.197

07/31/06  11:50 FAX 97317114                STANDARDS & PRACTICES                                    ☒002



Commonwealth of Pennsylvania

Department of Corrections

# Code of Ethics

Joseph D. Lehman
Commissioner

DC-174

A 642

# Foreword

The Pennsylvania Department of Corrections is dedicated to achieve two basic goals: to assure the safety of the public by providing safe and secure facilities for the housing of the criminal offender and to encourage the emotional and intellectual maturity of inmates through realistic, responsible policies.

As a correctional employe, your professional deportment and attitude demonstrated through the performance of your duties contribute greatly to the respect, trust, and confidence afforded our agency by the public and by the inmates.

This handbook will provide you with the basic principles, rules and regulations by which you as an employe of the Department of Corrections are to conduct yourself. To large degree, the success of all programs in the correctional system depends upon adherence to these standards.

With every confidence in your ability to do the job, I wish you success as a professional in the Department of Corrections.

Sincerely,

Joseph D. Lehman
Commissioner

November 1990

## DEPARTMENT OF CORRECTIONS
## CODE OF ETHICS

This handbook does not include every detail or situation involved in the operation of a Department facility. It aims at the presentation of overall policy guidelines. Facilities will issue more specific and detailed information as needs or circumstances dictate. In no instance, however, will facility rules and regulations take precedence over the policy contained herein.

### A. General Responsibility of Department of Corrections Employees

Consistent with the responsibility of all correctional employes in the Commonwealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

### 1. Discrimination

The responsibility of all corrections employes is to act in relation to all citizens of the Commonwealth without regard to age, race, color, ancestry, creed, sex, marital status, national origin, non-job related handicap, or political beliefs. This necessarily includes the inmates whom we supervise and fellow employes w'th whom we work. All employes are expected to fully comply with the Department of Corrections policy prohibiting sexual harrassment.

—1—

A 644

07/31/06  11:50 FAX 97317114        STANDARDS & PRACTICES                      @005

## 2. Conflicts of Pecuniary Interest

No department employe shall engage directly or indirectly in any personal business transaction or private arrangements for personal profit which accrues from or is based upon his/her official position or authority. The scope of this provision shall include prohibition against entering into any type of business transaction or private arrangements with inmates. Honorariums paid to Department officials for speaking on official topics shall be deposited in the appropriate Department fund.

## 3. Representation of Interests

No department employe shall represent or act as an agent for any private interest, whether compensable or not, which could be reasonably expected to result in a conflict between the private interest of the employe and his official state responsibility. This includes but is not limited to representing the interests of inmates.

With prior written approval from the Commissioner or his designee, employes can represent inmates in certain proceedings, such as the Pardons Board provided no conflict arises as a result of the representation.

## 4. Gifts and Favors

Employes and their families shall not directly or indirectly solicit, accept, or agree to accept any gift of money or goods, loans or services for personal benefit which would influence the performance of their work duties or decision making. Correctional employes shall not accept or perform favors or accept or distribute any gifts, money, or loans to or from inmates or members of an inmate's family.

## 5. Information

No department employe shall, for personal gain or for the gain of others, use information not available to the public at large, or divulge confidential information without its authorized release; nor shall the employe receive compensation for consultation which substantially draws upon official ideas or data which have not been disclosed to the public.

## 6. Private Employment

No department employe shall engage in or accept private employment or render private services when such employment or service is incompatible or in conflict with the discharge of the employe's official duties or would tend to impair the employe's independent judgement or action in the performance of his/her duties. Requests for outside employment must be made in compliance with Management Directive 515-.18, Supplementary Employment.

## B. Specific Rules and Regulations—Department of Corrections

1. Each employe in the correctional system is expected to subscribe to the principle that some-

—2—

—8—

A 645

07/31/06  11:50 FAX 97317114          STANDARDS & PRACTICES                    ☑006

thing positive can be done for each inmate. This principle is to be applied without exception.

This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

2. Only the minimum amount of force necessary to defend oneself or others, to prevent escape, to prevent serious injury or damage to property or to quell a disturbance or riot will be used. Excessive force, violence or intimidation will not be tolerated. Fighting or horseplay while on duty is prohibited.

3. In event of an emergency, all correctional employes may be utilized for custodial services under the direction of the Superintendent or his designee.

4. Each employe is to assist in preventing escape or in pursuing an escapee as directed by the Superintendent or his designee.

5. In the event any official or employe has been seized, no employe or official shall disregard, alter, modify, or change in any manner the prescribed duties, responsibilities, or obligations on demand by the prisoner or plea between hostages, regardless of consequences, unless on orders from the Commissioner or higher authority.

—4—

6. There shall be no fraternization or private relationship of staff with inmates, parolees, or members of their families. This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from either the inmate or the inmate's friends, relatives, or representatives. Moreover, employes are not to deliver gifts or money to inmates' friends, relatives, or representatives.

7. Personal or telephonic contact with ex-offenders must be reported to your immediate supervisor by no later than the beginning of your next scheduled shift or work day.

8. The personal property of inmates will be handled with extreme care and disposed of only by properly designated authority in a manner designated by official Department of Corrections policy. Similiarly, no employe may assume the right of ownership of property owned by fellow employes, the state or by inmates; theft or abuse of property or equipment is prohibited.

