1

1

2

3

4

5          THE PENNSYLVANIA HOUSE OF REPRESENTATIVES
                   JUDICIARY COMMITTEE
6     SUBCOMMITTEE ON CRIME AND CORRECTIONS HEARING
                  ON WOMEN'S PRISON ISSUES

7

8

9

10

11                  Monday, August 18, 1997
                      Curie Hall Auditorium
12     State Correctional Institution - Cambridge Springs
                     451 Fullerton Avenue
13                 Cambridge Springs, PA 16403
                      1:00 o'clock p.m.

14

15

16

17

18                        ORIGINAL

19

20

21

22

23

24                                              A 677

A 678

2

1      REPRESENTATIVE BIRMELIN:  Good afternoon.

2  I want to welcome you here to the House Judiciary

3  Hearing on Women's Prison Issues.

4      We're going to be meeting this afternoon,

5  the committee and the committee staff will be havin

6  a tour of the prison tomorrow, and on Wednesday

7  morning we will be hearing from some other

8  testifiers on the issues of women's prison.

9      I'm Representative Birmelin, I'm the

10  chairman of the subcommittee.  I'd like to briefly

11  introduce the other panel members that are seated

12  here with me and we may have some others who will

13  join us and I will introduce them as that

14  opportunity arrives.

15      To my far left is Representative Linda

16  Bebko-Jones.  And you're from Erie County; is that

17  correct?

18      REPRESENTATIVE BEBKO-JONES:  Right.

19      REPRESENTATIVE BIRMELIN:  My immediate

20  left is Representative Kathy Manderino, she's from

21  Philadelphia County.

22      To my right is Attorney Brian Preski.

23      To his right is Representative Don Walko

24  from Pittsburgh, Allegheny County.

A 679

3

1            And on the far right -- I've always wanted

2       to say that -- on the far right is Representative

3       Babette Josephs from Philadelphia County as well.

4            We want to thank you for coming here.

5       Some of you are testifiers, some of you are

6       observers.  I will tell you that the proceedings

7       here are going to be videotaped today by the

8       Pennsylvania Cable Network, that's why the camera is

9       here.  And also we have a court reporter here

.0      reporting testimony and questions of the panel as

1       the testifiers present their testimony today.

2            If you have a desire for any of the

3       information that they are presenting, if you will

4       address your request to the chief counsel, Brian

5       Preski, we'll see that you get that information.

5            I apologize for the late start.  As I

7       explained to the superintendent, nothing in

       Harrisburg starts on time so don't expect this to

       start on time, unfortunately.  However, we will get

       started.

            Several of our people are here to testify.

       The first is the superintendent ever Cambridge

       Springs Correctional Institution, Bill Wolfe, who

       tells me he's been here since the day the state

4

1    opened the facility.

2              Mr. Wolfe, we'll ask you to come foreward

3    -- and a welcome to the committee members.

4              SUPERINTENDENT WOLFE:  Thank you very

5    much.

6              First of all, I would like to welcome you

7    Chairman Gannon, members of the House, and our

8    guests, to SCI Cambridge Springs.  I would also like

9    to welcome you on behalf of Commissioner Horne and

10   the Department of Corrections.  Cambridge Springs is

11   proud to be the site selected for these public

12   hearings.

13             The Commonwealth purchased Alliance

14   College in late 1990 in a response to prison

15   overcrowding that our nation and the Commonwealth

16   was experiencing at that time.  In February of 1991

17   I was transferred from SCI-Waynesburg where I served

18   as superintendent, and SCI-Waynesburg was a minimum

19   security women's facility, and I was appointed

20   superintendent of this institution.

21             We've come a long way since our humble

22   beginnings in a community that initially did not

23   want to host a prison.  And secondly, a physical

24   plant that had to be retrofitted to serve and

5

1    function as a correctional institution.

2             Our first 25 inmates arrived in the Spring

3    of 1992 following nearly a one year hiring freeze

4    during the Casey administration.  Our first inmates

5    arrived from SCI-Waynesburg and served as a working

6    train to help us prepare to open up the facility for

7    the rest of the inmates.  Today we have

8    approximately 500 inmates housed here and we employ

9    approximately 260 people from the local area.

10            Tomorrow morning prior to our tour you

11   will learn a little bit more about the history of

12   our institution during a reception in my office.  I

13   personally believe, and I've been working with

14   female offenders for approximately eight, eight and

15   a half years.  And I think this is a very important

16   topic and a very timely topic.  And I'm certainly

17   encouraged by your presence here today to look at

18   women's prison issues.

19            The Department of Corrections houses

20   approximately 33,000 inmates.  Of that 33,000

21   inmates only 1,800 inmates are women.  And

22   consequently, and even nationwide, a lot of times

23   women's issues are caught in the backwash of the

24   large numbers of their male counterparts.  So I'm

6

1    extremely pleased that you're here and I hope that

2    we have a very productive hearing.

3              On a subject that is very near and

4    personal to me, I've been asked to speak about some

5    of the issues that are different between males and

6    females, and I've had the privilege of working with

7    both populations.  Prior to being appointed as

8    superintendent at Waynesburg I worked 18 and a half

9    years with the male offender.  So I'm in a position

10   where I can compare and contrast some of the big

11   differences.

12             First, when you're dealing with women most

13   striking to me was the types of crimes that women

14   commit and the circumstances that surround their

15   involvement in crime.

16             Most serious crimes that women commit are

17   domestically oriented, or if it's committed outside

18   of the domestic situation usually women serve in a

19   supportive role to a male perpetrator.

20   Consequently, women, in fact, as you tour our

21   facility tomorrow, pose significant differences

22   concerning security issues.  When the department

23   looked at acquiring Alliance College as a

24   consideration, it was felt since women offenders

7

1    would be housed here, that this site could

2    appropriately be converted to a women's prison

3    facility.

4            When working with women important issues

5    are childcare, not only during the woman's period of

6    incarceration.  The vast majority of our women here,

7    at least 80 percent are mothers and many of these

8    leave young children behind in the community.  And

9    that's a serious issue.

