# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA LAMBERT,

                Plaintiff,

        v.

SUPERINTENDENT WILLIAM WOLFE,
in his individual capacity, et al.,

                Defendants.

Civil Action No. 96-247 Erie

Judge Sean J. McLaughlin
Magistrate Judge Baxter

## REPLY TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      Admitted.

2.      Denied in part.  SCI Cambridge Springs actually opened (from an administrative standpoint) on January 1, 1991 when Wolfe became the prison's superintendent.  It is admitted that the first wave of 25 inmates came to the prison in March of 1992 and that the inmate census gradually increased between that time and the summer of 1997 to an estimated 580 prisoners.  In late March of 1994, for example, the inmate census was 219.  On September 30, 1994, the inmate population was 311.

3.      Admitted that in the context of Raun's deposition, plaintiff's counsel referred to twenty-four Cambridge Springs employees whose names were brought up in connection with inappropriate conduct toward a Cambridge Springs inmate.  As reflected in the deposition transcript, the names were read to Raun as a predicate to asking him whether  he could think of any other names.  The list of names read to Raun was not represented by plaintiff's attorney to be

an exhaustive list or the entire universe of Cambridge Springs personnel who had allegedly acted inappropriately toward Cambridge Springs inmates.  In fact, as reflected in a chart prepared by the defendants in the framework of this litigation, at least 36 Cambridge Springs staff members (apart from Raun and Eicher) were alleged either by an inmate or another prison employee to have had inappropriate social or sexual contact with an inmate.  In addition, there may have been as many as almost a hundred reports of "sexual improprieties" or "sexual abuse" received at the prison during the first five years of the prison's operation, according to deputy superintendent Kormanic.  Therefore, the statistical analysis contained in item three of defendants' statement of material facts is irrelevant from the standpoint of determining the actual average number of complaints were lodged per year per inmate population.  To the extent that the 2.7% and .7% figures purport to reflect the actual average, those contentions are denied.

4.     It is denied that between 1992 and 1997 there were only twelve "confirmed cases of staff on inmate sexual activities" if that statement is intended to mean that there were only twelve confirmed <u>instances</u> of such activities during that time period.  As reflected in the plaintiff's statement of material facts submitted with her reply brief, several of the <u>cases</u> (including Lambert's) involved <u>multiple activities</u> over a period of time with a <u>particular inmate victim</u> and others (such as the Miller, Merry, and Zimmerman cases) involved <u>multiple inmate victims</u>.  It is admitted that DOC investigators confirmed that twelve members of the Cambridge Springs staff had engaged in sexual activities with inmates.  However, as discussed in plaintiff's statement of material facts, the record shows that in the face of substantial evidence, investigators refused to acknowledge wrongdoing on the part of certain staff members, casting doubt on their judgment with respect to the confirmation of cases of staff-on-inmate sexual behavior.  See, for example, the <u>Stone case</u> (where superintendent Wolfe reinstated the officer

following a brief suspension despite the fact that the inmate who accused him of engaging in oral sex with and fondling her passed a polygraph examination) and the <u>Miller case</u> (where indications of sexual misconduct on Miller's part over a period of several months were attributed by in-house investigators to Miller's merely being overly friendly" and "touchy" sort of person) In addition, the statistical significance of their being "only" twelve confined cases during that time period of staff-on-inmate sexual abuse is diminished by the realities (confirmed in plaintiff's statement of material facts) that captain Bartlett (the prison's in-house investigator) was himself a sexual predator (of subordinate staff members) who had no meaningful training with respect to conducting investigations; that prison personnel who were preying upon inmates threatened to retaliate against prisoners if they informed on them; and that Bartlett effectively discouraged inmates from cooperating in investigations by requiring them to be Mirandized (i.e., warned that anything they said could be used against them in a subsequent criminal prosecution).

5.      Denied for the same reasons expressed in the preceding answer.  In addition, the charts reflect the dates of the investigation, not the dates the allegations were actually made. Furthermore, even using the "date of investigation" as the benchmark, there were nine, rather than seven, allegations of inappropriate contacts, and the accuracy of the chart is questionable, given the fact that Raun (a defendant in this case who had sexual contact with the plaintiff while physically abusing her) is not listed in it.

