**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| **LISA LAMBERT** | ) |
|         **Plaintiff** | ) |
| | ) |
| _____ | ) |
|       **v.** | )   **C.A. No. 96-247Erie** |
| | ) |
| | )   **District Judge McLaughlin** |
| **WILLIAM WOLFE, et al.,** | )   **Magistrate Judge Baxter** |
|         **Defendants.** | ) |


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

## I.    RECOMMENDATION

It is respectfully recommended that the motion for partial summary judgment [Document # 55] be denied in all respects.


## II.    REPORT

###    A.    Procedural History

On August 20, 1996, Plaintiff, an inmate formerly incarcerated at SCI-Cambridge Springs, filed the instant civil rights action alleging that her constitutional rights have been violated. Originally named as Defendants are: William Wolfe, former Superintendent; Charles Utz[1], Deputy Superintendent; Intelligence Captain Keith Bartlett[2]; John Raun, a guard; James

_____

[1] Since the initial filing of this case, Defendant Utz died and by Order dated June 2, 1998, District Judge McLaughlin directed that he be dismissed from this case.

[2] Since the initial filing of this case, Defendant Bartlett has also passed away. By Order dated October 18, 2006, District Judge McLaughlin allowed Plaintiff to substitute the Estate of Keith Bartlett for Bartlett himself. For the convenience of this Court, we will refer to Defendant

Eicher, a guard; Victoria Kormanic, Deputy Superintendent, all current or former employees of SCI-Cambridge Springs.  Defendants Wolfe, Estate of Bartlett, Raun and Kormanic are represented by the Attorney General's Office, while Defendant Eicher[3] is proceeding in this action *pro se.*

In the complaint, Plaintiff alleges that she suffered physical and mental abuse at the hands of prison staff.  The abuses consisted of: 1) a series of rapes and sexual assaults by Defendant Officer James Eicher between March and October of 1994; 2) a number of "sexually-tainted" assaults by Defendant Officer John Raun between May of 1993 and October of 1994; and 3) the filming of Plaintiff by guards during a strip search while she was naked at the direction of Defendants Kormanic and Wolfe on November 11, 1994.  Plaintiff is seeking monetary damages against Officers Eicher and Raun stemming from their physical abuse of her; against Superintendent Wolfe and Bartlett, whose deliberate indifference enabled the physical abuse to occur; and against Wolfe and Kormanic, who authorized members of the prison staff to film her naked.

In 2000, the parties agreed to administratively close this case while Plaintiff challenged her underlying criminal conviction.  Plaintiff's first degree murder conviction was ultimately upheld and Plaintiff moved to reopen this case on January 25, 2006, and District Judge McLaughlin granted that motion.

Defendants Bartlett's Estate, Wolfe, Raun and Kormanic have filed a motion for partial summary judgment.  Document # 55.  Plaintiff has filed a brief in opposition.  Document # 64.  These Defendants have not filed a reply brief.  These issues are ripe for disposition by this Court.

---

Estate of Bartlett as Defendant Bartlett throughout this Report and Recommendation.

[3]  At the time of the filing of the initial complaint, Defendant Eicher was himself incarcerated for crimes relating to the claims alleged against him in the complaint.  On March 22, 1999, Defendant Eicher, acting *pro se*, filed an Answer to the complaint.  Document # 23.  Since that time, he has been released from prison, yet he has not provided this Court with his current address.

## B.    Standard of Review

Federal Rule of Civil Procedure 56(c)  provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990), quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim.

<u>Celotex</u>, 477 U.S. at 322; <u>Country Floors</u>, 930 F.2d at 1061.

### C.    The allegations of abuse

#### 1.    By Defendant Eicher

Beginning around October of 1993 and continuing for several months, Defendant Eicher followed Plaintiff around the institution, repeatedly offering her gifts (of chocolate, perfume, and lace panties) and writing her romantic letters.  Document # 55, Exhibit U, Plaintiff Lisa Lambert's Deposition, page 9.  Defendant Eicher's harassment escalated to grabbing, fondling and kissing Plaintiff against her will.  <u>Id.</u>

In March of 1994, Defendant Eicher raped Plaintiff for the first time in the music room located in Curry Hall.  <u>Id</u>. at 38.  When she arrived there as instructed by Defendant Eicher, he and James Merry (another guard who is not named as a defendant in this matter) met her at the door.  Merry told Plaintiff that she was there to do whatever Defendant Eicher wanted, grabbed her arm, pushed her into the room, and locked her in with Defendant Eicher.  <u>Id.</u> at 40.  Eicher told Plaintiff that Merry was outside the door standing watch.  <u>Id.</u> at 40.  Inside the room, Defendant Eicher pulled down Plaintiff's pants, kissed her, performed oral sex on her, and then forced her to engage in intercourse against her will.  Document #64-22, Plaintiff Lisa Lambert's Affidavit, pages 38-39.  Merry unlocked the door and Plaintiff was allowed to leave.

On March 23, 1994, Defendant Eicher again raped Plaintiff in the music room.  During the course of the rape, Defendant Eicher ejaculated on Plaintiff's clothes, on a carpet, and on choir robes hanging nearby. <u>Id.</u> at 39.