9. No employe shall leave his assigned post or leave the institution or grounds without being properly relieved and receiving proper authorization from a supervisor. Proper relief involves communicating any special observations or orders to the relief personnel.

10. Lawful orders by a supervisor to a subordinate must be executed promptly and faith-

—5—

A 646

STANDARDS & PRACTICES

☑007

fully by the subordinate even though the employe may question the wisdom of such order. The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

11. Employes are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

12. All facility keys issued to employes will remain in their possession at all times. Under no circumstances are keys ever to be unguarded, mislaid, unaccounted for, taken from the institution, or turned over to an inmate.

13. Employes in uniform are required to keep said uniforms in a clean and neat condition, free from decoration, other than those officially prescribed. Nonuniformed employes will be required to meet the standards of neatness and grooming as established by their facility.

14. Employes may use their identification as an employe of the Department of Corrections only for identification in performing the duties and responsibilities required in the scope of their employment. Department identification will not be used where an employe may have other employment or in representing other interests.

—6—

15. Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

16. Alcoholic beverages and controlled substances shall not be carried, stored, or consumed on state property or in any state Facility or vehicle. When a controlled substance or nonpropriety drug is prescribed by a physician, the employe shall immediately notify his/her supervisor and obtain prior written approval to bring the medication onto facility grounds. Such medication must always be kept under the secure control of the employe. An employe shall not report for duty in an unfit condition.

17. Personal weapons shall not be brought onto state property without the advanced written approval of the Superintendent.

18. Employes shall not testify in any civil case in which the Department of Corrections may have an interest without informing the Commissioner, unless under court order.

19. An employe shall not use a Commonwealth vehicle for personal business or for any other reason except as authorized. When involved in in an accident while operating a state vehicle,

—7—

all employes will promptly notify their supervisor, and follow the guidelines established in the Governor's Office Administrative Circular 76-28, dated May 9, 1976, and Commissioner's memorandum dated January 27, 1982.

20. Employes shall not read books, magazines, newspapers, or other non-job related printed material while on official duty. Employes are required to remain alert while on duty; inattentiveness, sleeping or the appearance thereof is prohibited.

21. Whenever a supervisor has reasonable grounds to believe that an employe is being influenced by a medical or psychiatric condition which is effecting or is likely to effect the employe's ability to perform assigned duties, the Deputy Commissioners, Superintendent, Bureau Director, or Regional Director shall direct such employe to undergo reasonable examination, at the expense of the Department, to determine the employe's fitness for duty.

An employe who has sustained an injury, illness, or any other condition incurred in the line of duty which could affect the employe's ability to perform assigned duties may be required by the Deputy Commissioners, Superintendent, Bureau Director or Regional Director to undergo reasonable examination, at the expense of the Department, to determine the employe's fitness

—8—

for duty.

An employe who has suffered an injury, illness, or any other debilitation condition not incurred in the line of duty which could affect his/her ability to perform required duty assignments, may be required by the Deputy Commissioners, Superintendent, Bureau Director or Regional Director to obtain and submit a complete medical report from his/her physician concerning his/her physical and/or mental condition. The report shall include a detailed explanation and prognosis of the employe's injury, illness, or condition and any other pertinent information which would aid the Facility's medical officer in evaluating the situation prior to the employe's return to active duty.

22. An employe who knows that he/she will be unable to report for duty due to illness, emergency, or injury shall immediately notify his/her supervisor in accordance with their local policy, advising the supervisor of the nature of the injury, emergency, or illness; and, the expected date of return to duty.

The supervisor shall also be advised of a change in any conditions which may occur after the original notification was given. An employe injured while on duty shall report such injury to his/her supervisor as soon as possible and shall comply with the provisions of existing

—9—

A 648

regulations pertaining to such injuries. An employe who becomes ill while on duty and finds it necessary to be relieved from an assigned post or duty shall report this fact to his/her immediate supervisor and comply with #9 above.

23. An employe shall submit any necessary and/or requested work related reports in a timely manner and in accordance with existing regulations. Reports submitted by employes shall be truthful and no employe shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresent the facts in any Department record or report.

24. During off-duty hours, employes will conduct themselves in such a manner so as to demonstrate the public's trust and confidence inherent in their position as a public servant. Any conduct which brings discredit to their profession, responsiblities, the Department of Corrections, or public service at large shall be subject to immediate discipline.

25. All individuals, including employes, are subject to search upon entrance or egress from a state facility or at any time while on state property owned by the Department of Corrections.

26. Personal cameras and recording devices are prohibited from being brought onto state grounds or introduced into Department of Corrections facilities by employes, inmates, visitors

—10—

or the public at large without the advanced written approval of the Superintendent or Regional Director. Similarly, such devices are prohibited from detached duty assignment areas, such as outside hospitals, etc.

27. All employes shall participate in training that is mandated or required by the Department of Corrections.

28. Gambling on official duty is strictly prohibited.

29. All employes have the responsibility to provide their supervisor with their current address and telephone number.

30. All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

31. No employe shall permit an inmate to be in control or exercise authority over other inmates.

32. Corrections Officers are to read, sign and fully comply with all post orders.

## C. ENFORCEMENT

These rules and regulations have been written

—11—

A 649

STANDARDS & PRACTICES

@010

in the best interest of the Department of Correc-
tions, its employes, and the public which we
serve and protect. In event of a conflict involved
in interpretation, the best interest of public
policy shall be served.