10           Also, childcare when women are released

11   because many of these women are single heads of the

12   household and many of our vocational programs that

13   we have prepare women to go in to the work force,

14   but being a single head of the household primarily

15   responsible for childcare, what do the women do when

16   they go to work?  Are there adequate childcare

17   facilities in the community to assist single parents

18   that are attempting to enter the work force.

19           Abuse issues are also significantly

20   different.  When I first started working with women

21   I was absolutely astounded at the number of women in

22   our system that are victims of physical, sexual and

23   mental abuse.

24           Health care issues are also significantly

A 684

8

1    different and much more critical for women.  I

2    understand Dr. Mowie will be addressing the

3    committee during the next few days, and I'm sure he

4    would be happy to expound much more on that.

5              Also, mental health issues and drug and

6    alcohol abuse issues are significant issues that our

7    programming attempts to address in our attempts to

8    reintegrate these women back in to the community.

9              The other thing, and I do have a treatment

10   background, the Department of Corrections, I came up

11   through the treatment ranks and I truly enjoy

12   working with women offenders because I found that

13   women -- I found that in general, speaking on a

14   continual -- the behavior goes on both ends of the

15   scale.  But in general, women are much more

16   concerned about and committed to their participation

17   in treatment programs and their overall

18   rehabilitation process that we enter in the

19   community, that I found in working with many of

20   them.

21             This has been a real challenge for us.

22   We're very proud of how far we've come.  And in

23   closing I would like to say that if you are in need

24   of anything during the next three days, feel free to

A 685

9

1    ask our staff.  If there is anything that we can do

2    to make your stay here more comfortable and more

3    enjoyable, we'll do everything we can to accommodate

4    you.

5         REPRESENTATIVE BIRMELIN:  Thank you.  I'm

6    going to ask the committee if they have questions of

7    you to hold them until Wednesday.  If you're not

8    going to be here Wednesday, catch him on the way

9    out, but he's going to be back to testify Wednesday

10   morning as well.

11        And our next testifier has indicated to me

12   that she's on a tight schedule so I would like to

13   ask Tish Donze, director of the Mercy Center for

14   Women if she would come before our committee at this

15   time and give her testimony.

16        MS. DONZE:  Thank you very much.

17        The agency that I'm the director of is

18   called the Mercy Center for Women, and our primary

19   goal is to provide transitional housing for homeless

20   women and their children.  And we provide that

21   transitional counseling with extensive support

22   services on site.

23        Now, usually, I mean, we're not targeting

24   the women we serve as coming out of correctional

1

1

2

3

4

5          THE PENNSYLVANIA HOUSE OF REPRESENTATIVES
                     JUDICIARY COMMITTEE
6     SUBCOMMITTEE ON CRIME AND CORRECTIONS HEARING
                   ON WOMEN'S PRISON ISSUES

7

8

9

10

11

12

13

14              Wednesday, August 20, 1997
                    Curie Hall Auditorium
15     State Correctional Institution - Cambridge Springs
                    451 Fullerton Avenue
16              Cambridge Springs, PA 16403
                    9:00 o'clock a.m.

17

18

19

20                    **ORIGINAL**

21

22

23

24

A 687

A 688

162

1      folks who had worked in facilities that may have had

2      troubled histories.

3              And I wanted them to understand the former

4      and current, what my intentions were in terms of

5      staff misconduct.  Inmates on staff assaults, zero

6      tolerance for drug use in institutions, there so

7      some drug use in institutions, and concluded the

8      discussion with them in saying inappropriate conduct

9      that would violate our code of ethics.  So he

10     understands very clearly as do his colleagues and

11     folks that work in his office what our intentions

12     are.

13             And I nurture that relationship because I

14     think that's very significant for a person in his

15     position to understand what the priorities are, what

16     the expectations are.

17             REPRESENTATIVE MANDERINO:  Thank you.

18             Commissioner Wolfe, I think I was the

19     person that Representative Birmelin said someone

20     wanted to ask you questions, so you may want to come

21     to one of the mikes.

22                     - - - -

23             (Whereupon, there was a brief pause in the

24     proceedings.)

A 689

163

1                      - - - -

2              REPRESENTATIVE MANDERINO:   Thank you.

3           I think it's only fair to give you the

4     opportunity, because I asked both inmates and staff

5     level, and now as management level vis-a-vis -- I

6     don't think I need to preface it, I don't make

7     excuses for asking a probing question.

8           I do want you to know I have a realistic

9     view of life in the real world, and I don't think

10    whether it's the prisons or are pristine

11    institution, so I'll just say that in context.

12           But everything is based on where you see

13    it from, and obviously from the inmates level when I

14    asked them about what changes if any they saw in

15    policies, procedures, or way of operating after

16    instances, they didn't see it.  On the next level

17    staff was more aware of it, and named some specific

18    things such as cameras and some tightening up of

19    time schedules.

20           But I really want to give you the

21    opportunity as the senior management of the prison

22    to give your perspective in terms of at least with

23    regard to the instances that I knew of because I

24    read newspaper articles about it, what changes you

1    as an institution made or didn't make, or what

2    policies you changed or reinforced as a result of

3    those instances happening at Cambridge Springs.

4         SUPERINTENDENT WOLFE:  I think as the

5    Commissioner touched upon, there have been a number

6    of changes that were made as a result of this.

7    After our very first case which did not involve

8    sexual intercourse, it was an inappropriate

9    relationship that had formed between a staff member

10   and an inmate.  And I had consulted quite a bit with

11   Superintendent Byrd, we communicate regularly, on

12   common issues and concerns.

13        Very early on, and we've been working with

14   the Commissioner's office, there has been a number

15   of meetings that we have had, a number of occasions

16   when I've talked to the Commissioner, also to

17   Superintendent Byrd and the director of our training

18   academy, about the need for specialized training for

19   employees that work specifically with female

20   offenders.  And perhaps the Commissioner may wish to

21   talk about some of the programs that are in, that

22   are being developed to address some of those needs

23   at the academy.