6.      Denied in part.  The Code of Ethics is the <u>only</u> document addressing the subject of fraternization between staff members and inmates.  It is admitted that members of the Cambridge Springs staff have received training in the Department's Code of Ethics.  However, as reflected in plaintiff's statement of material facts, the training was inadequate during the time period officers Eicher and Raun abused her.  It is admitted that Section B(6) of the Code of Ethics

provides: "There shall be no fraternization or private relationship of staff with inmates, or members of their families" and that the only examples of prohibitions under this section are "trading, bartering or receiving gifts, money, and favors from either the inmate or the inmate's friends, relatives, or representatives" or "deliver[ing] gifts or money to inmates' friends, relatives, or representatives." Section B(6) does not explicitly refer to fraternization or the sexual exploitation of inmates. It is admitted that Section B(2) requires Department of Corrections employees to treat inmates in an "intelligent, humane and impartial" way and prohibits them from directly profanity against inmates, engaging in "vengeful, brutal or discriminatory treatment" toward inmates, or subjecting them to corporal punishment. Again, this section does not expressly refer to fraternization or the sexual exploitation of inmates. Plaintiffs deny that any other prison-level or Central Office Department of Corrections policies speak to the issues of fraternization or the sexual exploitation/abuse of inmates by DOC personnel. There is no evidence in the summary judgment record confirming that when hired, DOC employees are explicitly placed on notice that they are not to engage in sexually inappropriate relations with inmates. The remainder of this item is admitted.

7. It is admitted that Wolfe had conversations with Mary Byrd, the superintendent of SCI Muncy regarding the sexual abuse of inmates and that Muncy is the only other all female prison in Pennsylvania. Wolfe acknowledged, however, during the deposition, that he received no substantive advice from Byrd with respect to policies and procedures to deter the sexual exploitation of Cambridge Springs inmates other than the observation that female staff members should be watched as well as male staff members. It is denied that Wolfe actually had "zero tolerance" for the sexual exploitation of Cambridge Springs inmates — as reflected in the fact that his in-house investigator (captain Bartlett) received no meaningful training with respect to

the investigations of staff-on-inmate abuse; the fact that Wolfe tolerated having a sexual predator (Bartlett) function as his in-house investigator; the fact that he allowed staff members to remain employed at the prison in circumstances indicating that they were sexual predators (see, for example, the <u>Miller</u> and <u>Stone</u> cases); and the fact that despite knowing that many sexually abusive activities at the prison occurred in isolated areas (such as the prison's music room, the food preparation room, bathrooms off of hallways, basements, and unoccupied floors of dormitories), Wolfe did not request the installation of surveillance cameras until 1996 (cameras were not installed until 1997). It is admitted that when deposed, Wolfe characterized staff-on-inmate sexual abuse as "reprehensible" and among the "biggest fears in life."

8.      It is admitted that Wolanin testified as stated in this item. However, for the reasons expressed in the preceding answer, plaintiff denies that the summary judgment record establishes that Wolfe actually <u>practiced</u> a "zero tolerance" protocol.

9.      It is admitted that Lazenby testified as stated in this item. However, for the reasons previously expressed, plaintiff denies that the summary judgment record confirms that Wolfe did not tolerate sexual abuse or exploitation by prison personnel. In addition, Lazenby's conclusion in the <u>Stone</u> case that the inmate's positive polygraph results implicating Stone in sexual abuse could not be the basis for terminating officer Stone; and his failure to move against Miller (in the <u>Miller</u> case) on the grounds that Miller was simply a "touchy" type of person belie his testimony that when staff members were "dirty they need to be cleaned out."

10.     It is admitted that Raun testified as quoted. However, (as discussed in plaintiff's statement of material facts) the record confirms that it was superintendent Wolfe's policy not to reveal to prison personnel <u>why</u> a Cambridge springs staff member was removed from prison grounds or when an employee was either terminated or permitted to resign for reasons related to

the sexual abuse of an inmate. At best, an officer might hear rumors about the reason an employee's removal from the prison. Lazenby (who was the prison's security captain until 1995) acknowledged that, at best, there would be merely rumors. As reflected in the record, Wolfe specifically instructed the prison's control room officers not to have his memos relating to an employee's removal from prison grounds read at role call (emphasizing the orders with bold letters and exclamation marks).

11.     It is admitted that Wolfgang and Wolfe testified as quoted in this item and that Wolfgang, a Cambridge springs psychologist, had information about alleged staff on inmate abuse (related to Zimmerman) which she did not forward to prison authorities. However, the record shows that Wolfe had been aware of rumors about Zimmerman's sexual improprieties prior to the initiation of an investigation by the Department's Central Office and that Wolfe never asked that the rumors be investigated.

12.     Denied. In light of deputy superintendent Kormanic's acknowledgment that there may have been almost a hundred complaints of sexual exploitation/abuse received from inmates during her tenure, there is reason to believe that the list annexed as Attachment D contains only some of the staff members who were alleged to have had inappropriate social or sexual contact with Cambridge Springs inmates.