On April 7, 1994, Defendant Eicher raped Plaintiff twice in the prison fieldhouse.  Following the sexual assaults, Defendant Eicher told Plaintiff he would "get her" if she told anyone.  <u>Id.</u>  Later that same day, Plaintiff was accused of being in an unauthorized area, the unoccupied fourth floor of Luter Hall.  When questioning Plaintiff about the infraction, Defendant Bartlett, an intelligence captain, accused her of being on Luter Four to meet Eicher. Document # 55, Exhibit U, Plaintiff Lisa Lambert's Deposition, page 60.  Defendant Bartlett

4

questioned Plaintiff, asking whether she was "fucking officer Eicher."  Id. at 61.  Further, "he said, I know you are, I know how you girls are, I know you're fucking Officer Eicher." Id. Plaintiff described the encounter:  "He didn't ask me.  He screamed at me and slammed his fist down on the table.  I was scared to death of him he was five times the size of me - and I couldn't tell him anything."  Id. at 60. Due to the Eicher's threats, as well as the antagonistic manner in which Bartlett "investigated" the matter, Plaintiff denied any inappropriate contact by Eicher.  Id. at 61-62.

On April 14, 1994, Defendant Bartlett issued a report of his investigation to Defendant Wolfe.  Bartlett concluded that Plaintiff was lying about why she was in an unauthorized area, discounted the written statement of inmate Lisa Lazzelle who indicated that she heard Eicher tell Plaintiff to meet him on Luter Four, and found Eicher's denial of misconduct credible because he "maintained good eye contact, sat with his feet on the floor, appeared relaxed, and answered all questions directly and confidently."  Document # 64-12, Report of Fact Finding, page 5. Lambert was issued a misconduct for lying and for being in an unauthorized area.  Id.

Sometime in July or August of 1994, Plaintiff first reported the abuse to Sandra Wolfgang, a staff psychologist.  Document # 55, Exhibit U, Lambert Deposition, pages 41, 58. In August or September, Plaintiff began to identify her abusers (both Eicher and Raun) by name to Wolfgang.  Id. at 63.  In October, Plaintiff showed Wolfgang bruises to corroborate her versions of the abuse.  Id. at 59.

On August 20, 1994, Defendant Eicher followed Plaintiff into a bathroom in a prison recreation area, pushed her into a stall, pulled her pants down, performed oral sex on her and then raped her twice.  Document # 64-22, page 39.

On September 9, 1994 (Plaintiff's birthday), Defendant Eicher took Plaintiff to the second floor of Alliance Hall where he performed oral sex on her and raped her.  Following the assault, Defendant Eicher asked Plaintiff: "How's that for a birthday present?"  Id. at 40.

On October 10, 1994, Defendant Eicher took Plaintiff to Alliance Hall and raped her.  Id.

In a report to Deputy Commissioner Thomas Fulcomer dated November 29, 1994, Defendants Wolfe and Bartlett indicated that at the request of Vaughn Davis, the investigation of

5

Eicher and Lambert had continued, but had reached a "stalemate" as neither party would consent to a polygraph.  Document # 64-12, page 6.  Shortly thereafter, Vaughn Davis authorized Bartlett to close the investigation.  Id. at 8.

On May 24, 1994, the Office of Special Investigations ("OSI")[4] commenced an investigation which resulted in the discovery of Defendant Eicher's sexual assaults against Plaintiff.  Document # 64-12, page 2.   On September 27, 1995, Defendant Eicher's employment was terminated for violations of the Department of Corrections' Code of Ethics provision which prohibits fraternization between inmates and staff and for the provision which mandates cooperation with internal investigations.  Document # 55, Exhibit N.  On May 23, 1996, Defendant Eicher was convicted in the Court of Common Pleas of Crawford County of aggravated indecent assault, indecent assault, and official oppression.  Defendant Eicher was sentenced to 1½ to 3 years incarceration and has since been released from prison.  Id. at 38.


###        2.        By Raun

Defendant Raun's alleged abuse of Plaintiff occurred during roughly the same time period and seems to be independent of the abuse inflicted by Defendant Eicher.  Beginning in May of 1993, Raun made advances toward Plaintiff.  He sought her out while she was on isolated cleaning detail, backed her into a corner, ran his fingers across her lips and hugged her.  In May of 1993, Plaintiff reported Raun's inappropriate conduct to Charles Utz (originally named as a defendant in this action).  Document # 55, Exhibit U, Lambert Deposition, pages 12, 18-19.  According to Plaintiff, Utz did not take Plaintiff's complaint seriously and instructed her that Raun "was a healthy young man, and ... basically laughed it off."  Id. at 12.  A day later, Captain Lazenby questioned Plaintiff about the complaint against Raun and warned her that she "better not get Raun into trouble."  Id. at 19.

Following Plaintiff's complaint against him, Defendant Raun became hostile and

_____

    [4]  The Office of Special Investigations was later renamed the Office of Professional Responsibility ("OPR").  This Court will use the two names interchangeably as it is not clear when the agency name was changed.

menacing in this actions toward her.  Raun began to follow her around the prison, stare at her, grab her by the hair, and push himself up against her.  He also bruised her mouth, and smashed her into a wall.[5]

Sometime later[6], Plaintiff complained to Martha Miller, the prison grievance coordinator, about Raun's abuse.  Id. at 13.  Following the complaint to Miller, Raun became enraged.  Id. at 20, 22.  Raun dragged Plaintiff up the stairs of Luter Hall and physically assaulted her.  Id. at 28. He dragged her up the stairs by her hair, flung her into the wall, left teeth marks on her, and rammed himself against her.  Id. at 21-22.  The abuse occurred several times per week and ended during the early weeks of October of 1994.  Id. at 28.