Any employe who violates the provisions of
this code shall be subject to immediate dis-
ciplinary action by the appointing authority.
Nothing herein shall abridge the remedies or
responsibilities of employes covered by the Civil
Service Act, applicable Collective Bargaining
Agreements, Governor's Code of Conduct,
#1980-18, or the laws of the Commonwealth.

—12—

COMMONWEALTH OF PENNSYLVANIA
Pennsylvania Department of Corrections
July 17, 1995

Case No.     95-F-016

SUBJECT:          James Merry, CO II

COMPLAINANT:      Elizabeth Maysonet, OB-4751
                  Allegation ⁻ Violation Code of Ethics

TO:               William J. Wolfe
                  Superintendent
                  State Correctional Institution Cambridge Springs

FROM:             Vaughn L. Davis
                  Director
                  Special Investigations Office

The enclosed report of investigation is being furnished to you for your review and information.

It has been recommended that ongoing training relative to the Department's Code of Ethics and specifically the fraternization with inmates and the section of the Pennsylvania Crimes Code that concerns Indecent Assault and Aggravated Indecent Assault be intensified at Cambridge Springs for all current and new staff.

This report and recommendations have been approved by the Commissioner of Corrections, Martin F. Horn.

This report is **CONFIDENTIAL** and may not be disseminated to any other agency without the direct approval of the Commissioner.

If you have any questions, please contact me.

VLD/cb

A 651

COMMONWEALTH OF PENNSYLVANIA
Pennsylvania Department of Corrections
January 4, 1996

SUBJECT:    Clarification to Policy 1.2.4
            Inmate Abuse Allegation Monitoring Policy

TO:         Superintendents
            Grievance Coordinators — *1/1/96*
            Bureau Directors

FROM:       Vaughn L. Davis
            Director
            Office of Professional Responsibility

*CC: Deputies Capts Unit Mgrs 1-16-96*

Please be advised that the Inmate Abuse Allegation Monitoring Policy, 1.2.4, deals solely with three specific areas of abuse as follows:

    1.    USE OF EXCESSIVE FORCE
    2.    LIFE-THREATENING ACT
    3.    ORAL / WRITTEN THREAT TO INFLICT PHYSICAL INJURY

**Conditions of confinement, harassment, nonperformance of duty and inadequate medical care** are NOT considered abuse allegations.  Therefore, only those inmate complaints and grievances that rise to the level of abuse as defined in Policy 1.2.4 should be forwarded to the Office of Professional Responsibility for review and tracking purposes.

If you have any questions, please contact me.

VLD/hr

cc:    Commissioner Horn
       Executive Deputy Commissioner Clymer
       Executive Assistants to Commissioner
       Robert S. Bitner, Chief Hearing Examiner

GP EXHIBIT
123

A 652



**CONFIDENTIAL** POLICY STATEMENT

Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | Policy Number: |
|---|---|
| INMATE ABUSE ALLEGATION MONITORING PROCESS | 1.2.4 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| 10-2-92 | | 11-2-92 |

## I. AUTHORITY

The authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 29, P.L. 177, No. 175, as amended.

## II. PURPOSE

A. The Department of Corrections has the legislatively delegated responsibility to exercise lawful authority in the administration of the state correctional system. The Department of Corrections is committed to ensure that the correctional system is administered and operated in a safe, humane manner. This policy has been established to track and monitor allegations of staff abuse of power by:

1. Providing the Commissioner's Office with the earliest notification regarding the existence of allegations of abuse;

2. Channelling allegations of abuse received outside the Consolidated Inmate Grievance Review System to the most effective investigative authority;

3. Providing a review of the quality of the institutional responses to grievances alleging abuse before final disposition by CORC; and

4. Creating a repository data base related to allegations of abuse.

cc: Deputies
administ
Capt.
Lt. Bartlett

A 653

## III. APPLICABILITY

A.   This policy is applicable to four classes of persons and entities:

1.   All persons who are employed by the Department of Corrections.

2.   All persons committed to the custody of the Department of Corrections.

3.   All persons and entities having business with or using the resources of the Department of Corrections.

4.   All persons and entities attempting, establishing, or maintaining contact with persons committed to the custody of the Department of Corrections.

## IV. DEFINITIONS

A.   ABUSE:   Employee conduct that is prohibited either by law or by Department of Corrections policy and involves

a.   the use of excessive force upon the inmate; or
b.   the occurrence of an unwarranted life-threatening act against the inmate; or
c.   an articulated oral or written threat to inflict physical injury directed specifically toward the inmate.

Excluded from the definition of abuse are:

d.   conditions of confinement;
e.   claims of inadequate medical care and intentionally denied nonemergency medical treatment; and
f.   harassment or nonperformance of duty.

B.   CENTRAL OFFICE:   Headquarters of the Department of Corrections.

C.   COMMISSIONER:   The Secretary of the Department of Corrections and the delegated authority of the Secretary.

**3**

A 654

2

D.  COMPLAINT:      An allegation of abuse submitted by an inmate or other person or entity to the Department of Corrections outside the Consolidated Inmate Grievance Review System.