24        We also brought in outside trainers, the

A 691

165

1    former director of OPR came in and gave a hair

2    raising lecture to staff as to the consequences of

3    being involved in this type of unprofessional

4    behavior, ranging from civil liabilities, criminal

5    liabilities and possibilities of being incarcerated,

6    which as a result of our zero tolerance towards this

7    type of behavior between inmates and staff we have

8    aggressively investigated each and every complaint

9    and rumor.  And in every case we investigate a rumor

10   we don't always come to a finding of guilt.  But as

11   rumors would persist we would go back and

12   reinvestigate and call in OPR and, yes, rumors do go

13   around institutions.  Rumors are part of institution

14   life.  And it's very difficult chasing rumors.  It's

15   like chasing ghosts many times.

16          And you follow the investigative trail as

17   far as you can.  If rumors persist we reopen

18   investigations, and we've done that in a number of

19   cases.

20          So beyond that we have also installed

21   electronic surveillance equipment to monitor staff

22   and inmate movements.

23          Procedurally -- well, it has always been,

24   our staff have always been trained that never to

166

1    place themselves in a compromising situation.

2    Somebody earlier testified that staff have more

3    recently been told not to be seen or about

4    one-on-one with inmates.  That has been our practice

5    from very early on.  Not to put themselves in a

6    compromising situation, and you can could do that by

7    surrounding yourself and not going in to --

8         REPRESENTATIVE MANDERINO:  With regard to

9    the case involving Walton who I understand was, from

10   my reading was a prison guard?

11        SUPERINTENDENT WOLFE:  No, he was a food

12   service instructor.

13        REPRESENTATIVE MANDERINO:  Former food,

14   I'm sorry.  See, it's those bad notes I took.

15   Eichert was the prison guard?

16        SUPERINTENDENT WOLFE:  Yes.

17        REPRESENTATIVE MANDERINO:  Walton was the

18   former food supervisor.  Miller was the trades

19   instructor?

20        SUPERINTENDENT WOLFE:  Yes, ma'am.

21        REPRESENTATIVE MANDERINO:  Who's

22   Zimmerman.

23        SUPERINTENDENT WOLFE:  He was our former

24   maintenance manager, facility maintenance manager,

A 693

167

1          in charge of our maintenance department.

2                    COMMISSIONER HORNE:  And we fired him.

3                    SUPERINTENDENT WOLFE:  Yes, he was fired.

4                    REPRESENTATIVE MANDERINO:  Now, that one

5          was fired but there were no criminal charges

6          brought?

7                    SUPERINTENDENT WOLFE:  Right, because as a

8          result of our investigation there was unethical

9          behavior but fraternization, but it never rose to

10         criminal sexual behavior, sexual acts.

11                   REPRESENTATIVE MANDERINO:  All four of

12         those classifications of positions, prison guard,

13         teacher, instructor and maintenance manager or food

14         supervisor, those are all what I heard referred to

15         as contact employees versus --

16                   SUPERINTENDENT WOLFE:  Non contact.

17                   REPRESENTATIVE MANDERINO:  Versus non

18         contact employees.

19                   In each of those cases of investigation am

20         I correct in assuming that each of those cases of

21         investigation were done by OPR, or was Zimmerman

22         done just internally?

23                   SUPERINTENDENT WOLFE:  No.  I'm not even

24         sure I gave this to the Commissioner -- may I have a

Erie, PA

1    moment to review it?

2           Since the institution started receiving

3    inmates back in March of '92 we've had 12 employees

4    that were either, either we discharged or they were

5    permitted to resign.  And we have made two criminal

6    prosecutions and one pending criminal prosecution.

7           Out of those 12 cases I requested from

8    central office in 11 cases I requested the outside

9    assistance of OPR.  I take this very seriously.  I

10   also understand that since the '70s people are very

11   skeptical of government, government officials, their

12   motives, their credibility, their morality.

13           REPRESENTATIVE MANDERINO:  Join the

14   growing club.

15           SUPERINTENDENT WOLFE:  And for somebody to

16   investigate themselves I feel is inappropriate.  And

17   I've had a number of discussions with the

18   Commissioner as to how many occasions we have gone

19   outside of the institution, beyond our local

20   investigation and asked for somebody to come in who

21   was not associated with our staff or our facility to

22   come in and assist us to independently investigate

23   these cases.  And I'm very proud that 11 of those 12

24   cases that was done.

169

1       REPRESENTATIVE MANDERINO:  Of the 12

2   employees involving discipline, were all 12 of those

3   folks who were directly the one who committed the

4   ethical violation, whatever kind it was?

5       SUPERINTENDENT WOLFE:  Yes, ma'am.

6       REPRESENTATIVE MANDERINO:  In any of those

7   12 instances, and in particularly any of the

8   instances that rose to the level of criminal

9   prosecution, was in any disciplinary action,

10  investigation or termination of any of the staff

11  directly above or responsible for those employees'

12  supervision or any senior management staff?

13      SUPERINTENDENT WOLFE:  Well, that would be

14  me, ma'am, and I'm still here.

15      REPRESENTATIVE MANDERINO:  So in between

16  you and that particular person there was no --

17  obviously you're still here, there was no --

18      SUPERINTENDENT WOLFE:  None.

19      REPRESENTATIVE MANDERINO:  -- disciplinary

20  action taken?

21      When there is an investigation done is the

22  investigation done beyond the person themselves?

23  Does the investigator ask what happened below,

24  obviously they ask what happened below with the

A 696

Erie, PA

170

1   inmate, do they ask what happened above with the

2   supervisors?

3        SUPERINTENDENT WOLFE:  Oh, absolutely.

4   And in each one of these cases these were done by

5   independent employees, it was not done out in the

6   open, it was done secretively.  And perhaps I

7   understand your question as to who, who's to blame

8   for this.

9        REPRESENTATIVE MANDERINO:  No, I'm not

10  really asking who's to blame because obviously the

11  actor is ultimately responsible for their actions.