13.     Admitted.

14.     The quoted sections of the four documents referenced in this item are accurate. It is denied that in all or even most instances where Wolfe felt it was better for OPR (also known as OSI) to investigate allegations of sexual abuse rather than for his investigators to do so, Wolfe requested OPR/OSI support. The record does not establish that fact.

15.     It is admitted that Wolfe testified as quoted in this item and that documents contained in Attachment N show some of the actions Wolfe took in connection with the <u>Eicher</u>, <u>Walton</u>, <u>Hammers</u>, and <u>Miller</u> cases.  It is denied that Wolfe invariably took decisive action in all instances where investigations indicated wrongdoing on the part of prison personnel.  (See, for example, the <u>Stone</u> and <u>Miller</u> investigations.)

16.     It is admitted that Wolfe and Raun testified as quoted in this item and that some staff members in the Institution knew "when" an employee was fired or escorted off the prison grounds.  However, it is denied that a "message" related to the abuse of inmates was sent to prison personnel by virtue of the fact that an employee was fired or escorted off the grounds in light of Wolfe's policy of not disclosing to staff members the reason for either.  (See reply to item ten above and section D of plaintiff's statement of material facts.)

17.     Admitted.  However, as outlined above and discussed in plaintiff's statement of material facts, the need for additional training was initiated by Vaughn Davis in 1995 (four years after Wolfe assumed his position as superintendent at the prison).  Furthermore, as detailed in plaintiff's statement of the facts, Wolfe did not request surveillance cameras until the fifth year of his administration and never developed and promulgated institution-level policies to address the sexual exploitation of inmates despite (as admitted by him) having the authority and responsibility for doing so.

18.     Admitted.  Davis' presentation was videotaped in 1995.

19.     Admitted.  The need for surveillance cameras should have been obvious to Wolfe long before 1996 (when he requested them), given the realities that Cambridge Springs had many isolated settings where staff could and, in fact, did molest inmates.

20.     Denied.  Bartlett was not "the" investigator in the unidentified cases alluded to. In some instances, C.O. Beck participated in the investigations.  In others, Bartlett's investigations (including the Eicher investigation), was either taken over altogether or lead by Central Office investigators.

21.     Admitted that the October 12, 1996 memo from Wolfe contains the information summarized and quoted in this item.

22.     Admitted.

23.     Admitted.  In addition, the plaintiff related other abusive misconduct by Raun to Ms. Wolfgang.

24.     Admitted.

25.     Admitted that the <u>stated</u> reason, according to Kormanic, for her request to Wolfe for authority to take pictures of the plaintiff was to establish the baseline described in this item. It is not admitted that it was the <u>actual</u> reason.

26.     This item is denied as stated.  Actually, the plaintiff refused to have <u>nude</u> pictures of herself taken that day and Kormanic did not inform her that she would not be videotaped/photographed while nude (and would have her bra and underpants on when the pictures were taken) or that the photographs would remain in Kormanic's sole possession.  See plaintiff's declaration and statement of material facts, Section VI.

27.     It is admitted that the plaintiff was taped/photographed while dressed in undergarments.  However, she was also filmed while nude.  As acknowledged by the defendants, there are time gaps of several minutes in the videotape.  Moreover, no inventory was made of the number of photographs that were taken of Lambert that day.  It is admitted that neither Beck nor other men were present at the time of the filming.

28.     Denied.  Plaintiff has no knowledge of the location or possession of the <u>nude</u> shots taken of her on November 22, 1994 from that date forward.  Moreover, Kormanic's cited testimony related only to the filming of the plaintiff <u>while in a bra and panties</u>.

29.     Admitted that Wolfe and Kormanic testified as related in this item.  There was no testimony or other evidence, however, that it was <u>routine</u> to videotape/photograph inmates <u>while nude</u> and the stripsearch policy does not speak to that issue.  Nor does the DOC stripsearch policy authorize the filming of an inmate while nude for the purpose of establishing a so-called "baseline" of an inmate's physical condition where an inmate has accused a staff member of abusing her.

30.     Admitted that the letters in question explained what had <u>purportedly</u> occurred on November 22, 1994 and why.  Denied that the letters explained what <u>actually</u> occurred and why.

<u>/s/ Angus Love</u>
Angus Love
I.D. No. 22392
PENNSYLVANIA INSTITUTIONAL LAW
PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966

Counsel for Plaintiff

DATE:  December 15, 2006