On June 15, 1994, OSI began an investigation involving Plaintiff's complaints against Defendant Raun.  Document # 55, Exhibit T, Cover Sheet of OPR Investigation of John Raun. The record before this Court does not reveal any information about how the OSI investigation was commenced, the information obtained during the investigation or the ultimate resolution of the complaints.  Id.

### 3.    Other Sexual Misconduct at SCI-Cambridge Springs during the relevant time frame[7]

SCI- Cambridge Springs began accepting female inmates on March 30, 1992.  Document # 55, Exhibit A, Wolfe Deposition, pages 10-11.  Approximately two-thirds of the cases of

---

[5]  The record presently before this Court does not reflect a date upon which these more physical assaults began.

[6]  Again, the record is not clear as to the date of the grievance or the physical abuse that followed.

[7]  The record before this Court is replete with additional incidents (and accompanying facts and figures) well beyond the relevant time frame at issue in this case.  See, for example, Document #55, Exhibit A, Wolfe Deposition, page 109 (confirming twelve cases of staff on inmate sexual misconduct between 1992 and **1997**).  For purposes of this motion, the relevant time period here is the period of time from when Plaintiff alleges the physical abuse began in May of 1993 until it ended, around the end of calendar year 1994.

sexual misconduct at SCI-Cambridge Springs involved male staff on female inmates.  Id. at page 48.

Between February and August of 1994, Paul Walton, the food service instructor, repeatedly forced an inmate worker to fellate him in addition to fondling, groping, and kissing her in various areas of the dietary department.  Document # 55, Exhibit N.  On November 11, 1994, Walton was barred from the premises by order of Superintendent Wolfe, pending an investigation.  Id.  Later, Walton's employment was terminated and he was convicted of indecent assault and sentenced to a term of imprisonment. Id.

Martin Miller, the plumbing trades instructor, grabbed an inmate's breasts and buttocks between July of 1994 and January of 1995.  Id.  In November of 1994, Wolfe directed Bartlett to conduct an investigation regarding information about Miller's involvement with inmate Jolanda White which came to light during an unrelated investigation by OSI.  Document # 55, Exhibit L, page 5.  Bartlett concluded that Miller was overly friendly with inmates: "I was stern with Mr. Miller and **reminded him that we had talked about him touching inmates before**.  I told him he is never to touch any inmates except in self-defense. [...]  I told him this was going in a written report to the Superintendent and he could be in serious trouble if his behavior does not change." Document # 55, Exhibit L, page 7 (emphasis added).   Miller's behavior was addressed on December 20, 1994.  See Document # 64-15, page 11.[8]  Miller (who over an extensive period of time had preyed upon several women working in his labor pool, as well as a fellow corrections officer) was eventually terminated by Superintendent Wolfe around April of **1996**, was convicted of crimes associated with the molestation of several female inmates, and was sentenced to prison. Document # 55, Exhibit N.

James Merry, a sergeant, had a consensual sexual relationship with an inmate from

---

[8]  In March of 1996, when requesting an investigation of Miller by the Commonwealth's Office of Special Investigation (hereafter, "OSI"), Superintendent Wolfe noted that there were "numerous inmate allegations of sexual misconduct by Miller" underlying the request for investigation and that "during the past several years we have received similar allegations concerning Mr. Miller."  Document # 55, Exhibit M, Wolfe Memorandum Requesting OPR Investigation, page 29.

December 1993 though November of 1994.  In November of 1994, Superintendent Wolfe directed Bartlett to investigate allegations about Merry's involvement with inmate Elizabeth Masonette which came to light during an unrelated investigation by OSI.  Document # 55, Exhibit L, page 5.  A former coworker of Merry informed OSI that Merry had admitted that he had "slept" with the inmate. Document # 64-18, page 8.  A second inmate Carmel Bynum, told an OSI investigator that in June of 1993, while she was working on the second floor of Alliance Hall, Merry tongue-kissed her against her will and had done so on one other occasion.  On April 14, 1995, Merry resigned his employment at the prison.  Document # 55, Exhibit A, Wolfe Deposition, page 115; Document # 64-18, Investigation file of James Merry, page 3.  Merry was not charged with any crime.

Carl Zimmerman, the facilities maintenance manager, secretly kept a room in an abandoned storage facility known as "Freddy's Place" during 1993 and early 1994.   The room contained a couch, a chair, a heater, and a door that could be locked from the inside with only Zimmerman having a key and was used for the purpose of carrying out sexual liaisons with inmates.  Zimmerman had a sexual relationship with inmate Lisa Gunnarson, beginning in 1993 and persisting for over a year.  Additionally, Zimmerman conducted an on-going relationship with inmate Terry Walker (both Zimmerman and inmate Walker admitted to a witness that they were in an on-going personal relationship).  Defendant Wolfe acknowledged that he was aware of rumors regarding Zimmerman's "possible sexual relationships with inmates" prior to the OSI investigation in August of 1994.  Document # 55, Exhibit A, Wolfe Deposition, page 81-82.  The record reflects that Wolfe believed the rumors were "non-specific in nature" and that  he "implicitly trusted" Zimmerman.  Document # 64-22, pages 21-22.  No investigation was ever directed by Wolfe at the institution level.  An investigation was eventually authorized by the Special Investigation Office following a written complaint from inmate Deborah Foreman in July of 1994.  The OSI investigation specifically indicated that Zimmerman had violated Pennsylvania Criminal Code Section 3126 relating to indecent assault.  Document # 64-19, pages 3, 10.  Zimmerman's employment was terminated, but he was not prosecuted.  Document # 55, Exhibit A, Wolfe Deposition, pages 78, 121.