E.  COMPLAINANT:    The person or entity submitting a complaint on their own behalf or on behalf of an inmate.

F.  CORC:           The Central Office Review Committee established under the Consolidated Inmate Grievance Review System.

G.  DC-ADM 804:     Department of Corrections Administrative Directive 804 titled "Consolidated Inmate Grievance Review System" contained in the Inmate Handbook.

H.  DEPARTMENT:     The Department of Corrections of the Commonwealth of Pennsylvania.

I.  GRIEVANCE:      An allegation of abuse submitted by an inmate through the Consolidated Inmate Grievance Review System.

J.  GRIEVANT:       The inmate submitting a grievance.

K.  INMATE:         A person lawfully committed to the custody of the Department of Corrections and incarcerated at any state correctional institution, state regional correctional facility, community corrections center, or motivational boot camp.

L.  INSTITUTION:    Any state correctional institution, state regional correctional facility, community corrections center, or motivational camp operated by the Department of Corrections.

M.  MONITOR:        The procedure for collecting and reviewing information regarding complaints and grievances of abuse of inmates.

N.  OIG:            Office of Inspector General's satellite office in the Department of Corrections

O.  SCAN:           State Correctional Analysis Network.

P.  SIO:            The Special Investigations Office of the Department of Corrections.

A 655

**V.  POLICY**

   A.   The Department will develop and maintain a system to
        monitor information regarding complaints and grievances
        alleging abuse of inmates.

   B.   The Department will monitor the information described in
        Section V.,A. for the purpose of detecting, deterring,
        and responding to actual and alleged incidents of abuse
        of inmates.

   C.   The specific procedural operations authorized by this
        policy are confidential in nature and are not public
        documents.    The  confidentiality  of  the  specific
        procedural operations is not subject to any disclosure
        requirement otherwise governing the contents of the
        Department's Administrative Manual.

   D.   This policy does not create any rights or privileges in
        any person and is intended only to provide guidance and
        direction for the orderly processing of a limited type of
        grievance or complaint raised by or on behalf of inmates.

**VI.  PROCEDURE**

   A.   The Special Investigations Office (SIO) will develop,
        with the cooperation of the Office of Inspector General –
        Corrections Office (OIG), a confidential operations
        manual of specific actions needed to effect each aspect
        of the procedures established by this section.

   B.   **INMATE COMPLAINTS AND THIRD PARTY COMPLAINTS**

        1.   In the event that a complaint alleging abuse is
             filed directly with Central Office by an inmate or
             by a third party, i.e., a party other than an
             inmate, the Commissioner's office will determine,
             based on the nature of the complaint, whether the
             allegation  warrants  investigation  by  the
             institution's security staff, the SIO, the OIG, or
             other investigative authority.

             (a)  If an investigation is referred by the
                  Commissioner's  office  directly  to  the
                  institution, SIO will be notified via memo
                  (from the Commissioner's office) only of the
                  inmate's name, number, institution and date of
                  referral.   The institution security office
                  must complete the investigation within 30 days
                  by report which will be sent back to the
                  Commissioner's Office who will then send a
                  letter to the complainant with a copy to SIO.
                  If  the  investigation  results  are  not
                  satisfactory, SIO may be notified to take
                  additional investigative action.

A 656

2.   When the complaint is referred for investigation directly to SIO or other investigative authority, SIO will be notified, will log the complaint and open a file.

When the complaint is referred by a criminal justice agency or an executive or legislative office, SIO will conduct the investigation.

3.   When a complaint is assigned by SIO for internal investigation by the institution, the following procedures will apply:

(a)   Investigations assigned to the institution should be completed by a report within thirty days of receipt of the investigative order.

   i.   If the investigation cannot be completed within thirty days, the institution will notify the SIO of the need for additional investigation and an anticipated date of completion.

(b)   Upon completion of the investigation, a copy of the investigative report prepared by the institution will be forwarded to the SIO for review.

   i.   The review will be completed by SIO within 15 working days. The SIO will make findings only that the institutional investigation is satisfactory or unsatisfactory.

   ii.   Unsatisfactory reports will be returned to the institution for additional investigative activity, and the appropriate Regional Deputy Commissioner will be notified. A resubmission date shall be established by the SIO.

   iii.   Satisfactory reports will be forwarded to the Commissioner and will include a letter prepared by SIO for the Commissioner's signature, addressed to the complainant, summarizing the results of the investigation and what action, if any, was taken.

c.   The SIO will notify the Regional Deputy Commissioner on a monthly basis of the status of every pending investigation conducted by the institutions within that Regional Deputy Commissioner's region. The Regional Deputy Commissioner will review each case investigation as to its timeliness.

*6*
A 657

4.    When the complaint is assigned to SIO for investigation, the following procedures shall apply:

   (a)  Investigations assigned to SIO should be completed within 30 days of receipt of the investigative order.

   (b)  A report will be forwarded to the Commissioner and will include a letter prepared by SIO for the Commissioner's signature, and addressed to the complainant, summarizing the results of the investigation and what action, if any, was taken.

      i.   If the investigation cannot be completed within 30 days, the SIO will notify the appropriate Regional Deputy Commissioner of the need for additional investigation and an anticipated date of completion.

      ii.  The SIO will notify the Regional Deputy Commissioner on a monthly basis of the status of every pending investigation conducted by SIO within that Deputy Commissioner's region. The Deputy Commissioner will review each case investigation as to its timeliness.