12  I'm really asking who took, how responsibility was

13  taken for the incident and what happened as a

14  result.  Because not only does what happened affect

15  the person who either was discharged and the person

16  who was the subject of that, but it also effects

17  everyone else who was working or it still remains in

18  that functioning unit, whether it's the prison or

19  the legislature.  So I was really asking what

20  resonating consequences, if any, were going

21  throughout the institution after the discharge?

22       SUPERINTENDENT WOLFE:  Oh, each time we

23  have an instance, such as this, it has a devastating

24  effect upon an institution.  It affects morale, it

171

1    creates a degree of labor and management issues.

2    The effect of these are devastating.  And seriously

3    impact upon the institution.  And our management of

4    this is critical.

5           COMMISSIONER HORNE:  May I add something?

6    I think Superintendent Wolfe's points about the

7    impact is an important one.  And I think he, let's

8    say in several of these cases the fact, the

9    supervisor or supervising personnel who had a

10    responsibility in these areas attested in the

11    investigation, or may well have either brought or

12    when a rumor was brought to their attention added in

13    the investigation, number one.

14           Number two, one of the problems that

15    occurs here is that when -- and you asked earlier

16    when a staff person makes an allegation against

17    another staff person, or even corroborates an

18    allegation made elsewhere, hard feelings have been

19    known to result.  The union does take a very hard

20    line on their own members who are accused of this

21    and while they represent the individuals an element

22    of shunning kind of behavior does result.

23           And finally, I want to point out that in

24    the last month we demoted the senior security

A 698

Erie, PA

172

1    supervisor here.  One of the reasons -- and

2    transferred -- one of the reasons that we took that

3    action was because we had lost confidence in the

4    overall tone that was being set.  Because I believe

5    that the way the staff responds to this set at the

6    top, and I was not satisfied nor was the

7    superintendent with the tone that was being set.

8    And while it's very difficult to pin, as the

9    superintendent said, the individual actor is

10    responsible, you know, on the night shift we have

11    600 inmates and 25 uniformed staff.  They are spread

12    thin.  It's very difficult to hold an individual

13    sergeant or lieutenant responsible for what an

14    individual maintenance worker or clerical worker or

15    teacher or CO or dietary worker does.

16           But it is possible, I think, ultimately to

17    hold the chief security supervisor responsible for

18    an attitude about sex and sexuality and

19    fraternization.  And after having previously been

20    warned and counseled, another instance of behavior

21    that suggested to me bad judgment and immaturity

22    about this issue arose, based upon which the

23    superintendent and I consulted and that person was

24    removed.

173

1          REPRESENTATIVE MANDERINO:  That was the

2    senior --

3          COMMISSIONER HORNE:  The senior

4    superintendent of -- or because of it's side -- the

5    senior security adviser here is a captain and shift

6    commanders are lieutenants, so it's a notch down

7    from the other facilities.  But the captain of the

8    guard who was the senior security supervisor here.

9          REPRESENTATIVE MANDERINO:  And who was the

10   captain of the guard?

11         COMMISSIONER HORNE:  He wasn't criminally

12   charged so I --

13         REPRESENTATIVE MANDERINO:  But he's not

14   here now?

15         COMMISSIONER HORNE:  Yes, that's right.

16   He was demoted back to lieutenant and transferred to

17   another facility.

18         REPRESENTATIVE MANDERINO:  In security?

19         COMMISSIONER HORNE:  As a lieutenant.

20   Certain amount of civil service protection, those

21   are several service jobs.

22         My point is that we do try to assess the

23   accountability of the line.  In cases like this it's

24   very very difficult to fix precisely, but I think

A 700

Erie, PA

174

1    that over a period of time, and I've been here two

2    and a half years, and I had come to believe that

3    when I saw this kind of behavior by this individual

4    in this role, when I saw it a second time I said,

5    that explains a lot of the attitudes that

6    subordinate employees have.

7            REPRESENTATIVE MANDERINO:  And when was

8    that transfer effective, when did that move happen?

9            SUPERINTENDENT WOLFE:  That was about

10   three and a half weeks ago.

11           REPRESENTATIVE MANDERINO:  So it was July

12   of this year?

13           COMMISSIONER HORNE:  Beginning of August.

14   It was within the last 30 days.

15           REPRESENTATIVE MANDERINO:  Thank you very

16   much.  Thank you for your answers and attention.

17           REPRESENTATIVE BIRMELIN:  Representative

18   Josephs.

19           REPRESENTATIVE JOSEPHS:  Thank you,

20   Mr. Chairman.

21           And thank you for appearing here.  I first

22   want to apologize, I think Superintendent Byrd, I

23   did not mean by any of my remarks to intimate that

24   you were not doing a splendid job at your facility

175

1   because your reputation I think precedes you.

2              I have a question for the Commissioner

3   which has to do with the procedure by which you

4   acquire properties through the department of general

5   service.  You said something about inheriting the

6   plant, I may have heard you wrong.

7              What happens exactly?  What kind of input

8   do you or somebody in your department have with the

9   department of general services when they find a

10  site, whether it's a site that needs to be

11  constructed or converted, or any indication of that?

12             COMMISSIONER HORNE:  The department of

13  general services handles all land acquisitions for

14  the Commonwealth.  And through the bureau of real

15  estate services for and negotiates land

16  acquisitions.  We provide them with our

17  requirements, we will participate with their staff

18  in site surveys, and we have final approval there

19  acting on our behalf as our agent.  When I said we

20  inherited, Cambridge Springs was acquired during the

21  prior administration.  So I had no involvement.  I

22  assume that the previous Commissioner did.

23             REPRESENTATIVE BEBKO-JONES:  We could

24  assume that some credible expert had input.

176

1           COMMISSIONER HORNE:  Yes.  But from that

2      you should not assume that that correctional expert

3      said that this was their ideal choice.  Much as we

4      like this community and we like what we're doing

5      here now, sometimes those decisions, as you well

6      know, are made for other reasons.

7           REPRESENTATIVE JOSEPHS:  Do you have any

8      knowledge of the parole departments interaction with

9      the department of general services, whether they

10     have input when leases are taken?