9

### D.    Supervisory Liability of Wolfe and Bartlett

In her complaint, Plaintiff alleges:

> Officers Raun and Eicher were tacitly encouraged and able to exploit Ms. Lambert because of the deliberate indifference of Defendants Wolfe, [...] and Bartlett. [...] Other SCI-Cambridge Springs guards were sexually harassing and abusing [other] female prisoners prior to and **throughout this time period.** However, Defendants Wolfe, [...] and Bartlett acquiesced to this pattern of exploitation. [...] The deliberate indifference that characterized the administration's approach to the problem of the sexual abuse and exploitation of female inmates by prison personnel during this time period had the effect of tacitly authorizing and encouraging officer Raun's and Eicher's abuse of Lisa Lambert and was a moving force and cause of the constitutional violations at issue.

Document # 1, ¶¶ 16, 17, 19 (emphasis added).

The Eighth Amendment right of a convicted prisoner not to be sexually assaulted by a guard is clearly established.  See Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir.1993) (prisoner has constitutional right to be secure in her bodily integrity and free from attack by guards); Stoneking v. Bradford Area School Dist., 882 F.2d 720, 726 (3d Cir.1989). See also Sutton v. Utah State School for Deaf and Blind, 173 F.3d 1226, 1241 (10th Cir.1999) (a state supervisor may be liable for failing to take appropriate steps to prevent sexual assaults by subordinates on persons for whose safety state was responsible); Butler v. Dowd, 979 F.2d 661, 675 (8th Cir.1992) (en banc) (prisoners have a constitutional right to be free of sexual attacks).

In order to succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show: (i) "he has suffered an objectively, sufficiently serious injury," and (ii) "that prison officials inflicted the injury with deliberate indifference."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).   The first prong of the Farmer test is an objective one.  Plaintiff must demonstrate that he has been incarcerated under conditions posing a substantial risk of serious harm. 511 U.S. at 834. The second prong of the Farmer test is a subjective one, requiring Plaintiff to demonstrate that Defendants acted with deliberate indifference.  To establish deliberate indifference: 1) a prison official must know of and disregard an excessive risk to inmate health or safety; 2) the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and 3) the official must also draw the inference.  Farmer, 511 U.S. at 837.  Thus,

"deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for prisoner's interests or safety." Id. at 835 (citations omitted).

Defendants move for summary judgment in favor of Defendants Wolfe and Bartlett based upon the assertion that Plaintiff has failed to allege any personal involvement by them in the physically or sexually abusive behavior. In her Opposition Brief, Plaintiff counters that Defendant Wolfe was "deliberately indifferent to Lambert's sexual exploitation in his failure to supervise and train prison officials and failure to have claims of sexual abuse properly investigated" and that Defendant Bartlett failed to meaningfully investigate allegations of misconduct. Plaintiff paints a disturbing picture. She alleges that during the time period at issue, SCI-Cambridge Springs was a virtual haven of sexual activity between Department of Corrections employees and inmates and that Defendant Wolfe's and Bartlett's actions (or lack thereof) fostered an attitude of acquiescence toward such pervasive misconduct. Even the officer charged with investigating allegations of sexual misconduct was himself eventually demoted for sexual harassment.

Generally, when a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). That is to say, the supervisor must be personally involved in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir. 1988). See also Rizzo v. Goode, 423 U.S. 362 (1976); Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action). The personal involvement of the supervisory official "can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005), quoting Rode, 845 F.2d at 1207); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-1295 (3d Cir. 1997).

However, "a defendant's knowledge of a risk can be proved indirectly by circumstantial evidence." Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001). "Policymakers may be

11

liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  A.M. v. Luzerne County Juvenile Det.Ctr., 372 F.3d 572, 586 (3d Cir. 2004).  "The standard of individual liability for supervisory public officials will be found to be no less stringent than the standard of liability for the public entities that they serve.  In either case, a person is not the moving force behind the constitutional violation of a subordinate, unless that person ... has exhibited deliberate indifference to the plight of the person deprived."  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

A case of supervisory liability may be made by "showing that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries" [Beers-Capitol, 256 F.3d at 134] and, may also be imposed in "situations in which the risk of constitutionally recognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it" [id].  "When dealing with supervisory defendants, as opposed to defendants who allegedly had direct knowledge of a serious threat to inmate safety, the standard for deliberate indifference is not the 'actual knowledge' standard required in Farmer," but rather, the four-pronged Beers-Capitol test.  Ward v. Taylor, 2006 WL 839402, at * 6 (D.Del. March 30, 2006).

The Third Circuit has developed a four-part test for the imposition of supervisory liability based on the Supreme Court's opinion in City of Canton v. Harris, 489 U.S. 378, 390 (1989) (holding that a municipality could be liable when "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need").  No judgment can be entered against Wolfe or Bartlett based upon supervisory liability absent an identification by Plaintiff of a specific supervisory practice or procedure that these Defendants failed to employ and specific findings that:

> 1)      the existing policy, custom, or practice created an unreasonable risk of the

                    injury;

      2)      the supervisor was aware that the unreasonable risk existed;

      3)      the supervisor was indifferent to that risk; and

      4)      the injury resulted from the policy or practice.