C.  INMATE GRIEVANCES

   1.  When an inmate files a grievance alleging abuse, the institutional Inmate Grievance Coordinator will forward a copy of the grievance response and investigation (if applicable) to SIO.

   2.  SIO will open a file on that grievance.

   3.  Inmate grievances alleging abuse which are sent directly to Central Office will be forwarded to SIO. SIO will open a file on the grievance and return it to the local grievance coordinator, who will inform the inmate that, pursuant to DC-ADM 804, the grievance will be considered to have been properly filed and that a response is forthcoming. A copy of the grievance response and investigation (if applicable) will be forwarded to SIO.

   4.  If the grievance is resolved at the Inmate Grievance Coordinator's level or the Superintendent's level, notice of resolution shall be forwarded to SIO to include the Superintendent's response to the grievance.

7

A 658

(a) In the event that SIO, upon review of the matter, does not raise concerns regarding the thoroughness or integrity (without prejudice) of the institution's investigation, the file will be closed without further action.

(b) In the event that SIO, upon review of the matter, raises concerns regarding the thoroughness or integrity of the institution's investigation, SIO will inform the Superintendent of its findings and remand the matter with instructions to review the issues as raised by the SIO. The Superintendent will, within 5 working days of receipt of notification, review the matter, consistent with the concerns raised by SIO and may, at his/her discretion, adjust the resolution of the grievance as appropriate. The Superintendent shall, within 5 working days, notify SIO of the outcome of his/her review, specifically addressing the issue(s) raised by SIO. **In the event that SIO remains concerned as to the thoroughness or integrity of the investigation, SIO may, with the Commissioner's approval, initiate and conduct an independent investigation.**

(c) Failure of the inmate to appeal from the grievance coordinator's response or the Superintendent's response, in accordance with DC-ADM 804, will be considered a resolution at the level of response from which no appeal was taken.

5. When an inmate grievance alleging abuse is appealed to CORC (Central Office Review Committee), SIO will be contacted and requested to immediately forward the results of the investigation to the CORC coordinator.

D. **NEED FOR FURTHER REVIEW**

If the SIO determines a pattern of abuse may exist involving the same individual or institution(s) a referral will, upon approval by the Commissioner, be made to the OIG for further review and/or investigation.

E. **REPOSITORY**

1. SIO will maintain a two-year hard-copy repository of complaints alleging abuse.

2. A permanent electronic data base of the above complaint and grievance information will be established and maintained by SIO.

A 659

**F.    RESEARCH**

     1.    In coordination with SCAN, a report by SIO will be prepared on a monthly basis for submission to the Commissioner that will detail the substantive information contained in the data base created under section VI.E.2.

         a.    The following Central Office Staff will also receive a copy of the report:

             i.    Executive Deputy Commissioner
             ii.   Regional Deputy Commissioners
             iii.  Executive Assistants to the Commissioner
             iv.   Director of Community Corrections
             v.    Director of SIO
             vi.   Chief of Security
             vii.  Coordinator, CORC
             viii. Deputy Inspector General, DOC Satellite Office

**VII. SUPERSEDED POLICY AND CROSS-REFERENCE**

    A.    This is a new policy.  No existing policies are superseded.

    B.    Cross References:

        1.    Administrative Directive DC-ADM 804 "Consolidated Inmate Grievance Review System"

        2.    Policy Statement: "State Corrections Analysis Network (SCAN)" issued 08/30/91

JEK:js
9/25/92

A 660



| | |
|---|---|
| **POLICY STATEMENT** | |
| **Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Abuse Allegation Monitoring** | **DC-ADM 001** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **December 19, 2001** | *Jeffrey A. Beard* <br> **Jeffrey A. Beard, Ph.D.** | **January 14, 2002** |

## I.   Authority

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206 and 506 and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186 and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   Purpose

The purpose of this document is to establish policy and procedures for the reporting and investigation of allegations of inmate abuse.

## III.   Applicability

This policy is applicable to all persons employed by, incarcerated in, or who have business with the Department of Corrections.

## IV.   Definitions

### A. Abuse

1. Conduct that is prohibited either by law or by Department policy. Such conduct involves:

   a. the use of excessive force upon an inmate;

   b. an occurrence of an unwarranted life-threatening act against an inmate; and/or

   c. an articulated verbal or written threat to inflict physical injury directed toward an inmate.

A 661

2. Excluded from this definition are:

   a. conditions of confinement;

   b. claims of inadequate medical or intentionally denied medical care;

   c. harassment or nonperformance of duty by a staff member; and/or

   d. abuse by another inmate.

## B. Abuse Allegation Monitoring

The procedures for collecting and reviewing information regarding complaints and grievances of abuse of inmates.

## C. Central Office

The Headquarters of the Department of Corrections.

## D. Complaint

An allegation of abuse submitted by an inmate or other person or entity to the Department.

## E. Complainant

The person or entity submitting a complaint on his or her own behalf or on behalf of an inmate.

## F. Department

The Pennsylvania Department of Corrections.

## G. Facility

Any State Correctional Institution, State Regional Correctional Facility, Community Corrections Center, Contract Facility or Motivational Boot Camp operated by the Department.