11           COMMISSIONER HORNE:  I wouldn't want to

12     speak for them, they're a cabinet level entity.

13           REPRESENTATIVE JOSEPHS:  I did expect that

14     answer.  I just wanted to hear it.

15           I think that, I have a couple of

16     observations that I'd like to make rather than ask

17     questions and we can end this.

18           Dr. Lewis and some other people had kind

19     of said, I'm a parent, I'm as concerned about my

20     children as the women are.  I think that there are

21     many single heads of households in the male

22     population that we just don't know about, and that

23     we don't deal with at all.  And I would be very

24     interested in some kind of legislative or regulatory

177

1    change, I would help support that, that would help

2    parents of either sex offenders who are in that role

3    of responsibility to maintain contacts more because

4    I would like to prevent the very increased incidents

5    of children of these parents who get in to trouble

6    from going that route.  As a human and physical and

7    societal kind of preventive measure.  I think that

8    we ought to be looking in the General Assembly.

9            And I would hope that you would be

10   supportive of any kind of move that would be made in

11   that direction.

12           I do have one short question.  I think you

13   said that the average employee at this institution's

14   tenure was about two years.  I wonder if

15   Superintendent Byrd can tell us what the average

16   tenure is at her institution just for comparison?

17           SUPERINTENDENT BYRD:  I can tell you the

18   administrative staff equals 32 years of experience

19   and from my immediate staff the average length of

20   state service I would say is 18 years.  And I do

21   have with me in this stack of paper the average

22   length of service for the other employees, the

23   people who run the institution, the daily officer,

24   staff, et cetera, et cetera.  We have, I'm sure, a

178

1    very large percentage, high percentage of staff who

2    have worked in that institution for their entire

3    careers.

4              REPRESENTATIVE JOSEPHS:  So obviously

5    there is much more institutional experience in an

6    older facility.  I would, however, encourage you

7    from wherever you operate, to do some of the things

8    that need to be done here.  I think particularly

9    with the population that at least to me seems to be,

10   seems to be more likely to reenter society with more

11   success because it is a minimum system, it is a

12   minimum facility here, we have heard, not only from

13   inmates but from outside people that there are real

14   problems with prerelease planning and release

15   planning in general.

16              I can image, like Representative

17   Manderino, I also live in the real world; I can

18   image the kind of problems that you have.  I maybe

19   should cast that into the mode of saying I'd like to

20   help with that.  I think it needs to happen.  And

21   I'd like to see it happen as fast as it can.

22              I'm also very concerned about these

23   incidents of sexual abuse and close it.  And I will

24   follow investigations as much as I can from where I

179

1      sit, and I would appreciate whatever information

2      that I can have from all of you, at the male

3      institutions as well.  I am not so naive to think

4      that it does not happen there, I'm sure it does.

5                  COMMISSIONER HORNE:  And let me also point

6      out that not all of the employees that

7      Superintendent Wolfe mentioned among the 12 were

8      men.

9                  REPRESENTATIVE JOSEPHS:  Yes, I was going

10     to say the same thing.  I am quite clear in my mind

11     that abuse happens with perpetrators of either sex

12     and victims of either sex.  I'm quite well aware of

13     that.

14                 COMMISSIONER HORNE:  Let me point out to

15     you that the United States Department of Justice has

16     actually filed lawsuits against the State of Arizona

17     and the State of Michigan because of ongoing and

18     systematic sexual molestation and abuse of female

19     inmates in their female prisons.  And it says, the

20     government named the lead defendant, no one is more

21     determined than I than that Pennsylvania does not be

22     in the same situation.  And I am really appreciative

23     of the willingness of, as me and labor unions work

24     with us and we're going to finish to work.

1          We've retained I think one of the

2     country's leading authorities on women and

3     codependence and behavior and institutionalized

4     women as a consultant to work with the staff here

5     specifically at Cambridge Springs, to assist us in

6     deciding how best to fix the problem.  I don't know

7     that we'll ever fully solve it, but to reduce it.

8          REPRESENTATIVE JOSEPHS:  I understand

9     that.  But the incidents of five rising, I believe

10    that's at least what the newspapers are reporting,

11    to the point of criminal prosecution tells me that

12    there are many multiple other incidents going on and

13    impossible to, certainly as Representative Manderino

14    said, we have the same thing going on in the

15    legislature, we know it, we're trying to reduce.

16          But it needs to happen, obviously.

17          And finally, I'm interested in legislation

18    which would change the situation in which a person

19    who violates parole for a relatively trivial reason,

20    like forgetting to report his or her address, or not

21    being able to find a place to live because he or she

22    is poor, or any of those, I'm very upset about the,

23    perhaps it's statute that sends that person back to

24    a prison for a technical violation.

181

1    I would like to work with you on

2    legislation and appropriations that would set up

3    appropriate facilities for people almost like

4    amounting to sentencing at the end of the

5    incarceration rather than previous to it.  And I

6    don't think that that requires a response except I

7    would like to have your help and I hope you will say

8    yes.

9    COMMISSIONER HORNE:  Well, it does require

10   a response for two reasons.  One is because,

11   frankly, not withstanding the public perception and

12   allowing that there might be an exception, I would

13   say it's rare that the parole board returns a person

14   to state prison for something as trivial as that.

15   Often there is other, I think the board

16   responds very appropriately and their first concern

17   is public safety.

18   And then just as I said earlier, that in a

19   minimum security prison you have to focus on

20   procedures more than you do in maximum security.

21   And in a community where you have no procedures

22   other than your procedures and accountability you

23   have to hold parolees to a higher standard.

24   And I think the parole board in

182

1    Pennsylvania in the last two and a half years has

2    done a major turn around.  And let me tell you if I

3    find an inmate who's taking up a bed that I

4    desperately need because he failed to tell us where

5    he's living, you can bet I get on the phone and

6    complain to the parole board chairman.  And I think

7    he shares my view.