Beers-Capitol, 256 F.3d at 134, quoting Sample, 885 F.2d at 1118.  See also Kimble v. Tennis, 2006 WL 1548950 (M.D. Pa. 2006) ("[S]upervisory liability will also attach if plaintiff identifies a specific supervisory practice or procedure that the defendants failed to employ which created an unreasonable risk of harm to plaintiff, for which the defendants were aware and indifferent.").

The Third Circuit has admonished district courts that they must bear in mind that

> under the teachings of City of Canton, it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did.  The district court must insist that [Plaintiff] identify specifically what it is that [Defendant] failed to do that evidences his deliberate indifference.  Only in the context of a specific defalcation on the part of the supervisory official can the court assess whether the official's conduct evidenced deliberate indifference and whether there is a close causal relationship between he 'identified deficiency' and the 'ultimate injury.'

Sample, 885 F.2d at 1118.

Importantly, Defendants in this case have only generally argued that Defendants Wolfe and Bartlett cannot be held liable in their respective capacities as supervisors.  In response, Plaintiff has identified facts and presented evidence as to each of the four prongs of the Beers-Capitol test in support of her argument against the imposition of summary judgment.  Because Defendants have not argued in reply, Plaintiff, as the non-moving party, has met her burden to come forward with specific facts showing a genuine issue for trial in order to defeat summary judgment on the issue of supervisory liability.  See Matsushita Electric, 475 U.S. 574.

Because this is Defendants' motion for summary judgment and Plaintiff has met her shifting burden, and because Defendants have not replied, this Court need not address each of the four Beers-Capitol prongs as to both Wolfe and Bartlett.  The fact that Plaintiff meets any of the four prongs in opposition to the pending motion for summary judgment will defeat summary judgment, and this Court need not engage in a full blown analysis of the Beers-Capitol test.

13

1.    **Defendant Wolfe**

a)    **Wolfe's policy created an unreasonable risk**

Defendant Wolfe became the Superintendent of SCI-Cambridge Springs in January of 1991, more than fifteen months prior to the transfer of the first inmate into the facility. Document # 55, Exhibit A, pages 10-11.  As admitted in Defendants' Answer, Defendant Wolfe was in charge of establishing and implementing policies and practices for the protection of the female inmates from physical abuse.  Document # 2, pages 2, 11; Document # 64-4, pages 2, 11.

Plaintiff has presented evidence sufficient to show that Defendant Wolfe was aware of the "great risk" of sexual exploitation of female inmates by prison staff [Document # 55, Exhibit A, Wolfe Deposition, page 53], as well as the number of inexperienced staff working at SCI-Cambridge Springs [id. at 118].  This Court will take judicial notice of the fact that Defendant Wolfe was aware of the unique configuration of the physical facility of SCI-Cambridge Springs being that it had recently been converted from a college campus to a prison containing numerous secluded non-monitored areas.  Throughout the time period encompassed by this action, male employees routinely had direct supervisory contact with the female prisoners and were permitted, as a matter of practice, to escort inmates across campus from building to building without the presence of a female officer.  Document # 55, Exhibit A, Wolfe Deposition, pages 29-33. Yet, Wolfe did not issue any written policy statement or directive in regard to the sexual exploitation of female inmates.  Id. at 62-63.

Throughout his deposition testimony, Defendant Wolfe reports that he had a "zero-tolerance policy" toward the abuse of inmates by staff.[9]   Id. at 17-19, 51-53, 69.  "I know ... there's going to be sexual behavior in a prison.  We do everything we can to prevent that through training and screening our candidates."  Id. at 52.

_____

[9] Other SCI-Cambridge Springs staff mentioned Superintendent Wolfe's "zero tolerance policy" toward sexual abuse of inmates.  See Document # 55, Exhibit H, OSI Investigator Michael Wolanin's Deposition, page 74; Exhibit I, Intelligence Captain Ronald Lazenby's Deposition, page 35, 135-36; Exhibit C, Defendant Corrections Officer John Raun's Deposition, page 16-17; Exhibit J, Staff Psychologist Sandra Wolfgang's Deposition, page 170; and Exhibit K, Bartlett Deposition, pages 74-75.

Plaintiff argues that this "zero tolerance" policy was essentially "toothless."  Plaintiff presents evidence that Defendant Wolfe's professed "zero-tolerance policy" rested only upon the Department of Corrections' Code of Ethics.  Defendants acknowledge that the Code of Ethics is the Department of Corrections' "most significant" written document concerning the "fraternization of staff and inmates."[10]  Document # 55, Exhibit A, Wolfe Deposition, page 56; Document # 57, Defendants' Statement of Material Facts Not in Dispute, ¶ 6.  Defendants' reliance on this written policy as insulating Wolfe from the physical abuse perpetrated by his subordinates is misplaced.  This policy simply does not apply to the facts at hand.  Sexual and physical assaults are far more egregious than  "fraternization" or a private relationship between inmates and staff.[11]

_____

[10]   The Code of Ethics provides, in relevant part:

> There shall be no fraternization or private relationship of staff with inmates, or members of their families.  This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from either the inmate or the inmate's friends, relatives, or representatives.  Moreover, employees are not to deliver gifts or money to inmates' friends, relatives or representatives.