## H. Facility Manager

The Superintendent of a State Correctional Institution, State Regional Correctional Facility, Commander of a Motivational Boot Camp, Regional Director of a Community Corrections Center and/or the Director of the Training Academy.

## I. Grievance

An allegation of abuse submitted by an inmate through the Inmate Grievance System.

## J. Grievant

The inmate submitting a grievance.

### K. Inmate

A person committed to the custody of the Department and incarcerated at any state correctional facility.

### L. Office of Professional Responsibility (OPR)

The Office responsible for monitoring inmate abuse allegations.

### M. Secretary's Office of Inmate Grievances and Appeals

The office responsible for the review and disposition of all appeals of inmate grievances to Central Office.

## V.  Policy

It is the policy of the Department to ensure that inmates are not subjected to corporal or unusual punishment, humiliation, mental abuse, or punitive interference with the daily functions of institutional living and that any alleged abuse is thoroughly investigated.[1]

## VI.  Procedures

A.  The Department of Corrections has the legislatively delegated responsibility to exercise lawful authority in the administration of the state correctional system. The Department of Corrections is committed to ensuring that the correctional system is administered and operated in a safe secure manner.

B.  Four classes of persons and entities can make allegations of inmate abuse:

1.  all persons who are employed by the Department;

2.  all persons committed to the custody of the Department;

3.  all persons and entities having business with or using the resources of the Department; and

4.  all persons and entities attempting, establishing, or maintaining contact with persons committed to the custody of the Department.

C.  Reporting Of Inmate Abuse Allegations All Persons Who Are Employed by the Department

Any employee receiving written or verbal notification from an inmate or a third party alleging an incident of abuse, or who is a witness to an abuse, is required to complete a **DC-121 Part 3, Employee Report of Extraordinary Occurrence** for submittal to his/her supervisor and the facility's Grievance Coordinator. All reports shall be completed prior to completion of the employee's duty shift.

---

1 3-4268, 1-ABC-3D-06, 3-ACRS-3D-05

D.  Reporting of Inmate Abuse Allegations by All Persons Committed to the Custody of the Department

   1.  Any Inmate who is the victim of an abuse may report the abuse in the following manner:

      a.  filing an inmate grievance in accordance with Department policy **DC-ADM 804, "Inmate Grievance System;"**

      b.  reporting it in writing, or verbally, to any staff member; or

      c.  reporting it in writing to the Office of Professional Responsibility of the Department of Corrections.

   2.  Abuse allegations received by other Central Office employees shall be referred to the Office of Professional Responsibility.

E.  Reporting of Inmate Abuse Allegations by All Persons and Entities Having Business With or Using the Resources of the Department and All Persons and Entities Attempting, Establishing, or Maintaining Contact With Persons Committed To The Custody Of The Department.

   Any person having knowledge concerning an alleged abuse may make reports of allegations of inmate abuse, verbally or in writing, to any staff member of the facility or of the Central Office of the Department.

## VII.  Suspension During An Emergency

In an emergency or extended disruption of normal facility operation, the Secretary, or designee may suspend any provision or section of this policy, for a specific period.

## VIII.  Rights Under This Policy

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## IX.  Release of Information and Dissemination Of Policy

   A.  **Release of Information**

      1.  **Policy**

         This policy document is public information and may be released to members of the general public, staff, legislative, judicial, law enforcement and correctional agencies and/or inmates upon request.

## 2. Procedure Manual (if applicable)

The procedure manual for this policy is <u>not public information</u> and shall not be released in its entirety or in part, without the prior approval of the Secretary of Corrections or designee. This manual or parts thereof, may be released to any Department of Corrections employee on an as needed basis.

## B. Distribution of Policy

### 1. General Distribution

The Department of Corrections' policy and procedure manuals (when applicable) shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution to other individuals and/or agencies is subject to the approval of the Secretary of Corrections or designee.

### 2. Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures.

## X.   Superseded Policy and Cross Reference

### A. Superseded Policy And Procedure

#### 1. Department Policy

a. 1.2.4, Inmate Abuse Allegation Monitoring Process issued October 2, 1992, by former Secretary Joseph D. Lehman,

b. 1.2.4-1, Inmate Abuse Allegation Monitoring Process issued May 16, 1995, by former Secretary Martin F. Horn,

c. 1.2.4-2, Inmate Abuse Allegation Monitoring Process issued December 7, 1995, by former Executive Deputy Secretary Raymond E. Clymer, Jr.

#### 2. Facility Policy and Procedures
This document supersedes all facility policy and procedures on this subject.

### B. Cross References:

#### 1. Administrative Manuals

a. DC-ADM 804, Inmate Grievance System

b. 6.3.1, Facility Security

## 2. ACA Standards

a. Administration of Correctional Agencies: None

b. Adult Correctional institutions: 3-4268

c. Adult Community Residential Services: 3-ACRS-3D-05

d. Adult Correctional Boot Camp Programs: 1-ABC-3D-06

e. Correctional Training Academies: None



| POLICY STATEMENT |
|---|
| Commonwealth of Pennsylvania • Department of Corrections |

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Abuse Allegation Monitoring** | **DC-ADM 001** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **August 29, 2005** | *Jeffrey A. Beard, Ph.D.* | **September 29, 2005** |

## I.   Authority

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   Purpose

The purpose of this document is to establish policy and procedures for the reporting and investigation of allegations of inmate abuse.