8          So I think you've got to take that with a

9    grain of salt.  I will also tell you that we do

10   fund, our department supports through its community

11   correction program halfway back houses, which

12   provide an opportunity for parole officers to take

13   an individual and keep them in their home community

14   in a halfway house, a non secure halfway house.

15   Most often a contract facility run by a private

16   group such as Gateway, if it's drug abuse, or adapt

17   in reading --

18          REPRESENTATIVE JOSEPHS:  I'm aware, you

19   know, of so many of those programs.

20          COMMISSIONER HORNE:  We house on any

21   different day hundreds of parolees there for two,

22   three, six months as an alternative for them going

23   back to prison.  We recently hopped on board with

24   Eagleville Hospital so they can participate, who are

183

1     actively using drugs who are medically intoxication

2     and hospitalized them in Eagleville for 90 days,

3     following which they are returned to the community

4     and we pay, the Department of Corrections pays for

5     drug and alcohol after care and relapse prevention

6     post release.

7             And those programs have had a dramatic

8     impact.  In fact, the number of parole violators

9     returned to state correctional institutions has

10    dropped in the last year, I think in large measure

11    as a result of those efforts.  So I think your idea

12    is a good one, but I think that we're already

13    spending money on that.

14            REPRESENTATIVE JOSEPHS:  I would be very

15    interested if you would forward to the Chairman of

16    the Committee the figure that backs up that

17    statement.

18            Thank you.

19            Thank you, Mr. Chairman.

20            REPRESENTATIVE BIRMELIN:  Representative

21    Manderino has again asked for a one question follow

22    up which I assume is going to be brief.

23            REPRESENTATIVE MANDERINO:  Hold me to it.

24            Thank you.

184

1      Commissioner Wolfe, the regular meet and

2      discuss meetings, I asked the union president about

3      it and her attendance.  Can you tell me who

4      specifically attends those meetings regularly on

5      behalf of management?  And if you're not one of

6      them, which I don't necessarily expect that you are,

7      do you get copies of those minutes?  And also, does

8      your boss get copies of those minutes?

9      SUPERINTENDENT WOLFE:  First of all, we

10     definitely, the superintendent, facility management

11     is the chairperson for that, for that meeting.  I

12     frequently go in at some point during the meeting,

13     generally the beginning, if there is specific issues

14     I would like to address to the membership.  I

15     occasionally spend a whole meeting there.  Many

16     times I don't, depending upon the issues to be

17     discussed.  I also have my deputy superintendent for

18     centralized services sit in on the management side,

19     as well as the captain of the guard, and our

20     personnel officer.

21     REPRESENTATIVE MANDERINO:  And then just

22     the other half about the minutes, do you receive

23     copies of minutes and does your boss, who I

24     understood from yesterday is the western regional

185

1    deputy commissioner for the western region.

2            SUPERINTENDENT WOLFE:  Minutes are taken

3    by a secretary, I do receive a copy of the minutes.

4    The local minutes are distributed to central office,

5    as well as other SCI who are familiar with issues

6    that go along with their system.

7            REPRESENTATIVE MANDERINO:  Today to the

8    deputy commissioner of the western district?

9            SUPERINTENDENT WOLFE:  Yes.

10           REPRESENTATIVE MANDERINO:  Thank you.

11           REPRESENTATIVE BIRMELIN:  Just in closing

12   let me thank those of you who participated, not only

13   you who are here right now, but for those who were

14   here in the Monday session, as well as those who

15   took us on the tour yesterday.  Having been in many

16   of our state prisons at this point in time I feel

17   like I'm right at home.  But I'm allowed to go home.

18   And I appreciate that.

19              But I guess I am addressing these comments

20   to you, that is sort of echoing what I said earlier.

21   I think by and large the Department of Corrections

22   is attempting to and does do a very good job given

23   the resources that it has, and that's the job you've

24   been asked to do.

A 712

186

1          I do in my experience see that there are

2     some problems, and I know you do.  And I know your

3     professional colleagues do as well.  And I would

4     extend to you the offer that I personally as a

5     legislator of the subcommittee and the whole

6     committee, and I know some of my colleagues would,

7     we'd be interested in working with you if

8     legislative changes would make the system better.  I

9     didn't say easier but better.

10          And of all the things that we heard here

11    today and saw on the tour and Monday, I guess the

12    one thing that probably impresses me the most is

13    that in women inmates lives the best thing that we

14    can do is keep them connected with their family.

15    You may have drug programs here, that's fine, you

16    may have cosmetology too, that's fine, they may be

17    out cutting grass and keeping busy and building

18    shacks in the wood working shop.  That's all fine.

19          But overwhelmingly, what I'm see is if we

20    can keep these women prisoners connected to their

21    families, they'll have hope.  They'll have a sense

22    of still belonging and being an active parent.  The

23    love connection will be there, and they can endure

24    what they have to go through here.

187

1            I mean, several of the prisoners, I didn't

2       have any of them tell me they were innocent, I

3       killed a guy, you know, wrote bad checks, I mean

4       that is pretty honest and up front.  Oh, I'm

5       innocent, whatever, they know they're here for a

6       reason of their own doing.

7            But I also know that the family connection

8       is so strong with these women, or at least with most

9       of them that this is the one thing that I think we

10      really have to work at maintaining if we can at all.

11      And because of the prison situation that's not icy.

12      I think one of the best situations was the idea of

13      teleconferencing somehow or other with families so

14      that through the technology that is existing today

15      we can maintain that connection.

16            COMMISSIONER HORNE:  We're actually

17      investigating that.

18            REPRESENTATIVE BIRMELIN:  I knew you would

19      tell me you were on top of that.  And I'm glad to

20      hear that.  But I am not a lock 'em up and throw

21      away the key, I know most of these people are not,

22      and I know that if we can give the public an

23      alternative to that and show them that it works, the

24      public will come along and they will support that.

188

1    But we have to show them.  And it's my sense if this

2    is the overwhelming solution, mostly with women but

3    I think that's an avenue we ought to pursue.  With

4    that I'll conclude these meeting and extend that

5    offer to you.