Document # 55, Exhibit E, Department of Corrections Code of Ethics, page 5.  Every employee receives a copy of this Code of Ethics at the beginning of their employment with the Department of Corrections.  Document # 55, Exhibit A, Wolfe Deposition, page 61; Exhibit G, Commonwealth Director of Special Investigations Vaughn Davis Deposition, page 20.  Wolfe explained: "our employees are drilled into how seriously we take our code of ethics" which "covers abuse."  Document # 55, Exhibit A, Wolfe Deposition, page 53.

[11]   Defendants also present a videotaped copy of a  training presentation by Vaughn Davis, the Commonwealth's Director of Special Investigations, regarding the Code of Ethics including the "anti-fraternization" policy.  Davis made this same presentation to the staff of SCI-Cambridge Springs for the first time in September of 1994 at the request of Defendant Wolfe.  Document # 55, Exhibit A, Wolfe Deposition, page 67.  The presentation was mandatory for all staff.  Id.  This training post-dates the majority of the actions complained of in this lawsuit.

Wolfe also approved the purchase of other training tapes [Document # 55, Exhibit P, Deputy Superintendent Victoria Kormanic's Deposition, pages 114-115] and Wolfe was responsible for having cameras installed at SCI-Cambridge Springs in 1997 [Document # 64-21, page 42].  These eventual deeds are irrelevant to the matter at hand - i.e., whether Defendant

Plaintiff also argues that Defendant Wolfe had a practice of concealing allegations of sexual abuse by aborting investigations of such allegations when the staff member involved resigned from employment.  Plaintiff argues that "terminating investigations prematurely precluded prison officials from learning the scope and extent of the alleged abuse."  Document # 63, page 10.  The record reflects that several investigations were terminated when the subject resigned from employment.  Merry had an on-going sexual relationship with an inmate but was not criminally prosecuted after he resigned his employment.  Document # 64-18.  Despite a specific finding by OSI that Zimmerman had violated the criminal code relating to indecent assault, he was not criminally prosecuted after his resignation.  Document # 64-19.  Employee Jennifer Langford was also allowed to resign her employment without criminal prosecution after an investigation revealed that she was cohabitating with a parolee and former inmate.  Document # 55, Exhibit A, Wolfe Deposition, pages 79, 92.  Similarly, employees Mort and Bish were allowed to resign their employments following investigations of sexual misconduct directed toward inmates - no criminal prosecution commenced.  Id. at Exhibit A, Wolfe Deposition, page 115 (Mort); id. at Exhibit K, Bartlett Deposition, pages 68-69 (Bish).  See also id. at Exhibit K, Bartlett Deposition, page 142 (expressing that generally when the subject of an internal investigation resigned, the investigation was terminated.).  Further, when the subject of an investigation was fired no announcement was made to employees regarding the outcome of the investigation.[12]  Plaintiff explains that these practices led other employees to make the inference that Defendant Wolfe's administration would allow perpetrators to be shielded from criminal prosecutions by resignation.

Next, Plaintiff argues that Defendant Wolfe did not establish any guidelines as to how inmates could confidentially report the sensitive subject of sexual abuse by staff.   Inmates who

---

Wolfe was "deliberately indifferent" toward the safety of Lisa Lambert in 1993 and 1994 - as they are well beyond the relevant time frame.

[12]  For example, Wolfe testified that in regards to the Zimmerman investigation, "I think we reaffirmed the code of ethics by the firing." [Document # 55, Exhibit A, page 95], yet did not make any announcement to employees regarding Zimmerman's termination.

wished to report sexual misconduct had to do so through the standard grievance procedure. Document # 55, Exhibit P, Deputy Superintendent Kormanic Deposition, page 33. Plaintiff has presented evidence that when she reported the abuse by Raun, she was met with disbelief by the "investigators" and further escalated abuse by Raun.

Further, Plaintiff has presented evidence that Wolfe was aware that his chief investigator Defendant Bartlett, who had minimal training in conducting investigations, was *Mirandizing* inmates who made allegations of sexual misconduct by guards.  Document # 64-22, page 44.  As part of the *Miranda* warnings, a complaining witness/victim would be warned that she could be criminally prosecuted as a result of her statement thereby possibly deterring her from fully participating in the investigation.  Document # 64-7, Bartlett Deposition, page 31.

### b)      Plaintiff's injury resulted from the practice/policy

Plaintiff argues that Wolfe's failure to adequately supervise staff, failure to create policies that would protect the inmates, and failure to fully investigate claims directly resulted in the injurious conduct toward her.

As to Defendant Raun, Plaintiff first reported his abuse in May of 1993 to Deputy Superintendent Utz.  Utz did not take Plaintiff's allegations seriously and told Plaintiff that Raun "was a healthy young man, and ... basically laughed it off."  Document # 55, Exhibit U, Lambert Deposition, page 12.  A day later, Captain Lazenby warned Plaintiff that she "better not get Raun into trouble."  Id. at 19.  Raun's abuse continued.  Later, Plaintiff reported Raun's abuse to Martha Miller, the prison grievance coordinator.  After the report to Miller, Raun became enraged and his abuse against Plaintiff escalated in retaliation for the reporting.  As to Defendant Eicher, the sexual abuse perpetrated against Lambert by him continued after the April 1994 investigation.