## III.   Applicability

This policy is applicable to all persons employed by, incarcerated in, or who have business with the Department.

## IV.   Definitions

### A. Abuse

1. Conduct ***by an employee, contractor, volunteer, or any individual who has business with or uses the resources of the Department*** that involves:

    a.  the use of excessive force upon an inmate;

    b.  an occurrence of an unwarranted life-threatening act against an inmate;

A 667

    c.  an articulated verbal or written threat to inflict physical injury directed toward an inmate; and/or

    d.  sexual contact with an inmate.

  2.  Excluded from this definition are:

    a.  conditions of confinement;

    b.  claims of inadequate medical or intentionally denied medical care;

    c.  harassment or nonperformance of duty by a staff member; and/or

    d.  abuse by another inmate, *to include sexual contact*.

**B. Abuse Allegation Monitoring**

The procedures for collecting and reviewing information regarding *abuse* complaints of an inmate.

**C. Central Office**

The Headquarters of the Department of Corrections.

**D. Complaint**

An allegation of abuse submitted by an inmate or other person or entity to the Department.

**E. Complainant**

The person or entity submitting a complaint on his/her own behalf or on behalf of an inmate.

**F. Department**

The Pennsylvania Department of Corrections.

**G. Facility**

Any State Correctional Facility, State Regional Correctional Facility, Motivational Boot Camp, Training Academy, Community Corrections Center, and the Central Office Complex as a group and/or individually.

**H. Facility Manager**

The Superintendent of a State Correctional Facility, State Regional Correctional Facility, or Motivational Boot Camp, Director of a Community Corrections Center, or Director of the Training Academy.

I.  **Grievance**

A formal written complaint by an inmate related to a problem encountered during the course of his/her confinement.

J.  **Grievant**

The inmate submitting a grievance.

K.  **Inmate**

A person committed to the custody of the Department and incarcerated at any state correctional facility.

L.  **Office of Professional Responsibility (OPR)**

The Office responsible for monitoring inmate abuse allegations.

M.  *Sexual Contact with an Inmate*

*Sexual contact refers to any sexual behavior directed towards an inmate and includes, but is not limited to: rape; any acts or attempts to commit acts which involve sexual contact; sexual abuse or assault; the intentional touching, either directly or through clothing, of the genitalia, anus, groin, breast, inner thighs, or buttocks. This does not refer to the physical contact that may occur during a search of an inmate's person, in accordance with Department policy, DC-ADM 203, "Searches of Inmates and Cells."*

V.  **Policy**

It is the policy of the Department to ensure that an inmate is not subjected to corporal or unusual punishment, *or personal abuse or injury*.[1]

VI.  **Procedures**

A.  The Department has the legislatively delegated responsibility to exercise lawful authority in the administration of the state correctional system. The Department is committed to ensuring that the correctional system is administered and operated in a safe secure manner.

B.  Allegations of inmate abuse may be reported by:

1.  *an inmate;*

2.  *an employee, contractor, visitor, volunteer, or any individual who has business with or uses the resources of the Department; and*

---

[1] 4-4281, 4-ACRS-6A-03, 1-ABC-3D-06

   3.  all persons and entities attempting, establishing, or maintaining contact with persons committed to the custody of the Department.

C.  Any employee who receives written or verbal notification from an inmate or a third party alleging an incident of abuse, or who is a witness to an abuse, is required to complete a **DC-121 Part 3, Employee Report of Incident** for distribution to his/her supervisor and the facility's *Security Office*. All reports shall be completed prior to completion of the employee's duty shift.

D.  Any inmate who is the victim of an abuse *should* report the abuse in the following manner:

   1.  report it verbally or in writing to any staff member;

   2.  file a grievance in accordance with Department policy **DC-ADM 804, "Inmate Grievance System;"** or

   3.  report it in writing to the Department's Office of Professional Responsibility (OPR).

E.  Any person who has knowledge concerning an alleged abuse *should notify* a staff member at the facility or at the Central Office of the Department.

F.  An allegation of abuse that is received by any Central Office employee shall be referred to the OPR.

## VII. Suspension During an Emergency

In an emergency or extended disruption of normal facility operations, the Secretary/ designee may suspend any provision or section of this policy for a specific period.

## VIII. Rights Under This Policy

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department.

## IX. Release of Information and Dissemination Of Policy

### A. Release of Information

   1.  Policy

      This policy document is public information and may be released upon request.

   2.  Procedures Manual (if applicable)

      The procedures manual for this policy is <u>not public information</u> and shall not be released in its entirety or in part, without the prior approval of the Secretary/

designee. This manual or parts thereof may be released to any Department employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

   The Department's policy and procedure manuals (when applicable) shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution to other individuals and/or agencies is subject to the approval of the Secretary/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures.