6              COMMISSIONER HORNE:  Thank you very much.

7              REPRESENTATIVE BIRMELIN:  And whatever

8    offices these other representatives are able to

9    avail to you we'll be glad to do that.

10             We want to thank who are here and all

11   who attended and.  If any of you are really looking

12   for a cure for insomnia we will provide a transcript

13   for the testimony that I assume that will be

14   available probably in another month or two.

15             But we thank you for coming and this

16   hearing is now concluded.

17                   - - - -

18             (Whereupon, the proceedings were concluded

19   at 1:30 o'clock p.m.)

20                   - - - -

21

22

23

24

A 715

**JOSEPH D. LEHMAN**
COMMISSIONER
DEPARTMENT OF CORRECTIONS

Mort, Kenneth (Lt.)
December 1993

**COMMONWEALTH OF PENNSYLVANIA**

Telephone 814-398-5100
Network: 8 684-5100

**STATE CORRECTIONAL INSTITUTION**

**WILLIAM J. WOLFE**
SUPERINTENDENT

**AT CAMBRIDGE SPRINGS**

Address All Replies
To Superintendent

December 20, 1993

Mr. Vaughn Davis, Director
Special Investigations Office
Department of Corrections
P.O. Box 598, 2520 Lisburn Road
Camp Hill, PA  17001-0598

Dear Mr. Davis:

This letter is to advise you and your staff that effective this
date, Lt. Kenneth D. Mort resigned his position as an employee of
the Department of Corrections, Commonwealth of Pennsylvania.  This
action eliminates the need to continue the investigation of the
allegations made by inmate Russo, OB5950 and Kloss, OB6513.
Therefore, this investigation is terminated.

Thank you and your staff for your assistance and cooperation in
this manner.

Very truly yours,

William J. Wolfe
Superintendent

WJW/jfh

Enclosure:Copy of Resignation

cc:Deputy Commissioner Fulcomer
  /Deputy Kormanic
   Captain Lazenby
   Lt. Bartlett
   Debra Gieda, Special Investigator
   File

A 716

APPENDIX P



| | POLICY STATEMENT |
|---|---|
| | Commonwealth of Pennsylvania ● Department of Corrections |

| Policy Subject: | | Policy Number: |
|---|---|---|
| SEXUAL HARASSMENT POLICY | | 1.6.2 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| September 20, 1994 | | 9/20/94 |

## I. AUTHORITY

The Administrative Manual is established by the authority of the Commissioner of Corrections pursuant to sections 201, 206, 506, and 901-B, of the Administrative Code of 1929, Act of April 9, 1929, P.L. 188, No. 175, as amended.

## II. PURPOSE

The purpose of this directive is to establish guidelines and written procedures governing appropriate behavior and the responsibilities of staff in compliance with Department policy in the prohibition of sexual harassment.

## III. APPLICABILITY

This policy is applicable to all persons who are employed by the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

"Sexual Harassment": Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when;

A.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individuals employment;

B.  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; and/or

C.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

EXHIBIT
142

A 717

Sexual Harassment Policy
conts. page 2 of 3

"**Chief Administrator**":  The superintendents or Commander of a Correctional facility or the appropriate Office, Division or Bureau Directors.

## V. POLICY

**All employees are entitled to work environment free from sexual harassment.  The Department prohibits any form of sexual harassment.**

## VI. PROCEDURE

Any employee who engages in or knowingly condones sexual harassment shall be subject to disciplinary action, including discharge.

Any employee who believes that he or she is the victim of sexual harassment shall be encouraged to report the incident.

The employee may:

A.    Notify his/her immediate supervisor;

B.    If the employee's immediate supervisor is the person alleged to have engaged in harassment, notify the next person in the chain of command; or

C.    Report sexual harassment directly to your Personnel Office or the Office of Affirmative Action who will report the incident to the appropriate chief Administrator.

**Any employee who is seeking corrective action shall document all incidents as they happen, name, date, time and where.**

A Supervisor receiving an oral or written report of sexual harassment shall advise the Chief Administrator of the allegations.  The Chief administrator or designee shall notify the Office of Affirmative Action only when the incident cannot be resolved internally.  The Chief Administrator or designee shall initiate a review of the allegations and respond as soon as possible, but not later than five working days.  The following steps should be taken as appropriate:

A.    Discuss the allegations with the charged employee.

B.    Discuss the allegations with the reporting employee.

C.    Refer the incident to the appropriate Office for formal investigation.

A 718

Sexual Harassment Policy
conts. page 3 of 3

      D.    Refer the incident to the Office of Affirmative Action for formal investigation, if appropriate.

      E.    Schedule the charged employee for a pre-disciplinary conference, if warranted.

      F.    Take other corrective action as required.

**In all cases, the Chief Administrator or designee shall:**

      A.    Inform the reporting employee in writing of the action being taken; and

      B.    Submit to the Office of Affirmative Action a copy of any written complaint, a summary of any oral complaint, a copy of the response to the reporting employee and a copy of any investigation report.

The Chief administrator shall be notified of the outcome of any formal investigation conducted by the Internal Investigations Unit or the Office of Affirmative Action.

**Retaliatory action against anyone complaining of sexual harassment is prohibited.**

**VII. SUPERSEDE POLICY AND CROSS REFERENCE**

This policy supersedes Sexual Harassment Policy 1.6.2 dated July 17, 1992. This policy also cross-references with;

The Affirmative Action Policy      1.6.1
The Contract Compliance Policy

ACA Cross Reference:
3-4054 Equal Employment Opportunity - Sexual Harassment

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI-CAMBRIDGE SPRINGS
December 30, 1994

SUBJECT:    STAFF INVESTIGATIONS

TO:        WILLIAM J. WOLFE
           SUPERINTENDENT


FROM:      KEITH R. BARTLETT
           INTELLIGENCE CAPTAIN

Per your memo 'Request for Investigation' dated December 05, 1994, the following report is
submitted.

1.    The investigation on Sergeant Merry has been started and I am awaiting evidence from the
      phone company before further action can be taken. I will keep you advised.