Plaintiff's presentation successfully opposes Defendants' motion for summary judgment. Given all of the evidence in the record, summary judgment in favor of Defendant Wolfe should be denied and Plaintiff should be allowed to present her case for supervisory liability against him to a jury.

### 2.    Defendant Bartlett

According to Plaintiff, Defendant Bartlett was deliberately indifferent to her safety by failing to "meaningfully investigate complaints of sexual and physical abuse by guards against other female inmates and against Lisa Lambert" and that such "indifference tacitly encouraged officers Raun and Eicher to abuse Ms. Lambert."  Document # 1, ¶ 22.

Plaintiff argues that Bartlett himself was a "sexual predator"[13] and that his own negative behavior and attitudes set a tone at the prison that tacitly encouraged employees to prey upon inmates.  Very telling in this regard is the later testimony of Department of Corrections Commissioner Martin Horne. When testifying in 1997 before a subcommittee of the State Senate Judiciary Committee on issues related to female prisoners, Department of Corrections Commissioner Martin Horne linked Defendant Bartlett's own predatory behavior toward SCI-Cambridge Springs personnel to the predatory activities of SCI-Cambridge Springs staff members toward inmates:

> We [recently] demoted the senior security supervisor here [Captain Bartlett].  One of the reasons ... we took that action was because we had lost confidence in the overall tone that was being set.  Because I believe that the way the staff responds to this is set at the top, and I was not satisfied nor was the superintendent with the tone that was being set. ... It's very difficult to hold an individual sargeant or lieutenant responsible for what an individual maintenance worker or clerical worker or teacher or Corrections Officer or dietary worker does.  But it is possible, I think, ultimately to hold the chief security supervisor responsible for an attitude about sex and sexuality and fraternization.  And after having previously been warned and counseled, another instance of behavior that suggested to me bad judgment and immaturity about this issue arose, based upon which the superintendent and I consulted and that person was removed. [...] I had come to believe that when I saw this kind of behavior by this individual in this role, when I saw it a second time I said, that explains a lot of the attitudes that subordinate employees have.

Document # 64-21, pages 22-24.

---

[13]  Defendant Bartlett was eventually demoted for an incident in which he induced a subordinate male officer to crawl under his desk to simulate the performance of an oral sex act as a prerequisite to Bartlett granting the employee's request for vacation time.  Document # 64-20, Investigation of Defendant Keith Bartlett, page 39-41.

a)        **Defendant Bartlett's practice created an unreasonable risk**

Defendant Bartlett began his employment at SCI-Cambridge Springs in May of 1992. Document # 55, Exhibit K, Deposition of Keith Bartlett, page 11.  In his capacity as an intelligence captain, Bartlett was responsible for investigating possible misconduct by personnel against inmates, yet Defendant Bartlett received minimal training with respect to the investigation of staff-on-inmate abuse and had no expertise in conducting internal investigations. Id. at 78.

During Bartlett's initial investigation of Eicher and Lambert, Bartlett aggressively questioned Lambert using intimidation techniques, including the use of profanity and slamming his hand on the table.  Document # 55, Exhibit U, Lambert Deposition, page 61.  Plaintiff has presented evidence that Defendant Bartlett routinely *Mirandized* inmates when investigating alleged sexual misconduct by employees.  Document # 55, Exhibit K, Bartlett Deposition, pages 129-132.  Plaintiff argues that Bartlett's practice of *Mirandizing* victims, along with the lack of a confidential procedure by which an inmate could complain of sexual abuse, as well as Defendant Bartlett's antagonistic manner of interrogation, was likely to have had a "chilling effect" on the reporting of sexual abuse.

Additionally, the record before this Court demonstrates that Bartlett repeatedly sexually harassed and even had sexual and romantic relationships with his subordinate officers during the time period relevant here as well as after.[14]  Document # 64-20, pages 1-49.  As early as November 15, 1994,  Deputy Superintendent Kormanic noted in Bartlett's own personnel file that she "discussed concerns [with him] about dating subordinate staff and possibly compromising his integrity as a manager."  Document # 64-30, page 19.

---

[14]  On October 30, 1996, OSI began an investigation after a written complaint from an officer alleging that Bartlett preyed upon, dated, and socialized with guard trainees.  The investigation concluded that Bartlett's behavior had "become a negative issue in the management of SCI-Cambridge Springs."  Document # 64-20, pages 47-49.

b)      **Plaintiff's injury resulted from Defendant Bartlett's practice**

As early as April of 1994 (following two of the sexual assaults), Defendant Bartlett questioned Plaintiff about any involvement between her and Eicher after Plaintiff was found alone in an unauthorized area [Document # 55, Exhibit U, Lambert Deposition, page 61] and another inmate gave a written statement indicating that she overheard Eicher tell Plaintiff to meet him at that location for sex [Document # 64-13, page 19]. Following the investigation, Plaintiff was sexually assaulted by Eicher three more times (August 20, 1994; September 9, 1994; and October 10, 1994).

Given all of the evidence in the record, summary judgment in favor of Defendant Bartlett should be denied as Plaintiff should be allowed to present her case for supervisory liability against him to a jury.