## X.   Superseded Policy and Cross Reference

### A. Superseded Policy and Procedure

1. Department Policy

   DC-ADM 001, Inmate Abuse Allegation Monitoring, issued December 29, 2001.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross References:

1. Administrative Manuals

   a. DC-ADM 203, Searches of Inmates and Cells

   b. DC-ADM 804, Inmate Grievance System

2. ACA Standards

   a. Administration of Correctional Agencies: None

   b. Adult Correctional institutions: 4-4281

   c. Adult Community Residential Services: 4-ACRS-6A-03

   d. Adult Correctional Boot Camp Programs: 1-ABC-3D-06

    e.  Correctional Training Academies: None



**PENNSYLVANIA DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PENNSYLVANIA 17001-0598**
**(717) 975-4859**

August 13, 1996

VIA Messenger

Ethel S. Barnett, Chairman
State Civil Service Commission
Strawberry Square Complex
P.O. Box 569
Harrisburg, PA 17108-0569

Re:    Zimmerman v. DOC/SCI-Cambridge Springs
       SCSC Appeal No. 18329

Dear Chairman Barnett:

Enclosed for filing please find the original and five (5) copies of the Proposed Adjudication on Behalf of The Department of Corrections.

Also, at the last hearing on May 29, 1996, the Department admitted into evidence six (6) additional Exhibits, all of which were photographs and which were marked AA-11 through AA-16, respectively. One of each of these photographs was provided to the Commission at the hearing. Accordingly, I am enclosing with this letter three (3) additional sets of each of these Exhibits.

By copy of this letter I am providing a copy of the Department's Proposed Adjudication to Appellant's attorney along with one of each of the six photographs.

If you need anything further, please do not hesitate to contact me. Thank you very much for your attention and cooperation.

Sincerely,

Shawn P. Kenny
Assistant Counsel

SPK:len
enclosure
cc:    William Taggart, Esquire, 900 State St., Suite 104, Erie, PA 16501-1425 (w/enclosure)
       Joyce Henninger
       Superintendent Wolfe, SCI-Cambridge Springs (w/copy of brief)
       file

A 673

16

## COMMONWEALTH OF PENNSYLVANIA
## STATE CIVIL SERVICE COMMISSION

Carl L. Zimmerman,                              :
                                                :
                    Appellant                   :
                                                :
                                                :    State Civil Service Commission
              v.                                :    Appeal No. 18329
                                                :
State Correctional Institutional at             :
Cambridge Springs,                              :
                                                :
                Appointing Authority            :
                                                :
William Taggart                                 :    Shawn P. Kenny
Attorney for Appellant                          :    Attorney for Appointing Authority
                                                :

### PROPOSED ADJUDICATION ON BEHALF OF
### THE DEPARTMENT OF CORRECTIONS,
### STATE CORRECTIONAL INSTITUTION AT CAMBRIDGE SPRINGS

This is an appeal by Carl Zimmerman (Appellant) challenging his removal from

his position as a Facility Maintenance Manager II with regular status, at the State

Correctional Institution at Cambridge Springs ("SCI-Cambridge Springs"). Three

hearings were held in Pittsburgh: On August 30, 1995; January 29, 1996 and May 29,

1996.

I.    FINDINGS OF FACT

1.    On August 9, 1994, Appellant signed a voluntary confession and voluntary

      resignation from his position as a Facility Maintenance Manager at the State

      Correctional Institution at Cambridge Springs. Appellant admitted that he

      violated Sections B6 and B30 of the Department of Corrections Code of Ethics

      because he misled an investigator of the Department of Corrections and

*54*

A 674

the corner where the secretary's desk was located. Appellant conceded that there is indeed a blind spot in that corner which cannot be observed. (p.1037). A review of the photographs introduced by the Department at the last hearing confirms that there is in fact plenty of space for two consenting adults to do what ever they wanted to do without being observed through the small window located in the doorway which is tucked at the end of a hallway leading into the secretary's office area. Moreover, as noted, there are numerous buildings and grounds located on the prison compound where the two could be unobserved, as testified by Ms. Gunnarson.

Appellant also made much over the fact that he had a medical emergency at home involving his son who had fallen off a jungle jim. Of course, Appellant's seizeds upon this unfortunate incident after the fact so as to mitigate his conduct on August 9, 1994. Think about this. What parent wouldn't asked that they be allowed to take their child to the hospital in the event of a legitimate emergency, whether he was to be questioned or not. Instead, Appellant said nothing about this and mentioned it to no one. Yet, Appellant had the presence of mind to ask Superintendent Wolfe in the evening of August 9, whether he would be compensated for having to stay at work late to speak to the investigators.

Finally, the admissions made by Mrs. Zimmerman to Pauline Blood cannot be overlooked. Appellant had requested Ms. Blood to bring to his house a list of commonwealth telephone numbers within a few days of his resignation on August 9. Mrs. Zimmerman told Ms. Blood that she "wished I had been his secretary sooner, that maybe none of this would have happened."

34

675

#1. Video cameras installed 1992-1996.

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**SCI-Cambridge Springs**
**September 2, 1998**

**SUBJECT:**   Surveillance Inquiry

**TO:**     Bill Barr
         Superintendent's Assistant

**FROM:**    Tammy Turner
         Business Manager

        Research and planning of surveillance equipment and usage began in the spring of 1996.  A plan was devised to install this equipment in six of the ten buildings within the SCI-Cambridge Springs perimeter.  In May of 1996 our plan was supported and approved by Secretary Horne.  Cost and product research commenced after the Secretary's approval.

        Purchasing requests were forwarded to the Department of General Services (DGS) in August of 1996.  DGS bid out the equipment and issued a PO in March of 1997.  The items were received at SCI-Cambridge Springs April 1997 and installed shortly there after.

A 676