2.    On December 30, 1994, I spoke to Mr. Ron Randolph regarding reports of sexual contact
      with an unknown inmate. I advised him that this was an official investigation and it is his
      duty to cooperate.

      Mr. Randolph denies any wrong doing and states he has never touched an inmate.
      Considering there are no other witnesses to this case, there is no other evidence to justify
      further investigation. I did caution Mr. Randolph and told him to be careful not to be out
      of line with his work crew, not to get too close to them, and to avoid being overly friendly
      with them.

      I recommend terminating this investigation.

3.    On December 30, 1994, I also spoke to Mr. Marty Miller and inmate J. White-OC3674, in
      regards to sexual contact allegations. I gave both parties their Miranda Rights and advised
      Mr. Miller of his duty under the Code of Ethics to cooperate with an investigation.

      Inmate White denies any sexual contact. She admits that they joke around and that Mr.
      Miller pats them (the whole crew) on the back when they do a good job. Inmate White
      said she would like to be removed from his crew to avoid her name being brought up
      again.

      Mr. Miller denies any sexual contact and states he would be willing to take a polygraph
      test. He said he even refuses to go on jobs with only one inmate to avoid problems. He

admits to patting inmates on the back and joking with them.

I was very stern with Mr. Miller and reminded him that we had talked about him touching inmates before. I told him he is never to touch any inmate except in self defense. He said he understood this and he would correct this. I told him this was going in a written report to the Superintendent and he could be in serious trouble if his behavior does not change.

I advised Mr. Allen of the situation and he told me he had also spoken to Mr. Miller about inmate contact when he (Mr. Miller) first started.

I recommend this investigation be terminated with an official counseling session.

Lt. Beck was present for the interviews with Mr. Miller and inmate White.

Sir, if you have any further questions or concerns, please do not hesitate to contact me.

KRB/hs

CC:    Deputy Kormanic
       Mr. Vaughn Davis, Director SIO
       File: ...\D30

# MIRANDA RIGHTS WAIVER

MY NAME IS RONALD R. LAZENBY OF SCI-CAMBRIDGE SPRINGS

Robin C. Brick Sr

I WISH TO ADVISE YOU THAT YOU HAVE AN ABSOLUTE RIGHT TO REMAIN SILENT; THAT ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW; THAT YOU HAVE A RIGHT TO TALK TO AN ATTORNEY BEFORE AND HAVE AN ATTORNEY PRESENT WITH YOU DURING QUESTIONING; THAT IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE APPOINTED TO REPRESENT YOU WITHOUT CHARGE BEFORE ANY QUESTIONING IF YOU SO DESIRE; AND IF YOU DECIDE TO ANSWER ANY QUESTIONS, YOU MAY STOP ANY TIME YOU WISH.

1. DO YOU UNDERSTAND THESE RIGHTS I HAVE EXPLAINED TO YOU? yes

2. WITH THESE RIGHTS IN MIND, DO YOU WISH TO TALK?

A 722

25

# MIRANDA RIGHTS WAIVER

MY NAME IS KEITH R. BARTLETT OF SCI-CAMBRIDGE SPRINGS

I WISH TO ADVISE YOU THAT YOU HAVE AN ABSOLUTE RIGHT TO REMAIN SILENT; THAT ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW; THAT YOU HAVE A RIGHT TO TALK TO AN ATTORNEY BEFORE AND HAVE AN ATTORNEY PRESENT WITH YOU DURING QUESTIONING; THAT IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE APPOINTED TO REPRESENT YOU WITHOUT CHARGE BEFORE ANY QUESTIONING IF YOU SO DESIRE; AND IF YOU DECIDE TO ANSWER ANY QUESTIONS, YOU MAY STOP ANY TIME YOU WISH.

1.  DO YOU UNDERSTAND THESE RIGHTS I HAVE EXPLAINED TO YOU?

2.  WITH THESE RIGHTS IN MIND, DO YOU NOW WISH TO TALK TO US?

A 723

26

# MIRANDA RIGHTS WAIVER

MY NAME IS KEITH R. BARTLETT OF SCI-CAMBRIDGE SPRINGS.

I WISH TO ADVISE YOU THAT YOU HAVE AN ABSOLUTE RIGHT TO REMAIN SILENT; THAT ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW; THAT YOU HAVE A RIGHT TO TALK TO AN ATTORNEY BEFORE AND HAVE AN ATTORNEY PRESENT WITH YOU DURING QUESTIONING; THAT IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE APPOINTED TO REPRESENT YOU WITHOUT CHARGE BEFORE ANY QUESTIONING IF YOU SO DESIRE; AND IF YOU DECIDE TO ANSWER ANY QUESTIONS, YOU MAY STOP ANY TIME YOU WISH.

1.    DO YOU UNDERSTAND THESE RIGHTS I HAVE EXPLAINED TO YOU?

2.    WITH THESE RIGHTS IN MIND, DO YOU NOW WISH TO TALK TO US?

_Elizabeth Maynard_    3/10/95

_Witnessed by: Sgt Clair_  3-10-95

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
March 10, 1995

SUBJECT:  **COT Richard Hammers**

TO:        Control

FROM:      William J. Wolfe
           Superintendent

Effective March 10, 1995, C.O.T. Richard Hammers is not permitted to enter the institution until further notice, without the approval of my office.

**NOT TO BE READ AT ROLL CALL!**

WJW/jfh

cc: Deputy Kormanic
    Deputy Utz
    Roger Cyr
    Shift Commanders
    File

A 725

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
March 25, 1996

SUBJECT: Martin Miller

TO:        Control

FROM:      William J. Wolfe
           Superintendent

Effective March 25, 1996, Martin Miller is not permitted to enter the Institution until further notice, without the approval of my office.

### NOT TO BE READ AT ROLL CALL!

WJW/cld

cc:    Deputy Kormanic
       Deputy Utz
       Roger Cyr
       Shift Commanders
       File/miller.396

EXHIBIT
80

PENGAD-Bayonne,N.J.

A 726