E.      **Statute of Limitations as applied to Defendant Raun**

Defendants move to dismiss the claims against Defendant Raun which predate August 20, 1994, as they are barred by the statute of limitations. In opposition, Plaintiff argues that Defendant Raun's harassment constitutes a continuing violation[15] of Plaintiff's Eighth Amendment rights and is not barred by the statute of limitations.

---

[15] The United States Court of Appeals for the Third Circuit has recognized the continuing violation doctrine and explained: "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Brenner v. Local 514, United Bhd. of Carpenters and Joiners of America, 927 F.2d 1283, 1295 (3d Cir. 1991). In Cowell v. Palmer Township, 263 F.3d 286 (3d Cir. 2001), the Third Circuit set forth three factors that must be considered in invoking the doctrine of continuing violation: 1) subject matter - whether the violations constitute the same type of act, tending to connect them in a continuing violation; 2) frequency - whether the acts are recurring or more in the nature of isolated incidences; and 3) degree of permanence - whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent. Id. at 292.

The federal civil rights laws do not contain a specific statute of limitations for § 1983 actions.  However, it is well established that the federal courts must look to the relevant state statute of limitations.  <u>Wilson v. Garcia</u>, 471 U.S. 74, 78 (1985).  In Pennsylvania, the statute of limitations is two years from the date of the alleged violation.  <u>See</u> <u>Urrutia v. Harrisburg County Police Dept.</u>, 91 F.3d 451 (3d Cir.(Pa.) 1996).

Here, the complaint was filed on August 20, 1996, so to be timely filed all acts complained of must have occurred after August 19, 1994.  At least, some of the allegations in the complaint involving Defendant Raun occurred prior to this date.  Plaintiff alleges that as early as May of 1993, Defendant Raun began harassing her and touching her inappropriately.  Document # 1, ¶ 11.  However, the record before this Court is murky as to the chronology of events involving Raun and Lambert.  See *supra*, pages 6-7.  Therefore, the application of the statute of limitations and the continuing violations doctrine is impossible to determine on this record.  Because Defendants have not met their burden here, summary judgment should be denied.

### F.    Strip Search

Plaintiff alleges that in November of 1994, following her return to SCI-Cambridge Springs from a court date, she was forced to submit to the videotaping and photographing of her naked body during a search.  Document # 1, ¶ 23-25.  This was done at the direction of Defendants Wolfe and Kormanic.  <u>Id.</u>  Defendants admit that a strip search was conducted, but they deny that Plaintiff was naked during the routine search.  Document # 2, ¶ 24- 25.

 "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation [...] of the [...] constitutional rights of [...] convicted prisoners ...."  <u>Bell v. Wolfish</u>, 441 U.S. 520, 546 (1979).  Prison officials are accorded deference by the courts in implementing policies that are necessary to maintain institutional security.  <u>Bell</u>, 441 U.S. at 547.

The applicability of the Fourth Amendment's protections against unreasonable searches and seizures "turns on whether the person invoking its protection can claim a justifiable, a

reasonable, or a legitimate expectation of privacy that has been invaded by government action." Hudson v. Palmer, 468 U.S. 517, 525 (1984). A reasonableness test is employed by district courts when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body. Bell, 441 U.S. at 520. The reasonableness of the search is the critical factor in determining whether a Fourth Amendment violation has occurred:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell, 441 U.S. at 559.

As to the justification for the search, Defendants argue that "a private, quick, no-contact visual search of Plaintiff's body for signs of bruising or lack thereof was entirely permissible and prudent given Plaintiff's penchant for lodging sexual harassment claims." Document # 56, page 26. Moreover, DC-ADM 203 allowed inmates to be strip searched upon their return from court and it was routine to conduct such a search of an inmate on her way to RHU. Document # 55, Exhibit Z, page 14. According to Defendants, because Plaintiff had made two sets of sexual harassment allegations against Raun, a photographic record of such a search would serve as a baseline to protect her from future abuse.

This Court need not opine as to the reasonableness of Defendants' justification as there is a disputed material issue of fact as to the manner and scope of the search. Plaintiff alleges she was photographed completely naked, while Defendants argue that Plaintiff was permitted to retain her undergarments at all times. Defendants even provide a copy of the videotape in support of this claim.[16] During the videotape, Plaintiff is strip searched but always clothed in her undergarments. Plaintiff has provided an affidavit stating that photos were taken of her "exposed

---

[16] However, neither the photographs nor a log of the photographs have been made a part of the record before this Court.

breasts, genitals, and buttocks." Document # 67-3, pages 1-7. The videotape itself contains two breaks in time amounting to 51 minutes[17] which were not recorded. Whether Plaintiff was photographed and videotaped completely naked is a material factual dispute affecting this Court's legal analysis as to the reasonableness of the scope and manner of the search.

Accordingly, Defendants have not carried their burden of showing that no genuine issue of material fact exists in regard to the reasonableness of the strip search, and, so, summary judgment should be denied in this regard.

## III.    CONCLUSION

_____It is respectfully recommended that the motion for partial summary judgment [Document # 55] be denied in all respects.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of appellate rights. See Nara v. Frank, ___ F.3d ___, 2007 WL 1321929 (3d Cir. May 08, 2007).

S/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief United States Magistrate Judge

Dated: May 31, 2007

---

[17] The videotape begins at 3:15 and runs to 3:33, stops, begins again at 4:02 runs to 4:05, stops, and begins again at 4:29 and runs to 4:34. Document 3 55, Exhibit X.